No. 26-1321

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305
and AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES
NATIONAL VETERANS AFFAIRS COUNCIL,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF VETERANS AFFAIRS and DOUGLAS
A. COLLINS, in the official capacity as U.S. Secretary of Veterans Affairs,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Rhode Island

**MOTION FOR STAY PENDING APPEAL AND ADMINISTRATIVE STAY**

CHARLES C. CALENDA
*United States Attorney*

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney
General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
TYLER J. BECKER
*Attorneys, Appellate Staff
Civil Division, Room 7258
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 532-4252*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT..............................................1

STATEMENT...............................................................................................................4

      A.      Statutory Background..........................................................................4

      B.      The Collective-Bargaining Agreement............................................5

      C.      Executive Order 14,251 .....................................................................6

      D.      VA's Implementation Of The EO.....................................................7

ARGUMENT ......................................................................................................... 11

I.      The Government Is Likely To Succeed On The Merits. ..................................... 11

      A.      The Preliminary Injunction Is Fundamentally Flawed.............................12

      B.      The Enforcement Order Gravely Erred By Significantly
              Expanding The Injunction's Scope...........................................................16

              1.      The District Court Wrongly Mandated Specific
                         Performance Of The Collective-Bargaining Agreement...............16

              2.      The District Court Wrongly Rejected VA's New
                         Termination Decision As Unlawful Without Explanation............18

III.      The Equitable Factors Favor a Stay....................................................................... 21

CONCLUSION ...................................................................................................... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## INTRODUCTION AND SUMMARY OF ARGUMENT

In the Federal Service Labor-Management Relations Statute (FSLMRS), Congress "establishe[d] a comprehensive framework governing labor-management relations in federal agencies," permitting "collective bargaining between federal agencies and their employees' unions" and creating the Federal Labor Relations Authority (FLRA) to "administer[] this framework, including by investigating and adjudicating labor disputes." *Ohio Adjutant Gen.'s Dep't v. FLRA*, 598 U.S. 449, 452–53 (2023). Congress reserved to the President, however, authority to exclude federal agencies or subdivisions from this collective-bargaining regime if he makes certain national-security determinations. In March 2025, the President exercised that authority by issuing Executive Order 14,251 (EO), 90 Fed. Reg. 14553 (Apr. 3, 2025) which excluded most of the Department of Veterans Affairs (VA) from the FSLMRS's coverage.

In a separate lawsuit, American Federation of Government Employees (AFGE) challenged that EO, arguing that it reflected First Amendment retaliation for union speech. The Ninth Circuit stayed and then reversed a preliminary injunction barring the order's implementation, determining that the government was likely to succeed on the merits and the equities favored the government. *AFGE v. Trump*, 167 F.4th 1247 (9th Cir. 2026). VA then duly implemented the EO by terminating its 2023 collective-bargaining agreement (CBA) with AFGE.

In this case, which AFGE brought through its National VA Council and a local affiliate, neither AFGE nor the district court questioned the EO's validity. Nevertheless, the court enjoined VA's termination and—even worse—later effectively ordered specific performance, turning any contractual violation into judicial contempt. VA accordingly remains indefinitely bound to a zombie collective-bargaining agreement with a union that may no longer represent employees, who themselves no longer collectively bargain—an agreement that the district court has made subject to its own enforcement instead of the exclusive administrative scheme Congress created. That is legally and practically untenable.

Two orders are at issue. First, the preliminary injunction requires VA to reinstate the collective-bargaining agreement, which VA terminated for reasons that the district court concluded were likely unlawful. VA sought clarification that the injunction did not preclude re-termination, which the court granted. Accordingly, VA issued a fresh termination decision, explaining that VA's exclusion alone warranted terminating the collective-bargaining agreement, which cannot operate outside of the FSLMRS. Dkt. 36-1. The court then issued a second order "[e]nforc[ing]" the injunction, stating without explanation that the re-termination was not "lawful." A31–A32 (emphasis and quotation omitted). For the first time, the court stated that the injunction mandated not just the collective-bargaining agreement's "reinstatement" but also "compliance" with it in both "form *and* substance," effectively ordering

specific performance. A32. The court even ordered VA to show cause why its re-termination was not in contempt of the injunction.

This Court should immediately stay the preliminary injunction and enforcement order.[1] Even in its original form, the preliminary injunction was fundamentally flawed, requiring reinstatement of a collective-bargaining agreement that can no longer be performed. The unchallenged EO bars VA employees from collective bargaining and renders unavailable the FSLMRS mechanisms that exclusively enforce collective-bargaining agreements and resolve federal-labor-management disputes. Against that backdrop, the district court's criticisms of VA's termination make little sense. But even if the original injunction were justifiable, the court's expansion of its injunction in its unreasoned enforcement order is far worse: it indefinitely binds VA to the collective-bargaining agreement and exposes VA to contempt threats should it fail to perform the duties set out across the agreement—all without the FLRA to resolve disputes or apply its federal-labor expertise in crafting remedies.

The district court has essentially created a shadow FSLMRS—a contempt-backed regime to enforce collective-bargaining agreements against the government that bears no resemblance to the carefully reticulated scheme that is supposed to exclusively govern federal-labor-management relations. Indeed, the order to specifically perform contractual duties is unlike *any* regime of contract enforcement

---

[1] Plaintiffs oppose this request.

that Congress has authorized, defying even general government-contract principles, which do not permit courts to remedy breaches by injunction. Following the court's unreasoned order blocking VA's newly explained re-termination decision, VA is at a loss on how to escape this shadow regime.

Failure to stay these orders will cause serious and irreparable harm. The President determined—and AFGE does not challenge here—that continued application of the FSLMRS to VA would be inconsistent with national security requirements and considerations. Furthermore, every day that VA is forced to comply with the voluminous collective-bargaining agreement causes irreparable governmental and public harm. Among other things, VA estimates a daily cost of over $100,000 in unrecoverable employee time spent on union matters rather than VA duties and over 1,000 VA employees being removed from direct-patient-care roles. That redirection will result in an estimated 11,000 patient-care hours lost every week. In the equitable balance, the government and public's interest in promptly freeing VA to direct its employees to mission-critical work in conformity with the EO far outweighs AFGE's speculative and reparable injuries, as the Ninth Circuit and two D.C. Circuit panels have concluded.

## STATEMENT

### A.   Statutory Background

Congress enacted the FSLMRS as part of the Civil Service Reform Act of 1978 (CSRA). *See* 5 U.S.C. §§ 7101–7135. The FSLMRS grants federal employees collective-

bargaining rights, requiring that unions and federal agencies negotiate over certain matters. *Id.* §§ 7102(2), 7106, 7114. It also created the FLRA to administer key FSLMRS provisions, including by certifying labor organizations as exclusive bargaining representatives and "resolv[ing] complaints of unfair labor practices" and "exceptions to arbitrator's awards." *Id.* § 7105(a)(2); *see id.* §§ 7104, 7105.

The FSLMRS mandates exclusive mechanisms for resolving federal labor disputes. An employee or union may file a grievance through procedures that all collective-bargaining agreements must include, culminating in an arbitration that usually can be appealed through the FLRA, with limited review in the courts of appeals. *Id.* §§ 7121–7123.

The FSLMRS authorizes the President to "exclud[e] any agency or subdivision thereof from coverage under this chapter if" he makes certain national-security determinations. *Id.* § 7103(b)(1).

### B.    The Collective-Bargaining Agreement

AFGE and VA entered into the 308-page collective-bargaining agreement at issue on August 8, 2023. Dkt. 13-1, at 290. Many provisions are inextricably entwined with the FSLMRS, which authorized the agreement's creation and controls its enforcement. The agreement begins, for example, by recognizing AFGE "as the sole and exclusive representative" for various VA employees "in units consolidated and certified by the … FLRA." *Id.* at 3 (CBA art. 1, § 1). The agreement also contains a

comprehensive grievance and arbitration procedure, including FLRA (and sometimes court of appeals) review as provided by the FSLMRS. *Id.* at 219–26 (CBA arts. 43, 44).

### C.  Executive Order 14,251

On March 27, 2025, President Trump issued Executive Order 14,251, determining that certain agencies, including VA, have "as a primary function intelligence, counterintelligence, investigative, or national security work" and that the FSLMRS "cannot be applied to th[ose] agencies and agency subdivisions in a manner consistent with national security requirements and considerations." 90 Fed. Reg. at 14553–55.

The EO does not apply to "the immediate, local employing offices of any agency police officers, security guards, or firefighters." 90 Fed. Reg. at 14554. The EO also permitted the VA Secretary to issue "an order suspending the application" of VA's exclusion to VA subdivisions if the Secretary certifies certain determinations to the President. *Id.* The Secretary initially issued such a suspension order but has since rescinded it. *See* 90 Fed. Reg. 50950 (Nov. 13, 2025).

The President issued another EO on August 28, 2025, excluding additional agencies and subdivisions and briefly extending the Secretary's deadline to suspend, Exec. Order No. 14,343, 90 Fed. Reg. 42683, but the Secretary has issued no further suspension orders.

**D.    VA's Implementation Of The EO**

1.    On April 3, 2025, AFGE and other unions sued VA and Secretary Collins, among others, in the Northern District of California, asserting that the EO violated the First Amendment and was ultra vires. *See AFGE v. Trump*, 167 F.4th 1247, 1254 (9th Cir. 2026). That court preliminarily enjoined the government from "implementing or enforcing" the EO against AFGE and the other plaintiffs. *AFGE v. Trump*, 792 F. Supp. 3d 985, 1006–07 (N.D. Cal. 2025). The Ninth Circuit promptly stayed that injunction pending appeal, *AFGE v. Trump*, 148 F.4th 648, 654 (9th Cir. 2025) (per curiam), and then vacated it, *AFGE*, 167 F.4th at 1256. The court explained that the EO "discloses no retaliatory animus on its face" but rather "expresses that the President's primary—if not only—concern with union activity was its interference with national security, which is a judgment that § 7103(b)(1) at least presumptively entrusts to the Executive." *Id.* at 1256–57. The court determined that the equities favored the government, noting that although "agencies have started to terminate certain CBAs," "the harm to the unions would likely be mitigated to a fair extent by reinstating the terminated agreements if the union plaintiffs were to prevail." *Id.* at 1259.

On August 6, 2025, several days after the Ninth Circuit stay and pursuant to the EO, VA terminated its master collective-bargaining agreement with AFGE for all employees covered by the EO. *See* Dkt. 17-1, ¶ 12; Dkts. 13-3, 13-5. AFGE then filed this suit, alleging that VA's termination violated the Constitution and the

7

Administrative Procedure Act (APA) and seeking a preliminary injunction barring VA "from implementing, enforcing, and/or taking any action to effectuate the August 6 Termination" and directing VA to rescind that termination. Dkt. 13, at 35; Dkt. 14. AFGE did not challenge the validity of the EO, including VA's exclusion from the FSLMRS.

2.    On March 13, 2026, this district court issued a preliminary injunction, requiring VA to "reinstate the Master CBA—as well as any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the Master CBA—for the remainder of the agreed-upon term provided in the Master CBA." A29. The court determined that plaintiffs were likely to succeed on their retaliation and arbitrary-and-capricious claims. A12–24. The injunction referred only to reinstatement, not performance of collective-bargaining-agreement obligations. *See* A29 The court accepted the premise that "Plaintiffs' claims only pertain to Secretary Collins' and the VA's actions" rather than "the issuance of the EO" and that the "case is not about the constitutionality of the EO." A11–12 (rejecting VA's claim-splitting arguments). Indeed, the court recognized that the unchallenged EO remained in force, "expressly exclud[ing] the VA from FSLMRS coverage." A7.

Nevertheless, in analyzing plaintiffs' retaliation claim, the district court looked to circumstances surrounding the EO. A13 (pointing to a White House fact sheet). And in evaluating all claims, the court looked to circumstances surrounding the

8

August 2025 termination that had since changed: VA's since-rescinded suspension order and the Office of Personnel Management's (OPM) since-revised guidance to agencies to refrain from terminating collective-bargaining agreements "until the conclusion of litigation or further guidance from OPM." A15–17 & A16 n.7, A20–22. The court concluded that the August 2025 termination likely violated the First Amendment and APA. A18, A24.

3.     VA complied with the injunction by reinstating the relevant collective-bargaining agreements. Dkt. 33-2. VA also moved to clarify that the injunction "does not enjoin re-termination of the Master CBA for other reasons." Dkt. 32, at 2. The same day, plaintiffs moved to enforce the preliminary injunction, arguing that mere *reinstatement* was not sufficient and that VA was also required to adhere to every collective-bargaining-agreement term. Dkt. 33.

The district court granted VA's clarification motion, stating that it was "at a loss to understand how [its] injunction could possibly be read to order that … the Defendants are wholesale prohibited from terminating the Master CBA again prior to the end of the three-year term governing the contract." A30 ("To reinstate the Master CBA means that all parties covered by this contract will continue to be covered by this contract until it is terminated or amended in a lawful manner.").

Accordingly, on March 26, 2026, VA re-terminated the collective-bargaining agreement, identifying "three independent bases" for termination. Dkt. 36-1, at 2. First, the EO "is a valid directive binding on VA that excludes VA from the coverage

of the FSLMRS," which means that "by operation of law, VA need not, and cannot, continue performance and VA cannot be bound by any contractual or statutory obligation stemming from the FSLMRS." *Id.* at 2–3. Second, the collective-bargaining agreement "was drafted with the expectation it would operate and be enforced under the provisions of the FSLMRS," which no longer apply to VA. *Id.* at 3. Third, the collective-bargaining agreement "is inconsistent with national security requirements and considerations, as determined by the President, and cannot be applied in a manner that adheres to the President's valid, binding direction in EO 14251." *Id.* at 5.

The next day, notwithstanding its clarification order, the district court granted plaintiffs' motion to enforce, determining that VA's re-termination "is not in compliance with this Court's clarification that 'all parties covered by [the CBAs] will continue to be covered by this contract until it is terminated or amended *in a lawful manner.*'" A31 (alteration in original). The court did not explain why re-termination was not "lawful." Yet the court required the government to show why the re-termination was not "in blatant violation of the" preliminary injunction "and therefore in contempt of this Court." A32. The enforcement order also mandated "compliance with" the collective-bargaining agreement "in both form *and* substance." A32. It further mandated that "the currently pending grievances and arbitrations submitted under the Master CBA will continue to be processed." A32. After the government appealed, Dkt. 42, the district court placed contempt proceedings in abeyance.

Defendants sought a stay pending appeal in district court on March 29, 2026, Dkt. 45, which was denied on April 6, 2026.[2]

## ARGUMENT

A stay pending appeal is warranted. The government is likely to succeed on the merits, the government will face irreparable injury absent a stay, and the balance of equities and public interest support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

### I.    The Government Is Likely To Succeed On The Merits.

On appeal, the government is likely to succeed in challenging the preliminary injunction and the enforcement order expanding it. Both orders incorrectly presume that a federal collective-bargaining agreement can exist outside the FSLMRS (i.e., where collective bargaining and enforcement procedures are no longer legally available, as all agree is the case here). The enforcement order compounds this error by (1) creating a contempt-backed enforcement regime in which the district court may compel specific performance of collective-bargaining-agreement duties that cannot be reconciled with Congress's choices and (2) refusing without explanation to allow VA to re-terminate the collective-bargaining agreement.

---

[2] This Court denied the government's original stay motion, filed April 3, 2026, without prejudice to refiling after the district court acted on the then-pending district-court stay request.

## A. The Preliminary Injunction Is Fundamentally Flawed.

The district court originally required that VA only "reinstate" its collective-bargaining agreement. A29. Even this initial command was error.

1. There is a fundamental contradiction in reinstating a collective-bargaining agreement concerning employees who may not collectively bargain. The FSLMRS "provides for collective bargaining between federal agencies and their employees' unions." *Ohio Adjutant Gen.'s Dep't v. FLRA*, 598 U.S. 449, 452 (2023). It is the sole source of federal employees' "right … to engage in collective bargaining," 5 U.S.C. § 7102(2), and a labor organization's entitlement "to act for, and negotiate collective bargaining agreements covering, all employees in the [relevant] unit," *id.* § 7114(a)(1).

The statute also includes a review scheme, "wherein the Congress 'intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims.'" *AFGE v. Secretary of Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (alterations omitted). The FSLMRS requires collective-bargaining agreements to contain "procedures for the settlement of grievances," 5 U.S.C. § 7121(a)(1), which include "claim[s] of breach" of the agreement, *id.* § 7103(a)(9). Any grievance not settled under the negotiated grievance procedures "shall be subject to binding arbitration." *Id.* § 7121(b)(1)(C)(iii). The FSLMRS also created the FLRA and required that this expert body review arbitral awards, along with all allegations of unfair labor practices, in the first instance. *Id.* §§ 7104, 7122(a). Congress prohibited

any further review unless the FLRA's order involves an unfair labor practice, in which case an aggrieved party may then—and only then—seek judicial review of the order in a court of appeals. *See id.* § 7123(a).

The FSLMRS framework permeates collective-bargaining agreements, including that at issue here. This agreement is premised on AFGE being certified by the FLRA "as the sole and exclusive representative" with "the right to speak for and to bargain on behalf of the employees it represents." Dkt. 13-1, at 3 (CBA art. 1, §§ 1, 3(A)). The rights and procedures set out in the agreement depend on the FSLMRS's applicability. The agreement provides, for example, that units may be clarified only through an alternative-dispute-resolution process, followed by an FLRA petition. *See id.* at 3 (CBA art. 1, § 4). Similarly, the agreement's grievance procedures are intertwined with the FSLMRS. *See id.* at 226 (CBA art. 44, § 2(G)) (providing that "[t]he arbitrator's decision shall be final and binding," except insofar as "either party may file an exception … in accordance with applicable law and regulations"); 5 U.S.C. § 7121 (setting forth requirements for collective-bargaining-agreement grievance procedures). And the agreement presumes that AFGE may represent employees at all grievance stages, *see* Dkt. 13-1, at 220 (CBA art. 43, § 5), including informal resolutions, *id.* at 220–21 (CBA art. 43, § 6), grievance meetings, *id.* at 221–23 (CBA art. 43, § 7), and national-level grievances, which may be filed only by AFGE or VA, *id.* at 224 (CBA art. 43, § 11).

As the district court recognized (at A7), the FSLMRS's provisions no longer apply here because the President excluded VA from the FSLMRS. *See* 90 Fed. Reg. at 14553 (citing 5 U.S.C. § 7103(b)(1)). After the Ninth Circuit rejected AFGE's challenge to this exclusion, *see AFGE v. Trump*, 167 F.4th 1247, 1259 (9th Cir. 2026), AFGE here disclaimed any challenge to the EO. A11; Dkt. 13, at 28–34.

It is undisputed in this case that VA is not subject to the FSLMRS. Accordingly, with limited exceptions, VA employees may not collectively bargain, AFGE may not exclusively represent VA employees, and the collective-bargaining agreement's negotiated-grievance process—which is enforced through arbitration, FLRA orders, and limited review by courts of appeals—is no longer available. The collective-bargaining agreement is thus inoperable. Nor does the unavailability of Congress's specified enforcement pathway "mean the district courts are open. It means that review is precluded in any court." *AFGE*, 716 F.3d at 637 (quotation omitted); *see Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.) (observing that "what you get under the CSRA is what you get").

In short, AFGE's attempt to challenge the termination while accepting the EO is a contradiction in terms. If there is no FSLMRS coverage, there can be no collective-bargaining agreement. Whether viewed as a merits error or a jurisdictional defect given the FSLMRS's limitations on judicial review, *see* 5 U.S.C. § 7123, the district court erred in ordering reinstatement of a collective-bargaining agreement against an agency now outside the statutory collective-bargaining framework.

2.      In any event, the district court erred in concluding that VA's first termination likely violated the First Amendment and the APA. On retaliation, the district court relied on a White House fact sheet describing the EO. A13–14. But as the Ninth Circuit explained, the document "conveys an overarching objective of protecting national security through its assessment that collective bargaining impedes the functioning of agencies with national security-related responsibilities." *AFGE*, 167 F.4th at 1257. Such evidence is even less indicative of retaliation in VA's termination, given that "Secretary Collins had no role in the issuance of the EO." A11.[3]

The district court's conclusion that VA's first termination was arbitrary and capricious under the APA is on no firmer ground. Under that narrow standard, courts review only whether "the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather than accept VA's reasonable explanation that it was following the EO, the court incorrectly required VA to offer additional national-security justifications for the termination. *See* A20. Contrary to the court's reasoning (at A22–24), VA did not need to make independent national-security determinations to justify ending collective bargaining. Nor is it arbitrary or

---

[3] For similar reasons, the district court erred (at A14–15) in concluding that VA officials' statements regarding union activities' incompatibility with VA's mission indicate unconstitutional retaliation. *AFGE*, 167 F.4th at 1257 (noting that "AFGE focuses on particular lines … in the worst possible light"). Regardless, those statements do not relate to VA's second termination, which the district court invalidated without explanation. *See infra* Part II.B.2.

15

capricious to follow a presidential determination, which is unreviewable under the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992).

### B.    The Enforcement Order Gravely Erred By Significantly Expanding The Injunction's Scope.

The district court's terse enforcement order greatly expanded the injunction's scope in two ways, neither of which the government had an adequate opportunity to address before being put into place, and either of which independently warrants a stay.

### 1.    The District Court Wrongly Mandated Specific Performance Of The Collective-Bargaining Agreement.

The enforcement order moved far beyond "reinstatement" to newly mandate "compliance" with the collective-bargaining agreement, making clear that failing to do so could subject the government to contempt. A32 (requiring compliance "in both form *and* substance"). The district court has already directed the performance of duties under the agreement. A32 (ordering that "currently pending grievances and arbitrations submitted under the Master CBA will continue to be processed"). But this means of enforcing the government's collective-bargaining-agreement obligations bears no resemblance to the FSLMRS's reticulated enforcement regime. *See supra* Part I.A.1. Ordinarily, if a union believes that the agency violated the collective-bargaining agreement, its only recourse is through the multi-step grievance-arbitration process culminating with FLRA review. *See supra id.* Under the enforcement order,

however, VA faces judicial contempt should it breach any obligation in the agreement's 67 articles. *See* Dkt. 13-1.

Moreover, by ordering the government to specifically perform—indeed, *generally* perform—the entire contract, the district court exceeded any regime of government-contract enforcement authorized by Congress. The Tucker Act and Little Tucker Act have long created implied exceptions to the APA's waiver of sovereign immunity for actions seeking non-monetary relief. *See* 5 U.S.C. § 702. The "sole remedy for an alleged breach of contract by the federal government is a claim for money damages, either in the United States Claims Court …, or, if damages of no more than $10,000 are sought, in district court." *Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986) (citation omitted); *see* 28 U.S.C. §§ 1491(a)(1), 1346(a)(2). "Federal courts" thus "do not have the power to order specific performance by the United States of its alleged contractual obligations." *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989). Accordingly, even if the here-inapplicable FSLMRS did not provide the exclusive means for enforcing a collective-bargaining agreement, *but see supra* Part I.A.1, the district court's order to comply, rather than reinstate, A32, is still wrong.[4]

---

[4] In exceeding its authority, the district court committed jurisdictional error. *See Coggeshall Dev. Corp.*, 884 F.2d at 3 (explaining the absence of "any waiver of sovereign immunity by the United States as to specific performance for breach of contract" and that "[a]bsent a waiver of sovereign immunity, courts are totally lacking in jurisdiction" (citing 5 U.S.C. § 702)).

Furthermore, the district court's conclusion that an agency can be ordered to comply with a collective-bargaining agreement after being excluded from the FSLMRS is inconsistent with § 7103(b)(1). Congress authorized the President to exclude agencies or subdivisions from the FSLMRS, which creates federal employees' right to collectively bargain, when he determines national security so warrants. If an excluded agency nonetheless remained bound by a preexisting collective-bargaining agreement, the President's national-security authority to make FSLMRS exclusions would be rendered meaningless for the agreement's term. The only reasonable construction of § 7103(b)(1) is that the President's determination also excuses an excluded agency's obligations under extant collective-bargaining agreements.[5]

### 2. The District Court Wrongly Rejected VA's New Termination Decision As Unlawful Without Explanation.

Faced with the district court's conclusion that its August 2025 termination was invalid, VA decided to "'deal with the problem afresh' by taking *new* agency action" supported by "new reasons." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020). It secured the court's assurance that the preliminary injunction could not "possibly be read" to "wholesale prohibit[]" VA from re-terminating the agreement, A30, and then

---

[5] In denying a stay, the district court suggested defendants "debut[ed] new arguments" not made in their "motion for preliminary injunction." A33. But the enforcement order vastly expanded the preliminary injunction (requiring only "reinstatement") to also mandate "compliance." A32. The government's arguments against this expanded edict were necessarily new in some respects.

issued a new termination notice, explaining the reasons for doing so, Dkt. 36-1. Notwithstanding the Secretary's thorough explanation of the incompatibility between the EO and the collective-bargaining agreement, *see id.*, the court enjoined the new termination without explanation, stating only that it was not conducted "in a lawful manner," A31 (emphasis and quotation omitted). The court also ordered defendants to show cause why re-termination was not a "blatant violation of the Preliminary Injunction Order" and thus "in contempt" of court. A32.

The district court's failure to explain the re-termination's perceived defect alone warrants a stay. "Every order granting an injunction … must … state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). This requirement is necessary for the defendant, who could otherwise receive a "contempt citation on a decree too vague to be understood." *NBA Props., Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990) (Breyer, J.) (quotation omitted). This Court too needs an explanation to determine "whether the [district court's] decision was within the bounds of its discretion or was based on an erroneous legal theory." *In re Financial Oversight & Mgmt. Bd.*, 41 F.4th 29, 40 (1st Cir. 2022) (quotation omitted). The court's failure to explain is particularly problematic because it had just assured defendants that the preliminary injunction did *not* bar VA from re-terminating. A30. In declaring the re-termination unlawful on unspecified

19

grounds, the source of the perceived defect or how VA could re-terminate consistent with the court's orders is anyone's guess.[6]

The unexplained enforcement order is even more puzzling given the Secretary's careful explanation of three independent reasons for re-termination. *See* Dkt. 36-1. The district court's prior orders never suggested the Secretary must disregard the logical effects of VA employees' inability to collectively bargain. Rather, the preliminary injunction focused on multiple circumstances surrounding the August 2025 termination irrelevant to the March 2026 termination. Since the initial termination, OPM revised its guidance recommending that agencies refrain from terminating collective-bargaining agreements while litigation over the EO continues. *Compare* A16–17 (citing 2026 guidance), *with* A7–8, A16–17 (relying on 2025 guidance). There is no question that VA's re-termination accords with OPM's current, government-wide advice. Similarly, while at the time of the initial termination the Secretary ordered certain suspensions from the EO's exclusions, he has since rescinded that order. *Compare* A15, A21–22 (invoking suspension order in the constitutional and APA analyses), *with* A3 n.2 (acknowledging rescission). Any inferences drawn from this suspension regarding the initial termination cannot be drawn regarding the re-termination.

---

[6] As with the expansion of the injunction's scope in the enforcement order, the government's arguments contesting the district court's invalidation of the Secretary's post-injunction re-termination decision were necessarily new; the government had no opportunity to respond to that invalidation earlier.

## III.    The Equitable Factors Favor a Stay.

The preliminary injunction and enforcement order threaten irreparable injuries to the government and the public, whose interests "merge," *Nken*, 556 U.S. at 435. The district court has mandated, under threat of contempt, VA's compliance with the collective-bargaining agreement. Contrary to the district court's unreasoned conclusion that the government lacked irreparable harm, *see* A33, such an order is utterly foreign to any type of labor-relations or contract suit that Congress has authorized, *see supra* Part I.B.1, and represents a significant intrusion on the Executive Branch. That interference is particularly inappropriate because it stymies VA's implementation of the President's determination that collective bargaining by most VA employees is inconsistent with national security—an undisputed determination meriting the utmost judicial respect. *See, e.g.*, *Trump v. International Refugee Assistance Project*, 582 U.S. 571, 581 (2017) (per curiam) ("The interest in preserving national security is an urgent objective of the highest order." (quotation omitted)). Consistent with the Ninth Circuit and two D.C. Circuit stay panels confronting the same EO, this Court should recognize that the preliminary injunction's effect on national security tips the equities in the government's favor. *See AFGE*, 167 F.4th at 1259; *American Foreign Serv. Ass'n v. Trump*, No. 25-1020, 2025 WL 1742853 at *3 (D.C. Cir. June 20, 2025) (per curiam); *National Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 (D.C. Cir. May 16, 2025) (per curiam).

21

The quantifiable costs are also significant and irreparable. Under the enforcement order, VA must "return approximately 1,961 employee[s]" to working on union matters rather than spending that taxpayer-funded time on "work on behalf of the VA and its mission." Dkt. 45-2 ¶ 11(b). Over 1,000 employees returned to "serving Veterans in direct patient-care roles" after VA terminated the collective-bargaining agreement. *Id.* Each day that VA is subject to the preliminary injunction and enforcement order could result in approximately "1,600 patient care hours lost." *Id.* VA's cost of compliance with the collective-bargaining agreement is estimated at "approximately $110,000 dollars per day." *Id.* To comply with the collective-bargaining agreement, VA could have to restore to unions "over 180,000 square feet of office space, worth approximately $5.4 million, and 2,000 pieces of information technology (IT) equipment, worth approximately $600,000, that had previously been provided to VA unions free of charge." *Id.* ¶ 11(a). Plaintiffs have not agreed to pay anything back should defendants prevail, meaning costs would be unrecoverable beyond the $1,000 bond ordered.

By contrast, AFGE's alleged harms are either speculative, as with their alleged loss of membership, *see AFGE*, 167 F.4th at 1259 (rejecting the same argument because "union membership is voluntary and the status of the unions could be restored if [the plaintiffs] succeed"), or reparable, as with their alleged loss of union dues, *see NACM-New England, Inc. v. National Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1, 5 (1st Cir. 2019) (observing "[t]he general rule" that "traditional economic damages can

22

be remedied by compensatory awards, and thus do not rise to the level of being irreparable" (quotation omitted)), and loss of collective-bargaining benefits, *see AFGE*, 167 F.4th at 1259 (concluding such harms "would likely be mitigated to a fair extent by reinstating the terminated agreements if the union plaintiffs were to prevail").

## CONCLUSION

This Court should stay the injunction and enforcement order pending appeal and should enter an administrative stay pending consideration of this motion.

Respectfully submitted,

BRETT A. SHUMATE
　*Assistant Attorney General*

YAAKOV M. ROTH
　*Principal Deputy Assistant Attorney*
　　*General*

CHARLES C. CALENDA
　*United States Attorney*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL

*s/ Benjamin T. Takemoto*

BENJAMIN T. TAKEMOTO
TYLER J. BECKER
　*Attorneys, Appellate Staff*
　*Civil Division, Room 7258*
　*U.S. Department of Justice*
　*950 Pennsylvania Avenue NW*
　*Washington, DC 20530*

　*(202) 532-4252*

April 2026

23

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,197 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Benjamin T. Takemoto*

BENJAMIN T. TAKEMOTO

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

*s/ Benjamin T. Takemoto*
BENJAMIN T. TAKEMOTO

**ADDENDUM**

# TABLE OF CONTENTS

Order on Plaintiffs' Motion for a Preliminary Injunction ...............................................A1

Text Order on Defendants' Motion to Clarify the Preliminary Injunction ............... A30

Order on Plaintiffs' Motion to Enforce the Preliminary Injunction........................... A31

Order on Defendants' Motion to Stay Pending Appeal................................................ A33

Ai

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305 and AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL,<br>　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS and DOUGLAS COLLINS in his official capacity as U.S. Secretary of Veterans Affairs,<br>　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 25-cv-583-MRD-PAS |

# MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.

In 2023, the American Federation of Government Employees National VA Council ("NVAC") and the United States' Department of Veterans Affairs ("VA") entered into a three-year Master Collective Bargaining Agreement ("Master CBA"). ECF No. 14-1 at 12. The NVAC represents (and negotiates on behalf of) approximately 300,000 VA employees. ECF No. 13 at 2. AFGE Local 2305 is local to Rhode Island and represents 450 or so employees working at VA facilities within this state. ECF No. 14-1 at 12. On August 6, 2025, VA Secretary Collins terminated the Master CBA. ECF No. 13-3. The NVAC and Local 2305 are asking this Court to preliminarily enjoin the VA and VA Secretary Collins from continuing to implement

A1

or enforce this termination.  ECF No. 13 at 36; ECF No. 14 at 2.  For the reasons explained below, the Plaintiffs' Motion for Preliminary Injunction is GRANTED.

## I.    BACKGROUND

In 1978, Congress codified federal employees' right to collective bargaining in the Federal Service Labor-Management Relations Statute ("FSLMRS"), Chapter 71 of title 5 of the U.S. Code.  The President of the United States may exclude an agency or subdivision of an agency from the reach of Chapter 71 when, according to the President, (1) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative or national security work," and (2) Chapter 71 "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1).  In March 2025, President Trump issued Executive Order 14,251 (the "EO"), declaring that the VA, along with several other agencies, met the criteria for exclusion from Chapter 71's coverage.  EO § 1, ECF No. 13-4.  The EO made an exception to these excluded agencies from coverage for "the immediate, local employing offices of any agency police officers, security guards, or firefighters," and specifically allowed the Secretary of the VA to issue an order suspending the application of the EO to any subdivision of the VA as long as the Secretary "certifies to the President that the provisions of the [FSLMRS] can be applied to such subdivision in a manner consistent with national security requirements and considerations" and submits the certification for

2

A2

publication in the Federal Register within 15 days of the EO.[1]  EO §§ 2, 4, ECF No. 13-4.

Exactly 15 days later, on April 11, 2025, Secretary Collins submitted an order to suspend the application of the EO to several unions but did not include the Plaintiffs (the "Suspension Order").[2]  Am. Compl. Ex. B, ECF No. 13-2 at 2.  On August 6, 2025, Secretary Collins sent a letter to the National Presidents of each Plaintiff announcing that, effective immediately, the Master CBA (along with any supplements to that agreement and any memoranda of understanding) between the agency and each Plaintiff were terminated.  Am. Compl. Ex. C, ECF No. 13-3 at 2–3.  On the same day, Secretary Collins sent an internal memo to his "Under Secretaries,

---

[1]  Various unions are challenging the EO on constitutional and APA grounds. Most recently, the Ninth Circuit Court of Appeals vacated the preliminary injunction the Northern District of California had issued after the appellate court disagreed with the district court's conclusion that the plaintiffs' First Amendment retaliation claim was likely to succeed on the merits.  *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-4014, 2026 WL 534591, at *6, *8 (9th Cir. Feb. 26, 2026).  The Ninth Circuit held that, on the record before it, President Trump would have issued the EO even if the plaintiffs had not spoken out against his proposed and implemented policies.  *Id.* at *6.

In the nation's capital, the D.C. District Court concluded in two challenges to the EO that the union plaintiffs in those cases were likely to succeed on the merits of their claims that the EO was an *ultra vires* act.  Two appeals from the grants of preliminary injunctive relief are currently pending before the District of Columbia Circuit Court of Appeals.  *See* D.C. Cir. Case Nos. 25-5157, 25-5184.  The D.C. Circuit Court stayed each injunction.  *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *1 (D.C. Cir. May 16, 2025); *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *4 (D.C. Cir. June 20, 2025).  The merits of each appeal has been fully briefed and argued before the same three-judge panel; an opinion on the merits of each appeal is forthcoming.

[2] The Suspension Order was in place until November 7, 2025, when Secretary Collins rescinded it in its entirety.  ECF No. 13-7 at 2.

Assistant Secretaries, and Other Key Officials" announcing the termination and communicating that "[t]aking this step removes barriers in VA's ability to effectively execute its mission without delay, resulting in a more responsive and accountable workforce that better serves Veterans and safeguards American interests."[3] Am. Compl. Ex. E, ECF No. 13-5 at 2–3.

In November 2025, the Plaintiffs commenced this litigation against the VA and Secretary Collins. In the amended (read, operative) complaint, the Plaintiffs assert that the termination of the Master CBA was in fact retaliation for their speech and conduct in opposition to the Trump presidential campaigns and Trump administrations in violation of Plaintiffs' First Amendment rights. ECF No. 13 at 35. The Plaintiffs also assert that the August 6 termination of the Master CBA violates the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A–C). *Id.* at 29–35. Soon thereafter, the Plaintiffs filed a motion for preliminary injunction seeking "an order enjoining Defendants from taking any actions to effectuate the [t]ermination" of the contracts as announced on August 6. ECF No. 14 at 2. The motion is fully briefed and the Court heard argument on February 19.

---

[3] For those not familiar with the VA's work and responsibilities and connection to our national security, according to the VA national security is one of its primary functions—it plays a crucial role in the country's "national emergency preparedness strategy." ECF No. 17 at 18. Since 1982, the VA has been involved with preparing the country for national emergencies like war, terrorism, and natural disasters by working on plans and implementing actions to support local, state, and national emergency management efforts, ensuring continuity of services to veterans, coordinating with other agencies, and serving as backup for medical military personnel. ECF No. 17-1 ¶ 4.

Case 3:25-cv-00583-MRD-PAS    Document: 304    Filed 03/26/04/2025    Page 5 of 29    PageID #: 2127

## II. LEGAL STANDARD

"To be granted a preliminary injunction, a plaintiff 'must establish' that: (1) it is 'likely to succeed on the merits'; (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in [its] favor'; and (4) 'an injunction is in the public interest.'" *Doe v. Trump*, 157 F.4th 36, 46 (1st Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The third and fourth factors are considered together when the Government is the opposing party. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

## III. DISCUSSION

The Plaintiffs seek preliminary injunctive relief on its claims that the termination of the Master CBA is (1) in retaliation for their speech and conduct thereby constituting viewpoint discrimination in violation of the First Amendment, and (2) arbitrary and capricious agency action in violation of the APA. The Plaintiffs ask this Court to preliminarily enjoin the Defendants from "taking any action to effectuate the Termination." ECF No. 14 at 2.

### A. JURISDICTIONAL DEFENSES

Before reaching the preliminary injunction factors, the Court must consider two jurisdictional defenses that the Defendants raise in their opposition to the motion.

#### 1. Claim Channeling

Chapter 71 created the Federal Labor Relations Authority ("FLRA"), 5 U.S.C. § 7105, to review agency actions and disputes related to the federal workforce. As

described by the D.C. Circuit Court of Appeals, the FLRA is "a three-member agency charged with adjudicating federal labor disputes, including 'negotiability' disputes and 'unfair labor practice' disputes." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) (citing § 7105(a)). "In negotiability disputes, the FLRA determines whether agencies and unions must bargain over certain subjects." *Id.* (citing §§ 7105(a)(2)(E), 7117(c)(1)). "In unfair labor practice proceedings, the FLRA resolves whether an agency must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to comply with the Statute." *Id.* (citing §§ 7105(a)(2)(G), 7116(a), 7118). "The FLRA's decisions in such disputes are subject to direct review in the courts of appeals." *Id.* (citing § 7123(a), (c)).

The Defendants assert that the FSLMRS deprives district courts of jurisdiction to review Plaintiffs' claims relative to the terminated Master CBA because Congress exclusively "channeled" these claims to the FLRA. ECF No. 17 at 31. The Defendants suggest that Plaintiffs should simply file a petition with the FLRA and request that this body clarify Plaintiffs' right to represent employees at the VA. *Id.* at 33. If the FLRA dismisses the petition for lack of jurisdiction (given the EO's pronouncement that the VA is no longer protected by the FSLMRS), then the Plaintiffs may appeal that decision to the Circuit Court. *Id.*

The Plaintiffs' responses to this threshold jurisdictional defense strategy are compelling. When it comes to removing agencies from Chapter 71 protection, they contend that the FLRA has a long history of concluding that it lacks jurisdiction over challenges to executive action. ECF No. 19 at 17. And they note that federal courts

have repeatedly ruled against the Federal Government on this jurisdictional argument. *Id.* at 17, 19–21. As a practical matter, the Plaintiffs convincingly detail why and how the grievance and complaint structure at the FLRA would not allow their claims to reach the FLRA on the merits. *Id.* at 23–24.

Generally, when courts are asked to decide whether claims related to agency action have to be reviewed within the framework set up by a federal statute, there are three factors to consider: (1) would "precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim?"; (2) "is the claim 'wholly collateral' to the statute's review provisions?"; and (3) "is the claim 'outside the agency's expertise'?" *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–213 (1994)). While the Court acknowledges this formal framework and the parties' arguments pertaining to these factors, there are several relevant considerations that the Court finds persuasive. For the following reasons, the Court concludes that, in this case, all factors weigh against channeling Plaintiffs' claims to the FLRA.

Notably, the EO expressly excludes the VA from FSLMRS coverage, which the Office of Personnel Management ("OPM") explicitly recognized in a Memorandum[4] issued the same day as the EO. Therefore, the FLRA is not actually available as a tribunal the Plaintiffs can utilize for the claims pending before this Court. In the Court's view, any attempt by Plaintiffs to use the FLRA as the forum for its claims is

---

[4] U.S. OPM Memorandum, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs*, March 27, 2025, https://perma.cc/3N4T-DCQE.

futile. This finding rests on the FLRA's history of declining to exercise jurisdiction over challenges to executive orders and the actions flowing therefrom, as well as on the Defendants' tacit admission that the FLRA is likely to dismiss on jurisdictional grounds any petitions challenging an excluded agency's action. Relatedly, the Defendants represent in the declaration submitted in support of their opposition to the motion for preliminary injunctive relief that they have asked the FLRA to either stay or hold in abeyance all of their matters currently before the FLRA. *See* Therit Decl. ¶ 16(a), ECF No. 17-1. If the FLRA is likely to dismiss for lack of jurisdiction, then it will not evaluate the Plaintiffs' claims on the merits which will, in turn, fail to create an opportunity for the Circuit Court to review the adjudication of these claims on the merits. Because the Circuit Court's review would be limited to the record created at the FLRA, which would likely be limited to a jurisdictional question, the substantive claims would not have been considered or adjudicated and therefore not ripe for the federal appellate court's review.

Second, the Defendants also point out that Therit's declaration provides several examples of grievances the NVAC has filed with the VA related to the implementation of the EO and termination of the Master CBA. ECF No. 17 at 32–33. However, Therit's description of grievances suggests that the NVAC is challenging the effects of the termination and not the lawfulness of the actual termination itself. *See* ECF No. 17-1 ¶ 17. In addition, Therit's examples indicate the NVAC filed the grievances with the VA, and not with the FLRA. *See id.* Indeed, Therit only mentions the FLRA twice; first as having certified AFGE as the

8

A8

recognized representative for VA employees, and second (as mentioned above) to state that to implement the EO the VA asked the FLRA to stay or hold in abeyance all FLRA matters "pending the outcome of the litigation related to EO 14,251." *Id.* ¶ 16(a). The Plaintiffs' engagement with the grievance process at the VA is not a compelling argument for why the claims pending here should be channeled to the FLRA.

Third, as Plaintiffs argue, the Defendants' channeling argument does not have a winning track record as it has defended against challenges to the implementation of various Trump Administration policies. *See, e.g., New York v. Kennedy*, 789 F. Supp. 3d 174, 197 (D.R.I. 2025). Hyper relevant to the EO governing the administrative action challenged here, the Ninth Circuit recently rejected this channeling argument, in part because "the FLRA has regularly found that it lacks jurisdiction to hear cases brought by a union against an agency excluded from FSLMRS coverage under § 7103(b)(1)" and in part because the VA (along with other agencies) initiated "affirmative litigation against unions in federal district courts over" this EO which signaled that the government believes "district courts have jurisdiction to decide cases involving agencies excluded from Chapter 71 coverage." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-4014, 2026 WL 534591, at *5 (9th Cir. Feb. 26, 2026).[5] This Court finds both points persuasive. The Defendants

---

[5] The "affirmative litigation" to which the Ninth Circuit referred is a case that the VA and several other agencies filed in Texas against various unions on the same day that the EO issued. *See* W.D. Tex. 6:25-cv-119, ECF No. 1. The federal agencies sought a declaratory judgment that it could, pursuant to the authority in the EO, terminate a slew of CBAs. *See id.*, ECF No. 72 at 2. AFGE filed a motion to dismiss

have cited no case where a court has channeled this sort of action to the FLRA and this Court has no interest in breaking new ground here.

For all these reasons, the Court concludes it is not required to decline jurisdiction over the Plaintiffs' claim in favor of the FLRA.

### 2. Claim Splitting

The Defendants also argue that this case impermissibly splits the Plaintiffs' instant claims from the claims raised in the Northern District of California challenging the EO itself. ECF No. 17 at 26–29. The principle against splitting claims between different courts says that all claims pertaining to the same, single transaction or a series of related transactions between the same parties need to be adjudicated together, as part of the same case. *See Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 38 (1st Cir. 1998). The Defendants consider the VA Secretary's act of terminating the Master CBA as one part of a series of connected actions which began with the issuance of the EO. ECF No. 17 at 27. The Plaintiffs respond that the August 2025 termination of the Master CBA is a different transaction than the March 2025 issuance of the EO and could not, as a practical matter, be part of the California case because the preliminary injunction sought and granted (though now vacated) against the EO was adjudicated by the district court

---

for lack of standing and improper venue, and acknowledged that if the court was not inclined to grant the motion then it should transfer it to California so the district court (which was then fielding the head-on challenge to the propriety of the EO) could adjudicate this case as well. *Id.*, ECF No. 41. The district court agreed with the unions that the agencies lacked standing and dismissed the case. *Id.*, ECF No. 72 at 2.

and appealed to the Ninth Circuit before the VA terminated the Master CBA. ECF No. 19 at 9, 11, 16.

The Plaintiffs have the better argument. The challenged actions in each case, though ultimately executed by the Federal Government, were undertaken by different individuals and entities within the Government. Secretary Collins had no role in the issuance of the EO, and the Plaintiffs' claims only pertain to Secretary Collins' and the VA's actions. The Master CBA termination occurred after the Plaintiffs (and others) had secured preliminary injunctive relief with respect to the implementation of the EO and while the California district court's decision was on appeal at the Ninth Circuit (depriving the district court of jurisdiction for the duration of the appeal). Moreover, the eventual final resolution of the challenges to the EO in California and D.C. may not resolve the Plaintiffs' claims docketed here in Rhode Island because the Plaintiffs are in fact challenging a separate action to the issuance of the EO. If the EO is ultimately struck down, then Plaintiffs' claims become moot. But a final judgment in either case challenging the EO could be years away and the Plaintiffs need not wait to adjudicate the Secretary's distinct, discrete action of termination the Master CBA.

\* \* \*

With the resolution of the two jurisdictional arguments the Defendants raise in place, the Court proceeds to consider the "*sine qua non* of the preliminary injunction analysis." *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (Selya, J.).

## B.    LIKELIHOOD OF SUCCESS ON THE MERITS

From the outset, the Court wants to be clear that it is deeply mindful of the lane it is in and will stay in. This case is not about the constitutionality of the EO. The motion before the Court is about whether the Defendants' termination of the Master CBA is unconstitutional as a violation of the Plaintiffs' First Amendment rights and/or the APA as well as in violation of the APA as an arbitrary and capricious administrative action. With this clear mission in mind, the Court first examines the Plaintiffs' First Amendment retaliation claim.

### 1.  First Amendment Retaliation

To establish a First Amendment retaliation claim, the Plaintiffs ultimately would need to prove that: (1) they "engaged in constitutionally protected conduct," (2) they were "subjected to an adverse action by [the Defendants]," and (3) "the protected conduct was a substantial or motivating factor in the adverse action." *Gattineri v. Town of Lynnfield, Massachusetts*, 58 F.4th 512, 514 (1st Cir. 2023) (quoting *Falmouth Sch. Dep't v. Doe on behalf of Doe*, 44 F.4th 23, 47 (1st Cir. 2022)). The U.S. Supreme Court has clarified that this element is actually a "but-for" cause showing, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019) (citing *Hartman v. Moore*, 547 U.S. 250, 260 (2006)).

The Defendants do not dispute the Plaintiffs' contention that they have engaged in speech and conduct protected by the First Amendment. *See* ECF No. 17 at 42. The Plaintiffs provide several examples of their conduct and speech as both

vocal opponents of Trump Administration policies and avid supporters of the Biden and the Harris campaigns. ECF No. 14-1 at 13. AFGE has actively litigated against the Trump Administrations. For example, it filed suits in February 2025 against (1) the "Fork in the Road" early termination incentive program; (2) the dismantling of USAID; and (3) the mass termination of probationary employees. *Id.* at 14-15. NVAC has been publicly supportive of all the litigation and has filed a lot of national grievances against the VA. *Id.* at 14. The Defendants also do not dispute that the termination of the Master CBA is an adverse action for the Plaintiffs. *See* ECF No. 17 at 42; ECF No. 14-1 at 24. The focus for this claim, therefore, is whether the Plaintiffs have demonstrated a likelihood of success on the merits of the third element: whether the VA terminated the Master CBA because of the Plaintiffs' speech and conduct (taking into consideration whether the Defendants would have terminated the Master CBA in the absence of the Plaintiffs' conduct and speech challenging the various labor policies). *See Nieves*, 587 U.S. at 399.

In support of this element, the Plaintiffs point to a variety of published statements or actions. First, a Fact Sheet[6] published on the White House webpage the same day as the EO issued explicitly criticizes unions that have worked against the Trump Administration's efforts:

> The President needs a responsive and accountable civil service to protect our national security. Certain Federal unions have declared war on President Trump's agenda. The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block

---

[6] The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Agreements*, March 27, 2025, https://perma.cc/G8N4-U8SB.

> Trump policies. . . . President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.

ECF No. 14-1 at 24–25. The Plaintiffs assert this statement corroborates the Defendants' motive behind the Master CBA termination. ECF No. 19 at 30. Second, Plaintiffs highlight statements made by a representative of the VA soon after the termination letters. *Id.* at 25. In an article published on August 18, 2025, the representative said:

> The unions in the exempted units have posed no or minimal hinderance to VA operations . . . They have filed no or few grievances against VA and they have not proved an impediment to the department's ability to effectively carry out its mission . . . AFGE, NAGE, NNU and SEIU by contrast are using their authority under the [FSLMRS] to broadly frustrate the administration's ability to broadly frustrate the administration's ability to manage the agency.

Silva Decl. Ex. H, ECF No. 14-2 at 87. Third, Plaintiffs point to Secretary Collins' statement in a VA Press Release issued August 6 (the same day as the termination): "Too often, unions that represent VA employees fight against the best interest of Veterans while protecting and rewarding bad workers . . . we're making sure VA resources and employees are singularly focused on the job we were sent here to do: providing top-notch care and service to those who wore the uniform." Silva Decl. Ex. I, ECF No. 14-2 at 89. Fourth, Plaintiffs point to an email attached as an exhibit to a declaration from a VA physical therapist in Indiana who serves as President of the local AFGE chapter in which a union member received formal notice from the VA employer that indicated how restricted the VA was in its labor practices while the Master CBA was in place:

14

> Terminating the [CBAs] will benefit employees like you who were previously covered by agreements that restricted VA's ability to hire, promote and reward high performing employees, hold poor performers accountable, and implement changes that better serve Veterans. This decision also permits employees and managers to more freely engage in open communications to improve the organization without union filtering or interference.

Burke Decl. Ex. L, ECF No. 14-4 at 103. Fifth, Secretary Collins favored some unions over others when he issued the April 11 Exemption Order and named a few specific unions but not others. ECF No. 19 at 30.

The Defendants respond that the only motivation for terminating the Master CBA was the authorization through the EO and that none of the President's potential animus toward the Plaintiffs can be imputed to the Defendants. ECF No. 17 at 43, 44. The Defendants contend that their statements were simply expressions of national security concerns, and that the termination is unrelated to the Plaintiffs' speech or conduct. *Id.* at 45, 48–49. During oral argument on the pending motion for preliminary injunction, the Defendants repeatedly emphasized the timing of the termination letters and asks this Court to place significant weight on the fact that the termination letters issued days after the Ninth Circuit Court of Appeals granted the government's application for a stay pending its appeal of the Northern District of California's grant of injunctive relief. Hr'g Tr. at 27:8–21, 37:3–10, ECF No. 29. While timing is important, the Court cannot ignore the ample support the Plaintiffs provide to show that the Defendants' termination of the Master CBA was motivated by retaliation for the Plaintiffs' advocacy on behalf of their membership. The Defendants have provided little counterevidence to indicate the termination was not

15

A15

retaliatorily motivated and/or would have occurred in the absence of the Plaintiffs'
grievances, litigation conduct, and advocacy. The comments described above
demonstrate that the Defendants' laser focus was on the ways the VA perceived
employee unions as frustrating the work and purpose of the VA and how much better
the VA could operate without the unions. *See, e.g.*, Silva Decl. Ex. I, ECF No. 14-2 at
89. Absent from both the August 6 press release and internal memo to the Under
Secretaries, etc. was any mention that terminating the Master CBA would advance
or support the nation's security interests. *See id.*; Am. Compl. Ex. E, ECF No. 13-5
at 3. The only explanation for the announced agency action was that "[t]aking this
step removes barriers in VA's ability to effectively execute its mission without delay,
resulting in a more responsive and accountable workforce that better serves Veterans
and safeguards American interests." ECF No. 13-5 at 3.

The Plaintiffs also point to the explicit OPM guidance that agencies should
refrain from terminating any CBAs until the litigation challenging the EO itself
concluded.[7] And, if there was any ambiguity as to what OPM intended to instruct,
OPM issued a memo on February 12, 2026 explaining that: "For various reasons,
including litigation, implementation of these Executive Orders at certain agencies
and agency subdivisions has been delayed. The [OPM] now advises agencies and

---

[7] In the OPM's Frequently Asked Questions pertaining to the EO, the clear,
direct response to the first question – "What do agencies need to do to terminate
applicable CBAs?" – is "Agencies should not terminate any CBAs until the conclusion
of litigation or further guidance from OPM directing such termination. Agencies
should review relevant case law and consult with their General Counsels regarding
next steps with any existing CBAs. See *Department of Labor*, 70 FLRA 27 (FLRA
2016)." Silva Decl. Ex. L, ECF No. 14-2 at 101.

agency subdivisions covered by E.O. 14251 and EO 14343 that they should proceed to terminate or modify CBAs in order to fully comply with those [EOs] . . . ." ECF No. 22-1 at 5. In all, the Defendants' emphasis on the date of the termination as separated in time from the April 11 Exemption Order works against them when the OPM guidance and this recent memo are added into the mix. The Defendants terminated the Master CBA days after the Ninth Circuit expressed a likelihood of success on the merits of the appeal and issued a stay of the preliminary injunction order, but this was far from the conclusion of this litigation and far earlier than the guidance from the OPM indicated was appropriate.

Turning to the single document the Defendants provided to counter the Plaintiffs' argument and show that the Master CBA was going to be terminated regardless of the Plaintiffs' past speech and conduct, Therit's declaration states the following: The Master CBA "interfered with the VA's ability to execute and implement the President's initiatives related to national security" when the initiatives conflicted with the CBA and the Plaintiffs were unwilling to negotiate with the VA over the implementation of the initiative. ECF No. 17-1 at 8 ¶ 13. And the CBA "obstruct[ed] the VA's ability to address employees with performance or conduct issues," citing, as an example, the VA's inability to "quickly terminat[e] employees with performance or conduct issues" after an arbitrator concluded the VA had "improperly implemented" a federal statute and the VA "was forced to enter into a settlement agreement with Plaintiff NVAC that was costly to the VA." *Id.* at 10 ¶ 15, 12 ¶ i.

17

A17

Taking all of these statements and documents into consideration, the Plaintiffs have established a likelihood of success on the merits of their First Amendment retaliation claim because the termination of the Master CBA on August 6 seems substantially motivated by the Plaintiffs' history and frequency of vocally opposing changes to labor policies. *See Gattineri*, 58 F.4th at 514. That the Defendants (1) accepted the EO's invitation to exempt entities from the EO by naming several unions (other than Plaintiffs) rather than subdivisions of departments as actually authorized by section 4 in the EO and then (2) took action to terminate the Master CBA days after the Defendants learned an appellate court was likely to rule in its favor on the merits of the constitutionality of the EO are certainly strong indications of the Defendants' focus for the exemption vs. termination decisions. Other than the one, vague, post hoc statement about national security that appears in Therit's declaration, there is zero indication from the Defendants that the termination decision would have been made or implemented without the retaliatory motive. *See Nieves*, 587 U.S. at 399. This is a crucial factor in the injunctive relief calculus and its absence weighs in the Plaintiffs' favor.[8]

---

[8] The Plaintiffs also seek preliminary injunctive relief on their alternative First Amendment claim—that the Master CBA termination constitutes impermissible viewpoint discrimination because the VA is punishing the Plaintiffs for their "views and positions" advanced "in its public advocacy, grievances, and lawsuits that oppose the Administration politically." ECF No. 14-1 at 27; ECF No. 19 at 33. Because the Court concludes the Plaintiffs have shown a likelihood of success on the merits of their First Amendment retaliation claim, the Court need not reach this claim at this time.

The Plaintiffs also briefly state that, because the Master CBA termination is in violation of the First Amendment, the Court may set aside this action pursuant to

## 2. APA - Arbitrary and Capricious[9]

Agency action is arbitrary and capricious in violation of 5 U.S.C. § 706(1)(A) if it is not reasonable and reasonably explained. *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures

---

5 U.S.C. § 706(1)(B) (that the agency's action is contrary to a constitutional right) as well. ECF No. 14-1 at 34. The Defendants respond that this claim fails for the same reason as the substantive First Amendment claims. ECF No. 17 at 57. Because the Court concludes the Plaintiffs have shown a likelihood of success on the merits of the First Amendment retaliation claim, Plaintiffs have also shown a likelihood of success on the merits of this claim.

[9] The Defendants do not protest that the termination constitutes a final agency action subject to judicial review under the APA. *See* 5 U.S.C. § 704. The Court does not linger here because, as the Plaintiffs write, the August 6 termination letters are the end result of the Defendants' decisions to implement the EO by terminating the Master CBA and this termination stripped Plaintiffs' ability to carry out their missions as well as their members' bargained-for rights. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (defining final agency action that will be subject to judicial review under the APA). ECF No. 14-1 at 29.

The Defendants do, however, challenge this Court's ability to review the administrative action taken here because, they say, the decision to terminate the Master CBA was well within their discretion and 5 U.S.C. § 701(a)(2) shields such decisions from judicial review. ECF No. 17 at 51–52. The Plaintiffs respond that the Supreme Court has read this part of the APA extremely narrowly and in circumstances different from those presented here. ECF No. 19 at 35. The Plaintiffs have the better argument here. As recently recognized by a colleague in this court, "a key tenet of the APA . . . is that the statute 'establishes a basic presumption of judicial review [for] one suffering legal wrong because of agency action.'" *Rhode Island State Council of Churches v. Rollins*, No. 25-CV-569, 2025 WL 3111213, at *6 (D.R.I. Nov. 6, 2025) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16–17 (2020)). The Supreme Court instructs that the agency discretion provided in the APA is an exception to the presumption that applies in "rare circumstances" not present here "where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* (quoting *Dep't of Commerce v. New York*, 588 U.S. 752, 772 (2019)).

19

that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action can be "arbitrary and capricious when the agency relies on improper factors, fails to consider pertinent aspects of the problem, offers a rationale contradicting the evidence before it, or reaches a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023) (citation omitted) (cleaned up).

The Plaintiffs provide several reasons why the Master CBA termination is arbitrary and capricious. First, the Defendants did not reasonably explain either in the termination letter issued to each plaintiff or in the internal memo circulated to the "Under Secretaries, Assistant Secretaries, or Other Key Officials" the same day, *see* ECF No. 13-5, why they decided to terminate the Master CBA. This is especially significant in the face of the explicit guidance from the OPM instructing agencies to refrain from terminating CBAs until the litigation challenging the EO had concluded, *see* Silva Decl. Ex. L, ECF No. 14-2 at 101. ECF No. 14-1 at 31. The Defendants respond that the only justification it needs is that it was authorized by the EO to terminate the Master CBA. ECF No. 17 at 53–54.

Second, the Plaintiffs argue that the Master CBA termination runs afoul of the EO's Section 2. The Court understands the Plaintiffs to read this section to plainly exempt from the EO's reach all bargaining unit employees who work in a "local

20

A20

employing office" that employs "police officers, security guards, or firefighters," which means that if a local employing office that appoints police officers, etc. also appoints and supervises employees not in police, security, or fire positions then all of the employees appointed by that local employing office are beyond the reach of the EO. ECF No. 14-1 at 31–32; ECF No. 14-8 ¶ 23; Hr'g Tr. at 17:12–18:20, ECF No. 29. For example, within a local medical facility, the medical director is at the top of the org chart and the police officers within that local employing office ultimately work for that medical director (as do the doctors, nurses, cleaning staff, etc.). ECF No. 14-1 at 31–32. And, assert Plaintiffs, the Defendants do not seem to disagree with this interpretation because, in their opposition to the motion, the Defendants quote from an OPM FAQ issued on September 10, 2025 (but not provided as an exhibit to a declaration) in which the OPM explains the meaning of Section 2 by acknowledging that the local employing office may include "administrative staff." ECF No. 17 at 55; ECF No. 19 at 37. This argument highlights that the meaning of Section 2 of the EO may not be crystal clear, but the Court need not resolve any ambiguity on this record because, for the reasons set forth below, it concludes the Plaintiffs have shown a likelihood of success on the merits of this APA claim regardless of the actual scope of Section 2.

Moving on, the Plaintiffs argue that the Master CBA termination is inconsistent with the EO's Section 4 because (as alluded to earlier) Chapter 71 coverage decisions can be made on an agency or subdivision basis and not union by union, as the Defendants did here with the April 11 Suspension Order and the

termination. ECF No. 14-1 at 32. The Plaintiffs point to an absurd effect that, by terminating some union contracts and not others within the VA, similarly situated VA workers have different rights depending on the union to which they belong. *Id.* For one example, at one facility nurses are still covered but nurse practitioners are not. *Id.*

Fourth, the Plaintiffs assert that the Secretary rescinding the April 11 Suspension Order days after Plaintiffs initiated this litigation shows that national security was not front of mind, that the termination was retaliatory, and the rescission a litigation strategy. *Id.* at 34. The Defendants contend that they made the decision to rescind the Suspension Order before this case was filed in this Court and because they are committed to compliance with the EO. ECF No. 17 at 55–56.

Fifth, the Plaintiffs argue there is no indication from the Defendants that the decision to terminate the Master CBA was the result of a national security concern. Instead, the Defendants repeatedly cited efficiency and management decisions, which are not what the EO or the FSLMRS authorizes. ECF No. 14-1 at 33. The Defendants respond that this argument is simply the Plaintiffs' opinion and that the Plaintiffs are asking this Court to substitute its judgment for that of the Defendants, which is not allowed. ECF No. 17 at 56. The Court notes again that neither the press release nor the internal Memo released on August 6 mention national security concerns or interests, highlighting instead the cost to the VA of its employees' union-representation as well as the difficulty the VA has had rewarding high performing employees and holding poorly performing employees accountable. Silva Decl. Ex. I,

ECF No. 14-2 at 89; ECF No. 13-5. Without any mention of the basis authorized by the FSLMRS and the EO for terminating coverage of Chapter 71 protections and therefore the collectively bargained agreements between unions and agencies or subdivisions, the Court concludes that the reasons on which the Defendants relied in August to explain the termination and the perceived benefits thereof cannot be a reasonable explanation for this agency action. *See Fed. Commc'ns Comm'n*, 592 U.S. at 423 (explaining how courts consider whether an agency action is reasonable or reasonably explained); *Littlefield*, 85 F.4th at 643 (listing indicators of arbitrariness and capriciousness).

The Court also notes that the single mention of national security in Therit's declaration (quoted above during the Court's discussion of the First Amendment retaliation claim) does not persuasively counteract the same-day statements the Defendants made when announcing the Master CBA termination. The Supreme Court and First Circuit have clearly explained that "[j]udicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 34 (1st Cir. 2026) (order of court) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (citation modified)). "[A]n agency must stand by the reasons it provided at the time of its decision and cannot rely on post-hoc rationalizations developed and presented during litigation." *Id.* (quoting *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 37 F.4th 746, 761 (1st Cir. 2022)). "Although agencies may later 'elaborate' on the reasons initially provided to justify agency action, they may not provide altogether new reasons after-

the-fact." *Id.* (citing *Regents of the Univ. of Cal.*, 591 U.S. at 21). The Defendants have not provided this Court with any statements they issued or made at the time of the termination that specifically highlights or explains national security as a basis for the termination decision.

Overall, the Plaintiffs' arguments summarized above as well as the Defendants' statements made contemporaneously with the termination letters have persuaded this Court that the Plaintiffs are likely to succeed on the merits of their § 706(1)(A) arbitrary and capricious claim. In addition to the Defendants' statements are their actions, including their decision to terminate the Master CBA rather than remove specific subdivisions from Chapter 71 coverage as authorized by the EO and terminating the Plaintiffs' contract but not that of other unions at the same time, which convinces this Court that the agency action was neither reasonable nor reasonably explained.

## C.    IRREPARABLE HARM

Moving on now to consider the next factor in the preliminary injunction test. Plaintiffs seeking preliminary relief must demonstrate that "they are '*likely* to suffer irreparable harm in the absence of preliminary relief.'" *Trump*, 157 F.4th at 80 (quoting *Winter*, 555 U.S. at 20). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

24

The Plaintiffs contend they and their members have been harmed in myriad ways since the August 6 termination of the Master CBA and they provide several declarations from various local chapter presidents to support their contentions.  *See* ECF No. 14-1 at 35–40, ECF Nos. 14-3 – 14-8.  For example, Plaintiffs' members and officers may no longer perform their duties or any core union functions during the workday or in space within the VA previously designated for this work; the VA has halted the entire grievance process; VA employees no longer have disciplinary process protections or safeguards, including a right to a union representative to assist throughout the process.  Benefits have already been altered, such as a decrease in parental leave time from 16 weeks to 12 weeks, and there are repercussions for employees who are knowingly associating with their union.  ECF No. 14-1 at 35–40.  The Plaintiffs assert that the termination of the Master CBA's protections have "undermined confidence in the union's functionality" and so "union membership is rapidly declining."  *Id.* at 39.

The Defendants counter with a contention that the Plaintiffs have not asserted any irreparable injuries.  The loss of collective bargaining benefits, they say, can be reinstated through the FLRA if the Plaintiffs ultimately prevail in this action.  ECF No. 17 at 58.  The alleged chilling of pro-union speech is simply not true, the Defendants contend, and the loss of membership is speculative and therefore insufficient to meet this factor.[10]  *Id.* at 60.

---

[10] The Defendants also contend that the harm here can't be imminent because the Plaintiffs waited three months after the termination of the Master CBA to initiate this case.  ECF No. 17 at 58.  The Plaintiffs respond by pointing out that the First

Starting with the latter counterargument, the Plaintiffs provide support that union membership has been in decline since August by attaching an email to one declaration in which a member wrote to the union in October 2025 to cancel their membership "due to the fact that I am not being represented by the union anymore" and no longer wishes to pay the biweekly dues. ECF No. 14-5 Ex. A at 9. The Defendants' first counterargument is also a nonstarter; there are benefits from the Master CBA the loss of which cannot be adequately rectified later if the Plaintiffs ultimately prevail in this case. Disciplinary processes, once concluded, have an immediate and irreparable effect on the employee(s) in question. Parents cannot turn back the clock to have more time with an infant prior to returning to work once they have missed the early formative weeks of development and their own recovery time.

The Court concludes that the Plaintiffs have shown they and their members are likely to be irreparably injured in the absence of an injunction in this case.

### D. BALANCE OF THE EQUITIES/PUBLIC INTEREST

The combined consideration of balancing the equities and the public interest requires the Court to weigh "the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)),

---

Circuit has considered an almost 8-month gap between agency action and filing a complaint to be just fine. *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 16 (1st Cir. 2012). ECF No. 19 at 39. The Court is not persuaded that the timing of the motion for preliminary injunction should preclude the relief the Plaintiffs seek at this time.

"pay[ing] particular regard for the public consequences in employing the extraordinary remedy of injunction," *id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). The Plaintiffs argue that the prevention of constitutional violations is always in the public interest and that there is no public interest in allowing unlawful agency action to stand. ECF No. 14-1 at 40–41. The Defendants argue that if an injunction is put in place then "the extensive actions to implement the [EO]" will have to be reversed to return the VA's labor management operations to the status quo pre-CBA termination. ECF No. 17 at 62–63. The Defendants claim this includes preventing the VA from complying with the EO and other instructions from the President, directing the payroll service provider to restart collecting dues, and reissuing space and resources to the union reps.[11] *Id.*; Therit Decl. ¶ 18, ECF No. 17-1.

The Court acknowledges that the changes resulting from the termination of the Master CBA are significant and that reversing these changes will have associated costs of time and resources for the VA. But the significant injury to the Plaintiffs from the loss of status as representatives of many VA employees and to their members from the revocation of the protections and benefits of the Master CBA weighs more heavily at this juncture. As to the public's interest, the Court is mindful

---

[11] The Defendants also respond that an injunction here would harm the public and President Trump because an injunction would interfere with the discretion to make decisions about the national security issues with which Congress entrusts the President. ECF No. 17 at 60–61. This point seems more appropriate for the opposition to a motion for injunctive relief in a case challenging the EO directly. The Court again notes that the action under review here is not the EO issued by President Trump, but the VA's and Secretary Collins' termination of the Master CBA.

that the First Circuit has been clear that "there is generally no public interest in the perpetuation of unlawful agency action." *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). Because the Plaintiffs have sufficiently demonstrated their likelihood of success on the merits of their claims and the likely irreparable nature of their injuries in the absence of a preliminary injunction, the Court concludes these last factors also weigh in favor of granting the relief requested.

### E. BOND

The parties disagree over whether the Plaintiffs should be required to post a bond. ECF No. 14-1 at 41; ECF No. 17 at 64–65. While Fed. R. Civ. P. 65(c) instructs the district court to require security posted by the moving party, the First Circuit has stated "that the provisions of Rule 65(c) are not mandatory" and that the district courts have "substantial discretion to dictate the terms of an injunction bond." *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991). In the face of litigation challenging the current presidential administration's policies and implementation thereof, the district courts in this Circuit have either required a nominal bond or waived bond in its entirety. *See, e.g., New York v. Kennedy*, 789 F. Supp. 3d 174, 214 (D.R.I. 2025) (requiring $100 bond); *Maine v. United States Department of Agriculture*, 778 F. Supp. 3d 200, 238 (D. Me. 2025) (requiring $1,000 bond); *Barbara v. Trump*, 790 F. Supp. 3d 80, 104 (D.N.H. 2025) (requiring $1 bond); *Colorado v. United States Department of Health and Human Services*, 788 F. Supp. 3d 277, 315 (D.R.I. 2025) (waiving bond entirely). The Court

has no reason in this case to deviate from this pattern and ORDERS the Plaintiffs to post a nominal bond in the amount of $1,000.

## IV.  ORDER

The Plaintiffs' Motion for Preliminary Injunction (ECF No. 14) is GRANTED. The Defendants shall reinstate the Master CBA—as well as any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the Master CBA—for the remainder of the agreed-upon term provided in the Master CBA.


IT IS SO ORDERED.

_____
Melissa R. DuBose
United States District Judge


March 13, 2026

| 03/23/2026 | TEXT ORDER: Before the Court is Defendants Motion to Clarify the Preliminary Injunction entered on March13, 2026. ECF No. 32 . The Defendants claim to be confused by two ambiguities they perceive in the text of the preliminary injunction order. The Court does not know how to state the order any more simply or directly. The Court concluded that the Plaintiffs are likely to succeed on the merits of their claim that the August 2025 termination of the Master CBA was a retaliatory action in violation of the First Amendment and an arbitrary and capricious agency action in violation of the APA. The Court ordered the Defendants to reinstate the Master CBA. The additional plain language simply acknowledges that the Master CBA has an agreed-upon term and may have "amendments, local supplemental agreements, and memoranda of understanding" related thereto using the terms employed by Plaintiffs in their motion, ECF No. 14 at 2, and not questioned by the Defendants in their response in opposition. The Court is at a loss to understand how that conclusion and the resulting injunction could possibly be read to order that (1) the Defendants are wholesale prohibited from terminating the Master CBA again prior to the end of the three-year term governing the contract or (2) the Defendants must reinstate any contract that is not encompassed by the Master CBA and agreements related thereto as identified above. To reinstate the Master CBA means that all parties covered by this contract will continue to be covered by this contract until it is terminated or amended in a lawful manner. As the Defendants themselves explain in their pending motion, to have entered an order enjoining the Defendants beyond the scope the Court articulated would step beyond the Courts authority at this juncture of the case.<br><br>The Defendants' Motion to Clarify is, accordingly, GRANTED. As the Defendants prepare their response to the Plaintiffs' pending Motion for Enforcement (ECF No. 33 ), the Court expects that the Defendants' compliance with the plain language of the preliminary injunction order will not be delayed. To be clear, the pending motion for enforcement is no reason to delay compliance with the Court's March 13, 2026 order to reinstate the Master CBA in full. So Ordered by District Judge Melissa R. DuBose on 3/23/2026. (Urizandi, Nissheneyra) (Entered: 03/23/2026) |
|---|---|

A30

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305 and AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL, Plaintiffs, v. UNITED STATES DEPARTMENT OF VETERANS AFFAIRS and DOUGLAS COLLINS in his official capacity as U.S. Secretary of Veterans Affairs, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 25-cv-583-MRD-PAS |

ORDER

The parties appeared before the Court this morning on the Plaintiffs' Motion to Enforce the Preliminary Injunction Order (ECF No. 33). The Court explained that the Status Report submitted by the Defendants yesterday (ECF No. 36) with the March 26 Notice of Termination ("re-termination letter") attached does not render moot either the March 13 Preliminary Injunction Order (as clarified on March 23) or the Plaintiffs' Motion to Enforce. The re-termination letter issued yesterday is not in compliance with this Court's clarification that "all parties covered by [the CBAs] will continue to be covered by this contract until it is terminated or amended *in a lawful manner*." (Emphasis added.) The Plaintiffs' Motion to Enforce is GRANTED.

The Court orders and instructs as follows[1]:

- The Preliminary Injunction Order dated March 13, as clarified on March 23, is in full force and effect and will remain so until it is modified, dissolved, or stayed by a court.

---

[1] This Order is intended to memorialize the immediate effect of the Court's ruling on the Plaintiffs' Motion to Enforce and the next step in this case. The Court

- The Defendants' reinstatement of and compliance with the Master CBA, along with any "amendments, local supplemental agreements, and memoranda of understanding related thereto," shall be in both form *and* substance.

- Defendants must immediately notify bargaining units that, pursuant to the Preliminary Injunction issued by the Court on March 13, 2026, the re-termination letter shall not be given any force or effect, the Master CBA (as qualified above) shall remain applicable and binding in both form and substance, and the currently pending grievances and arbitrations submitted under the Master CBA will continue to be processed. The Defendants shall file a status report with this Court by Wednesday, April 1 to confirm compliance with this Order and the March 13 Preliminary Injunction Order.

- The Defendants shall show cause by the end of day Tuesday, March 31 why the Court should not consider the re-termination letter ostensibly filed as a Status Report on March 26 to be in blatant violation of the Preliminary Injunction Order in place and therefore in contempt of this Court. The Plaintiffs may respond by the end of day on Thursday, April 2. The Court shall schedule a show cause hearing on Friday, April 3.

IT IS SO ORDERED.

_____
Melissa R. DuBose
United States District Judge

March 27, 2026

---

may provide additional reasoning and discussion after hearing the parties on the show cause proceedings detailed below.

| | |
|---|---|
| 04/06/2026 | TEXT ORDER: Before the Court is the Defendants' Emergency Motion to Stay this Courts Preliminary Injunction Order (ECF No. 30 ) and Enforcement Order (ECF No. 39 ). ECF No. 45 . The Court has carefully considered the Defendants' arguments, the Plaintiffs' arguments in opposition to the motion (ECF No. 47 ), and the caselaw related to the parties' arguments. The First Circuit is clear that "'[a]stay is an intrusion into the ordinary processes of administration and judicialreview' and is not granted as 'a matter of right.'" *State v. UnitedStates Dep't of Hous. & Urb. Dev.*, No. 26-1217, 2026 WL 887242, at *8(1st Cir. Apr. 1, 2026) ("HUD") (quoting *Nken v. Holder*, 556 U.S.418, 427 (2009)). By simply reiterating arguments already made to this Court in this case and attempting to debut new arguments not previously made to the Court while it considered the Plaintiffs' motion for preliminary injunction, the Defendants have fallen far short of meeting their "burden of justifying the extraordinary relief it requests." *New York v. Kennedy*,155 F.4th 67, 72 (1st Cir. 2025). Specifically, the Defendants have failed to persuade this Court that it is likely to succeed on the merits of their appeal, that they will be irreparably injured without the stay, that other parties interested in the proceeding will be irreparably injured, or that the public's interest will be adversely affected. *See Nken*, 556 U.S. at 426; *HUD*, 2026 WL 887242, at *8; New York, 155 F.4th at72. <br><br> The Court acknowledges and appreciates the Defendants' status report indicating that the parties are in discussions about compliance with the Court's orders. ECF No. 48 . While the First Circuit adjudicates the merits of the interlocutory appeal, this Court expects the parties' full compliance, in both form and substance, with its prior orders. So Ordered by District Judge Melissa R. DuBose on 4/6/2026. (Urizandi, Nissheneyra) (Entered: 04/06/2026) |