No. 26-1321

# In the United States Court of Appeals for the First Circuit

---

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES
LOCAL 2305; AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES NATIONAL VA COUNCIL,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF VETERANS AFFAIRS;
DOUGLAS COLLINS, in the official capacity as U.S. Secretary of
Veterans Affairs,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Rhode Island
Case No. 1:25-cv-00583-MRD-PAS
Hon. Melissa R. DuBose, Judge

---

**SUPPLEMENTAL APPENDIX TO PLAINTIFFS-
APPELLEES' RESPONSE TO EMERGENCY MOTION TO
STAY PENDING APPEAL AND ADMINISTRATIVE STAY**

---

KEKER, VAN NEST & PETERS
LLP
BROOK DOOLEY
TRAVIS SILVA
JILON LI
ALEXANDRA WHEELER
ELIZABETH HECKMANN
633 Battery Street
San Francisco, California 94111
Telephone: 415 391 5400
Facsimile: 415 397 7188

ZIMMER, CITRON & CLARKE,
LLP
DAVID ZIMMER
EDWINA CLARKE
130 Bishop Allen Drive
Cambridge, Massachusetts
02139
Telephone: 617-676-9421

Counsel for Plaintiffs-Appellees

6123577

# SUPPLEMENTAL APPENDIX[1]

| Date | Docket Number | Description | Supplemental Appendix (SA) Page Range |
|---|---|---|---|
| 11/25/2025 | 13 | Amended Complaint for Declaratory and Injunctive Relief | 1-38 |
| 11/25/2025 | 14-3 | Declaration of William Wetmore | 39-384 |
| 11/25/2025 | 14-4 | Declaration of Mary-Jean Burke | 385-492 |
| 11/25/2025 | 14-6 | Declaration of Sonia Chaves | 493-508 |
| 11/25/2025 | 14-7 | Declaration of Ira Kedson, PSY D. | 509-520 |
| 12/19/2025 | 17 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction | 521-587 |
| 12/19/2025 | 17-1 | Declaration of Tracey Therit (exhibits excluded) | 588-611 |
| 2/19/2026 | | Transcript for Preliminary Injunction Hearing | 612-663 |
| 3/20/2026 | 32 | Defendants' Motion for Clarification of Preliminary Injunction | 664-672 |
| 3/20/2026 | 33 | Plaintiffs' Motion to Enforce the Preliminary Injunction | 673-676 |
| 3/20/2026 | 33-1 | Memorandum in Support of Plaintiffs' Motion to Enforce the Preliminary Injunction | 677-690 |
| 3/23/2026 | | Text Order re Motion to Clarify Preliminary Injunction | 691-692 |
| 3/24/2026 | 34 | Defendants' Response to Plaintiffs' Motion to Enforce the Preliminary Injunction | 693-702 |
| 3/26/2026 | 36 | Defendants' Status Report | 703-705 |
| 3/30/2026 | | Text Order re Emergency Motion to Stay | 706 |

---

[1] *E.g., State v. U.S. Dep't of Housing & Urban Dev.*, No. 26-1217, Doc. 00118417568; *cf.* Fed. R. App. P. 30.

6123577

| | | | |
|---|---|---|---|
| 4/1/2026 | 47 | Opposition to Defendants' Emergency Motion to Stay Pending Appeal | 707-731 |
| 4/1/2026 | 47-1 | Declaration of Pace Schwarz in Support of Plaintiffs' Opposition to Defendants' Emergency Motion to Stay Pending Appeal | 732-735 |
| 4/1/2026 | 47-2 | Supplemental Declaration of Mary Jean Burke in Support of Plaintiffs' Opposition to Defendants' Emergency Motion to Stay Proceedings Pending Appeal | 736-739 |
| 4/2/2026 | 49-1 | Declaration of Mary Jean Burke in Support of Plaintiffs' Response to Defendants' Status Report | 740-744 |
| 4/2/2026 | 49-3 | Exhibit B to the Declaration of Mary Jean Burke in Support of Plaintiffs' Response to Defendants' Status Report | 745-749 |
| 4/2/2026 | 49-9 | Exhibit H to the Declaration of Mary Jean Burke in Support of Plaintiffs' Response to Defendants' Status Report | 750-760 |

6123577

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and**<br><br>**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305**<br><br>    *Plaintiffs,*<br><br>    **v.**<br><br>**UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and**<br><br>**DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs**<br><br>    *Defendants.* | **Case No. 25-cv-00583-MRD-PAS** |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

3379461

1.      Plaintiffs the American Federation of Government Employees National Veterans Affairs Council (NVAC) and American Federation of Government Employees Local 2305 bring this lawsuit to challenge the unlawful actions of the United States Department of Veterans Affairs (VA) and its Secretary Douglas A. Collins.[1]  NVAC is an autonomous labor organization affiliated with the American Federation of Government Employees that represents, and bargains on behalf of, more than 300,000 bargaining unit employees at the VA.

2.      Since August 8, 2023, the VA and NVAC have been parties to the 2023 Master Collective Bargaining Agreement (Master Agreement) that recognizes NVAC's right as the sole and exclusive representative of the VA bargaining unit employees that it represents and that provides those employees with a variety of workplace rights.  *Master Agreement between the Dep't of Veterans Affairs and the Am. Fed. of Gov't Emps.,* U.S. Dep't of Veterans Affairs (August 8, 2023).  The Master Agreement is attached hereto as **Exhibit A**.

3.      On August 6, 2025, Secretary Collins terminated the Master Agreement and informed NVAC that the VA would no longer recognize NVAC as the exclusive representative of over 300,000 bargaining unit employees.  This action, which Secretary Collins stated was based on President Donald J. Trump's March 27, 2025 Executive Order 14251 (EO 14251), was arbitrary and capricious, in excess of statutory authority, and contrary to NVAC's constitutional rights.

4.      Since 1978, federal employees have been granted the right to bargain collectively by the Federal Service Labor-Management Relations Statute, which is codified at Chapter 71 of Title 5 of the United States Code (hereinafter, Chapter 71).  Pursuant to this right, the VA and NVAC entered into the Master Agreement, which governs the collective bargaining relationship

---

[1] As used in this Complaint, "NVAC" refers to Plaintiff the American Federation of Government Employees National Veterans Affairs Council; "AFGE Local 2305" refers to Plaintiff American Federation of Government Employees Local 2305; and "AFGE" refers to the American Federation of Government Employees, which is the AFL-CIO-affiliated international federation with over 900 local AFGE unions and which is not a party to this action.  "VA" refers to Defendant the United States Department of Veterans Affairs, and "The Secretary" or "Secretary Collins" refers to Defendant Douglas A. Collins.  "Master Agreement" refers to the 2023 Master Collective Bargaining Agreement between NVAC and the VA.

3379461

**SA002**

between them and confers critical rights and workplace protections on bargaining unit employees. Previous nationwide term agreements were executed in 1982, 1997, and 2011.

5.    Chapter 71 allows the President to "issue an order excluding any agency or subdivision thereof from coverage under this chapter," *i.e.*, from Chapter 71's obligation to engage in collective bargaining, if "(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1) (hereinafter, Section 7103).

6.    On March 27, 2025, President Trump invoked Section 7103 when he issued EO 14251.  Section 2 of EO 14251 excluded the entire VA (except for "the immediate, local employing offices of any agency police officers, security guards, or firefighters") from coverage under Chapter 71 on the claimed basis that the VA has "as a primary function intelligence, counterintelligence, investigative, or national security work" and that Chapter 71 "cannot be applied to [the VA] in a manner consistent with national security requirements and considerations."  In this way, EO 14251 excluded all VA employees (other than "the immediate, local employing offices of any [VA] police officers, security guards, and firefighters") from coverage under Chapter 71, thereby eliminating their right to engage in collective bargaining unless they were later exempted from the EO's coverage by the Secretary as described below.

7.    Section 4 of EO 14251 provides that "the Secretar[y] of . . . Veterans Affairs [is] delegated authority under 5 U.S.C. § 7103(b)(1) to issue orders suspending the application of . . . Executive Order 12171, as amended, to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of the Federal Service Labor-Management Relations Statute."  In other words, Section 4 authorized Secretary Collins to exempt certain "subdivisions" of the VA from the reach of EO 14251 and return them to coverage under Chapter 71.

8.    On April 11, 2025, Secretary Collins issued an order (April 11 Order) exempting seven entities, which are one international union and six additional union affiliates, from EO

14251, thereby bringing these bargaining units back "under the coverage" of Chapter 71 and restoring their rights to collective bargaining. In his April 11 Order, Secretary Collins did not exempt any AFGE affiliates, including NVAC, AFGE Local 2305, or any other Local on behalf of which NVAC acts. The April 11 Order did not provide any explanation for why Secretary Collins chose to exempt non-AFGE affiliates or why he chose not to exempt AFGE affiliates. The April 11 Order is attached hereto as **Exhibit B**.

9.     Notwithstanding the April 11 Order, the VA took no action to formally terminate the Master Agreement until August 6, 2025.

10.    On August 6, 2025, in letters to NVAC leadership and without any advance warning, the Secretary announced that he was unilaterally terminating NVAC's Master Agreement effective immediately ("August 6 Termination" or "Termination"), including "any amendments, local supplemental agreements, and memoranda of understanding at all levels with NVAC/AFGE for all VA bargaining unit employees, except police officers, firefighters, and security guards represented by NVAC/AFGE, effective August 6, 2025." Letters from Douglas A. Collins, Sec'y of Veterans Affairs, to Everett B. Kelley, President of AFGE, and Alma L. Lee, President of NVAC (Aug. 6, 2025). The letters effectuating the August 6 Termination are attached hereto as **Exhibit C**.

11.    The Secretary's August 6 Termination was unlawful under the Administrative Procedure Act (APA) and the Constitution.

12.    First, under the APA the Termination was arbitrary and capricious, an abuse of discretion, and contrary to law. Both the Termination and the related April 11 Order were issued without any rationale or justification. Secretary Collins had the authority to determine that Chapter 71 could be applied to certain "subdivisions" of the VA consistent with national security concerns, but the Secretary did not make any such determination. He instead arbitrarily terminated collective bargaining rights on a union-by-union basis, which is inconsistent with Section 7103 and EO 14251.

13.     Further, the Termination does not comply with the plain text of EO 14251's language prohibiting its application to the "immediate, local employing offices of any agency police officers, security guards, or firefighters" because it has the effect of denying Chapter 71 coverage and contractual protections from bargaining unit employees who are employed by such offices.

14.     Finally, the VA admitted that its decisions to exclude NVAC members and represented employees from Chapter 71's coverage and to terminate the Master Agreement were premised on union political activity as opposed to statutorily prescribed national security considerations.  And because they were based on political animus and other impermissible reasons, these decisions granted some VA employees Chapter 71 rights while depriving others who work at the same facility or in nearly identical roles of those same rights.  These kinds of classifications are inconsistent with the limitations that Congress wrote into Section 7103, which permits the Executive to act only where the Executive determines that Chapter 71 "cannot be applied to [an] agency or subdivision in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1)(B)

15.     The Termination was also inconsistent with a memorandum issued on March 27, 2025, by the Acting Director of the Office of Personnel Management (OPM), Charles Ezell, who released guidance (OPM Guidance) to agency leadership on how to implement EO 14251.  *See* Memo. of Charles Ezell, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs*, Office of Pers. Mgmt. (March 27, 2025), https://www.opm.gov/chcoc/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs/.  The OPM Guidance in effect at the time of the Termination instructed agencies not to terminate collective bargaining agreements during the pendency of litigation over EO 14251.

16.     As if to highlight the Secretary's capriciousness, three days after AFGE initiated this lawsuit challenging the VA's implementation of the Executive Order, the Secretary acted to take away Chapter 71 rights from even the few unions that benefitted from his April 11 Order.

4

3379461

The entire premise of the April 11 Order was that the Secretary was to identify where the VA could continue to apply Chapter 71 "consistent with national security requirements and considerations." Executive Order 14251, § 4(b)(i).  So, as of April 11, 2025, the Secretary believed that the VA could continue recognizing those unions without endangering national security.  et, on November 7, the Secretary rescinded the April 11 Order (November 7 Rescission). The Secretary offered no explanation for why, in April, he thought that the VA could continue to work with some unions in a manner "consistent with national security" but, in November, he reached the opposite conclusion. Indeed, the timing of the November 7 Rescission confirms the pretextual nature of the Secretary's actions—the Secretary is motivated by political animus and defending against litigation, not protecting national security.

17.    Second, the Termination violates the APA's prohibition on agency action contrary to the Constitution as it violates the First Amendment.  By terminating NVAC's collective bargaining rights, the Secretary retaliated against NVAC for its political and legal advocacy and affiliation with AFGE; discriminated against NVAC based on NVAC's viewpoints "hostile" to the Trump Administration's policies; infringed on the right to petition by chilling NVAC's and bargaining unit employees' participation in grievances, arbitration, and litigation; and infringed on the right to free association by impinging NVAC's ability to organize and advocate with its bargaining unit employees, all in violation of the First Amendment.

18.    Third, the Secretary acted in excess of his statutory authority when he issued both the Termination and the April 11 Order on which it was based.  A Section 7103 order can be issued only where an "agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and [] the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."  But, neither the VA nor any identifiable subdivision has such a primary function, and the Secretary failed to demonstrate that the provisions of Chapter 71 cannot be applied to the VA in a manner consistent with national security requirements and considerations.  Further, both Section 7103 and EO 14251 authorize determinations as to Chapter 71's applicability only for

5

SA006

agency or agency subdivisions; neither permits the union-by-union determinations the Secretary imposed.

19.     The Termination independently violates the First Amendment to the Constitution for the same reasons discussed above.

20.     Because the Termination violates the APA and the Constitution and exceeds the Secretary's authority under EO 14251, the Court should vacate the Termination and declare it unlawful.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the Constitution and laws of the United States.  This Court also has jurisdiction under 28 U.S.C. § 1346(a)(2) and 5 U.S.C. § 702 because Defendants are a United States official and agency.

22.     The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

23.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because NVAC represents federal employees in this District, AFGE Local 2305 resides within this District, and because a substantial part of the events or omissions giving rise to the claim occurred within this District.

## PARTIES

24.     Plaintiff NVAC is a labor organization and unincorporated association headquartered in Salem, Virginia.  NVAC represents more than 300,000 professional and non-professional employees who work in nearly every division of the United States Department of Veterans Affairs, including the Veterans Health Administration, Veterans Benefits Administration, National Cemetery Administration, and operational components such as, but not limited to, the Office of Information and Technology, Board of Veterans' Appeals, Office of

6

3379461

**SA007**

Acquisition, Logistics, and Construction, and Office of Finance. Approximately 30% of VA employees are themselves veterans, and they include nurses, physicians, dentists, pharmacists, physical and occupational therapists, housekeepers, engineers, custodians, cooks, numerous other healthcare and support staff, cemetery workers, gardeners, archivists, security officers, claim processors, clerical workers, firefighters, IT professionals, bookkeepers, and numerous other civil servants all dedicated to the mission of ensuring high quality care and service for our nation's veterans, as well as their caregivers and beneficiaries. NVAC brings this action on behalf of itself as an organization and on behalf of its members and represented employees, who have been deprived of constitutional protections and lost statutory and contractual protections at work due to the termination of the Master Agreement.

25.    Plaintiff AFGE Local 2305 is a labor organization and unincorporated association headquartered in Providence, Rhode Island. In this District, AFGE Local 2305 represents more than 450 professional and nonprofessional employees who work at the Providence VA Regional Benefit Office and the Providence Veterans Center. AFGE Local 2305 also represents professional and nonprofessional employees in VA facilities outside this District. AFGE Local 2305-represented employees include psychologists, program support assistants, social workers, program specialists, vocation rehabilitation counselors, veterans service representatives, and others. AFGE Local 2305 brings this action on behalf of itself as an organization and on behalf of AFGE Local 2305-represented employees, who have been deprived of constitutional protections and lost statutory and contractual protections at work due to the termination of the Master Agreement.

26.    Defendant Department of Veterans Affairs is a federal agency headquartered in Washington, D.C. It is a party and signatory to the Master Agreement, which it is no longer honoring except as applied to police officers, firefighters, and security guards.

27.    Defendant Douglas A. Collins is the Secretary of Veterans Affairs and is sued in his official capacity. He ordered the Termination.

3379461

**SA008**

## FACTUAL BACKGROUND

**A.     Congress codifies collective bargaining rights for federal workers.**

28.     Almost fifty years ago, Congress enacted the Federal Service Labor-Management Relations Statute (FSLMRS), Pub. L. No. 95-454, 92 Stat. 1111 (1978), granting federal employees the right to organize and bargain collectively.  The FSLMRS is contained in Title VII of the Civil Service Reform Act of 1978 (CSRA) and codified at Chapter 71 of title 5 of the U.S. Code.

29.     The FSLMRS establishes a comprehensive framework governing collective bargaining for federal government employees based on Congress's determination that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest" and "contributes to the effective conduct of public business."  5 U.S.C. § 7101(a)(1)(A), § 7101(a)(1)(B).

30.     Chapter 71 grants employees "the right to form, join, or assist any labor organization, or to refrain from any such activity." 5 U.S.C. § 7102.  The FSLMRS also guarantees employees the right "to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter."  5 U.S.C. § 7102(2).

31.     Pursuant to Chapter 71, agencies must "accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election, by a majority of the employees in an appropriate unit who cast valid ballots in the election."  5 U.S.C. § 7111(a).

32.     The labor organization that has been selected as the exclusive representative "is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit" and "is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership."  5 U.S.C.

3379461

**SA009**

§ 7114(a)(1).  Chapter 71 mandates that agencies and federal sector labor organizations "meet and negotiate in good faith" to arrive at a collective bargaining agreement.  5 U.S.C. § 7114(a)(4).

33.    Under Chapter 71, federal employees may voluntarily choose to pay membership dues to their representative labor organization.  5 U.S.C. § 7115.  If an employee provides written authorization to an agency to deduct membership dues from the employee's pay, agencies are required to honor the request.  *Id.*

34.    The FSLMRS also prohibits labor organizations and federal employees from calling for or participating in labor strikes, work stoppages, and slowdowns.  5 U.S.C. § 7116(b)(7)(A), § 7311.

35.    Congress excluded, by statute, several agencies from Chapter 71's scope, including the Government Accountability Office, the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, the Tennessee Valley Authority, the Federal Labor Relations Authority, the Federal Service Impasses Panel, and the United States Secret Service and the United States Secret Service Uniformed Division.  5 U.S.C. § 7103(a)(3).

36.    Chapter 71 also grants the President limited authority to order additional agencies or subdivisions thereof excluded from Chapter 71's coverage.  The President may do so only after making a determination that (1) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" and (2) "the provisions of [Chapter 71] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1).

37.    In 1979, shortly after the enactment of the CSRA, President Carter invoked the narrow exclusion power in Section 7103(b)(1) by issuing an executive order excluding specific intelligence and national security agency subdivisions from Chapter 71.  *See* EO 12171, *Exclusions from the Federal Labor-Management Relations Program*, 44 Fed. Reg. 66565 (Nov. 20, 1979).

38.    While every president after President Carter, except for President Biden, has used Section 7103(b)(1) to exclude agency subdivisions and organizational subcomponents from Chapter 71, prior exclusions had been surgically narrow, with the excluded subdivision having an

3379461

**SA010**

obvious, bona fide link to national security.  For example, President Reagan excluded subdivisions under the Joint Chiefs of Staff and subdivisions of the Department of Energy.  *See* EO 12338, 47 Fed. Reg. 1369 (Jan. 11, 1982).  President George H.W. Bush excluded the Defense Mapping Agency Reston Center, a subdivision of the Department of Defense.  *See* EO 12693, 54 Fed. Reg. 40629 (Sep. 29, 1989).  President Clinton excluded the Naval Special Warfare Development Group.  *See* EO 13039, 62 Fed. Reg. 12529 (Mar. 11, 1997).  President George W. Bush excluded subdivisions of the Department of Justice, such as the National Drug Intelligence Center and Office of Intelligence Policy and Review.  *See* EO 13252, 67 Fed. Reg. 1601 (Jan. 7, 2002).  President Obama excluded subdivisions of the Departments of the Army, Navy, and Air Force, as well as other subdivisions of the Department of Defense.  *See* EO 13760, 82 Fed. Reg. 5325 (Jan. 12, 2017).  And President Trump, in his first term, excluded the Defense Counterintelligence and Security Agency within the Department of Defense.  *See* EO 13869, 84 Fed. Reg. 18125 (Apr. 24, 2017).

39.    However, until this year, no president had invoked Section 7103 to exclude entire Cabinet departments from Chapter 71's coverage.  And no president had invoked Section 7103 to make union-by-union classifications.

**B.    Prior to the issuance of EO 14251, AFGE and NVAC persistently sought to protect its hundreds of thousands of members and represented employees from the Trump Administration's assault on federal employees and their unions.**

40.    AFGE was founded in 1932 by federal employees seeking to create a right to fair employment and pay during the Great Depression.  It is the largest union of federal workers, representing approximately 820,000 federal civilian and D.C. Government employees across more than 900 local unions.  AFGE is also comprised of over 70 agency-based Councils, including NVAC, in addition to its 900 local unions.  AFGE members work across the federal government; the departments and agencies with the highest memberships are the VA, the Social Security Administration, the Department of Defense, and the Department of Homeland Security.

3379461

41.     More than 40 years ago, VA employees began organizing under the NVAC umbrella.  Today, NVAC is an independent bargaining council of AFGE that represents more than 300,000 VA employees.  Within the VA, the Veterans Health Administration's hospitals and clinics employ the largest number of NVAC-represented workers.  AFGE Local 2305 is an independent affiliate of AFGE that represents more than 450 VA employees at the Providence VA Regional Benefit Office in Providence, the Providence Veterans Center in Warwick, and other VA facilities.

42.     Out of the 300,000 NVAC-represented employees, roughly 3,000 are employed as firefighters, police officers, and security guards.  There are approximately 2,500 VA police officers, most of whom work within the Veterans Health Administration, protecting patients, visitors, and staff at VA medical centers and community clinics around the country.  *See* Testimony of Bryan J. Hunt, *Ensuring VA's Security: How Can Congress Best Support VA's Law Enforcement?*, House Comm. on Veterans' Affairs Subcomm. on Oversight and Investigations, Congress.gov                    (May                    16,                    2024), https://www.congress.gov/118/meeting/house/117298/witnesses/HHRG-118-VR08-Wstate-HuntB-20240516.pdf; *see also* Dep't of Veterans Affairs, VA Directive 0731, Police Staffing Policy            (May            6,            2022),            at            2, https://www.va.gov/vapubs/viewPublication.asp?Pub_ID=1378&FType=2.

43.     NVAC's core functions are to secure fair and reasonable collective bargaining agreements with the VA; to negotiate the implementation of new policies and changes to working conditions during the term of that agreement; to file and prosecute grievances against the VA to enforce the agreements; to file and pursue unfair labor practices against the VA to enforce the FSLMRS; to represent bargaining unit employees in arbitration, administrative appeals, and statutory appeals; to participate in safety inspections and abatements; and to provide support to members and represented employees navigating a variety of federal processes.

44.     The current Master Agreement went into effect on August 8, 2023.  The Master Agreement has a term of three years followed by automatic one-year renewals absent a timely

3379461

**SA012**

notice to reopen.  The Master Agreement is the product of comprehensive negotiations to safeguard essential rights for NVAC-represented workers.  Renegotiations commenced in December 2017, during President Trump's first term, and resulted in NVAC filing more than a dozen national level grievances and unfair labor practices against the VA for engaging in bad faith bargaining.  For example, in 2019, the VA attempted to force upon NVAC certain provisions that would weaken worker protections like employee due process rights.  Negotiations came to a standstill when NVAC vigorously opposed, and ultimately succeeded in defeating, these harmful proposals after multiple arbitrators found that the VA's negotiators violated their duty to bargain in good faith.  After renewed negotiations began in 2022, the VA's continued intransigence led a federal arbitrator to determine that it was, yet again, bargaining in bad faith.  Following this finding, the parties finally reached agreement on the current Master Agreement in August 2023.  *See* Jory Heckman, *VA Signs New Labor Agreement with AFGE, its First Update in More than a Decade*, Fed. News Network (Aug. 8, 2023), https://federalnewsnetwork.com/workforce/2023/08/va-signs-new-labor-agreement-with-afge-its-first-update-in-more-than-a-decade/.

45.    Article 1 of the Master Agreement recognizes AFGE "as the sole and exclusive representative" for all "previously certified nonprofessional and professional employees, full-time, part-time, and temporary[.]"  AFGE has delegated authority to NVAC to act as the representative of such employees in negotiations, grievances, and other matters.

46.    The Master Agreement includes provisions that contain critical worker protections, such as, for example:

    i)    **Hiring Procedures**: The Master Agreement establishes fair application and selection procedures, as well as guidance related to the use of personnel records.

    ii)    **Working Hours**: The Master Agreement mandates rest breaks, guaranteed compensation for and equitable limitations on overtime work, protocols for alternative work schedules, and robust leave protections (*e.g.*, sick leave, bereavement leave, jury duty, etc.).

    iii)    **Health and Safety Requirements**: The Master Agreement sets forth clear and detailed requirements for the VA to maintain safe and healthful workplaces.  It also provides

12

**SA013**

for safety trainings, mandatory reporting of unsafe working conditions, protections against retaliation for such reporting, institutional transparency and accountability with respect to workplace safety documentation (*e.g.*, injury logs), and mandatory facility level violence prevention plans.

iv)    **Due Process Rights**: The Master Agreement sets forth detailed and efficient procedures and disciplinary protocols, including for example a requirement that employees be provided with advance notice and an opportunity to review evidence and respond to proposed disciplinary action, a 90-day opportunity for employees to address performance concerns using a performance improvement plan developed in consultation with local unions before the VA can take adverse action based on unacceptable performance, and a guarantee that disciplinary action be timely and based only on just and sufficient cause.

v)    **Grievance and Arbitration Rights**: The Master Agreement contains a negotiated grievance procedure including the right to proceed to binding arbitration before a neutral third party in matters affecting conditions of employment, including for example disciplinary action, pay, leave, overtime, work schedules, and more.

vi)    **Family Leave Benefits**: The Master Agreement grants employees with certain benefits that are more generous than those required by law, including for example an additional four weeks of unpaid maternity and paternity leave and the ability to invoke benefits under the Family and Medical Leave Act to care for the parents of a spouse with a serious health condition.

47.    In addition to bargaining for improved working conditions and benefits for bargaining unit employees, NVAC advocates against legislation harmful to NVAC-represented employees and against the interest of the public at large.  It also works to protect the rights of its bargaining unit employees by filing grievances against agency initiatives that violate NVAC-represented employees' rights, including more than 20 such national level grievances in 2025.  Six of these 2025 grievances pre-dated the Secretary's April 11 Order exempting certain favored unions from EO 14251's scope.

3379461

**SA014**

48.     For example, NVAC vocally opposed the Veterans Affairs Accountability and Whistleblower Protection Act (VA Accountability Act), signed into law by President Trump in June 2017, which created a new disciplinary authority to take adverse actions against VA employees, weakened due process protections, and expedited appeal deadlines to challenge unlawful firings.

49.     As part of its advocacy against the VA Accountability Act, NVAC filed two grievances against the VA after it unilaterally implemented the Act without meeting its bargaining obligations and in breach of its contractual obligation to provide performance improvement plans. NVAC prevailed in both matters, and the VA was found to have violated myriad legal obligations.

50.     Following extensive litigation in administrative forums and federal court, former VA Secretary Denis McDonough announced that the VA would not utilize its disciplinary authority under the VA Accountability Act due, in large part, to NVAC's successful challenges to the Act.  In July 2023, NVAC and the VA settled the second of two disputes over the VA's implementation of the VA Accountability Act, resulting in thousands of former VA employees being offered monetary relief, and in some cases, reinstatement. *See* Drew Friedman, *VA, AFGE Reach 'Historic' Settlement to Reinstate, Compensate Thousands of Wrongfully Fired Feds*, Fed. News Network (Jul. 31, 2023), https://federalnewsnetwork.com/veterans-affairs/2023/07/va-afge-reach-historic-settlement-to-reinstate-compensate-thousands-of-wrongfully-fired-feds/.   NVAC, the VA, the FLRA, and members of Congress all issued statements announcing the historic settlement agreement, with the VA announcing the "total cost . . . expected to be in the hundreds of millions of dollars."  *See VA and AFGE reach settlement agreement resolving litigation over discipline taken under the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017*, U.S. Dep't of Veterans Affairs (July 28, 2023), https://news.va.gov/press-room/va-and-afge-agreement-uaccountability-and-whistleblower/.

51.     On August 8, 2023, then-candidate Trump spoke at a campaign event in Windham, New Hampshire and vowed, "[I will] direct my Secretary of Veterans Affairs to fire every corrupt VA bureaucrat who Joe Biden has outrageously refused to remove from the job or

14

**SA015**

put back in the job," and speaking of the settlement funds, "to take every penny of those funds to finally build a brand-new state-of-the art VA hospital right here in the great state of New Hampshire." *See Former President Trump Speaks in Windham, New Hampshire*, CSPAN (Aug. 8, 2023), https://www.c-span.org/program/campaign-2024/former-president-trump-speaks-in-windham-new-hampshire/630830.

52.     Additionally, NVAC opposed the VA Maintaining Internal Systems and Strengthening Integrated Outside Networks Act of 2018 (VA MISSION Act), signed into law by President Trump in June 2018, which privatized large segments of Veterans Affairs healthcare services and thus undermined the quality and accessibility of care available to veterans.  AFGE and NVAC lobbied against the legislation, including participating in legislative hearings and submitting testimony to Congress on numerous occasions.  Moreover, AFGE, along with 16 other labor organizations, urged the Senate to reject the bill because it "does nothing to help build up the internal capacity at the VA" and instead "outsources primary care to the private sector[.]"  Joint Letter to Senate from AFGE, et al. opposing VA MISSION Act (May 22, 2018), https://www.afge.org/globalassets/documents/generalreports/2018/5-22-18-joint-letter-to-senate-opposing-s-2372-the-va-mission-act.pdf.

53.     In 2025 alone, NVAC submitted more than 20 demands to engage in mid-term bargaining of the Master Agreement, including on topics like employee classification consistency, deferred resignation for federal employees, changes to employee performance standards, and realignment of VA departments.

54.     As discussed below, not only did Secretary Collins and the VA target NVAC for its own advocacy but also for its affiliation with AFGE and its advocacy.  For instance, AFGE and other organizations have created an online clearing house called "Civil Service Strong" that provides best practices and resources for federal workers trying to understand and exercise their rights.  It has also held town halls, rallies, and engaged in educational and legislative efforts in Congress.

3379461

**SA016**

55.    Finally, AFGE engages in litigation to protect its members' and represented employees' interests, particularly in light of the Trump Administration's assault on the federal workforce.  For example, AFGE initiated several prominent lawsuits in the weeks before President Trump issued EO 14251 and before Secretary Collins issued the April 11 Order.  On February 4, 2025, AFGE sued to stop the infamous "Fork in the Road" initiative as arbitrary and capricious.[2]  On February 6, 2025, AFGE sued to stop the administration from shutting down the U.S. Agency for International Development.[3]  On February 19, 2025, AFGE sued to stop a government directive for mass termination of probationary employees at six agencies, including the VA.[4]  Through these suits and other public advocacy, AFGE had thus prominently positioned itself as a litigation adversary of the Trump Administration in the weeks prior to the President's decision to issue EO 14251.

**C.    President Trump issues Executive Order 14251 to retaliate against unions that oppose him politically.**

56.    On March 27, 2025, President Trump issued EO 14251, which invoked Section 7103(b)(1) to exclude numerous agencies and agency subdivisions from coverage under Chapter 71 of Title 5.  A copy of EO 14251 is attached hereto as **Exhibit D**.

57.    EO 14251 is unprecedented in its scope.  It excludes about two-thirds of the federal workforce from coverage under Chapter 71 of title 5, including six Cabinet departments (the Departments of Defense, State, Treasury, Justice, Veterans Affairs, and Energy), as well as numerous independent agencies and subdivisions.  The government has admitted that EO 14251 goes far beyond the scope of any prior executive order invoking Section 7103(b)(1).  *Am. Fed. of Gov. Emps., AFL-CIO v. Trump*, No. 25-CV-03070-JD, 2025 WL 1755442, at *5 (N.D. Cal. June 24, 2025).

---

[2] *Am. Fed. of Gov't Emps., et al., v. Ezell, et al.*, No. 1:25-cv-10276 (D. Mass.)

[3] *Am. Fed. of Gov't Emps., et al. v. Trump, et al.*, No. 1:25-cv-00352 (D.D.C.)

[4] *Am. Fed. of Gov't Emps., et al., v. U.S. Office of Personnel Management, et al.*, No. 3:25-cv-01780 (N.D. Cal.)

3379461

**SA017**

58. EO 14251 purports to justify its unprecedented exclusion of swaths of the federal workforce from collective bargaining rights on the ground that they "have as a primary function intelligence, counterintelligence, investigative, or national security work." EO 14251, § 1. But, in addition to the inclusion of the VA, the addition of agencies such as the National Institute of Allergy and Infectious Diseases, the National Institutes of Health, the Bureau of Land Management, the Bureau of Ocean Energy Management, the Animal and Plant Health Inspection Service, the National Science Foundation, and the International Trade Commission to the list of agencies excluded from Chapter 71 coverage lays bare the pretextual nature of the President's conclusory "determination."

59. The President made some efforts to protect unions or professions that he favors from the effect of his order. EO 14251 purports to contain two mechanisms that exempt, or that may exempt, certain bargaining unit employees from the Executive Order's exclusion from Chapter 71 coverage. *First*, Section 2 of EO 14251 exempts from exclusion "the immediate, local employing offices of any agency police officers, security guards, or firefighters, provided that this exclusion does not apply to the Bureau of Prisons[.]" *Id.* at § 2 (b). *Second*, Section 4 of EO 14251 authorizes the Secretaries of Defense and Veterans Affairs to further exempt from the Section 2 exclusion "any subdivisions of the departments they supervise" thereby restoring collective bargaining rights to those select subdivisions, if they certify that Chapter 71 "can be applied to [specific subdivisions] in a manner consistent with national security requirements and considerations." *Id.* at § 4. EO 14251 provides that, to exempt a subdivision from the Order's scope, the Secretary must make the required certification in the Federal Register within 15 days from the date of the Order. *Id*. at § 4(b)(ii).

60. The White House published a "Fact Sheet" about EO 14251 that made the President's purpose plain. The Fact Sheet called out "hostile Federal unions" as "dangerous." The Fact Sheet proclaimed that "[c]ertain Federal unions have declared war on President Trump's agenda" citing as an example the fact that "VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration." The Fact Sheet warns that while

17

3379461

**SA018**

"President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions." *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements*, The White House (March 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/.

61.    On the same day EO 14251 was issued, March 27, 2025, Acting OPM Director Ezell released the OPM Guidance which informed agencies that they could (and should) take certain actions forbidden by collective bargaining agreements—such as ceasing to participate in grievance procedures, conducting reduction in force articles, or using non-contractual protocols for underperforming workers—only after such agreements were terminated.

62.    On April 8, 2025, OPM published a "Frequently Asked Questions" document on EO 14251 (OPM FAQ), which instructed agencies not to "terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination." *See* Frequently Asked Questions, *Executive Order 14251: Exclusions from Federal Labor-Management Relations Programs*, OPM.gov (Apr. 8, 2025), at 11 https://www.opm.gov/labor-management-relations/labor-management-relations/faqs-eo-14251-exclusions-from-federal-labor-management-relations-programs.pdf.  OPM later reversed this guidance; on August 14, 2025—eight days *after* the August 6 Termination—the DOJ submitted a letter to the Ninth Circuit indicating the OPM FAQ had been revised to read that "[a]gencies may choose to terminate, abrogate, or repudiate CBAs with other unions, and should consult with their General Counsels to assess the next steps regarding those CBAs." *Am. Fed. of Gov't Emps. v. Trump*, No. 25-4014, Dkt. No. 34.1 at 2 (9th Cir. Aug. 14, 2025).

D.    **The status of litigation over EO 14251.**

63.    On March 27, 2025, the same day EO 14251 was issued, federal agencies pre-emptively filed lawsuits in Kentucky (Kentucky Action) and Texas (Texas Action) seeking

18

SA019

declaratory judgments that they could lawfully terminate collective bargaining agreements pursuant to the Order and to OPM's Guidance.[5]  In the Texas Action, the VA sought declaratory judgment against AFGE's Councils and Affiliates, including NVAC.  The government alleged that the VA should be permitted to terminate collective bargaining agreements, including the Master Agreement, because they were "[r]estrictive and [o]nerous," and it again noted the government's concern about "[u]nions hostile to the President's agenda."  *U.S. Dep't of Def. v. Am. Fed of Gov. Emps, AFL-CIO, District 10*, No. 6:25-cv-00119, Dkt. No. 1 ¶ 83 (W.D. Tex. Mar. 27, 2025).  In particular, the VA viewed as "hostile" several initiatives by AFGE to advocate for the rights of union members and represented employees including such activities as filing lawsuits, drafting grievances, establishing an online clearing house with AFGE supporters, petitioning and educating members of Congress, educating the public about anti-worker policies, holding and participating in town halls, and staging rallies.  *See id.* ¶ 172.  Both the Kentucky and Texas Actions have been dismissed for lack of standing.

64.    Several other union associations, unions, and their affiliates also brought various suits challenging EO 14251.  In total, five injunctions have been issued against the operation of EO 14251 itself.[6]  The government has appealed the issuance of four injunctions, and it moved to stay those injunctions pending appeal.  The Courts of Appeals stayed three of the four injunctions pending appeal.[7]  In *Fed. Educ. Assoc. v. Trump*, No. 25-5303 (D.C. Cir.), the United States Court of Appeals for the District of Columbia Circuit denied the government's motion for a stay pending

---

[5] *See U.S. Dep't of Treasury v. Nat. Treasury Emps. Union Chapter 73*, No. 2:25-cv-00049, Dkt. No. 1 (E.D. Ky. Mar. 28, 2025); *U.S. Dep't of Def. v. Am. Fed of Gov. Emps, AFL-CIO, District 10*, No. 6:25-cv-00119, Dkt. No. 1 (W.D. Tex. Mar. 27, 2025).

[6] Injunctions have issued in: *Nat. Treasury Emps. Union v. Trump*, No. 1:25-cv-00935, Dkt. No. 32 (D.D.C. Apr. 25, 2025); *Am. Foreign Serv. Assoc. v. Trump*, No. 1:25-cv-01030, Dkt. No. 36 (D.D.C. May 14, 2025); *Fed. Educ. Assoc. v. Trump*, No. 1:25-cv-01362, Dkt. No. 34 (D.D.C. Aug. 14, 2025); *Am. Fed. of Gov't Emps. v. Trump*, No. 4:25-cv-03070, Dkt. No. 60 (N.D. Cal. June 24, 2025); *Am. Fed. of Labor & Congress of Indus Orgs v. Trump*, No. 1:25-cv-2445, Dkt. No. 44 (D.D.C. Oct. 1, 2025).  AFGE is a party to the case in the Northern District of California.

[7] *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, Dkt. No. 2116273 (D.C. Cir. May 16, 2025); *Am. Foreign Serv. Assoc v. Trump*, No. 25-5184, Dkt. No. 2121647 (D.C. Cir. June 20, 2025); *Am Fed. of Gov't Emps.*, No. 25-4014, Dkt. No. 32 (9th Cir. Aug. 1, 2025).

19

appeal, and the District Court's injunction in that case is currently in effect.  None of these cases addressed the Secretary's April 11 Order or the August 6 Termination.

**E.    Secretary Collins's April 11 Order comes in close proximity to AFGE-initiated litigation.**

65.    Section 4 of EO 14251 contains a "delegation" of authority to the Secretaries of Defense and Veterans Affairs "to issue orders suspending the application of section 1-402 or 1-404 of Executive Order 12171, as amended, to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of the Federal Service Labor-Management Relations Statute."[8]  Under EO 14251's plain terms, the Secretary had to "certif[y] to the President that the provisions of the Federal Service Labor-Management Relations Statute can be applied to such subdivision in a manner consistent with national security requirements and considerations" and "such certification [had to be] submitted for publication in the *Federal Register* within 15 days of the date of" EO 14251.  EO 14251 was issued on March 27, 2025, meaning that Secretary Collins had until April 11 to exercise the authority granted to him by Section 4.

66.    On April 3, 2025, six major unions sued in the Northern District of California to enjoin EO 14251.  AFGE is the lead plaintiff in that case.[9]  Thus, AFGE initiated suit over EO 14251 during the 15-day period that EO 14251 gave Secretary Collins to suspend the effect of the Executive Order to VA subdivisions.

67.    In the run-up to Secretary Collins's April 11 deadline, AFGE and NVAC sent letters to Secretary Collins urging him to exempt the entire VA from EO 14251's scope and explaining how VA employees, including housekeepers, food service workers, mental health professional, and cemetery workers, do not perform national security work as a primary function

---

[8] EO 14251's limitation of exemptions only to agency *subdivisions* aligns with Section 7103(b), which authorizes exclusions from Chapter 71's coverage only at the level of an agency or agency subdivision.

[9] *Am. Fed. of Gov't Emps. v. Trump*, No. 4:25-cv-03070 (N.D. Cal. April 4, 2025).

20

SA021

of their jobs within the meaning of Section 7103(b).  Secretary Collins also faced heavy congressional pressure to use this authority to exempt the entire VA from the scope of EO 14251.[10]

68.    On April 11, a mere eight days after AFGE sued to challenge the EO, Secretary Collins issued his order.  The April 11 Order purports to exempt from the EO's scope seven *unions*, thereby restoring statutory bargaining rights only to those unions and the VA employees they represent, while simultaneously leaving outside of Chapter 71 coverage other unions whose members and represented employees work within the same VA subdivisions.

69.    The Secretary did not include the certification required by Section 4(b) of the Executive Order when he issued the April 11 Order, and so no such certification was ever published in the Federal Register.  Similarly, the April 11 Order provided no explanation for why the Secretary chose to exempt some unions from the exclusionary effect of EO 14251.

70.    Instead, the Secretary merely parroted the Order and "agree[d] the Department of Veterans Affairs has as a primary function national security work[.]"  This conclusory statement lacks any reasonable basis, particularly given that the employees stripped of bargaining rights, purportedly on national security grounds, include NVAC-represented employees serving in the same or similar positions exempted by the April 11 Order, such as administrative assistants, nurses, dieticians, inventory management specialists, pharmacists, program analysts, physical therapists, social workers, and psychologists.

71.    VA press secretary Pete Kasperowicz, however, did explain the Secretary's arbitrary and retaliatory motive by stating that "[t]he unions in the exempted units have posed no

---

[10] For example, 22 Senators and 107 Members of the House of Representatives signed a letter explaining that "[t]he destruction of workforce protections at VA discourages employees from speaking up and pushes key information on waste, fraud, and abuse into the shadows" and that "the [O]rder specifically calls out dedicated VA employees and the unions representing them for their pushback on this Administration's shameful and illegal attacks on federal employees and VA."  The congressional letter further warned that the Order and any corresponding action by Secretary Collins other than wholesale restoration of collective bargaining rights would be "retaliatory in nature."  Richard Blumenthal, Mark Takano, et al. Letter to the Honorable Doug Collins, Congress of the United States (Apr. 2, 2025) at 1-2, https://juliabrownley.house.gov/wp-content/uploads/2025/04/2025-04-02-Letter-to-SecVA-on-Collective-Bargaining-EO-Impacts-vF.pdf.

21

3379461

or minimal hindrance to VA operations" as "[t]hey have filed no or few grievances against VA and they have not proved an impediment to the department's ability to carry out its mission." Eric Wagner, *VA is selectively enforcing Trump's order stripping workers of union rights*, Government Executive (April 18, 2024), https://www.govexec.com/workforce/2025/04/va-selectively-enforcing-trumps-order-stripping-workers-union-rights/404694/. Mr. Kasperowicz further stated that "AFGE, NAGE, NNU and SEIU by contrast are using their authority under the [FSLMRS] to broadly frustrate the [Trump] administration's ability to manage the agency." *Id*. These statements made clear that the Secretary's April 11 Order was not meant to meaningfully determine whether Chapter 71 could be applied to the VA as they articulated no bases as to why the "ability to manage the [VA]" implicates national security requirements and considerations. *See id*. Rather, the statements demonstrate that the April 11 Order was intended to reward unions that acquiesce to the Trump Administration's agenda for the VA and to punish unions that oppose it.

**F.    Secretary Collins terminates the Master Agreement.**

72.    The VA did not terminate the Master Agreement in April 2025. Following issuance of EO 14251, NVAC's Master Agreement remained in place and continued to obligate the VA to provide safeguards and protections to NVAC-represented employees.

73.    On August 6, 2025, the Secretary announced that he was unilaterally terminating the Master Agreement, including "any amendments, local supplemental agreements, and memoranda of understanding at all levels with NVAC/AFGE for all VA bargaining unit employees." Exhibit C. The August 6 Termination Letters stated that "VA no longer recognize[d] NVAC/AFGE as the exclusive representative" for the nearly 300,000 VA bargaining unit employees "effective August 6, 2025." *Id*. On that same date, the Secretary also took action to terminate collective bargaining agreements between the VA and the National Association of Government Employees; National Federation of Federal Employees; National Nurses Organizing Committee/National Nurses United; and the Service Employees International Union. [11]

---

[11] *VA Terminates Union Contracts for Most Bargaining-Unit Employees*, VA News (August 6,

22

3379461

74.    At that time, the VA did not terminate collective bargaining agreements or rights for those unions listed in the April 11 Order.

75.    The VA's implementation of EO 14251 was arbitrary and capricious.  Section 7103 permits the President to issue orders excluding an "agency" or "subdivision thereof" from the coverage of Chapter 71, and Section 4 of EO 14251 grants the Secretary delegated authority to exempt agency "subdivisions."  Yet, in combination, the August 6 Termination, the related actions that the Secretary took on August 6, 2025, against other unions, and the April 11 Order, did not make classifications about the VA as a whole or about any "subdivision" of the agency.  For example, the VA's hospitals and medical centers are organized within the Veterans Health Administration, which is an agency subdivision.  But rather than granting Chapter 71 coverage to all (or no) employees within a particular subdivision, such as the Veterans Health Administration, the VA implemented EO 14251 in a manner that arbitrarily treats similarly situated VA workers differently based on their union affiliation.

76.    The agency's initial focus on specific unions, rather than agency subdivisions, arbitrarily and impermissibly denied collective bargaining rights to certain VA employees, while other VA employees with similar job descriptions and responsibilities retained their bargaining rights.  Take, for example, the Providence Veterans Center and Providence VA Medical Center, which are located less than 10 miles apart and which are both within the Providence VA Health Care System, part of the Veterans Health Administration subdivision.  Psychologists and program support analysts at the Providence Veterans Center are represented by Local 2035, which was not exempted by the April 11 Order.  However, psychology technicians – who provide support services to psychologists – and program support assistants, registered nurses,

---

2025 https://news.va.gov/press-room/va-terminates-union-contracts-for-most-bargaining-unit-employees/,  (announcing termination of collective bargaining agreements for: National Veterans Affairs Council (AFGE/NVAC); National Association of Government Employees (NAGE); National Federation of Federal Employees (NFFE); National Nurses Organizing Committee/National Nurses United (NNOC/NNU); and the Service Employees International Union (SEIU)).

3379461

**SA024**

nursing assistants, medical technologists, and others at the Providence VA Medical Center are represented by the Laborers International Union of North America (LiUNA), which was exempted by the April 11 Order. Thus, as of August 6, when the Secretary ordered the Termination, VA psychology technicians in Rhode Island continued to enjoy Chapter 71 rights while VA psychologists in Rhode Island did not.

77.    Even within the same medical center, bargaining unit employees performing similar work were treated differently by the VA. For example, at the Coatesville VA Medical Center (CVMC) in Coatesville, PA, some employees are represented by Teamsters Local 115 (which the VA has exempted from EO 14251), and some employees are represented by AFGE Local 310 (not exempted). Employees represented by Teamsters Local 115 occupy the same or similar positions and have virtually indistinguishable job descriptions and responsibilities at CVMC compared to employees represented by AFGE Local 310. Teamsters Local 115 represents registered nurses at this medical center, whereas AFGE Local 310 represents, among others, nurse practitioners, physical assistants, social workers, and psychologists. VA employees represented by Teamsters Local 115 work together on the same patient care teams and, often, in the same departments, including medical surgery and mental health, as employees represented by AFGE Local 310. Yet, without justification, in August, the VA implemented EO 14251 to preserve collective bargaining rights for the employees represented by the Teamsters Local 115, and not for the employees represented by AFGE Local 310.

78.    Furthermore, the VA implemented EO 14251 in a manner that failed to comply with the plain text of Section 2 of the EO. Section 2 of EO 14251 provides that "Notwithstanding the forgoing," i.e., the withdrawal of Chapter 71 coverage, "nothing in this section shall exempt from the coverage of Chapter 71 of title 5, United States Code: (a) the immediate, local employing offices of any agency police officers, security guards, or firefighters, provided that this exclusion does not apply to the Bureau of Prisons."

79.    The August 6 Termination failed to correctly implement this exemption. Within the Veterans Health Administration (VHA), the VA police force is organized at the local, facility

24

3379461

SA025

level.  The command structure is established so that individual police officers report to facility police chiefs, and each police chief in turn, reports to the local medical facility director.  The "local employing office" of these police officers is therefore the local medical facility, which also employs bargaining unit employees in many occupations other than police officer, firefighter, or security guard.  Yet, on their face, the August 6 Termination Letters claim to only exempt "police officers, firefighters, and security guards represented by AFGE" from the bargaining unit employees whose contracts were terminated, on the basis that "EO 14251 exempted police officers, firefighters, and security guards from its coverage."  Exhibit C. Internal VA memoranda issued by Secretary Collins further confirm the Secretary's intent to exempt three positions (*i.e.*, police officers, firefighters, and security guards) from EO 14251.[12] A copy of this memo is attached hereto as **Exhibit E**.

80.    However, EO 14251 did not merely exempt these three *positions* or give the Secretary authority to do so.  Rather, it exempted "*the immediate, local employing offices* of any agency police officers, security guards, or firefighters." EO 14251 at § 2 (emphasis added).  The VA's implementation of EO 14251 ignores the language about "immediate, local employing offices."  Indeed, at VA medical centers across the country, bargaining unit members of the *same* AFGE local union are divided into two groups—police officers who kept their collective bargaining rights and non-police officers who lost their rights—because of the VA's failure to implement Section 2 according to its plain meaning.

81.    When it publicly announced its termination of the Master Agreement, the VA emphasized NVAC's advocacy as a reason why its members were losing their collective bargaining rights.

82.    For example, VA claimed that: "AFGE worked hand-in-hand with the Biden Administration to reinstate more than 100 former employees fired for misconduct during the first

---

[12] Memo of Secretary Collins, *Implementation of Executive Order (EO) 14251: Exclusions from Federal Labor-Management Relations Programs (Exclusions) (VIEWS 13530892)*, Dep't of Veterans Affairs (Aug. 6, 2025).

**SA026**

Trump Administration and pay nearly $134 million to some 1,700 former VA employees who were fired for misconduct during President Trump's first term." *VA Terminates Union Contracts for Most Bargaining-Unit Employees*, VA News (August 6, 2025), https://news.va.gov/press-room/va-terminates-union-contracts-for-most-bargaining-unit-employees/.    The VA also highlighted AFGE's opposition to the 2018 MISSION Act signed into law during President Trump's first term.

83.    The VA also claimed that the termination of the Master Agreement would save administrative "cost[s]" such as "lost rent and expenses for union bosses' government phones and computer equipment." *VA Terminates Union Contracts for Most Bargaining-Unit Employees*, VA News (August 6, 2025), https://news.va.gov/press-room/va-terminates-union-contracts-for-most-bargaining-unit-employees/.

84.    The August 6 Termination stripped more than 300,000 AFGE bargaining unit employees represented by NVAC of critical workplace rights and benefits, inflicting immediate and devastating consequences on VA workers nationwide.

85.    Without contractual safeguards on work schedules, management may now unilaterally impose overtime, shift rotations, and schedule changes; deny rest breaks; and assign undesirable hours or shift assignments with no meaningful check or procedural safeguards like those negotiated in the Master Agreement, such as advance notice or consideration of extenuating circumstances.  Alternative, compressed, and flexible work schedules are being unilaterally terminated without advance notice.  Similarly, without negotiated leave provisions, NVAC-represented employees have lost important procedural protections, such as the ability to swap shifts with one another, challenge arbitrary denials, or challenge cancellations of leave.  And without enforceable health and safety provisions, employees face more hazardous conditions, less accountability, and an increased risk of injury and illness in the workplace.

86.    NVAC-represented employees no longer have the benefit of contractual entitlements to union representation and consultation rights during investigatory examinations where they are compelled to answer questions under the threat of discipline and termination.  VA

26

3379461

officials are issuing disciplinary action to employees without advance notice and an opportunity to respond to the charges and evidence compiled against them. Once disciplinary action is issued to employees, their appeal options no longer include an opportunity to file a grievance through the negotiated procedure and proceed to binding arbitration. Instead, NVAC-represented employees are often left with no recourse to challenge personnel actions before a neutral, third party outside of the VA. For non-adverse actions, statutory appeal procedures are only available on limited grounds to employees alleging discrimination or whistleblower retaliation who can file appeals with the Equal Employment Opportunity Commission or Office of Special Counsel, respectively.

### G.    The Secretary's subsequent actions.

87.    On August 28, 2025, President Trump issued Executive Order 14343 (Further Exclusions Order) that determined that at least six additional agencies or subdivisions should be excluded from FSLMRS and denied collective bargaining rights to the Patent and Trademark Office, National Weather Service, United States Agency for Global Media, and others. *See* Further Exclusions Order § 2. A copy of the Further Exclusions Order is attached hereto as **Exhibit F**. The Further Exclusions Order also extended the deadline for Secretary Collins to exempt VA subdivisions from the original EO 14251's scope, thus permitting an additional opportunity to amend the April 11 Order and rectify its deficiencies. Secretary Collins again chose not to consult with AFGE or its Councils or Affiliates as to whether the April 11 Order should be amended. Instead, he chose to do nothing.

88.    On November 7, 2025, only three days after NVAC filed this lawsuit and one day after being served with the initial complaint, the Secretary issued a new order rescinding his April 11 Order (November 7 Rescission). As before, the Secretary provided no reasonable explanation for this change of direction. Instead, Secretary Collins simply stated that "[h]aving further considered the delegation of authority provision under Section 4 of EO 14251 and the statutory authority under 5 U.S.C. 7103(b)(1), VA's order of suspension . . . is hereby rescinded." A copy of the November 7 Rescission is attached hereto as **Exhibit G**.

27

Notwithstanding that the Secretary's authority to act under Section 4 of EO 14251 had expired and that Section 4 authorized the Secretary to act only when consistent with national-security requirements, the Secretary offered no explanation for the November 7 Rescission, which is obviously litigation-inspired conduct.

### CLAIMS FOR RELIEF
### COUNT 1:
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### (Against All Defendants)

89.    Plaintiffs incorporate paragraphs 1 through 88 above by reference as if fully set forth herein.

90.    Under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

91.    The Termination is a final agency action.

92.    The Termination is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law (as prohibited by § 706(2)(A)) for several reasons. *First*, the Termination lacks any written rationale. Congress wrote Section 7103(b) to require the President to make two specific findings: (1) that an agency or subdivision has a primary function intelligence, counter-intelligence, investigative or national security work, and (2) that Chapter 71 could not be applied to that agency or subdivision in a manner consistent with national security requirements and considerations. EO 14251 delegated to Secretary Collins the authority to determine whether Chapter 71 could be applied to certain subdivisions consistently with national security requirements and considerations. But Secretary Collins did not make that determination in exercising his authority under EO 14251. Indeed, the Secretary's April 11 Order offers no explanation for why he exercised his Section 4 authority on behalf of some unions but not others, leaving courts and the public without any basis to understand his reasoning.

3379461

SA029

93.     *Second*, the agency initially selected **unions** to be inside or outside of Chapter 71's coverage.  This was not authorized by EO 14251 or Section 7103, which permits Chapter 71 classifications to occur at the agency or agency "subdivision" level, not by individual unions.

94.     *Third*, Defendants failed to follow the plain text of Section 2 of EO 14251, which states that "nothing in this section shall exempt from the coverage of Chapter 71 of title 5, United States Code: (a) the immediate, local employing offices of any agency police officers, security guards, or firefighters."  The Termination purports to exempt from Chapter 71's coverage hundreds of thousands of NVAC-represented employees who work at the "immediate, local employing offices" of VA police officers, security guards, or firefighters.  The Secretary acted in excess of his delegated authority by misinterpreting Section 2 to apply only to employees occupying the positions of police officers, security guards, and firefighters rather than to the "immediate, local employing offices" of such positions.

95.     *Fourth*, at the time it was ordered, the Termination selected which unions should retain their collective bargaining rights based on their political activity and based on the purported administrative "costs" of complying with collective bargaining agreements.  This determination was not in accordance with Section 7103, which requires that such determinations be made on the basis of national security requirements and considerations, not upon the Secretary's political aims.

96.     *Fifth*, at the time it was ordered, the Termination granted some VA employees Chapter 71 rights while depriving other VA employees Chapter 71 rights, even where differently-treated employees work at the same VA facility, or in substantially similar roles.  These classifications were arbitrary and capricious themselves, and they are evidence that the Termination was ordered not on the basis of whether Chapter 71 could be "applied . . . in a manner consistent with national security requirements and considerations," but rather that the Termination reflected retaliation and political animus.

97.     *Sixth*, the Termination is inconsistent with OPM Guidance in effect at that time instructing agencies to refrain from terminating collective bargaining agreements until the conclusion of litigation over EO 14251.

3379461

**SA030**

98.    The Secretary's November 7 Rescission demonstrates the capricious nature of Defendants' actions.  In the April 11 Suspension, the Secretary claimed that he considered national security. Yet, three days after Plaintiffs filed their initial complaint, which challenged the April 11 Order, the Secretary rescinded it, stating merely that he had "further considered the delegation of authority provision under Section 4 of EO 14251 and the statutory authority under 5 U.S.C. 7103(b)(1)."  The Secretary does not attempt to explain how providing Chapter 71 coverage to the previously exempted unions and their represented employees suddenly implicates national security concerns, nor could the Secretary provide any such explanation, given that in April he specifically certified that those unions and the VA employees they represent could continue to bargain collectively consistent with national security considerations.

<div align="center">

**COUNT 2:**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**(Against All Defendants)**

</div>

99.    Plaintiffs incorporate paragraphs 1 through 98 above by reference as if fully set forth herein.

100.    Under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (B) contrary to constitutional right, power, privilege, or immunity."

101.    The Termination violates the First Amendment in contravention of § 706(2)(B).

102.    *First*, the Termination is unconstitutional retaliation.  The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech.  The government retaliates in violation of the First Amendment when it takes an adverse action, sufficient to chill a person of ordinary firmness, against a person for their protected expression.

103.    Defendants acted because of NVAC's advocacy, litigation, and speech and because of Plaintiffs' association with AFGE and its advocacy, litigation, and speech.  This violates the First Amendment's prohibition on government retaliation for engaging in speech that the

<div align="center">30</div>

3379461

<div align="right">**SA031**</div>

government disfavors.  NVAC and AFGE engage in advocacy in support of its union members and represented employees, which has drawn the ire of the VA and the Trump Administration, including by filing several lawsuits protecting its members' and represented employees' interests from the Trump Administration's assault on the federal workforce.  NVAC has filed several national level grievances against the VA, including more than 20 in 2025.  In 2025, NVAC has submitted more than 20 demands to engage in mid-term bargaining including on topics like employee classification consistency, OPM's "fork in the road" email concerning a deferred resignation option for federal employees, and realignment of VA departments.  NVAC also opposed the VA Accountability Act signed into law by President Trump in 2017, filed two related national grievances, and engaged in litigation resulting with a settlement with the VA in 2023 under the Biden Administration.  NVAC and AFGE also jointly lobbied members of Congress in opposition to the 2018 VA MISSION Act.  AFGE and other organizations have created an online clearing house called "Civil Service Strong" that provides best practices and resources for federal workers trying to understand and exercise their rights.  AFGE has also held town halls, rallies, and engaged in educational and legislative efforts in Congress.

104.    Secretary Collins and the VA terminated the Master Agreement to retaliate against NVAC for protected First Amendment activity.  The Termination—which scrapped years of painstaking negotiation and eliminated a myriad of hard-bargained for rights and protections—would chill a person of ordinary firmness from engaging in speech opposing the Trump Administration.

105.    Secretary Collins and the VA terminated the Master Agreement to punish Plaintiffs' speech and expressive associations. The VA has said explicitly in the Texas Action that it is concerned with "[union]s hostile to the President's Agenda," and it identified those "hostile" initiatives as including AFGE's attempts to engage in protected petitioning and advocacy activity. The VA justified the Termination by explaining that exempted unions had "posed no or minimal hindrance to VA operations" in part because they "have filed no or few grievances against VA"

31

SA032

(even though the Secretary later acted to withdraw Chapter 71 coverage even from those unions it intended to favor).

106. *Second*, the Termination is unconstitutional viewpoint discrimination. The government must abstain from regulating speech based on content—when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. Viewpoint discrimination is an egregious form of content-based regulation, is presumptively unconstitutional, and may be justified only if the government provides that the regulation is narrowly tailored to serve compelling state interests.

107. The Termination violates the First Amendment's prohibition on viewpoint discrimination. Plaintiffs engage in protected expression and expressive association. The VA and Secretary Collins seek to punish Plaintiffs because Defendants disagree with their viewpoint. Defendants have openly stated their view that NVAC is "hostile" to the "President's ability to oversee the Executive Branch" and seek to "limit his authority to oversee agents executing and implementing initiatives." Defendants have identified NVAC and AFGE as "unions that oppose [the Trump] administration's agenda" and that are "hostile to the President's agenda." In particular, the VA and Secretary Collins are concerned about AFGE's litigation and advocacy efforts against President Trump. Defendants' reasons for the Termination include NVAC's and AFGE's opposition to legislation and "hand-in-hand" work with the Biden Administration resolving litigation and grievances over terminations of VA employees pursuant to the VA Accountability Act.[13] Defendants cannot articulate a compelling government interest for the classifications they have made, nor can they show that their actions are narrowly tailored.

108. *Third*, the Termination violates the First Amendment's right to expressive association. The First Amendment protects the right to associate with others in pursuit of a wide variety of political, social, and economic ends. The government may not punish public employees,

---

[13] *VA Terminates Union Contracts for Most Bargaining-Unit Employees*, VA News (August 6, 2025) https://news.va.gov/press-room/va-terminates-union-contracts-for-most-bargaining-unit-employees/.

3379461

**SA033**

through employment decisions, withholding of workplace benefits or imposition of inconveniences, or otherwise, on the basis of their political beliefs and associations absent action that is narrowly tailored to serve a compelling state interest.

109.    The Termination violates Plaintiffs' and their represented employees' rights to expressive association.  Plaintiffs and their represented employees associate with each other in furtherance of political, social, and economic goals; they also associate with AFGE for those same purposes.  The Termination severs the bonds between those members and their union and cripples NVAC's ability to effectively advocate with the VA for the contractual rights of its represented employees.  Defendants also eliminated any official time or physical space NVAC members or represented employees could use to coordinate union activities, gutted procedural protections governing vacations and paid time off, and revoked family and medical leave options on the basis of their associations with NVAC and AFGE.  Furthermore, Defendants punish Plaintiffs for NVAC's work with other unions and NVAC's petitions, advocacy to the public, Congress, and Trump Administration.  Defendants further seek to penalize Plaintiffs for their association with AFGE and AFGE's efforts to coalition build, to create its "Civil Service Strong" clearinghouse, to persuade and educate the public and members of Congress, and to engage in petitions.  As discussed, Defendants fail to provide any compelling government interests narrowly tailored to justify these burdens.

110.    *Fourth*, the Termination violates the First Amendment's right to petition.  The Petition Clause of the First Amendment protects the rights of individuals to appeal to courts and other forums established by the government.  The government must not significantly impair an entity's ability to approach any department of the government including administrative agencies and courts absent a substantial relation between that impairment and a sufficiently important government interest.

111.    The Termination significantly impairs Plaintiffs' right to petition the government, including bargaining with the VA over pay and work conditions and participating in certain grievance procedures.  Defendants also seek to punish Plaintiffs for bringing litigation in court

33

3379461

**SA034**

against the Trump Administration.  Further, Defendants' intended effect is to eliminate NVAC, which will have the obvious knock-on effect of chilling the ability of individual employees to petition the government in similar ways on matters of public concern.  Defendants offer no important government interest as justification for this impairment, let alone one with substantial relation to some purported need for the impairment.

## COUNT 3:
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C)
### (Against All Defendants)

112.    Plaintiffs incorporate paragraphs 1 through 111 above by reference as if fully set forth herein.

113.    Under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be. . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

114.    The Secretary exceeded his statutory authority by issuing the Termination.  The Termination retained NVAC and its represented employees from exclusion from Chapter 71 coverage by making union-level classifications, which is not authorized. Instead, Section 7103 only permits Chapter 71 classifications at the level of the "agency" or the "agency subdivision."

## COUNT 4:
### Violation of the First Amendment
### (Against All Defendants)

115.    Plaintiffs incorporate paragraphs 1 through 114 above by reference as if fully set forth herein.

116.    Separate and apart from the APA, 5 U.S.C. § 706(2), Defendants violate the First Amendment of the Constitution for the same reasons discussed in paragraphs 99-111 above, which Plaintiffs incorporate as fully set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter orders:

3379461

**SA035**

**A.**     Declaring that the August 6 Termination of NVAC's Master Agreement is arbitrary and capricious, in excess of statutory authority, violates the First Amendment's prohibitions on retaliation, viewpoint discrimination, right to petition, and freedom of association; and is null and void;

**B.**     Preliminarily and permanently enjoining Defendants and all their officers, employees, contractors, and agents from implementing, enforcing, and/or taking any action to effectuate the August 6 Termination;

**C.**     Staying, postponing, or preliminarily setting aside the August 6 Termination pursuant to 5 U.S.C. § 705, and permanently doing the same pursuant to 5 U.S.C. § 706;

**D.**     Directing Defendants to issue guidance to all their officers, employees, contractors, and agents to rescind the termination of the Master Agreement and to abide by its terms;

**E.**     Awarding Plaintiffs reasonable attorney fees and costs incurred;

**F.**     Providing such further relief as the Court may deem just and appropriate.

Respectfully submitted,

LAW OFFICE OF CARLY B. IAFRATE, PC

Dated: November 25, 2025

By:    */s/ Carly Beauvais Iafrate*

35

3379461

**SA036**

Carly Beauvais Iafrate, #6343
Law Office of Carly B. Iafrate, PC
408 Broadway, 1st Fl.
Providence, RI 02909
(401) 421-0065
ciafrate@verizon.net

Dated: November 25, 2025          By:     */s/ Travis Silva*
Brook Dooley *(pro hac vice)*
Travis Silva *(pro hac vice)*
Taylor Reeves *(pro hac vice)*
JiLon Li *(pro hac vice)*
Alexandra Wheeler *(pro hac vice)*
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
BDooley@keker.com
TSilva@keker.com
TReeves@keker.com
JLi@keker.com
AWheeler@keker.com


*Attorneys for American Federation of Government Employees National VA Council and American Federation of Government Employees Local 2305*

36

3379461

**SA037**

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2025, I electronically filed this amended complaint for declaratory and injunctive relief, and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

I further certify that I will serve by certified mail a copy of this amended complaint for declaratory and injunctive relief and all supporting papers on the individuals listed below (see Fed. R. Civ. P. 4(i)), and that such mailing is intended to be completed on November 26, 2025.

1.      U.S. Department of Veterans Affairs, Office of the General Counsel (022D), 810 Vermont Avenue N.W. Washington, D.C. 20420.

2.      Douglas Collins, in his official capacity as Secretary of the Department of Veterans Affairs, U.S. Department of Veterans Affairs Office of the General Counsel (022D), 810 Vermont Avenue N.W. Washington, D.C. 20420.

3.      Civil Process Clerk, Office of the United States Attorney, District of Rhode Island, One Financial Plaza, 17th Floor Providence, RI 02903.

*/s/ Jessica Landers*

3379461

**SA038**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305<br><br>    *Plaintiffs,*<br><br>    **v.**<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and<br><br>DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs<br><br>    *Defendants.* | **Case No. 25-cv-00583-MRD-PAS** |

## <u>DECLARATION OF WILLIAM WETMORE</u>

1

SA039

I, William Wetmore, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction. I am over 18 years of age, and I have personal knowledge of the facts set forth herein, and if called to testify as a witness thereto under oath, I could competently do so.

2.      I am a retired federal employee with 40 years of federal service. Prior to my retirement in 2020, I was employed as an attorney at the United States Department of Veterans Affairs ("VA") Board of Veterans Appeals at VA Central Office in Washington, DC.

3.      I am the Third Executive Vice President for the American Federation of Government Employees, AFL-CIO National Veterans Affairs Council ("NVAC"). I have served in this position since 2003. Previously, I served as an NVAC National Representative from 1998 to 2003.

4.      I am also the Chairperson of the NVAC Grievance and Arbitration Committee. I have been a member of the NVAC Grievance and Arbitration Committee in various capacities since 2003.

5.      I am also the Treasurer of AFGE Local 17 at VA Central Office. I have served in this position and others, such as President and First Vice President, since 1992.

*NVAC's purpose and mission*

6.      Founded in 1932 by federal employees seeking to create a right to fair employment and pay during the Great Depression, AFGE is the largest union of federal workers, representing approximately 820,000 federal civilian and D.C. Government employees across more than 900 local unions. AFGE members work across the federal government; the departments and agencies with the highest memberships are the VA, the Social Security Administration, the Department of Defense, and the Department of Homeland Security.

7.      More than 40 years ago, VA employees began organizing under the AFGE umbrella. Today, NVAC is an independent bargaining council of AFGE. AFGE delegated its bargaining authority on behalf of VA employees to NVAC, providing the VA with a single,

2

nationwide counterparty that bargains on behalf of AFGE-represented VA employees.  Within the VA, the Veterans Health Administration's hospitals and clinics employ the largest number of NVAC-represented workers.

8.      NVAC represents nationwide bargaining units covering approximately 300,000 professional and non-professional employees who work at nearly every VA administration and component, including the Veterans Health Administration, Veterans Benefits Administration, National Cemetery Administration (i.e. the principal subdivisions of the VA) and operational components such as, but not limited to, the Office of Information & Technology, Office of Finance, Office of Emergency Management, and the VA History Office. The largest number of NVAC-represented workers are employed at hospitals and clinics under the Veterans Health Administration; these employees include physicians, dentists, registered nurses, pharmacists, physical and occupational therapists, housekeepers, engineers, custodians, cooks, and numerous other healthcare and support staff. NVAC-represented workers in other VA administrations and components include, for example, cemetery workers, attorneys, gardeners, archivists, claim processors, clerical workers, IT professionals, bookkeepers, and numerous other civil servants.

9.      NVAC's mission is to support and advocate for the federal employees who take care of our nation's veterans, including working for a safe and fair workplace for all members. Nearly 40 percent of NVAC's members are themselves veterans. As the exclusive bargaining representative of these workers, NVAC provides many services to bargaining unit employees. Core functions of NVAC include working in a mutually respectful partnership with the VA to secure a fair and reasonable master collective bargaining agreement; negotiating implementation of new policies during the term of the collective bargaining agreement between NVAC and the VA, which is called the "Master Agreement"; filing and prosecuting grievances (locally and nationally) against the agency to enforce the terms and conditions of the Master Agreement, federal law, regulations, and VA policies; representing workers in arbitration and before peer review boards; participating in safety inspections and negotiating safety abatements; and providing guidance and support to members seeking to access benefits or other government

**SA041**

processes, such as accessing benefits under the Uniformed Services Employment and Reemployment Rights Act of 1994  USERRA.

10.    There are approximately 170 local unions representing AFGE bargaining unit employees at the VA. These 170 local unions fall under the representational jurisdiction of the NVAC and are covered by the 2023 Master Collective Bargaining Agreement.

11.    Out of the total number of NVAC-represented employees, roughly 3,000 are employed as firefighters, police officers, and security guards.  There are approximately 2,500 VA police officers, most of whom work within the Veterans Health Administration, protecting patients, visitors, and staff at VA medical centers and community clinics around the country. Within the Veterans Health Administration, the VA police force is generally organized at the local, facility level. The command structure is established so that individual police officers report to facility police chiefs, and each police chief in turn, reports to the local medical facility director.

### *Master Agreement*

12.    Through my position, I am familiar with the 2023 Master Collective Bargaining Agreement between the VA and NVAC. I served on the NVAC negotiating teams for the 2011 Master Agreement and 2023 Master Agreement. I am a signatory to both agreements. The 2011 Master Agreement negotiations lasted nearly 8 years. The 2023 Master Agreement negotiations lasted more than 6 years and covers the largest consolidated bargaining unit of federal employees, not only in the VA but in any agency or department within the Executive Branch. I am also familiar with the harm inflicted on VA employees as a consequence of the VA's August 2025 termination of the Master Agreement and its decision not to recognize NVAC as the employees' exclusive representative.

13.    The current Master Agreement went into effect on August 8, 2023.  The Master Agreement has a term of three years followed by automatic one-year renewals absent a timely notice to reopen.  The 2023 Master Agreement is attached hereto as **Exhibit A.**

14.    The Master Agreement is the product of nearly six years of hard-fought negotiations to safeguard essential rights for NVAC workers.  Negotiations for the 2023 Master

**SA042**

Agreement commenced in December 2017 when, in the first year of the first Trump Administration, then-VA Secretary David Shulkin chose to reopen and renegotiate the then-current 2011 master collective bargaining agreement. These negotiations resulted in NVAC filing more than a dozen national level grievances and unfair labor practices against the VA for engaging in bad faith bargaining.

15.    For example, in 2019, the VA attempted to force upon NVAC certain provisions that would weaken worker protections like employee due process rights. Negotiations came to a standstill when NVAC vigorously opposed, and ultimately succeeded in defeating, these harmful proposals after multiple arbitrators found that the VA's negotiators violated their duty to bargain in good faith. After renewed negotiations began in 2022, the VA's continued intransigence led a federal arbitrator to determine that it was, yet again, bargaining in bad faith. Following this finding, the parties finally reached agreement on the current Master Agreement in August 2023.

16.    The Master Agreement contains numerous substantive terms negotiated on behalf of VA employees that cannot be unilaterally changed by the VA without first bargaining in good faith with the union. These include terms that are specifically important to VA employees in their day-to-day work, such as guaranteed time off between shifts, mandatory lunch breaks, mandatory rest periods for employees working overtime, ninety-day performance improvement plans, "temporary promotion" pay for employees assigned to perform higher-graded duties, and a long list of detailed provisions guaranteeing that employees will be provided with adequate safety equipment and a safe working environment. The Master Agreement also provides enforcement mechanisms to ensure that the VA complies with those provisions, such as union notification requirements, a request-for-information procedure that allows local unions access to important safety-related records, and a negotiated grievance and arbitration procedure should the VA fail to meet its obligations under the Master Agreement, federal law, government-wide regulation, or VA policy.

17.    More specifically, the current Master Agreement provides, for example:

5

**SA043**

i)      **Hiring Procedures:** The Master Agreement establishes fair application and selection procedures, as well as guidance related to the use of personnel records.

ii)      **Working Hours:** The Master Agreement mandates rest breaks, guaranteed compensation for and equitable limitations on overtime work, protocols for alternative work schedules, and robust leave protections (e.g., sick leave, bereavement leave, jury duty, etc.).

iii)      **Health and Safety Requirements:** The Master Agreement sets forth clear and detailed requirements for the VA to maintain safe and healthful workplaces. It also provides for safety trainings, mandatory reporting of unsafe working conditions, protections against retaliation for such reporting, institutional transparency and accountability with respect to workplace safety documentation (e.g., injury logs), and mandatory facility level violence prevention plans.

iv)      **Due Process Rights:** The Master Agreement sets forth detailed and efficient procedures and disciplinary protocols, including for example a requirement that employees be provided with advance notice and an opportunity to review evidence and respond to proposed disciplinary action, a 90-day opportunity for employees to address performance concerns using a performance improvement plan developed in consultation with local unions before the VA can take adverse action based on unacceptable performance, and a guarantee that disciplinary action be timely and based only on just and sufficient cause.

v)      **Grievance and Arbitration Rights:** The Master Agreement contains a negotiated grievance procedure including the right to proceed to binding arbitration before a neutral third party in matters affecting conditions of employment, including for example disciplinary action, pay, leave, overtime, work schedules, and more.

vi)      **Family Leave Benefits:** The Master Agreement grants employees with certain benefits that are more generous than those required by law, including for example additional four weeks of unpaid maternity and paternity leave (in addition to the twelve provided

6

**SA044**

for by federal law) and the ability to invoke benefits under the Family and Medical Leave Act to care for the parents of a spouse with a serious health condition.

### *Grievances and arbitrations*

18.    As Chair of the NVAC Grievance and Arbitration Committee, I direct NVAC's work assessing and prosecuting grievances and arbitrations under the terms of the Master Agreement.  I work with NVAC's national leadership, local unions, subject matter experts, and represented employees to assess and determine whether, and if so, how NVAC will provide representation in all manner of legal challenges to the conduct of the VA and its agents.

19.    NVAC files grievances across a wide and dynamic range of issues that include, for example, legal entitlements governing medical care and services, VA staffing and hiring requirements, mandated training and education, licensure and certification requirements, employee due process rights and collective bargaining rights, and much more.

20.    NVAC has filed more than 20 national level grievances in 2025. Nine of NVAC's 2025 grievances were filed before April 11. They are:

i)    NG-1/29/2025: "National Grievance against the Department of Veterans Affairs for bypassing and failing to bargain in good faith with the Union concerning 'deferred resignation' offers"

ii)    NG-2/3/2025: "National Grievance against the Department of Veterans Affairs for Failing to Engage in the Interactive Process and Summarily Delaying Employees' Requests for Reasonable Accommodation to Telework"

iii)    NG-2/7/2025: "Second National Grievance against the Department of Veterans Affairs for further violations of the Master Agreement and federal law concerning the 'deferred resignation' program"

iv)    NG-2/10/2025: "Fourth National Grievance against the Department of Veterans Affairs for failure to comply with the Cohen Award and violation of the Settlement Agreement, effective on July 28, 2023, resolving disputes arising out of NG 08-01-2017, which

7

concerned VA's failure to fulfill its bargaining obligations prior to taking actions under 38 U.S.C. § 714"

v)    NG-2/28/2025: "National Grievance against the Department of Veterans Affairs for repudiating Article 20 of the Master Agreement by issuing the 'Return to In-Person Work' directive and for failing to bargain in good faith with the Union concerning its unilateral termination of telework and remote work arrangements"

vi)    NG-3/4/2025: "National Grievance against the Department of Veterans Affairs for failure to comply with the Darby Award"

vii)    NG-3/10/2025: "National Grievance against the Department of Veterans Affairs for Conducting an Unlawful Reduction in Force (RIF) and Committing Violations of the Master Agreement, Applicable Regulations, and Federal Law"

viii)    NG-3/12/2025: "National Grievance against the Department of Veterans Affairs for Implementing the VA Flag Display Policy in Violation of Federal Law and the MCBA"

ix)    NG-3/25/2025: "National Grievance against the Department of Veterans Affairs for bypassing the Union when it directed employees to respond to emails from OPM titled, 'What did you do last week?' and for violating applicable authorities by requiring employees to respond while in a non-duty status and/or without proper compensation"

21.    These grievances challenge several Trump Administration initiatives, including: the VA's implementation of the Office of Personnel Management's "Fork in the Road" initiative and deferred resignation program; the VA's unilateral termination of telework and remote work arrangements; the VA's implementation of an unlawful reduction in force; the VA's continued refusal to comply with settlement agreements that resolved grievances under the VA Accountability Act; the VA's implementation of a "flag display policy" limiting the display of certain flags at the VA; the VA's directive to employees to respond to email by OPM asking for five bullet points of what they accomplished at work during the prior week.

**SA046**

22.     AFGE and NVAC have taken other public actions to protect members' interests. For example, in 2025, NVAC submitted more than 20 demands to engage in mid-term bargaining of the 2023 Master Agreement, including on topics like employee classification consistency, deferred resignation for federal employees, and realignment of VA departments.

23.     AFGE and other organizations have also created an online clearing house called "Civil Service Strong" that provides best practices and resources for federal workers trying to understand and exercise their rights.  It has also held town halls, rallies, and engaged in educational and legislative efforts in Congress.

**The VA's termination of the Master Agreement**

24.     On March 27, 2025, President Trump issued Executive Order 14251.  The Executive Order excluded several Cabinet departments and agencies, including virtually the entire Department of Veterans Affairs, from coverage under Chapter 71 of title 5 of the U.S. Code on the basis that it and the other excluded departments and agencies "have as a primary function intelligence, counterintelligence, investigative, or national security work" and that Chapter 71 "cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations.  Exec. Order No. 14251 at § 1(a). However, Section 4 of Executive Order 14251 authorizes the Secretaries of Defense and Veterans Affairs to exempt from the Order "any subdivisions of the departments they supervise" thereby restoring collective bargaining rights to those subdivisions' employees, if they certify that Chapter 71 "can be applied to [specific subdivisions] in a manner consistent with national security requirements and considerations."  Section 4 gave the VA Secretary until April 11 to exercise that authority.

25.     In the run-up to the April 11 deadline, AFGE and NVAC sent letters to Secretary Collins urging him to exempt the entire VA from the Executive Order's scope and explaining how VA employees, including housekeepers, food service workers, mental health professional, and cemetery workers, do not perform national security work as a primary function of their jobs. A true and correct copy of AFGE's March 31, 2025 letter to Secretary Collins is attached hereto

SA047

as **Exhibit B.** A true and correct copy of NVAC's April 2, 2025 letter to Secretary Collins is attached hereto as **Exhibit C.**

26.     On April 11, 2025, Secretary Collins issued an order pursuant to Section 4 of the Executive Order suspending from the EO's coverage seven individual local unions, thereby restoring statutory bargaining rights guaranteed under the FLMRS to only those unions.  Neither the Secretary nor any other VA official consulted with NVAC as to the decision to exclude NVAC from the April 11 order. Neither NVAC nor any AFGE local was exempted from the EO's coverage.

27.     NVAC's Master Agreement remained in place even after the Secretary acted on April 11, 2025.  During this time, the Master Agreement continued to obligate the VA to provide safeguards and protections to NVAC-represented employees.

28.     On August 6, 2025, Secretary Collins sent two letters to AFGE leadership: one to AFGE National President Dr. Everett Kelley, and another to NVAC Council President Alma Lee. A true and correct copy of both letters, which are substantively identical, is attached hereto as **Exhibit D** and **Exhibit E** (the Termination Letters).  The Termination Letters announced that, effective immediately, the Secretary had unilaterally terminated NVAC's Master Agreement, "any amendments, local supplemental agreements, and memoranda of understanding at all levels with AFGE for all VA bargaining unit employees."  Exhibits D and E at 1. The Termination Letters stated that "VA no longer recognize[d] AFGE as the exclusive representative" for the nearly 300,000 VA bargaining unit employees in its membership "effective August 6, 2025."  *Id*.  The Termination Letters excluded from EO 14251's coverage "police officers, firefighters, and security guards represented by AFGE" from the bargaining-unit employees whose contracts were terminated, on the basis that "EO 14251 exempted police officers, firefighters, and security guards from its coverage." *Id*.

29.     An internal memorandum issued by Secretary Collins on August 6, 2025 to Under Secretaries, Assistant Secretaries, and Other Key Officials titled "Implementation of Executive Order (EO) 14251: Exclusions from Federal Labor-Management Relations Programs (Exclusions)

**SA048**

(VIEWS 13530892)" indicates the VA's position that Section 2 of EO 14251 only exempts three positions (i.e., police officers, firefighters, and security guards).  A true and correct copy of the August 6, 2025 internal memorandum is attached hereto as **Exhibit F.**

*Effects of the VA's termination of the Master Agreement*

30.     Without the Master Agreement and the right to collectively bargain, the VA can make unilateral changes to conditions of employment, and the union and represented employees are deprived of the negotiated grievance procedure that allows them to bring complaints about workplace disputes before a neutral third party. Moreover, because the Master Agreement requires that grievances must generally be filed within 30 calendar days of the underlying violation, NVAC and local unions could have no contractual means of filing a grievance under the Master Agreement's procedures for violations outside the 30-day period, even in the scenario where the Master Agreement is later restored, meaning that NVAC and local unions might never have an opportunity to challenge such violations.

31.     As one example, following the August 6 Termination, the VA unilaterally canceled an arbitration based on a grievance filed by AFGE Local 85, which was scheduled to commence on September 30, 2025. The VA had agreed to the September arbitration date in June of 2025, and the dispute had been pending since February 2024. However, on August 11, the VA notified the arbitrator and union representative that "VA is denying the grievance pursuant to EO 14251" and "these arbitration proceedings should cease immediately."  The VA also stated that "you are hereby put on notice that VA will not pay for any arbitration services rendered after August 6, 2025, related to this grievance" and "VA will not participate any further in the arbitration process or abide by any arbitration decision issued after August 6, 2025, related to this grievance." A true and correct copy of the email exchange between the VA, arbitrator, and union representative is attached hereto as **Exhibit G**.

32.     The Master Agreement includes important procedural protections for employees facing discipline. For example, the Master Agreement reinforces VA employees' statutory "*Weingarten* rights," which, upon request, allow a union representative to represent employees in

11

any investigatory examination that the employee reasonably believes could result in disciplinary action. In my experience, the majority of employees who are facing an investigation or disciplinary action avail themselves of their right to representation, which is seen as one of the most important services the union provides.

33.    Moreover, the Master Agreement provides VA employees with access to the negotiated grievance and arbitration procedure to appeal the merits of adverse personnel actions to a neutral third-party arbitrator, which is not available under VA's administrative grievance procedure wherein the VA appoints its own internal "grievance examiner." The Master Agreement obligates VA officials to meet with employees and union representatives to resolve workplace disputes and if they cannot, to proceed to binding arbitration wherein the union provides representation. Statutory appeals to independent agencies like the Equal Employment Opportunity Commission, Office of Special Counsel, and Merit Systems Protection Board are only available in limited circumstances, and even so, are limited in scope and available relief. In short, unless it involves a claim of discrimination or reprisal, VA employees covered by the Title 5 personnel system, including more than 230,000 VA workers represented by AFGE (not including those 80,000 covered by the Title 38 personnel system), can only obtain neutral third-party arbitrator review of the merits of disciplinary action (i.e., admonishments, reprimands, or suspensions of 14 calendar days or less) by utilizing the Master Agreement's negotiated grievance procedure. Likewise, unless it involves a claim of discrimination or reprisal, VA employees covered by the Title 38 personnel system, including more than 80,000 physicians, dentists, registered nurses, physician assistants, optometrists, podiatrists, chiropractors, and expanded-function dental auxiliaries represented by AFGE, can only obtain neutral third-party arbitrator review of the merits of adverse or major adverse actions by utilizing the Master Agreement's negotiated grievance procedure.

34.    While management retains the right to hire, fire, or discipline employees, the Master Agreement provides protections to ensure that employees are afforded the right to union representation, as well as a comprehensive process to respond to proposed discipline and later

12

**SA050**

appeal wrongful discipline to a neutral third-party arbitrator. Now that VA employees no longer have the Master Agreement's protections and access to the negotiated grievance procedure, employees are being deprived of their choice of forum and their right to seek review before a neutral third-party arbitrator.

35.     Additionally, the Master Agreement provides for "official time" consistent with 5 U.S.C. § 7131, which union representatives can use to perform their representational duties during the workday. One concrete benefit of official time is allowing union representatives to resolve payroll-related disputes, which are particularly complex at the VA. The rules governing VA employee pay are extremely nuanced. Frontline employees as well as human resources, payroll, and management officials often misunderstand employee entitlements to shift differentials, premium pay, overtime pay, and hazard pay. The payment of timely and correct compensation also depends on how employees are coded in the various VA human resources and payroll systems, including whether they are eligible for pay entitlements under the Fair Labor Standards Act (FLSA) or those set forth in Title 5 and Title 38 of the U.S. Code. Union representatives at the VA are specially trained to assist employees to recognize and correct complex payroll issues. Union representatives routinely succeed in assisting employees to rectify underpayments, either through making an informal request to responsible human resources, payroll, or management officials, or by pursuing a formal grievance on behalf of individual employees or groups of similarly situated employees. When an underlying payroll error impacts a larger population of VA employees, NVAC may elect to pursue a national level grievance under the Master Agreement on behalf of the bargaining unit. NVAC's national level grievances under the Master Agreement and resulting arbitration awards have resulted in the recovery of hundreds of millions of dollars in back pay in recent years. The VA no longer permits national or local union officials to take official time.

36.     Another major representational duty that union officials perform during official time is advising and representing employees who are facing disciplinary action, such as admonishments, reprimands, suspensions, demotions, and removals from the federal service. Given the administration's stated desire to "swiftly terminate" civil servants it deems to be "poor

SA051

performing employees," I anticipate that there will be an increased demand for the union's services moving forward. Recently, VA unilaterally implemented a number of new workplace rules that will likely lead to increased discipline for employees. This includes rules that impede employees' free speech, such as the so-called "flag policy" that bans most non-military affinity group flags from VA facilities, another rule barring employees from including pronouns or their role as a union representative in VA email signatures, and another rule implementing employee surveillance tools on government equipment. Notably, Article 17, Section 4 of the Master Agreement prohibits the electronic recording of conversations between employees and management officials (such as in discussions about potential discipline) without mutual consent.

I declare under penalty of perjury under the laws of the United States the foregoing is true and correct.  Executed this 25th day of November 2025, in Waldorf, Maryland.

*William Wetmore*

WILLIAM WETMORE

14

**SA052**

# Exhibit A

SA053



**VA** | U.S. Department of Veterans Affairs



Out of Many/**One Union**
AFGE NVAC / AFL-CIO

AFGE **National VA Council**



# Master Agreement Between the Department of Veterans Affairs and the American Federation of Government Employees

# 2023

**August 8, 2023**

**SA054**

Page Intentionally Left Blank

SA055

# Master Agreement Between the Department of Veterans Affairs and the American Federation of Government Employees

# 2023

SA056

Page Intentionally Left Blank

SA057

# Table of Contents

DEDICATION ................................................................................................. 1

PREAMBLE .................................................................................................... 2

**INTRODUCTION**

ARTICLE 1 - RECOGNITION AND COVERAGE ............................................... 3

ARTICLE 2 - GOVERNING LAWS AND REGULATIONS ................................... 6

**LABOR-MANAGEMENT COLLABORATION**

ARTICLE 3 - LABOR-MANAGEMENT COOPERATION ..................................... 7

ARTICLE 4 - LABOR-MANAGEMENT TRAINING .............................................. 10

ARTICLE 5 - LABOR-MANAGEMENT COMMITTEE .......................................... 15

ARTICLE 6 - ALTERNATIVE DISPUTE RESOLUTION ....................................... 16

ARTICLE 7 - QUALITY PROGRAMS ............................................................... 19

APPENDIX  A .............................................................................................. 30

**EMPLOYEE RIGHTS AND PRIVILEGES**

ARTICLE 8 - CHILD CARE ............................................................................. 31

ARTICLE 9 - CLASSIFICATION ..................................................................... 33

ARTICLE 10 - COMPETENCE ........................................................................ 36

ARTICLE 11 - CONTRACTING OUT ............................................................... 37

ARTICLE 12 - DETAILS AND TEMPORARY PROMOTIONS .............................. 38

ARTICLE 13 - REASSIGNMENT, SHIFT CHANGES, AND RELOCATIONS ........ 42

ARTICLE 14 - DISCIPLINE AND ADVERSE ACTION ....................................... 46

ARTICLE 15 - EMPLOYEE ASSISTANCE ....................................................... 50

ARTICLE 16 - EMPLOYEE AWARDS AND RECOGNITION ............................... 52

ARTICLE 17 - EMPLOYEE RIGHTS ............................................................... 56

ARTICLE 18 - EQUAL EMPLOYMENT OPPORTUNITY .................................... 62

ARTICLE 19 - FITNESS FOR DUTY .............................................................. 69

ARTICLE 20 - TELEWORK ........................................................................... 72

ARTICLE 21 - HOURS OF WORK AND OVERTIME ........................................ 81

ARTICLE 22 - INVESTIGATIONS .................................................................. 92

ARTICLE 23 - TITLE 5 MERIT PROMOTION .................................................. 94

ARTICLE 24 - OFFICIAL RECORDS .............................................................. 108

ARTICLE 25 - OFFICIAL TRAVEL ................................................................ 110

ARTICLE 26 - PARKING AND TRANSPORTATION ......................................... 115

ARTICLE 27 - PERFORMANCE APPRAISAL .................................................. 117

ARTICLE 28 - REDUCTION IN FORCE .......................................................... 130

ARTICLE 29 - SAFETY, HEALTH, AND ENVIRONMENT .................................. 137

ARTICLE 30 - OCCUPATIONAL HEALTH ....................................................... 164

ARTICLE 31 - SILENT MONITORING ............................................................ 169

ARTICLE 32 - STAFF LOUNGES .................................................................. 170

ARTICLE 33 - TEMPORARY, PART-TIME, AND PROBATIONARY EMPLOYEES ........ 171

ARTICLE 34 - JOB SHARING ....................................................................... 178

**SA058**

*Employee Rights and Privileges (continued)*

ARTICLE 35 - TIME AND LEAVE ........................................................................................ 180
ARTICLE 36 - TIMELY AND PROPER COMPENSATION ................................................. 199
ARTICLE 37 - TRAINING AND CAREER DEVELOPMENT .............................................. 200
ARTICLE 38 - UNIFORMS ................................................................................................ 203
ARTICLE 39 - UPWARD MOBILITY .................................................................................. 205
ARTICLE 40 - WITHIN-GRADE INCREASES AND PERIODIC STEP INCREASES ..................... 207
ARTICLE 41 - WORKERS' COMPENSATION ................................................................... 213

## UNION RIGHTS AND PRIVILEGES

ARTICLE 42 - AFFILIATIONS ............................................................................................ 218
ARTICLE 43 - GRIEVANCE PROCEDURE ....................................................................... 219
ARTICLE 44 - ARBITRATION ........................................................................................... 225
ARTICLE 45 - DUES WITHHOLDING ............................................................................... 227
ARTICLE 46 - LOCAL SUPPLEMENT .............................................................................. 231
ARTICLE 47 - MID-TERM BARGAINING .......................................................................... 233
ARTICLE 48 - OFFICIAL TIME ......................................................................................... 236
ARTICLE 49 - RIGHTS AND RESPONSIBILITIES .......................................................... 241
ARTICLE 50 - SURVEILLANCE ........................................................................................ 245
ARTICLE 51 - USE OF OFFICIAL FACILITIES ................................................................ 246

## TITLE 38

ARTICLE 52 - TITLE 38 ADVANCEMENT .......................................................................... 251
ARTICLE 53 - CLINICAL RESEARCH .............................................................................. 252
ARTICLE 54 - TITLE 38 NURSE PAY/SURVEY ............................................................... 253
ARTICLE 55 - VHA PHYSICIAN AND DENTIST PAY ...................................................... 255
ARTICLE 56 - TITLE 38 HYBRIDS ................................................................................... 263
ARTICLE 57 - PHYSICAL STANDARDS BOARD ............................................................ 272
ARTICLE 58 - PROFESSIONAL STANDARDS BOARD ................................................... 275
ARTICLE 59 - PROFICIENCY ........................................................................................... 276
ARTICLE 60 - TITLE 38 REPRESENTATION AT BOARDS OR HEARINGS ................... 277
ARTICLE 61 - TITLE 38 VACANCY ANNOUNCEMENTS ................................................ 278
ARTICLE 62 - VETERANS CANTEEN SERVICE ............................................................. 279

## GENERAL PROVISIONS

ARTICLE 63 - RESEARCH GRANTS ................................................................................ 281
ARTICLE 64 - RESEARCH PROGRAMS AND DEMONSTRATION PROJECTS .......................... 282
ARTICLE 65 - WAGE SURVEYS ...................................................................................... 283
ARTICLE 66 - TECHNOLOGY FOR ADMINISTERING, TRACKING, AND MEASURING VBA
WORK ............................................................................................................................... 284
ARTICLE 67 – SKILLS CERTIFICATION .......................................................................... 286

**DURATION OF AGREEMENT** ..................................................................................... **290**

**SIGNATURE PAGE** ...................................................................................................... **291**

**INDEX** .......................................................................................................................... **292**

# DEDICATION

This Agreement is dedicated to the AFGE National VA Council President Alma L. Lee.

As the Council's Chief Negotiator for the 1997, 2011, and 2023 Master Agreements, President Lee has dedicated her career to improving the lives of VA employees and fostering a strong labor-management partnership at the VA.

This Agreement symbolizes VA and AFGE's hard work, dedication, and commitment to the VA and our shared focus on improved outcomes for Veterans.

The negotiators of this Agreement hope it will help to create unity and respect across our great VA.

**SA060**

# PREAMBLE

## Section - 1

This Master Agreement is made between the Department of Veterans Affairs (the Department) and the American Federation of Government Employees (AFGE) National Veterans Affairs Council of Locals (the Union).

## Section - 2

The Department and the Union agree that a constructive and cooperative working relationship between labor and management is essential to achieving the Department's mission and to ensuring a quality work environment for all employees. The parties recognize that this relationship must be built on a solid foundation of trust, mutual respect, and a shared responsibility for organizational success. Therefore, the parties agree to work together using partnership principles, Labor-Management Forums, and the Master Agreement to identify problems and craft solutions, enhance productivity, and deliver the best quality of service to the nation's veterans.

**SA061**

# ARTICLE 1 - RECOGNITION AND COVERAGE

## Section 1 - Exclusive Representative

AFGE is recognized as the sole and exclusive representative for all of those previously certified nonprofessional and professional employees, full-time, part-time, and temporary, in units consolidated and certified by the Federal Labor Relations Authority (FLRA) in Certificate No. 22-08518 (UC), dated February 28, 1980, and any subsequent amendments or certifications. The parties agree that should AFGE request the FLRA to include subsequently organized employees in the consolidated unit, such FLRA certification will not be opposed by the Department if the unit would otherwise be considered an appropriate unit under the law. Upon certification of FLRA, such groupings automatically come under this Agreement.

## Section 2 - AFGE Role

As the sole and exclusive representative, the Union is entitled to act for and to negotiate agreements covering all employees in the bargaining unit. The Union is responsible for representing the interests of all employees in the bargaining unit.

## Section 3 - Employee Representation

A. The Department recognizes that, as the exclusive representative of employees in the bargaining unit, the Union has the right to speak for and to bargain on behalf of the employees it represents. The Department will not bypass the Union by entering into any formal discussions or agreements with other employee organizations or bargaining unit employees concerning all matters affecting personnel policies, practices, or working conditions. The Department will not assist or sponsor any labor organization other than AFGE in any matter related to grievances, collective bargaining, or conditions of employment of employees in the AFGE bargaining unit.

B. Pursuant to 5 USC 7114(a)(2)(A), an exclusive representative of an appropriate unit in an agency shall be given the opportunity to be represented at any formal discussion (including those held with other employee organizations) between one or more representatives of the agency and one or more employees in the unit or their representatives concerning any grievance or any personnel policy or practices or other general condition of employment.

C. The Department's consultations and dealings with other employee organizations shall not assume the character of negotiations concerning conditions of employment in the AFGE bargaining unit.

**SA062**

## Section 4 - Unit Clarification

A.  The Union will be predecisionally involved in bargaining unit determinations for position changes and establishment of new positions. When a position changes, and the parties do not agree over whether the position(s) is/are inside or outside the unit, the parties are encouraged to utilize the Alternate Dispute Resolution (ADR) process. If still unresolved, either party may file a Clarification of Unit (CU) petition with the FLRA. If the position previously has been in the bargaining unit, the employee and/or position will remain in the bargaining unit until a decision is issued on the petition.

B.  If after predecisional involvement, the Department determines that a new, unencumbered position is outside the bargaining unit, the parties are encouraged to first attempt to resolve any disagreements through ADR methods. If no agreement is reached, the Union may file a CU petition through the FLRA.

C.  The Department and the Union are encouraged to mutually decide CU issues and develop a system to communicate these decisions.

## Section 5 - Elections and Extensions of Represented Facilities

A.  Whenever a CU or election petition is filed by either party, the filing party will send copies of the petition to the AFGE National Office at Membership and Organizing Department, 80 F Street, NW, Washington, DC 20001-1583 and to the Department at The Office of Labor-Management Relations (LMR), 810 Vermont Street, NW, Washington, DC 20420.

B.  If employees are drawn from an existing facility and assigned to an unrepresented Community Based Outpatient Clinic (CBOC) (or similar entity) under the administrative control of the originating facility, and AFGE is the exclusive representative of all employees at the originating facility, the Department will not oppose any AFGE petition to represent employees who are assigned to that CBOC.

C.  If an unrepresented CBOC (or similar entity) is staffed by new employees, and is under the administrative control of a facility entirely represented by AFGE, the Department will not oppose any AFGE election petition to represent employees who are assigned to the CBOC (or similar entity).

## Section 6 - Bargaining Unit Lists

A.  Once per calendar year, upon request, the Department will provide to the Union, to the extent available in an existing automated database, listings of bargaining unit employee names, job titles, series, professional or non-professional status, service, work location, and duty station.

**SA063**

B.   Twice per calendar year, upon request, a field facility will provide the local union, to the extent available in an existing automated database, listings of bargaining unit employee names, job titles, series, professional or non-professional status, service, work location, and duty station.

C.   If the Department is temporarily unable to comply with the Union's request made under either A or B, it will immediately notify the Union of when the information will be available.

## Section 7 - Certification

The Department and the AFGE National Office will meet annually to discuss and review the accuracy of the AFGE certification and jointly request that the FLRA update the certification as necessary.

SA064

# ARTICLE 2 - GOVERNING LAWS AND REGULATIONS

## Section 1 - Relationship to Laws and Regulations

In the administration of all matters covered by this Agreement, officials and employees shall be governed by applicable federal statutes. They will also be governed by government-wide regulations in existence at the time this Agreement was approved.

## Section 2 - Department Regulations

Where any Department regulation conflicts with this Agreement and/or a Supplemental Agreement, the Agreement shall govern.

**SA065**

# ARTICLE 3 - LABOR-MANAGEMENT COOPERATION

## Section 1 - Guidance

The parties agree that the following sections should be interpreted as suggestions, not prescriptions.

## Section 2 - History

A. Since the inception of 5 USC Chapter 71, cooperation and communication have been and remain goals of labor-management relations. The implementation and maintenance of a cooperative working relationship between labor and management known as "Partnership" was established by Executive Order 12871 and a Presidential Memorandum dated October 28, 1999. The Order and the Memorandum were revoked by Executive Order 13203 in 2001.

B. In December, 2009, Executive Order 13522 was issued, creating Labor-Management Forums. Pursuant to the spirit of that Executive Order and this Master Agreement, the Department shall allow employees and their Union representatives to have predecisional involvement in all workplace matters to the fullest extent practicable, without regard to whether those matters are negotiable subjects of bargaining under 5 USC 7106; provide adequate information on such matters expeditiously to Union representatives where not prohibited by law; and make a good-faith attempt to resolve issues concerning proposed changes in conditions of employment, including those involving the subjects set forth in 5 USC 7106(b)(1), through discussion in its Labor-Management Forums.

## Section 3 - Purpose

While the parties are no longer required by Presidential Executive Order to engage in Partnership, the desire and intent in this Article is to describe and encourage effective labor-management cooperation. The Department and the Union are committed to working together at all levels to improve service to veterans, ensure a quality work environment for employees, and effect a more efficient administration of VA programs. The parties support and encourage cooperative labor-management relationships at all levels.

## Section 4 - Principles

Labor-management cooperation is premised on open communication between Union and Department officials. Because different approaches may effectively foster communication in different settings, specific methods for cooperation will be jointly determined by the affected parties. Normally, these efforts should be guided by the following principles:

SA066

A.   Cooperation;

B.   Mutual respect;

C.   Open communication and sharing of information at all points along the decision-making process;

D.   Trust;

E.   Efficiency;

F.   Consideration of each other's views and interests;

G.  Identification of problems and workable solutions;

H.   Understanding of, and respect for, the different roles that the Department and the Union can play in achieving mutual goals; and,

I.    Minimizing or eliminating collective bargaining disputes.

## Section 5 - Scope

A.   In a cooperative labor-management relationship, the parties may discuss any topic, including:

1.  Matters involving personnel policies, practices, and working conditions;

2.  Numbers, types, and grades of employees as well as methods, means and technology of work; and,

3.  Participation on labor-management committees.

B.   If an agreement is reached using cooperative methods, by mutual consent the parties may choose to fulfill the collective bargaining obligation through such cooperation.

## Section 6 - Training

To promote effective labor-management relationships, the parties may determine the need for, and identify, appropriate training. Some types of training that may be appropriate include ADR, work process improvement, group dynamics, and relationship by objectives.

**SA067**

## Section 7 - Use of Time

A.  Where the parties establish a joint labor-management committee (forum) under this article, union representatives will be on official time. This official time will not be counted against any allocated official time as described in this agreement.

B.  In instances where sub-committees are established by this joint labor-management committee, and the parties have determined that Subject Matter Experts (SME) and/or union representatives are required, the Union will notify the Department of the appointment of a person to participate in sub-committee activities under this article and whether that person is participating as a SME for which duty time would be appropriate or as a union representative for which official time would be appropriate. If designated as a union representative, that time will not be counted against any allocated official time as described in this agreement.

C.  To the extent possible, activities will be conducted during the normal duty hours of the participants. Committee members will be compensated in accordance with applicable law. Once an individual has been designated by the Union to participate in cooperative labor-management activities, that person will be made available for such participation.

## Section 8 - Expenses

When activities are conducted under this article, the Department will bear the travel and per diem expenses of bargaining unit members involved in that activity to the extent permitted under the Federal Travel Regulations.

SA068

# ARTICLE 4 - LABOR-MANAGEMENT TRAINING

## Section 1 - Union Sponsored or Requested Labor-Management Relations Training

A.  The parties agree that Union sponsored Labor-Management Relations (LMR) training is of mutual benefit when it covers appropriate areas (examples are: contract administration, grievance handling and information relating to federal personnel/labor relations laws, regulations, and procedures). Training which relates to internal union business will not be conducted or attended on official time.

B.  Scheduling arrangements for the use of official time for training will be determined locally. Department personnel responsible for work scheduling will be given appropriate and adequate notice, to include specific agendas, of scheduled LMR training for maximum attendance.

C.  The amount and use of official time for LMR training, other than joint LMR training, is an appropriate subject for local negotiation.

## Section 2 - Joint Master Agreement Training

The parties will jointly provide Master Agreement training. The cost of the Master Agreement joint training will be paid by the Department. Training will be done jointly; however, this does not preclude additional training by each party. Any training document will be prepared jointly.

## Section 3 - Joint Labor-Management Training

A.  Each field facility will have a joint LMR training program. The ongoing program will have equal representation between the Union and the Department and decisions will be made by consensus consistent with interest-based bargaining principles. The local joint LMR training activity will develop a local LMR training plan which could consist of Interest-Based Bargaining, Alternative Dispute Resolution (ADR), Quality Programs, Cooperative LMR, communication skills, local supplements, district or regional training, etc.

B.  LMR training will be recorded in each employee's individual training record.

C.  Trainers appointed by the union will be on official time. This official time will not be counted against any allocated official time as described in this agreement. Attendees at joint labor management training will be on duty time. LMR training will normally be presented jointly unless training is conducted by a mutually agreed upon third-party. The parties may develop a joint train-the-trainer/facilitator program.

*Department of Veterans Affairs Labor Management Relations | DVA /AFGE Master Agreement*

**SA069**

D. Local facilities are encouraged to give recognition to individuals or groups who materially advance the process of LMR training.

E. Normally, local facilities will ensure that appropriate resources are made available at the local level for joint LMR training.

F. The parties are encouraged to share training materials or experiences to nurture better LMR training.

G. The provisions of this article apply to joint training at all levels from local through national.

## Section 4 - Third-Party Sponsored Training

Third-party sponsored training may be considered duty time or official time, as appropriate.

## Section 5 - National Joint Training and Education Committee Charter

A. Purpose
The national parties have jointly established a National Training and Education Committee (NTEC) that will advise the Assistant Secretary for Human Resources and Administration (HRA) on joint labor-management training and education needs and will plan the development of agreed upon national labor relations training programs. The NTEC will recommend priorities and curricula for joint labor relations training and education to be accomplished in the Department with a national focus.

B. Objectives:

1. To identify national labor relations training and education needs of common interest to the Union, the Department, and the Administration;

2. To determine type and degree of joint training needed;

3. To determine the priorities for proposed national joint training;

4. To identify delivery methods for the proposed national joint training;

5. To recommend proposals to the Assistant Secretary for HRA and the Administrations for national joint training and education activities;

6. To charter appropriate sub-groups (this will include guidance, resources, and evaluation of final products);

7. To develop a communication and marketing plan for national joint training;

8. To plan uniform and consistent national labor relations training for the Union and the Department;

SA070

9.  To facilitate and encourage participation of all parties in labor relations training and/or other educational programs, including facility requests for joint labor relations training;

10. To evaluate the success of training programs accomplished and share best practices;

11. To initiate needs assessments as appropriate to determine topics for joint training;

12. To provide subject matter experts for developing curricula and serving as faculty as needed;

13. To keep NPC advised of joint LMR training initiatives;

14. To allow any member of the NTEC to suggest an agenda item but the co-chairs will establish the agenda; and,

15. To assure that Department participants on the NTEC will have the authority to speak for their Administrations or staff offices.

C.  Guiding Principles (Process Boundaries):

1.  To ensure consistency with national goals of participating organizations;

2.  To seek input/feedback from all organizations affected/involved;

3.  To establish an atmosphere of mutual trust and respect;

4.  To establish open and honest communications with a view toward recognizing and addressing the interests of the parties;

5.  To share information and responsibility;

6.  To focus on global issues of interest at the national and local levels; and,

7.  To ensure a One-VA approach to national joint labor relations training.

D.  Membership

1.  NCA – 1 member

2.  VHA – 1 member

3.  VBA – 1 member

4.  LMR – 1 member

5.  OI&T – 1 member

6.  EES – 1 member

**SA071**

7. AFGE – 6 members

8. AFGE support – 1 member (non-voting)

9. LMR support – 1 member (non-voting)

E. Structure and Decision Making Process:

1. There shall be six Department members and six Union members;

2. Co-chairpersons will represent the Union and the Department and will serve for two years. The responsibility for chairing the meetings will be rotated between the chairpersons;

3. The NTEC will meet quarterly;

4. Each year the NTEC will determine the agenda for the following year;

5. Conference calls will be scheduled every two months and additional calls will be scheduled if needed;

6. The Department will fund the travel and per diem for meetings of the NTEC;

7. The Union will commit members to participate on curriculum development subgroups and to participate as instructors in joint training;

8. Decisions will be made by using the consensus approach that integrates the interests of the parties (if consensus is not reached by the NTEC, the chairs will attempt to resolve the dispute); and

9. Minutes will be recorded at each meeting and distributed to each member for review and comment, and then distributed as appropriate.

F. Definitions:

1. Joint training - training agreed to by both parties.

2. National joint training - national labor relations training mutually agreed to and developed by both the Union and Department to address mutual needs/concerns.

3. National focus training and education - labor relations training which is global in content to assure uniformity and consistency at all levels.

4. Intended audience of training and education - local union officials, stewards and representatives; Union national officials; first-level supervisors, managers and executives; Human Resources Management Officers and specialists; and employees.

**SA072**

G.  Desired Outcomes:

1.  More efficient use of resources through better collaboration and coordination of training and education activities affecting the Union and the Department;

2.  Foster clear and effective communication mechanisms between the Union and the Department to ensure better collaboration;

3.  Improve the relationship between the Union and the Department through collaborative and coordinated training and education activities;

4.  Maximize participation in joint training and education at all levels;

5.  Improve access to labor relations training at all levels; and,

6.  Develop outcome measures to demonstrate success.

H.  Additions:
The NTEC may add to this section, by mutual agreement.

**SA073**

# ARTICLE 5 - LABOR-MANAGEMENT COMMITTEE

There shall be a joint Labor-Management Relations Committee which shall meet twice a year in Washington, normally approximately six months apart, for up to a maximum of three days. The Department will authorize official time (if otherwise in a duty status) and travel and per diem for the five National Veterans Affairs Council Officers, fifteen District Representatives, five National Safety and Health Representatives, and twelve National Representatives, or alternates, for participation in these meetings. The parties will exchange agenda items sufficiently in advance so that arrangements can be made for appropriate representation. The Union will provide the Department with the names of the Union designated representatives as far in advance as possible but no later than three weeks in advance of the meeting so that official time, travel, and per diem may be arranged.

SA074

# ARTICLE 6 - ALTERNATIVE DISPUTE RESOLUTION

## Section 1 - Commitment

The Department and the Union are committed to the use of ADR problem-solving methods to foster a good labor-management relationship. The Union and Department at all levels should be committed to the use of ADR problem-solving methods as a priority to resolve disputed matters. Those involved in the development and use of an ADR system shall be trained in the principles and methods of ADR.

## Section 2 - Definitions and Intentions

A.   ADR is an informal process which seeks early resolution of employee(s), labor, and management disputes.

B.   Any ADR process must be jointly designed by the Union and the Department. ADR should be effective, timely, and efficient. It should focus on conflict resolution and problem-solving and foster a cooperative labor and management relationship. Participation in the ADR process must be voluntary.

C.   ADR may be used in the context of labor-management cooperation.

D.   The parties agree to ongoing evaluation to improve the process.

## Section 3 - Rights and Responsibilities

A.   The parties have the responsibility of informing employees and management officials of the ADR option to resolve disputes. ADR should be undertaken in good faith and not circumscribed by formal rules and regulations.

B.   Both parties will:

1.   Respond to questions about the ADR process;

2.   Provide information to employees on the ADR process; and,

3.   Help employees complete the designated ADR form.

C.   Employees may utilize the ADR process to resolve individual concerns with the mutual consent of the Union and the Department. However, the parties agree to encourage the use of ADR except for the most egregious or frivolous matters.

D.   Disputes resolved by ADR are final when written and signed. The Union and the Department will have the right to participate in all stages of the ADR process. This is in addition to an employee's right to Union representation.

**SA075**

E.   ADR resolutions shall not set precedent unless agreed to by the parties. Resolutions under ADR cannot conflict with or supersede agreements between the parties.

F.   Once an employee elects to use an ADR process, the Union has a right to participate in that process. This right is in addition to an employee's right to Union representation.

## Section 4 - Implementation

A.   ADR is an appropriate subject matter for local negotiations.

B.   ADR agreements must state the objective of all parties as well as a commitment from all parties to resolve their disputes in a non-adversarial environment.

C.   The parties at all levels shall jointly adopt an ADR problem-solving method that will include mutually agreed upon third parties. ADR methods may include but are not limited to early neutral evaluation, mediation, interest-based problem solving, peer review, conciliation, facilitation, and neutral fact-finding.

D.   ADR methods may be used prior to or during a grievance/arbitration or statutory appeal. In the use of ADR processes, contractual time frames will be stayed by mutual agreement. Statutory time frames cannot be stayed.

E.   ADR data that is collected nationally for the use of the VA ADR Steering Committee will be provided to the Union member of that committee.

## Section 5 - Characteristics

A.   Characteristics of a successful ADR program generally include:

1.   The program is designed in cooperation with the local union;

2.   Employees are educated on and made aware of the program;

3.   All parties are encouraged to use the process and resolve workplace conflict at the earliest stage possible;

4.   Adequate resources are allocated to the development and maintenance of the program;

5.   The process is evaluated on an on-going basis; and,

6.   Mediators and facilitators are adequately trained.

**SA076**

B. Successful mediators and facilitators generally are able to:

1. Assist the parties in identifying the issues;

2. Foster joint problem-solving;

3. Explore settlement opportunities;

4. Maintain strict neutrality;

5. Maintain complete confidentiality;

6. Structure the session so there will be an exchange of information;

7. Consider options to resolve issues;

8. Assist the parties in developing skills for defusing emotions; and,

9. Assist in developing a settlement agreement with the concurrence of all parties.

**SA077**

# ARTICLE 7 - QUALITY PROGRAMS

## Section 1 - Introduction

A.  Both parties recognize the importance of a strong commitment to comprehensive quality programs in the Department. Service to the veteran is the cornerstone of the relationship between the Department and employees.

B.  Both parties agree that a successful quality program must empower all employees to fully participate in the development and implementation of Department programs and processes. The Department recognizes the Union as the exclusive bargaining unit representative in implementing, maintaining, and improving these quality programs. Participation of bargaining unit employees in the Department's quality programs is a matter left to the discretion of the Union in its role on the facility Quality Council.

## Section 2 - General

A.  The Quality Programs referred to in this article are to include Quality Programs initiated by the Department utilizing methods (such as LEAN, Six Sigma, Baldridge Criteria and Systems Redesign) aimed at reviewing and improving Department programs and processes.

B.  Both parties agree that the commitment of the local facility Director and local union President is critical for success of Quality Programs.

C.  Bargaining unit employees who spend time on Quality Programs initiated by the Department in a nonrepresentational capacity will be on duty time. Bargaining unit employees serving in a union representational capacity will be on official time. This official time will not be counted against any allocated official time as described in this agreement.

D.  Time spent on Quality Programs initiated by the Department will be considered duty time.

E.  It is recognized that all levels of the Department and the Union are responsible for successful implementation, maintenance, and improvement of quality programs. Therefore, the parties should strive for open communication, developing teamwork, sharing of information, integration and acceptance of the union/management role, reduced paperwork, improved work processes, etc.

F.  It is in the interest of both parties that there be a sharing and communication of information regarding, e.g., Joint Commission, requirements, processes, and results.

**SA078**

## Section 3 - Quality Programs Council Charter

The following is the Charter agreed to by the parties.

---

VA QUALITY COUNCIL CHARTER FOR QUALITY PROGRAMS

---

I.  PURPOSE

This charter establishes a National Quality Council (NQC/work group) and quality councils throughout the Department. Members of the councils will demonstrate continuing commitment to the principles and practices of quality improvement both as council members and as participants in their respective organizations.

II.  SCOPE

    A.   This charter applies to quality programs within the VA.

    B.   Both the Department and the AFGE National VA Council (NVAC) mutually agree that the scope of the agreement will be limited to process, programs, and related issues as covered by this charter. The Councils/Teams will not establish projects which are matters solely and properly subject to collective bargaining, matters currently covered by the Master Agreement, and individual/employee grievances and problems or other appeals/complaints processes as projects. The AFGE NVAC will communicate this requirement to their locally appointed quality representatives. The Department will similarly communicate this requirement.

    C.   Neither the union nor the Department waives the right to bargain over quality initiatives which would otherwise be bargainable, nor do they waive any other legal, contractual, or past practice right.

    D.   The Department and the union recognize that, in order for quality programs to be a successful tool in problem solving, the parties may agree to depart from the Federal Labor Management Relations Statute in such areas as the parties' rights and the negotiability of subjects.

    E.   No bargaining unit employees will be coerced or intimidated into participating in Quality Improvement Teams (QITs). Participation in the process is entirely voluntary.

    F.   Union and management will recognize each other as legitimate customers in their everyday dealings with each other.

**SA079**

III.  GENERAL ROLES OF VA AND AFGE

The Department and the NVAC serve as champions of quality throughout the organization. The National Quality Council and other work teams/groups, will provide an environment that supports employee involvement, contribution, teamwork, and a positive atmosphere of trust/respect between management and employees.

IV.  QUALITY COUNCILS/WORK GROUPS - GENERAL

    A.  Purpose:

        1.  All Quality Councils/work groups will foster quality improvement by:

           a.  Providing visible leadership,

           b.  Encouraging subordinate managers and employees to use quality improvement techniques, and

           c.  Fostering the integration of quality improvement with management support systems. Such systems include, e.g., strategic planning, performance management, and awards and recognition.

    B.  Organization and Membership:
The union may, at their discretion, select a number of employees equal to management's selections to serve on the Councils/work groups. There must be present at least one person from both management and union. In the event multiple unions participate in the program, the number of union members on a council shall not exceed that of management and AFGE shall determine the union membership mix. All members will make every effort to attend the meetings. All quality council members must have had quality improvement awareness training. The union and the Department, respectively, will endeavor to select employees who they feel best represent the various components of the organizational entity.

V.  THE NATIONAL QUALITY COUNCIL

    A.  Purpose

        1.  Serves as the model for VA's quality improvement effort,

        2.  Provides leadership to foster quality improvement within VA, and,

        3.  Supports the integration of quality improvement in the day-to-day operations of VA.

SA080

B. Membership

1. The NQC/work group shall include up to 4 representatives on the National Quality Council, each with an equal voice. The NVAC President will make the selection of NVAC employees to sit on the NQC/work group. Management will have equal membership to Union membership.

2. Each member of the Council will normally serve a minimum of 18 months. The Council will be co-chaired by the union and management.

C. Function
The NQC/work group fosters implementation of quality improvement by:

1. Examining the Department's Mission of the Quality Improvement (QI) Program and promoting the goals and principles established in it;

2. As necessary, establishing cross-functional and other projects designed to foster quality improvement throughout VA;

3. Providing assistance and support to other Councils/work groups;

4. Reviewing positive/negative quality improvement experiences from specific facilities as presented by NQC members;

5. Establishing guidance, procedures, and format for implementing quality improvement projects at the NQC/work group level; and,

6. Operating under the rules and procedures specified in Appendix A.

## VI.  REGIONAL/AREA COUNCILS

Regional/Area Councils may be established at management's discretion. If such councils are established they shall comply with the guidelines for facility councils and/or national councils as appropriate.

## VII.  FACILITY QUALITY COUNCILS

A. Where practicable, based upon the size of the activity, each activity will establish a Facility Quality Council (FQC/work group) or work group. Each FQC/work group will operate under a charter which includes at a minimum a statement of purpose, organization, membership, responsibilities, and functions. However, if the parties mutually agree, they may combine the functions of the FQC/work group into any facility partnership council.

B. Membership. The membership shall be personnel who work at the facility. Each council and/or work group will have co-chairs selected by consensus of the membership. The co-chairs may be rotated periodically.

**SA081**

C. Responsibilities

1. Promote quality improvement goals and principles,

2. Identify quality improvement opportunities, and

3. Recognize participation and accomplishments in the quality improvement process.

D. Procedures

Each QC/work group will establish its own operating procedures, deciding such issues as frequency of meetings, communication processes, and membership tenure. All QC/work groups have the option to invite additional people to their meetings when the need for additional expertise arises. All QC/work groups will make decisions based on consensus.

1. QC/work groups are encouraged to use an experienced facilitator for conducting Council meetings for the first year.

2. All quality council/work group meetings will be conducted during normal duty hours with the following exception: meetings may be held during normal/regular lunch or break periods with consensus of the council or team. Any overtime related to Quality Council/work group work will be paid in accordance with governing directives and law. Union representative participation shall be considered official time. This official time will not be counted against any allocated official time as described in this agreement.

3. Quality Councils sponsor QIT activities. The Councils:

   a. Determine the scope of the processes to be examined (e.g., is it a local or cross-component issue?);

   b. Prioritize and select processes for team action in their scope of authority (office staffing needs and workloads will necessarily be considered in making these decisions);

   c. Solicit volunteers and select team members, based on the particular skills and expertise needed by the team;

   d. Monitor and support teams and individuals working on quality efforts, including obtaining or providing necessary training;

   e. Obtain periodic reports from active teams; and,

   f. Obtain administrative support as necessary.

SA082

4. QC/work groups receive recommendations from the QITs they have sponsored. They:

   a. Review all recommendations from their teams;

   b. Determine whether each recommendation is within their scope of authority to implement; and,

   c. Determine whether a recommendation should be referred to a higher level within the facility because of scope.

5. Implementation of recommendation from QITs will be handled as follows:

   a. The Service/Division Quality Council (S/DQC)/work groups will recommend to appropriate management quality improvement changes which can be implemented at the local level.

   b. When practicable based upon the size of the facility, the FQC/ work group will receive recommendations from QITs they have sponsored and from the S/DQC/work groups. The FQC/work group will recommend to the appropriate senior management official those quality improvement changes that can be implemented at the Facility level.

   c. The QIT recommendations may be adopted and implemented, returned to a QIT for reconsideration, or rejected. On a timely basis, reconsidered or rejected recommendations will be accompanied by a clear, reasoned explanation to the QIT.

   d. Quality councils at the facility can approve projects within their scope and authority for QIT consideration. Projects involving cross-functional areas must be approved by the appropriate quality council (national, facility, or service/division).

## VIII.  QUALITY IMPROVEMENT TEAMS

A. Purpose
   The purpose of QITs is to conduct quality improvement projects which will result in improved VA operations.

B. Scope of Projects

   1. The Sponsoring Council will define the purpose and scope of each quality improvement project.

   2. QI initiatives will not focus on or result in loss of grade, pay, or bargaining unit positions (i.e., reduction in staffing).

**SA083**

C. Membership

1. QIT members will be appointed by the appropriate Quality Council and may be drawn from employees in a VA component and representatives of outside groups, such as VA customers and partners who are closely associated with a particular process. The union may, at its discretion, designate a representative to fully participate as a member on each QIT without the need to use official time. The union representative will be appointed at the same time as other members of the QIT.

2. Employee participation in QI is voluntary. Employees may resign from the team at any time by notifying a Team Leader in writing. Employees will be fully informed concerning QI objectives and processes before their participation is requested. Employees will not be disadvantaged if they choose not to volunteer to serve on a team.

3. Prior to serving on a team, employees will be trained on QI techniques.

D. Team Leaders

1. Are selected by the QIT, or QC/work group;

2. May be any member of the team; and

3. Are responsible for calling meetings, communicating resource needs (e.g., personnel, training, funding, and equipment) and keeping the Council informed.

E. Team Facilitators

Team facilitators will be chosen by the Sponsoring QC/work group and should be from outside the team. The facilitator must be trained in QI problem solving methods and group dynamics. The facilitator may help in selecting and using problem-solving tools, train members of the team in their use, and help guide discussions.

F. Union Participation and Official Time

1. The union has the right to be present at all QIT Meetings. The union will determine who the representative will be at the team meetings, and in the event that they cannot be released from duty, the union may designate another representative or request the meeting be postponed until they are available.

2. The union will be provided the same advance notice of meetings that team members receive. Official time to attend such meetings, not to exceed a total of 5 hours per week/facility, shall be in addition to any official time presently allowed by local agreements.

SA084

G. Procedures

1. Descriptions of improvement projects will be accessible to all facilities and QITs via computer, where practicable, based upon the size of the facility.

2. All QIT meetings will be conducted during normal duty hours with the following exception: meetings may be held during normal/regular lunch or break periods with consensus of the team. Any overtime related to QIT work will be paid in accordance with governing directives and law.  Union representative participation shall be considered official time. This official time will not be counted against any allocated official time as described in this agreement.

3. Quality improvement projects will be selected by Quality Councils and/ or QITs. When a QIT has selected a quality improvement project, the project will be submitted to the Quality Council for approval. Each QIT member will be trained in QI techniques and will apply those techniques towards the successful completion of the improvement project(s) on which the team is working.

4. To the extent possible, teams will receive the support they need for projects. Projects not self-generated will be defined and presented to the team. Team members who happen to be Union representatives will serve on the team as employees, not as the Union's representative.

5. QIT meetings are to be scheduled on a regular basis. Management will make every effort to insure that bargaining unit team members are released from normal duties to attend meetings.

6. The Sponsoring Council and/or management are responsible, to the extent possible, for providing teams access to data, staff, and contractors and with resources (training, travel funds, equipment, office supplies, facilities, time, etc.) necessary to carry out the quality improvement project.

H. Performance Appraisals
No adverse inference will be made in performance appraisals for professionally expressed opinions or positions taken on QIT issues by employees serving on QITs, or by employees not serving on QITs. Time spent performing QIT activities will not be evaluated in relation to performance standards of the employees' regular positions.

I. Awards
Any awards provided to QI teams will be group awards. Monetary awards for employees not participating on QI teams will not be adversely affected due to non-participation.

**SA085**

IX.  TRAINING

    A.  Every effort will be made to provide QI awareness training to all employees. The union's on-site representatives located in each local facility will be trained at the same time as other bargaining unit employees in the facility. If multiple sessions are required, the union representative will be offered attendance in the first session held at their facility.

    B.  VA management agrees to provide facilitator training courses for those employees selected to serve as facilitators.

    C.  Management and union/bargaining unit employees will receive training appropriate to their QI task or responsibility.

X.  COMMUNICATION/PUBLIC RELATIONS

    A.  All existing "Mission Statements" will be jointly examined by the appropriate Quality Council with changes made as necessary. All new "Mission Statements" will be jointly developed by the appropriate Quality Council.

    B.  All QI publications, memoranda, circulars, directives, etc., unique to AFGE will be identified by both the official VA and union logos.

XI.  MANAGEMENT  RESPONSIBILITIES

    A. Local Management

        1.  Local management will reimburse employee authorized travel and other authorized expenses related to QI training and Council/Team participation.

        2.  The impact of QI Council/Team meetings and workload/tasking will be recognized by supervisors as valid work and appropriate/necessary adjustments will be made to employees' normal work loads, concerning due date extensions, workload counts, and deadlines.

    B.  Central Office (CO) management will provide administrative support to the NQC/work group. Specifically, CO will:

        1.  Provide overall staff support to the NQC/work group.

        2.  Record, disseminate and modify/amend the minutes of all meetings of the NQC/work group.

        3.  Compile, distribute, and maintain a QI bibliography.

        4.  Share expertise in the quality field with the Facility Councils.

**SA086**

5. Maintain an inventory of QI courses and serve as liaison with the training coordinators of the Department.

6. Support the NQC/work group in issuing the newsletter and in other communication efforts.

7. Provide support and assistance to quality councils, as necessary.

## XII.  NOTICE

A. Any local QI agreement(s) in conflict with this charter will be superseded by this charter in those specific areas where the conflict exists.

B. It is understood that QI now exists at some facilities and that it will require an expeditious transition period to implement all features of this QI national agreement. The transition period will be no more than one hundred twenty (120) days from receipt of this program at the local station or conclusion of local bargaining, whichever is later, and less than one hundred twenty (120) days where possible.

C. The composition of QITs in existence prior to the effective date of this agreement shall not be affected by this agreement. Each facility will notify the local union of the QITs in existence prior to the effective date of this agreement.

D. It is recognized by both parties that QI projects are initiated at all levels. VA management must pay special attention to its obligation to provide union notification before implementation of QIT recommendations where appropriate. VA management will closely monitor QI activities at all levels to assure that managers do not bypass the union.

## XIII.  DURATION

Both the union and management recognize that to achieve cultural transformation, many changes in the operating process have to occur; therefore, either party may give written notice to reopen this charter 30 to 60 calendar days prior to the first annual anniversary of this charter. The request for renegotiating the provision(s) of this charter shall be in writing and submitted 30 days prior to beginning the negotiations. If reopened, all provisions of this charter shall remain in effect until conclusion of negotiations unless otherwise mutually agreed. Participation by an individual employee in the QI effort remains voluntary despite any opposing position by management or the union. Participation in the QI effort remains voluntary. While either party may withdraw from the agreement at any time after 1 year, the parties are committed to utilizing QI for 1 year from the conclusion of their transition period or the establishment of a program. Both union and management will consider withdrawal as the option of last resort only after extensive discussion and consultation fail to resolve a problem. The union maintains that participation in QI is a union permissive right.

**SA087**

XIV.  TRAINING

The Department will provide joint training to the parties prior to implementation of the QI Program at the facility. The parties agree that the Department will provide the necessary resources and training to ensure a successful program.

# APPENDIX  A

**The National Quality Council will adhere to the following rules and behaviors:**

1. The Council meetings will be attended by principals/designees only. Every effort will be made to insure principals/designees are available for meetings. Observers, technical experts, and presenters may be invited to attend Council meetings in a non-voting/participating capacity. Any member may request to be briefed on decisions made at a previous meeting if the member was not in attendance when the decisionswere made.

2. The Chairperson will designate a Council member in their absence to chair Council meetings.

3. The Council will operate by consensus decision-making. Consensus shall be defined as stated in Webster's Ninth New Collegiate Dictionary or newer edition.

4. A quorum must be present to conduct official business, with a quorum consisting of two thirds of the members.

5. An agenda will be prepared in advance for each meeting of the NQC/work group with each member being given the opportunity to submit items.

6. Discussion and decisions of the NQC/work group will be recorded in meeting reports and sent in draft to the members for approval before publication.

7. Facilitators will be obtained when needed. Facilitators will remain neutral and will not participate in decisions.

**SA089**

# ARTICLE 8 - CHILD CARE

## Section 1 - Policy and Purpose

The parties recognize that working parents may have special child care needs during working hours. The parties recognize the need for such parents to secure appropriate child care arrangements. The Department will continue its efforts to secure adequate funding in order to support and foster child care services for its employees.

## Section 2 - Child Care Activities

A.  The Department will continue to provide and/or support various activities in order to meet ongoing child care needs. These may include, but are not limited to, such things as child care and parenting information, child care resource and referral information, workshops, and counseling as available through the Employee Assistance Program.

B.  It is the Department's intention to utilize available funds nationwide to foster local solutions to child care needs. These may include construction of on-site facilities or near-site facilities, participation in shared facilities with other federal agencies, establishment of mini-centers, or other child care services.

C.  In accordance with PL 101-509 of the 1991 GSA Appropriations Act, the Department agrees to pay legally permissible expenses for training, conferences, or other meetings in connection with the provision of child care services for persons employed to provide child care services if the Department determines that such training, etc., is relevant and necessary. The Department also agrees to pay similar expenses for Department employees who have oversight responsibilities for the operation of child care facilities, i.e., members of local child care Committees and Boards of Directors, if it is determined such training is relevant and necessary.

D.  The head of each facility or appropriate designee will provide inquiring employees with current listings of the qualified, licensed child care centers in the immediate area. Recognizing that a broad range of child care needs exists in compiling such listings, management will request specific information i.e., age groups served, types of programs offered, and special needs programs.

## Section 3 - Local Child Care Committees

A.  When a site for a VA Child Care Center is selected, the parties will establish a local Committee comprised of one Department representative, one local union representative, parents, and other parties as appropriate. The Department will have subject matter experts available to meet with the

**SA090**

Committee on an as-needed basis. The Committee will guide development of the local child care program, including development of marketing strategies, operating procedures, and admission priorities.

B.  The Committee will have the opportunity to review and make recommendations which will be considered in the design of the facility. The Committee will participate in the selection of the child care provider.

C.  Once the Center becomes operational, the Committee will be replaced by a Board of Directors which the Committee will assist in establishing. The local union will designate one representative to serve on the Board of Directors.

D.  Bargaining unit employees who perform Child Care Committee functions in a nonrepresentational capacity will be on duty time. Bargaining unit employees serving in a union representational capacity will be on official time. This official time will not be counted against any allocated official time as described in this agreement.

## Section 4 - Employee Needs

A.  It is agreed that the responsible official will grant emergency annual leave requests and consider emergency requests for leave without pay brought about by unexpected changes in child care arrangements, contingent upon operational exigency.

B.  The Department agrees to utilize programs which may assist employees with child care needs; for example, part-time employment, job sharing, leave, flextime, etc.

C.  The Department recognizes that it may be necessary for employees to contact child care providers during duty hours.

## Section 5 - Facilities

In accordance with 40 USC 490(b), the Department will provide space, equipment, furnishings, and other services necessary to support the operation of each child care facility on federal property.

## Section 6 - Miscellaneous

The parties agree that this Article will not delay or impact any pending child care initiatives. The Union will be kept informed of the child care initiatives.

**SA091**

# ARTICLE 9 - CLASSIFICATION

## Section 1 - General

A. Each position covered by this Agreement that is established or changed must be accurately described in writing and classified to the proper occupational title, series, code, and grade.

B. Title 5 position descriptions (PD) must clearly and concisely state the principal and grade controlling duties, responsibilities, and supervisory relationships of the position.

C. Employees will be furnished a current, accurate copy of the description of the position to which assigned at the time of assignment and upon request. In order to ensure accurate PDs, the term "other duties as assigned" should not be used to assign duties that are not related to the employee's position. In such instances, the employee should discuss these duties with the supervisor to determine whether the PD is accurate. The Department reserves its right to assign work that is not in the PD. If that occurs on a regular basis, the PD must be revised to accurately reflect the job duties.

D. Position descriptions will be kept current and accurate, and positions will be classified properly. Employees shall be properly compensated for duties performed on a regular and recurring basis. Changes to a position will be incorporated in the PD to assure that the position is correctly classified/graded to the proper title, series, and grade. Incidental changes may be made in the form of pen and ink notations on the PD as requested by the Department. The local union will be provided the opportunity to review proposed changes in PD descriptions and copies of updated PDs. Current PDs will be provided to the local union, upon request.

E. Employees dissatisfied with the classification of their positions should first discuss the problem with their supervisors. If a supervisor is unable to resolve the issue to the employee's satisfaction, the employee can discuss the matter with the Human Resources Manager or appropriate staff member who will explain the basis for the classification/job grading. An employee and/or the local union, upon request, will have access to the PD, evaluation report, if available, organizational and functional charts, and other pertinent information directly related to the classification of the position. This informal classification review process should be completed in a reasonable period of time. When a desk audit is conducted it will be completed within 90 days of the local union or employee request. This time frame may be extended by mutual consent. As appropriate, desk audits will be performed at the

employee's work station. If the employee still believes there is an inequity, an appeal may be filed with the Department or Office of Personnel Management (OPM), as appropriate. An employee may file a classification/job grading appeal at any time through appropriate channels whether or not this informal classification review process was followed.

F.  The Department will meet and confer with the local union on procedures pertaining to systematic position classification and special maintenance reviews.

G.  Vacant positions will not be posted until the appointing authority assures that they are authorized, properly described, evaluated, and classified according to series, title, and grade.

H.  No position(s) will be downgraded without a thorough review. For a downgraded position, the employee's pay and grade will be maintained on an incumbent basis in accordance with law and regulations.

I.  Delegations of authority for the classification of positions will be specified in Department policies and regulations.

## Section 2 - Classification Standards

A.  Title 5 positions will be classified by comparing the duties, responsibilities, and supervisory relationships in the official PD with the appropriate classification and job grading standard.

B.  The Department will apply newly issued OPM classification and job grading standards within a reasonable period of time. The local union will be provided with copies of new standards. Current standards will be provided upon request.

C.  The Department will provide the Union with copies of any Department guidance provided to OPM in connection with any classification standards.

## Section 3 - Classification Appeals

A.  The Department will provide employees and the local union with copies of procedures for filing classification appeals through the Department or OPM channels, upon request.

B.  Employees or their representatives are encouraged to submit their classification/job grading appeals through the local Human Resources Management (HRM) office. The HRM office will forward the appeal to the Department or OPM, as appropriate, no later than 15 days from receipt and will provide the Local with 2 copies of the employee's appeal request.

**SA093**

However, this does not preclude an employee from filing a classification/job grading appeal directly to the Department or OPM, as appropriate.

C.   An employee who files a classification appeal is entitled to a copy of the classification appeal file. The local union is entitled to the same material, upon request.

D.   General Schedule (GS) and Federal Wage System (FWS) employees who file appeals with the Department concerning the title, series and grade, and/or coverage of their position will have their appeal decided within a reasonable period of time with a goal of 60 days from the date the Appeals Office receives a completed application. Classification appeal decisions will be forwarded to the local union.

## Section 4 - Effective Date

The effective date of a personnel action taken as a result of an appeal should not be later than the beginning of the fourth pay period following the date of the decision.

SA094

# ARTICLE 10 - COMPETENCE

A.  The Department shall train bargaining unit employees on all new equipment, technology changes, and clinical procedures needed to perform the duties of their job. For employees who are subject to production and timeliness standards, the training time will be excluded from the production or timeliness standard.

B.  Competencies established for an employee's position shall be in writing and communicated to the employee when the employee enters a position or when a new competency is established for the employee's position.

C.  Prior to the assignment of an out of the ordinary duty, employees shall be encouraged to state if they feel that this is an area that they need to review. The request should not be used punitively against them and the review shall be authorized by the Department.

D.  The local union shall have input into the training of employees who are expected to cross cover areas.

E.  If problems arise with employees' competencies, remedial training shall be afforded.

F.  Competencies must not exceed the scope of licensure, registration, or certification, whichever is applicable.

G.  Copies of competencies will be provided to the local union. When the Department changes an employee's competency, the local union will be afforded a reasonable opportunity to bargain regarding negotiable matters related to the change.

H.  Disputes over the matters that may be bargained concerning competencies may be referred to partnerships or the equivalent at the appropriate level.

I.  For the purposes covered by this Agreement, competencies as such shall not be used for performance evaluations, as replacements for or additions to performance standards, or as qualification standards.

**SA095**

# ARTICLE 11 - CONTRACTING OUT

## Section 1 - Periodic Briefings

Periodic briefings will be held with AFGE officials at the local and national levels to provide the Union with information concerning any Department decisions that may impact bargaining unit employees in implementing Office of Management and Budget (OMB) Circular A-76.

## Section 2 - Site Visits

The Department will notify the local union if a site visit is going to be conducted for potential bidders seeking contracts for work performed by bargaining unit employees. A local union representative may attend such a site visit.

## Section 3 - Union Notification

When the Department determines that unit work will be contracted out, the Department will notify the local union to provide them an opportunity to request to negotiate as appropriate.

## Section 4 - Employee Placement

When employees are adversely affected by a decision to contract out, the Department will make maximum effort to find available positions for employees. This effort will include:

A.   Giving priority consideration for available positions within the Department;

B.   Establishing an employment priority list and a placement program; and,

C.   Paying reasonable costs for training and relocation that contribute to placement.

## Section 5 - Inventory of Commercial Activities

The Department will maintain an inventory of all in-house commercial activities performed by the Department and will update this inventory annually. The inventory will include information on all completed cost comparisons and will be made available to the Union upon request.

## Section 6 - Reopener

The parties agree that any agreement reached in Mid-term Bargaining regarding Contracting Out may be incorporated in this Agreement.

SA096

# ARTICLE 12 - DETAILS AND TEMPORARY PROMOTIONS

## Section 1 - General

A. A detail is the temporary assignment of an employee to a different position for a specified period of time, with the employee returning to their regular duties at the end of the detail. Details are intended only for the needs of the Department's work requirements when necessary services cannot be obtained by other desirable or practicable means.

B. Employees shall be recognized for the work they perform. Details of one week or more shall be recorded and maintained in the Official Personnel Folder/electronic Official Personnel Folder (OPF/eOPF). In addition, employees may document in the eOPF details of less than one week, by submitting an SF-172 or a memorandum.

C. The Department will provide notification of all details to the local union President. Where the detail did not result in changes to conditions of employment, the notification will be at least weekly. Where changes to conditions of employment would result, the Department will provide reasonable advance notice. When a detail is known far enough in advance and affects conditions of employment, the notification should occur as soon as practicable but no later than 10 days prior to the employee being detailed.

D. The following procedures shall apply when offering noncompetitive details of 10 consecutive workdays or more to both classified and unclassified positions:

1. The Department will canvass the qualified employees to determine if anyone wishes to be detailed. If the same number of volunteers as vacancies exist, they shall be selected. If an employee believes they are qualified and is excluded from consideration for a detail because of lack of qualifications, the Department, upon request of the local union, will articulate in writing the qualifications required for performance of the detail that the employee lacks.

2. If more employees volunteer than vacancies exist, the Department will select from the qualified volunteers. Seniority will be the selection criterion, except when management demonstrates and determines that the position to which an employee will be detailed requires unique skills and abilities that are not possessed by another qualified employee or that a medical or operational need requires or precludes the detail of a particular employee.

**SA097**

3.  If there are no volunteers, then the least senior qualified employee(s) will be selected, except when the Department demonstrates and determines that the position to which an employee will be detailed requires unique skills and abilities that are not possessed by another qualified employee or that a medical or operational need requires or precludes the detail of a particular employee or when the Department makes a detail to accommodate a substantiated medical or health problem.

4.  If there are fewer volunteers than vacancies, then the volunteers will be selected and additional persons will be selected as in Paragraph D. 3 in this section.

5.  Seniority shall be defined locally through negotiations between the local union and the Department. Examples include service computation date, continuous service in the Department, continuous service in the facility, continuous government-wide service, and service time in a work unit. Once established, the definition of seniority will not be changed for the duration of the Master Agreement.

E.  Details of less than 10 consecutive workdays shall be on a fair and equitable basis and procedures for such details will be a subject for local negotiations.

F.  For details outside of the duty station, a case-by-case analysis must be done comparing the distance from the old duty station to the employee's residence versus the distance from the new duty station to the employee's residence. When a significant difference exists, the employee shall be given duty time for travel commensurate with the new duty station.

## Section 2 - Temporary Promotions

A.  Employees detailed to a higher graded position for a period of more than 10 consecutive work days must be temporarily promoted. The employee will be paid for the temporary promotion beginning the first day of the detail. The temporary promotion should be initiated at the earliest date it is known by the Department that the detail is expected to exceed 10 consecutive work days. The 10 consecutive work day provision will not be circumvented by rotating employees into a higher-grade position for less than 10 days solely to avoid the higher rate of pay. For the purposes of this section, a GS employee, who performs the grade-controlling duties of a higher-graded position for at least 25% of their time for 10 consecutive work days or a FWS employee who performs higher-graded duties on a regular and recurring basis, shall be temporarily promoted. A Title 38 or Hybrid Title 38 employee who is detailed to a higher-graded assignment shall be referred, at the effective date of the detail, to a Professional Standards Board for expedited promotion consideration. The Professional Standards Board will be held within 30 days of the effective date of the detail. The approving official should issue the decision as soon as possible.

**SA098**

B.   Title 5 temporary promotions in excess of 120 calendar days shall be filled through competitive procedures under Article 23 – Title 5 Merit Promotion as though the promotion were permanent. Temporary promotions of 120 days or less shall be made in accordance with Section 1.

## Section 3 - Detail to Lower-Graded Duties

Should the requirements of the Department necessitate a detail to a lower-level graded position, this will in no way adversely affect the detailed employee's salary, classification, or position of record.

## Section 4 - Representatives

The Department will make every effort to avoid placing a local union representative on a detail that would prevent that individual from performing representational functions. The Department agrees to notify the appropriate local union office prior to placing any designated local union representative(s) on detail away from the representative's normal duty station.

## Section 5 - Details for Medical Reasons

A.   Employees who are temporarily unable to perform their assigned duties as certified by a health care provider may voluntarily submit a written request to the Department for temporary assignment to duties commensurate with the serious injury or illness and the employee's qualifications. The request will be accompanied by medical certification. The Department may require that such requests be reviewed by a Federal Medical Officer for medical sufficiency and appropriate recommendations. The Department will consider such requests in accordance with applicable rules and regulations and medical recommendations. The Department will, to the extent that it is operationally feasible, temporarily reassign the employee to an appropriate vacancy or duties and responsibilities within their own service/ section. Such reassignment will be commensurate with the employee's limitations and qualifications. Employees will continue to be considered for promotional opportunities for which they are otherwise qualified.

B.   This section does not provide the procedures for employees affected by job-related injuries or who request reasonable accommodation; those subjects are addressed in other articles of this Agreement.

## Section 6 - Local Negotiations

The parties at the local level may negotiate additional procedures for details and temporary promotions.

**SA099**

## <u>Section 7- Rotations</u>

When the rotation of employees through higher-graded positions has the effect that compensation at the higher grade is avoided, the Department will comply with government-wide regulations.

SA100

# ARTICLE 13 - REASSIGNMENT, SHIFT CHANGES, AND RELOCATIONS

## Section 1 - General

A. Definition
For purposes of this Article, a reassignment means a change of an employee from one position to another while serving continuously within the Department, without promotion or demotion. Because they are permanent, all reassignments will be documented in the employee's electronic Official Personnel Folder (eOPF).

B. Reassignments in connection with reductions in force for Title 38 staffing adjustments are not governed by this Article, but are governed by procedures similar to Title 5 Reduction in Force (RIF) procedures.

C. If a reassignment, shift change, or relocation of a Title 38 employee involves an issue of professional conduct or competence, then 38 USC 7422 applies.

D. Reassignments shall not be used as punishment, harassment, or reprisal.

E. If more employees volunteer than vacancies exist, the Department will select from the qualified volunteers. Seniority will be the selection criterion. If there are an insufficient number of volunteers, then the least senior qualified employee(s) will be selected.

F. Seniority shall be defined locally.

G. Reassignment to a position that provides specialized experience that the employee does not already have and is required for subsequent promotion to a designated higher-graded position and/or to a position with known promotion potential must be made on a competitive basis. All excepted service reassignments shall be done fairly and equitably, with a full opportunity for the employee to be reassigned.

H. The request of an employee seeking reassignment shall be entitled to prompt and fair consideration.

## Section 2 - Local Bargaining

The parties agree that reassignment is a subject appropriate for local bargaining. General areas which should be addressed include, but are not limited to:

**SA101**

A.  Posting of job notices;

B.  Submitting voluntary requests;

C.  Consideration of requests; and,

D.  Notification of reassignments.

## Section 3 - Shift Change and Relocation

The parties recognize that giving consideration to seniority promotes improved employee morale and productivity. Employees may request to relocate from one area of the local duty station to another (or from one shift to another) in the same position, title, and series within the same service and with the same advancement potential. In filling such vacancy, seniority will be considered and the request will be granted if the employee has the requisite skills and abilities provided such relocation would be consistent with effective and efficient staffing. The Department reserves the right to make the assignments based on other good faith considerations in assuring effective management of the work force.

## Section 4 - Voluntary Requests for Reassignment

Employees may, in writing, make the following requests under the following conditions:

A.  Types of Requests:

1.  To work a particular shift within a work area (days, evenings and nights);

2.  To work in a particular work location within the same shift (e.g., Building 4 second/pm shift);

3.  To work in a particular building or work unit (e.g., Building 5 or Building 4-5E);

4.  To be given relief assignments within the same shift on a continuing basis (e.g., an Environmental Management Service Housekeeping Aide or Nutrition & Food Service Worker relieves for two workers on their days off and a third employee on one day off. Examples of voluntary requests may include, but are not limited to the following: Housekeeping Aide, WG-2, to Laundry Worker, WG-2; Nursing Assistant, GS-4, to Health Technician, GS-4; File Clerk, GS-4 to Mail Clerk, GS-4);

5.  To be reassigned to another facility;

6.  Any additional types as negotiated locally.

**SA102**

B.  Conditions:

1.  An available vacancy must exist;

2.  The employee must meet basic qualifications for the position (grade, title, and physical requirements);

3.  The employee must be performing at an acceptable level of performance;

4.  Requests for voluntary reassignments will be considered;

    a.  First, within the work area

    b.  Second, within the building and/or service

    c.  Third, within the duty station

5.  The selected employee shall normally be released and reassigned within two pay periods after written notification.

6.  Requests will remain active and on file until rescinded by the employee.

Disputes involving reassignments shall be resolved through the negotiated grievance procedure.

## Section 5 - Administrative/Involuntary Reassignments

Administrative reassignments/involuntary reassignments are reassignments initiated by the Department to meet valid operational needs. When such a reassignment is to be done, the Department will provide the local union with 30 days' notice, and bargain to the extent required by law and this agreement prior to effectuating the involuntary reassignment. In an emergent situation where the Department has less than 30 days' notice of the need for the reassignment, the Department will provide the local union with as much advance notice as it has, and an explanation of why the 30 day timeframe could not be met. The Department will provide the local union with the reasons for the action, the number/title(s) of positions affected, and the actions the Department intends to take to reduce the impact on employees. Reassignments that are noted in other articles, such as but not limited to, Discipline, Investigations, Performance, Workers' Compensation, RIF, and Reasonable Accommodation, shall follow the procedural requirements found within those respective articles.

## Section 6 - Leave

All leave previously requested and approved will be transferred with the employee.

**SA103**

## Section 7 - Relocation Expenses

An employee whose duty station changes either involuntarily not for cause or due to promotion shall be entitled to relocation expenses in accordance with regulations. Employees who request to relocate, absent a promotion, may be entitled to relocation expenses.

## Section 8 - Voluntary Reduction in Grade

Prior to acting on an employee's request for a voluntary reduction in grade, the Department will assure that:

A.  The employee has been fully apprised in writing about the effects of such an action; and,

B.  The employee has been given an explanation of other alternatives relevant to the particular case.

## Section 9 - Reassignments for Medical Reasons

A.  Employees who are unable to perform their assigned duties as certified by a health care provider may voluntarily submit a written request to the Department for assignment to duties commensurate with the serious injury or illness and the employee's qualifications. The request will be accompanied by medical certification. The Department may require that such requests be reviewed by a federal medical officer for medical sufficiency and appropriate recommendations. The Department will consider such requests in accordance with applicable rules and regulations and medical recommendations.

B.  The Department will, to the extent that it is operationally feasible, reassign the employee to an appropriate vacancy or duties and responsibilities within their own service/section. Such reassignment will be commensurate with the employee's limitations and qualifications. Employees will continue to be considered for promotional opportunities for which they are otherwise qualified.

C.  This section does not provide the procedures for employees affected by job-related injuries or who request reasonable accommodation; those subjects are addressed in other articles of this Agreement.

SA104

# ARTICLE 14 - DISCIPLINE AND ADVERSE ACTION

## Section 1 - General

The Department and the Union recognize that the public interest requires the maintenance of high standards of conduct. No bargaining unit employees will be subject to disciplinary action except for just and sufficient cause.

Disciplinary actions will be taken only for such cause as will promote the efficiency of the service. Actions based upon substantively unacceptable performance should be taken in accordance with Title 5, Chapter 43 and will be covered in Article 27 - Performance Appraisal System.

## Section 2 - Definitions

For purposes of this article, the following definitions are used:

A.  For Title 5 Employees:

1.  A disciplinary action is defined as admonishment, reprimand, or suspension of 14 calendar days or less and

2.  Adverse actions are removals, suspensions of more than 14 calendars days, reduction in pay or grade, or furloughs of 30 calendar days or less.

B.  For Title 38 Employees:

1.  A disciplinary action is defined as an admonishment or reprimand taken against an employee for misconduct and

2.  A major adverse action is a suspension, transfer, reduction in grade, reduction in basic pay, or discharge taken against an employee for misconduct.

## Section 3 - Removal of Disciplinary Actions

Admonishments and reprimands may be removed from an employee's files after a six month period. If an employee requests removal of such actions after six months, they should be removed if the purpose of the discipline has been served. In all cases, an admonishment should be removed from an employee's file after two years and a reprimand will be removed after three years.

## Section 4 - Administrative Reassignment

Administrative reassignments will not be used as discipline against any employees, unless appropriate procedures are followed.

**SA105**

## Section 5 - Alternative and Progressive Discipline

The parties agree to a concept of alternative discipline which shall be a subject for local negotiations. The parties also agree to the concept of progressive discipline, which is discipline designed primarily to correct and improve employee behavior, rather than punish.

## Section 6 - Fairness and Timeliness

Disciplinary actions must be consistent with applicable laws, regulations, policy, and accepted practice within the Department. Discipline will be applied fairly and equitably and will not be used to harass employees. Disciplinary actions will be timely based upon the circumstances and complexity of each case.

## Section 7 - Processing Admonishments and Reprimands

A.  An employee against whom an admonishment or reprimand is proposed is entitled to a 14 day advance written notice, unless the crime provisions are invoked. The notice will state the specific reasons for the proposed action.

The Department agrees that the employee shall be given up to eight hours of time to review the evidence on which the notice of disciplinary action is based and that is being relied on to support the proposed action. Additional time may be granted on a case by case basis. Upon request, one copy of any document(s) in the evidence file will be provided to the employee and/or their designated representative.

B.  The employee or their representative may respond orally and/or in writing as soon as practical but no later than 10 calendars days from receipt of the proposed disciplinary action notice. The response may include written statements of persons having relevant information and/or appropriate evidence.

C.  Extensions for replying to proposed disciplinary actions may be granted for good cause. The management official will issue a written decision at the earliest practicable date. The written decision shall include the reason for the disciplinary action and a statement of findings and conclusions as to each charge. The decision shall also include a statement as to whether any sustained charges arose out of "professional conduct or competence," and a statement of the employee's appeal rights. In responding to a proposed disciplinary action, the employee will be entitled to local union representation.

SA106

## Section 8 - Processing Suspensions, Adverse Actions, and Major Adverse Actions

A.   An employee against whom a suspension, adverse action, or major adverse action is proposed is entitled to 30 days advance written notice, except when the crime provisions have been invoked. The notice will state specific reasons for the proposed action. The Department agrees that the employee shall be given the opportunity to use up to eight hours of time to review the evidence on which the notice is based and that is being relied on to support the proposed action. Additional time may be granted on a case- by-case basis. Upon request, one copy of any document(s) in the evidence file will be provided to the employee and their designated representative.

B.   The employee and/or representative may respond orally and/or in writing as soon as practical but no later than 14 calendar days from receipt of the proposed action notice. The response may include written statements of the persons having relevant information and/or other appropriate evidence. The Department has the right to restrict the response time to seven days when invoking the crime provision.

C.   Extensions for replying to proposed adverse actions and suspensions may be granted when good cause is shown. The appropriate management official will issue a written decision at least five days prior to the effective date. The written decision shall include the reason for the disciplinary action and a statement of findings and conclusions as to each charge. The decision shall also include a statement if any sustained charges arose out of "professional conduct or competence" and a statement of the employee's appeal rights. In responding to a proposed disciplinary action, the employee will be entitled to local union representation.

D.   These provisions do not apply to probationary or trial employees.

## Section 9 - Notice of Disciplinary Actions

A.   Notice of a final decision to take disciplinary action shall be in writing and shall inform the employee of appeal and grievance rights and their right to representation. The employee will be given two copies of the notice; one copy may be furnished to the local union by the employee. The Department will inform the local union when it takes a disciplinary action against a unit employee.

B.   Notices shall explain in detail the reasons for the action taken and all evidence relied upon to support the decision. The notice will also advise the employee how long the action will be maintained in their file. The supervisor shall discuss the notice with the employee. If the employee elects to have a Union representative present, the discussion will be delayed until the local union has an opportunity to furnish a representative.

**SA107**

## Section 10 - Investigation of Disciplinary Actions

A.  The Department will investigate an incident or situation as soon as possible to determine whether or not discipline is warranted. Ordinarily this inquiry will be made by the appropriate line supervisor. The employee who is the subject of the investigation will be informed of their right to representation before any questioning takes places or signed statements are obtained. Other employees questioned in connection with the incident who reasonably believe they may be subject to disciplinary action have the right to Union representation upon request.

B.  Disciplinary investigations will be conducted fairly and impartially, and a reasonable effort will be made to reconcile conflicting statements by developing additional evidence. In all cases, the information obtained will be documented. Supervisory notes may be used to support an action detrimental to an employee only when the notes have been shown to the employee in a timely manner after the occurrence of the act and a copy provided to an employee as provided for in Article 24 - Official Records.

SA108

# ARTICLE 15 - EMPLOYEE ASSISTANCE

## Section 1 - Program Purpose

The purpose of the Department's Employee Assistance Program (EAP) is the appropriate prevention, treatment and rehabilitation of employees with alcohol, drug abuse or other biopsychosocial problems that are adversely affecting the employee's job performance and/or conduct. Biopsychosocial problems may include physical, emotional, financial, marital, family, legal, or vocational issues. Employees who suspect they may have such a problem, even in the early stage, are encouraged to voluntarily seek counseling and information on a confidential basis by contacting the individual(s) designated to provide such services. Supervisors are also encouraged to note when employees appear to be experiencing difficulties for which EAP may provide assistance, and to refer the employee to EAP for assistance. Early intervention may be helpful in returning the employee to full productivity. Employees and supervisors will be informed about the program annually.

## Section 2 - Record of Participation

A. The Department will ensure that the confidentiality of medical records of employees concerning treatment for problems related to alcohol, drugs, emotional concerns, or other personal issues will be preserved in accordance with current public laws and OPM regulations.

B. After an employee is no longer participating in the program, records will be maintained confidentially and preserved in accordance with applicable laws and regulations.

## Section 3 - Voluntary Participation

A. The Department will assure that no employee will have job security, performance rating, proficiency rating, or promotion opportunities jeopardized, or be subject to disciplinary action, adverse action or major adverse action, solely because of a request for counseling or referral assistance.

B. Although the existence and functions of counseling and referral programs will be publicized to employees, no employee will be required to participate or be penalized for merely declining referral to EAP services.

## Section 4 - Confidentiality

A. The parties recognize that employee trust and confidence in the program are keys to its success. For that reason, all confidential information and records concerning employee counseling and treatment will be maintained in accordance with applicable laws, rules, and regulations.

**SA109**

B.  Without an employee's specific written consent, the supervisor may not obtain information about the substance of the employee's involvement with a counseling program. Information obtained with the employee's authorization from such counseling programs may not serve as the basis for disciplinary action, adverse action or major adverse action.

## Section 5 - Relationship to Other Actions

A fundamental purpose of EAP is to assist employees with problems that may result in conduct or performance deficiencies. However, the program is not intended to shield employees from corrective action in all instances. For this reason, the Department will hold in abeyance a proposed corrective action so long as the employee participates in EAP, does not engage in new instances of misconduct or performance deficiency, and successfully completes the treatment to which they are referred. If the employee meets these requirements, the proposed corrective action will be rescinded. This provision only applies in the first instance of the problem(s) requiring EAP assistance and does not apply if severe, egregious, or criminal misconduct is involved. A successful program assists the employee in overcoming a personal problem so that performance and/or conduct improves and corrective action, such as disciplinary action, adverse action, major adverse action, or other performance- based actions, becomes unnecessary.

## Section 6 - Excused Absence

A supervisor or manager shall grant up to 1 hour (or more as necessitated by travel time or unusual circumstances) of excused absence for each counseling session, up to a maximum of 8 total hours, during the assessment/referral phase of rehabilitation.

## Section 7 - Leave Associated with EAP

It is the policy of the Department to grant leave (sick, annual, or LWOP) for the purpose of treatment or rehabilitation for employees under the EAP as would be granted for employees with any other health problem.

## ARTICLE 16 - EMPLOYEE AWARDS AND RECOGNITION

### Section 1 - Background and Purpose

Recognition of employees through monetary and non-monetary awards reflects the parties' efforts to promote continuous improvement in Department performance. The employee recognition program provides a positive indication of the parties' commitment to providing quality public service. The employee recognition program, as described in this article, has the following characteristics:

A.  It is an incentive program; that is, employee recognition is based on achievement and improvement. Achievements are linked to the Department's mission of providing high quality care and service to veterans and the public. The program is intended to motivate employees to strive for excellence. Strong emphasis is placed on recognition of efforts to improve service to veterans and the public.

B.  It recognizes the accomplishments of employees both as individuals and as members of groups or teams. Because of the interrelationship of work performed by employees, enhanced Department performance is sought through teamwork, not through competition among individuals. This program is based on the concept that individual employees who, through personal efforts and accomplishments support the goals of their teams, work units and, thus, deserve recognition. It is also based on the concept that groups or teams which improve Department performance deserve recognition. It recognizes that the Department, the Union, and employees have important roles in identifying and recognizing employees deserving of awards and praise. The intent of this program is to promote a positive work environment and to link awards to employee contributions that enhance Department performance.

C.  Further, it is the intent of this program to ensure that employees will be appropriately rewarded regardless of changes in the Department's organizational structure, work processes, or work initiatives.

### Section 2 - Policy

A.  There is no limit on the number of awards that employees may receive or the frequency with which they may receive awards unless otherwise stated in this article.

B.  When employees are considered for awards, the relative significance and impact of their contributions will be considered in determining which type of award would constitute appropriate recognition and, for monetary awards, in determining the amount of money to be granted. Funding availability must also be considered in the granting of monetary awards.

**SA111**

C.  Awards will be processed in a timely and expeditious manner.

D.  The Department will provide an award recipient with written documentation that clearly articulates the specific reason(s) that the employee received the award. Employees are encouraged to relate this information to specific evaluation criteria when completing applications for merit promotion.

## Section 3 - Types of Awards

Awards which employees may be eligible to receive include but are not limited to:

A.  Special Contribution Award

B.  Instant Award

C.  Suggestion Award

D.  Time-off Award

## Section 4 - Award Panels

Each facility will establish award panels consisting of management and bargaining unit employees. The composition and membership of each panel will be decided jointly by the local union and the Department. The local union will designate the bargaining unit panel members. Panel decisions will be made by consensus and will then be forwarded to the Director of the facility. Award panels will be formed at the beginning of assessment period. Panels will perform the following functions, maintaining the strictest confidentiality and avoiding even the appearance of conflicts of interest:

A.  Establish fair and equitable mission-related criteria for awards.

B.  Operate within parameters as negotiated locally.

## Section 5 - Monetary Awards

A.  Special Contribution Awards
    The special contribution award is a special act or service award which recognizes individuals or groups for major accomplishments or contributions which have promoted the mission of the organization. Award amounts should be linked to the significance and impact of the accomplishment or contribution. A special contribution award may be made to an individual employee or to a group. A group may consist of individuals from a single organization or multiple components/offices/units.

SA112

B.  Instant Awards

This is a special act or service award given to an employee for noteworthy contributions or accomplishments in the public interest which are connected with or related to the recipient's official employment. The distinction between a special contribution award and an instant award rests in the relative significance of the contribution or accomplishment.

C.  Suggestion Awards

The Department will encourage employees to file suggestions under the Department's Suggestion Program. Suggestions will be considered in a fair and equitable manner. Suggestion awards will be appropriate for tangible suggestions, intangible suggestions, and problem identification, as defined in the Department's Suggestion Program.

1.  In the event no decision is made regarding adoption or non-adoption of a suggestion within 90 days of submission, the employee, upon request, will be given a written or oral status report.

2.  Non-adoption of employee suggestions is to be written and contain specific reasons for non-adoption.

3.  If the idea set forth in a rejected suggestion is later adopted, the appropriate suggestion coordinator will reopen the case for award consideration if the matter is brought to their attention within two years after the date of rejection notice.

## Section 6 - Time-Off Awards

Time-off awards may be granted to an individual or group of employees for contributions that benefit the Department. These awards may be granted for contributions such as, but not limited to, the following:

A.  A significant contribution involving completion of a difficult project or assignment of importance to the mission of the Department;

B.  The completion of a specific assignment or project in advance of an established deadline and with favorable results;

C.  Displaying unusual initiative, innovation, or creativity in completing a project or improving the operation of a program or service;

D.  Displaying unusual courtesy or responsiveness to the public which clearly demonstrates performance beyond the call of duty and which produces positive results for the Department; and,

**SA113**

E.  Exemplary work by an employee as a canvasser for special campaigns or programs such as the Combined Federal Campaign, US Savings Bonds, or blood donor program. (An award for such an effort may not exceed one work day per activity.)

## Section 7 - Award Nomination Procedures

A.  Employees and management officials are encouraged to identify individual employees who they believe should be recognized for high quality accomplishments or contributions.

B.  Nominations of individual employees should be submitted in writing to the appropriate manager or award panel. The nominations should include a description of the accomplishments or contributions of the nominee(s) and an explanation of their significance, as well as the name and telephone number of the employee submitting the nomination. Nominations should not include suggestions for the type of award or the amount of money to be granted. Information provided in the nominations will be considered in determining appropriate recognition.

**SA114**

# ARTICLE 17 - EMPLOYEE RIGHTS

## Section 1 - General

A.  In an atmosphere of mutual respect, all employees shall be treated fairly and equitably and without discrimination in regard to their political affiliation, union activity, race, color, religion, national origin, gender, sexual orientation, marital status, age, or non-disqualifying handicapping conditions irrespective of the work performed or grade assigned.
Employees will also be afforded proper regard for and protection of their privacy and constitutional rights. It is therefore agreed that the Department will endeavor to establish working conditions that are conducive to enhancing and improving employee morale and efficiency.

B.  Instructions will be given in a reasonable and constructive manner.
Such guidance will be provided in an atmosphere that will avoid public embarrassment or ridicule.

C.  If an employee is to be served with a warrant or subpoena, it will be done in private without the knowledge of other employees to the extent it is within the Department's control.

D.  No disciplinary, adverse, or major adverse action will be taken against an employee upon an ill-founded basis such as unsubstantiated rumors or gossip.

E.  No employee will be subjected to intimidation, coercion, harassment, or unreasonable working conditions as reprisal or be used as an example to threaten other employees.

F.  Recognizing that productivity is enhanced when employee morale is high, managers, supervisors, and employees shall endeavor to treat one another with utmost respect and dignity.

G.  An employee who exercises any statutory or contractual right shall not be subjected to reprisal or retaliation, and shall be treated fairly and equitably.

H.  All VA employees will, consistent with the Master Agreement and other collective bargaining agreements:

1.  Be provided a healthy and safe environment;

2.  Be encouraged to give suggestions and ideas to make the Department a better workplace and enable the Department to better serve veterans;

**SA115**

3.  Be encouraged to enhance their work life and career development; and,

4.   Be afforded assistance and told of expectations by the Department to enable them to perform their jobs.

## Section 2 - Rights to Union Membership

Under 5 USC 7102, each employee shall have the right to form and join a Union, to act as a designated Union representative, and to assist the Union without fear of penalty or reprisal. This right shall extend to participation in all Union activities including service as officers and stewards/representatives. A bargaining unit employee's grade level, compensation, title, or duties shall not limit the employee's right to serve as a Union official, to represent the bargaining unit or to participate in any Union activities.

## Section 3 - Rights to Union Representation

The Department recognizes an employee's right to assistance and representation by the Union, and the right to meet and confer with local union representatives in private during duty time, consistent with Article 48 - Official Time, and local supplemental agreements. If the employee and the local union representative cannot be released immediately, the employee and the local union representative will normally be released two hours before the end of their tour of duty. If such release is not made, appropriate relief from time frames will be afforded (e.g., one day extension for each day of delay). The Department agrees to annually inform all employees of the right to Union representation under 5 USC 7114(a)(2)(B) by postings on official bulletin boards and other appropriate means. During their initial orientation, each employee will be provided with a copy of Weingarten rights and the Master Agreement. These documents also will be available electronically.

## Section 4 - Use of Recording Devices

No electronic recording of any conversation between a bargaining unit employee and a Department official may be made without mutual consent except for Inspector General investigations, other law enforcement investigations, ORM/EEO investigations, or duly authorized Boards of Investigation. All electronic recordings will be transcribed. The employee will be given a copy of the recording at the same time they receive the transcript for review. The employee will have the right to review the transcript for accuracy, and may make corrections. The employee will receive a copy of the final corrected transcript. Information obtained in conflict with this Section will not be used as evidence against any employee.

## Section 5 - First Amendment Rights

Employees have the right to present their views to Congress, the Executive Branch, or other authorities and to otherwise exercise their First Amendment rights, consistent with applicable laws, without fear of penalty or reprisal.

SA116

## Section 6 - Access to Documentation

Consistent with the Privacy Act and related government wide regulations in existence on the effective date of the Master Agreement, employees have a right to be made aware of any information specifically maintained under their name and/or social security number or any other personal identifiers. This includes any documentation that is not covered by official records referenced in Article 24 - Official Records. In most cases, employees will be provided with copies of documents maintained in their eOPF or Merged Record Personnel Folder (MRPF). When no copy of a document in the eOPF, MRPF, or other system of records is automatically provided, the employee will receive a copy upon request. The Department will annually provide employees with a list of systems of records in which information is maintained and retrieved by employee name, social security number, or other personal identifier. Such list will include general descriptions of the types of documents included in each system of records. Information not in compliance with this provision may not be used against the employee.

## Section 7 - Personal Rights

A. Employees shall have the right to direct and fully pursue their private lives, personal welfare, and personal beliefs without interference, coercion, or discrimination by the Department so long as such activities do not conflict with job responsibilities or applicable laws.

B. The Department will make every reasonable effort to provide for secure storage of personal belongings.

C. The Department shall instruct employees on how to file a claim for reimbursement under 31 USC 3721 and related regulations and will make forms available in case of loss if some personal item is damaged, irretrievably lost, or destroyed.

## Section 8 - Dignity and Self Respect In Working Conditions

Employees, individually and collectively, have the right to expect, and to pursue, conditions of employment which promote and sustain human dignity and self-respect.

## Section 9 - Employee Right to Privacy

Searches and seizures by the Department of the private property of its employees are subject to Constitutional constraints. Employees may store personal papers and effects in their offices, desks, and file cabinets. However, a search or seizure of such items without a warrant may be justified if the Department has reasonable grounds for suspecting that the search will produce evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a non-investigative

**SA117**

work-related purpose, such as insuring the internal security of the Department. Security concerns may necessitate searches of Department space or employees, subject to Constitutional constraints. It should be understood that employee's person and personal items owned by the employee, such as pocketbooks, briefcases or other like materials, are not subject to search without reasonable suspicion that criminal activity is involved. As an exception, if searches are used when individuals enter a facility, then such search methods must be conducted consistently for all individuals.

## Section 10 - Whistle-Blower Protection Act

Consistent with the Whistleblower Protection Act, currently codified at 5 USC 2302(B)(8), employees shall be protected against reprisal of any nature for the disclosure of information not prohibited by law or Executive Order which the employee reasonably believes evidences a violation of law, rule or regulation, or evidences gross mismanagement, a gross waste of funds, an abuse of authority, or substantial and specific danger to public or employee health or safety. The Department will annually notify employees about their rights under the Whistle Blower Protection Act. If training on the Whistle Blower Protection Act is required, employees will be provided duty time to complete it.

## Section 11 - Unlawful Orders

An employee has the right to refuse orders that would require the employee to violate an applicable law. The employee will promptly bring their specific concerns to the supervisor or appropriate Department official. The Department official will consider the employee's concern and promptly notify the employee whether the order is lawful or unlawful. Refusal to obey an unlawful order will not subject the employee to disciplinary or adverse action or major adverse action.

## Section 12 - Improper Orders

An employee has the right to question an improper order that would direct them to act outside the scope of practice, privileges, competencies, or qualifications. The employee will promptly bring their concern about the improper order to an appropriate supervisor. The supervisor will promptly apprise the employee whether the order was proper or improper. A refusal to obey an improper order will not subject the employee to disciplinary or adverse action or major adverse action.

## Section 13 - Conflicting Orders

When an employee receives conflicting orders, they will bring the conflict to the attention of the supervisor who gave the last order or another appropriate supervisor. The employee will be given a clarified order. The employee will not be subject to disciplinary, major adverse or adverse action for following the clarified order.

SA118

## Section 14 - Group Meetings

The Department agrees that group meetings of employees serve as a useful means of communication. Employees may request group meetings to discuss their concerns about workplace issues. Supervisors will consider and provide a response to such requests. The right of the local union to be notified of and attend such meetings is set forth in Article 49 - Rights and Responsibilities.

## Section 15 - Labor Recognition Week

The parties agree to jointly present the concept of labor recognition week to the VA National Partnership Council. That concept would involve jointly sponsoring Labor Day Recognition Week during the week preceding Labor Day.

## Section 16 - Counseling

Counseling shall be reasonable, fair, and used constructively to encourage an employee's improvement in areas of conduct and performance. It should not be viewed as disciplinary action. At any counseling session where an employee has the right to local union representation, the employee shall be advised of that right at the beginning of the session.

A. Oral Counseling

When it is determined that oral counseling is necessary, the counseling will be accomplished during a private interview with the concerned employee and local union representative if requested and appropriate. If after such a meeting, the employee is dissatisfied and wishes to pursue a grievance, the employee may proceed to either Step 1 or to Step 2 of the grievance procedure. If there is to be more than one Department official involved in a counseling session with an employee, the employee will be so notified in advance and the employee may have a local union representative at the session.

B. Written Counseling

1. Written counseling will be accomplished in the same manner as specified above, except that two copies of a written statement will be given to the employee.

2. A written counseling for misconduct may only be kept or used to support other personnel actions for up to six months unless additional related misconduct occurs, and then it may be retained up to one year.

3. A written counseling for performance may only be retained and used beyond the appeal period of the annual performance rating to support a timely personnel action related to that rating or any timely action taken during that period.

**SA119**

4. In the case of probationary employees, a written counseling may be kept up to the time a decision is made whether or not the employee will be continued beyond the probationary period.

**SA120**

# ARTICLE 18 - EQUAL EMPLOYMENT OPPORTUNITY

## Section 1 - Policy

The Department and the Union affirm their commitment to the policy of providing equal employment opportunities to all employees and to prohibit discrimination because of race, color, religion, sex (including sexual harassment), sexual orientation, national origin, age (40 years of age and over), or disabling condition.

## Section 2 - Equal Employment Opportunity Program

The Department's Equal Employment Opportunity (EEO) Program shall be designed to promote equal employment opportunity in every aspect of the Department's personnel policy and practice in accordance with applicable law and government-wide rules and regulations. The program shall include, but not be limited to, the following:

A.   Providing reasonable job accommodation for qualified disabled employees;

B.   Reviewing selection processes and staffing procedures to identify those which are inconsistent with governing Federal EEO rules and regulations and taking corrective actions consistent with such rules and regulations in those instances where adverse EEO impacts are found;

C.   Procedures that allow for the redesigning of jobs, where feasible and desirable, and which do not create an undue hardship to achieve the Department's mission to utilize to the maximum extent possible the present skills of qualified disabled employees;

D.   Making reasonable accommodations for the religious needs of employees when such accommodations can be made without undue hardship to the conduct of Department programs;

E.   Commitment to the prevention of workplace harassment and sexual harassment; and,

F.   Affirmative Employment Plan(s).

## Section 3 - Reasonable Accommodations for Employees with Disabilities

A.   In accordance with Section 501 of the Rehabilitation Act of 1973, as amended, and other government-wide rules and regulations pertaining to the employment of individuals with disabilities, the Department is committed to affirmative action for the employment, placement, and advancement of qualified individuals with disabilities including disabled veterans.

**SA121**

B. The Department will offer reasonable accommodation to qualified individuals with known physical disabilities or mental impairments, or those who have a record of past impairment regardless of the type of appointment, unless the Department can demonstrate that the accommodation would impose an undue hardship on the operation of the Department's program (as defined in 29 CFR 1614.203).

C. Requests should be made in accordance with VA Handbook 5975.1 (Processing Request for Reasonable Accommodation by Employees and Applicants with Disabilities) or in accordance with the local facility's Equal Employment Opportunity Commission (EEOC) approved policy on request for reasonable accommodation. The Department shall process requests for reasonable accommodation and provide accommodations, when appropriate, in as short a timeframe as is reasonable. When possible, decisions regarding accommodations should be rendered within 30 calendar days of the date the request was received.

D. The parties recognize that individual accommodations will be determined on a case-by-case basis, taking into consideration the employee's specific disability, the employee's suggestions for reasonable accommodations, existing limitations, the work environment, and undue hardship imposed on the operation of the Department's program as defined above. Qualified employees with disabilities may request specific accommodations. However, the Department is not required to provide the employee's accommodation of choice, as long as the Department provides a reasonable accommodation.

E. Should a non-probationary employee become unable to perform the essential functions of their position even with reasonable accommodation due to a disability, the Department shall offer to reassign the employee when there is a funded vacant position available for which the employee is qualified, subject to all conditions in 29 CFR 1614.203(g) being met.

F. For employees with disabilities, job restructuring is one of the principal means by which some qualified workers with disabilities can be accommodated. The principal steps in restructuring jobs are:

1. Identify which factor, if any, makes a job incompatible with the worker's disability;

2. If a barrier is identified in a nonessential job function, the barrier is eliminated so that the capabilities of the person may be used to the best advantage; and,

3. Job restructuring does not alter the essential functions of the job (any changes made are those which enable the person with a disability to perform those essential functions).

**SA122**

G.  The parties agree that in many cases, changes in the work environment and other accommodations enable persons with disabilities to more effectively perform their job duties. Alterations and accommodations may be, but are not limited to, the following:

1.  Rearranging files or shelves;

2.  Widening access areas;

3.  Maintaining hazard-free pathways;

4.  Raising or lowering equipment;

5.  Moving equipment controls from one side to the other, or modifying them for hand or foot operations;

6.  Installing special holding devices on desks, benches, chairs or machines; and,

7.  Providing qualified interpreters for the hearing impaired.

H.  With respect to the modernized systems environment, examples of accommodations are:

1.  The surface that holds the terminal will be adjusted to a level suitable to the employee's needs;

2.  The keyboard will have "light touch," guards, and other adaptive devices that will be considered;

3.  Visually impaired employees will be permitted to label "home" keys;

4.  Operational and training materials will be available in Braille;

5.  Lap trays will be considered;

6.  Computer based voice-output systems or VDT screen enlargers or other appropriate devices will be provided for visually impaired employees;

7.  Hardware and software will be configured to accommodate color blindness (e.g., blinking cursor, highlighting); and,

8.  Printer switches will be available in "light touch" and located in an easily accessible location.

I.  An employee may be provided assistive devices if the Department determines that the use of the equipment is necessary to perform official duties. Such equipment does not cover personal items which the employee would be expected to provide, such as hearing aids or eye glasses.

J.  The Department's facilities shall be accessible to employees with disabilities.

**SA123**

K.  The Department will be liberal in granting leave to accommodate the disabling conditions of employees. For example:

1.  Leave without pay may be granted for illness or disability; and,

2.  Sick leave can be appropriately used by a person with a disability who uses prosthetic devices, wheel chairs, crutches, guide dog, or other similar type devices for equipment repair, guide dog training, or medical treatment.

L.  The Department will provide training to employees with disabilities on the same basis as other employees, consistent with this Agreement. Once an employee is selected for training, the Department will provide reasonable accommodations to the employee to attend and complete the training.

M.  For the purpose of continuing to provide reasonable accommodations for hearing-impaired employees, the Department agrees to provide interpreter services for those employees who seek local union assistance and/or representation for their individual concerns, unless the employee wants to retain confidentiality. To the extent possible, interpreter services should be arranged in advance, and the entire process treated with confidentiality.

N.  For the purpose of performing official business travel, the Department agrees to reimburse travel expenses that are necessary to reasonably accommodate the employee's disability, consistent with Federal Travel Regulations.

O.  Employees with disabilities may, where appropriate as a reasonable accommodation, request telework arrangements.

## Section 4 - Affirmative Employment Plans

A.  The Department's Affirmative Employment Plan shall be designed to promote positive opportunities for all employees to contribute to the Department's mission to the maximum extent possible, consistent with EEO principles. The Department shall ensure that where there are situations of underrepresentation, targeted recruitment and development plans will be implemented. The parties are encouraged to jointly develop Affirmative Employment Plans.

B.  Affirmative Employment Plans should include, where appropriate, provisions for reviewing individual services to ensure that affirmative employment policy is apparent within the service and to make more use of bridge positions and cross-training.

C.  The Department will fulfill any labor-management obligations, as appropriate, with the Union at the national level prior to submitting the National Affirmative Employment Plan to EEOC for approval. The parties recognize that the National Affirmative Employment Plan must be submitted to EEOC.

**SA124**

D.  The Department at the local level will fulfill any labor-management obligations, as appropriate, with the local union prior to submitting local Affirmative Employment Plans to the next organizational level where required (for example, to the Department or EEOC). The parties recognize that the local plans must be submitted to headquarters in sufficient time for the Department to meet the EEOC requirement in C above.

E.  The Department will comply with all equal employment opportunity requirements throughout the Department, as outlined in 29 CFR 1614.102, the Disabled Veterans Affirmative Action Promotion Plan (38 USC 4214), 5 CFR Part 720, and the statutory or regulatory requirements in EEOC Management Directive 715 (MD-715).

## Section 5 - Information, Data, and Reports

A.  The Department agrees to provide employees access to written information describing the discrimination complaint procedures and their local Affirmative Employment Plan(s).

B.  The Department agrees to the timely posting of names, pictures, and office telephone numbers of EEO Counselors on designated local bulletin boards. The Department will also provide the local union with a current list of local EEO Counselors and will update the list when changes are made.

C.  The Department agrees to provide the Union with copies of the National Affirmative Employment Plan and any other reports submitted to EEOC, including statistical data, concurrently with submission to the EEOC.

D.  Each facility preparing an Affirmative Employment Plan and any other reports will provide a final copy of the same, including statistical data, to the appropriate local union when they are prepared.

## Section 6 - EEO Counselors

A.  The Department agrees to post the contact information for the appropriate Office of Resolution Management (ORM) office on local bulletin boards.

B.  The Department will assure that EEO counselors are available and accessible to employees who may have a discrimination complaint.

C.  The responsibilities of the Department include counseling employees, former employees and applicants who believe they have been discriminated against in the workplace and informing the aggrieved person(s) about the EEO process. The EEO Counselor should work with the parties to provide a channel through which informal resolution(s) can be attempted.

**SA125**

D. The parties agree that proper training will be provided to designated EEO counselors consistent with appropriate EEOC regulations.

## Section 7 - VA Diversity Council/EEO Committees

A. The Union can appoint two representatives to serve on the Department of Veterans Affairs Diversity Council (VADC). The Department will provide official time, travel, and per diem for the employees appointed by the Union to serve on the VADC. Official time to attend such meetings shall be in addition to any official time presently allowed by this Agreement.

B. Local EEO committee meetings will be conducted during normal duty hours. Bargaining unit employees participating in local EEO committees and special emphasis programs, but not serving in a representational capacity, shall be on duty time.

C. The membership and operation of local committee(s), such as the EEO Advisory Committee, the Diversity Committee, etc., are appropriate subjects for local bargaining. The Department will provide official time for any local union representative serving on such local committees. Official time to attend such meetings shall be in addition to any official time presently allowed by this Agreement. The local union will determine who the representative will be at such meetings.

D. The membership and operation of local committee(s), such as the EEO Advisory Committee, the Diversity Committee, etc., are appropriate subjects for local bargaining. Bargaining unit members will be selected by the local union.

## Section 8 - Special Emphasis Program Managers (SEPM)

A. Purpose
The Special Emphasis Programs support and strengthen the EEO/Affirmative Action programs by addressing the unique concerns of particular constituent groups and helping to ensure that members of these groups are employed, advanced, and retained with the Department on a nondiscriminatory basis. Government-wide special emphasis programs include the Federal Women's Programs, the Hispanic Employment Program, the Selective Program for Handicapped Individuals, the Upward Mobility Program, the Veterans Employment Program, the Asian-American Program, Asian Pacific-American Program, Native-American Program, African-American Program, and other similar special emphasis programs. Other programs may be established at the discretion of a local committee, such as the EEO Committee, the Diversity Committee, etc.

**SA126**

B. Responsibilities and Requirements
The duties and responsibilities of SEPMs may include such activities as:

1. Analyzing employment policies and practices to identify barriers to the hiring, development, advancement, and retention of a particular constituency;

2. Recommending to the Department changes in personnel policies, practices, and procedures;

3. Initiating affirmative employment efforts; and,

4. Participating in planning the implementation, monitoring, and evaluating of the Federal Employment Opportunity Retention Plan.

Upon appointment to the collateral duty assignment of SEPM, the employee will receive, in writing, the duties and responsibilities of the SEPM, including time allocation for program activities. The employee may document this collateral duty by submitting an SF-172 or memorandum for inclusion into their eOPF.

C. Selection of SEPMs
The Department will request nominations from the local union when the Department is considering individuals to serve as SEPM on a collateral duty basis.

D. Management Support
The Special Emphasis Programs are an essential part of the total EEO program and merit the full cooperation of employees, supervisors, local union(s), and managers. Appropriate publicity and recognition should be given to the programs and training provided to SEPMs, as needed, and to supervisors and managers at all levels regarding the program's activities and goals as they relate to the mission of the agency. Similar information should be presented during the orientation of new employees. All SEPMs need management support in terms of facilities, time, and cooperation.

## Section 9 - Complaints

The complaint process afforded to employees must follow the procedures set forth by government-wide EEOC regulations, which can be found in 29 CFR Part 1614 and its subparts.

**SA127**

# ARTICLE 19 - FITNESS FOR DUTY

## Section 1 - Scope

This article applies to Title 5 and Hybrid employees. For Title 38 employees see Article 57 - Physical Standards Boards. The Department may direct a Title 5 or Hybrid employee to undergo a fitness for duty examination only under those conditions authorized by this article and in accordance with 5 CFR 339. The Department will have the right to require medical examinations only if they are job related and consistent with business necessity.

## Section 2 - Prerequisite Conditions

When there are reasonable grounds to believe that a health problem is causing performance or conduct problems of an employee, the employee shall be given an opportunity to provide medical evidence documenting the health problem affecting their performance or conduct and/or an opportunity to voluntarily initiate an application for disability retirement on their own behalf.

## Section 3 - Medical Determination

A.  The Department may require an employee receiving worker's compensation benefits or assigned to limited duties as a result of an on-the-job injury to report for medical evaluation when the Department has identified an assignment or position (including the employee's regular position) which it reasonably believes the employee can perform consistent with the medical limitations of their condition.

B.  The Department may offer a medical examination when an individual has made a request for medical reasons for a change in duty status, assignment, working conditions, or any other benefit or special treatment (including reemployment on the basis of full or partial recovery from a medical condition) and the Department, after it has received and reviewed medical documentation, determines that it cannot grant, support, or act further on the request without verification of the clinical findings and current clinical status.

1.  When the Department orders or offers a medical examination under the provisions of the prevailing regulations, it shall inform the employee in writing of its reasons for ordering or offering the examination and the consequences of failure to cooperate. The Department shall designate the examining physician but shall offer the employee the opportunity to submit medical documentation from their personal physician which the Department shall review and make part of the file.

**SA128**

2. The Department shall provide the examining physician with a copy of any approved medical evaluation protocol, applicable standards and requirements of the position, and/or a detailed position description of the duties of the position including critical elements, physical demands, and environmental factors.

3. The Department shall order or offer a psychiatric evaluation to an employee only when the employee first provides results of a general medical or psychiatric examination or the Department has first conducted a nonpsychiatric medical examination and, after review of the documentation or examination report, the Department's physician concurs that a psychiatric evaluation is warranted for medical reasons.

C. All medical examinations ordered or offered pursuant to Paragraphs 3A and 3B in this section shall be at no cost to the employee and performed on duty time at no charge to leave.

## Section 4 - Procedures

In seeking a fitness for duty examination which may or may not lead to a disability application, the following rules and procedures shall apply:

A. In all discussions with any Department official, the employee shall be entitled to local union representation. Prior to any discussion, the employee shall be notified of this right, given an opportunity to contact and discuss the matter with their local union representative, and permitted the right of representation in such discussion.

B. During these procedures, the employee will be apprised of their rights and, where supported by appropriate medical evidence, given the opportunity for suitable interim adjustments in their work assignments.

C. The Department will ordinarily offer the employee a reassignment to a position when the results of a medical examination reveal that the employee:

1. Cannot satisfactorily perform useful and efficient service in their regularly assigned job;

2. Retains the capacity to do other work at the same grade or pay level within the work location or the commuting area; and,

3. Otherwise meets the minimum qualifications for an available position that the Department seeks to fill.

D. When the Department determines that the medical evidence reveals the employee is totally disabled for service in their current position, and

SA129

reasonable accommodation for another position cannot be made, the Department will so advise the employee and provide appropriate counseling.

## Section 5 - Counseling

When a disabled employee meets existing disability retirement requirements, the Department will counsel them concerning disability retirement and explain the procedure for voluntarily applying for disability retirement. In the event that such an employee is unable to file on their own behalf, the Department may initiate, with notice to the employee, an application for the employee in accordance with applicable laws and regulations.

    A.   The Department shall provide the employee proper notice, in accordance with 5 CFR Section 831.1205(b), and shall permit the employee 30 days in which to respond in writing.

    B.   If the medical evidence and performance records establish that the employee retains the capacity to perform satisfactorily in a vacant lower graded position which the Department seeks to fill within the employee's commuting area, the employee will be informed of their option to request such a demotion.

## Section 6 - Confidentiality of Records

All records pertaining to the employee's examination and any subsequent personal information included with an application for disability retirement are confidential and may be disclosed only to those with an administrative need to know or specifically authorized by the employee. There will be a written statement to the employee of the disclosure.

**SA130**

## ARTICLE 20 - TELEWORK

### Section 1 - General

A.  The Department and the Union jointly recognize the mutual benefits of a flexible workplace program to the Department and its employees. Balancing work and family responsibilities, assistance to the elderly or disabled employees, and meeting environmental, financial, and commuting concerns are among its advantages. In recognizing these benefits, both parties also acknowledge the needs of the Department to accomplish its mission. The primary intent of the telework program is to support the mission of the Department in an alternative work setting. Telework must not be used as an alternative to or in lieu of dependent care. Employees who telework will be permitted to take care of personal matters in the same way as employees who do not telecommute. The Department Telework Program will be governed by applicable law, government-wide rules and regulations, VA Directives and Handbooks, and this article.

B.  Any Telework Program established under this article will be a voluntary program which permits employees to work at home or at other approved sites away from the office for all or a part of the workweek.

C.  The parties agree that employees participating in telework are performing the same duties as their counterparts working at VA facilities. In the interest of fairness and equity, employees shall not be disadvantaged on their performance expectations because of their participation in telework. The Department shall use the same measurements of work for employees who are on telework as are used for those employees who perform those same tasks at their Official Duty Station (ODS).

### Section 2 - Definitions

A.  Telework
The terms"telework" and"telecommuting" are synonymous and include working at home or in satellite office sites or other approved telework work sites.

B.  Alternate Duty Station (ADS)
A worksite other than the employee's official duty station, such as employee's residence (defined as a specific room or area within an employee's primary residence), a telecommuting center, a facility established by state, local, or county governments, private sector organizations for use by teleworkers, or an established satellite location including other VA facilities. The alternative worksite must be mutually agreeable to the employee and their supervisor.

**SA131**

C. Official Duty Station (ODS)

A telecommuting employee's official duty station continues to be the permanent duty station. Generally, the official worksite for an employee covered by a telework agreement is the location of the regular worksite for the employee's position (that is, the place where the employee would normally work absent a telework agreement), as long as the employee is scheduled to report physically at least twice a pay period on a regular and recurring basis to that regular worksite. Employees should refer to 5 CFR 531.605 for application of special situations.

D. Telework Center

The Department satellite facility that the General Services Administration (GSA) establishes to provide federal employees an opportunity to work at an alternative location that is geographically convenient to the employee's residence. The space at the telework center is owned or leased by one or more federal agencies.

E. Regular and Recurring Telework

Regular and recurring telework means the employee works at an ADS on a regularly scheduled basis (for example, one or more days per week, the second Wednesday of each pay period, Tuesday afternoon, two hours per day, etc.), at a home, a telework center, or other offsite location.

F. Short-Term or Temporary Telework

Short-term or temporary telework is when an employee is prevented from reporting to the regular worksite due to an injury, recuperation from surgery, etc., for short periods of time (usually no more than three to six months). Employees participating in this type of telework may work full-time or may combine part-time work with leave use depending on the circumstances of the individual and the portability/availability of work at the alternative site.

G. Periodic or Intermittent Telework

Periodic or intermittent telework is ad-hoc in nature and can be used when a project or assignment requires intense concentration or weather conditions are unfavorable.

## Section 3 - Criteria

If employees meet the criteria for telework, the Department may approve their participation in telework arrangements in accordance with applicable law and this article. Department officials are responsible for determining which positions are appropriate for telework arrangements, consistent with labor relations obligations. The guidelines for approving telework arrangements are based on, but not limited to, the following:

A.   Work activities to be performed at an ADS must be portable (may be performed away from the traditional worksite, either in whole or in part, and can be evaluated by the supervisor);

B.   The position's contact with other employees, the supervisor or manager, and serviced clientele is predictable and normally scheduled and can otherwise be accomplished via telephone or videoconferencing;

C.   The technology needed to perform work offsite must be available;

D.   Employees may be linked electronically to the traditional office location by computer or may simply take work to the ADS, requiring no computer;

E.   Privacy Act materials, evidence, or sensitive documents (hard copy or electronic) may be accessed remotely, provided the employee agrees to protect government/VA records from unauthorized disclosure or damage and will comply with the requirements of the Privacy Act and all other applicable federal laws and government-wide regulations and other applicable VA Policies and Directives;

F.   The employee volunteered (or concurred with the supervisor's recommendation) to perform work at the ADS;

G.   An employee has a "fully successful" (or equivalent) performance appraisal. If the employee has worked more than 12 months and does not have an appraisal, they shall be assumed to be "Fully Successful" for purposes of telework;

H.   The employee must have a telephone, workspace suitable to perform work, utilities adequate for installing equipment, and space that is free from interruptions and provides reasonable security and protection for government property;

I.   The employee is willing to sign and abide by the Telework Program Agreement concerning participation in the Telework Program.

## Section 4 - Furniture and Equipment

A.   Employees participating in the Telework Program will be provided equipment necessary to perform their duties, consistent with the telework proposal, VA Form 0740 (August 2022) and the Alternative Workplace Telework Agreement.

B.   The Department will allow each employee on telework to use an assigned Department computer at the employee's ADS. If an employee prefers to use a personal computer, or if a portable computer is unavailable, the Department

**SA133**

will load and maintain all software to the personal computer that is necessary for accomplishing the job. A phone line and portable computer will be provided.

C. Any time the Department gives up space or otherwise downsizes the office, any excess equipment or furniture may be made available to employees in this program, subject to the limitations of Paragraph A above. Agreements between the local union and the facility will address how the equipment will be assigned.

## Section 5 - Telework Program Agreement

A. Prior to participating in the Telework Program, employees will be required to complete, on a one-time basis, a Telework Program Agreement that has been negotiated between the Department and the local union. A new Telework Program Agreement must be completed if significant changes occur (e.g., change in ADS address/location, change in supervisor, and/or change in official duty station). Continued participation in telework shall be subject to periodic review by the supervisor for compliance with the requirements of this article.

B. The Agreement documents a commitment by the employee and the supervisor to abide by the applicable guidelines and must be in place before the employee begins working at an alternative worksite.

C. Participants may be permitted to work at home or other telework worksites full days or a portion of a day.

D. At a minimum, Telework Agreements must contain the following:

1. ADS location such as the employee's home address or the address of the telecenter;

2. The location of the ADS must be of mutual agreement to the employee and the Department;

3. A telework schedule which identifies the days the employee will work each week, pay period, or month. For intermittent arrangements, the agreement should prescribe the procedures that will be used for approval of specifically requested days to be worked at the ADS. Agreements for short term/temporary use should identify the time period (from/to date), number of days, and hours per week or pay period during which work will be performed;

**SA134**

4. Procedures for administrative processes such as leave approval from the ADS, time and attendance reporting, weather dismissal time and attendance, etc;

5. Privacy Act/security provision;

6. Description of the work to be performed at the alternative worksite that can include specific duties or projects to be completed and any deadlines for delivery that may apply;

7. Any procedures required for work processes such as a requirement to submit progress reports, submission, and review of completed work, participation in meetings, conference calls, etc.; and,

8. The duration of the employee's participation.

E. Teleworkers must complete and sign the Telework Self-Certification Safety Checklist (contained in VA- 0740) certifying that the ADS is safe and that all requirements to do official work at home are met. The employee agrees to permit inspections by representatives of the Department, as required, during normal working hours to insure proper maintenance of any government-owned property and conformance with safety standards.
The employee will be provided advance notice of any inspection. The local union has the right to be present at the inspection. The date of the safety inspection will be coordinated between the safety inspector and the employee within five days of the day that the inspection has been determined to be needed. The date of this inspection will be provided to the local union.

## Section 6 - Hours of Work and Leave

A. Employees performing work at the alternate worksite will follow established procedures for requesting and obtaining approval of leave, consistent with Article 35 - Time and Leave of this Agreement.

B. Employees performing work at the alternate worksite are subject to the same maximum workday limits as they would be if they were performing work at their official duty station, consistent with Article 21 - Hours of Work and Overtime of this Agreement.

C. The number of days each week, pay period, or month an employee will work at an alternative worksite will vary depending on the individual arrangement made between the employee and the supervisor. Employees may work as few as one day per month or as many as five days per week for full time telework.

D. Employees on duty shall be available to participate in regular staff meetings and other meetings necessary to the accomplishment of work; have direct interaction with the supervisor, coworkers, and customers; and

**SA135**

access equipment, files, and reference materials not available at the ADS. Supervisors will consider deviations from this requirement to include such circumstances as accommodating physical disabilities, recovery from illness or injury, field work, etc.

E.  With supervisory approval, employees may choose to change their scheduled work hours, or change to or from an Alternative Work Schedule. For example, an employee may begin their work at an earlier time when working from home since no time is spent commuting to the worksite.

## Section 7 - Pay Issues

A.  An employee's pay will not be negatively impacted solely by the employee's decision to telework. Overtime pay, premium pay, special salary rate, and other entitlements continue while the employee telecommutes as long as the employee remains eligible under Federal pay laws/authorities for overtime pay, premium pay, special salary rates, and other entitlements. Employees will be notified by the Department prior to accepting telework of any consequences to their pay entitlements that will result from telework.

B.  The governing rules, regulations, and policies concerning attendance, leave, and overtime are unchanged by participation in telework. Hours of duty must be addressed in telework agreements. Employees will be compensated for overtime or night work performed with approval in advance.

C.  To claim expenses related to the business use of part of the employee's home, the employee must meet specific requirements as found in the appropriate Internal Revenue Service's publications, currently IRS Publications 17 and 587. It is advisable to consult a tax advisor to see if a deduction might be available.

## Section 8 - Position Descriptions and Performance Standards

A.  Telecommuting will seldom require changes in position descriptions, but may affect factors such as supervisory controls or work environment. An employee is not relieved of and is expected to meet the performance standards established for their position at the official duty station.

B.  When there are no employees performing similar tasks at the ODS, the performance standards for telecommuting employees should be results-oriented and should describe the quantity and quality of expected work products and the method of evaluation.

SA136

## Section 9 - Temporary Recall from ADS

A.  Employees who are on duty may be required to report to their ODS for previously scheduled training, conferences, other meetings, or to perform work on a short term basis that cannot otherwise be performed at the ADS or accomplished via telephone or other reasonable alternative methods.

B.  Employees may also be required to report to their ODS for valid operational needs to perform agency work which cannot otherwise be performed on another workday, at the ADS, via telephone, or other reasonable alternative methods. In such cases, employees will be provided reasonable advance notice and be provided a reasonable time to report. Employees should make every effort to report as soon as possible.

C.  When requiring an employee to report on short notice, the employee's needs will be considered along with the reason for the change in work location.

## Section 10 - Requests to Telework

The employee will submit a standard request form, Telework Proposal (VA- 0740) for their assignment to be performed at the ADS. The request will describe the duties to be performed and the specific day(s) involved. The request will be submitted to the Department for approval. The Department will document approval or denial of the request as soon as possible. Employees must make the request to work at the ADS at least one workday in advance; however, this time frame may be waived at the discretion of the Department.

If the assignment is initiated by the Department, and the employee concurs, the employee is still responsible for submitting a Telework Program Work Assignment Request (VA-0870a) in addition to signing the Telework Program Agreement described in Section 5 of this article.

## Section 11 - Removal from Program

A.  The Department may remove an employee from the Telework Program based on the employee's failure to adhere to the requirements specified in the Telework Program Agreement and/or a decline in overall performance below the fully successful level. Normally, employees will not be removed from participation for single, minor infractions of Telework Program requirements. Supervisors will counsel employees about specific problems before effecting removal. The counseling will be confirmed in writing. When a decision is made to remove an employee from the Telework Program, the employee must be given written notice indicating the reason(s) for removal. The employee may reapply for Telework Program participation 30 calendar days after removal from the program, provided that their performance is at least fully successful.

**SA137**

B.  Any time an employee believes they need to permanently or temporarily return to work in the ODS, the employee will normally provide the Department with 30 calendar days notice of the needed change, except in emergency situations. The Department will make reasonable efforts to accommodate the employee's needs. Employees returning to the ODS in these circumstances must recognize that the equipment and workstations that are made available by the Department may not immediately be the same as the ones they had prior to participating in the Telework Program. The Department is expected to provide the employee a complete work area equal or similar to that of others in their occupation in their assigned work area within a reasonable timeframe.

## Section 12 - Problems Affecting Work Performance

Employees will promptly inform supervisors whenever any problems arise which adversely affect their ability to perform work at the ADS. Examples could include situations such as equipment failure, power outages, telecommunications difficulties, etc.

## Section 13 - Emergency Closing/Group Dismissal

A.  A telecommuting employee will sometimes, but not always, be affected by an emergency requiring the main office to close. When both the main office and the ADS are affected by a widespread emergency, the Department should grant the telecommuting employee excused absence as appropriate.

B.  When an emergency affects only the ADS for a major portion of the workday, the Department can require the telecommuting employee to report to the main office, approve annual leave or leave without pay, or authorize an excused absence.

C.  The telework site may be unaffected by emergencies that lead to closings and dismissals at the ODS. If work can proceed at an ADS, then the employee may not be excused from duty just because other employees elsewhere have been dismissed or excused from reporting.

## Section 14 - Telecommuting Centers

The parties agree to discuss the feasibility of telecommuting centers.

## Section 15 - Emergency Situations

In the event of a local emergency situation such as a transit strike or a natural disaster which adversely affects an employee's ability to commute to the workplace, the parties agree to immediately discuss possible temporary telework arrangements for affected employee(s).

SA138

## Section 16 - Evaluation of Program

The parties agree to meet six months after the implementation of this Agreement to assess any concerns relevant to employees working at their residence such as availability of laptop computers.

## Section 17 - Union Notification

The local union will be notified when employees are placed on telework and taken off telework.

## Section 18 - Local Telework Negotiations

Upon the effective date of this Agreement, the local parties may begin negotiations over the following issues:

A. Application and selection procedures for participation in the telework and the alternative work schedule and compressed work schedule. These procedures may include, but are not limited to, issues such as negotiating procedures for breaking ties if the number of applicants exceeds the number of opportunities available;

B. Methods for resolving conflicting employee requests for specific work at home schedules;

C. Methods for rewarding increased productivity of telecommuters;

D. Procedures for disbursing excess equipment or furniture;

E. Determining the eligibility of other positions, if any, for telework, alternative work schedules, and compressed work schedules that are not listed as currently eligible for telework;

F. Determining the feasibility of establishing a local telework committee for oversight of telework; and,

G. Any other issues affecting the bargaining unit not otherwise covered in this Article.

## Section 19 - Grandfather Clause

On the effective date of this Agreement, employees currently working at an ADS are not required to reapply for telework.

**SA139**

# ARTICLE 21 - HOURS OF WORK AND OVERTIME

## Section 1 - General

A.  A change in the administrative workweek and changes in the regularly scheduled administrative workweek are considered changes in conditions of employment for purposes of the notice requirement of Article 49 - Rights and Responsibilities, of this Agreement. There are laws and government-wide regulations specific to certain groups of employees such as physicians, dentists, personnel covered by the Baylor Plan, and firefighters. Where there is a conflict with this article, those laws and government-wide regulations shall apply.

B.  A rest period of 15 minutes duration will be allowed each employee twice during each eight hour day, normally one in the first half and one in the second half of the shift. A rest period of 10 minutes duration will be allowed each employee during each period of extended shift overtime of at least two hours duration. On days when all work is overtime, or in the case of extended shifts, a rest period of 15 minutes will be allowed for each period of four hours worked. Rest periods will not be added to periods of leave or the beginning or end of the employee's work shift. Except where the immediate work requirement of an employee's position requires the employee's constant presence, the Department will not restrict employee mobility during rest breaks.

C.  "Basic work requirement" means the number of hours, excluding overtime hours, that an employee is required to work or is required to account for by leave or otherwise.

## Section 2 - Work Schedule Options (AWS and Credit Hours)

A.  General

This section sets forth the procedures to be followed for Alternative Work Schedule (AWS) including flextime, compressed work schedules, and credit hours. This section also provides a menu of options that employees may request. AWS means a schedule other than the traditional eight hours fixed shift. Flexible work schedules, compressed work schedules, and credit hours are included in the definition of alternative work schedule. When an employee(s) makes a request supervisors must consider operational needs, including the employee's work unit(s) and the interests of the employee(s) before making a decision. The Department shall apply AWS in a fair and equitable manner. AWS is a subject for local bargaining consistent with this Agreement. AWS programs will not require the Department to extend the operating hours of the facility.

**SA140**

B. <u>Flextime</u>

1. "Flexible work schedule" means an eight hour workday in which the employee may vary the time of arrival and/or departure. A flexible work schedule includes core time and a flexible band. "Flexible time" and "flexible bands" mean the specific periods of the workday during which employees may opt to vary their arrival and departure times. Whenever possible, the flexible bands shall be 6:00 am to 6:00 pm.

2. "Modified Flex-tour" is a type of flextime where an employee selects a starting time within the established flexible time band. This establishes the employee's assigned schedule; however, the employee is allowed 15 minutes flexibility on either side of the selected arrival time. For example, an employee selecting 7:30 am as a starting time under modified flex-tour may report for work any time between 7:15 am and 7:45 am. Changes in starting time must be approved by the supervisor.

3. "Flex-in/flex-out" - Employees working a flexible schedule will be allowed to flex out and in during the workday, subject to supervisory approval. If a combination of an employee's starting time and the amount of time the employee is away from the worksite precludes the completion of a full workday prior to 6:00 pm, the employee will be placed in the appropriate leave category at their request or allowed the use of approved credit hours, as appropriate.

4. "Core hours" means that period of time when employees on a particular shift are expected to be at work.

C. <u>Compressed Work Schedule (CWS)</u>

1. "Compressed Work Schedule" (CWS) means, in the case of a full time employee, an 80 hour biweekly basic work requirement that is scheduled for less than 10 workdays, and in the case of a part-time employee, a biweekly basic work requirement of less than 80 hours that is scheduled for less than 10 workdays and that may require the employee to work more than eight hours in a day.

   a. "5-4-9" is a work schedule that includes eight workdays of nine hours each plus one workday of eight hours within the biweekly pay period.

   b. "4-10" is a work schedule that includes eight workdays of ten hours in each biweekly pay period.

   c. "6-12-8" is an eighty hour bi-weekly basic work schedule that includes six twelve hour workdays and one eight hour workday.

**SA141**

2. Requests for CWS:

    a. Each employee desiring to work under a CWS plan must submit a written request to their supervisor for a decision. The Department shall act upon these requests as soon as possible, but in no case later than 30 calendar days after the request is made. If the request is denied, the supervisor will explain in writing the reasons for the denial; upon request, a sanitized copy will be provided to the local union. Decisions on CWS will be made based on valid operational needs. Employees already established in a CWS will not be required to file a new request for each pay period.

    b. All new employees or re-hires shall be given the opportunity of requesting participation in the CWS plan.

    c. Any conflicts in scheduling that result will be resolved in favor of the employee who is most senior, as defined locally.

    d. Employees who wish to terminate or change their participation in a CWS may do so at the beginning of any pay period after notifying their supervisor at least one pay period in advance or as negotiated locally. Hardship situations will be considered to the greatest extent possible and handled on an individual basis.

    e. When this contract is implemented, employees on CWS don't have to reapply for CWS in order to continue.

    f. Conflicts in scheduling that involve more requests for a particular day off than can be accommodated will be handled in accordance with the provision of Section 2 C.2.c above. Hardship situations will be considered on a case-by-case basis and to the greatest extent possible.

    g. Existing policies and practices remain in effect unless in conflict or inconsistent with this article.

    h. CWS and credit hours may be used by employees in the same work or organizational unit.

    i. Eligible employees will not be precluded from participating in CWS based solely on their position. This includes but is not limited to Veterans Benefits Administration (VBA), Austin Finance Center, Veterans Health Administration (VHA), and VA Central Office (VACO).

SA142

D   Credit Hours

1. Definition

a. Those hours within a flexible work schedule in excess of the employee's daily tour of duty which are performed at the employee's option with the approval of their supervisor, so as to vary the length of a succeeding workday or workweek. Employees cannot be required to work credit hours in lieu of overtime.

b. Employees on a flexible work schedule will not be precluded from earning credit hours based solely on their position.

2. Procedures

a. Participating employees, including flextime/flex-tour participants and part-time employees, will be authorized to earn up to three credit hours per day, provided that there is work available for the employee and it can be performed at the requested time(s).

b. Credit hours shall be earned in 1/4-hour increments and may be used in 1/4-hour increments.

c. The maximum number of credit hours which a full-time employee may carry over from pay period to pay period is 24 hours. A part-time employee may not carry over more than one quarter of the hours in their basic biweekly work schedule from pay period to pay period.

d. When an employee ceases to work in a work unit where credit hours may be earned, the employee shall be given the following options:

i. Sufficient advance notice to use earned credit hours prior to leaving the work unit;

ii. Compensation for the earned credit hours at the employee's current rate of basic pay; or,

iii. Transfer of the earned credit hours to the new work unit.

3. Request to Work Credit Hours

a. Normally, the employee will request to work credit hours during the workday preceding the day they wish to work. This request will be submitted to the immediate supervisor. In the supervisor's absence, the request shall be submitted to the next level supervisor. The request shall be documented as approved or denied by the supervisor as soon as possible on the same day submitted.

b. The above procedure shall not preclude the working of same day credit hours upon mutual agreement of the supervisor and the employee.

SA143

E. Exceptions

1. CWS and Fixed Shift Employees
The parties agree that there are situations that may not readily accommodate a plan described in this section. Consideration and disposition of such situations shall be made on a case-by-case basis, subject to partnership and/or local bargaining.

2. Adverse Impact
If a facility experiences adverse impact pursuant to 5 USC 6131 with either the AWS or credit hours, negotiations in accordance with Article 47 - Mid-Term Bargaining of the Master Agreement will begin immediately in an attempt to resolve the impact to both parties' satisfaction.

3. Temporary Suspension of AWS and/or Credit Hour Plan
Temporary suspension of AWS and/or Credit Hours may be made for up to 14 days by a facility director, for a bona fide emergency, subject to immediate partnership discussions or negotiations.

F. Special Provisions for Suspension of CWS

1. CWS may be suspended when employees are attending and/or conducting training with beginning and ending times which would conflict with their CWS schedule.

2. An employee will continue to participate in the CWS plan while in travel status unless there is a need to change the work schedule; for example, the hours of operation at the travel site differ from those of the employee.

G. Miscellaneous

1. If the Department proposes to make any change to the AWS Plan (including the CWS Plan and Flextime Plan) or the Credit Hour Plan of bargaining unit employees or to restrict the application of the plans to any new position, the local union shall be notified and given an opportunity to bargain.

2. Employees who are Union representatives who are on a flextime plan shall be allowed to earn Credit Hours while involved in representational activities in accordance with the provisions of this Agreement. In the performance of labor-management activities, employees who are Union representatives will be given the opportunity to work the AWS Plan and/or the Credit Hour Plan in accordance with the provisions of this Agreement.

3. The parties understand and agree that Credit Hours for FWS are initiated by the employee, subject to approval by the supervisor. In contrast, the parties understand and agree that overtime and compensatory time (with the exception of religious compensatory time) are initiated by the Department will be requested and bargained locally.

**SA144**

4. In maintaining adequate staffing coverage, it is agreed and understood that the Department shall approve CWS in a fair and equitable manner.

5. The Department shall provide the local union with advance written notice of any survey or study concerning AWS and/or Credit Hours in which information is sought from bargaining unit employees.

6. This Agreement does not preclude an employee from requesting an altered tour of duty for specific personal reasons.

7. Under a CWS plan, a full-time employee who is relieved or prevented from working on a day designated as a holiday (or an "in lieu of" holiday) by federal statute or Executive Order is entitled to their rate of basic pay for the number of hours of the CWS on that day, per 5 CFR Part 610.

8. If a part-time employee is relieved or prevented from working on a day within the employee's scheduled tour of duty that is designated as a holiday by federal statute or Executive Order, the employee is entitled to basic pay for the number of hours of the CWS on that day. When a holiday falls on a non-workday of a part-time employee, they are not entitled to an in lieu of day for that holiday.

9. Determining in lieu of holidays when holidays fall on non-workdays:

   a. If a holiday falls on a non-workday of the employee, except for holidays falling on a Sunday non-workday, the employee's preceding workday will be the designated in lieu of holiday.

   b. If the holiday falls on the Sunday non-workday of an employee, the subsequent workday will be the employee's designated in lieu of holiday.

H. Lunch Breaks
The Department shall continue the existing lunch and break arrangements. If the Department determines that an adjustment to lunch and/or breaks is necessary to solve any significant public service or operational problems caused by the AWS Plan, the local union shall be given the opportunity to bargain on such changes in working conditions.

## Section 3 - Tours of Duty/Scheduling

A. For the purpose of this section, these definitions of terms are used:

1. Established Tour - A tour of duty approved with a specific beginning and ending time.

2. Work Shift - 1st shift (days), 2nd shift (evenings), 3rd shift (nights) within a 24 hour period.

**SA145**

B.  An employee's workweek will usually not extend over more than five days of the period Sunday through Saturday.

C.  Employees shall not be scheduled to work more than two of the established work shifts (days, evenings, and nights) within any fourteen consecutive day period unless the parties locally agree to a period longer than fourteen consecutive days.

D.  Employees shall not be required to report to work unless they have had at least 12 hours of off-duty time between work tours. Exceptions may be made by mutual agreement between the employee and their supervisor.

E.  Rotation - Scheduled off-tours shall be rotated fairly and equitably among affected employees, i.e., day/evening, day/night.

F.  Rotation of weekends and holidays shall be on a fair and equitable basis within a group and may be a subject for local bargaining. The weekends are defined as Saturday and Sunday and may be expanded to include Friday or Monday when scheduling permits.

G.  Records of weekend and off tours shall be kept by the Department to ensure fair and equitable treatment of employees. These records shall be readily available for review by the employees and local union.

H.  Seniority among employees with comparable qualifications will be the determining factor for access to a preferred tour. Seniority will be defined locally.

I.  Excessive use of overtime in any area will be evaluated by the local union and the Department to review staffing options.

J.  Every practicable effort will be made to assure that work schedules will not be for more than six consecutive days for eight hour tours, three consecutive days for twelve hour tours, and four consecutive days for ten hour tours with no less than two consecutive days off. Changes in the above procedures shall not be made without notice to the local union.

K.  The local union shall be provided schedules upon request. Alterations, procedures, and time frames for posting schedules shall be negotiated locally. If posted time sheets are altered, notification will be given to the employee in a timely manner.

L.  When a change of uniform is required, the Department will provide up to ten minutes at the beginning and ending of a tour for the employees to change clothes. In addition, employees will be allowed a reasonable amount of time to change clothes when their clothing becomes soiled.

SA146

M.  The Department will permit reasonable clean-up time at the end of each shift for the purpose of returning tools or equipment and cleaning up the work areas and machinery as necessary in each work area. No employee shall be required to remain after the end of their shift  without appropriate compensation for the purpose of cleaning up the designated area.

## Section 4 - General Overtime Provisions

A.  Overtime shall be distributed in a fair and equitable manner.

B.  When an employee works overtime, whether covered by the Fair Labor Standards Act or exempt, such overtime will be paid in increments of 15 minutes.

C.  Employees shall be paid differential and premium pay in addition to the overtime compensation in accordance with applicable regulations.

D.  It is agreed that non-bargaining unit employees shall not be scheduled on overtime to perform the duties of bargaining unit employees for the sole purpose of eliminating the need to schedule bargaining unit employees for overtime.

E.  The Department shall make a reasonable effort to give the employee as much notice as possible when planned overtime is required, and further, will give due consideration to the employee's personal circumstances. At the employee's request, the Department will endeavor to avoid mandated overtime exceeding four hours at the end of the employee's tour of duty.

F.  Those employees eligible by Title 5 or Title 38 can accrue and use compensatory time when approved by the Department. Eligible employees may request compensatory time off in lieu of premium pay for overtime work. The approving official will consider staffing needs in the decision whether to approve compensatory time. Supervisors shall not require the above mentioned employees to take compensatory time in lieu of overtime pay. Appropriate officials or their designees, may, at the request of a GS or FWS employee on a flexible schedule, grant compensatory time off in lieu of overtime pay, whether such overtime hours are regularly scheduled or irregular or occasional in nature. If the employee does not request compensatory time off in lieu of overtime pay, or if the employee's request for compensatory time off in lieu of overtime pay is not granted, the employee shall be compensated for such overtime under the applicable statutory provisions.

G.  The Department shall, to the extent practicable, permit employees who earn compensatory time instead of overtime to use their compensatory time at the earliest time convenient to them within 26 pay periods.

**SA147**

Normally, compensatory time off shall be granted before annual leave is approved. If annual leave would otherwise be forfeited, however, the annual leave shall be granted before compensatory time off. Any employee who is unable to use compensatory time within 26 pay periods shall receive overtime pay instead.

H.  Employees who are required to work overtime will be allowed to call at no cost to themselves to make necessary arrangements. This shall include but is not limited to dependent care arrangements and updates, medical appointments, classes and self-improvement commitments, etc.

I.  When employees in a voluntary situation indicate in advance that they will work overtime, the Department should have an expectation that they will keep their commitment. It is understood that employees occasionally may be unable to report for assigned overtime work. Therefore, an employee who volunteers for overtime work and fails to report as scheduled without good cause may have their name placed at the end of any overtime roster.

J.  Employees who are called back to work for a period of overtime unconnected to their regularly scheduled tour or who work overtime on their day(s) off are entitled to a minimum of two hours overtime pay. Employees called in for emergency work outside their basic workweek shall not normally be required to perform non-emergency functions. This does not preclude employees from being called in to provide coverage in non-emergency situations.

K.  Rosters of employees will be utilized to determine voluntary or involuntary overtime. The mechanics and eligibility of the rosters are subjects for local negotiations and seniority will be the criterion. The Department will make available to the Union, upon request, current records of overtime assignments.

L.  Employees required to work through their non-duty meal period shall be paid for such time.

M.  In the event of an extension of a regular work shift into an evening or night work shift for more than a three hour overtime work period, reasonable time will be allowed, when possible, for procurement and eating of food. This will occur no later than three hours after the overtime starts.

SA148

## Section 5 - Paid On-Call/Standby

A.  Title 5 Employees and Hybrids earning on-call pay under authorities other than 38 USC 7454.

1.  Paid on-call and standby duty will be rotated among all qualified staff. Records of paid on-call and standby duty shall be kept by the Department and made available to the local union upon request. Employees scheduled for paid on-call duty shall be issued pagers or other mobile technology which will be used to notify them of a need for their return to duty.

2.  On-call employees shall not be expected to work more than 16 consecutive hours of actual work, except in rare and unusual circumstances.

3.  Employees will not be required to stay at home unless they are in a standby duty status (5 CFR 550.141) or required to wear and respond to beepers/pagers unless they are scheduled to be in an on-call duty status under the provisions of 38 USC 7457.

4.  Employees shall not be scheduled on-call while on annual leave.

5.  If an on-call or standby tour of duty is terminated in a work unit, the decision and reason shall be specific and in writing and forwarded to the local union to fulfill bargaining obligations.

6.  Those employees currently in a standby pay retention status will continue to be paid under the provisions of 38 USC 7457(c).

B.  Registered Nurse (RN), Certified Registered Nurse Anesthetist (CRNA), Physician Assistant (PA), Expanded Function Dental Auxiliary (EFDA), and Hybrids earning on-call pay under 38 USC 7453(h) or 7454:

1.  RNs and CRNAs earn premium pay at 10% of their overtime rate for officially scheduled on-call duty pursuant to 38 USC 7453(h). PAs and EFDAs earn premium pay on the same basis as RNs for officially scheduled on-call duty pursuant to 38 USC 7454(a). Other hybrid employees may earn premium pay on the same basis as nurses for officially scheduled on-call duty pursuant to 38 USC 7454(b).

2.  Procedures relating to on-call duty for employees covered by Paragraph 1 above are contained in VA Handbook 5007, Part V, Chapter 5, Paragraph 1. This paragraph is purely for informational purposes and is not itself subject to collective bargaining or grievable under the negotiated grievance procedure.

3.  Records of on-call duty shall be kept by the Department and made available to the local union upon request.

**SA149**

## Section 6 - Local Negotiations

Those facilities having locally negotiated agreements will continue to honor those agreements so long as they do not conflict with the Master Agreement. A conflict shall be resolved in favor of the Master Agreement.

SA150

# ARTICLE 22 - INVESTIGATIONS

## Section 1 - General

A.  As exclusive representative, the local union shall be given the opportunity to be present at any examination of an employee in the bargaining unit(s) by a representative of the Department in connection with an investigation if:

1.  The employee reasonably believes that the examination may result in disciplinary action against the employee; and,

2.  The employee requests representation.

B.  The right to union representation is not intended to interfere with the routine interaction between supervisors and employees in the normal course of a workday.

C.  The Department shall annually inform its employees of their right to union representation under 5 USC 7114(a)(2)(B) by posting notice of such rights on bulletin boards and through other appropriate means.

D.  If any supervisor or Department official, in advance of or during the questioning of an employee, contemplates the likelihood of disciplinary action, the employee shall be informed of their right to union representation prior to further questioning. If an employee in the bargaining unit requests local union representation, the Department will reschedule the meeting as soon as possible, and the local union will be given the opportunity to be present.

## Section 2 - Investigations

A.  The Department agrees that before employees conduct a formal investigation, they shall be properly trained.

B.  The Department will inform the local union in advance of a formal administrative investigation when a bargaining unit employee is the subject of the investigation or inquiry.

C.  Investigations should consider all facts, circumstances, and human factors. An investigation shall be conducted in an expeditious and timely manner.

D.  Employees have the right to be represented by the local union while being questioned in a formal investigation or while being required to provide a written or sworn statement. Before such questioning begins or a statement given, employees will be informed of the reasons they are being questioned or asked to provide a statement.

**SA151**

E.  If an employee is the subject of an investigation, they will be informed of the right to local union representation prior to being questioned or asked to provide a statement. The employee will also be informed of the nature of the allegation(s). Once an employee requests local union representation, except in very rare and unusual circumstances, no further questioning will take place until the local union is present.

F.  Supervisors, employees, and local union representatives will not, except as specifically authorized, disclose any information about an investigation.

    A copy of the statement of the employee will be given to the employee and/or the employee's representative upon request. If no action was taken as a result of this investigation, the employee who was the subject will receive the findings in a timely manner.

G.  Upon request, the subject of the investigation and the local union will be furnished a copy of the complete investigation file (not just the evidence file) and all other relevant and pertinent information which would be provided under the Freedom of Information Act (FOIA) or 5 USC 7114, which would normally include the Administrative Investigation Board (AIB) report findings.

H. The statement of employee rights and obligations will be consistently applied throughout the bargaining unit. That statement will be consistent with this Agreement and include the following:

    1.  The employee's right to representation by the local union;

    2.  The right of an employee to a copy of their personal statement or testimony; and,

    3.  The right of an employee not to incriminate themself.

I.  When an employee has requested local union representation in an investigative proceeding, the local union representative may fully and actively represent the employee and is not limited to the role of an observer.

J.  An employee's representative shall receive a complete copy of all evidence used to support the Department's action. This includes, but is not limited to, copies of all tapes, testimony/transcripts, recommendation and/or findings, and photographs. The Department will make every effort to provide additional information requested by the employee's representative. The Department will provide a written explanation of any denial of information requested in a timely manner.

K.  The participation of bargaining unit employees on an AIB will be with the consultation of the Union.

# ARTICLE 23 - TITLE 5 MERIT PROMOTION

## Section 1 - Purpose and Policy

The parties agree that the purpose and intent of the provisions contained herein are to ensure that promotions are made equitably and in a consistent manner. Promotions shall be based solely on job-related criteria and without regard to political, religious, labor organization affiliation or non-affiliation, marital status, race, color, sex (including pregnancy, sexual orientation, gender identity, gender expression, transgender status), national origin, non-disqualifying disabling condition, or age. This article sets forth the merit promotion system, policies, and procedures applicable to bargaining unit positions in the Department.

## Section 2 - Career Ladder Advancement

A.  While promotion within career ladder positions is neither automatic nor mandatory, career advancement is the intent and expectation in the career ladder system.

B.  The full performance level is the highest grade level to which an employee may be promoted non-competitively within a career ladder.

C.  When the employee requests information about eligibility for promotion to the next grade in a career ladder position, the Department will provide the employee with the position description and performance standards for the next grade level. Upon request, the Department will discuss the differences between the current position and the promotion to the next level of the career ladder with the employee.

D.  An employee is eligible for a career ladder promotion provided all of the following conditions have been met:

1.  The employee encumbers a career ladder position;

2.  The employee has the ability to perform the higher grade level duties;

3.  The employee has completed at least one year in the current grade;

4.  There is sufficient work at the higher grade level position;

5.  Sufficient funds are available; and

6.  The employee's current rating of record is "Fully Successful" or higher and must not rate below "Fully Successful" on a critical element that is also critical to the performance at the next higher grade of the career ladder.

**SA153**

E.  The Department normally will complete its review of an employee's eligibility for a career ladder promotion on or before the 60th calendar day before the employee has completed one year in their current grade.

F.  In the event that the employee met the promotion criteria, but the appropriate Department official failed to initiate the promotion timely, the promotion will be retroactive to the beginning of the first pay period after the pay period in which the requirements were met.

G.  Additionally, when the Department knows in advance that the budget or availability of work may impact on promotion in the career ladder, it should not wait until the end of year discussion to inform an employee that there may be problems regarding a career ladder promotion. Whether the decision not to promote is made near the time of the year end appraisal or not, the rationale behind the decision will be discussed with the employee.

H.  The employee will be provided notice of the reasons as to why the employee is not being promoted.

1.  In the instance that the employee is not promoted due to a lack of available higher graded work or lack of funds, the employee will be provided notice within seven calendar days of the Department making that determination. The Department will conduct subsequent reviews at six-month intervals, and promote or notify the employee as to the reasons why the employee is not being promoted.

2.  If an employee is not meeting the performance criteria for promotion, the employee will be given a written notice at least 60 days prior to the earliest date of promotion eligibility. The written notice will state what the employee needs to do to meet the promotion plan criteria. Should a career ladder plan require only a three-month training period, the above notice shall be a reasonable period prior to the earliest date of promotion eligibility.

a.  If the employee is not meeting the criteria but is making progress, the supervisor will ensure that the employee has the opportunity to acquire pertinent skills and knowledge and to demonstrate that they meet promotion requirements as soon as feasible.

b.  If the employee is experiencing problems, the provisions in Paragraph I of this section are applicable.

I.  At any time a supervisor and/or employee recognize an employee's need for assistance in meeting the career ladder advancement criteria, the supervisor and employee will develop a plan tailored to assisting the employee in meeting the criteria. The plan should include all applicable training, as well as any other appropriate support. At the request of the employee, the local union may provide assistance. If a non-probationary employee fails to meet the promotion criteria after the appropriate assistance, the Department may:

**SA154**

1.  Provide the employee with additional time to meet the promotion criteria;

2.  Assign the employee duties commensurate with their current grade (The career ladder plan may end, and the employee will remain at the level they attained within the career ladder. The employee may be reinstated back into the career ladder plan non-competitively if the employee remains in the position covered by the career ladder plan.); or,

3.  The employee may be assigned to another position at the same grade and step.

## Section 3 – Definitions

For the purpose of this article, the definitions contained in Part 335 and other related parts of Title 5 CFR shall be incorporated as a part of this Agreement except as otherwise defined in this Agreement.

## Section 4 - Applicability of Competitive Procedures

A.  Promotions
    Any selection for promotion must be made on a competitive basis unless it is excluded by Section 5 below.

B.  Reassignments/Changes to Lower Grade
    Any selection to a position that provides specialized experience that the employee does not already have and is required for subsequent promotion to a designated higher grade position and/or to a position with known promotion potential must be made on a competitive basis.

C.  Details
    Competitive procedures will be applicable to any selection for detail of more than 120 days to a higher graded position, to a position with known promotion potential, or a position which provides specialized experience required for subsequent promotion to a designated higher-graded position.

D.  Training
    Competitive procedures will be applicable to selections for training when eligibility for promotion to a particular position depends on whether the employee has completed that training.

E.  Appointments
    Competitive procedures apply to the transfer of a federal employee or to the reinstatement of a former federal employee to a position above the highest grade previously held permanently (unless the position is a higher-graded successor position as described in Paragraph D 5 of Section 5 of this article) or to a position at or below that grade if the position has promotional potential above the highest grade previously held permanently. The employee must not

**SA155**

have been demoted or separated for cause from the higher grade(s) and, when competitive procedures apply, be identified as a well-qualified candidate with eligible Department employees to be eligible for appointment. To the extent feasible, the same qualification standards and the same methods of evaluation will be applied to both Department employees and persons being considered for appointment to higher-graded positions above the highest grade previously held permanently by transfer or reinstatement. If it is determined that these methods are not feasible, the parties will meet and confer on the methods to be utilized.

F.    The procedures for vacancies filled under competitive actions are described in this article.

## Section 5 - Applicability of Noncompetitive Actions

A.    Promotions
The following promotions may be taken on a noncompetitive basis unless otherwise provided:

1.    Promotion of the incumbent in a position that is reclassified at a higher grade due to the accretion of additional duties and responsibilities and not as the result of a planned management action;

2.    Promotion of an incumbent or an individual entitled to re-employment rights to a position that is reclassified to a higher grade without significant change in duties or responsibilities either on the basis of a new classification standard or as the result of correction of an original classification error (When the incumbent of the upgraded position meets the legal requirements and qualification standards for promotion to the higher grade, the incumbent will be promoted.);

3.    Promotion of an employee previously selected competitively for a lower step of a career ladder;

4.    Promotion after receiving priority consideration;

5.    Promotion of an employee when directed by authorized authorities (i.e., judges, arbitrators, FLRA, and other appropriate authorities);

6.    Agencies may noncompetitively reinstate, transfer, or promote an employee up to the highest grade previously held on a permanent basis under career or career-conditional appointment, provided the employee was not demoted or separated from that grade for cause;

7.    Temporary promotions to a higher grade totaling 120 days or less during any 12 month period (If a temporary promotion which was not expected to exceed 120 days was originally made on a noncompetitive basis, any extension beyond 120 days must be made under competitive procedures.);

**SA156**

8.  Career ladder promotions following noncompetitive conversion of a cooperative education student in accordance with the requirements of applicable OPM policy;

9.  Promotion of an employee covered by an approved training agreement;

10. Promotion of an employee placed competitively in a trainee position;

11. Any other noncompetitive action authorized by law or existing government-wide regulation.

B.  Reassignments/Changes to Lower Grade
A reassignment or change to a lower grade position that does not provide specialized experience that the employee does not already have and is required for subsequent promotion to a designated higher-graded position or to a position having no known promotional potential may be taken on a noncompetitive basis.

C.  Details
The following details may be made on a noncompetitive basis:

1.  Details of 120 days or less to a higher-graded position (see Article 12 - Details and Temporary Promotions);

2.  Details of 120 days or less to a position at the same or lower grade with known promotional potential or to a position which provides specialized experience required for subsequent promotion to a designated higher-graded position;

3.  Details to a position at the same or lower grade with no known promotion potential or to a position which does not provide specialized experience required for subsequent promotion to a designated higher-graded position;

4.  Details to unclassified duties.

D.  Other Noncompetitive Actions:

1.  Conversion of an employee from a temporary promotion to a permanent promotion in the same position and duty station provided the vacancy announcement for the temporary promotion indicated that the promotion could later become permanent;

2.  Selection from an OPM-approved register;

3.  Transfer of a federal employee or reinstatement of a former federal employee (including conversion to reinstatement from a temporary appointment) to a position at the same or lower grade than the highest permanent grade held under a career or career-conditional appointment

**SA157**

provided the candidate was not demoted or separated for performance or conduct reasons from a higher grade, and also provided that the position does not have known promotion potential to a grade higher than the highest permanent grade held;

4. Reinstatement to the same career ladder position for which an employee was previously selected competitively or to a similar career ladder position having similar qualification requirements and having no greater known promotion potential;

5. Reinstatement of a former Department employee to a position which is the higher-graded successor to a position they previously held (Such reinstatements may be made noncompetitively when classification of the successor position is based on the establishment of a new position classification standard or the revision of a position classification standard.);

6. A position change permitted by reduction-in-force regulations;

7. Consideration or selection of:

    a. Disabled veterans under 5 CFR 315.604;

    b. Disabled veterans under 5 CFR 315.707;

    c. Cooperative education students under 5 CFR 213.3202;

    d. Veterans Readjustment Appointments under 5 CFR 307;

    e. Appointments under 5 CFR 213.3102 (u);

    f. Schedule A & B Excepted Appointments;

    g. Any other noncompetitive action authorized by law or existing government-wide regulation.

E. Additional procedures for noncompetitive details and reassignments are described in Article 12 - Details and Temporary Promotions and Article 13 - Reassignment, Shift Changes, and Relocations.

## Section 6 – Title 5 Vacancy Announcements and Areas of Consideration

A. When the Department elects to post a Title 5 vacancy for consideration of internal bargaining unit candidates, the following procedures will apply. The Department reserves its right to make selections for appointments from among properly ranked and certified candidates or from any other appropriate non-competitive source authorized by law or regulation e.g., Schedule A.

B. Areas of Consideration for Remote Positions. A remote position is a position in which the employee, under a written remote work agreement, is scheduled to perform their work at an alternative worksite and is not expected to perform

**SA158**

work at an agency worksite on a regular and recurring basis. A remote worker's official worksite may be within or outside the local commuting area of an agency worksite. The Department may post a single vacancy announcement for all areas of consideration but must consider the referred candidates in the following order:

1. FIRST – The Administration or VA Staff office posting the vacancy.

2. SECOND - Any other internal candidates of the Department.

3. THIRD - From among properly ranked and certified candidates or from any other appropriate source.

C. Areas of Consideration for all Other Positions
The Department may post a single vacancy announcement for all areas of consideration but must consider the referred candidates in the following order:

1. FIRST - Facility-wide (including satellites) except:

   a. For VACO unit positions, GS-12 and above, the area of consideration may be expanded.

2. SECOND – Administration or Staff office posting the vacancy

3. THIRD – The Department or from any other appropriate source.

D. Information on Vacancy Announcements
Vacancy announcements will include, at a minimum:

1. Statement of nondiscrimination;

2. Announcement number and opening and closing dates;

3. Position number(s), title(s), series, pay plan, and grade(s) (or pay rate);

4. Number of vacancies to be filled;

5. Promotional test to be used, if any, and where applicable, positions in the "same-line-of-work;"

6. Geographic and organizational location;

7. Time-in-grade requirements, if any;

8. Area of consideration;

9. Summary of qualification requirements and duties for the position;

10. Hours of work and/or the availability of alternative work schedule options;

**SA159**

11. If appropriate, a statement that the vacant position is a trainee position leading to a noncompetitive promotion and conditions for promotion;

12. Permanent or temporary nature and duration, if temporary;

13. Instructions on how to apply;

14. Name and telephone number of the personnel specialist or other individual to contact for specific assessment criteria and other information relating to the announcement; and,

15. The HR Office or the address where the application is to be submitted.

The Department agrees to standardize VA vacancy announcements to the extent feasible.

E. Announcing Career Ladder Vacancies and Vacancies Covered by Training Agreements
Career ladder vacancies and vacancies covered by training agreements may be announced at any or all grades.

F. Posting and Distribution of Vacancy Announcements
The Department may post vacancies using a variety of methods including an automated application tracking system.

1. Individual vacancy announcements will remain open and posted for a minimum of eight (8) calendar days. The Department may limit or expand the number of applicants that may be received after the posting date;

2. Open continuous announcements will remain posted at all times. (When it has been determined that an open continuous vacancy will be filled, the cut-off notice will be posted in order for all interested employees to apply.);

G. Amending Vacancy Announcements
If a vacancy announcement has been posted and is later found to contain a substantial error concerning items listed in Paragraph D of Section 6, the announcement will be amended if the selecting official still intends to fill the position under the competitive process. The amendment should cite the change(s) and indicate whether or not the original applicants need to reapply in order to be considered.

H. Vacancy Announcement/Locating Candidates
The local union and each applicant will be notified in writing if an announcement is canceled and will be provided with a reason for the cancellation. However, such cancellations will not be used for the purpose of compromising merit promotion principles.

SA160

## Section 7 - Competency Assessments

A. <u>Definition</u>
A competency is a measurable pattern of knowledge, skills, abilities, behaviors, and other characteristics that an individual needs to perform work roles or occupational functions successfully. Competencies specify the "how" of performing job tasks, or what the person needs to do the job successfully.

1. Knowledge is a body of learned information used directly on the job;

2. Skill is a present competence to perform a skill, and unlike an ability, involves observable, quantifiable, and measurable performance parameters such as typing and pipefitting;

3. Ability is the power to perform an activity at the present time. (An ability is evidenced by the performance of some activity or work and should not be confused with an aptitude which is only a potential for performing an activity. An aptitude cannot be determined or measured by information in applications.);

4. Other Characteristics must be directly observable or measurable and job-related.

B. The parties agree that competencies developed for all current and future unit positions, and changes and modifications thereto, will be fair, job-related, applied equitably and uniformly, and established in accordance with law, higher authority rules and regulations, and this Agreement.

1. For each announced vacancy in the bargaining unit, not less than three and not more than eight competencies will normally be identified.

a. Competencies shall be measurable (degree of possession can be discerned) and reasonable (some candidates can be expected to possess them). Any competencies which do not meet these criteria will be dropped.

b. The competencies developed will be reviewed to determine which ones are critical to successful job performance. These competencies (at least two) will be designated as selection factors.

c. Task examples shall be developed for each competencies. The task examples shall be derived from, and consistent with, the official PD of record. Task examples shall be identified in the vacancy announcement and fully documented and made part of the merit promotion package.

**102**

**SA161**

## Section 8 - Ranking Procedure for Competitive Action

Unless the Department elects to refer all minimally qualified candidates to the selecting official, the applications of all minimally qualified candidates will, at the discretion of the Department, be ranked by either a ranking official or ranking panel prior to referral to the selecting official. If applications are ranked the following procedures will apply.

A. Panel Membership/Ranking Official Requirements

1. Ranking official or Panel members will not be in competition for the vacancy(s) and must be at least the same grade or higher, if possible, than the vacancy to be filled.

2. A relative of an applicant may not serve as a ranking official or on the panel.

3. A ranking official and members of a panel should be familiar with the job requirements of the position(s) being filled.

B. Panel Information
The Department will provide the ranking official or promotion panel with all the necessary information for completing its function.

C. Ranking Official/Panel Responsibilities

1. The ranking official/panel will evaluate each application in order to ascertain the relevancy of the candidate's background (including but not limited to work experience, awards, training, outside activities, etc.) to the competencies needed to perform the job successfully. Candidates will be evaluated on the extent to which they possess the competencies relevant to the position being filled. This assessment will be based on the applicant's description of the proportion of time spent performing relevant activities, the complexity of the activity, identifiable results, level of contacts involved in performing the work, or the scope of responsibilities and duties performed.

a. In making this evaluation, the task examples should not be taken as the only types of evidence which demonstrate possession of a competency.

2. Determining the Best Qualified List for Referral:

a. First Area of Promotion Consideration.

i. The ranking official or evaluation panel will review the listing of ranked promotion candidates to determine whether a meaningful break is present. The meaningful break is where:

a) The lowest ranking candidate above the break should be able to perform the job with substantially equal success as all candidates with higher scores, and

b) The highest ranking candidate below the break should not be able to perform with substantially equal success as those above the break.

   ii. Promotion candidates above the break will be placed on the best qualified list for referral.

  b. Upon request, a copy of any referral list forwarded to a selecting official will be provided to the local union.

D. Multiple Grade Levels or Locations
If an announcement pertains to more than one grade level or geographic location, a separate list of eligible persons will be developed for each grade level and location.

E. Documentation
The ranking official/panel will document working notes. Notes may be annotated on worksheets used by the ranking official/panel. The notes will serve as reference material to document the process by which the decision was made.

F. Confidentiality
The results of the ranking official/panel's actions will be treated confidentially and in accordance with provisions of the Privacy Act.

## Section 9 - Sources of Information on Candidates

A. Any awards the applicants have received and submitted with their application must be considered but only to the extent they are relevant to the rating factors/job elements for the position being filled.

B. information submitted in response to the vacancy announcement will be used to evaluate qualifications and to rate and rank candidates.

C. Interviews
If interviews are used, they must be job-related, reasonably consistent, and fair to all candidates. If more than one Department official is conducting the interview, a union representative may be present upon the employee's request.

**SA163**

## Section 10 – Selection

A.  In the event of unanticipated vacancy(s) for the same position as the posted vacancy occurring within 90 days of the selection, the selecting officer may make additional selections from the well-qualified candidates selected from the original vacancy announcement.

B.  When a selection has been made, the Department will arrange a release date, notify the employee, and ensure that the appropriate personnel forms are processed. The effective date of a promotion action, other than promotion within a career ladder, will be the first day of the pay period in which the employee is scheduled to report. If an employee has been selected for promotion, has accepted the offer, and a reporting date has been established, and the resultant request for personnel action (SF-52) is not timely received and/or acted upon by the appointing official, the action shall be made retroactive to the reporting date.

C.  Employees in career ladder positions who are eligible to be promoted to the next higher grade level in accordance with Section 2 above, will be promoted on the first pay period after meeting the criteria.

D.  The Department recognizes that it is important for maintaining high morale to try to select from within the facility when the candidates are equally qualified to those candidates available from outside sources. Thus, the Department will agree to look closely at the relative qualifications of candidates from outside and within and shall exercise good faith in the selection.

E.  If the vacancy is one for which an under-representation exists and is a targeted occupation as identified in the Affirmative Employment Plan, and there are well qualified candidates whose selection would reduce the under-representation, then the selection official will give serious consideration to those individuals.

## Section 11 - Priority Considerations

A.  Definition
    For the purpose of this article, a priority consideration is the bona fide consideration for noncompetitive selection given to an employee as the result of a previous failure to properly consider the employee for selection because of procedural, regulatory, or program violation. Employees will receive one priority consideration for each instance of improper consideration.

B.  Processing
    The procedures for processing a priority consideration shall be:

1. Employees will be notified in writing by the authorized Department official of entitlement to each priority consideration. Such notice will advise employees that if a vacancy is announced and posted and the employee wishes to exercise their priority consideration, the employee should submit the necessary application to the Human Resources Management Services (HRMS) with a written request that they wish priority consideration for the vacancy.

2. Priority consideration is to be exercised by the selecting official at the option of the employee for an appropriate vacancy. An appropriate vacancy is one that the employee is interested in, is eligible for, and which leads to the same grade level as the vacancy for which proper consideration was not given.

3. Prior to the evaluation of other applicants, the name(s) of the employee(s) requesting to exercise priority consideration will be referred to the selecting official. The selecting official will make a determination on the request prior to evaluating other applicants.

4. The fact that the employee chooses to exercise a priority consideration does not preclude that employee from also filing an application through the regular posting process.

C. Local Union Notification
In order to assure compliance with this section, the local union, upon request, will be furnished statistics on priority considerations granted and exercised and the results. Statistics will be kept and provided to the local union on a quarterly basis. The local union will also be notified in writing of each individual priority consideration completed.

## Section 12 - Keeping Employees Informed

A. Employees who apply for and inquire about a specific promotion action will be given the following information:

1. Whether they met the minimum qualification requirements;

2. Whether they were in the group from which selection was made;

3. Who was selected; and,

4. Upon request, the selecting official shall provide a verbal statement of the reason(s) why the employee was not selected regarding what areas, if any, they should improve to increase their chances for future selection.

B. Upon request, an employee will be shown any supervisory appraisal of past performance which has been used in considering them for promotion. An employee is not entitled to see records on another applicant unless they are

**SA165**

the selecting official, a member of the selection panel, or otherwise officially involved in the promotion process, or they have the written consent of the subject of the record or are an agency official with a need to review the record. However, an employee and/or the local union shall have access, consistent with law, government-wide rule, or regulation, to all pertinent records used in the process of filling vacancies which are requested for the purpose of processing or filing a grievance, EEO complaint, or other appeal.

## Section 13 - Local Union Review of Competitive Actions

A. The local union will be permitted to conduct audits of promotion packages for all bargaining unit positions when it has reason to believe a discrepancy exists or when requested to do so by an employee.

B. The local union will provide the Department with the names of the local union representatives who are responsible for conducting audits. Any changes to the list of designated representatives will be sent to the Department in writing. The representative designated to conduct the audit will not have been an applicant for the promotion package being audited.

C. If the employee chooses to use the Union procedure, they must make a written request to the local union within 15 working days after the selection is posted on the biweekly promotion listing. A local union request under Paragraph A above must be made within the same time limits.

D. The designated Department official responsible for the package will, consistent with the Privacy Act, make the pertinent records from the package available to the local union auditor within seven working days of receipt of the audit request. An auditor shall treat information confidentially. If, during the course of the audit, additional information is determined to be necessary, the union can make a request for that information consistent with 5 USC 7114(b)(4).

E. Employees who elect to use the grievance procedure rather than the Union audit procedure must initiate action in accordance with Article 43 - Grievance Procedure.

# ARTICLE 24 - OFFICIAL RECORDS

## Section 1 - Official Records and Files

No personnel record may be collected, maintained, or retained except in accordance with law, government-wide regulations, Department regulations, and this Agreement or its Supplements. All personnel records are confidential and shall be known or viewed by officials only with a legitimate need to know for the performance of their duties; they must be retained in a secure location. Employees shall be advised of the nature and purpose of their eOPF and its location.

## Section 2 - Access to Records

A. During normal duty hours, employees and/or their representative(s) designated in writing shall have the right to examine records personally identified to the employee (i.e., eOPF, EEO, evidence files, appeal and grievance records), PDs, and classification standards during normal duty hours. Employees, or their representative(s) designated in writing, may receive at no cost copies of personally identified records which have not been previously furnished. Additional copies will be provided; however, there may be a charge in accordance with the Department fee schedules in effect at the time of request.

B. Employees' access to their own medical records maintained by the Department may be refused only if, in the sole judgment of a health care professional, their disclosure would be harmful to the mental or physical health of the individual. In such cases, the medical record(s) may be released only to an employee's representative designated in writing. There may be instances where the Department health care official may encourage the release of medical information to another health care professional.

C. The employee shall have the right to prepare and enter a concise statement of disagreement with any document filed on the left (temporary) side of the eOPF. Nothing in this section shall negate an employee's right to grieve any matter.

D. Access to personnel records of the employee by the employee and/or the designated representative will be granted when requested if such records are maintained on the facility where the employee is located. If the records are not so maintained, the appropriate administrative office will immediately initiate action to obtain the records from their location within three working days of the request and make them available to the employee and/or designated representative.

**SA167**

## Section 3 - Outdated Records

A.  All official personnel records shall be purged and information disposed of in accordance with appropriate records control schedules.

B.  When eOPFs are purged, personal materials provided by the employee shall be returned to the employee (e.g., transcripts, certificates).

C.  Each facility will maintain a system of follow-up to assure that any written counseling, disciplinary, or similar action with a time limit on it is removed on the proper date and returned to the employee.

D.  If any outdated or unauthorized material is accidentally left in a file, it may not be used to support any personnel action detrimental to the employee.

## Section 4 - Supervisory Notes

A.  Individual files on each employee not approved by the Department as an official system of records will not be kept by Department officials at any level.

B.  Subject to Paragraph C of this section, if supervisors make a personal decision to keep notes on employees, the notes or files:

   1.  Must be absolutely uncirculated and cannot be reviewed by anyone else (this includes secretaries, other supervisors, or Department officials); and,

   2.  Must be maintained in secure fashion in order to prevent disclosure.

C.  Supervisory notes may only be used to support any action detrimental to an employee if such note(s) have been shown to the employee at the earliest available time after the entry was made and a copy provided to the employee. Once an employee has received a copy of the supervisory note(s), the note(s) can be provided to an appropriate Department official with a legitimate need to know for the performance of their duties.

D.  The time frames for retaining supervisory notes will be up to six months, unless used in a personnel action.

**SA168**

## ARTICLE 25 - OFFICIAL TRAVEL

### Section 1 - Compensation and Travel

A.  To the maximum extent practicable, time spent in travel status away from the employee's ODS will be scheduled by the Department within the normal working hours. Where it is necessary that travel be performed during non-duty hours, the employee will be paid overtime or may opt for compensatory time when such travel constitutes hours of work under 5 USC or the Fair Labor Standards Act, if applicable. If the travel does not constitute hours of work under 5 USC or the Fair Labor Standards Act, the employee may be eligible for compensatory time for travel. It is the employee's responsibility to request and obtain travel authority in advance of travel.

B. Official travel away from an employee's ODS is hours of work if the travel is:

1.  Within the days and hours of the employee's regularly scheduled administrative workweek, including regularly scheduled overtime hours; or,

2.  Outside the hours of the employee's regularly scheduled administrative workweek, is ordered or approved, and meets one of the following four conditions:

    a.  Involves the performance of work while traveling (such as driving a loaded truck);

    b.  Is incident to travel that involves the performance of work while traveling (such as driving an empty truck back to the point of origin);

    c.  Is carried out under arduous and unusual conditions (e.g., travel on rough terrain or under extremely severe weather conditions); or,

    d.  Results from an event that could not be scheduled or controlled administratively by any individual or agency in the executive branch of government (such as training scheduled solely by a private firm or a job-related court appearance required by a court subpoena).

3.  To be creditable as hours of work, travel must be officially authorized. In other words, travel must be for work purposes and must be approved by an authorized agency official or otherwise authorized under established agency policies.

C.  When an employee performs official travel outside their normal working hours, but the travel does not constitute hours of work under 5 USC or the Fair Labor Standards Act, then the employee will be allowed to accrue compensatory time off for travel.

**SA169**

D.  Employees are entitled to compensatory time off for travel consistent with 5 CFR 550.1404. For the purpose of compensatory time off for travel, time in a travel status includes:

1.  Time spent traveling between the ODS and a temporary duty station;

2.  Time spent traveling between two temporary duty stations; and,

3.  The usual waiting time preceding or interrupting such travel (e.g., waiting at an airport or train station prior to departure).

4.  Compensatory time off for travel shall be administered consistent with VA Handbook 5007, Part VIII, Chapter 15. Determinations regarding what is creditable as "usual waiting time" are within the sole and exclusive discretion of the employing agency. Employees may request credit of excess waiting time by providing a written explanation in the Remarks Section of VA Form 0861. The explanation must include the amount of excess waiting time requested, the reason for the excess waiting time, an explanation why the employee was unable to use the time for personal use and any additional information or documents that supports the request. Extended periods of waiting time when the employee is free to rest, sleep, or otherwise use the time for their own purposes, are not creditable as time in a travel status.

E.  Compensatory time off for travel may only be earned for time in a travel status when such time is not otherwise compensable. Compensable refers to periods of time creditable as hours of work for the purpose of determining a specific pay entitlement. For example, certain travel time may be creditable as hours of work under the overtime pay provisions.

F.  Compensatory time off for travel is forfeited:

1.  If not used by the end of the 26th pay period after the pay period during which it was earned;

2.  Upon voluntary transfer to another agency;

3.  Upon separation from the Federal Government.

G.  An employee may not receive payment for unused compensatory time off for travel.

## Section 2 - Change from Per Diem Allowance to Actual and Necessary Subsistence Expenses

A.  Advance Authorization
An employee scheduled to travel in an area for which a per diem allowance is prescribed may request advance authorization for travel on the basis of

**SA170**

actual and necessary subsistence expenses. Any such request will normally be approved when the supporting justification showing that the unusual and exceptional circumstances for the request meets the requirements of the Federal Travel Regulations and Department-wide guidelines.

B.  Post Approval
Reimbursement for actual and necessary subsistence expenses allowable under law and/or rules and regulations issued above will normally be authorized on a post-approval basis if the employee can justify that prudent expenses required by the ordered travel exceeds (as defined by the Federal Travel Regulations and Department-wide guidelines) the prescribed per diem rate. This provision applies only to travel involving assignments of 30 calendar days or less.

## Section 3 - Continuation of Approved Travel Expenses

Employees who are unable to arrive at or return from their destination as scheduled will be reimbursed for authorized travel expenses, and any applicable fees or penalties provided the inability to arrive or return is due to arduous travel conditions beyond the employee's control. Employees in these circumstances will be in travel/duty status for the duration of their absence.

## Section 4 - Advancement of Expenses

A.  Employees required to travel shall have the option of requesting a travel advance. Such request shall be filed by the employee as soon as possible and processed by the Department as expeditiously as possible. Normally, the Department will not require an employee to travel overnight prior to receiving a travel advance. If an employee does not have adequate funds, the Department will make every effort to make alternative arrangements, in accordance with the Federal Travel Regulations, and Department-wide travel policy.

B.  The Department shall process all claims for travel expenses as expeditiously as possible. The Department will make every effort to reimburse bargaining unit employees within five business days after submission of proper travel claim.

## Section 5 - Transportation, Travel, and Per Diem

A.  The Department shall authorize local travel orders and pay expenses for Union representatives engaged in representational duties on official time, when traveling between locations such as integrated facilities, CBOCs, Veterans Integrated Service Network (VISN), and Area Offices, or Memorial Integrated Service Network (MISN), or their successor organizations.

**SA171**

B.  The Department shall not require employees to use a government credit card unless the employee makes more than five authorized trips a year. However, the Department has the discretion to issue a travel charge card to any employee who requests it.

C.  The Department shall issue cell phones or phone calling card(s) to employees, upon request, while on official travel.

D.  When an employee on official travel uses a privately owned vehicle (POV), travel expense will be reimbursed consistent with the provisions in this article. Employees shall neither be required to use POVs for government business nor shall they suffer any loss of pay, reprisal, or adverse action on account of refusal to use a POV for government business. In the event the use of POVs is authorized, mileage for such use shall be compensated at the prevailing rate published in federal regulations.

E.  Travel and per diem is an appropriate subject for local bargaining.

## Section 6 - Document and Property Loss/Theft

An employee is accountable for government documents or property in their possession and/or custody. Employees exercising reasonable care will not be held responsible for documents or property damaged, lost, or stolen from their possession and/or custody. Employees accountable for transporting government documents containing personally identifiable information must adhere to established work rules affecting the handling of such documents.

## Section 7 - Protective Assistance

The Department recognizes that some travel job assignments present a threat to the personal safety of employees. When employees or the local union bring such circumstances to the attention of the supervisor, appropriate measures will be taken to assure the safety of the employee. The parties agree to jointly review existing employee protective procedures from time to time to assure that employees receive the maximum feasible protection from such dangers.

## Section 8 - Return to Duty Station

An employee on a long-term assignment may be authorized occasional return trips to their permanent duty station at government expense on non-workdays. Approval for such return trips are at the administrative discretion of the authorizing official and may be authorized in accordance with the Federal Travel Regulations and the published travel policy of the Department.

## Section 9 - Travel Savings Award Program

A.  It is the employee's option whether to participate in the Travel Savings Award Program. Each time the employee has saved the government two hundred dollars or more, the Department shall reimburse the employee half the savings, as expeditiously as possible after the employee properly documents the savings. The amount of creditable savings will be reduced by the amount of any additional reimbursable transportation expenses that are incurred, such as additional taxicab charges.

B.  If an employee on approved official government travel elects to use their own personal airline or hotel travel benefits, such as free airline vouchers or frequent traveler club benefits and similar items, and the use of the benefits results in a cost savings to the Department, the employee may request an award of up to half the savings consistent with the Travel Savings Award Program policy. Such funds shall be reimbursed to the employee as expeditiously as possible following the employee's submission of an approved request for reimbursement.

C.  If an employee on approved official government travel elects to utilize lodging that costs less than the maximum lodging per diem rate, or completely avoids lodging expense, the employee may request an award of up to half the savings consistent with the Travel Savings Award Program policy. Such funds shall be reimbursed to the employee as expeditiously as possible following the employee's submission of an approved request for reimbursement. If the employee stays at a hotel, the hotel must be Federal Emergency Management Administration (FEMA) approved for fire/safety requirements. This can be verified at https://apps.usfa.fema.gov/hotel/, or its successor.

D.  Transportation and lodging are not the exclusive bases for realizing creditable travel savings under this program. Employees may be eligible for reimbursement in other circumstances, consistent with the Travel Savings Award Program where the employee demonstrates a cost savings to the Department.

SA173

# ARTICLE 26 - PARKING AND TRANSPORTATION

## Section 1 - Local Negotiations

The parties agree that parking is a substantive subject for local supplemental negotiations to the extent not specifically covered in this Agreement.

## Section 2 - General

Where employees are not being charged for parking that is available at the time this Agreement becomes effective, no charge will be initiated for the duration of this Agreement except where required by law. The parties agree that secure, adequate, and accessible parking for employees helps better serve customer needs and should be a consideration in local arrangements.

## Section 3 - Relocation

The Department agrees that if they relocate an office or should circumstances prompt changes in lease agreements, prior to the "solicitation for offers," the Department will notify the local union and/or place the issue on the agenda of the local Partnership Council. Parking space for the local union is a subject for local bargaining.

## Section 4 - Violations

An employee will receive two courtesy warnings and one counseling prior to receiving a parking citation by VA police except where a vehicle is parked in clearly marked emergency lanes or parking spaces. All citations issued will be reviewed by the Director or appropriate Department official who may make a recommendation to the Federal Court. The citation or parking warnings will be purged in accordance with the VA Records Control Schedule.

## Section 5 - Shuttle Service

The Department may provide existing or future shuttle service on a space available, first come, first served basis for employee use. Changes in the shuttle service used by employees are a subject for local bargaining.

## Section 6 - Security

In Department owned parking facilities, the Department will provide a safe and secure parking area for its employees including, but not limited, to the following:

A.  Lighting - Adequate lighting in all parking areas throughout the facility.

B. Security Service - For employee safety, VA police will provide escort service, when available and if requested, to parking areas under Department jurisdiction, traffic control, and general facility security.

C. Inspections - Inspections of grounds including facility and parking areas are to be regularly scheduled.

D. Pedestrian Crosswalks - Crosswalk areas from parking area to facility will be clearly marked.

E. Signage - Clearly understandable and unobstructed signs (traffic, pedestrian, etc.) consistent with both General Services Administration (GSA) standards and guidelines and safety traffic engineering principles are to be provided.

F. Problem Reporting - Local procedures will be negotiated for problem reporting, e.g., car lights left on, lights out on parking lots, damaged or obstructed signs, etc.

G. The provision of electronic security measures and security fencing are subjects for local bargaining.

## Section 7 - Commute Options

A. The parties agree to explore alternative commuting options and to encourage their use.

B. The Department will make appropriate arrangements for employees to advertise ride-sharing opportunities.

C. Where possible, the Department will work closely with public transportation agencies to ensure the availability of public transportation to the facility with special emphasis on accommodating mobility impaired employees.

## Section 8 - Transit Subsidies

A. Transit subsidies are designed to encourage employees to use mass transportation in commuting to reduce air pollution, noise, and traffic congestion in metropolitan areas.

B. As provided in the VA Directive 0633, or successor document, and any applicable collective bargaining agreement, qualified employees shall receive a subsidy in the form of transit vouchers for purchase of "fare media" or reimbursement that must be used toward public transportation commuting costs. All eligible bargaining unit employees shall be provided the benefit allowed each employee by the Directive.

**SA175**

# ARTICLE 27 - PERFORMANCE APPRAISAL

## Section 1 - Overview

A. The Department will strive for continuous improvement in performance to fulfill the Department's commitment to providing quality customer service. Accomplishment of the mission is intended to be achieved within an environment that both recognizes the interdependence of employee contributions and promotes teamwork. Improvement in Department performance will be sought by analyzing work processes and correcting systemic problems and/or revising processes, as appropriate.

B. Through a strategic management process, goals will be established, measured, and monitored in a systematic manner. The results of performance appraisal may be used as a basis for recognizing and rewarding accomplishments, identifying developmental needs, and recommending appropriate personnel actions.

C. The purpose of an employee's performance appraisal is to provide a fair and equitable framework for honest feedback and open two-way communication between employees and their supervisors. The performance appraisal focuses on contributions within the scope of the employee's job description in achievement of the Department's overall mission. The performance appraisal process includes an annual written appraisal for each employee.

D. The parties share an interest in improving the performance of the Department's workforce. This shall be achieved by establishing elements and standards that link the employee's performance to the Department's mission; providing employees with frequent feedback; recognizing individual and group performance; customer service; establishing appropriate rewards for good performance; identifying areas for improved performance; and actions to accomplish that improvement.

E. The parties believe that the performance appraisal process, constructively used, is one of the most effective methods for optimizing the effectiveness of the Department's workforce. The Department has a very real responsibility for helping employees maximize their performance, which can be accomplished through constructive and positive performance evaluations.

F. The performance appraisal process will emphasize:

1. Communication with employees on a continuing basis regarding their achievements and areas in which they could improve;

2. Employee and employee representative participation in the development of the program;

**SA176**

3. Employee development/evolution of the supervisor's role to coach (rather than being used as a disciplinary tool);

4. Continued performance improvement of the organization and its employees and assistance to employees in improving unacceptable performance;

5. Recognition of special contributions as part of or in addition to regular job duties.

G.  An annual rating of "fully successful" assures employees of eligibility for award consideration, promotion consideration, and within grade increases and serves as a positive, tangible assertion that the employee is meeting their job requirements.

H.  The performance appraisal process as set forth in this article is intended to be innovative and evolutionary in nature. Its effectiveness is critical to the Department achieving its mission.

## Section 2 - Definitions

A.  Appraisal
    The process under which performance is reviewed and evaluated.

B.  Appraisal Period
    The established period of time for which performance will be reviewed and a rating of record will be prepared.

C.  Critical Element
    A work assignment or responsibility of such importance that unacceptable performance on the element would result in a determination that an employee's overall performance is unacceptable. Such elements shall be used to measure performance only at the individual level. Performance plans must contain at least one critical element that must be used in deriving a summary rating.

D.  Non-Critical Element
    A dimension or aspect of individual, team, or organizational performance, exclusive of a critical element, that is used in assigning a summary level. Such elements may include, but are not limited to, objectives, goals, programs plans, work plans, and other means of expressing expected performance. Performance plans must contain at least one non-critical element that must be used in deriving a summary rating.

E.  Minimum Appraisal Period
    The 90 day period during which an employee must have performed under communicated performance elements and standards that may result in a performance rating.

**SA177**

F. <u>Performance</u>

The accomplishment of work assignments or responsibilities.

G. <u>Performance Plan</u>

All written or otherwise recorded, performance elements that set forth expected performance. A plan must include all critical and non-critical elements and their performance standards.

H. <u>Performance Rating</u>

The written or otherwise recorded appraisal of performance compared to the performance standard(s) for each critical and non-critical element on which there has been an opportunity to perform for the minimum period.

I. <u>Performance Standard</u>

The management-approved expression of the performance threshold(s), requirement(s), or expectation(s) that must be met to be appraised at a particular level of performance. A performance standard may include quality, quantity, timeliness, and manner of performance. Performance standards can be written for more than one level of achievement where appropriate. However, performance standards must be written at least at the fully successful achievement level.

J. <u>Progress Review</u>

A face-to-face meeting with employee(s), at least once during the appraisal period, about their performance. Such a meeting usually occurs during the mid point period.

K. <u>Rating Official</u>

The Department official who rates an employee's performance. Normally, the Rating Official shall be the immediate supervisor.

L. <u>Rating of Record</u>

The performance rating prepared at the end of the appraisal period for performance of assigned duties over the entire period and the assignment of a summary level. This constitutes the official rating of record as defined in 5 CFR Part 430.

M. <u>Special Rating of Record</u>

A performance rating prepared at the end of the minimum 90 day period of performance, used in limited circumstances to document current performance as a basis of a personnel action.

N. <u>Summary Ratings</u>

The record of the appraisal of each critical and non-critical element and the assignment of an overall rating. These ratings will be assigned in accordance with the following criteria:

1. Outstanding. The achievement levels for all elements are designated as Exceptional.

2. Excellent. The achievement levels for all critical elements are designated as Exceptional. Achievement levels for non-critical elements are designated as at least Fully Successful. Some, but not all non-critical elements may be designated as Exceptional.

3. Fully Successful. The achievement level for at least one critical element is designated as Fully Successful. Achievement levels for other critical and non-critical elements are designated as at least Fully Successful or higher.

4. Minimally Satisfactory. The achievement levels for all critical elements are designated as at least Fully Successful. However, the achievement level(s) for one (or more) non-critical elements is (are) designated as Less Than Fully Successful.

5. Unsatisfactory. The achievement level(s) for one (or more) critical elements is (are) designated as Less Than Fully Successful.

## Section 3 - Policy

A. In its entirety and application, the performance appraisal process will to the maximum extent feasible, be fair, equitable, and strictly related to job performance as described by the employee's job description.

B. Conduct unrelated to job performance shall not be considered in measuring an employee's performance.

C. Performance appraisals shall be fair and objective. They shall measure actual work performance over the entire rating period in relation to the performance requirements of the positions to which employees are assigned. Regardless of the source(s) of information used for performance appraisal, such information will be collected, used, and maintained in accordance with the Privacy Act.

D. Union officials who are granted official time for representational activities under Article 48 - Official Time, will not be penalized in their performance appraisals for such use of official time. Their performance of duties shall be evaluated against assigned elements and performance standards for the time they were available to perform their duties. The use of official time, in accordance with this Agreement, shall not influence an employee's performance evaluation in any way. If an employee union official spends 100% on official time or does not spend a sufficient amount of time in the performance of regular duties during a performance period to be fairly rated against the performance standards, the employee's performance evaluation for the appraisal period will reflect that they were not given a rating for that

**SA179**

performance appraisal period. For the purposes of personnel actions where a rating of record is necessary the last rating of record will be used.

## Section 4 - Performance Management Responsibilities

Performance management responsibilities:

A.  Appropriate Department officials shall be responsible for:

   1.  Providing supervision and feedback to employees on an on-going basis with the goal of improving employee performance.

   2.  Nominating deserving employees for performance awards.

B.  Employees are responsible for:

   1.  Performing the duties outlined in their position description and performance elements.

   2.  Promptly notifying supervisors about factors that interfere with their ability to perform their duties at the level of performance required by their performance elements.

## Section 5 - Performance Standards

A.  Objective criteria will be used to the maximum extent feasible in establishing and applying performance standards and elements. The rating official will establish and communicate in writing to employee(s) critical and non-critical elements and performance standards, at the beginning of the appraisal period (normally within 30 days). After initial issuance of critical and non-critical elements and performance standards, the elements and standards will be provided annually, thereafter. All aspects of the performance plan, including numerical standards, measurement indicators, priorities, and weightings, if applicable, will be communicated in writing to the affected employees at the time the employees receive their performance elements and standards. The local union may provide input into any changes to performance standards and/or establishment of new performance standards.

B.  Whether or not more than one level is defined, the rating official will provide the employee with information that is adequate to inform them of what is necessary to reach an "Exceptional" level on each element. Additional information regarding performance expectations can be in the form of written instructions, work plans, records of feedback sessions, responses to employee questions concerning performance, memoranda describing unacceptable performance, or any reasonable manner calculated to apprise the employee of the requirements against which they are to be measured. This additional specification should be sufficient to assist the employee in achieving the "Exceptional" level.

SA180

C.  Performance standards and elements to the maximum extent feasible shall be reasonable, realistic, attainable, and sufficient under the circumstances to permit accurate measurement of an employee's performance, and adequate to inform the employee of what is necessary to achieve a "Fully Successful" level of achievement. Performance standards that assess an employee's manner of performance must be job related, documented, and measurable. There must be a nexus between the expected manner of performance and the expected job results.

D.  Performance standards must be written at least at the Fully Successful achievement level. However, standards can be written for more than one level of achievement where appropriate.

E.  The local union shall be given reasonable written advance notice (no less than 15 calendar days) when the Department changes, adds to, or establishes new elements and performance standards. Prior to implementation of the above changes to performance standards, the Department shall meet all bargaining obligations.

F.  To the maximum extent feasible, performance standards shall be defined in terms of objective criteria. In addition, they shall be defined in the terms of criteria that are observable, measurable, fair and job-related. Performance measures in terms of quality, quantity or timeliness, must provide a clear means of assessing whether objectives have been met.

G.  Employees will be evaluated based on a comparison of performance with the standards established for the appraisal period. Elements and standards shall be based on the requirements of the employee's position.

H.  Normally, elements are not weighted or assigned different priorities. However, the Department will inform the employee, at the time the elements and standards are communicated, whether aspects of any job elements are to be accorded different priority. If the elements, standards, or priority changes, that change(s) will be communicated to the employee when it becomes effective. In addition, each time an employee is assigned to a new position, the Department shall communicate the specific elements and performance standards, and any differing priority of the position that will apply to the employee.

I.  When the Department mandates national performance standards, all bargaining obligations with the Union shall be met at the national level.

## Section 6 - Communications

A.  An orientation briefing will be provided to all new employees entering on duty, and there will be an oral discussion to explain, clarify, and communicate the employee's job responsibilities as articulated in the employee's PD and/or

**SA181**

performance plan. The purpose of this discussion is to ensure that there is a clear and common understanding of the duties and responsibilities contained in the employee's PD and/or performance plan.

B.  Orientation sessions shall be held when there is a change in the work situation. Examples may include, but are not limited to:

1.  A change in the supervisor of record;

2.  When the employee is detailed;

3.  A change in the work unit's goals, objectives, or work processes;

4.  A change in assignments; or

5.  When an employee returns from an extended absence.

C.  Normally within 30 days after entry into the position or when an employee's PD or performance plan is changed, employees shall receive a copy of the PD and the performance plan. Employees shall be advised of the major tasks and responsibilities of their jobs, including which are critical and non-critical, and any priority and weighting for the elements.

D.  The rating official will assure that the employee has an up-to-date PD, access to up-to-date copy of the Department's mission and goals and, if applicable, the career ladder plan, and will initiate a dialogue with the employee to discuss the employee's duties and responsibilities in relation to the organizational unit's goals and the Department's mission. Employees are encouraged to bring training or developmental needs to the attention of the supervisor.

E.  At the beginning of each rating period and when changes are made to performance standards the Department agrees that the supervisory personnel shall meet with their employees to discuss new or revised critical and non-critical elements and standards; however, if the elements have not changed, the supervisor shall communicate to them that the critical and non-critical elements will remain the same for the appraisal period. Critical and non-critical elements and standards can change, among other cases, when an employee moves from one level in a career ladder position to another level. The purpose of the meeting shall be to clarify any questions that the employees have concerning their performance standards (for example, explanations or examples of what employees must do to perform at each level). Any questions left unanswered during the meetings referenced above will be responded to within one week of the end of the meeting. If questions remain from a group meeting, the entire group shall be informed of the response.

**SA182**

## Section 7 - Uses of the Performance Appraisal Process

A. The performance appraisal process is used for making a basic determination that an employee is meeting their job requirements. It is also the basis for making certain personnel-related decisions.

B. Within-Grade Increase - An employee who has attained a rating of "Fully Successful" and has achieved an "acceptable level of competence" will be entitled to appropriate within-grade increases.

C. A rating of "Fully Successful" will be used as the initial factor in determining basic eligibility for consideration of awards, promotions, and other personnel actions.

D. Each element in the employee's performance plan will be rated with one of the following "Levels of Achievement:"

   1. Exceptional

   2. Fully Successful

   3. Less Than Fully Successful

E. Performance standards will be written at the "Fully Successful" level of achievement. Supervisors may elect to write standards at levels other than the "Fully Successful" achievement level, or to provide other guidance on how to exceed performance expectations.

F. In general, an "Exceptional" level of achievement means that all "Fully Successful" performance standards for the element are significantly surpassed. This level is reserved for employees whose performance in the element far exceeds normal expectations and results in significant contributions to the organization.

G. An "Outstanding" summary rating is attained when the achievement levels for all elements are designated as "Exceptional." An "Excellent" summary rating is attained when the achievement levels for critical elements are designated as "Exceptional" and the achievement levels for non-critical elements are designated as at least "Fully Successful." Employees who want to achieve the "Exceptional" achievement level on one or more of their elements are encouraged to talk with their supervisor about appropriate stretch goals for each element in question.

H. Any employee receiving an "Outstanding" performance rating shall be eligible to receive an award.

**SA183**

I.  Any employee receiving an "Excellent" performance rating shall be eligible to receive an award.

J.  Any employee receiving a "Fully Successful" performance rating shall be eligible to receive an award.

## Section 8 - Process

A.  All bargaining unit employees will receive an annual performance appraisal for the period October 1 through September 30, or other dates agreed to by the national parties, thereby certifying that the job duties and responsibilities have been performed at an acceptable level. The evaluation will be issued in writing to the employees within 60 calendar days of the end of the appraisal period. Employees new to the Department (with less than 90 calendar days) as of October 1, will receive a delayed evaluation upon completion of the 90 calendar days.

B.  If there is a change from one permanent position to another during the last ninety days of the appraisal year, the special rating of record becomes the rating of record for the appraisal period. The employee's existing rating shall be used as the rating of record until a rating of record is prepared. Ratings for periods of time which are less than the full annual appraisal period will be so noted. Ratings of record must be postponed or delayed as required in 5 CFR 430 and 531.

C.  The employee self-assessment is a critical source of employee performance information and can contribute to improved communication between supervisors and employees. An employee who chooses to prepare such assessment shall be granted a reasonable amount of time to document the accomplishment and prepare the assessment. The employee shall submit that self-assessment to their immediate supervisor within 10 working days after the end of the appraisal cycle.

D.  Employees should be aware that their self-assessment/input is essential to the appraisal process. Employees are strongly encouraged to provide information to the rating official that can be used to supplement the rating official's knowledge concerning their performance and contributions to the mission of the Department. Employees who wish to do self-assessments under this section will be given appropriate guidance to help them prepare a performance self-assessment. The guidance will be provided during duty time and structured around their performance plan.

E.  When evaluating performance, the Department shall not hold employees accountable for factors which affect performance that are beyond the control of the employee. All changes in working procedures must be communicated

**SA184**

to employees before they can be charged with errors. If the initial instruction was communicated in writing, the change should also be communicated in writing.

F.  The fact that an employee assumes new tasks, receives new elements, changes positions, is a trainee, or gets promoted does not create a presumption that their performance may not be exceptional or otherwise deserving of recognition or an award. Rather, each employee's appraisal shall be strictly based on their performance against those elements that apply during the relevant appraisal cycle.

## Section 9 - Progress Reviews and Informal Discussions

A.  Ongoing appraisal - An appraisal program shall include methods for appraising each critical and non-critical element during the appraisal period. Performance on each critical and non-critical element shall be appraised against its performance standard(s). Ongoing appraisal methods shall include, but not be limited to, conducting one or more progress reviews during each appraisal period.

B.  Supervisors will conduct at least one mid-point formal progress review with each employee and document the results of the review.

C.  The purpose of the progress review is to exchange information concerning the performance of the employee as compared to the established elements and standards. In this review, employees are encouraged to discuss information which impacts on their performance. The supervisor shall notify an employee of adverse information when they become aware of it; information not provided to the employee at that time shall not be used to adversely affect the employee's performance appraisal. The review may include identification and consideration of any formal or informal training felt to be helpful in aiding the employee to accomplish their performance plan.

D.  Informal discussions are a standard part of supervision and should occur throughout an appraisal period.

1.  Discussions may be initiated by the supervisor or employee. Discussions may be held one-on-one or between a supervisor and a work group.

2.  Discussions should be candid, forthright dialogues between the supervisor and employee(s) aimed at improving the work product. Discussions will provide the opportunity to assess accomplishments and progress and identify and resolve any problems in the employee's or work team's work product. Where indicated, the supervisor shall provide additional guidance aimed at developing the employee(s) and improving the work product or outcome. Discussions will provide the employee the opportunity to seek further guidance and understanding of their work performance.

**SA185**

3.  Informal discussions may become formal, depending on the circumstances.

## Section 10 - Performance Improvement Plan (PIP)

A.  If the supervisor determines that the employee is not meeting the standards of their critical element(s), the supervisor shall identify the specific, performance-related problem(s). After this determination, the supervisor shall develop in consultation with the employee and local union representative, a written PIP. The PIP will identify the employee's specific performance deficiencies, the successful level of performance, the action(s) that must be taken by the employee to improve to the successful level of performance, the methods that will be employed to measure the improvement, and any provisions for counseling, training, or other appropriate assistance. In addition to a review of the employee's work products, the PIP will be tailored to the specific needs of the employee and may include additional instructions, counseling, assignment of a mentor, or other assistance as appropriate. For example, if the employee is unable to meet the critical element due to lack of organizational skills, the resulting PIP might include training on time management. If the performance deficiency is caused by circumstances beyond the employee's control, the supervisor should consider means of addressing the deficiency using other than a PIP. The parties agree that placing the employee on 100% review alone does to not constitute a PIP.

B.  The PIP will afford the employee a reasonable opportunity of at least 90 calendar days to resolve the specific identified performance-related problem(s). The PIP period may be extended.

C.  Ongoing communication between the supervisor and the employee during the PIP period is essential; accordingly, the supervisor shall meet with the employee on a bi-weekly basis to provide regular feedback on progress made during the PIP period. The parties may agree to a different frequency of feedback. The feedback will be documented in writing, with a copy provided to the employee. If requested by the employee, local union representation shall be allowed at the weekly meeting.

D.  The goal of this PIP is to return the employee to successful performance as soon as possible.

E.  At any time during the PIP period, the supervisor may conclude that the employee's performance has improved to the Fully Successful level and the PIP can be terminated. In that event, the supervisor will notify the employee in writing, terminate the PIP, and evaluate the employee as Fully Successful or higher.

F.  In accordance with 5 CFR 432.105 (a) (2), if an employee has performed acceptably for one year from the beginning of an opportunity to demonstrate an acceptable performance (in the critical element(s) for which the employee was afforded an opportunity to demonstrate acceptable performance), and the employee's performance again becomes unacceptable, the Department shall afford the employee an additional opportunity to demonstrate acceptable performance before determining whether to propose a reduction in grade or removal.

## Section 11 - Performance-Based Actions

A.  Should all remedial action fail and the employee's performance is determined to be unacceptable, the supervisor will issue a rating of unacceptable performance to the employee. One of the following actions will be taken: reassignment, reduction to the next lower appropriate grade, or removal.

B.  An employee who is reassigned or demoted to a position at a lower grade shall receive a determination of their standing after 90 calendar days in the new position.

C.  A notice of reassignment for performance reasons shall contain an explanation of the reasons why training had been ineffective or inappropriate. When a reassignment is proposed in these instances, the following shall apply:

1.  The reassignment shall be to an available position for which the employee has potential to achieve acceptable performance;

2.  The employee shall receive appropriate training and assistance to enable the employee to achieve an acceptable level of performance in the position;

3.  The reassignment shall be within the commuting area of the employee's current position; and

4.  The reassignment shall be at the grade and step level equal to that of the position held by the employee prior to the reassignment.

D.  An employee whose reduction in grade or removal is proposed for unacceptable performance is entitled to:

1.  Thirty calendar days' advance written notice of the proposed action which identifies both the specific instances of unacceptable performance by the employee on which the proposed action is based, and the critical element(s) of the employee's position involved in each instance of unacceptable performance;

2.  A reasonable time, not to exceed 20 calendar days, to answer orally and in writing;

**SA187**

3. A reasonable amount of authorized time up to eight hours, to prepare an answer (additional time may be granted on a case-by-case basis);

4. The employee and/or their representative will be provided with a copy of the evidence file.

E. An official who sustains the proposed reasons against an employee in an action based on unacceptable performance will set forth their reasons for the decision in writing.

F. The employee will be given a written decision which:

1. Specifies the instances of unacceptable performance on which the decision is based; and

2. Specifies the effective date, the action to be taken, and the employee's right to appeal the decision.

G. The final decision in the case of a proposed action to either remove or downgrade an employee based on unacceptable performance shall be based on those instances which occurred during the 1-year period ending on the date of the notice proposing the performance-based action.

H. The decision shall inform the employee of their right to appeal to either the Merit Systems Protection Board (MSPB) in accordance with applicable laws or to file a grievance under the negotiated grievance procedure.

**SA188**

# ARTICLE 28 - REDUCTION IN FORCE

## Section 1 - Purpose

The Department and the Union recognize that unit employees may be seriously and adversely affected by a Reduction in Force (RIF), staffing adjustment (Title 38), reorganization, or transfer of function action. The Department recognizes that attrition, reassignment, furlough, hiring freeze, and early retirement are among the alternatives to RIFs that may be available. This article describes the exclusive procedures the Department will take in the event of a RIF, reorganization, or transfer of function as defined in this article. It is also intended to protect the interests of employees while allowing the Department to exercise its rights and duties in carrying out the mission of the Department.

## Section 2 - Applicable Laws and Regulations

For purposes of Title 5 employees, the policy, procedures, and terminology described in this article are to be interpreted in conformance with 5 USC 3501-3504, 5 CFR Part 351, 29 CFR 1613.203, and other applicable government-wide laws and regulations. For purposes of Title 38 employees, the policies, procedures, and terminology of this article are to be interpreted in conformance with VA Directive and Handbook 5111. Either party may reopen Directive and Handbook 5111 within one year with proper notice. Any successor to the Directive and Handbook or changes or revisions to this document will be developed through the predecisional involvement of the Union and subject to collective bargaining.

## Section 3 - Application

The Department agrees to fairly and equitably apply this article and any laws or regulations relating to any matter in this article.

## Section 4 - Union Notification

A.  Directors of VA facilities shall be responsible for properly notifying the Union in conjunction with any of the actions described in this article.

1.  A facility-based action affecting the interests of one local union shall require notice to the President of that local.

2.  A facility-based action affecting the interests of two or more local unions shall require notice to a party designated by the Union.

B.  For actions covered by this article, the Department agrees to notify the Union as described in Paragraphs A 1 and A 2 in this section at the earliest possible date but no later than 90 calendar days prior to the effective date.

**SA189**

C.  All notices per Sections A and B above will be given prior to any notice to affected unit employees. Verbal notices will be confirmed in writing.

D.  A properly constructed notice to the Union under this section shall consist, at a minimum, of the following information:

1.  The reason for the action;

2.  The approximate number, types, and geographic location of position affected; and,

3.  The approximate date of the action.

## Section 5 - Definitions

For the purpose of this article, the following terms are defined in law and regulations and are included for informational purposes:

A.  Reduction-In-Force (RIF)
When the Department releases a competing employee from their competitive level by furlough for more than 30 days, separation, demotion, or reassignment requiring displacement, when the release is required because of lack of work, shortage of funds, insufficient personnel ceiling, reorganization, the exercise of reemployment rights or restoration rights, or reclassification of an employee's position due to erosion of duties when such action will take effect after the Department has formally announced a RIF in the employee's competitive area and when the RIF will take effect within 180 days.

B.  Transfer of Function
The transfer of the performance of a continuing function from one competitive area and its addition to one or more other competitive areas or the movement of the competitive areas in which the function is performed to another commuting area is known as a transfer of function.

C.  Reorganization
A reorganization is the planned elimination, addition, or redistribution of functions or duties in an organization or activity.

D.  Title 38 Staffing Adjustments
Changes resulting in a reduction of full-time Title 38 staff may occur through separation or reassignment to other facilities or other commuting areas, changes in assignment or reassignment within the facility, and changes to a lower grade or pay based on changes in staffing levels or patterns of at least one full-time permanent Title 38 employee.

**SA190**

E.  Competitive Area
An area in which employees compete for retention is known as a Competitive Area. A competitive area must be defined solely in terms of the Department's organizational services or units and geographical location, and it must include all employees within the competitive area as defined.

F.  Competitive Level
Positions in a competitive area that are in the same grade (or occupational level) and classification series that are so alike in qualification requirements, duties, responsibilities, pay schedule, and working conditions that the incumbent of one position can successfully perform the critical elements of any other position in the level upon assignment to it, without loss of productivity or undue interruption is known as competitive level. Competitive levels for Title 38 employees will be determined in accordance with VA Directive and Handbook 5111.

## Section 6 - Freezing of Vacancies

The Department will freeze all relevant vacant positions within the facility 60 days prior to the effective date of a RIF. When the Department decides to fill a vacant position after the effective date of the RIF, whether previously frozen by virtue of RIF or in the creation of new vacancies, employees who have been demoted will be offered the vacancy, provided the employee is qualified or has been given a waiver of qualifications for the intended position. Employee entitlement to this special consideration shall be determined in accordance with Section 24 of this article.

## Section 7 - Employee Notification

An individual employee who is adversely affected by actions stated in this article shall be given a specific notice not less than 60 days prior to the effective date of the action. All such notices shall contain the information required by the OPM regulations in addition to the information required by this article.

## Section 8 - Content of Notices

The content of the specific notice shall include the following information:

A.  The specific action to be taken;

B.  The effective date of action;

C.  The employee's competitive area, competitive level, subgroup and service date, and the annual performance ratings of record for the applicable three years;

D.  The place where the employee may inspect the regulations and records pertinent to their case;

**SA191**

E.  The reasons for retaining a lower standing employee in the same competitive level because of a continuing exception;

F.  Grade and pay retention information; and,

G.  The employee's grievance or appeal rights.

## Section 9 - Employee Information

The Department shall provide complete information needed by employees to fully understand the action and why they are affected. At a minimum, the Department shall:

A.  Inform all employees as fully and as soon as possible of the plans or requirements for actions in accordance with applicable rules and regulations;

B.  Inform all employees of the extent of the affected competitive area, the regulations governing such action, and the kinds of assistance provided to affected employees;

C.  Maintain and publicize a list of vacancies Department-wide and maintain a copy of the government-wide job bulletins, such as Federal Jobs or Federal Research Service; and,

D.  Conduct a placement program within the Department to minimize the adverse impact on employees who are affected by RIF. The placement program will include counseling for employees by qualified personnel on opportunities and alternatives available to affected employees.

## Section 10 - Personnel Files

The Union may review any bargaining unit employee's eOPF at an employee's request in writing if the employee believes that the information used to place them on the register is inaccurate, incomplete, or not in accordance with laws, rules, regulations, and provisions of this article.

## Section 11 - Records

The Department will maintain all lists, records, and information pertaining to actions taken under this article for at least two years in accordance with applicable rules and regulations.

## Section 12 - Retention Register

The Department will state in writing that to the best of its knowledge the retention register is accurate as of the date it was developed. A copy of the retention register will be made available to the Union at the earliest possible time.

**SA192**

## Section 13 - Employee Use of Authorized Time and Department Facilities

A.  Employees who are identified for transfer of function, separation, or change to a lower grade as a result of RIF under this article shall be entitled to reasonable time while otherwise in a duty status without charge to leave for:

1.  Preparing, revising and reproducing job resumes and/or job application forms;

2.  Participating in employment interviews;

3.  Using the telephone to locate suitable employment; and,

4.  Reviewing job bulletins, announcement, etc.

B.  Such employees will also be entitled to reasonable use of the following facilities and/or services for the purpose of locating suitable employment: telephone, reproduction equipment, interagency messenger mail, e-mail, typing, and counseling.

## Section 14 - Performance Appraisals

Except for employees who are re-rated after a period allowed in 5 CFR Part 432, annual performance appraisals for purpose of retention standing will be frozen 60 days prior to the effective date of the action. The three latest annual appraisals of record prior to the freeze will be used to determine eligibility for additional credit toward an employee's service computation date. To be credited under this section, an appraisal must have been issued to the employee with all appropriate reviews and signatures and must be on record.

## Section 15 - Release from Competitive Level

When an employee is to be released from their competitive level, the "best offer" is made. The offer will be as close to the employee's current grade as possible and in the same commuting area if possible.

## Section 16 - Employee Response to Specific Notice

Upon receipt of specific notice notifying the employee that they are offered a reassignment or change to lower grade or will be released from their competitive level, the employee shall have the 14 days specific notice period in which to accept or reject the offer made. If a position with a higher representative rate or grade (but not higher than the rate or grade of the employee's current position) becomes available on or before the effective date of the RIF, the Department will make the better offer to the employee. However, making the better offer will not extend the 60 day notice period.

**SA193**

## Section 17 - Reassignment to a Different Geographic Area

Dislocation of employees outside of their commuting area shall be avoided when the Department has alternatives. When the Department is not able to place an employee within the local commuting area and the employee is reassigned to another geographic area, such action will be considered to be in the best interest of the government. The employee's relocation expenses shall be at government expense and reimbursed at the authorized rates.

## Section 18 - Relocation Trips

When the Department assigns an employee to a position requiring a move to another geographic area, the employee will be granted administrative leave and/or excused absence, as appropriate, to locate housing and make related arrangements at the new work location. The employee shall be placed in travel status for such trips and shall receive travel and per diem reimbursement at the authorized rates.

## Section 19 - Time Allowed for Relocation

Employees reassigned to a different commuting area who relocate will be allowed a period of time, as appropriate, to complete the move and report to work at the new work location.

## Section 20 - Displaced Employees

The Department shall provide any employee to be separated by RIF or transfer of function with the appropriate information regarding unemployment benefits available to them.

## Section 21 - Details

Employees on detail will not be released during a RIF from the position to which they are detailed but, rather, from the affected employee's permanent position of record.

## Section 22 - Transfer of Function

A. When a transfer of function occurs, the Department will first solicit qualified volunteers for transfer from among those employees in positions that have been identified for transfer. If there are not enough qualified volunteers from among these affected employees, the Department will solicit qualified volunteers from the competitive area.

B. If the total number of employees who volunteer for transfer exceeds the total number of employees required to perform the function in the competitive area that is gaining the function, preference will be given to the volunteers with the highest retention standing. In the event there are not enough volunteers for the transfer, the employee with the lowest retention standing will be selected.

**SA194**

C. Whenever possible, affected employees who do not volunteer to be transferred shall be reassigned to vacant positions within the competitive area for which the employee is qualified and which the Department has determined to fill.

## Section 23 - Repromotion Rights of Affected Employees

For a period of two years, affected employees demoted by an action covered by this article will be re-promoted to vacancies as they occur according to the following criteria:

A. The Department determines to fill the vacancy;

B. The employee has the requisite skills and abilities for the position without undue interruption; and,

C. Another qualified employee does not have a higher retention standing.

## Section 24 - Reemployment Priority Rights of Affected Employees

Career and career-conditional employees who have received a specific RIF notice and have not declined a valid job offer at a rate lower than the current grade will be entered on the Department's Reemployment Priority List (RPL) for the commuting area in which they are qualified and available. Department components must use the RPL in filling vacancies before offering employment to an individual from inside or outside the Department (with some exceptions for veterans). Career employees may remain on the list for two years and career conditional employees for one year from the date of separation unless removed earlier through placement or declination of an offer.

**SA195**

# ARTICLE 29 - SAFETY, HEALTH, AND ENVIRONMENT

## Section 1 - General

A.  The parties recognize that a safe and healthful work environment is valued by the Department; is necessary for the accomplishment of the Department's missions; and contributes to a high quality of life for the employees. It shall be the responsibility of the Department to establish and maintain an effective and comprehensive Occupational Safety and Health Program (Program) in accordance with Public Law 91-596, the Occupational Safety and Health Act of 1970 (referred to as the Act), Executive Order 12196, 29 CFR Part 1960 (and all its sub parts along with Directives and the VA Handbooks 7700 and 7700.1) and, 29 CFR 1904 (Occupational Safety and Health Administration (OSHA) Recordkeeping Provision for Federal Employees). In administering the program, the Department agrees to recognize the Union as the exclusive representative of bargaining unit employees. The Department shall furnish places and conditions of employment which are free of recognized hazards and unhealthful working conditions.

B.  The Department will abate recognized hazards that are causing or are likely to cause death or serious harm and protect employees in the interim.

C.  Specific procedures for preventing and abating safety and health hazards will be jointly developed with the Union through the National, Intermediate, and Local Safety committees.

## Section 2 - National Safety and Health Committee

The Union will have representation for each of the administrations that is a part of the Department Safety and Health Committee. Bargaining unit employees who spend time on the National Safety and Health Committees initiated by the Department in a nonrepresentational capacity will be on duty time. Bargaining unit employees serving in a union representational capacity will be on official time. This official time will not be counted against any allocated official time as described in this agreement. The Department shall pay for all meeting related travel expenses as well as per diem. The parties shall exchange agenda items as far in advance as possible of the meeting so that travel and per diem may be arranged.

## Section 3 - Union Participation

A.  The Union President will designate five National Safety and Health Representatives who will each be on 50% official time. They will work with the Department's national-level safety and health officials in developing and implementing the Program. The National Safety and Health Representatives will represent the interests of the Union and the employees in the

development and implementation of all aspects of the Department's and Administrations' occupational safety and health program. The National Safety and Health Representatives will be the points of contact for any safety and health initiatives at the Department, Administration, and/or System levels that impact employee safety and health. The parties will develop joint training programs and materials in safety and health for bargaining unit employees. The representatives will provide training and assistance to local unions in the performance of their responsibilities under the Program. The National Safety and Health Representatives may visit facilities within the bargaining unit to work with local unions on safety and health matters. Notice of such visits will be given to the Director of each facility.

B.  The Department recognizes that Union participation in its Occupational Safety and Health Program is essential for the success of that Program. The Union may designate representatives at the facility level, intermediate levels, and the National level who will represent the interests of the Union and the employees in the development and implementation of this Program. The parties agree that work on the Safety and Health Program is a part of the ongoing Partnership between the Department and the Union. Time spent serving as a Union representative during safety and health inspections, as a member of a Safety and Health Committee or its subcommittees, developing plans for abatement of materials, investigating accidents, and safety-related committee assignments will be considered duty time.

C.  The National Safety and Health Representatives will be given copies of all Designated Agency Safety and Health Official (DASHO) letters and other national-level communications to the field on safety and health matters as well as all safety manuals and publications. The DASHO written correspondence and reports will include the Department's goals and objectives annually for reducing and eliminating occupational accidents, injuries, and illnesses. The report should include the plans and procedures for evaluating VBA, NCA, and VHA occupational safety and health programs and their effectiveness at all operational levels.

D.  The Department will pay tuition, travel, and per diem expenses for each National Safety and Health Representative to attend at least one conference each year.

E.  The NVAC President may designate additional representatives to work on individual projects of mutual interest to the parties. The NVAC President may designate representatives at the National or appropriate intermediate levels within the Department to develop and implement the Safety and Health Program at that level.

**SA197**

F.   The Union's National, Intermediate, and local union Safety and Health Representatives will be authorized the use of long distance communications and conference call capabilities.

G.   Each local union at a bargaining unit facility may designate a local Safety and Health Representative who will serve as the local union's point of contact for safety and health matters at the facility. Functions of local Safety and Health Representatives include, but are not limited to the following:

1.   Conduct joint inspections;

2.   Issue joint reports regarding inspection findings to the appropriate Department official;

3.   Participate, as appropriate, in inspections conducted by governmental authorities outside the Department's control including Joint Commission;

4.   Receive and investigate employee reports of unsafe or unhealthy conditions (employees should submit such reports to both the local union's and Department's representatives);

5.   Develop and monitor abatement plans needed to correct local conditions as appropriate (all personnel subject to the hazard shall be advised of the action and of the interim protective measure in effect and shall be kept informed of the subsequent progress on the abatement plan. To document receipt, the completed Abatement Plans will be jointly signed by the local union's Safety Representative and a representative from the Department);

6.   Refer matters to Environmental Protection Agency (EPA), OSHA and/or National Institute for Occupational Safety and Health (NIOSH) as appropriate;

7.   Receive copies of any written notice referred by a facility official in response to an employee report of an unsafe or unhealthy condition, in compliance with 29 CFR 1960 time limits;

8.   Monitor preventive maintenance plans for Heating, Ventilating, and Air Conditioning (HVAC) system components;

9.   Receive all reports of security incidents involving threats to employees, their offices, and property (such reports may be sanitized as appropriate);

10. Receive all accident reports (such reports may be sanitized as appropriate).

H.   Each facility with 25 or more employees will have an Occupational Safety and Health and Fire Prevention Committee (Committee) in accordance with 29 CFR 1960 and all its subparts.

SA198

I.   The local union will be afforded representatives on such Committees, the number of which is subject to local negotiation. The facility's Committee may establish subcommittees to address particular issues or subjects, and the local union will be represented on each subcommittee. The local union will be given the opportunity to have a representative on any other facility-level committee that relates to the safety and health issues of bargaining units. These will include, but not be limited to, Blood Borne Pathogens and Infection Control Committees.

J.   The local union will be given the opportunity to participate in all scheduled workplace inspections which are intended to detect hazards to employee safety and health, whether conducted by Department Safety and Health personnel, non-Department employees acting on behalf of the Department, OSHA and EPA personnel, or other regulatory agencies and bodies.

## Section 4 - Standards

A.   The Department shall comply with Occupational Safety and Health Standards issued under Section 6 of the Act and/or where the Secretary of Labor has approved compliance with alternative standards in accordance with 29 CFR 1960 and all its sub-parts. The Department will notify the Union in accordance with Article 47 - Mid-Term Bargaining, prior to the submission of any alternate standards to the Secretary of Labor. On a case-by-case basis, the parties shall adopt more stringent safety and/or health standards to address specific concerns.

B.   Personal Protective Equipment (PPE), as required by appropriate OSHA standards to protect employees from hazardous conditions encountered during the performance of their official duties will be provided and replaced as necessary at no cost to employees required to wear specific PPE. Employees who are exposed to the hazards of outdoor environments, such as heat or extreme cold weather, will be provided appropriate PPE to OSHA recommendations. Some commonly needed types of PPE include, but are not limited to: safety glasses; steel-toed safety shoes/boots; SPF lotion; etc. Hazard assessments to determine the need for PPE will be conducted by each facility for each workplace. These assessments will also evaluate the need for and feasibility of engineering controls or other devices designed to reduce workplace injuries and illnesses or eliminate the need for PPE. These assessments will be documented and a copy provided to the local union. When assessments determine the appropriateness of PPE, affected employees will have the opportunity to choose from available and appropriate styles and sizes to optimize employee comfort and protection. Employees will receive training on the proper use and care of PPE.

**SA199**

C. Consistent with 5 CFR 1910.132, the Department shall provide training to those employees who are required by this section to use PPE and shall certify in writing that the training was provided.

D. Nothing in this section precludes local level negotiations.

## Section 5 - Report, Evaluation, and Abatement of Unsafe and Unhealthful Working Conditions

A. Any employee, group of employees, or representatives of employees who believe that an unsafe or unhealthful working condition exists in any workplace has the right to report such condition to the appropriate supervisor, the facility director, the appropriate Department Safety and Health official, and the Union. In the case of immediate threat to life or danger of serious physical harm, the employee shall immediately report the situation to the supervisor and/or facility Safety and Health personnel.

B. Facility Safety and Health personnel and local safety representatives will evaluate employee reports of unsafe or unhealthful working conditions in accordance with 29 CFR 1960. The local union will be formally notified of all hazards as defined in 29 CFR 1960.

C. The Department agrees to ensure prompt abatement of unsafe and unhealthful working conditions.

D. If there is an emergency situation in an office or work area, the first concern is for the employees and the public they serve. Should it become necessary to evacuate a building, the Department will take precautions to guarantee the safety of employees and the public. Individuals ordinarily will not be readmitted until it is determined in conjunction with whatever expert resources have been called in, depending on the circumstances, that there is no longer danger to the evacuated personnel. "Expert resources" may include, but are not limited to, local police departments, the Federal Protective Service, local fire departments, appropriate health authorities, etc. The local union Health and Safety Committee members or local union Health and Safety Representatives will be notified as soon as the Department becomes aware regarding the emergency situation.

E. In accordance with 29 CFR 1960, an abatement plan will be prepared if the abatement of an unsafe or unhealthy working condition will not be possible within 30 calendar days. Such plan shall contain a proposed timetable for the abatement and a summary of steps being taken in the interim to protect employees from being injured as a result of the unsafe or unhealthy working conditions.

F.    When abatement action is dependent upon GSA or other lessors, the abatement must be prepared in conjunction with appropriate members of that group. The facility Health and Safety Committee will be timely notified and consulted, and all personnel subject to the hazard shall be advised of interim measures in effect and shall be kept informed of subsequent progress on the abatement plan.

G.    Prior to the establishment of an official abatement plan, the Department shall take interim steps for the protection of the employees.

H.    Any equipment, devices, structures, clothing, supplies, tools, or instruments that are found to be unsafe will be removed from service, locked-out, and/ or tagged-out or rendered inoperative, as appropriate.

I.    An employee and/or their representative submitting a report of unhealthful or unsafe conditions should be notified in writing within 15 days if the official receiving the report determines there are not reasonable grounds to believe such a hazard exists and does not plan to make an inspection based on such report. A copy of each such notification shall be provided by the Department to the appropriate certified safety and health committee, where established. The Department's inspection or investigation report, if any, shall be given to the employee and/or their representative 15 days after completion of the inspection, for safety violations, or within 30 days, for health violations, unless there are compelling reasons.

## Section 6 - Comprehensive Analysis of Injuries and Illnesses

A.    The Department agrees that comprehensive analysis will be performed to determine causes and appropriate corrective actions concerning patterns of injuries and illnesses that occur at each facility. The analysis will examine such factors as: the general conditions under which the affected employee's job is performed; the processes and procedures involved in the performance of that job; and, any unusual factors that may have contributed to the injury or illness. Recommendations to correct the conditions that contributed to the injury or illness will be included in the written results of this analysis and presented to the facility safety committee.

B.    Particular attention will be paid where patterns of injuries or illnesses are found in a given occupation, facility, or part of a facility. Experience in correcting hazards will be shared within the Department in an effort to find optimal ways of reducing injuries and illnesses.

C.    The Department shall post a copy of its agency annual summary of federal occupational injuries and illnesses for a facility, as compiled pursuant to 29 CFR 1960.67 or 1960.69, at such facility, not later than 45 calendar days after the close of the fiscal year or otherwise disseminate a copy of

**SA201**

the annual summary for a facility in written form to all employees of the facility. Copies of the annual summary shall be posted for a minimum of 30 consecutive days in a conspicuous place or places in the facility where notices to employees are customarily posted. Where facility activities are physically dispersed, the notice may be posted at the location to which employees report each day. Where employees do not primarily work at or report to a single location, the notice may be posted at the location from which the employees operate to carry out their activities. Each federal agency shall take necessary steps to ensure that such summary is not altered, defaced, or covered by other material.

## Section 7 - Imminent Danger Situations

A.  The term "imminent danger" means any conditions or practices in any workplace which are such that a danger exists which could reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through normal procedures (29 CFR 1960.2(u)).

B.  In the case of imminent danger situations, employees shall make reports by the most expeditious means available. Consistent with 29 USC 651 and 29 CFR Part 1960 the employee has a right to decline to perform their assigned tasks because of a reasonable belief that, under the circumstances, the task poses an imminent risk of death or serious bodily harm coupled with a reasonable belief that there is insufficient time to effectively seek corrective action through normal hazard reporting and abatement procedures. However, in these instances, the employee must report the situation to their supervisor or another supervisor who is immediately available.

C.  If the condition can be corrected and the corrected condition does not pose an imminent danger, the employee must return to work. If the supervisor cannot correct the condition, the supervisor shall request an inspection by facility safety and/or health personnel.

D.  A local union representative will be given the opportunity to be present during the inspection by the facility safety and/or health personnel. If facility safety and/or health personnel decide the condition does not pose an imminent danger, the instruction to return to work shall be in writing and contain a statement declaring the area or assignment to be safe. When this notification is given to the employee, the local union shall be notified in writing as well.

E.  When the Department receives a report that a dangerous, unhealthful or potentially dangerous or unhealthful condition is present at a particular work site, the Department shall notify the Health and Safety Committee and the local union Health and Safety representative(s) of the alleged dangerous or unhealthful condition.

**SA202**

## Section 8 - Training

A. The Department shall provide safety and health training for employees, including specialized job safety training, appropriate to the work performed by the employee. This training will address the Department's and the facility's Occupational Safety and Health Program, with emphasis on the rights and responsibilities of employees.

B. The Department will provide basic and specialized safety and health training for Union Safety and Health Representatives. In accordance with applicable law and regulations, the Department shall provide training for all duties commensurate with the scope of the responsibilities.

C. The Union will participate in the development of safety and health training, including curriculum and training materials.

## Section 9 - Allegations of Reprisal

The Department agrees there will be no restraint, interference, coercion, discrimination, or reprisal directed against an employee for filing a report of an unsafe or unhealthful working condition or for participating in Department Occupational Safety and Health Program activities or because of the exercise by an employee on behalf of themself or others, of any right afforded by Section 19 of the Occupational Safety and Health Act, Executive Order 12196, or 29 CFR 1960.

## Section 10 - Work-Related Injuries and Illnesses

A. Employees must report any and all injuries that are work-related to their supervisor. The supervisor will take appropriate action to insure that:

1. The employee has the opportunity to report to the Employee Health Physician or their personal physician for treatment, completion of necessary reports, etc.

2. Appropriate facility personnel are promptly notified to ensure timely processing of necessary reports and employee claims. The Department agrees that assistance will be given to employees in preparing necessary forms and documents for submission to the Office of Workers' Compensation Programs (OWCP) and those employees will be informed of their rights under the Federal Employees' Compensation Act, as amended in 1974.

B. An employee who has sustained a work-related injury or illness will be required to perform duties only to the extent and limits as prescribed by the treating physician or the Employee Health Physician, as appropriate. No employee will be assigned duties when, in the physician's opinion, this would aggravate the employee's injury or illness. In the event that the employee's supervisor

does not have limited duty that meets the physician's stated limitations for the employee, the supervisor will make a good faith effort to locate limited duty work within the facility that the employee can perform. If limited duty is not available, the employee will be placed on continuation of pay, if eligible, or in an appropriate leave status at the employee's option. The local union may suggest limited duty opportunities at the facility. The Union has the right to represent any unit employee at any stage of this procedure (see Article 19 - Fitness for Duty).

C.   Within seven calendar days after receiving information of an occupational injury or illness, appropriate information concerning such injury or illness shall be entered on the log. The record shall be completed within seven calendar days after the receipt of information that an occupational injury or illness has occurred.

D.   Qualified inspectors must have sufficient documented training/experience in recognizing the particular safety and/or health hazard that they are inspecting (note 29 CFR 1960.25). At the request of the local union, the Department will certify in writing, by reference to classes/ experience, that the inspector is sufficiently competent to recognize and evaluate the particular safety and/ or health hazard that they are inspecting, and to suggest general abatement procedures.

## Section 11 - Use of Insecticides/Chemicals

There will be no application of insecticides/chemicals during working hours. However, exceptions may be made in sensitive hospital areas. Such other chemicals include paint, carpet glue, HVAC cleaning agents, and similar construction or maintenance chemicals. Whenever pesticides are used in a large scale application, the Health and Safety representatives as well as employees will receive advance notice about the spraying. Individuals with special health needs will be reasonably accommodated.

## Section 12 - Leases

A.   Prior to occupancy by any employee of space occupied by the Department, the Department will provide the local union a copy of the pre-occupancy inspection to identify possible hazards or serious violations of OSHA standards. All leases will comply with 29 CFR 1960.34 and 41 CFR Part 102. Careful consideration should be made by the Department to avoid incompatible groupings, e.g., chemical or biological laboratories in office space.

B.   Pursuant to 29 CFR 1960.30(d), when a hazard cannot be abated before occupancy, the local union and all employees subject to the hazard shall be advised of the preliminary abatement plan and of interim protective measures in effect, and shall be kept informed of subsequent progress on the abatement plan.

**SA204**

C.    These provisions are not a waiver of the local union's right to request additional information, consultation, and bargaining.

## Section 13 - Temperature Conditions

The parties recognize that temperature conditions in and around work areas can have a direct bearing on employees' health. As a part of an overall emergency contingency plan, supervisors who may have employees who are susceptible to heat or cold illness within their working environment will have a written plan for appropriate emergent cooling or heating procedures. The parties agree that the problem of temperature extremes, either hot or cold, and appropriate measures to reduce the risk of exposed employees are appropriate matters for referral to established Health and Safety Committees or to the local Health and Safety Representatives, consistent with the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) guidelines and preventive medical guidelines for emergency procedures.

## Section 14 - Asbestos

A.    The Department shall conduct an inspection in each facility to determine the existence of asbestos. Qualified inspectors will inspect the facility for asbestos under EPA standards for Hazardous Air Pollutants regulation.

B.    The Department will review all construction and/or space modification contracts and/or work orders to determine if asbestos is present and, if so, how to proceed with appropriate removal or containment.

C.    The Department will notify the local union prior to initiating procedures for asbestos removal.

D.    Where it has been determined that asbestos exists in a facility, the Department will conduct periodic air sampling as appropriate.

E.    If air sampling indicates that airborne concentrations of asbestos fibers exceeds regulatory levels, exposed employees will be notified in writing of the exposure within five days after discovery of the excessive asbestos concentration. The Department will assist affected employees in filling out and filing the appropriate OWCP forms.

F.    If the airborne asbestos concentration amounts are exceeded, the Department will insure abatement of the asbestos hazard pursuant to 29 CFR 1910.1001(f).

G.    Once significant airborne asbestos particles are detected, the Department will conduct sampling at intervals of no greater than three months to monitor employee exposure levels.

**SA205**

H. Union Health and Safety representatives will be given training on asbestos removal and permitted to monitor removal procedures.

I. Union Health and Safety Representatives will be given a copy of all tests monitoring asbestos levels.

J. Asbestos abatement plans may include the discontinuance of work or the shifting of employee work location. Notice of such abatement action will be provided to the local union in advance, except in an emergency situation in which the local union will be notified as soon as possible. The Department will meet its labor obligations in both instances.

K. The Department will ensure that all external surfaces within the unrestricted work environment in any facility shall be maintained free of accumulation of asbestos fibers.

L. Asbestos and asbestos-contaminated material shall be collected and disposed of in accordance with appropriate EPA regulations.

M. The Department will institute a medical surveillance program for all employees substantively engaged in work involving asbestos for 30 or more days per year. Employees who are exposed to airborne asbestos fibers will receive medical monitoring.

N. The Department will make available medical examinations and consultations to each employee prior to assignment to an area containing asbestos which requires that negative pressure respirators be worn.

O. When an employee is assigned to an area where substantive asbestos exposure will exceed 30 or more days per year, a medical examination must be given within 10 working days following the 30th day of exposure.

P. The Department shall record all measurements taken to monitor employee exposure to asbestos including tremolite, anthophyllite, and actinolite. Such records shall be maintained for at least 30 years. The records will include information such as the date of measurement, the operation which caused exposure, the sampling method employed by the Department, the number, duration and results of the samples, type of protective devices worn, and name of the employee exposed.

Q. The Department will initiate a maintenance program in all facilities that contain asbestos. Such a maintenance program will include:

1. Inventory of all asbestos containing materials in a facility;

2. Periodic examinations of asbestos containing materials to detect deterioration;

3.  Written procedures for handling asbestos materials;

4.  Written procedures for asbestos disposal;

5.  Written procedures for dealing with asbestos related emergencies;

6.  Training of those required to handle asbestos containing material in safe handling procedures;

7.  Training of all affected personnel in prohibited activities which would enhance dangerous exposure; and,

8.  The Department must inform all affected employees regarding the standards contained within this section regarding asbestos.

Such information must be provided to each employee on a yearly basis and include instructions regarding safe asbestos handling. Also, access to information regarding exposure records and medical records must be provided on a yearly basis.

## Section 15 - Mold

A.  The Department shall conduct an inspection in each facility to determine the existence of mold. Qualified inspectors will inspect the facility for mold under EPA standards for Hazardous Air Pollutants regulation.

B.  The Department will review all construction and/or space modification contracts and/or work orders to determine if mold is present and, if so, how to proceed with appropriate removal or containment.

C.  The Department will notify the local union prior to initiating procedures for mold removal.

D.  Where it has been determined that mold exists in a facility, the Department will conduct periodic surface and air sampling as appropriate.

E.  If surface or air sampling indicates that airborne concentrations of mold exceeds levels in the control sample, exposed employees will be notified in writing of the exposure within five days after discovery of the excessive mold concentration. The Department will assist affected employees in filling out and filing the appropriate OWCP forms.

F.  If the airborne or surface mold concentration amounts are exceeded, the Department will ensure abatement of the mold hazard.

G.  Once significant airborne or surface mold particles are detected, the Department will conduct sampling at intervals of no greater than three months to monitor employee exposure levels.

**SA207**

H.   Union Health and Safety Representatives will be given training on mold removal and permitted to monitor removal procedures.

I.   Union Health and Safety Representatives will be given a copy of all tests monitoring mold levels.

J.   Mold abatement plans may include the discontinuance of work or the shifting of employee work location. Notice of such abatement action will be provided to the local union in advance, except in an emergency situation in which the local union will be notified as soon as possible. The Department will meet its labor obligations in both instances.

K.   The Department will ensure that all external surfaces within the unrestricted work environment in any facility shall be maintained free of accumulation of mold.

## Section 16 - Use of Respirators

Situations requiring employees to wear respirators for safety shall be a subject for local bargaining which will include a process for respirator fit testing.

## Section 17 - On-site Security

A.   The Department shall protect employees from abusive and threatening occurrences and shall take reasonable precautions to ensure such protections.

B.   The Department shall arrange for emergency protective assistance at each facility to enable employees to receive assistance if the situation requires it.

C.   Whenever an employee is faced with a physically threatening situation, the Department shall provide appropriate assistance.

D.   Employees shall not be required to divulge personally identifiable information to the public in individual circumstances where the employee reasonably believes harassment or physical abuse may result. In such cases, the employee should inform the supervisor in a timely manner.

E.   The Department shall equip reception areas with appropriate security devices to ensure, to the maximum extent possible, employee safety.

F.   All phones will be labeled with appropriate emergency numbers.

**SA208**

## Section 18 - Emergency Preparedness

A.  Each facility shall have an emergency preparedness plan. This plan will publish the chain of command which will identify a member of the Department who will be physically present for employee direction during all scheduled work hours in each installation. The plan will also cover employee procedures in the event of fire, earthquake, bomb threat, tornado, flood, hurricane, weapons of mass destruction, or similar emergency or nationally declared emergencies. Evacuation drills will be conducted quarterly.

B.  The Department agrees to make reasonable efforts to assure that each installation has adequate personnel available to administer Cardio-Pulmonary Resuscitation (CPR). All clinical personnel and other employees required to respond to code calls will become familiar with all work site locations within the facility.

   1.  The Department will provide CPR shields and masks for those employees administering CPR.

   2.  Training for CPR certification and/or recertification will be at no cost to the employees.

C.  The Department agrees that the first concern when an employee is injured on the job is to make certain that the employee gets prompt emergency medical treatment. Doubts over whether medical attention is necessary will be resolved in favor of arranging medical treatment.

D.  When it is necessary to assist an employee to return home because of illness or incapacitation or to provide transportation to a medical facility, the Department will arrange for transportation. If a co-worker is required to transport the employee, there will be no charge to leave for the co-worker.

E.  The Department agrees to maintain adequate first aid supplies at each permanent installation. All employees will have reasonable access to these supplies.

## Section 19 - Smoking Cessation Program

A.  The parties agree that they will intensify efforts to assist those employees who are interested in breaking the smoking habit. The parties are committed to making cessation programs available to each and every employee who wishes to participate in them. The mechanics of the programs are an appropriate subject for local bargaining. Programs will include or be similar to programs conducted by the American Lung Association or the American Heart Association.

**SA209**

B. Employees who wish to stop smoking but who are unable to successfully complete a smoking cessation program, or who have quit smoking but are experiencing related difficulties, may seek additional assistance through the EAP. Employee participation in assistance or cessation programs is strictly voluntary.

## Section 20 - Video Display Terminals - Ergonomic Environment

Video Display Terminal (VDT) refers to a computer-like terminal which displays information on a television-like screen.

A. The policy of the Department is to provide safe and healthful workplaces for all employees. In keeping with the policy, the Department acknowledges that there are certain ergonomic and environmental factors that can contribute to the health and comfort of VDT users. These factors involve the proper design of work stations and the education of managers, supervisors, and employees about the ergonomic job design and organizational solutions to VDT problems as recommended in various studies published by the NIOSH.

B. The Department agrees that employees should be provided information about ergonomic hazards and how to prevent ergonomically-related injuries. This information could be provided by OSHA Safety and Health Guidelines and other available literature. The Department agrees to provide, to the maximum extent possible, workstations and equipment (chairs, tables, workstations, lighting, keyboards, screens, and printers, etc.) that meet ergonomic design criteria. It is also agreed that when equipment is purchased, to the extent possible, training should be provided by a vendor on how to safely and properly operate that equipment.

C. The Department will achieve this by:

1. Purchasing, using, and maintaining VDTs in a safe manner;

2. Providing accessory equipment, to include, but not limited to, keyboards, worktables, chairs that are height-adjustable and provide proper back support, foot rests, wrist rests, document holder, glare screens, and other ergonomic equipment;

3. The national parties agree to the process below for the purchase of furniture and office equipment to address individual requests for workstation modification. Options:

a. Negotiate using a locally-developed, mutually-agreed process;

b. Negotiate on a case-by-case basis; or,

c. Use the Alternative below;

Alternative:

1) The employee will be given an ergonomic assessment, which will identify the employee's needs and the available modifications;

2) The employee will be provided a list of available furniture/equipment;

3) The employee and a representative of the local union will meet with a Department official to discuss and decide on the employee's choice from among the available options;

4) The employee's choice will be selected if it is reasonable, considering all the circumstances.

   The local parties also may agree to use the above procedure for furniture or equipment that is to be provided to a group of employees.

d. Seeking and acquiring information and technical assistance, as needed, from appropriate resources on methods for most effectively designing VDT work station layouts;

e. Laying out workspaces that are properly illuminated to reduce glare and ensure visual comfort to VDT users while providing adequate lighting for traditional clerical tasks;

f. Educating employees about the proper and safe operations of VDTs, including the value of interspersing prolonged periods of VDT use with other work tasks requiring less intensive visual concentration;

g. Where there are prolonged periods of VDT use and no other work tasks available, those employees shall be given a rest break;

h. Distributing information to all employees annually on VDTs and ergonomic furniture and identifying Department resources for more information;

i. Reviewing the set-up of equipment and furniture for VDT work stations as a regular part of safety and health inspections.

D.  <u>VDT Emissions Test</u>

In accordance with standards for acceptable radiation emissions of VDTs, the Department will conduct periodic tests of terminals for any emissions. Any terminal that tests above standard will be repaired to meet the standard, or it will be removed from service.

E.  <u>Non-VDT Work Reassignment Request</u>

If a pregnant employee requests reassignment for all or some portion of their pregnancy and has a written recommendation from their physician, the

**SA211**

Department will reassign that employee to do available work that does not involve the use of a VDT.

F.   VDT Breaks

Where an employee uses a VDT or other keying device for at least one hour, the employee shall receive a 10 minute break for every hour of utilization. Such breaks will be in addition to regularly scheduled rest periods. This does not preclude employees from receiving rest breaks when suitable non-VDT work is not available.

G.   Lighting

1.   VDTs shall be placed perpendicular to and away from windows and between rows of lights, to avoid excessive glare and where such an arrangement is not possible, windows shall be fitted with blinds or drapes.

2.   Where the efforts in A. above have not satisfactorily resolved the problem of excessive glare, employees who operate a VDT will be furnished with an anti-glare screen.

3.   An articulating task light which is adjustable in direction and intensity will be provided for users upon request.

4.   The Department will provide lighting that is adequate/appropriate for the work setting.

H.   Keyboard and Screen

1.   Keyboards should be placed on a level and stable surface for normal keying function.

2.   Keyboards, in combination with their supporting surface, chair and other furniture shall permit users to adopt and maintain neutral wrist positions.

3.   Screens shall be easily adjustable for brightness.

4.   Screens shall be adjustable horizontally and vertically to fit the user's line of vision.

5.   Employees who operate a VDT will, upon request, be provided with adaptive devices such as a padded wrist rest, mouse pads, document holders that have adjustable height and tilt, foot rests, keyboard trays, and other appropriate adaptive devices designed to prevent repetitive strain injuries. The procedures stated in C.3 of this Section will be used in considering such requests.

**SA212**

I.  Printers

1.  Excessive impact printer noise shall be reduced by a combination of distance and/or noise-reducing techniques, such as noise-reducing cover or shield, carpeting, partitions, and sound absorbing ceilings and walls. Printers will meet the requirements of 29 CFR 1910.95(b)(1).

2.  Printers will be placed in a manner so that employees do not have to excessively bend, stoop, or reach to remove printed materials.

J.  Chairs and Desks

1.  The Department shall provide ergonomic adjustable chairs, designed to minimize musculoskeletal discomfort.

2.  When making an ergonomic assessment, professional consensus standards, including but not limited to, American National Standards Institute (ANSI) and NIOSH, should be considered when purchasing chairs and desks. When assigning work space and purchasing chairs and desks, professional consensus standards, including but not limited to ANSI and NIOSH, will be followed when required by the National Technology Transfer and Advancement Act.

K.  Training and Education

1.  The Department shall provide information annually for the safe and healthful operation of VDTs and associated equipment. The information shall include, but not be limited to instructions on relaxation exercise for visual and musculoskeletal strain, the proper use of footrests and wrist rests, adjusting furniture, proper posture, and other beneficial work habits.

2.  As new information becomes available, employees will be provided with updated information.

## Section 21 - Vision Program

This section concerns VDTs, eye examinations, and eyeglasses/contacts (including disposable lenses) and is entered into by and between the Department and the Union. This Agreement covers all employees in the AFGE bargaining unit that use a workplace VDT as part of their normal work and when the use of such equipment requires using PPE by an employee during the performance of their official duties in order to mitigate hazardous conditions encountered. Any examinations or special eyeglasses/contacts given as PPE in this section must be consistent with OSHA guidelines regarding VDT usage.

A.  Employees experiencing eye problems from use of a workplace VDT would meet with the Department and explore options provided in Section 20 above to address this problem.

**SA213**

B.   Employees shall only be eligible for VDT related eye exams and eyeglasses/ contacts (including disposable lenses) based upon supervisory certification that the employee does use a VDT in the course of their official duties and efforts made consistent with Section 20 are not sufficient to address the results of the VDT use associated with the position. Based on receiving this certification the employee can request reimbursement as provided in Section C below.

C.   To request reimbursement, the employee must present a form obtained from the Department to a licensed optical practitioner (e.g., optometrist or ophthalmologist) which will indicate that any prescription should only be for workplace VDT use. The practitioner must certify on the form that the special eyeglasses/contacts (including disposable lenses) are for workplace VDT use. Special eyeglasses/contacts are those that are:

1.   Required due to workplace VDT use if the person would not require the use of special eyeglasses/contacts or other treatment for a job that would not cause the same level of eye problem; or,

2.   The special eyeglasses/contacts required for the work at the workplace VDT are different in prescription or design from those which would be required to meet the other general daily vision needs of the individual.

This form must be returned to the Department. If an eligible employee provides a completed form and a prescription from the practitioner indicating that the employee needs special eyeglasses/contacts (including disposable lenses) in order to operate a workplace VDT without eyestrain or because of other optical-related problems, the Department shall reimburse the employee for 100% of the eye examination in an amount not to exceed $50.

D.   An employee who has met the conditions listed in A and B above will be entitled to a pair of special eyeglasses/contacts (including disposable lenses) for workplace VDT operation at Department expense. The Department will bear the cost up to $175. The Department will either procure the special eyeglasses/contacts (including disposable lenses) of the employee's choice, or will reimburse the employee upon the presentation of proper documentation. The option will be left to the Department.

E.   Employees shall be entitled to a reasonable amount of excused absence to obtain eyeglasses/contacts (including disposable lenses), and VDT eyeglass/ contact examination and fitting, provided that the employee, in fact, has an authorized VDT eyeglass/contact (including disposable lenses) prescription. Normally, this will not exceed two hours total time for all matters.

F.   If an eligible employee who has already received a Department provided pair of VDT glasses/contacts (including disposable lenses) believes that they

**SA214**

need a new VDT-related prescription, they shall be eligible to re-participate in the program, consistent with each of the steps identified above.

G. Eyeglasses/contacts (including disposable lenses) provided for under the terms of this Agreement remain government property, and as such, the employee may be requested to surrender them when the employee separates from the Department.

H. Employees are ineligible for participation in the Department's vision program while on OWCP, Leave Without Pay (LWOP) or extended sick leave.

## Section 22 - Indoor Air Quality

A. The parties agree that all employees are entitled to work in an environment containing safe and healthful indoor air quality.

B. The Department shall provide safe and healthful indoor air quality by conforming to laws, guidelines, regulations, and/or policies issued by federal regulatory agencies such as OSHA, ASHRAE, EPA, and GSA.

C. On-site investigations/inspections will be conducted when a problem concerning Indoor Air Quality or Building Related Illness is formally brought to the Department's attention. These investigations/inspections shall meet the criteria of the GSA Federal Property Management Regulations and the ASHRAE, the protocols of OSHA, or the American Conference of Government Industrial Hygienists.

D. In compliance with engineering standards, the Department shall maintain ventilation efficiency:

1. Ensuring that outdoor air supply dampers and room vents are open;

2. Removing or modifying partitions or obstructions which block fresh air flow;

3. Balancing the system to prevent inflow or outflow of contaminated air due to pressure differentials between rooms.

E. In all facilities, the Department shall ensure that:

1. Appropriate measures are taken to minimize and/or eliminate the impact of contamination from outside sources such as garages, cooling towers, building exhausts, etc.;

2. Where the levels of such contaminants become health threatening, the Department will either seek to relocate or evacuate the facility;

3. Temperature is maintained in accordance with ASHRAE standards;

**SA215**

4.  Humidity is maintained in accordance with ASHRAE standards;

5.  Filtration, electronic cleaners, chemical treatment with activated charcoal or other absorbents are used.

F.  Microbial Contamination

1.  The Department agrees to eliminate or control all known and potential sources of microbial contaminants by assessments and appropriate response to all areas where water collection and leakage has occurred including floors, roofs, HVAC cooling coils, drain pans, humidifiers containing reservoirs of stagnant water, air washers, fan coil units, and filters. Such response will normally require prompt cleaning and repair of contaminated areas.

2.  The Department also agrees to:

a.  Clean and disinfect or remove and discard porous organic materials that are contaminated (e.g., damp insulation in ventilation system, moldy ceiling tiles, and mildewed carpets); and,

b.  Clean and disinfect non-porous surfaces where microbial growth has occurred with detergents, micro biocides, or other biocides and insuring that these cleaners have been removed before air handling units are turned on.

In any leased space the Department will deal with the lessor and/or GSA to achieve these objectives.

## Section 23 - Renovation and Construction

A.  Wherever the Department decides to alter the physical work site of employees represented by the Union, the local union will be notified in advance in accordance with Article 47-Mid-Term Bargaining.

B.  The Department will:

1.  Isolate areas of significant renovation, painting, and carpet laying from occupied areas that are not under construction;

2.  Perform this work during evenings and weekends;

3.  Ensure that contaminated concentrations are sufficiently diluted prior to occupancy;

4.  Supply adequate ventilation during and after completion of work to assist in dilution of the contaminant level; and,

5.  In leased space work with the lessor and/or GSA in order to achieve and maintain these standards.

**SA216**

## Section 24 - Wellness Program

A.  The parties agree that recognizing, minimizing, and coping with stress are essential parts of employee wellness. The Department will provide training at least annually on stress reduction. This will be a part of each facility's Wellness Program.

B.  Employees who feel they are experiencing harmful levels of job-related stress may contact employee counseling services.

C.  Department facilities will establish Wellness Committees or subcommittees to address wellness and health programs.

D.  The Department agrees to provide the following services:

1.  Emergency diagnosis and initial treatment of injury or illness that becomes necessary during working hours and that is within the competency of the professional staff and facilities of the health service units and if the injury or illness is work-related and the above-described services are not available, the employee will be transported to the appropriate medical facility;

2.  Provision for special health examinations for specific categories of employees whose work environment presents peculiar health hazards;

3.  Individual facilities will provide diagnoses and/or screening tests and health education programs for unit employees as a health service;

    a.  It is understood by the parties that these services are subordinate to the Department's mission.

    b.  These services will be subject to the Department's determination of available resources.

4.  Referral of employees to private physicians, dentists, and other community health resources, upon request.

    a.  An employee will be expected to notify their supervisor of their intention to seek medical treatment in health units.

    b.  When this is not feasible, the employee may report directly to the health unit or person authorized to render emergency care.

5.  Each facility where employees are exposed to chemical or biological hazards will implement a medical surveillance program in accordance with applicable regulations.

6.  The Department and the Union support wellness and initiatives that focus on various activities, including physical activity, weight management, smoking cessation, stress management, healthy lifestyle classes, and nutrition.

**SA217**

a. Therefore, the Department will promote physical fitness and wellness by, at a minimum, providing stress reduction and physical fitness information.

b. Where fitness facilities or fitness areas are available at the worksite, employees will be permitted access to them.

c. If modifying, providing, or allowing access to a local fitness center, the local union will be involved in the process. The decision will give appropriate weight to such factors as health industry recommendations, facility design, maintenance, safety, and return on investment analysis.

d. Employees may utilize wellness/fitness centers during duty hours, infrequently, for short periods of time, for the participation in physical wellness activities, at no additional cost to the employees. Where existing methods are already in place, they will be continued, until changed through negotiations. This section is subject to local negotiations.

E. The Department shall permit employees to do non-strenuous stretching exercise that are socially acceptable in an office setting to relieve physical stress and/or discomfort. Some of these exercises may be performed by the employees at their workstation during the work time as necessary. The need for this will vary from employee to employee. Participation shall be voluntary.

## Section 25 - Equipment, Machinery, and Furniture

A. Employees are encouraged to report (see Section 5) equipment, machinery, or furniture that cause or have potential to cause injuries such as repetitive motion injuries. The Department agrees to investigate such reports expeditiously and to implement appropriate corrective action. All such ergonomic assessments and/or recommendations shall be in writing and submitted to the local Safety and Health Committee.

B. As much as possible, equipment, machinery, and furniture purchased by the Department will be ergonomically compatible with the individual. The local union will be involved in the development of facility policies that address the selection and purchase of equipment, machinery, and furniture.

C. The Department will ensure that employees have been oriented to the use of new equipment or machinery and will ensure that this equipment or machinery has been inspected before initial use, when required.

D. Only qualified personnel shall perform maintenance or repair on or about moving or operating machines. This does not preclude the normal or necessary adjustments

**SA218**

to be made to machinery or equipment while in operation. Qualified personnel shall not be required to perform any maintenance or repair while the machine is in operation where it can be shown that there is a substantial risk of injury or a feasible alternative exists.

## Section 26 - Workplace Violence

The parties agree that violence should be eliminated from all workplaces within the Department. Each facility will develop a policy and a plan jointly with the local union on the prevention of violence. Annual training shall be offered to all employees.

## Section 27 - Safety and Health Records

A.  The Department agrees to compile and maintain records required by the Act and the Department safety and health programs. The Department agrees to ensure access by employees, former employees, and Union representatives to records/logs of facility occupational injuries and illnesses (including copies of accident reports) and to the annual summary of these in accordance with 29 CFR 1960, consistent with FOIA and Privacy Act requirements.

B.  The Department and the Union will identify employees who occupy positions that carry potential risks to their health. The parties will establish and maintain procedures for the medical surveillance of such employees.

## Section 28 - Hazardous Duty Pay and Environmental Differential

A.  Environmental Differential (FWS)

1.  In accordance with 5 CFR Part 532, Subpart E, Appendix A, the appropriate environmental differential will be paid to an employee who is exposed to an unusually severe hazard, physical hardship, or a working condition meeting the standards described under the categories stated therein.

2.  If at any time an employee and/or the local union believes that differential pay is warranted under 5 CFR Part 532, Subpart E, Appendix A, the matter may be raised at step 3 of the negotiated grievance procedure.

B.  Hazardous Duty Pay

1.  Pay for irregular or intermittent duty involving physical hardship or hazard for GS employees will be paid in accordance with the provisions of OPM regulations (5 CFR, Part 550, Sub-part I).

2.  The parties agree that any physical hardship or hazardous duties must be considered as part of position classification. Upon request, the Department shall inform the employee or local union whether or not such

**SA219**

duties were taken into account in establishing the grade of the position and how the duties affected the grade established including whether, absent those duties, the grade would have been lower.

## Section 29 - Arrangements for Health Hazards Involving Communicable Diseases

Facilities will:

A.  Make appropriate arrangements for employees interviewing individuals with known communicable disease;

B.  Take appropriate precautions when there is contact with a person who may have tuberculosis (TB) and employees with exposure or potential exposure to TB will be offered TB screening tests during working hours at no cost to the employees;

C.  Keep records of employees exposure to active TB at the work site;

D.  Take appropriate precautions against the spread of infectious diseases;

E.  Provide timely testing for employees who reasonably believe they were exposed in the course of their employment to a serious infectious disease (there will be no cost to the employees for leave or the exam); and,

F.  Employees are encouraged to get flu vaccinations once a year.

## Section 30 - Pollution Prevention Strategy

A.  The Department will maintain a current list of all hazardous materials in their respective sections/services and will be required to maintain paper copies of current Material Safety Data Sheets (MSDS) in each workplace.

B.  All facilities will identify each employee using hazardous chemicals in the performance of their duties.

C.  Assessments will be made for each of the hazardous chemicals and a determination will be made if there could be a less hazardous chemical which would fulfill the respective need.

D.  All chemicals or hazardous materials purchased shall require MSDS with purchase.

E.  Employees will be retrained at least annually on the handling and disposal of each hazardous chemical.

**SA220**

F.     The Professional Industrial Hygienist will perform a physical inventory and audit January and July of each year and report to the facility Safety Committee on the compliance requirements, training needs of persons handling hazardous chemicals, and disposals requirements.

G.     Types and quantities of hazardous waste generated at each health care facility and the methods used for disposal of each type of waste will be identified.

H.     The facility Safety Committee will review methods used to dispose of hazardous waste for compliance with applicable criteria.

I.     All affected employees who may be affected by each hazardous chemical and the risks associated with the hazardous chemicals will be informed.

J.     Monitoring is a proper subject for the Safety and Health Committee.

## Section 31 - Dissemination of Occupational Safety and Health Program Information

A.     Any details of the Department's Occupational Safety and Health Program and applicable safety and health standards shall be made available upon request to employee representatives for review. A copy of any written program applying to the Department's Occupational Safety and Health Program should be provided to each committee member at the appropriate level.

B.     Each workplace shall post conspicuously in each facility, and keep posted information for employees of the provisions of the Act and Executive Order 12196. Each facility will provide the poster to each workplace detailing the necessary elements of 29 CFR 1960.12. Posters shall not be altered, defaced or covered by other material(s). If damaged or altered the Department will take responsibility for replacing them within 30 days. The Department will inform all employees of their rights under 29 CFR 1960 on an annual basis in writing.

## Section 32 - Exposure to Radiation

In accordance with the United States Nuclear Regulatory Commission (NRC) guidance and standards, the Department shall take necessary preventive steps to protect employees from exposure to radiation.

A.     Employees in high risk areas will be provided devices to measure current and accumulated exposure levels. Employees will be alerted monthly to the employees' current and accumulated exposure level, and annually to the employees' accumulated exposure level.

B.     The Department will take additional steps necessary to prevent exposure if any employee is exposed to a level of radiation that is or could become a

**SA221**

health or safety issue. Examples of known sources of possible exposure are security machines at points of entry and imaging/X-ray departments.

## Section 33 - Ergonomic Lifting

A. The Department agrees that all employees are a most valued resource and shall be recognized as such.

B. The Department agrees to provide employees with information concerning safe lifting. The Department further recognizes and agrees that this information must be appropriate to the specific work performed.

C. Any lifting equipment must be selected based on operational and employee needs, physical environment, hazard assessment, injury analysis, and Union input.

D. A joint committee, to include local union participation will be established in each facility to review available equipment, solicit employee input, and make recommendations. This may be done by a local health and safety committee, if one exists.

E. Implementation of this section also is appropriate for local negotiations.

## Section 34 - Temporary Work Restriction

When an employee provides the Department with a health care provider's statement that the employee has temporary work restrictions, the Department will address the employee's personal health care provider's recommendation and make a determination if there are any duties the employee can perform under those work restrictions. The Department will make every effort, to the extent it is operationally feasible, to identify duties the employee can perform in their position. The Department will inform the employee of the decision. Under the Health Insurance Portability and Accountability Act (HIPAA), the Department cannot contact the employee's personal health care provider without a signed release from the employee.

**SA222**

# ARTICLE 30 - OCCUPATIONAL HEALTH

## Section 1 - Purpose

The purpose of this article is to aid in the protection of employees from communicable diseases, maintain a healthful working environment, and provide preventive health measures.

## Section 2 - General

The following occupational health services, among others, shall be provided:

A.  Emergency diagnosis and first aid treatment of an injury or illness that becomes necessary during working hours and that are within the competency of the professional staff and facilities of the available occupational health service unit, whether or not such illness was caused by employment. Local policy may define emergency treatment of non-work related conditions in tracking of infectious diseases among the employee population. In cases where necessary emergency treatment is not available onsite, the employee may be taken to their physician or suitable community medical facility if the employee requests it or is unable to request it. Employees will be made aware annually that there may be charges for some services rendered;

B.  Pre-placement examinations where required by applicable laws, VA policy, or the OPM instructions;

C.  In-service occupational examinations of employees or examinations to appraise and report work environment health hazards to prevent and control health risks, as required;

D.  Administering, at the discretion of the responsible occupational health service unit physician or occupational healthcare provider, treatments and medications:

1.  Furnished by the employee and prescribed in writing by a personal physician as reasonably necessary to maintain the employee at work; or,

2.  Prescribed by a physician providing medical care under 5 USC Chapter 81.

E.  Preventive services to provide health education to maintain personal health; and to provide specific disease screening examinations and immunizations, in accordance with Article 29 - Safety, Health, and Environment, Section 24, D 2 and D 3 of this Agreement.

F.  Referral, upon their request, of employees to community health resources.

**SA223**

## Section 3 - Service Requirements

The Department shall:

A.   Provide post-exposure examinations as mandated by applicable regulatory agencies;

B.   Provide medical surveillance for employees exposed to hazardous materials and communicable diseases (such as asbestos or tuberculosis). The Department shall provide the local union a list of any classification or position that is required to be part of the medical surveillance program, including but not limited to the "fit-tested" for respirators program.

C.   Cooperate with local public health agencies, physicians and programs in providing measures that protect against diseases of public health significance.

D.   The occupational health unit will be supplied the specific medical information about the duties of an employee's position and any other pertinent factors necessary to assess that employee's ability to perform the job. (See Article 19-Fitness for Duty.)

E.   Provide, or make arrangements for, health maintenance examinations for all Department employees eligible for them. The occupational health care provider will use discretion in determining how comprehensive the medical evaluation will be. Special tests and diagnostic procedures may be ordered as appropriate, based upon the evaluation's findings. Employees will be informed of any discrepancies or abnormalities shown in the evaluation; and, they will be encouraged to follow up with treatment or corrective action as soon as possible with their personal primary care provider.

## Section 4 - Occupational Health Services

A.   The Department will provide an occupational health services program for all VA employees consistent with this Agreement and Department policy.

B.   Where there are 300 or more federal employees working in one location and there are no existing health services, arrangements shall be made to establish a Department occupational health unit unless occupational health services can be furnished by participation in a nearby occupational health unit serving other federal employees. For locations with fewer than 300 employees, occupational health services shall be provided by contract with private or public sources or by establishment of an occupational health service unit, whichever is deemed to be more feasible.

**SA224**

C.  Employees shall notify their supervisor when they seek treatment from an occupational health unit. When this is not feasible, they may report directly to the occupational health unit or person authorized to render emergency care. Facilities will have written procedures on how to address medical emergencies occurring to employees.

D.  The confidential nature of medical conditions shall be recognized and respected. Employee medical records maintained by the Department must be separately and distinctly secured from any other medical records.

E.  Procedures for disability retirement and OWCP are not part of the Occupational Health program and are governed by Article 41 - Worker's Compensation and other applicable authorities.

F.  Occupational health services will be provided under the direction of a licensed independent practitioner.

## Section 5 - Immunizations

A.  Through vaccinations and immunizations of employees, the Department will assist in maintaining a high level of protection against epidemics of communicable disease such as influenza. This will include the administration of vaccines, prophylactic drugs, and agents, usually without charge. Employees will be notified in advance of any charges and the amount, given the option to accept or not accept the immunization/vaccination, and provided information about other service providers who provide the immunization/vaccination.

B.  Justification for allocations of vaccinations and immunizations to employee populations will be provided to the Union at the time of the immunizations.

## Section 6 - Treatment

Nature and Extent of Non-Work Related Treatment:

A.  It is an expectation that all employees will have a private personal physician or healthcare provider;

B.  If an employee suffers a minor illness or injury, which interferes with their ability to perform their duties, treatment may be rendered;

C.  Treatment will be limited to relieve their discomfort and enable them to remain at work, and in an emergency, appropriate care to stabilize and transport the employee will be rendered;

**SA225**

D.  If the installation has dental facilities, emergency treatment may be given for minor dental conditions;

E.  These treatments are not intended to provide definitive medical or dental care or replace the employee's primary care provider;

F.  The employee will be referred to their private physician or dentist for any necessary follow-up or definitive care;

G.  In the event transportation or hospitalization is required, the employee will be responsible for associated costs;

H.  On an annual basis, employees shall be advised in writing that they will be charged for transportation and hospitalization.

## Section 7 - Pandemics

A pandemic is defined as an epidemic of infectious disease that is widespread across human populations.

A.  The parties agree that employees are an essential resource in caring for Veterans. The Department will take appropriate precautions to prevent the spread of infectious disease.

B.  The Department shall offer immunizations at no cost to the employee. No employee shall be forced to participate in an immunization program if the employee has a medical condition which would be adversely affected by the immunization. A statement from a health care provider (as defined in Article 35 Section 16 E (6) (d)) that an immunization would adversely affect the employee's medical condition is sufficient evidence of such a medical condition. An employee may also receive an exemption based upon their religious beliefs. An employee's written statement that they have a religious belief that conflicts with the immunization is sufficient to establish evidence of a religious belief. In either exception, any statements or records shall be kept confidential by the Department.

C.  Employees shall be issued appropriate individual PPE as recommended by recognized authorities such as OSHA. There shall be sufficient equipment so that employees are neither expected to reuse the equipment unless it is designed for reuse nor shall they share such equipment.

D.  If respirators are required for safety and health, each employee will be fit-tested and trained on the proper care of the respirator.

**SA226**

E.  The employee who is ill as a result of a pandemic will be granted sick leave or leave without pay upon request.

F.  If the employee is suspected to have contracted a communicable disease, and is sent home from the worksite without valid verification of the illness, there will be no charge to leave. In such instances the employee must be available to return to duty upon request, unless the employee requests to use sick or other leave.

G.  Temporary telework arrangements are appropriate for those employees who cannot report to work due to illness, providing the position held is conducive to telework. During pandemic, the usual requirements for telework may be waived in order to benefit both the Department and the employee.

## Section 8 - Local Bargaining

Local bargaining on this article is appropriate so long as it does not conflict or interfere with, or impair implementation of, this Master Agreement.

**SA227**

# ARTICLE 31 - SILENT MONITORING

## Section 1 - Purpose

A.  The primary purpose of monitoring public telephone conversations is not for evaluating performance but to ensure that complete and accurate information is courteously provided to the calling public and to determine training requirements.

B.  However, when monitoring is used to evaluate performance, the employee will be notified in advance of the period during which monitoring will occur. This period shall not exceed one week. In all cases immediate feedback to the employee will be provided.

## Section 2 - Task Force

The parties agree to establish a Labor-Management Task Force to examine alternatives to silent monitoring which follow the best practices of public and private sector organizations on this issue.

# ARTICLE 32 - STAFF LOUNGES

## Section 1

Recognizing that the health and well-being of employees are necessary to the successful accomplishment of the Department's mission, local management will provide staff lounges, break rooms, or other similar space for employee use.

## Section 2

Local bargaining to implement this provision is appropriate and will include, but not be limited to, arrangements in facilities where there is insufficient space for dedicated lounges. Other topics appropriate for local bargaining include, but are not limited to, access to microwaves, refrigerators, storage, coffee pots, and furniture. However, local agreements must be consistent with authorized use of appropriated funds.

## Section 3

Staff lounges shall be reasonably accessible to the employees' work areas.

## Section 4

The staff lounge should be of sufficient size to accommodate the number of employees reasonably expected to use the space at any given time.

## Section 5

Any current collective bargaining agreements and/or past practices shall remain in effect, until and unless changed through bargaining.

**SA229**

# ARTICLE 33 - TEMPORARY, PART-TIME, AND PROBATIONARY EMPLOYEES

## Section 1 - General

A. This article sets forth the different provisions applicable to temporary, part-time, and probationary employees for Title 5, Title 38 Hybrid (Hybrid), and Title 38 employees. Temporary, part-time and probationary employees are also covered by the terms of other articles in this Agreement to the extent consistent with applicable laws and regulations.

B. A counseling session or other routine meeting about performance is generally remedial and discipline is not anticipated. The right to representation does not apply to such meeting/session.

C. If during the course of any meeting/session, such meeting/session becomes an examination of an employee in the unit by a representative of the Department in connection with an investigation, the employee is entitled to union representation if:

1. The employee reasonably believes the examination may result in disciplinary action (such as separation) against the employee; and,

2. The employee requests representation.

D. The Department agrees that the local union has the right to be represented at formal discussions between management and a probationary employee of the bargaining unit, where such discussions deal with personnel policies and practices and/or matters affecting working conditions.

## Section 2 - Title 5 and Hybrid Employees

A. Temporary Employees

Temporary employees may be separated at any time upon notice in writing from the Department. When it is determined that a temporary employee is to be separated, the employee will be given two weeks notice except in egregious circumstances as demonstrated by an appropriate fact-finding, or when loss of funding or Full Time Equivalent Employee (FTEE) authority requires that notice be shortened.

B. Probationary Employees

1. All probationary periods will be established in accordance with 5 CFR Parts 315.801 and 315.802, and any other applicable Federal law. Probationary periods will also be governed by government-wide regulations in existence at the time this Agreement was approved.

**SA230**

A Title 5 or Hybrid employee who has completed a competitive or excepted service probationary period and moves to another Title 5 or Hybrid position, but does not successfully perform in the current position, can be offered another Title 5 or Hybrid position for which the employee is qualified, provided such position is not a promotion. In this case, the employee must meet qualification and licensure requirements of the position.

2. Title 5 and Hybrid employees serve a one-year probationary period unless otherwise specified in applicable Federal law. Probationary periods will also be governed by government-wide regulations in existence at the time this Agreement was approved. During that time, employees will have the opportunity to develop and to demonstrate their proficiency. To that end, the Department agrees that probationary employees will be advised in writing of applicable critical and non-critical elements, performance standards, and general conduct expectations at the beginning of their probationary period (normally 30 days). The supervisor will explain the requirements of the probationer's position and answer any questions the employee may have.

3. From the beginning of the probationary period, the supervisor will communicate with the employee frequently, will observe the employee closely, and assist in resolving any performance and/or conduct problems. In the event that there are repeated deficiencies in the employee's conduct and/or performance that progress to a point that the deficiencies may affect the employee's continued employment, the supervisor will counsel the employee in a timely manner and document the meeting, with a copy given to the employee.

4. After the employee has completed at least 90 days in the assignment, HR staff will contact the supervisor about the employee's performance and adjustment to the job, and any training or other needs or outstanding work that warrants attention for further placement consideration. The Department will consider employees' specific requests for assistance to improve their performance. Where performance deficiencies are reported, the employee and the Department will explore the courses of action that may be taken to overcome them and the Department will provide appropriate assistance. Any form used to document deficiencies will be shared with the employee. These procedures are minimum requirements and, where possible, extension of follow-up interviews is encouraged.

5. The Department may terminate an employee on a probationary or trial period because of their performance or conduct. The employee shall be notified in writing as to why they are being terminated and the effective date of the action. The information in the notice shall, at a minimum, consist of the conclusions as to the inadequacies of the employee's performance or conduct.

**SA231**

6. The Department shall utilize the probationary period as fully as possible to determine the fitness of the employee and may terminate their services during this period if the employee fails to demonstrate qualifications for continued employment. In keeping employees informed throughout the probationary or trial period, the supervisor will explain expectations and requirements as they specifically relate to the employee's position (e.g., excessive absence, training needs, standards of practice, etc.).

7. If a probationary employee is removed for conditions arising before appointment, the employee has a right to advance notice of the separation, the reason for the separation, an opportunity to provide an answer and supporting affidavits, and any applicable appeal rights, in accordance with 5 CFR 315.805. The Department shall consider the answer in reaching its decision, which shall be provided to the employee prior to the effective date of the decision.

C. Part-time Employees

1. To be considered part-time for purposes of this section, an employee must have a regularly scheduled tour of duty, set in advance, of at least 16 hours but not more than 32 hours in an administrative workweek. As an exception, the Department may employ an employee on a regularly scheduled tour of duty of 1 to 15 hours per week, but not more than 32 hours, in order to meet mission requirements.

2. An employee's hours may be extended beyond the 32 hour limitation for short periods of time to accommodate unexpected workloads or to provide necessary training. The Department should not assign extra hours for more than four pay periods without considering whether to establish a temporary or permanent full time position in lieu of such assignment.

3. When a holiday falls on a part-time employee's regularly scheduled workday, the employee will be paid for the number of hours they were scheduled for that day.

4. The Department will give full consideration to employee requests regarding part-time employment consistent with the Department's resource and mission requirements. Full consideration includes weighing the employee's reasons and the staffing needs of the Department.

5. The Department recognizes that part-time employment may be particularly appropriate for the following employees:

   a. Employees seeking gradual transition into retirement;

   b. Employees with disabilities or others who require a reduced workweek;

SA232

   c. Parents who must balance family responsibilities with the need for additional income;

   d. Students who must finance their own education and/or vocational training; or,

   e. Employees pursuing further education.

6. Requests to change from full time employment to part-time, or from part-time employment to full time, will be discussed with the employee. If an employee submits a written request and the request is denied, the employee will be provided with written reasons for the denial.

7. If the Department proposes to convert any full time positions to part-time, that will be a subject for negotiations in accordance with 5 USC 7106(b)(2) or (3).

8. A full time employee shall not be required to accept part-time employment as a condition of continued employment.

9. An employee may request a temporary or permanent adjustment of an established part-time work schedule based on personal need or to permit participation in Department approved details, other assignments, or training, and the Department will give full consideration to such request.

10. The Department agrees to provide part-time and full time employees on the same tour of duty equivalent access to employee activities, e.g., health facilities, and not to deny opportunities for attendance at Department approved training courses solely because of part-time status.

11. Consistent with applicable laws and regulations, a permanent part-time employee receives a full year of service credit for each calendar year worked (regardless of tour of duty) for the purpose of computing service for retention, retirement, career tenure, completion of probationary period, within-grade increases, leave category rate, and time-in-grade restrictions on advancement.

12. Prior to an employee accepting conversion to part-time status, the Department will advise the employee in writing of the effects of converting to part-time employment as it relates to employee benefits.

13. Employees who accept or convert to part-time positions have no guarantee that they will subsequently be converted to full time employment, but the Department agrees to fully consider the employee's request based on the employee's circumstances and the needs of the Department.

**SA233**

## **Section 3 - Title 38**

A.  Temporary Employees

Temporary employees may be separated at any time upon notice in writing from the Department. When it is determined that a temporary employee is to be separated, the employee will be given two weeks notice except in egregious circumstances as demonstrated by an appropriate fact-finding, or when loss of finding or FTEE authority requires that notice be shortened.

B.  Probationary Employees

1.  Title 38 employees serve a two year probationary period. During that time, employees will have the opportunity to develop and to demonstrate their proficiency. To that end, the Department agrees that each probationary employee will be advised in writing of the applicable functional statement and general conduct expectations at the beginning of the probationary period (normally 30 days). The supervisor will explain the requirements of the probationer's position and answer any questions the employee may have.

2.  Throughout the probationary period, the supervisor will communicate with the employee frequently and will observe the employee closely and assist in resolving any performance and/or conduct problems. In the event that there are repeated deficiencies in the employee's conduct and/or performance that progress to a point that the deficiencies may affect the employee's continued employment, the supervisor will counsel the employee in a timely manner and document the meeting, with a copy given to the employee.

3.  When the employee has had an opportunity to learn what is expected, the supervisor should give consideration to any inadequacies in performance or conduct. The employee's weak points should be discussed objectively and suggestions made for improvement. If the employee's performance is considered good or outstanding in some aspect, this fact should be made known to the employee.

4.  If the employee's adjustment and performance are not satisfactory, the employee's immediate or higher supervisor will submit a written request for formal or summary review through channels to the official authorized to approve further review of the employee's services. This request will describe the employee's deficiencies, and the supervisor's efforts, such as training, modification of assignments, use of preceptors, etc., to assist the employee. The request may be initiated any time during the probationary period, and may be made notwithstanding past or pending proficiency ratings or the results of any previous probationary review. If the immediate supervisor is the authorizing official, the same information is to be

**SA234**

forwarded in writing to the Chairperson of the appropriate Professional Standards Board for consideration as a part of the summary review.

5. Probationary Title 38 employees may be terminated after a Summary Board Review is conducted. The employee will normally be given 15 calendar days notice, but the notice period may be shortened if necessary to effect the separation before completion of the probationary period. The employee, on request, will be furnished a copy of the summary report of the Professional Standards Board proceedings, along with a transcript of any verbatim recording.

6. An employee who is subject to Summary Board Review may be represented by the representative of their choice; the representative's role is limited to assisting the employee in exercising the right to reply orally and/or in writing to the reasons for the review. Because summary reviews deal with issues related to professional competence or conduct and peer review, a union representative is not entitled to be present at a summary review except when serving as the employee's personal representative.

C. Part-time Employees

1. Part-time employees are those who perform duties on less than a full time basis, and have a regularly scheduled tour of duty that is less than 80 hours in a biweekly pay period.

2. When a holiday falls on a part-time employee's regularly scheduled workday, the employee will be paid for the number of hours they were scheduled for that day.

3. The Department will give full consideration to employee requests regarding part-time employment consistent with the Department's resource and mission requirements. Full consideration includes weighing the employee's reasons and the staffing needs of the Department.

4. The Department recognizes that part-time employment may be particularly appropriate for the following employees:

   a. Employees seeking gradual transition into retirement;

   b. Employees with disabilities or others who require a reduced workweek;

   c. Parents who must balance family responsibilities with the need for additional income;

   d. Students who must finance their own education and/or vocational training; or,

   e. Employees pursuing further education.

**SA235**

5. Requests to change from full time employment to part-time, or from part-time employment to full time, will be discussed with the employee. If an employee submits a written request and the request is denied, the employee will be provided with written reasons for the denial.

6. A full time employee shall not be required to accept part-time employment as a condition of continued employment.

7. If the Department proposes to convert any full time positions to part-time, that will be a subject for negotiations in accordance with 5 USC 7106(b)(2) or (3).

8. An employee may request a temporary or permanent adjustment of an established part-time work schedule based on personal need or to permit participation in Department-approved details, other assignments, or training, and the Department will give full consideration to such request.

9. The Department agrees to provide part-time and full time employees on the same tour of duty equivalent access to employee activities, e.g., health facilities, and not to deny opportunities for attendance at Department approved training courses solely because of part-time status.

10. Consistent with applicable laws and regulations, a permanent part-time employee receives a full year of service credit for each calendar year worked (regardless of tour of duty) for the purpose of computing service for retention, retirement, career tenure, completion of probationary period, within-grade increases, leave category rate, and time-in-grade restrictions on advancement.

11. Prior to an employee accepting conversion to part-time status, the Department will advise the employee in writing of the effects of converting to part-time employment as it relates to employee benefits.

12. Employees who accept or convert to part-time positions have no guarantee that they will subsequently be converted to full time employment, but the Department agrees to fully consider the employee's request based on the employee's circumstances and the needs of the Department.

## ARTICLE 34 - JOB SHARING

### Section 1 - General

A.  Job sharing is a form of part-time employment in which the tours of duty of two employees are arranged in such a way as to cover a single full-time position.

B.  Job sharing can provide the Department and employees with considerable work scheduling flexibility.

### Section 2 - Procedures

A.  The Department agrees that entry into job sharing is strictly voluntary, initiated by the employee, and without coercion by the Department. Job sharing will be considered when traditional part-time employment is not practical or feasible.

B.  The Department shall give bona fide consideration to employees' requests regarding part-time job sharing employment, including requests for reassignment from a non-job sharing arrangement to a job sharing arrangement and from a job sharing arrangement to non-job sharing arrangement, consistent with the Department's resources and mission requirements. Employees working in positions of the same occupational series, position description, or in the same line of work may request the opportunity to enter a job sharing arrangement. Employees must qualify for the position for which they are applying.

C.  Potential job sharing participants shall submit a written proposal to the immediate supervisor. The job sharers are expected to seek the Department's assistance and approval in drawing up the job sharing plan so that the work will be properly divided. Potential participants will receive a written response from the Department within a reasonable amount of time from the date of submission of their written proposal informing them of acceptance or rejection of their job sharing proposal. If rejected, the reasons will be stated. The participants may revise their written proposal to accommodate the reasons given for rejection and resubmit it for reconsideration.

D.  Although they share the duties of a full-time position, job sharers are considered to be individual part-time employees for all personnel and employment purposes.

E.  Each employee shall be informed of their regularly scheduled work hours, as agreed to by the employer, employees, and the other job sharer. The Department will make every reasonable effort to avoid scheduling additional

**SA237**

hours not contiguous with the established tour of duty The Department agrees that statutory, regulatory, and contractual provisions shall apply in any situation in which overtime may be worked. Additional hours will not be assigned to employees engaged in job sharing for the purpose of eliminating the need to schedule qualified, full-time employees for overtime. Such overtime hours will be assigned and accomplished according to contractual obligations.

F.   A variety of different work scheduling arrangements can be used as long as each job sharer works no less than 16 hours and no more than 32 hours each week. For example, split days (one job sharer works mornings and the other afternoons), alternate days (one job sharer works Monday and the other Tuesday, etc.), or split weeks (one job sharer works from Monday morning through noon Wednesday and the other works noon Wednesday through Friday). Although most job sharers split the hours of a full-time position in half, this is not a requirement. The work schedules of job sharers may overlap (one job share may work from 10 am to 2 pm every day and the other from noon to 4 pm). This arrangement can provide the Department with extra coverage during heavy workload periods. A certain amount of overlap may also be desirable to enable job sharers to attend staff meetings or familiarize each other with work developments.

G.   The employment of an individual in a part-time position shall not be a basis for exclusions from participation in job sharing.

H.   Those individuals currently engaged in a job sharing arrangement shall be covered under this article.

I.   Each employee entering into a job sharing arrangement shall be given a written explanation of their work schedule and an explanation of the impact of conversion to part-time on their rights and benefits. The job sharing agreement shall incorporate the understanding that in the event one of the job sharing participants leaves and the Department concludes that the needs of the position requires full-time staffing, the Department shall make every reasonable effort to assist the remaining job sharing partner in finding another partner. The remaining participant will be given a reasonable amount of time to find another partner.

J.   Leave requests by employees in a job sharing situation shall be approved or denied in accordance with Article 35 - Time and Leave of this Agreement.

K.   Performance appraisals for job sharing participants will be handled in accordance with Article 27 - Performance Appraisal of this Agreement. Throughout the tenure in a part-time position, the employee's appraisal will not reflect the performance of the job sharing partner.

**SA238**

# ARTICLE 35 - TIME AND LEAVE

## Section 1 - General

A.  Employees will accrue and use sick and annual and other types of leave in accordance with applicable statutes, OPM regulations, and this Agreement.

B.  All leave charges shall be in increments of one-quarter hour, except in the case of Title 38 physicians, dentists, chiropractors and optometrists, who accrue and use leave in full-day increments.

C.  For clearly compassionate and appropriate reasons, the Department may increase the stated limits applicable to all forms of leave in accordance with applicable government-wide regulation and law.

D.  Employees will not be denied leave based solely on their leave balance.

E.  No arbitrary or capricious restraints will be established to restrict when leave may be requested.

F.  Changes to the Department's automated time and attendance system shall be negotiated in accordance with government-wide law, regulations and this Agreement.

G.  Employees should request, in advance, approval of anticipated leave.

H.  When the employee is present on duty, the employee can use the electronic time and attendance system or SF-71 to request leave.

I.  Leave will be denied only for appropriate reasons and not as a form of discipline. No approved leave or approved absence will be a basis for disciplinary action except when it is clearly established that the employee submitted fraudulent documentation or misrepresented the reasons for the absence.

J.  Employees will not be adversely affected in any employment decision solely because of their leave balances.

## Section 2 - Annual Leave

A.  Annual leave is provided to allow employees extended leave for rest and recreation and to provide periods of time off for personal and unscheduled purposes. All employees may request at least two consecutive weeks of annual leave per year and take such leave subject to the Department's approval.

**SA239**

B.  The use of accrued annual leave is an absolute right of the employee, subject to the right of the Department to approve when leave may be taken.

C.  Employees should submit requests for annual leave as far in advance as possible. The Department will render timely decisions on employees' leave requests. The Department will make every effort to accommodate the employees' requests, consistent with valid operational needs.

1.  Vacation - Employees should submit requests for vacation leave as far in advance as possible. The Department will render timely decisions on employees' leave requests. The vacation plan for the next leave year will be completed by the end of the current calendar year. The procedures for vacation leave will be appropriate for local negotiations; where current practices are acceptable to the local parties, such negotiations need not occur.

2.  Unplanned Leave - When needs arise and the employee requests annual leave, employees must contact their supervisor or designee to request the leave. During operational hours of the facility/service, there will always be someone available who is authorized to receive and act on the request. The procedures for unplanned annual leave other than vacation leave will be appropriate for local negotiations; where current practices are acceptable to the local parties, such negotiations need not occur.

3.  Serious Personal Needs Situations - If the leave is requested to begin immediately, employees must contact their supervisor or designee to request the leave. The employee will be informed whether leave is approved or disapproved at the time it is requested. During operational hours of the facility/service, there will always be someone available who is authorized to receive and act on the request.

D.  If scheduling conflicts arise among employees' annual leave requests, they shall be resolved consistent with past practices or as otherwise negotiated in local supplemental agreements/MOUs insofar as they do not conflict with the Master Agreement.

E.  When an employee requests annual leave in conjunction with scheduled days off at the beginning and/or end of the leave period, the Department will not change that employee's days off except where necessary to meet valid operational needs.

F.  The Department recognizes the needs of employees to plan vacation and personal time off. However, previously approved annual leave may be cancelled if necessary to meet valid operational needs.

G.  The parties recognize that additional procedures for requesting and granting annual leave are appropriate for negotiation at the local level.

**SA240**

H.  Carryover (restored) leave will be addressed in accordance with applicable rules and regulations.

I.  All employees shall be excused or receive appropriate pay for all holidays prescribed by Federal law, and that may be added by Federal law, or that may be designated by Executive Order.

J.  Employees will be notified four times during each leave year of the maximum amount of annual leave that can be carried over by employees in each leave category (doctors, nurses, Title 5, etc.) and advise the employees they should request to use any amount the employee has accrued and will earn during the rest of the leave year that is over the maximum amount. This will include advising employees of the consequences of forfeiture and the law and regulations relating to forfeiture.

K.  Upon request, an employee will be provided, in writing, with the reason for a denial of annual leave. It is the responsibility of the Department to initiate action to reschedule annual leave that was denied. The times at which such rescheduled leave is used must be by concurrence of the employee and the Department.

L.  The Department will allow the maximum number of employees to use leave in accordance with coverage requirement.

M.  Where vacation schedules are used, the approved vacation schedule will be conspicuously posted and remain posted and be kept up-to-date for the leave year. Upon request, changes in the vacation schedule will be provided to the local union on a monthly basis.

## Section 3 - Excused Absence

Supervisors should excuse, without charge to leave, tardiness/absences which are brief, infrequent, and for a good cause.

## Section 4 - Sick Leave

A.  It is the responsibility of the employee who is incapacitated for duty to notify the immediate supervisor or designee (or to have any responsible person make the notification for the employee) at the work site as soon as possible but no later than two hours after the employee is scheduled to report for duty unless mitigating circumstances exist. The Department will assure a designated number is established for the supervisor or designee to receive such notifications; the employee's obligation is to complete one phone call, to either the established number, or to an alternate number the employee was notified to use. In the event that the supervisor or designee is not available, employees may use voice mail to notify the supervisor or designee of the type of leave requested.

**SA241**

B.  An employee who expects to be absent more than one day will inform the supervisor or designee of the expected date of return to duty and notify the supervisor of any change. In the case of extended illness, daily reports will not be required.

C.  Sick leave is an employee's earned benefit and will be granted to the employee for appropriate absences.

D.  Title 5 and hybrid employees are entitled to sick leave when the employee:

    1.  Receives medical, dental or optical examination or treatment;

    2.  Is incapacitated for the performance of duties by physical or mental illness, injury, pregnancy, or childbirth;

    3.  Provides care for a family member who is incapacitated by a medical or mental condition, or attends to a family member receiving medical, dental, or optical examination or treatment, or provides care for a family member with a serious health condition;

    4.  Makes arrangements necessitated by the death of a family member or attends the funeral of a family member (this includes use of sick leave to make arrangements for and attend a funeral or memorial service; necessary travel, pre-funeral and after-funeral/burial gatherings or ceremonies, memorial services; and reading of the will);

    5.  Would, as determined by the health authorities having jurisdiction or by a health care provider, jeopardize the health of others by being present on duty after exposure to a contagious disease; or,

    6.  Must be absent from duty for purposes relating to the adoption of a child, including appointments with adoption agencies, social workers, and attorneys, court proceedings, required travel, and any other activities necessary to allow the adoption to proceed.

E.  Sick leave shall be granted to Title 38 employees when:

    1.  They are incapacitated for the performance of their duties because of personal illness, disease, injury, pregnancy and confinement;

    2.  For necessary medical, dental, or optical examination or treatment;

    3.  When a member of the immediate family of the employee is afflicted with a contagious disease and requires the care and attendance of the employee; or,

    4.  When through exposure to contagious disease, the presence of the employee at the post of duty would jeopardize the health of others.

**SA242**

F.    The Department should make an effort to accommodate employees who request in advance, a change in work schedule to meet medical, optical or dental appointments.

G.    If an employee has insufficient sick leave accrued, the employee can request Leave Without Pay (LWOP) or other available leave instead of sick leave for an absence for which sick leave would otherwise be appropriate, subject to approval of the absence by the supervisor.

H.    Employees will not be required to reveal the nature of the illness as a condition for approval of sick leave.

## Section 5 - Documentation for Sick Leave

A.    Where an employee requests sick leave, or annual leave, or LWOP in lieu of sick leave, for periods of illness exceeding three consecutive workdays of the employee's work schedule, the employee must make an appropriate request and may be required to furnish evidence of the need for sick leave upon return to duty. An employee may support the request for sick leave:

1.    By medical certificate from the Department's employee health care provider or the employee's health care provider that is administratively acceptable; or,

2.    By the employee's self-certification in instances where the illness was not treated by a health care provider. The statement will indicate why a health care provider was not seen; for example, remoteness of area, general condition of the illness, or other specific reasons. The supervisor may request clarification should the employee's written statement not be sufficient to support the request.

B.    An employee with a chronic medical condition that does not require medical treatment but does result in periodic absences from work will not be required to furnish a health care provider certificate on a continuing basis if the employee is:

1.    Not on leave restriction; and,

2.    Provides, if requested, an administratively acceptable medical certificate every six months which clearly states the continuing need for periodic absences.

C.    Unless there is reasonable evidence to doubt the required information, administratively acceptable evidence for medical certification is a statement that says the employee was incapacitated for work and date(s) of incapacitation. This information will generally be considered sufficient for

**SA243**

medical certification purposes. However, employees will not be required to reveal the nature of the illness as a condition for approval of sick leave. This applies to sick leave of more than three consecutive workdays or certification for sick leave restrictions.

D.  Documents regarding employee absence for sick leave purposes are highly sensitive. The Department will ensure that they are maintained in a secure and confidential manner.

E.  Where there is substantial reason to believe that an employee is abusing sick leave entitlement, medical certificates may be required for any period of absence provided the employee has been formally notified in writing that such a requirement has been established for that person.

1.  If an employee has not used sick leave for three months after the notification in Paragraph E, the employee may request that the requirement be reviewed. If it is determined that a medical certificate is no longer warranted for sick leave of three consecutive workdays or less, the employee shall be so notified in writing.

2.  The requirement for medical certification must be reviewed six months after such requirement is imposed. If the requirement is not lifted, the employee may request a review of the certification requirement three months after a previous review. If it is determined that a medical certificate is no longer warranted for sick leave of three consecutive workdays or less, the employee shall be formally notified in writing.

3.  Frequency or amount of leave used will not be the sole factor for determining sick leave abuse, nor will leave for which acceptable medical documentation has been provided.

4.  When the Department determines that the sick leave abuse has ceased, the Department will remove the restriction and notify the employee in writing of this action.

5.  The employee will also be notified of the reasons in writing if the restriction is to be continued beyond six months.

## Section 6 - Sick Out

Employees may be required to furnish evidence of illness to support approval of sick leave for periods of less than three consecutive workdays when the Department has reasonable evidence that a "sick-out" has occurred. Under these circumstances, before the Department requires the employees' evidence, the Union will be provided with the reasonable evidence for the Department's allegations that a "sick-out" has occurred.

## Section 7- Registration and Voting

The Department agrees that when the voting polls are not open at least three hours before or after employees' regular hours of work, employees will be granted an amount of excused leave to vote, or to register to vote, which will permit them to report to work three hours after the polls open or leave work three hours before the polls close, whichever requires the lesser amount of time, so long as the absence does not seriously interfere with valid operational needs. Where release of an employee at the beginning or end of the day would seriously interfere with valid operational needs, the supervisor to the extent possible shall make other arrangements to allow the employee a reasonable amount of time during the workday to vote or register to vote. Under unusual circumstances an employee may be excused up to the full day.

## Section 8 - Unavoidable Delay While on Official Business

A. When employees are unable to return to their home station through no fault of their own while away on official government business, the employees will notify their supervisors as soon as possible and obtain appropriate instructions. In such instances, the employees will be paid overtime or approved compensatory time, as appropriate, for any time beyond normal duty hours that they are determined to be performing official duties. If the employees are unable to return to their duty stations and must stay overnight at some other location, per diem expenses will be paid when appropriate.

B. Employees also will be entitled to compensatory time for time spent in travel, in accordance with the Workforce Flexibility Act of 2004, as amended.

## Section 9 - Employee Absences for Court or Court-Related Services

A. In accordance with applicable law, government-wide regulations or other outside authority binding on the Department, an employee summoned or subpoenaed in connection with a judicial proceeding by a court or other authority responsible for the conduct of that proceeding shall be authorized to attend the judicial proceeding without charge to leave or loss of VA salary in the following instances:

1. For jury duty;

2. To appear as a witness on behalf of the Federal, District of Columbia, state, or local government;

3. To appear as a witness on behalf of a private party in an official and job-related capacity or to produce official records; or,

4. To appear as a witness on behalf of a private party in an unofficial capacity and one of the parties to the proceeding is either the United States, District of Columbia, or a state, or local government.

**SA245**

B. Even though no compensation is received for serving on jury duty in a federal court, employees may keep expense money received for mileage, parking, or required overnight stay. Money received for performing jury duty in state or local courts is indicated on the pay voucher or check as either "fees for services rendered" or "expense money." "Expense money" may be retained by the employee; "fees for services rendered" must be submitted to the appropriate financial office.

C. It is agreed that days off and/or schedules will not be changed to avoid granting absence for court or court-related services.

D. An employee who is granted court leave and is excused or released by the court for any day or substantial portion of a day is expected to return to the employee's regular Departmental duties except when:

1. Only a small portion of the work day would be involved and thus no appreciable amount of Department service would be rendered;

2. The distance from the court to the place of duty is such that this would be an unreasonable requirement; or,

3. The employee is regularly scheduled to work on a tour any part of which includes 6:00 pm - 6:00 am.

E. An employee who is granted court leave and serves for a full day or substantial portion of a day is not expected to report for the next tour of duty if that tour occurs within twenty-four hours of the court leave and if any or all of it occurs during 6:00 pm - 6:00 am.

## Section 10 - Leave Without Pay (LWOP)

A. Requests for LWOP will be given serious, bona fide consideration.

B. LWOP may be requested in the same manner and for the same purposes as annual leave and sick leave. LWOP may be granted even though the employee has a sick or annual leave balance.

C. Upon written request from the appropriate Union office, an employee may be granted LWOP to engage in Union activities on the national, district or local level or to work in programs sponsored by the Union or the American Federation of Labor - Congress of International Organizations (AFL-CIO). Such requests will be referred to the appropriate Department official. Such employees shall continue to accrue benefits in accordance with applicable OPM regulations. LWOP for this purpose is limited to one year but may be extended or renewed upon proper application.

D.   Employees granted LWOP for more than 30 calendar days will be notified that they can usually expect to return to their former position. However, it may become necessary in the interest of the service to reassign them to other positions at the same grade and pay within the commuting area of the employee's current duty station during their absence or upon their return.

E.   Employees may request LWOP for educational purposes.

F.   LWOP is granted at the discretion of the Department, except in the following cases:

   1.   When a disabled veteran requests LWOP for medical treatment;

   2.   When requested by a reservist or National Guard member for military duties, employees may request such leave after their military leave has been exhausted (38 USC 4316(d));

   3.   When requested by an employee who has suffered an incapacitating job-related injury or illness and is waiting adjudication of a claim for employee compensation by the OWCP; or,

   4.   When an employee makes a request pursuant to the Family and Medical Leave Act (FMLA) and meets the criteria for that program.

## Section 11 - Hazardous Weather/Emergency Conditions

A.   The Department and local union at each facility will jointly plan the procedures for hazardous weather/emergency conditions and will annually communicate these procedures to employees.

B.   The local union shall be informed by the appropriate Department official at the time the facility declares hazardous weather/emergency conditions. The method for such notification will be appropriate for local negotiations.

C.   When hazardous conditions (e.g., extreme weather conditions, serious interruptions in public transportation, earthquake, and disasters such as flood, fire or other natural phenomena) arise, the Department will determine whether all or part of the facility should be closed or whether the facility should be open as usual. If the Department decides to close all or part of the facility during periods the facility would otherwise be open, the Department will notify employees whether liberal leave or authorized absence will be authorized. Employees who are prevented from reporting to work due to the closure of all or part of a facility should be granted authorized absence in accordance with OPM guidance and/or government-wide regulations.

D.   Excused absence during emergency situations does not generally apply to employees who provide critical services because of the need to assure

**SA247**

continuity of essential patient care operations. However, in extreme situations, where employees who provide critical services make reasonable efforts to get to work and are unable to do so, excused absence is appropriate except in rare circumstances.

E.  Facilities under emergency conditions should provide meals and accommodations for employees who are required to remain on duty.

F.  The VA Incentive Awards Program is an appropriate vehicle and will be utilized for recognizing exceptional services rendered by employees during emergency/hazardous weather conditions.

G.  Whenever employees are unable to leave the facility at the end of their shift, and the employee is assigned work, the employee will be paid in accordance with established policy for the payment of premium rates.

H.  In accordance with government-wide regulations, the Department will fully implement the provisions of any approved program designed to provide inter-agency leave donation for employees affected by natural disasters.

## Section 12 - Accommodation for Religious Observances

A.  An employee whose personal religious beliefs require abstention from work during certain periods of time may elect to engage in overtime work to compensate for time lost by meeting those religions requirements.

B.  To the extent that such modifications in work schedules do not interfere with the efficient accomplishment of the Department mission, the Department shall in each instance, afford the employee the opportunity to work compensatory overtime and shall in each instance grant compensatory time off to an employee requesting such time off for religious observances when the employee's personal religious beliefs require that the employee abstain from work during certain periods of the workday or workweek.

C.  For the purpose stated in Paragraph B of this section, the employee may work such compensatory time before or after the granting of compensatory time off. Advanced compensatory time off should be repaid with the appropriate amount of compensatory time worked within a reasonable amount of time. Compensatory overtime shall be credited on an hour-for-hour basis or authorized fractions thereof. Appropriate records will be kept of compensatory overtime earned and used.

## Section 13 - Military Leave

A.  Military leave will be granted consistent with government-wide rules and regulations.

B. Full-time permanent and part-time permanent employees who are members of the National Guard or the Armed Forces Reserves are entitled to 15 calendar days of regular military training leave in a fiscal year for active duty or inactive duty for training.

C. The Department will not arbitrarily deny an employee's request for military leave.

D. For part-time employees, military leave is prorated based on the number of hours in the employee's work week.

E. Employees who do not use the entire 15 days can carry any unused military leave (not to exceed 15 days) over to the next fiscal year. Military leave may never exceed 30 days in any one calendar year.

F. The Department will take into consideration the schedules of employees who work off-tours and will, when possible, arrange schedules to allow such employees to have scheduled days off immediately preceding and following the required military leave

G. Those employees on 24/7 schedules will continue to be charged military leave on a daily basis for duty days.

H. Employees Returning From Active Duty. In accordance with the Presidential Memorandum dated November 14, 2003, as a welcome home, returning Federal civil servants who were called to active duty in the Global War on Terrorism will be granted 5 days of excused absence for every deployment.

## Section 14 - Advanced Annual/Sick Leave

A. An employee may be advanced all annual leave that will accrue up to the end of the leave year. However, advanced annual leave may not be granted to a temporary employee beyond the date set for the expiration of the employee's temporary appointment, or to any employee if there is a likelihood that the employee will retire, be separated, or resign from the Department before the date the employee will have earned the leave. Upon separation, employees must repay the balance of any remaining advanced annual leave; however, an employee may request a waiver in writing.

B. Advanced sick leave may be combined with annual leave or LWOP when necessary to cover one continuous period of absence.

C. Denials of requests for advance leave will be conveyed to the employee promptly and will contain an explanation of the reasons for the denial.

D.  Advanced leave may be approved in accordance with the employee's type of appointment. The employee will not be required to utilize any annual leave prior to utilizing the advanced sick leave.

E.  It is agreed that advance leave, including both sick and annual, will be fairly and equitably administered.

## Section 15 - Voluntary Leave Transfer Program

A.  As authorized by 5 CFR 630, Subpart I, as extended to Title 38 employees and consistent with this Agreement, employees are entitled to donate and receive leave for medical emergencies.

B.  The Leave Transfer Program allows an employee to transfer annual leave to an approved leave recipient (excluding the employee's supervisor) up to one-half of the amount of annual leave the employee will accrue during the leave year.

C.  The minimum amount of annual leave that may be transferred to and from a Title 5 employee, or Title 38 employee who is charged leave in hours, is four hours.

D.  Title 5 employees may transfer to Title 38 employees and Title 38 employees may transfer to Title 5 employees.

E.  The minimum amount of annual leave that may be transferred from a Title 38 employee who is charged leave in whole day increments is one day.
For a leave transfer between an employee who is charged leave in hours and an employee who is charge leave in whole days, the number of hours transferred for each whole day is eight hours. For a leave transfer between employees who are each charged leave in whole day increments, the recipient will be credited with one whole day for each whole day donated.

F.  Annual leave may not be transferred to an employee's immediate supervisor.

G.  The Department will assist employees in preparing or will prepare the employee's solicitation memorandum which is directed to employees whom the employee designates. The Department will advise employees of how and where to receive such assistance.

H.  When an employee receives donated leave, it may be used only for the medical emergency for which it was donated.

I.  If an employee has use or lose annual leave at the end of the leave year and would like to donate it, the employee should contact an appropriate Department official.

**SA250**

J.  The method of communicating the needs of employees who may want to participate in leave transfer is an appropriate subject for local negotiation.

K.  The parties are in the best position to determine whether donated annual leave is needed by its employees in disaster situations and can quickly facilitate the transfer of donated annual leave among administrations. They are responsible for:

1.  Determining whether, and how much, donated annual leave is needed by affected employees;

2.  Approving leave donors and/or leave recipients within the Department; and,

3.  Facilitating the distribution of donated annual leave.

L.  Forms for donating and receiving annual leave under the inter-agency Emergency Leave Transfer Program can be accessed on OPM's web site at https://www.opm.gov/forms/opm-forms/.

## Section 16 - Family and Medical Leave Act (FMLA)

A.  Maternity and Paternity Leave

1.  Under FMLA and this Agreement, bargaining unit employees are entitled to 16 weeks of LWOP during any 12 month period for the following reasons:

    a.  Birth of a son or daughter and the care of such son or daughter; and,

    b.  Placement of a son or daughter for adoption or foster care.

2.  Supervisors are encouraged to approve additional leave as circumstances warrant.

B.  Other family medical leave under FMLA and this Agreement, bargaining unit employees are entitled to 12 weeks of LWOP during any 12 month period for one or more of the following reasons:

1.  The care of a family member of the employee with a serious health condition. Family member is defined as:

    a.  Spouse and parents of spouse;

    b.  Children, including adopted children; and,

    c.  Parents.

2.  A serious health condition of the employee that makes the employee unable to perform the functions of the position of such employee.

**SA251**

C. Substitution of Paid Leave - For either Paragraphs A or B of this Section, the employee may elect to substitute annual leave, sick leave, compensatory time off, or credit hours for unpaid family or medical leave for any part of the applicable period consistent with governing laws and regulations. Employees may also combine annual leave, compensatory time, sick leave, or credit hours with unpaid family or medical leave for any period of approved leave. An employee may not retroactively substitute paid time off for unpaid family and medical leave.

D. Notice of Leave

1. The employee will make an appropriate request for use of family and medical unpaid leave.

2. When the need for unpaid family and medical leave is foreseeable and the employee fails to give 30 days notice with no reasonable excuse for the delay of notification, the Department may delay the taking of family and medical unpaid leave until at least 30 days after the date the employee provides notice of their need for family and medical leave.

3. If the need for leave is not foreseeable, the employee shall provide notice within a reasonable period of time appropriate to the circumstances involved. If necessary, notice may be given by an employee's personal representative (e.g., a family member or other responsible party). If the need for leave is not foreseeable and the employee is unable, due to circumstances beyond their control to provide notice of their need for leave, the leave may not be delayed or denied.

4. The time frame in Paragraph 2 above will be waived for good cause.

E. Medical Certification (when requesting leave for serious health conditions)

1. An employee shall provide written medical certification to the Department in a timely manner.

2. The written medical certification shall include:

   a. The date the serious health condition commenced;

   b. The probable duration of the serious health condition;

   c. The appropriate medical facts within the knowledge of the health care provider regarding the serious health condition including a statement as to the incapacitation, examination, or treatment that may be required; and,

   d. A statement that the employee is unable to perform the functions of their position.

**SA252**

3.  The Department shall not require any personal or confidential information in the written medical certification other than that required by Paragraph E 2 of this section.

4.  If the Department doubts the validity of the original certification, the Department may require, at the Department's expense, that the employee obtain the opinion of a second health care provider designated or approved jointly by the Department and the employee concerning the information certified under Paragraph E 2 of this section.

5.  If the opinion of the second health care provider differs from the original certification, the Department may require, at the Department's expense, that the employee obtain the opinion of a third health care provider designated or approved jointly by the Department and the employee concerning the information certified under Paragraph E 2 above.
    The opinion of the third health care provider shall be binding on the Department and the employee.

6.  "Health Care Provider" is defined as any of the following individuals:

    a.  A licensed Doctor of Medicine or Doctor of Osteopathy or a physician who is serving on active duty in the uniformed services and is designated by the uniformed service to conduct examinations;

    b.  Podiatrists, dentists, clinical psychologists, optometrists, and chiropractors (limited to treatment consisting of manual manipulation of the spine to correct a subluxation as demonstrated by x-ray to exist) who are authorized to practice by state law;

    c.  Nurse practitioners and nurse midwives who are authorized to practice by state law or Christian Science practitioners listed with the First Church of Christ Scientist, in Boston, Massachusetts;

    d.  Any health care provider recognized by the Federal Employees Health Benefits Program or who is licensed or certified under federal or state law to provide the service in question;

    e.  A health care provider as defined in Paragraph d of this definition who practices in a country other than the United States, who is authorized to practice in accordance with the laws of that country, and who is performing within the scope of their practice as defined under such law;

    f.  A Christian Science practitioner listed with the First Church of Christ Scientist, in Boston, Massachusetts; or,

    g.  A Native American, including an Eskimo, Aleut, or Native Hawaiian, who is recognized as a traditional healing practitioner by native traditional religious leaders and who practices traditional healing methods as believed, expressed, and exercised in Indian religions of

**SA253**

the American Indian, Eskimo, Aleut, or Native Hawaiians, consistent with Public Law 95-314, August 11, 1978 (692 Stat. 469), as amended by Public Law 103-344, October 6, 1994 (108 Stat. 3125).

7. To remain entitled to leave under FMLA, an employee or the employee's spouse, son, daughter, or parent must comply with any requirement from the Department that they submit to examination (not treatment) to obtain a second or third medical certification from a health care provider other than the individual's health care provider.

8. If the employee is unable to provide the requested medical certification before leave begins or the Department questions the validity of the original certification provided by the employee and the medical treatment requires the leave to begin, the Department shall grant provisional leave pending final written medical certification.

9. An employee must provide the written medical certification required by this section, signed by the health care provider, no later than 15 calendar days after the date the Department requests such medical certification. If it is not practicable under the particular circumstances to provide the requested medical certification not later than 15 calendar days after the date requested by the Department despite the employee's diligent, good faith efforts, the employee must provide the medical certification within a reasonable period of time under the circumstances involved, but no later than 30 calendar days after the date the Department requests such medical certification.

10. If, after the leave has commenced, the employee fails to provide the requested medical certification, the Department may:

    a. Charge the employee as AWOL, unless:

        1) The reason for not providing the medical certification was beyond the control of the employee;

        2) The employee made a good faith effort to provide the certification.

    Prior to being placed on AWOL, an employee will be provided written advance notice of at least 10 working days and given the reasons why AWOL is being charged. During this period, the employee may comply with the Department's request for certification, and the AWOL charges will be rescinded.

    b. Or allow the employee to request that the provisional leave be charged to leave without pay or charged to the employee's annual and/or sick leave account, as appropriate.

11. Any health care provider designated or approved by the Department shall not be employed by the Department or be under the administrative oversight of the Department on a regular basis unless the employee's

**SA254**

official duty station is located in an area where access to health care is extremely limited.

F.  Medical Recertification - While an employee is using leave under FMLA, the Department may require, at the Department's expense, subsequent medical recertification from the health care provider only if the circumstances described in the original medical certification change significantly or if the Department receives bona fide information that casts doubt upon the continuing validity of the medical certification. Such requests for medical recertification shall not occur more frequently than every six weeks.

G.  An employee eligible under the Department's Family Medical Leave Program may request to participate in the telework program consistent with Article 20 - Telework of this Agreement.

H.  Protection of Employment and Benefits - Upon return from family and medical leave, the employee will be restored to the same position as occupied before the leave or to an equivalent position in the same commuting area with equivalent benefits, pay, status, and other terms and conditions of employment.

I.  The Department shall inform its employees of their entitlements and responsibilities under FMLA, including the requirements and obligations of employees.

J.  An employee who meets the criteria for leave and has complied with the requirements under this section may not be denied leave, consistent with all applicable rules governing annual or sick leave, as appropriate.

## Section 17 - Blood, Bone Marrow and Organ Donor Leave

A.  Donor leave will be granted consistent with government-wide rules and regulations.

B.  Employees will be granted up to four hours of excused absence to donate blood to a Department sponsored or endorsed blood program. Additional excused absence will be granted to employees who donate blood platelets through Department endorsed Hemophoresis Programs. Time spent in necessary travel for such purposes shall also be administrative leave. The Department may require available documentation of blood donation when there is a basis to verify the donation.

C.  Upon request, subject to certification by a health care provider, leave-approving officials shall approve excused absence for employees who serve as living donors for bone marrow, organ, and tissue donation and transplantation. The use of excused absence can cover time off for activities

**SA255**

such as donor screening, the actual medical procedure, and recovery time. Leave-approving officials shall approve:

1.  Up to seven workdays of absence without charge to leave or loss of pay for each donation by employees participating as living bone marrow donors; or,

2.  Up to 30 workdays of absence without charge to leave or loss of pay for employees participating as living organ and tissue donors.

The length of absence from work can vary depending on the medical procedure involved in the donation. Therefore, for longer periods of incapacitation, leave-approving officials shall approve annual and/or sick leave or LWOP in combination with the maximum amounts of excused absence specified as above in this section.

## Section 18 - Leave for Bereavement

A.  Upon request, subject to any documentation requirements, leave-approving officials shall approve up to five days of annual leave, sick leave, and/or LWOP for employees to mourn the death of the following family members:

1.  Spouse;

2.  Children, including adopted and step-children;

3.  Parents, including stepparents;

4.  Siblings, including step-brother/sister; or,

5.  Any individual related by affinity, i.e., whose association with the employee is the equivalent to one of the family relationships identified above.

B.  Upon request, subject to any documentation requirements, leave approving officials shall approve one day of annual leave, sick leave, and/or LWOP for employees to mourn the death of a grandparent or parent of their spouse.

C.  The supervisor has discretion to require documentation (e.g., obituary, death certificate) prior to final approval of bereavement leave. However, this documentation will normally be required only in unusual circumstances.

## Section 19 - Funeral Leave

A.  Funeral leave is granted to allow an employee to make arrangements for, or to attend, the funeral or memorial service for an immediate relative who died as the result of a wound, disease, or injury incurred while serving as a member of the armed forces in a combat zone. The Department shall grant employees such funeral leave as is needed and requested, not to exceed

three workdays of excused absence, without loss of or reduction in pay. The three days need not be consecutive but if not, the employee shall furnish the approving authority satisfactory reasons justifying a grant of funeral leave for nonconsecutive days.

B.  The Department may grant funeral leave only from a prescribed tour of duty, including regularly scheduled overtime, from a period during which, except for absence on funeral leave, the employee would have worked.

## Section 20 - Rest and Relaxation Title 38 Physicians, Dentists, Podiatrists, and Optometrists

The Under Secretary for Health and facility directors or the professional person acting for them, are authorized to approve absence for a period not to exceed 24 consecutive hours for rest and relaxation for full-time physicians, dentists, podiatrists, and optometrists who have been required to serve long hours in the care and treatment of patients.

## Section 21 - Excused Absence (Administrative Leave)

Excused absence (sometimes referred to as administrative leave) is absence from assigned duties without charge to leave or loss of pay. Excused absence may be granted for activities which are in the government's interest.

**SA257**

# ARTICLE 36 - TIMELY AND PROPER COMPENSATION

## Section 1 - Timely Receipt

A.  Employees are entitled to timely receipt of all wages earned for the applicable pay period. Employees shall receive their leave and earning statements in a secure manner and no later than payday, when available. The options (Electronic Funds Transfer (EFT) or check) available to the employee will be communicated to existing employees within 30 days from the effective date of this Agreement and to new employees prior to choosing a method to receive wages.

B.  Employees will receive their salary payments through EFT unless they submit a written request for a waiver. An employee who has requested a waiver shall receive a check. The waiver request will be signed and dated, and state: "I request a waiver from EFT because I have determined EFT would impose a hardship." No employee will be required to justify their request for waiver.

## Section 2 - Errors in Payment

Employees will review their leave and earnings statements and notify their supervisors of any unexplained changes. When there is an error in payment, the Department will advise employees of the procedures available. Upon the employee's request, the Department will provide the necessary forms for filing a request for waiver of all overpayment of pay and allowances received in good faith.

## Section 3 - Special Payments

A.  Whenever a Department error results in the failure of an employee to receive less than 90% of their basic pay and allowances, Special pay can be authorized upon request from the employee or local payroll office. Corrective actions should begin immediately upon identification of the pay affecting error. Special pay authorizations can only be submitted upon completion of the corrective action(s). The processing of Special pay requests is made by VA's payroll provider and normally take 3-5 business days. Special payments will be made in the same form normally issued to an employee (i.e., EFT or check) or in other forms of payment. On an annual basis, the Department shall provide the Union with a report of AFGE bargaining unit employees who received authorizations for Special pay due to an employee receiving less than 90% of the basic pay and allowances.

**SA258**

# ARTICLE 37 - TRAINING AND CAREER DEVELOPMENT

## Section 1 - General Provisions

A.  The Department and the Union agree that the training and development of employees is of critical importance in carrying out the mission of the Department. In recognition of this, the Department will provide training and career development opportunities to employees of the bargaining unit. The Department is responsible for ensuring that all employees receive the training necessary for the performance of the employees' assigned duties.

B.  The parties agree that there may be reorganization, technological changes, RIFs, or other major actions which could have an impact on job security. In recognition of this, the Department will make every effort to provide training which would allow employees to move into existing or projected vacancies, consistent with budget and staffing restrictions.

C.  Nothing in this section is intended to interfere with applicable merit promotion requirements or Title 38 career advancement procedures.

## Section 2 - Local Training Committees

A.  There shall be a joint local level Training and Career Development Committee which will be authorized to reach joint agreements and make joint recommendations regarding training and career development programs.

B.  The committee will consist of Department and local union representatives. The committee will meet as needed to address training issues such as:

1.  Orientation sessions for new employees;

2.  In-service or on-the-job training to improve the employees' capability to perform their current jobs;

3.  Training for career enhancement;

4.  Cross-training and rotational assignments;

5.  Funding for training;

6.  Upward mobility; and,

7.  Tuition support.

## Section 3 - Training Costs

A.  The Department will pay all expenses, including tuition and travel, in connection with training required by the Department to perform the duties of

**SA259**

an employee's current position or a position to which an employee has been assigned.

B.  Depending upon the availability of funds and training priorities, the Department will also pay appropriate expenses for work-related training that will:

1.  Improve an employee's ability to perform their current job or a job the employee has been selected to fill through merit promotion;

2.  Increase an employee's knowledge or skills in connection with career growth or advancement opportunities; or,

3.  Approval of such training may also be contingent upon an agreement by the employee to share any costs with the Department.

C.  When resources for training are limited, approval for training funds will be based on fair criteria that are equitably applied.

## Section 4 - Reassignments and New Assignments

When employees are reassigned to new positions or assigned new duties in connection with their current positions, the Department will provide the training necessary to enable employees to perform all required duties.

## Section 5 - Scheduling Training

A.  When training required by the Department is conducted during an employee's regularly scheduled work hours, they will be granted excused absence to attend.

B.  When training is approved under Section 3(B) of this article, the Department will make a good faith effort to grant excused absences from work or make schedule adjustments to accommodate an employee's training or educational program.

## Section 6 - Training Information

A.  The Department shall inform employees, at least annually, about Department training opportunities, policies, and nomination procedures. Upon request, the Department will advise individual employees of training opportunities that meet identified educational or career objectives.

B.  The Department will maintain up to date information about training courses, programs, and seminars conducted or sponsored by the Department or available from some other source. This information shall be accessible to employees and publicized in such a way as to provide adequate notice to interested employees.

**SA260**

## Section 7 - Notification

Employees will be notified of approval or disapproval of training requests as soon as possible but in every case prior to the starting date of the training. Should an employee's request for training be disapproved solely for lack of funds, the employee may resubmit a request for training as funds become available. That request will be given first consideration but may be disapproved due to higher training priorities. If not selected for training, the employee will be notified of the reasons.

## Section 8 - Educational Programs and Continuing Education

A.   As resources permit, the Department shall work with educational institutions and other training sources to develop opportunities for employees to participate in long term educational programs.

B.   The parties recognize that a block of time for pursuing continuing education is beneficial to the Department. Each facility is therefore encouraged to grant a minimum block of time to employees for pursing continuing education opportunities.

## Section 9 - Local Negotiations

Procedures which ensure fair and equitable training opportunities are appropriate subjects for local bargaining.

## Section 10 - Tuition Support

A.   Employees who are eligible for receiving tuition support shall be informed of the availability of reimbursement funds and shall be given the opportunity to apply for the reimbursement funds.

B.   When a change in qualifications for a position mandates an additional requirement for an employee already holding that position, the Department will pay for the education needed for the employee to meet the new qualifications unless the employee is grandfathered in or taken out of the position.

C.   Tuition support for upward mobility is a proper subject for local bargaining.

D.   Bargaining unit employees shall have an equitable opportunity to compete for the receipt of available tuition support funds.

E.   All employees will be timely provided with information on the availability of funds for tuition support and on the processes by which an employee may apply for any available funds.

**SA261**

# ARTICLE 38 - UNIFORMS

## Section 1 - General

This article establishes policies, procedures, and responsibilities for acquiring, wearing, maintaining, and exchanging of official Department uniforms. An employee who is required by the Department to wear a uniform shall receive either an allowance for uniforms or be issued uniforms but not both. The Department shall issue uniforms in accordance with law, government-wide regulation, and VA policy. Nothing will prevent local negotiations on uniform issues.

## Section 2 - Purpose

The objective is to enhance employee and public pride and to project an image of the organization. Further, employees shall be provided with functional, durable, and comfortable uniforms appropriate for the assigned duties and climates. Employees shall be assured the highest possible degree of consistency in uniform appearance that is commensurate with the diversity of tasks and climates confronting employees that will enhance and clearly identify the role of the employee.

## Section 3 - Police Uniforms

The Department will provide Police Officers in the Department with certain items and their replacements, in accordance with Handbook 0730. The Department will provide an allowance for items not issued by the Department, in accordance with 38 USC 903. The Police Officer will not be required to use personal funds for mandated uniform items. The Department agrees to establish a system that provides for the expeditious acquisition of uniforms.

## Section 4 - Firefighter Uniforms

The Department will provide an allowance for items not issued by the Department, in accordance with 5 USC 5901-5903, VHA Handbook 1850.04, and government-wide regulation. The Firefighter will not be required to use personal funds for mandated uniform items. The Department agrees to establish a system that provides for the expeditious acquisition of uniforms.

## Section 5 - Repairs and Alterations

The Department shall repair or alter government-issued uniforms including required patches and emblems.

## Section 6 - Lab Coats

All full time employees who wear lab coats shall be issued a minimum of seven lab coats. Pathology and Laboratory shall be issued non-permeable lab coats. For other

**SA262**

employees, the minimum number of lab coats issued to each employee must be the number required to ensure that a clean lab coat is available each workday.

## Section 7 - Number of Uniform Items

All full time employees who wear uniforms that must be laundered between uses shall be issued a minimum of seven uniforms. For other employees, the minimum number of such uniforms issued to each employee must be the number required to ensure that a clean uniform is available each workday.

## Section 8 - Changes

Any proposed changes in the current style, color, texture, or design of uniforms currently in existence shall be forwarded to the Union at the affected level for bargaining.

## Section 9 - Distribution of Uniforms

The Department shall provide a consistent and equitable distribution system that will allow for a convenient exchange of laundered Department issued uniforms.

## Section 10 - Replacement

All Department issued uniforms and accessories shall be replaced when rendered unserviceable.

## Section 11 - Time to Change In and Out of Uniforms

This section is addressed in Article 21 - Hours of Work and Overtime, Section 3 L.

**SA263**

# ARTICLE 39 - UPWARD MOBILITY

## Section 1 - Goals and Objectives

The goal of Upward Mobility is to provide maximum opportunity for employees to advance so as to perform at their highest potential. An objective of Upward Mobility is to support the advancement of underrepresented minorities and women and to meet other special emphasis program goals. The Department's wide range of occupations will be considered in developing Upward Mobility opportunities.

## Section 2 - Program Penetration

The extent of any installation's Upward Mobility endeavors will depend on, among other things:

A. The number of lower-graded employees having the requisite potential;

B. The number and type of target positions available which would link employee potential with positions in support of the facility's operations;

C. Available training resources; and

D. Ceiling or budget constraints. Efforts will be made to create alternate ways to support Upward Mobility such as collaborative efforts with schools having different academic and vocational programs.

## Section 3 - Identifying Positions

Each facility will design an Upward Mobility Program, consistent with Section 2 above, that is responsive both to employee career advancement and to the facility's staffing needs. There will be joint labor/management involvement in the design of such a program. As part of this program, the parties will identify positions which may be appropriate for upward mobility. If the Department determines that a position should be filled as upward mobility, the position will be specifically described and announced as such. It will be filled at a grade level which is lower than the target level and will permit the consideration of employee potential as a factor in evaluating candidates for selection.

## Section 4 - Creating Training Positions

It is understood that upward mobility may also be achieved by:

A. Evaluating situations where vacant positions can be filled at lower-grade, trainee levels;

B. Identifying areas where bridge positions could be established in order to provide opportunities for employees to enhance their careers; and,

**SA264**

C. Skills upgrading to supplement the existing skills of employees so that they may fully qualify for positions in other career ladders. The consideration of positions for upward mobility will not be limited to any particular occupational series.

The Department will review promotion announcements to ensure that the qualifications sought of applicants are necessary for successful performance in the position (e.g., not all secretarial positions require the ability to take dictation).

## Section 5 - Employee Initiatives

Employees are encouraged to seek guidance from their immediate supervisor(s) or from the appropriate administrative office if they are interested in learning about available career opportunities. These employees will be furnished information about lines of career progression, education requirements, available job opportunities, etc. Upward Mobility announcements will be well communicated throughout the facility by such means as: e-mail, bulletin boards, newsletters, and staff meetings.

## Section 6 - Specialized Training

The Department also agrees that the Upward Mobility Program can be enhanced by providing tailored guidance and training in instances where it may be beneficial to help employees adjust. These special efforts may be made consistent with the requirements of the position, the selectee's talents and aptitudes, and within available resources.

## Section 7- Cross-Training

The parties recognize that cross-training, where this approach is feasible, can provide a valuable opportunity for employees to broaden their experience. Each facility will review the possibility of increasing the amount of cross-training conducted within its services or divisions.

**SA265**

# ARTICLE 40 - WITHIN-GRADE INCREASES AND PERIODIC STEP INCREASES

## Section 1 - Within-Grade Increases For Title 5, Hybrid, and Veterans Canteen Service (VCS) Employees

A. Applicability

1.  This section applies to all General Schedule, Federal Wage System, and non-appropriated fund employees in the unit of recognition. This includes Hybrid Title 38 employees appointed on a full time, part-time, or intermittent basis under 38 USC 7401(3) or 7405(a)(1)(B). It will be used in conjunction with Article 27 - Performance Appraisal. Periodic step increases for Title 38 employees are discussed in Section 2 below.

2.  It is noted that the general authority for Within-Grade Increases (WIGI) currently is contained in 5 USC 5335 and 5 CFR part 531, subpart D.

B. Definitions

1.  Acceptable Level of Competence - An employee will be considered to have attained an acceptable level of competence when they are currently performing at the fully successful or better level under the performance appraisal system, and such performance is documented by a rating of at least fully successful/satisfactory.

2.  Waiting Period - The term waiting period refers to the minimum time requirement of creditable service to become eligible for a WIGI.

3.  Within-Grade Increase - The term WIGI means a periodic increase in an employee's rate of basic pay from one step of the grade of their position to the next higher step.

4.  Equivalent Increase - This term means an increase in an employee's rate of basic pay which is equal to or greater than the amount of one WIGI. An equivalent increase is based on the step rate held by the employee before their advancement to the next step of the grade of their position. An equivalent increase does not include:

    a.  A statutory pay adjustment;

    b.  The periodic adjustment of a wage schedule;

    c.  The establishment of an above-minimum entrance rate or special salary rates;

    d.  A quality step increase or other incentive award;

e.  A temporary or term promotion when returned to the permanent grade or step; or,

f.  An increase resulting from placement of an employee in a supervisory or management position who does not satisfactorily complete a probationary period under 5 USC 3321(a)(2) and is returned to a position at the same grade and step held by the employee before such placement.

C.  Within-Grade Increases

1.  The determination to grant or withhold a WIGI will be based on the employee's appraisal of record and their current performance under a performance plan for 90 days or more.

2.  The WIGI will be granted as soon as the employee is eligible if they have met an acceptable level of competence.

D.  Performance/Competence Determination

1.  Communication of Performance Requirements - Employees shall be informed of the specific performance requirements that constitute an acceptable level of competence within the time frames and means of communication of performance standards established under the performance appraisal system.

2.  Acceptable Level of Competence Determinations:

a.  An acceptable level of competence determination shall be based on the current rating of record. This rating used as the basis for an acceptable level of competence determination must have been assigned no earlier than at the end of the most recently completed annual appraisal period. If the most recent rating is more than 90 days old, the current performance will be reviewed to ensure that the rating of record reflects current performance.

b.  When it is determined that current performance is not at an acceptable level, a special rating must be prepared to document current performance.

3.  Notification - Employees shall be provided with an acceptable level of competence determination as soon as possible after the completion of the required waiting period.

a.  Favorable Determination - The SF-50-B, Notification of Personnel Action, shall be used to advise employees that they have achieved an acceptable level of competence and will receive a within-grade increase.

**SA267**

b. Negative Determination - When it is determined that the employee's performance is not at an acceptable level of competence, the employee shall be given a written notice which includes the following:

1) The reasons for the negative determination and the respect in which the employee must improve their performance; and,

2) Information on the employee's right to request reconsideration of the negative determination.

E. Reconsideration

1. Procedures for WIGI Determinations

a. Where an employee has been assigned to a present supervisor for less than 90 days, and that supervisor cannot adequately assess the employee's performance, they shall secure the written views of the employee's prior supervisor before making a performance determination. A copy of this document will be given to the employee.

b. Except in rare and unusual circumstances, the WIGI will be granted as soon as the employee is eligible unless the employee was informed in writing:

1) During the most recent progress review; or,

2) In no event later than at least 60 calendar days before the end of the statutory waiting period for eligibility for a WIGI that their performance is below an acceptable level of competence and, unless their performance improves, the WIGI will be denied.

2. In those rare and unusual circumstances when the supervisor does not give 60 calendar days advance notice and the WIGI is delayed, the supervisor will reconsider the employee's level of competence not later than 60 calendar days after the date on which the employee completed the required waiting period, If the employee's level of competence is acceptable, the WIGI will be made retroactively effective on its original due date.

3. If at the end of the 60 calendar days, the employee's performance is not at an acceptable level of competence for the purpose of approving the WIGI, the employee will be given a written notice which will include:

a. An indication that the employee's work has been reviewed;

b. A statement that the employee's work has been determined to be of a less than acceptable level of competence;

c. An identification of those elements where the employee's performance has resulted in denial of the WIGI;

**SA268**

d.  A statement that the employee has a right to request, in writing, a reconsideration of the negative determination, provided the request is made within 15 days of the employee's receipt of the negative determination;

e.  The name of the reconsideration official to whom the employee may submit a request;

f.  A statement that the employee may have a local union representative when presenting a request to the reconsideration official;

g.  A statement that the employee may appeal via the appropriate procedure the basis for the negative determination in person and/or in writing; and,

h.  An explanation that the employee may be considered for a WIGI at any time during the next 26 calendar weeks if the employee demonstrates an acceptable level of competence.

F.  Exceptions

1.  Delays of Acceptable Level of Competence Determinations - The employee shall be informed in writing whenever their acceptable level of competence determination is being delayed in accordance with OPM regulations. The employee shall be informed of the reasons for delay and the specific requirements for performance at the acceptable level of competence.

2.  Waiver of Requirement to Make Acceptable Level of Competence Determinations - An acceptable level of competence determination shall be waived and a WIGI granted when an employee had not served for at least 90 days in any position under an applicable agency appraisal system during the final 52 weeks of the waiting period for the reasons specified in 5 CFR 531.409(d).

G.  Redeterminations
After a WIGI has been withheld, the Department may grant a WIGI at any time after it determines that the employee has demonstrated performance at an acceptable level of competence. In such cases, the WIGI will be effective the first day of the first pay period after the acceptable determination is made.

## Section 2 - Periodic Step Increases For Personnel Appointed Under 38 USC 7401(1) and 38 USC 7405(a)(1)(A):

A.  Applicability
This section applies to any physician, dentist, optometrist, podiatrist, Registered Nurse (RN), Physicians Assistant (PA), Expanded Function Dental Auxiliary (EFDA), or chiropractor, who is receiving less than the maximum

**SA269**

rate of their grade. Within-grade increases for Title 5, Hybrid, and VCS employees are discussed in Section 1 above.

B.  Governing Law
Under Department regulations set forth in VA Handbook 5007, Part III, Chapter 5, Section 1, and VA Handbook 5013, Part II, Paragraph 12, the employees listed in subsection 1 A will be advanced to the next higher step rate within such grade if they meet the eligibility requirements and waiting periods set forth in the regulations. Any reference to a Handbook in this section is to the document cited, or as found in the successor document.

C.  Eligibility
Pursuant to VA Handbook 5007, Part III, Chapter 5, Section I.b., a periodic step increase will be granted when:

1.  An employee's work is of an acceptable level of competence;

2.  No "equivalent increase" in compensation was received during the period under consideration; and,

3.  The benefit of successive increases shall be preserved for any person whose continuous service is interrupted by active military duty.

D.  Waiting Periods
Pursuant to VA Handbook 5007, Part III, Chapter 5, Section 1 c, the minimum time requirement of creditable service without an equivalent increase is either 52 weeks or 104 weeks of creditable service, depending upon the employee's occupation and grade. Please see the Department regulations for specific waiting period requirements and applicable exceptions.

E.  Disapproval and Reconsideration
Procedures for disapproval and reconsideration of periodic step increases are set forth in VA Handbook 5013, Part H, Paragraph 12. Those regulations provide that if disapproval is recommended, the rating official shall prepare a written justification and forward it, through the local HRM Office, to the approving official for decision. If disapproved:

1.  The employee will be notified in writing of:

    a.  The reason(s) for disapproval;

    b.  The fact that the employee will be reconsidered within 52 weeks (time to be specified); and,

    c.  The right to ask for a review of the decision under Paragraph 2 below.

SA270

2. An employee may request reconsideration of a decision to deny a periodic step increase or rate of adjustment within 15 calendar days of receipt of the notification required under c above. The reconsideration decision will be rendered by the next higher level professional/administrative supervisor at the health care facility or, if there is no higher level professional/administrative supervisor at the facility, the file is to be submitted to the appropriate Network Director for decision. All reconsideration decisions are final. If, on reconsideration, it is determined that an employee was performing at an acceptable level of competence, the employee shall be given the periodic step increase retroactive to the original due date.

**SA271**

# ARTICLE 41 - WORKERS' COMPENSATION

## Section 1 - General

The Office of Workers' Compensation Program (OWCP) is administered by the U.S. Department of Labor (DOL). Employees should consult the DOL for guidance on applicable laws, DOL regulations, and precedents if issues arise that are not covered herein.

## Section 2 - Counseling

A. The Department agrees that when an employee sustains an injury or an alleged acquired illness or exposure, in the performance of duties, and reports it to the Department, the supervisor and/or the appropriate Department official will immediately inform the affected employee of their rights under the Federal Employees Compensation Act (FECA). These rights include the following:

1. The employee's right to file for compensation benefits;

2. The types of benefits available;

3. The written procedure for filing claims at each station or workplace;

4. The option to use compensation benefits if approved in lieu of sick or annual leave; and,

5. The option to use continuation of pay for traumatic injuries in lieu of sick or annual leave.

B. The Department will review and respond to an employee's complaint of the mishandling of their Workers' Compensation claim. The response will be provided to the employee in writing in a timely fashion. The review and response will be completed no later than 30 days from the receipt of the complaint. If the review and response will not be completed in 30 days, the employee will be given a written response no later than the 30th day and the reasons for the delay, including an estimate of how much more time it will take to complete.

## Section 3 - Procedure for Filing Claims for Workers' Compensation Benefits

A. As soon as possible after experiencing a job-related injury or illness, the employee should contact their supervisor.

B. The Department shall, at that time, assure the employee is provided the proper forms and assist the employee in filling them out. The CA-16, CA-17,

**SA272**

CA-7, and CA-20 must be in hard copy; for other forms, the employee will be permitted to choose whether to use electronic or paper forms. The forms include:

1. CA-1 is the appropriate form for reporting a traumatic injury. A traumatic injury is a wound or other condition of the body caused by external force, including stress or strain. The injury must be identifiable by time and place of occurrence and member of the body affected; it must be caused by a specific event or incident or series of events or incidents within a single day or work shift. A traumatic injury also includes damage to or destruction of prosthetic devices or appliances.

2. CA-2 is the appropriate form for reporting an occupational disease or illness. An occupational disease is defined as a condition produced in the work environment over a period longer than one workday or shift. It may result from systemic infection, repeated stress or strain, exposure to toxins, poisons, or fumes, or other continuing conditions of the work.

3. CA-2A is the appropriate form for recording a recurrence of disability. A recurrence of disability is defined as a spontaneous return or increase of disability due to a previous injury or occupational disease without intervening cause or a return or increase of disability due to a consequential injury.

4. CA-16 authorizes an injured employee to obtain immediate examination and/or treatment from a physician for an on-the-job injury. An employee has the initial right to select a physician of their choice to provide necessary treatment. The physician must be listed by name on the CA-16. The term 'physician' includes doctors of medicine (MD), surgeons, osteopathic practitioners, podiatrists, dentists, clinical psychologists, optometrists, and chiropractors within the scope of their practice as defined by state law. Whenever possible, the employee will be provided CA-16 (Authorization for Examination and/or Treatment) within four hours after requesting the CA-16. When it is not possible, the Department will authorize medical treatment by telephone and send the completed form to the medical facility within 48 hours. The Department will provide the employee with information about accessing DOL's online medical provider search tool and will assist the employee in obtaining the list. The fact that a provider is listed in no way constitutes an endorsement of the provider, or the provider's services, by the Department.

5. CA-17 is the form used to report the duty status of the employee. The supervisor must fill out the left hand portion of the form describing the physical requirements of the position. The physician or practitioner completes the CA-17, Duty Status Report, as appropriate, to provide information such as the date the employee can return to work or any restrictions on work the employee will be able to perform.

**SA273**

6. CA-7 is the form used to claim compensation (wage loss) when the employee cannot return to work after Continuation of Pay (COP) ends, or when the employee is not entitled to receive COP, and claims compensation for wage loss. CA-7 is filed in occupational exposure or recurrence cases. In controverted cases, where pay is terminated, form CA-7 is submitted with form CA-1. CA-7 is also used to claim a schedule award for permanent impairment as a result of traumatic injury.

7. CA-20 is a Medical Report Form. This report may be made on CA-20, which is a form attached to CA-7. The Department will provide form CA-20 to the employee as often as needed.

8. The employee's PD.

C. The appropriate sections of these forms should be filled out by the employee and given to the supervisor as soon as possible, but not later than 30 calendar days from the date the employee notifies the Department of the injury or illness. If the employee is incapacitated, this action may be taken by someone acting on behalf of the employee. Supervisory action on CA-1 and CA-2 forms shall be completed within five working days after the employee completes their portion of the form. For all forms, the Department must complete the appropriate parts of the form(s) and transmit them to the DOL, OWCP, within the time limits set out by the DOL.

D. The Department will not request an employee to release the employee's medical records or other personally identifiable information, except to the extent required to adjudicate the employee's claim. This release will be specific to the injury/illness claimed. An employee will be informed of and afforded the opportunity to discuss the release of records with the Union prior to submitting the release.

E. All records relating to claims for benefits filed under FECA are covered by the government-wide Privacy Act system of records (DOL\Govt1). (See 20 CFR 10.11) The employee will be informed in writing of the employee's privacy entitlements/rights afforded by DOL under Title 20, System of Records.

F. At the time the employee files a claim, the employee will be asked to designate whether they wish a representative of the Union to be notified that the employee has filed a claim, and/or to receive a copy of the claim.

## Section 4 - Posting of Employee Rights

The Department agrees to post a notice on all Department controlled bulletin boards advising employees of the appropriate HR office room/building location for filing Workers' Compensation claims. The notice will also include HR office telephone numbers and/or the Department's OWCP Specialists office telephone number for

obtaining information/assistance relevant to Worker's Compensation claims. The Department further agrees to distribute annual notice to all employees providing them the same information.

## Section 5 - Election of Benefits Options

A.  As a rule, three years is the time limit for initially filing an OWCP claim.  It is to the employee's advantage to file a claim immediately after becoming aware of a medical condition that was caused by work.

B.  OWCP (DOL), not the Department, decides if an employee has a compensable injury and what benefits they are entitled to under FECA. OWCP will notify the employee in writing when the claim has been received and OWCP has assigned a claim number.

C.  Pending the approval of the compensation claim, an employee with a job-related traumatic injury/illness or occupational disease may elect to be placed on sick or annual leave instead of leave without pay. If the employee's claim is approved, the employee shall have the option of buying back any leave used and having it reinstated to the employee's account.

D.  An employee with a job-related traumatic injury/illness may elect to receive 45 days of COP if the claim is filed within 30 days of the injury. The entitlement to COP is not available to employees who file an occupational disease claim.

E.  f the employee's claim for compensation is disallowed by the DOL, OWCP, any of the 45 days of COP that were previously granted will be converted to sick leave, annual leave, and/or LWOP. The employee shall be responsible for advising the Department as to which form(s) of leave is/are requested and for completing an SF-71, Application for Leave, or its electronic equivalent.

## Section 6 - Placement of Workers' Compensation Claimants

A.  When an employee requests and supports their request with appropriate medical information, the Department will make a serious effort to assign the employee on a temporary basis to duties consistent with the employee's medical needs, pending resolution of their claim.

B.  Where the employee requests and supports their request with an approved OWCP claim and appropriate medical information, the Department will take prompt action with regard to all job related injuries or illnesses so that employees receive the appropriate benefits expeditiously, and are returned to duty as soon as possible. Employees will be informed about their rights and responsibilities related to job incurred illnesses or injuries.

**SA275**

C.   Employees will be provided transitional (light) duty assignments consistent with their qualifications and medical limitations. Light duty assignments must be in writing, of limited duration, and not to be considered indefinite or permanent in nature. Transitional (light) duty may also include reduced hours or changing the employee's scheduled tour of duty without loss of pay. Any such action will be consistent with the negotiated Article 23 – Title 5 Merit Promotion.

D.   Form CA-17, Duty Status Report, is the designated form to be used by the agency to have the attending physician list any work limitations or restrictions. Light duty is work that has been modified to meet physical restrictions of an employee. These requested restrictions are designed to protect the health and safety of the affected employee or others. These assignments may involve physical activities, environmental aspects of an assignment (e.g., exposure to dust or fumes), scheduling (e.g., no shift work for an unstable diabetic), travel equipment usage (e.g., respirators, ladder climbing, driving), communication abilities (e.g., inability to speak), sensory impairments (e.g., visual deficits, color blindness or other similar condition, diminished ability to sense heat or cold or other similar condition, etc.). Form CA-17 must specify, as shown in the PD, the physical and or mental capabilities required, e.g., lift — pounds, repetitive motions of certain body parts, squatting or bending, scheduling or environmental demands, or other restrictions, which must be considered.

**SA276**

# ARTICLE 42 - AFFILIATIONS

A.  The Department will honor the Union's rights as the exclusive representative regardless of any relationship between the Department and an affiliate body.

B.  The Department agrees that officials of an affiliate acting in a supervisory capacity over unit employees shall be bound by applicable law, regulation, the terms of this Agreement, and any applicable supplemental agreements in their supervisory relationships with bargaining unit employees.

**SA277**

# ARTICLE 43 - GRIEVANCE PROCEDURE

## Section 1 - Purpose

The purpose of this article is to provide a mutually acceptable method for prompt and equitable settlement of grievances. This is the exclusive procedure for Title 5, Title 38 Hybrids and Title 38 bargaining unit employees in resolving grievances that are within its scope, except as provided in Sections 2 and 3.

## Section 2- Definition

A.  A grievance means any complaint by an employee(s) or the Union concerning any matter relating to employment, any complaint by an employee, the Union, or the Department concerning the interpretation or application of this Agreement and any supplements or any claimed violation, misinterpretation or misapplication of law, rule, or regulation affecting conditions of employment. The Union may file a grievance on its own behalf, or on behalf of some or all of its covered employees.

B.  This article shall not govern a grievance concerning:

1.  Any claimed violation relating to prohibited political activities (Title 5 Chapter 73 Subchapter III);

2.  Retirement, life insurance, or health insurance;

3.  A suspension or removal in the interest of national security under 5 USC 7532;

4.  Any examination, certification or appointment;

5.  The classification of any position which does not result in the reduction in grade or pay of an employee.

C.  Under 38 USC 7422, the following exclusions also apply only to pure Title 38 bargaining unit employees:

1.  Any matter or question concerning or arising out of professional conduct or competence such as direct patient care or clinical competence;

2.  Any matter or question concerning or arising out of peer review; and/or,

3.  Any matter or question concerning or arising out of the establishment, determination, or adjustment of employee compensation under 38 USC 7422.

Note 1: The language in the above paragraph shall only serve to preclude a grievance where the Secretary, or a lawfully appointed designee of the Secretary (currently the Under-Secretary for Health), determines in accordance with 38 USC 7422 that the

grievance concerns or arises out of one or more of the three items listed above. Any determination under this language by the Secretary or their designee is subject only to judicial review pursuant to 38 USC 7422(c).

## Section 3 - Other Applicable Procedures

A.  As provided for in 5 USC 7121, the following actions may be filed either under the statutory procedure or the negotiated grievance procedure but not both:

1.  Actions based on unsatisfactory performance (5 USC 4303),

2.  Adverse actions (5 USC 7512),

3.  Discrimination (5 USC 2302(b)(1)).

B.  Nothing in this Agreement shall constitute a waiver of any further appeal or review rights permissible under Title 5, Chapter 71.

C.  An employee shall be deemed to have exercised their option under this section when they timely initiate an action under the applicable statutory procedure or file a timely grievance in writing under the negotiated grievance procedure, whichever event occurs first. Discussions between an employee and an EEO (ORM) counselor would not preclude an employee from opting to select the negotiated grievance procedure if the grievance is otherwise timely. For purposes of an EEO action, the time limit for filing a grievance will be extended by 30 days, beginning with the employee's receipt of a notice of the Right to File a Formal Discrimination Complaint.

## Section 4 - Jurisdiction

If either party considers a grievance non-grievable or non-arbitrable, the original grievance will be considered amended to include this issue. The Department must assert any claim of non-grievability or non-arbitrability no later than the Step 3 decision.

## Section 5 - Representation

The only representation an employee may have under this procedure is representative(s) approved in writing by the Union, in accordance with Section 7. An employee may pursue a grievance without union representation, but the Union may elect to attend each grievance step. The Union will be provided notice immediately when any grievance is filed as well as given advance notice of each meeting.

## Section 6 - Informal Resolutions

Most grievances arise from misunderstandings or disputes, which can be settled promptly and satisfactorily on an informal basis. The use of ADR is encouraged. The parties agree that every effort will be made to settle grievances at the lowest

**SA279**

possible level. Inasmuch as dissatisfactions and disagreements arise occasionally among people in any work situation, the filing of a grievance shall not be construed as reflecting unfavorably on an employee's good standing, performance, loyalty, or desirability to the Department. Reasonable time during work hours will be allowed for employees and Union representatives to discuss, prepare for, and present grievances including attendance at meetings with management officials concerning the grievances, consistent with Article 48 - Official Time and local supplemental agreements.

## Section 7 - Procedure

A.  Grievance meetings under this procedure will be face-to-face at the location of the grievant. By mutual agreement, the parties to the grievance may agree to teleconference the grievance meeting. The Union is entitled to have an equal number of representatives at all steps of the grievance procedure as the Department.

B.  Employees and/or their representatives are encouraged to informally discuss issues of concern to them with their supervisors at any time. Employees and/ or their representatives may request to talk with other appropriate officials about items of concern without filing a formal grievance if they choose. In the event of a formal filing of a grievance, the following steps will be followed.

Step 1.

An employee and/or the Union shall present the grievance to the immediate or acting supervisor, in writing, within 30 calendar days of the date that the employee or Union became aware, or should have become aware, of the act or occurrence; or, anytime if the act or occurrence is of a continuing nature. The immediate or acting supervisor will make every effort to resolve the grievance immediately but must meet with the employee/representative and provide a written answer within 14 calendar days of receipt of the grievance. If there is to be more than one Department official involved in the grievance meeting, the Union will be so notified in advance.

Step 2.

If the grievance is not satisfactorily resolved at Step 1, it shall be presented to the Service/Division Chief, or other equivalent Department official or designee within seven calendar days of the Step 1 supervisor's written decision letter. The recipient of the grievance shall sign and date the grievance. The Step 2 grievance must state, in detail, the basis for the grievance and the corrective action desired. If there is to be more than one Department official involved in the grievance meeting, the Union will be so notified in advance. The Step 2 official will provide the Step 2 answer within 10 calendar days from receipt of the grievance.

Step 3.

If no mutually satisfactory settlement is reached as a result of the second step, the aggrieved party or the Union shall submit the grievance to the Director within seven calendar days of receipt of the decision of Step 2. The recipient of the grievance shall date and sign the grievance. The Step 3 grievance must state, in detail, the basis for the grievance and the corrective action desired. The Director or designee shall meet with the aggrieved employee(s) and their Union representative(s) within seven calendar days from receipt of the Step 3 grievance to discuss the grievance. The Director or designee will render a written decision letter to the aggrieved employee(s) and the Union within 10 calendar days after the meeting.

Step 4.

If the grievance is not satisfactorily resolved in Step 3, the grievance may be referred to arbitration as provided in Article 44 - Arbitration. Only the Union or the Department can refer a grievance to arbitration.

Note 1: For Veterans Canteen Service (VCS) employees, Step 2 will be eliminated at those facilities where two levels of supervision are not present. In Step 3, the VCS Regional Manager, or their designee, will be the deciding official. The meeting will be at the duty station of the aggrieved employee and with an official higher than the Canteen Chief. By mutual agreement, the parties to the grievance may agree to teleconference the grievance meeting.

Note 2: For National Cemetery Administration (NCA) employees, where there are two levels of supervision, Step 1 will be the immediate supervisor. Step 2 will be an Assistant Cemetery Director where one exists and Step 3 will be the Cemetery Director. Where there is only one level of supervision, Step 1 will be the Cemetery Director and Step 1 time limits will apply; Step 2 will be eliminated and Step 3 will be the MSN Director or designee.

Note 3: For VA Headquarters unit employees, the officials listed below will replace those mentioned in the respective steps. If the local union requests, the Department shall advise the local union of the proper recipient of the grievance at each step.

Step 1 - Immediate supervisor

Step 2 - Service Director (or equivalent), or designee

Step 3 - Administration or Staff Office Head, or designee.

Note 4: At any step of the negotiated grievance procedure, when any management deciding official designates someone to act on their behalf, that designee will have the complete authority to render a decision at that step and will render the decision. The designee will never be someone who decided the issue at any previous step.

**SA281**

Note 5: It is agreed that grievances should normally be resolved at the lowest level possible. However, there will be times when a grievance may be more appropriately initiated at the second or third step of the procedure, for example, when a disciplinary action is taken by a Service Chief or higher level, when the supervisor at the lower level clearly has no authority to resolve the issue, or when the Union grieves an action of a management official other than a Step 1 supervisor. When a grievance is initiated at a higher step, the time limits of Step 1 will apply.

Note 6: Grievances over actions taken by VA Headquarters officials against field station employees may be grieved directly to arbitration in accordance with Article 44 - Arbitration. The request for arbitration in such cases should be made by the local union President or designee to the facility Director, clearly setting forth the basis for the grievance and the corrective action being requested. The parties may coordinate an effort for informal resolution prior to the actual arbitration.

Note 7: Local management-initiated grievances shall be filed with the local union president or designee and shall constitute Step 3 of the negotiated grievance procedure. Such grievance must be filed within 30 calendar days of the act or occurrence or when the Department became aware of, or should have become aware of, the act or occurrence. The time limits for the meeting and response will be 14 calendar days.

Note 8: The Union shall be provided a copy of all employee-filed grievances at all steps and all responses to those grievances. Copies of such grievances must be provided to the Union as soon as practicable, no later than two workdays after receipt. Copies of grievance responses must be provided to the Union when they are issued. When a grievance has been filed, the Department shall not discuss the grievance with the grievant unless the Union is given notice and an opportunity to be present. Any resolution of a grievance must be consistent with and not conflict with the terms of a collective bargaining agreement.

## Section 8 - Extensions

Time limits at any step of the grievance procedure may be extended by mutual consent of all parties.

## Section 9 - Failure to Respond in Timely Manner

Should the Department fail to comply with the time limits at any step in Section 7 above, the grievance may be advanced to the next step.

## Section 10 - Multiple Grievances

Multiple grievances over the same issue may be initiated as either a group grievance or as single grievances at any time during the time limits of Step 1. Grievances may be combined and decided as a single grievance at the later steps of the grievance procedure by mutual consent.

## Section 11 - National Level Grievances

A national level grievance is one that is filed by the Union or by the Department. Grievances between the Department and the Union at the national level shall be filed by the aggrieved party as follows:

A.  Within 30 calendar days of the act or occurrence or within 30 days of the date the party became aware or should have become aware of the act or occurrence or at any time if the act or occurrence is continuing, the aggrieved party (the Department or the Union) may file a written grievance with the other.

B.  Upon receipt of a grievance, the parties will communicate with each other in an attempt to resolve the grievance. A final written decision, including any position on grievability or arbitrability, must be rendered by the respondent within 45 days of receipt of the grievance. If a decision is not issued in 45 days, or if the grieving party is dissatisfied with the decision, the grieving party may proceed to arbitration in accordance with Article 44 - Arbitration. The time limits may be extended by mutual agreement.

**SA283**

# ARTICLE 44 - ARBITRATION

## Section 1 - Notice to Invoke Arbitration

Only the Union or the Department may refer to arbitration any grievance that remains unresolved after the final step under the procedures of Article 43 - Grievance Procedures. A notice to invoke arbitration shall be made in writing to the opposite party within 30 calendar days after receipt of the written decision rendered in the final step of the grievance procedure.

## Section 2 - Arbitration Procedure

A. On or after the date of the notice to invoke arbitration, the moving party will request the Federal Mediation and Conciliation Service (FMCS) to provide a list of seven impartial persons to act as an arbitrator. The parties shall meet within 10 calendar days after receipt of such list to select an arbitrator (this may be done by telephone for national level grievances). If the parties cannot mutually agree on one of the listed arbitrators, then the Department and the Union will alternatively strike one potential arbitrator's name from the list of seven and will then repeat this procedure until one name remains. The remaining person shall be the duly selected arbitrator. The parties will choose lots to determine who strikes the first name. Following the selection, the moving party will, within 14 calendar days, notify the FMCS of the name of the arbitrator selected. A copy of the notification will be served on the other party. The time limits may be extended by mutual consent.

B. The arbitration hearing date must be scheduled (not held) within six months from the date the arbitrator was selected or the grievance will be considered terminated. An exception to this time period will be made by mutual consent to extend the timeframes. Additionally, an exception will be made for inability on the part of the arbitrator to provide a hearing date. Should the Department refuse to participate in scheduling the arbitration within the time frames set forth in this article, the Union may unilaterally schedule the arbitration hearing date.

C. The procedures used to conduct an arbitration hearing shall be determined by the arbitrator. Both parties shall be entitled to call and cross-examine witnesses before the arbitrator. All witnesses necessary for the arbitration will be on duty time if otherwise in a duty status. On sufficient advance notice from the Union, the Department will rearrange necessary witnesses' schedules and place them on duty during the arbitration hearing whenever practical. Such schedule changes may be made without regard to contract provisions on Article 21 - Hours of Duty. A reasonable amount of preparation time for arbitration will be granted in accordance with the provisions of Article 48 - Official Time and local supplemental agreements.

D.  The arbitrator's fees and expenses shall be borne equally by the parties. If either party requests a transcript, that party will bear the entire cost of such transcript.

E.  For single station local grievances, the site normally will be the facility where the grievance exists. At the local union's request, another site may be designated upon mutual agreement. If another site is used, the local union will pay the cost of the site. For grievances at the national level, the Department and the NVAC President will communicate to work out a mutually agreeable site for the arbitration.

F.  The parties will attempt to submit a joint statement of the issue or issues to the arbitrator. If the parties fail to agree on a joint submission, each shall make a separate submission. The arbitrator shall determine the issue or issues to be heard.

G.  The arbitrator's decision shall be final and binding. However, either party may file an exception to the arbitrator's award in accordance with applicable law and regulations. The arbitrator will be requested to render a decision within 60 days. Any dispute over the interpretation of an arbitrator's award shall be returned to the arbitrator for settlement, including remanded awards.

H.  An arbitrator's award shall have only local application unless it was a national level grievance or the matter was elevated to the national level. Where it is mutually agreed between the NVAC President and the Department within 30 days after a local union has filed a notice for arbitration, an arbitration dispute will be elevated to the national level. The arbitrator has full authority to award appropriate remedies including reasonable legal fees pursuant to the provisions of Section 702 of the Civil Service Reform Act, in any case in which it is warranted.

**SA285**

# ARTICLE 45 - DUES WITHHOLDING

## Section 1 - Eligibility - Bargaining Unit Employees

Any bargaining unit employee may have dues deducted through payroll deductions. Such deductions will be discontinued only when the employee leaves the unit of recognition, ceases to be a member in good standing of AFGE, or submits a timely revocation form under the procedures of this article.

## Section 2 - Union Responsibilities for Bargaining Unit Employees

A.  The Union agrees to inform the Department, in writing, of the following:

   1.  The dues amount(s) or changes in the dues amount(s);

   2.  The names of the local union officials responsible for certifying each employee's authorization form, the amount of dues to be withheld, and changes in allotments; and,

   3.  The name and address of the payee to whom the remittance should be made.

B.  The local union agrees to promptly forward completed and certified form(s) to the appropriate administrative office.

## Section 3 - Department Responsibilities for Bargaining Unit Employees

A.  It is the responsibility of the Department to:

   1.  Process voluntary allotments of dues in accordance with this article and in amounts certified by the local union;

   2.  Withhold employee dues on a bi-weekly basis;

   3.  Transmit remittance to the local allottee designated by the Union in accordance with this article, as expeditiously as possible at the end of each pay period, together with two copies of a listing containing the following information:

      a.  The name of the employee and the anniversary date of the effective date of the dues withholding; and,

      b.  Identification of active employees for whom allotments have been temporarily stopped and identification of those which are a final deduction because of termination.

B.  Electronic transfer of funds is authorized for the transmittal of Union dues. Local unions who use this option shall continue to receive a hard copy of the current membership listing, dues deductions, and anniversary date each pay period.

**SA286**

C.  The Department will ensure that bargaining unit employees on dues withholding, who are reassigned from one VA facility to another but remain in the consolidated unit of recognition will continue on dues withholding. Upon arrival at the new station, the dues withholding will be remitted to the new local at the receiving station at the rate being withheld in the prior station until the appropriate office at the new station receives a notification of a change of rate from the designated local union official as described in the Section 2.

D.  In the event of a transfer or reassignment of a dues-paying member of the nationwide bargaining unit, within two weeks of entrance on duty (EOD) date, the Department will inform the receiving local union in writing of that employee's arrival and prior station.

E.  The Department agrees to withhold the union dues from a back pay award granted to an employee who was terminated and was on dues withholding at the time of a termination. The amount withheld from the back pay award will be calculated from the date of termination until the next anniversary date for dues withholding consistent with Section 6 of this article, unless the employee agrees in writing to authorize the dues withholding for the full period of termination. This authorization must be received before payment of the back pay award to the employee.

F.  The Department agrees to withhold union dues from a back pay award to an employee who was on dues withholding at the time of a suspension.

## Section 4 - Procedures for Withholding for Bargaining Unit Employees

Bargaining unit members wishing to have their dues withheld by payroll deduction will submit their completed SF-1187 to the local union-designated officials. These officials will certify the form and include the amount of dues to be withheld. The certified SF-1187 will be forwarded to the appropriate administrative office for processing. The deduction will become effective at the beginning of the first pay period that begins three or more workdays after the SF-1187 was submitted to the appropriate administrative office. Questions concerning whether an employee is in the unit of recognition and eligible for payroll deduction of union dues as a bargaining unit employee will be resolved through consultations between the Human Resource Manager or designee and local union officials and/or through a unit clarification petition. In the event a clarification of unit petition is filed, the employee's dues will be withheld pending a decision on the petition.

## Section 5 - Changes in Dues Amount for Bargaining Unit Employees

At any time there is a change in dues structure, the local will send a memorandum to the appropriate Department official noting the amount of the change. The new amounts will be deducted starting the next pay period following receipt by the

**SA287**

appropriate administrative office at least three workdays prior to the beginning of that pay period unless a later date is specified. The memorandum must be signed by one of the local union officials designated to certify dues withholding forms.

## Section 6 - Revocation for Bargaining Unit Employees

A. The local union is the authorized party that may provide an SF-1188, and must provide it to a union member upon request. The SF-1188 is also available on the OPM website. An employee may revoke dues withholding only once a year, by submitting a timely SF-1188 to the local union representative designated for such purpose. In order for the SF-1188 to be timely, it must be submitted to the local union during the 10 calendar days ending on the anniversary date of their original allotment. The local union representative must certify by date and signature the date the SF-1188 is given to the local union representative or by some other appropriate date stamping device.

B. The local union official will, by reference to the remittance listing, determine the anniversary date of the allotment. The ending date of the pay period in which the anniversary date occurs will be entered in Item 6 on the SF-1188. The entry will be initiated by the local union official, who will then deliver the form to the appropriate administrative office prior to the close of business of the Friday following the date entered in Item 6. If, through error of the Union, an SF-1188 is received in the appropriate administrative office later than the agreed-to date, the administrative office will process the form at the earliest possible time, but no later than the first pay period following receipt. Local union representatives will be on official time while receiving and processing the SF-1188.

## Section 7 - Continuation of Dues for Bargaining Unit Employees

A. When an employee is detailed or temporarily promoted out of the bargaining unit, local union dues withholding will restart automatically when the employee returns to the bargaining unit.

B. When an employee is detailed or by other personnel action placed in a bargaining unit position, the employee shall have all the rights of the bargaining unit, including the right of dues withholding.

C. Any time Department officials request the appropriate administrative office in writing to discontinue an employee's dues withholdings because the employee has left the unit of recognition (e.g., promotion or reassignment), a copy of such request shall be provided to the local union. Where a dispute arises over whether or not the person has left the unit, the procedures outlined in Section 4 will be used.

## Section 8 - Position Determination

When there is a dispute regarding a position being in or out of the bargaining unit that affects an employee who is on dues withholding, then the employee will remain on dues withholding. The parties will discuss the issue until a decision is reached, either through mutual agreement or the formal clarification of unit petition process.

## Section 9 - Costs

All payroll deductions and transmittals will be made at no cost to the Union.

**SA289**

# ARTICLE 46 - LOCAL SUPPLEMENT

## Section 1 - General

Contract provisions contained in Local Contracts/Supplements in existence prior to the Master Agreement will continue in effect insofar as they do not conflict with the Master Agreement. Whenever any subject is addressed in the Master Agreement, the terms of the Master Agreement shall prevail over the provisions of the Local Agreement concerning the same subject. Recognizing that the Master Agreement cannot cover all aspects or provide definitive language for local adaptability on each subject addressed, it is understood that Local Supplements may include substantive bargaining on all subjects covered in the Master Agreement so long as they do not conflict, interfere with, or impair implementation of the Master Agreement. However, matters that are excluded from Local Supplemental bargaining will be identified within each article.

## Section 2 - Procedures for Local Supplemental Agreement

A.  The parties agree that any time after this Agreement has been in effect for 30 days, the parties, upon the request of either local party, may negotiate a Local Supplement to this Master Agreement. The Local Supplemental Agreement may cover all negotiable matters regarding conditions of employment insofar as they do not conflict with the Master Agreement as defined in Section 1. The Local Supplement may include a provision for reopening. This is not intended to preclude local bargaining of items that are not covered by the Master Agreement, i.e., policies, procedures, and directives initiated at the facility level or national level.

B.  It is agreed that prior to implementation of any Local Supplement, the respective parties shall forward their agreement to VA Headquarters and the Union for review. The national parties shall review the Local Supplement within 30 calendar days of its receipt. In the event either of the national parties determines there exists a conflict with the Master Agreement, they shall forward a written document to the respective local union and the other national party identifying the conflict for resolution at the local level.

## Section 3 - Ground Rules For Negotiating Local Supplemental Agreements

In an effort to assist the local bargaining process, ground rules for bargaining Local Supplemental Agreements will include, but not be limited to, the following:

A.  Upon mutual agreement of the parties, bargaining over local supplements will be held utilizing an interest-based-bargaining (IBB) process. However, prior to initiating IBB, all bargaining team members must be trained in the IBB process. In the event the parties fail to mutually agree to utilize IBB, traditional bargaining will be used.

**SA290**

B.  The parties agree to establish a local negotiating committee consisting of an equal number of representatives of the local union and Department. Each party shall be represented by a Chief Negotiator. The parties further agree that all members of the Local Negotiating Committee will have the requisite authority to negotiate on behalf of their respective party. The negotiation process is the establishment of ground rules, face-to-face bargaining, preparation, facilitation, approved travel time, mediation, impasse, and third-party proceedings. The parties agree that all local union members of the negotiating committee will be on official time for the previously described negotiation process. Employee participation in this process will not in any way adversely affect their performance nor will they be held accountable for their full range of duties in addition to these activities. Neither party waives any legal rights.

C.  Each Chief Negotiator may approve attendance of alternates at Local Negotiating Committee sessions. The alternate will have the full rights, responsibilities, and authority of the Local Negotiating Committee member for whom they are substituting.

D.  The Department agrees to pay the travel and per diem for all local members of the Local Negotiating Committee pursuant to the Federal Travel Regulations.

E.  The Local Negotiating Committee will establish its bargaining schedule. The Department will ensure the availability of all Local Negotiating Committee team members

F.  In the event either party desires a facilitator, the parties must mutually agree upon the individual to serve as facilitator. When IBB is used, a facilitator will be used.

G.  If the Local Negotiating Committee has not reached agreement on a Local Supplement at the conclusion of the bargaining schedule, either party may use ADR or other methods, or elect to initiate impasse procedures. Moreover, neither party waives any rights regarding statutory impasse procedures.

H.  The parties agree that it is appropriate in establishing ground rules to include, among other things, physical location of bargaining, caucuses, subject matter experts, start date, official time, prep time, observers, IBB or traditional bargaining, number of people on each team, and administrative matters and materials.

**SA291**

# ARTICLE 47 - MID-TERM BARGAINING

## Section 1 - General

A. The purpose of this article is to establish a complete and orderly process to govern mid-term negotiations at all levels. The parties are encouraged to use an IBB approach in all mid-term negotiations and will ensure that negotiators are trained in this approach prior to the inception of bargaining.

B. Recognizing that the Master Agreement cannot cover all aspects or provide definitive language on each subject addressed, it is understood that mid-term agreements at all levels may include substantive bargaining on all subjects covered in the Master Agreement, so long as they do not conflict, interfere with, or impair implementation of the Master Agreement. However, matters that are excluded from mid-term bargaining will be identified within each article.

C. As appropriate, the Union may initiate mid-term bargaining at all levels on matters affecting the working conditions of bargaining unit employees.

## Section 2 - National

A. The Department will forward all proposed changes for which there is a bargaining obligation to the President of the NVAC or designee(s) along with copies of all necessary and relevant documents relied upon. When a new law is enacted and the Department decides not to issue a national policy, the Union will be notified prior to implementation.

B. If either party initiates a demand to bargain, briefings will occur within 20 workdays of the demand to bargain. Proposals will be submitted 20 workdays after the briefing. Any Union demand to bargain must be received by the designated Department official within 20 workdays from the date the NVAC President or designee receives the proposed change. The date of receipt shall be documented on a simple form agreed upon by both parties. Extensions or reductions of the 20 workday time period will be by mutual agreement.

C. The Department's bargaining obligation is triggered when the Union submits a bargaining demand. When the Union's bargaining demand is submitted, the parties will discuss the proposed change and share their interests and concerns.

D. The parties may first attempt to reach agreement by conducting telephone negotiations. In addition the parties will meet face-to-face quarterly. Such negotiations should normally begin no later than 10 workdays after the

Department chairperson receives the Union's demand to bargain. Telephone negotiations shall normally be for up to three hours per day, commencing at a mutually agreeable time on consecutive days unless concluded sooner.

E.  If the parties are unable to reach agreement, negotiations will normally proceed to face-to-face bargaining. When traditional bargaining is used, the Union's written proposal(s) will be submitted prior to bargaining. The parties retain the right to modify, withdraw, or add to any interests, concerns, or proposals they may have discussed or exchanged earlier.

F.  Bargaining sessions will be for 8-1/2 hour days at mutually agreeable times which include a break for lunch. However, the parties, by mutual agreement, may extend or shorten such bargaining sessions as necessary. The parties agree to utilize ADR mechanisms, as appropriate, without waiving either party's statutory rights.

G.  Each party may have up to four negotiators which by mutual agreement may be increased based on the complexity and/or number of issues to be negotiated. The parties will exchange the names of the bargaining team members for the specific issue(s) to be negotiated. This does not preclude the attendance of experts by mutual consent of the parties. Travel and per diem will be paid by the Department pursuant to the Federal Travel Regulations for bargaining team members. These members will be allowed official time to complete the bargaining obligation. An automated data base for existing and future memorandums of understanding will be established and maintained by the Department. This data base will be made accessible to both the national and local Union officials.

## Section 3 - Intermediate

The President of the NVAC or designee will provide the names of the bargaining team members for the specific issue(s) to be negotiated when the Union delegates national bargaining to the intermediate level. Ground rules for intermediate bargaining shall be established by the parties at that level.

The parties will make every effort to use bargaining team members from the geographic area of concern with travel and per diem for team members being paid by the Department.

## Section 4 - Local

A.  On all policies and directives or other changes for which the Department meets its bargaining obligation at the national level, appropriate local bargaining shall take place at individual facilities and may include substantive bargaining that does not conflict with negotiated national policy and

**SA293**

agreements. Upon request, the Union will be briefed on the proposed subject prior to the demand to bargain.

B.    Proposed changes in personnel policies, practices, or working conditions affecting the interests of one local union shall require notice to the President of that local. Proposed changes in personnel policies, practices, or working conditions affecting the interests of two or more local unions within a facility shall require notice to a party designated by the NVAC President with a copy to the affected local unions.

C.    Upon request, the parties will negotiate as appropriate. The Union representative shall receive official time for all time spent in negotiations as provided under 5 USC 7131(a).

D.    Ground Rules for local bargaining shall be established by the parties at the local level.

**SA294**

# ARTICLE 48 - OFFICIAL TIME

## Section 1 - Purpose

A. Official time as a necessary part of collective bargaining and related activities is in the public interest. The parties recognize that good communications are vital to positive and constructive relationships between the Union and the Department. These communications should facilitate and encourage the amicable settlement of disputes between employees and the Department involving conditions of employment and should contribute to the effective and efficient conduct of public business. They further recognize that this consolidated unit is very large and complex and requires Union coordination of its representational activities at several levels.

B. As provided in 5 USC 7131, official time shall be granted as specified in law and in any additional amount the Department and the Union agree to be reasonable, necessary, and in the public interest. Official time shall be granted for activities as specified in law and in amounts specified by this Agreement or otherwise negotiated. Official time shall be used for:

1. Handling grievances and other complaints;

2. Handling other representational functions; or,

3. Engaging in appropriate lobbying functions.

## Section 2 - Designated Union Officials/Representatives

A. Official time in the following amounts is authorized for each of these Union officials:

1. National VA Council President - 100%

2. Three National VA Council Executive Vice Presidents - 100%

3. National Treasurer - 50%

4. Fifteen District Representatives - 50%

5. Twelve Appointed National Representatives - 50%

6. Five Appointed National Safety and Health Representatives - 50%

These national Union representatives may designate a Union representative at their home station and transfer unused official time to that representative to perform the duties of the position for which official time is authorized.

B.  When the Union assigns individual(s) who are not subject to a national or local 100% official time allocation to participate on a national task force or committee, the Department will afford such individual(s) official time for preparation, travel, and participation related to such assignment. VA Central Office (VACO) LMR will work with local facilities to obtain the time as needed. This time will come from the bank of hours described below, if the employee is not otherwise on 100% official time. Should the bank of hours become unavailable, the Department will authorize the time to participate.

C.  Two members of the VA Mid-Term Bargaining Committee and two members of the VBA Mid-Term Bargaining Committee will be on 100% official time. VACO LMR will work with local facilities to obtain the time as needed for three other members of each committee, who will be allowed official time while preparing for, traveling and participating in activities related to each mid-term bargaining issue.

D.  The Union will provide the Department with a listing of the National Union Officers, District Representatives, National Representatives, and National Safety and Health Representatives so that each local facility may be informed. The Union will also provide a timely notice of any change in National Union representatives.

E.  Travel and per diem is authorized for National Union Officers, District Representatives, National Representatives, and National Safety and Health Representatives in connection with the semiannual meetings described in Article 5 - Labor Management Committee. Travel and per diem is also authorized as provided elsewhere in this Agreement or where otherwise agreed to by the parties or where required by law, rule, or regulation.

F.  When Union officials visit a facility other than where they are employed for the purpose of engaging in representational activities, they will notify the Department prior to their visit. The Department will notify the Union of any scheduling problems connected with the visit and the parties will attempt to work out a suitable arrangement.

G.  In addition to the above official time, the Union shall have a bank of hours from which to draw in order to have subject matter experts, administrative support during negotiations, support for national grievances, labor-management collaboration support, special projects and Department initiatives, etc. The President of the NVAC shall assign the time in no less than one hour increments. There shall be a one-time 25,000 hours for the first calendar year in which this agreement is in effect. Any hours remaining at the end of that calendar year shall carry-over until depleted. Prior to the use of this official time, VACO LMR and the Union will develop a tracking accountability system for the bank of hours within 30 days after the effective

SA296

date of this Master Agreement. VACO LMR and the NVAC President may arrange for additional hours to be added to the bank after the first contract year.

## Section 3 - Accumulated Official Time

Official time authorized for National Union representatives may be used as needed; however, upon request, the Union representatives will be advanced official time from future time accrual for that leave year. Any time not used during any pay period will be accumulated for the remainder of the leave year. Any time that was not used as needed by the end of the leave year will not be carried over to the next leave year.

## Section 4 - Additional Time Allotted

Time spent in connection with national bargaining and LMR Committee meetings shall not be charged against other official time allotted.

## Section 5 - Travel to Other Locations

A.  Once official time is authorized for a specific function that requires travel outside a Union representative's duty station, the representatives will be permitted to leave the facility to discharge their functions after notifying their respective supervisor of their destination, expected return date/time, and the category of representational activity involved. The categories are:

   1.  Negotiation of term collective bargaining agreements;

   2.  Negotiating changes to conditions of employment;

   3.  Dispute resolution; and/or,

   4.  General labor-management relations.

B.  Where travel to another location within the jurisdiction of a local union is necessary for representational activities consistent with the provisions of this Agreement, and the transportation is otherwise being provided to the location for official business, the Union will be allowed access to the transportation on a space-available basis and also authorized official time for travel. Personal transportation expenses (POV, mileage, etc.) will be reimbursed to the extent permitted by Federal Travel Regulations.

## Section 6 - Other Activities

A.  For the following matters, union representatives will be on official time:

   1.  All activities related to Labor-Management Committees (Forums);

   2.  Quality Program;

**SA297**

This official time will not be counted against any allocated official time as described in this agreement.

    B.   A union official who is designated as an employee's personal representative will be on duty time when preparing or presenting appeals to the MSPB and handling discrimination claims under EEOC procedures.

## Section 7 - Performance Evaluation

The use of official time, in accordance with this Agreement, will not adversely affect an employee's performance evaluation.

## Section 8 - Substitutions

The Union may substitute a retired VA employee for the designees at national LMR meetings or Department initiatives. The Department will provide travel and per diem, in advance, for that retired employee if they do not have a Department-issued credit card.

## Section 9 - Allegations of Abuse

Alleged abuses of official time shall be brought to the attention of an appropriate Union official and to an appropriate Department official on a timely basis by supervisors and Department officials. The Department official will then discuss the matter with the Local or NVAC president as appropriate.

## Section 10 - Local

    A.   Every local union will receive an allotment of hours equal to 4.25 hours per year for each bargaining unit position represented by that local union. Each VHA and VBA local union is entitled to a minimum of 50% official time. Each NCA local union is entitled to a minimum of 25% official time. Where a local represents employees at a CBOC, Consolidated Mail Out Pharmacy (CMOP), clinic, service center, or successor, at a duty station greater than 50 miles from the facility, that local union will be allotted 25% official time at that duty station.

    B.   There shall be no reduction in the official time allocation due to a merger. When mergers occur, the official time carried over from the local union's allocation shall not be less than the combined total of the local union's allocation prior to the merger.

    C.   For local unions already above the minimum amount of official time described above, existing local agreements and past practices regarding official time on the effective date of this Master Agreement shall continue in full force and effect.

**SA298**

1. Local unions that are above the 4.25 will not be able to receive an increase in official time until the number of bargaining unit employees has increased to the level where they are entitled to have an allocation equal to the 4.25 per bargaining unit employee

2. Local unions that are below the 4.25 minimum shall receive their increase in official time allocation no later than 60 days after this Agreement is effective. The allocation shall be based on the number of bargaining unit employees represented by the local union on the date this Agreement is effective.

3. The calculation period to determine the number of bargaining unit members represented by a local union is every six months after this Agreement is in effect.

D. The minimum amounts of official time described in Paragraph A in this Section are not intended to limit the amount of official time that can be negotiated by the parties locally.

E. Where arrangements for transfers of official time among Union representatives are not in effect, they can be negotiated locally.

**SA299**

# ARTICLE 49 - RIGHTS AND RESPONSIBILITIES

## Section 1- Introduction

The Parties recognize that a new relationship between the Union and the Department as full partners is essential for reforming the Department into an organization that works more efficiently and effectively and better serves customer needs, employees, Union representatives, and the Department.

## Section 2 - Rights and Responsibilities of the Parties

A. In all matters relating to personnel policies, practices, and other conditions of employment, the parties will have due regard for the obligations imposed by 5 USC Chapter 71 and this Agreement, and the maintenance of a cooperative labor-management working relationship.

B. Each party shall recognize and meet with the designated representative(s) of the other party at mutually agreeable times, dates, and places that are reasonable and convenient.

C. The Department supports and will follow statutory and contractual prohibitions against restraint, coercion, discrimination, or interference with any Union representative or employee in the exercise of their rights.

## Section 3 - Union Representation

The Union will be provided reasonable advance notice of, be given the opportunity to be present at, and to participate in any formal discussion between one or more representatives of the Department and one or more employees in the unit or their representatives concerning any grievance, personnel policy or practice, or other general condition of employment. The Union will also be allowed to be present and represent a unit employee at any examination by a representative of the Department in connection with an investigation if the employee reasonably believes that the examination may result in disciplinary/adverse action/ major adverse action against the employee and the employee requests representation.

## Section 4 - Notification of Changes in Conditions of Employment

A. The Department shall provide reasonable advance notice to the appropriate Union official(s) prior to changing conditions of employment of bargaining unit employees. The Department agrees to forward, along with the notice, a copy of any and all information and/or material relied upon to propose the change(s) in conditions of employment. All notifications shall be in writing by U.S. mail, personal service, or electronically to the appropriate Union official with sufficient information to the Union for the  purpose of exercising its full rights to bargain. The Department will work with the Union to identify

**SA300**

and provide specific training and equipment to address concerns related to the use of technology, to include the sending and receiving of electronic communications.

B.   The Department will provide the Union specific training and equipment to address concerns related to the sending and receiving of electronic communications. This will include the following:

1.   Use of technology;

2.   The sending and receiving of encrypted and unencrypted electronic communications;

3.   Validating date send receipt;

4.   E-signature date;

5.   Read receipt; and,

6.   Setting up printer capability(ies).

The parties agree that they will not utilize technological features that allow messages to expire.

C.   For the purposes of this section, the following definitions will apply:

1.   Electronic Record means a record created, generated, sent, communicated, received, or stored by electronic means.

2.   Electronic Signature means an electronic sound, symbol, or process attached to or logically associated with a record and executed by a designated person with the intent to sign the record upon receipt.

D.   The electronic record will be able to be retained, printed, accurately reflect the date, time and information set forth in the record when it was first generated, and must remain accessible for later reference for compliance with this Agreement.

E.   Each Union official/representative and current local union President or a local union President upon assuming office may designate Union representatives to receive face-to-face training. Designated Union representatives may request and receive additional training. U.S. Mail or personal service shall be the method used by the parties as the form of communication until the training has been successfully completed.

F.   For the purposes of this section, signature or e-signature is considered the time frame for receipt by either party.

Department of Veterans Affairs Labor Management Relations | DVA /AFGE Master Agreement

**SA301**

## Section 5 - Information

If the Union makes a request under 5 USC 7114(b)(4), the Department agrees to provide the Union, upon request, with information that is normally maintained, reasonably available, and necessary for the Union to effectively fulfill its representational functions and responsibilities. This information will be provided to the Union within a reasonable time and at no cost to the Union.

## Section 6 - Notification of Union Officials

The Union will annually provide the Department at each facility with an updated list of the names, titles, and work telephone numbers of all Union officials along with the room/location of the Union office and representatives as well as changes as they occur. The Department agrees to disseminate the list to all bargaining unit employees within 30 days after its receipt. The Department agrees to provide all new hires with a copy of the list when they enter on duty.

## Section 7 - Union-Employee Communication

The Department will not alter or censor the content of any direct communications between the Union and employees. However, Department facilities may not be used for posting or distribution of libelous or defamatory material directed at Department or Union officials or programs.

## Section 8 - Surveys and Questionnaires

A.  The Department will not communicate directly with bargaining unit employees through verbal or written surveys and questionnaires regarding conditions of employment without prior notification to the Union and bargaining where appropriate. This includes all questionnaires and surveys from all other agencies. Nothing in this section precludes the Union from the right to bargain over conditions of employment under the 5 USC Chapter 71.

B.  Participation in surveys will be voluntary, unless the parties agree to require participation. Employees will be assured that their responses will be confidential and their anonymity protected, unless the parties agree otherwise.

C.  The results of surveys conducted by either party regarding conditions of employment will be shared. If a third party conducts a survey and the results are distributed to the Department, the results will be shared with the Union.

## Section 9 - New Employee Orientation

The parties are encouraged to make a joint presentation to new employees to orient them about the Department and the Union. If the Union desires to make a presentation on its own, the Union will be afforded the opportunity to make a 30

SA302

minute presentation during each orientation session for new employees. The Union will be provided the same respect and dignity as other presenters and will not be subjected to intimidation or censure. The Department will provide the Union with notice of the date, time, and place of the orientation. The scheduled starting time of the Union presentation will be a subject for local negotiations. The Union official making the presentation will be allowed official time to make the presentation. This official time will not be counted against any allocated official time as described in this agreement. Stewards or Union officers may introduce themselves to new employees at the worksite and inform them of their availability for representation functions so long as there is no undue disruption of work activities.

## Section 10 - Voluntary Programs

The parties shall provide each other reasonable advance notice of the initiation or discontinuance of all voluntary programs such as bond campaigns, blood programs, fund drives, etc. When requested, appropriate bargaining will be held. The parties agree that employee participation in the Combined Federal Campaign, blood donor drives, bond campaigns and other worthy projects will be on a voluntary basis. This does not preclude publicizing such projects and encouraging employees to contribute.

## Section 11 - Exit

A.  The local union will be on the clearance check list in use at each facility for bargaining unit employees who are leaving employment at the facility.

B.  All information from exit interviews shall be provided to the Union. This information will be provided on a quarterly basis nationally, and if aggregated on a local level (that is, ten or more employees' data is collected), the local union is also entitled to this specific information.

C.  The Union will be provided a copy of Gains and Losses (G and L) for each pay period for bargaining unit employees.

**SA303**

# ARTICLE 50 - SURVEILLANCE

A. The parties recognize that surveillance is conducted for safety and internal security reasons.

B. If the Department uses "covert" or "hidden" electronic camera surveillances during an investigation, the following shall apply if a disciplinary/adverse action is proposed against an employee represented by the Union:

1. The Union will be given a copy of all relevant evidence collected;

2. The Union will be provided a copy of the pertinent video tapes; and,

3. The Union will be allowed to represent affected employees in any subsequent discussions or proceedings involving them.

C. The local union is not precluded from any further negotiations on the impact and implementation of covert or hidden electronic camera surveillances.

**SA304**

# ARTICLE 51 - USE OF OFFICIAL FACILITIES

## Section 1 - Union Office Space

A. The Department recognizes the importance and value of the Union's mission and purpose. Accordingly, the Department agrees to furnish office space to the Union appropriate for carrying out its representational and partnership duties in locations easily accessible to employees and private citizens and of size, furnishings, and decor commensurate with other administrative offices within the facility. Office space shall be sufficiently private to ensure confidentiality to the maximum extent possible. The office(s) shall be of sufficient size for necessary storage of confidential materials.

B. Each office shall be equipped with adequate telecommunication lines for most advanced telecommunications technology used by the Department, fax, and computer capabilities equal to those used in the top-level administrative offices in the facility. The Department shall authorize and thereafter install or permit the installation of private data lines (high speed internet) and private phone lines.

C. The Department shall provide to National Union Officers, District Representatives, National Representatives, National Safety and Health Representatives, and other Union representatives, separate space, equipment, etc., as provided in this article.

## Section 2 - Meeting Space

The Department will, on an as-needed basis, provide conference rooms as available for discussions between employees and Union officials. The Department will also provide suitable space for regular Union meetings. The Union agrees to exercise reasonable care in use of such space.

## Section 3 - Telephone

The Department will make internal telephones and government long distance service available to the Union for handling representational duties and conducting labor-management relations. The Union will use government long distance service in a reasonable, prudent, and cost-conscious manner.
Telephones provided to the Union shall have voice mail and speaker phone capabilities for representational and labor-management activities. In no instance will government long distance service be used for internal Union business.

**SA305**

## Section 4 - Equipment and Technology

A.  The Department will provide to each Union office the following:

1.  Fax machine;

2.  Personal computer with standard software, programs, and capabilities compatible with the Department's technology (examples of capabilities to be included are the ability to write to storage media, to host net meetings, and to run programs on storage media that contain audio and video files);

3.  Color printer;

4.  Remote access to the local area network (LAN);

5.  Remote access to the Department intranet;

6.  Access to e-mail, internet, intranet, and Departmental administrative functions (such as mail distribution lists, employee time and leave menu, etc.) in the Union office;

7.  Photocopier equal to administrative office level in the Union office and access to high-volume production equipment in the facility;

8.  Additional equipment may be negotiated locally;

9.  Additional equipment can be provided consistent with VA Handbook 6500 and current MOU.

B.  It is understood that technology is being provided with an expectation that increased efficiencies will be realized for both the Department and the Union. It is expected that the Union will utilize such equipment and technology to communicate with and receive notices from the Department as provided elsewhere in this Agreement. The above list of equipment is not intended to be all-inclusive. As new technology becomes available, equipment/ software/ programs used by administrative office level officials shall be made available to the Union in a time frame consistent with availability with other administrative offices. Within 90 days after receipt of technology or equipment, the Department will work with the Union to identify and provide specific training to address concerns related to the use of technology to include security, reliability, and appropriateness of use. Nothing herein is intended to impact or change the provisions of any other article in this Agreement.

C.  Maintenance, shuttle service (where available), and other customary and routine services and equipment, such as the telephone conferencing (currently Veterans Affairs National Telecommunications System (VANTS)) shall be provided to the Union office. Video conferencing/Live Meeting or successor systems shall be provided to the NVAC President's Office. The Department will make the public address system available to the Union for appropriate use.

**SA306**

D.   The Department agrees to provide, if requested, a link to the AFGE National Office, Union, and local union websites on the LMR pages of both the Department's intranet and the internet sites.

## Section 5 - Bulletin Boards

At each facility, the Union shall be provided bulletin boards in areas normally used to communicate with employees. Numbers and location of bulletin boards will be negotiated locally.

## Section 6 - Interoffice Mail System

The local and its representatives may use the interoffice mail system for regular representational communications (e.g., grievances, correspondence or memos to the Department).

## Section 7 - Metered Mail

Consistent with postal regulations, the Union shall have use of Department metered mail limited to representational matters. Mass mailings are inappropriate under this Section. Mass mailings by the Union on representational matters to the local unions and other Union national representatives is appropriate.

## Section 8 - Membership Drives

The Department agrees to provide adequate facilities for membership drives at locations that will provide access to unit employees during break and lunch periods. Detailed arrangements will be negotiated at the local level. At a minimum, the Union will be given the use of facilities at least equal to that provided to other organizations/ vendors or Department sponsored functions. The Department agrees that the Union may access employee meal or break areas during membership drives.

## Section 9 - Personnel Regulations and Policies

A.   The Department shall timely furnish the NVAC President and each local union a bound copy of 5 USC, 38 USC, 5 CFR, and 38 CFR, and access to or copies of Department Directives, Circulars, Handbooks, and equivalent successor documents. These publications shall be updated when such changes are reissued. Local Presidents will be advised of the Uniform Resource Locator (URL) to obtain the same information annually and when the URLs change.

B.   The Department shall provide the local union access to or hard copies of all labor management materials that do not constitute internal labor-management guidance and that are currently provided to HR and LR at each facility.

**SA307**

C.   The Union and each local union shall be provided access to or copies of, at no charge, Department personnel manuals, including classification standards.

## Section 10 - Transportation

A.   Where travel to another location within the jurisdiction of a local union is necessary for representational activities consistent with the provisions of this Agreement, the local union will be provided transportation on a space-available basis.

B.   When a Union representative uses a POV because of the unavailability of a government owned vehicle, travel reimbursement will be pursuant to travel regulations if the activity is pre-approved.

C.   Associated per diem and other matters concerning transportation are appropriate subjects for local bargaining.

## Section 11 - Literature

A.   The Department will provide space for the purpose of distributing Union material. The space will be in prominent locations as agreed upon locally.

B.   The distribution of literature will be permitted provided it is done during non-duty hours of the distributor and does not interfere with the mission of the Department.

## Section 12 - Access to Agreement

A.   The Department will provide to each employee on duty as of the date of this Agreement and to all unit employees entering on duty after that date at no cost, booklet copies of this Agreement, printed in type that can be read easily.

B.   The Department will initially provide the Council with 250 additional copies and each local with 20 additional copies of the Agreement.

C.   The Department will provide, at no cost to the Union, copies of supplemental agreement(s) sufficient to distribute to each employee in the unit covered by the supplemental agreement(s).

D.   The parties will survey the need to translate the Agreement into other languages and take appropriate action.

E.   The contract will be made available to employees on disc, compatible with the Department's computer system.

**SA308**

F.  The Department will provide sufficient advance copies of this Agreement for ratification purposes.

G.  This Agreement will be made available online on VACO LMR website.

**SA309**

# ARTICLE 52 - TITLE 38 ADVANCEMENT

A.  Compensation for all advancements will be made within two pay periods from the effective date of the advancement.

B.  Notice of decisions on advancement shall be communicated in writing within 10 workdays of the action taken.

C.  Supervisors shall monitor and review performance in order to determine progress or problems and to provide employees with information concerning performance. Discussions about performance will be held as often as needed, as determined by the employee and the supervisor.

# ARTICLE 53 - CLINICAL RESEARCH

A.  The parties recognize the benefits of participation in clinical research projects.

B.  The Union will be notified prior to implementation of any clinical research that impacts working conditions of bargaining unit employees.

C.  Participation in research projects will be voluntary, consistent with staff rights/ policy and the Department's right to assign work. Employees will receive training and written instructions regarding the intent and requirements of the research project prior to implementation.

D.  Staff involved in clinical research may be recognized for their participation/ contribution to the project by the annual performance evaluation and other means; for example, monetary awards, acknowledgment in papers.

**SA311**

# ARTICLE 54 - TITLE 38 NURSE PAY/SURVEY

## Section 1 - Nurse Pay Survey

A. The Union will have a mutually agreed upon representative on each Title 38 nurse pay survey team.

B. The selection of the discretionary facilities to be surveyed will be a subject for partnership.

C. In accordance with 38 USC 7451 and Department regulations, Title 38 nurse pay surveys shall be limited to the labor market area or other areas as authorized by regulations.

D. Surveys shall be done consistent with the provisions of 38 USC 7451 and Department regulations.

E. In gathering data in accordance with 38 USC 7451, and wherever feasible, survey data for Title 38 nurse pay surveys shall be collected based on on-site visits.

## Section 2 - Adjustments to Pay

A. In accordance with 38 USC 7451 and Department regulations, any adjustments in Title 38 nurse pay shall be examined on an annual basis whenever adjustments are made in General Schedule pay.

B. Whenever an adjustment in Title 38 nurse pay is delayed due to administrative error, a nurse shall be retroactively compensated for any lost salary.

## Section 3 - Premium Pay

A. Evening - In accordance with 38 USC 7453(b), a nurse performing service, any part of which is within the period beginning at 6 pm and ending at 6 am, shall receive additional pay for each hour of service at a rate equal to 10 percent of the nurse's hourly rate of basic pay if at least four hours fall between 6 pm and 6 am. When less than four hours fall between 6 pm and 6 am, the nurse shall be paid the differential for each hour of service performed between those hours.

B. Weekend - In accordance with 38 USC 7453(c), a nurse performing service, any part of which is within the period commencing at midnight Friday and ending at midnight Sunday, shall receive additional pay for each hour of service at a rate equal to 25 percent of such nurse's hourly rate of basic pay.

**SA312**

C.  Federal Holiday - In accordance with 38 USC 7453(d), a nurse performing service on a holiday designated by Federal statute or Executive Order shall receive for each hour of such service the nurse's hourly rate of basic pay, plus additional pay at a rate equal to such hourly rate of basic pay, for that holiday service, including overtime service. Any service required to be performed by a nurse on such a designated holiday shall be deemed to be a minimum of two hours in duration.

D.  Overtime - In accordance with 38 USC 7453(e)(I), a nurse performing officially ordered or approved hours in excess of 40 hours in an administrative work week, or in excess of 8 hours in a day, shall receive overtime pay for each hour of such additional service. The overtime rates shall be one and one-half times such nurse's hourly rate of basic pay. For further clarification, see Article 21 - Hours of Work and Overtime (Alternative Work Schedules).

E.  Compensatory Time - In accordance with 38 USC 7453(e)(3), compensatory time off in lieu of pay for service performed under the overtime provisions of Title 38 shall not be permitted unless voluntarily requested in writing by the nurse in question.

F.  On-Call Duty - In accordance with 38 USC 7453(h), a nurse who is officially scheduled to be on call outside such nurse's regular hours or on a holiday designated by Federal statute or Executive Order shall be paid for each hour of such on-call duty, except for such time as such nurse may be called back to work, at a rate equal to 10 percent of the hourly rate for overtime service (i.e., 15 percent of the hourly rate of basic pay).

**SA313**

# ARTICLE 55 - VHA PHYSICIAN AND DENTIST PAY

## Section 1 - General

A.  Compensation is excluded from negotiation under 38 USC 7422. Physician and dentist pay in the VHA is governed by Title 38 of the United States Code and VA Handbook 5007, Part IX. The Handbook is available by accessing the following link on the VA intranet and clicking on Directives and Handbooks: http://vaww1.va.gov/ohrm/HRLibrary/HRLibrary.htm

B.  The following language in Sections 2 through 3 is purely for informational purposes and is not itself subject to collective bargaining or grievable under the negotiated grievance procedure. The Secretary's pay policies will control this matter.

## Section 2 - Definitions

For informational purposes the Department provides the following references for definitions related to physician pay. It should be noted that the entirety of the definitions are found in VA Handbook 5007 Part IX:

A.  Aggregate Pay:
    The sum of all payments made to a physician or dentist in a calendar year exclusive of lump sum annual leave, reimbursement of travel, backpay, and severance. Physicians and dentists appointed under 38 USC 7305, 7306, 7401(1), and 7405(a)(I)(A) may not be paid aggregate compensation in a calendar year higher than the annual pay (excluding expenses) received by the President of the United States.

B   Annual Pay:
    The sum of base pay rate and market pay. Annual pay is basic pay only for purposes of computing:

    1.  Civil service retirement benefits;

    2.  Lump sum annual leave payments;

    3.  Life insurance;

    4.  Thrift savings plan;

    5.  Work injury compensation claims;

    6.  Severance pay;

    7.  Recruitment;

    8.  Relocation;

9.  Retention incentives;

10. Continuation of pay; and,

11. Advances in pay.

C.  <u>Base and Longevity Pay:</u>
A table consisting of 15 rates designated as steps 1 though 15. Physicians and dentists advance on the table at the rate of one step for every two years of VHA service.

D.  <u>Basic Pay:</u>
The rate of pay fixed by law or administrative action for the position held by an employee before any deductions and exclusions of additional pay of any kind (e.g., market pay, performance pay, recruitment incentive etc.) as prescribed under 38 USC 7431. However, annual pay is basic pay only for purposes of computing:

1.  Civil service retirement benefits;

2.  Lump sum annual leave payments;

3.  Life insurance;

4.  Thrift savings plan;

5.  Work injury compensation claims;

6.  Severance pay;

7.  Recruitment;

8.  Relocation;

9.  Retention incentives;

10. Continuation of pay; and,

11. Advances in pay.

E.  <u>Longevity Step Increase:</u>
Advancement to the next higher step of the grade based upon completing the required waiting period of two years (104 weeks) of creditable service,

F.  <u>Market Pay:</u>
A component of basic pay intended to reflect the recommitment and retention needs for the specialty, or assignment of a particular VHA physician or dentist.

G.  Performance Pay:
A component of compensation paid to recognize the achievement of specific goals and performance objectives prescribed on a fiscal year basis by an appropriate management official. Performance pay is paid as a lump sum.

H.  Tier:
A level within the annual pay range for an assignment or specialty.

## Section 3 - Pay Components

A.  Base Pay:
The Longevity pay schedule contains 15 rates of base pay, designated as steps 1 through 15. The rates of pay that correspond to each step are published annually on the Labor-Management Relations web site. The location is http://www1.va.gov/lmr/. The base pay rate payable to a physician or dentist is determined by the number of total years of service the physician or dentist has worked in VHA as reflected by their VA service date. At the same time as rates of basic pay are increased for a year under 5 USC 5303, the Secretary shall increase the amount of base pay payable under this subsection for that year by a percentage equal to the percentage by which rates of basic pay are increased under such section for that year. Longevity step increases (LSI) will be granted to physicians and dentists that are receiving less than the maximum step (Step 15). If such an increase would cause the employee's annual pay (sum of base and market pay) to exceed the amount of annual pay (excluding expenses) received by the President of the United States as specified in 3 USC 102, the employee will only receive the portion of the increase that does not exceed the annual limitation.

B.  Effective Date:
Longevity step increases are effective on the first day of the first pay period following completion of the required waiting period. When a step increase is delayed beyond its proper effective date solely through an administrative error or oversight, the step increase shall be made retroactively effective as of the date it was properly due.

C.  Market Pay:
Each VHA physician and dentist is eligible for market pay. Market pay is intended to reflect the recruitment and retention needs for the specialty or assignment of a particular physician or dentist at a Department facility.

D.  At least once every two years, the Secretary prescribes nationwide minimum and maximum amounts of annual pay (base pay and market pay). These amounts are published in the Federal Register for not less than 60 days prior to the effective date. In determining pay ranges at least two or more national surveys of pay for physicians and dentists are consulted. National surveys

**SA316**

consulted include data that describes overall physician and dentist income by specialization or assignment and benefits in broad geographic scope. Annual pay ranges approved by the Secretary are available on the Office of Human Resources Management (OHRM) web site, http://vaww1.va.gov/ohrm/Classification/Classification.htm

E.  For informational purposes, when the Department increases the nationwide minimum and/or maximum amounts of annual pay under this paragraph, physicians and dentists are not automatically entitled to a corresponding increase in their individual annual pay rates. Only physicians and dentists whose existing rate of annual pay falls below the newly prescribed nationwide minimum for their designated pay range will automatically receive an increase in market pay to make their annual pay rate equivalent to the new nationwide minimum.

F.  There may be up to four tiers of annual pay for each specialty or assignment for which a separate range of pay has been approved. Each tier reflects different professional responsibilities, professional achievements, or administrative duties. The two tier definitions, that are typically designed for bargaining unit positions for the annual pay ranges established for individual clinical specialty schedules are as follows:

    1.  Tier 1 Staff

    2.  Tier 2 Service chiefs, section chiefs and other supervisors or program managers.

G.  Compensation Panels recommend the appropriate pay table, tier level and market pay amount for individual physicians and dentists. The Compensation Panel(s) are also responsible for evaluating the market pay and tier of each physician and dentist under its jurisdiction at least once every 24 months and at such other times deemed necessary by the appropriate Department official. A change in duty basis (i.e., to/from full-time, part-time, or intermittent) will also require a re-evaluation of the market pay and tier by the Compensation Panel. Additionally, if it is anticipated that a change in assignment may result in a market pay or tier change, the Compensation Panel must be consulted.

H.  The Compensation Panel recommendations are taken into consideration by the appropriate approving official. The approving official determines the amount of market pay to be paid a physician or dentist after consideration of the range and tier recommended by the Panel. The approving official's decision is final.

I.  The Compensation Panel will recommend the following to the approving official in regard to the pay for individual physicians or dentists:

    1.  The appropriate specialty or assignment pay schedule;

    2.  The appropriate tier for the physician or dentist using the tier definitions;

**SA317**

3. A rate or an appropriate range of market pay for a physician or dentist, considering the nationwide minimum and maximum amounts of annual pay prescribed by the Secretary for the specialty or assignment.

J.  Compensation Panels:

1. Composition of Panels - Each panel is comprised of at least three physicians one of whom is designated as chairperson. Compensation Dentists Panels are comprised of two dentists. Panel members must be in a tier equal to or higher than the tier for which the physician or dentist is being considered.

    a.  Pursuant to 38 USC 7431(c)(4)(B)(iii):
        "The Secretary should, to the extent practicable, ensure that a panel or board consulted under this subparagraph includes physicians or dentists (as applicable) who are practicing clinicians and who do not hold management positions in the medical facility of the Department at which the physician or dentist subject to the consultation is employed."

    b.  When the Network Director or Facility Director solicits physicians to serve on the Compensation Panel, the Director should also include written notice for recommendations from the local union or VISN labor-management forums.

    c.  Upon request, the local union will receive notification and information on who currently serves on the local and network physician Compensation Panels and the expected term.

    d.  If the Facility or Network Director denies a physician eligibility to be a member based on the physician being a union representative, they should do so in writing. The notice shall include the rationale.

2. At least once every 24 months, the market pay of each physician and dentist is reviewed by the appropriate Compensation Panel in accordance with the criteria noted in VHA Handbook 5007 and Title 38 such as:

    a.  Experience in assignment or specialty;

    b.  The need for the specialty;

    c.  Health care labor market for the specialty;

    d.  Board certifications;

    e.  Accomplishments; etc.

3. Each physician and dentist will be provided a written notice of the results of the review, even if the review does not result in a pay adjustment. The VA Compensation Panel form VA 10-0432A will serve as the written notice.

K. Reconsideration:

1. If a physician or dentist believes that their tier determination is improper based on the nature of their assignment, the employee may submit a request for reconsideration to the official that approved the tier recommendation. The market pay amount authorized by the approving official is a final decision. However, employees may request reconsideration of a tier determination.

2. The request for reconsideration must be submitted in writing within 30 days of the end of the pay period in which the notice was received. The request must cite why the employee believes that their tier determination is inappropriate. If the request is referred to a Compensation Panel, the approving official will consider and record their decision and copy the employee. If the approving official determines that review by the Compensation Panel is not necessary, the employee will be notified of the decision in writing.

L. Changes in Assignment:

1. Same facility or to a different facility:
   If an assignment is involuntary, the Department may offer retention of market pay if a reduction would be against equity and good conscience or against the public interest.

2. Temporary Assignments and Details:
   Pursuant to VHA Handbook 5007, individuals temporarily assigned to a position with a different pay range or tier may receive a market pay adjustment after serving in the assignment for 90 days or more. Temporary assignments and details that result in a change in market pay must be documented and may not result in a reduction of an individual's existing market pay rate. Upon termination of a temporary assignment or detail, an individual's market pay is returned to the amount payable prior to the temporary assignment or detail.

M. Change in Duty Status:
   When a physician converts from part-time to full-time, or from full-time to part-time they will retain their step on the base and longevity pay scale. However, the market pay and tier are re-evaluated by the Compensation Panel. The employee who contemplates such voluntary decision shall have the right to have a written advisory opinion from the Compensation Panel of the possibility of such market reduction, prior to making this personnel decision.

N. Notice Requirements:
   Physicians and dentists must be notified in writing when an involuntary assignment in connection with a disciplinary action will result in a reduction in market pay. The notice must be provided at least 30 days in advance of the

**SA319**

effective date of the reduction, and include the amount of the reduction, and any appropriate appeal rights with regard to the new assignment. The local union will be notified of any involuntary assignments as related to reduction of market pay and local union representation.

O.   Performance Pay:
Physicians and dentists must be advised of the specific goals and objectives that will be measured in determining their eligibility for performance pay and the maximum monetary value associated with those goals and objectives. These goals and objectives and the maximum amount of performance pay available in connection with achieving the specified goals and objectives should be communicated by an appropriate Department official to the individual physician or dentist within 90 days of the beginning of the fiscal year. For the fiscal year that starts on October 1st, this date is July 3rd. Physicians and Dentists hired after July 1st are not eligible for performance pay per the Department's regulations. The amount is determined solely at the discretion of the approving official based on the achievement of the specified goals and objectives and is paid annually as a lump sum. Performance goals and objectives are generally developed locally and will differ from performance standards used for the Executive Career Field or proficiency rating systems.

P.   As related to their representational duties, required under 38 USC 7433(a), the local union, upon request, will be forwarded copies of sanitized versions of performance pay goals and objectives and associated pay amounts. For informational purposes, performance pay for a physician is not construed as "award" monies designated under Article 16 - Employee Awards and Recognition.

Q.   Title 38 employees covered by this chapter are entitled to back pay under this chapter if an appropriate authority finds that an unjustified or unwarranted personnel action resulted in the withdrawal, reduction or denial of all or a part of pay, allowances or differentials otherwise due the employee. This includes, among other things, basic pay for physicians and dentists. Basic pay includes the market pay component, additional pay, premium pay, leave, cost-of-living allowances, and post differentials. The appropriate authority is typically the official having authority to approve the applicable personnel action. Network Directors and VHA equivalents may authorize backpay for employees occupying non-centralized positions in their organizations.

## Section 4 - Labor Input into Biennial Review of Pay Ranges

In accordance with 38 USC 7431(e)(1)(A), the Secretary must prescribe minimum and maximum amounts of annual pay for VHA physicians and dentists not less than every two years. VHA will provide the Union with the data and other information prepared

**SA320**

for the analysis of the biennial review which relates to the bargaining unit employees. VHA will then facilitate a meeting with three designated representatives to solicit timely comments and input regarding the physician and dentist pay system.

## Section 5 - Availability of Data Regarding VHA Physician and Dentist Average Salaries

Any data concerning bargaining unit physicians and dentists obtained by VHA for general distribution or posted on websites will also be made available to the Union upon request.

**SA321**

# ARTICLE 56 - TITLE 38 HYBRIDS

## Section 1 - General

The authority to promote and advance Title 38 Hybrid employees is subject to 38 USC 7403 and VA Handbook 5005.

## Section 2 - Promotion and Reconsideration

A.   The promotion eligibility and subsequent reconsideration process for hybrid personnel appointed under 38 USC 7401(3) and 38 USC 7405(a)(1)(B) are made under the Department's promotion and reconsideration process under VHA Handbook 5005 Part III, Chapter 4 and the provisions of 38 USC 7403. The Department's promotion and reconsideration process may be found at http://vaww1.va.gov/ohrm/HRLibrary/Dir-Policy.htm.
Changes to this policy will be accomplished through collaboration pursuant to 38 USC 7403.

B.   Promotion actions will be taken without regard to race, color, religion, sex, national origin, disability, age, sexual orientation, labor affiliation or non-affiliation, status as a parent, or any other non-merit factor, and shall be based solely on job-related criteria.

C.   Qualification standards for individuals appointed under 38 USC 7401(3) are based primarily on the rank-in-person concept, where the combination of individuals' accomplishments, performance and qualifications determine their grade level. For positions above the full-performance level (journey level), the complexity of the assignment and scope of responsibility are also considered in establishing grade levels and must be completed 25% of the time or to the extent required within the standard.

D.   The Department will issue copies of their respective occupation qualification standards to hybrid employees at the time of initial appointment and at the time of a newly published standard. The local union will receive written copies of:

1.   A current and/or revised published copy of a qualification standard;

2.   The Professional Standards Board organizational location; and,

3.   Copies of the Department's full performance level for all respective hybrid occupations.

Sections 3, 4, 5, and 6 below are portions of VA Handbook 5005 and are provided for informational purposes.

**SA322**

## Section 3 - Promotion Eligibility At and Below the Full Performance Level

A.  For occupations covered by these guidelines, the full performance (journey) level may vary depending on the complexities of the assignment or the competencies possessed by the individual and are not dependent on the entry level grade of the occupation. In this rank-in-person system, the promotion potential of positions may not be limited to grades below the full performance level as identified in the qualification standard. This is also called the journey level. All individuals who perform successfully and acquire the required competencies may progress without competition to the full performance level.

B.  The employee shall be notified of the eligibility and be given 30 days to submit to their supervisor a self-assessment of their qualifications for promotion consideration. Employees may also notify their supervisor in writing that they are declining to submit a self-assessment during this 30 day period.

C.  Upon receipt of the employee's self-assessment, the supervisor will make a recommendation on promotion that is to be acted upon by the approving official within 30 days of the self-assessment being received. Promotions will become effective on the first day of the first full pay period following approval by the second level supervisor. In no case will the promotion be effected later than the first day of the first full pay period commencing 60 days after the employee's anniversary date. Employees who have not demonstrated such capability will be informed in writing by the supervisor that they are not being recommended for promotion. The written notice will state the reason(s) why the employee does not meet the criteria for promotion.

D.  If an employee will not be recommended to the Board for promotion, the employee will be advised in writing which of the following aspects of the specific occupation's qualification standards are not met:

1.  Year(s) of specialized experience at the lower grade;

2.  As noted in the specific occupation's qualification standard, if applicable, the level of licensure, certification, and/or professional distinction recognized by the occupation's professional body.

In addition, the employee will be given a written explanation that details why the employee is not considered to meet a criterion, and if appropriate, how the employee can improve their likelihood of meeting it in the future.

E.  It is understood the employee must also be performing at or above the fully satisfactory level, consistent with Article 27 - Performance Appraisal.

**SA323**

## Section 4 - Promotion Eligibility Above the Full Performance Level

A. Employees who are eligible for promotion consideration to a grade that requires a combination of personal qualifications and assignment characteristics are to be considered for promotion to such grades on the first anniversary date of their last promotion, provided they meet the administrative requirements. In addition, employees who are selected for assignments that warrant consideration for a higher grade based on complexity will be considered for promotion on a date other than the anniversary date of last promotion. The employee's anniversary date is the date of appointment or date of last promotion. If an employee is unable to access their anniversary date by their respective service screen, it will be provided to the employee in writing by the Department.

B. If an employee will not be recommended to the Board for promotion, the employee will be advised in writing which of the following aspects of the specific occupation's qualification standards are not met:

   1. Year(s) of specialized experience at the lower grade;

   2. Delineation of duties;

   3. As noted in the specific occupation's qualification standard, if applicable, the required level of licensure, certification, and/or professional distinction recognized by the occupation's professional body; or

   4. Performance of grade controlling duties at least 25% of the time.

   In addition, the employee will be given a written explanation that details why the employee is not considered to meet a criterion, and if appropriate, how the employee can improve their likelihood of meeting it in the future.

C. It is understood the employee must also be performing at or above the fully satisfactory level, consistent with Article 27 - Performance Appraisal.

D. The Union and affected employees will be provided access to all materials that describe how the criteria are to be applied. The Union will have access to educational materials available to Professional Standards Board members.

E. When a revised qualification standard is implemented that gives a facility discretion to fill or not fill a position(s) under position management, it shall be done under the requirement to keep functional statements accurate and in accordance with Article 23 – Title 5 Merit Promotion in which all employees in the facility who are qualified for the position(s) will have equal consideration for promotion. Furthermore, Union notification should occur under Article 49 - Rights and Responsibilities when:

1. The facility chooses to noncompetitively promote incumbents of positions rather than post a vacancy; or,

2. The facility chooses to limit the number of positions to be filled compared to those who are eligible and already performing grade controlling work, which would result in breaking up grade controlling assignments.

## Section 5 - Reconsideration Process

A. Notice of Decision - Employees are to be advised by their supervisors in writing of any decision not to promote them, of the reason(s) for the decision, of their right to request reconsideration, and that reconsideration must be preceded by an informal discussion with their supervisor.

B. Reconsideration to Grades at or Below the Full Performance Level:

1. If promotion to a grade at or below the full performance level is involved, the employee may, within 30 days of being notified of the decision, submit a written request through the immediate supervisor to the second level supervisor. The employee's written request for reconsideration must indicate when the informal discussion was held with the immediate supervisor and cite the specific reason(s) why the employee believes the decision was not proper. The approving official or designee may extend the 30 day period at the written request of the employee if the employee is unable to submit the information for reasons beyond the employee's control.

2. Second level supervisors are to review the employee's request within 30 days and determine whether to promote the employee. If a second level supervisor determines that a promotion is not warranted, the supervisor will provide the reasons for this decision to the employee in writing.

3. If the employee is not satisfied with the explanation of the determination to not promote, the employee can request within 30 days to have the determination reviewed by the next higher level board. The employee's request for reconsideration and the supervisor's explanation will be forwarded to the higher level board within 30 days.

4. The higher level board will make a recommendation within 30 days to the appropriate approving official, who will make a final decision within 30 days.

5. If the promotion is approved, the employee is to be promoted on the first day of the first pay period following a decision by the approving official. In no case will the promotion be effected later than the first day of the first full pay period commencing 180 days after the employee submits a written request for reconsideration, unless the employee requested an extension to the 30 day period to submit a written request for

**SA325**

reconsideration. In such cases, the number of additional days taken by the employee to submit a request will be added to the 180 day time limit. If the promotion is denied, the employee will be provided with a copy of the board action.

## Section 6 - Reconsideration for Promotions to Grades Above the Full Performance Level

A. An employee may submit a written request for reconsideration through the supervisor to the next higher level Professional Standards Board for review within 30 calendar days of the non- promotion decision. The approving official or designee may extend the 30 day period at the written request of the employee if the employee is unable to submit the information for reasons beyond the employee's control. The employee's written request for reconsideration must indicate when the informal discussion was held with the immediate supervisor and cite the specific reason(s) why the employee believes the decision was not proper. Supervisors are to review and comment on the employee's request in writing, and provide copies of those comments to the employee within 30 days.

B. The appropriate Professional Standards Board will review the information submitted by the employee, along with the supervisor's comments, and make a recommendation to the approving official within 30 days. Its recommendation may be extended up to the number of days it took the employee to provide the Board with the appropriate information. Upon completing its review, the Professional Standards Board is to forward its recommendation to the approving official for action.

C. Upon review of the reconsideration file, the approving official shall request any additional information needed to make a decision. This includes, but is not limited to, meeting with representatives of the Professional Standards Board, the employee, and/or the employee's supervisor prior to making a decision under paragraph 1 or 2 below. The approving official shall then take one of the following actions within 30 days:

1. Approve the employee's promotion. Promotions will be made effective on the first day of the first full pay period following approval. In no case will the promotion be effected later than the first day of the first full pay period commencing 120 days after the employee submits a written request for reconsideration, unless the employee requested an extension of the 30 day period to submit a written request for reconsideration. In such cases the number of additional days taken by the employee to submit a request will be added to the 120 day time limit.

**SA326**

2. Disapprove the promotion and notify the employee of the decision and the reasons for it, in writing.

## Section 7 - Effective Date

The promotion will be made effective by the Human Resources Management Officer on the first day of the pay period following the date of approval of the promotion by the approving official, but in no case earlier than the date on which all administrative requirements are met. A promotion may also be made effective at a future date set by the approving authority that does not violate law or negotiated agreement when doing so would benefit the employee. Promotion recommendations and actions that are administratively delayed beyond the time limits specified in paragraphs above will be made retroactively.

## Section 8 - Professional Standards Boards

A. The employees selected for the initial Board will serve either a 1 year, 2 year, or 3 year term. At the end of each of these initial terms, all new members will be selected to serve a 2 year term. Thus, members will rotate off the Board on a staggered basis and there will always be at least one member remaining on the Board from the previous year. Any revisions to this procedure will be accomplished through collaboration.

B. Professional Standards Board organizational location(s) (local, regional and national), Board composition, and member training requirements are found in VA Handbook 5005 Part II Chapter 3.

## Section 9 - Vacancy Announcements

A. For the purposes of this Agreement, grades below the full performance level are the Department established career ladders and pathways. Announcements for vacancies at the full performance level and below must span all grade levels in the qualification standards from the full performance level to the entry level. The application of competitive procedures is made for vacancies above the full performance level and must meet Article 23 – Title 5 Merit Promotion, Section 6 vacancy announcement information and posting requirements. Additionally, the provisions of Article 23 – Title 5 Merit Promotion, Sections 11, 12 and 13 apply to this article. Vacancy announcements and the auditing of promotion packages for Title 38 Hybrids shall be controlled by Article 23 – Title 5 Merit Promotion.

B. Vacancy announcement(s) will not be posted until the Department assures that they are appropriately authorized, properly described, and that the PD/ functional statement reflects the appropriate assignment and qualification for grade. Details, reassignments and temporary promotions of an employee performing grade controlling duties above the full performance level (at least

25% of their time) shall be done in accordance with Article 12 - Details and Temporary Promotions and Article 13 - Reassignment, Shift Changes and Relocations and the requirements of the Departments procedures for hybrid employees. All employees' who are qualified shall have equal access to training opportunities for grade controlling work above the full performance level. Title 38 Hybrid temporary promotions in excess of 120 calendar days shall be made using competitive procedures.

## Section 10 - Eligibility for Temporary Promotion, Detail, and Reassignment

Consistent with Article 12 - Details and Temporary Promotions and Article 13 - Reassignment, Shift Changes and Relocations, if an employee believes they are performing work that warrants a promotion, the employee will provide as much information as they are able to provide concerning their position or individual qualifications, to include, but not limited to, the changed duties as compared to the employee's qualification standards as the employee understands them, and time spent in the assignment-driven work above the full performance level, when the request for boarding is made. If the Department determines an employee is not qualified or eligible for a detail, a reassignment, or recommendation to the Professional Standards Board for consideration of temporary promotion, the Department will inform the employee of the reason in writing, upon request. The reason will include how the work does not match the qualification standard and performance standards of the employee's higher graded work above the full performance level. Additionally, the employee and the Union will receive, upon request, any instruction and/or other materials relied upon in the calculation method of time requirements needed for grade-controlling work. The Union will receive notification of the determination, when the Union represents the employee.

When the Department makes the determination not to fill a position above the full performance level, via the Department's position management authority, and subsequently directs and assigns the employee above the full performance work (at least 25% of time), the employee shall retain the right to request boarding for the time assigned to the higher-graded duties.

## Section 11 - Requesting Boarding

An employee may request boarding, and the Department will consider it, when the employee believes the duties of the position have changed significantly since any previous boarding. The employee will provide as much information as they are able to provide concerning those changes, to include but not limited to, the changed duties as compared to the employee's qualification standards as the employee understands them, and time spent in the assignment driven work above the full performance level, when the request for boarding is made.

**SA328**

## Section 12 - Training

Training availability will be made known to all similarly situated employees and selections for training will be made fairly and equitably.

## Section 13 - Position Descriptions/Functional Statements

A.  At the time of initial assignment and upon request, employees will be furnished a current, accurate copy of the description of the position to which they are assigned. The PD/functional statement will have the date evaluated and the signature of the supervisor. The option will be given to the employee to sign the PD/functional statement upon receipt. The local union will be provided the opportunity to review proposed changes in all PD/functional statements and receive copies of updated PD/functional statements and organizational charts.

B.  Whenever possible, employees will be afforded the opportunity to assist in the preparation of their PD/functional statements; however, supervisors and/or managers are responsible for assigning work to positions and insuring they are accurate. For positions which are identified in the Department's career ladders below the full performance level, a complete PD/functional statement needs to be established only for the target, full performance position.

C.  Copies of current PDs for bargaining unit positions will be provided to the local union upon request. PD/functional statements will be kept current and accurate, and positions will be graded properly. PD/functional statements shall be subject to periodic review.

## Section 14 - Erosion of Grade

A.  Before the Department reduces the grade, the employee has the right to discuss with their supervisor whether grade-controlling duties have changed as reflected in the nature of the assignment, either by erosion or planned management action. During the discussion, the Department will identify for the employee how the nature of the assignment is perceived to have changed and how such change renders the employee's grade inappropriate under the applicable Secretary's classification processes and standards.

B.  The employee will be afforded the opportunity to describe and/or present evidence showing what the job consisted of historically and how it changed or remained the same, with respect to grade-controlling duties.

C.  The employee will be advised in writing which of the following aspects of the specific occupation's qualification standards are not met:

    1.  Delineation of duties; or,

**SA329**

2. Performance of grade-controlling duties at least 25% of the time.

D. An employee whose grade is reduced is entitled to grade and pay retention under 5 CFR Part 536.

## Section 15 - Special Salary Surveys at the National and Local Level

The Union will be involved predecisionally before the Department initiates a survey to determine a special salary rate. The predecisional process will include all elements related to the survey.

**SA330**

# ARTICLE 57 - PHYSICAL STANDARDS BOARD

## Section 1 - General

This Article applies only to Title 38 employees and is provided for informational purposes only. The Physical Standards Board (PSB) process, and/or the examination and evaluation process for Title 38 employees, is governed by 38 USC and VA Handbook 5019.

In the event that the Department believes that a Title 38 employee is physically or mentally incapable of performing their duties, the Department will give a specific reason to the employee in writing. The employee shall be entitled to meet with the recommending medical official and to provide any oral and written evidence from their own physician/counselor before a recommendation is made. In any such meeting, the employee is entitled to Union representation and shall be provided notification of such entitlement.

## Section 2 - Notification

When the Department orders or offers a medical examination under the provisions of the prevailing regulations, it shall inform the employee in writing of its reasons for ordering or offering the examination and the consequences of failure to cooperate. The Department shall designate the examining physician but shall offer the employee the opportunity to submit medical documentation from their personal physician which the Department shall review and make part of the file.

## Section 3 - Guidelines for Physicians

A. The Department shall provide the examining physician with a copy of any approved medical evaluation protocol, applicable standards and requirements of the position, and/or a detailed functional statement of the duties of the position including critical elements, physical demands, and environmental factors.

B. The Department shall order or offer a psychiatric evaluation to an employee only when the employee first provides results of a general medical or psychiatric examination or the Department has first conducted a nonpsychiatric medical examination and, after review of the documentation or examination report, the Department's physician concurs that a psychiatric evaluation is warranted for medical reasons.

C. All medical examinations ordered or offered pursuant to Paragraphs 3A and 3B in this section shall be at no cost to the employee and performed on duty time at no charge to leave.

**SA331**

D.  An employee can be directed to undergo a fitness for duty examination only if the employee's position is one that has established essential functions, either mental or physical. Such essential functions must have wording to clearly support them, by being objective. Essential functions are those that are so fundamental to the position that a person cannot do the job without performing them. A function is "essential" if, among other things, the position exists specifically to perform that function, there are a limited number of other employees who could perform the function, or, the function is specialized and the individual is hired based on their ability to perform them. Determination of the essential functions of a position must be done on a case-by-case basis so that it reflects the job as actually performed, and not simply the components of a generic PD.

E.  When the Department orders a medical examination or questions an employee or a potential employee's abilities to meet a specific job qualification, the Department will provide the essential functions of the employee's position to the examining physician (the Department's or a private physician). The Union shall receive answers on how the Department came to the conclusions of the "essential functions", both physical and mental, of a specific PD or functional statement, upon request.

## Section 4 - Procedures

In seeking a fitness-for-duty examination which may or may not lead to a disability application, the following rules and procedures shall apply:

A.  In all discussions with any Department official, the employee shall be entitled to Union representation. Prior to any discussion, the employee shall be notified of this right, given an opportunity to contact and discuss the matter with their Union representative, and permitted the right of representation in such discussion.

B.  During these procedures, the employee will be apprised of their rights and, where supported by appropriate medical evidence, given the opportunity for suitable interim adjustments in their work assignments.

C.  When the results of the medical examination reveal that the employee:

1.  Cannot satisfactorily perform useful and efficient service in their regularly assigned job;

2.  Retains the capacity to do other work at the same grade or pay level within the work location or the commuting area; and,

**SA332**

3.  Otherwise meets the minimum qualifications for an available position that the Department seeks to fill; The Department will ordinarily offer the employee a reassignment to this position.

D.  When the Department determines that the medical evidence reveals:

1.  The employee is totally disabled for service in their current position; and,

2.  Reasonable accommodation for another position cannot be made, The Department will so advise the employee and provide appropriate counseling.

## Section 5 - Appeals Procedure

Once any decision is made that removes an employee from their position or duties for physical or mental inability to perform, the employee, consistent with Title 38, shall be able to use the appropriate appeals procedure as listed in VA Handbook 5019, Part III. When a disabled employee meets existing disability retirement requirements, the Department will counsel the employee concerning disability retirement and explain the procedures for voluntarily applying for disability retirement.

## Section 6 - Counseling

A.  When a disabled employee meets existing disability retirement requirements, the Department will counsel them concerning disability retirement and explain the procedure for voluntarily applying for disability retirement. In the event that such an employee is unable to file on their own behalf, the Department may initiate, with notice to the employee, an application for the employee in accordance with applicable laws and regulations.

B.  If the medical evidence and performance records establish that the employee retains the capacity to perform satisfactorily in a vacant lower graded position which the Department seeks to fill within the employee's commuting area, the employee will be informed of their option to request such a demotion.

## Section 7 - Confidentiality

Confidentiality must be maintained throughout the review process. All records pertaining to the employee's examination and any subsequent personal information included with an application for disability retirement are confidential and may be disclosed only to those with an administrative need to know or specifically authorized by the employee. There will be a written statement to the employee of any disclosure.

**SA333**

# ARTICLE 58 - PROFESSIONAL STANDARDS BOARD

A.  The Union may submit names of candidates for Professional Standards Boards. The Department will give serious consideration to appointing from the candidates recommended by the Union.

B.  Employees normally will be reviewed annually by the Professional Standards Board.

**SA334**

# ARTICLE 59 - PROFICIENCY

A.  The Department will involve employees actively in the promotion/evaluation process. Employees will be notified 90 days prior to the due date for proficiency.

B.  Employees will be given 60 days to provide information that will be used in the proficiency.

C.  When employees meet time-in-grade requirements for promotion to the next grade, the employee will be evaluated for promotion at the next scheduled boarding.

D.  Employees will receive current copies of criteria for promotion and special advancement on initial employment. Employees will receive updated copies of promotion and special advancement criteria when changes are made.

E.  Where employees are not promoted, they will receive an explanation regarding those specific elements in which they are deficient.

F.  Proficiencies will be done timely to prevent delays in the boarding cycle. Employees whose proficiencies have been unduly delayed without good cause will be made whole.

**SA335**

# ARTICLE 60 - TITLE 38 REPRESENTATION AT BOARDS OR HEARINGS

A.  The Union will be allowed to represent any unit employee at any hearing before a Title 38 Disciplinary Board or whenever a probationary employee appears before a Professional Standards Board in a termination proceeding. A representative in a Professional Standards Board hearing may do those things an employee is entitled to do under regulations.

B.  If the employee does not choose to have Union representation, the Union may be permitted to have an observer present at hearings described in Paragraph A. The Union observer may attend the Professional Standards Board hearing only during the employee's presentation. Consistent with applicable laws and regulations, Union representatives and observers must protect the confidentiality of any information to which they have access in connection with a Board Hearing.

**SA336**

# ARTICLE 61 - TITLE 38 VACANCY ANNOUNCEMENTS

## Section 1 - General

All Title 38 bargaining unit positions will be announced facilitywide with posting and/or distribution a proper subject for local bargaining. If facilities are consolidated, positions will be posted at each geographic location. These announcements must be readily available for review by employees.

## Section 2 - Contents of Vacancy Announcement

The qualifications for the position and educational/certification level will be kept current and clearly defined on the vacancy announcement. If the requirements of the job/position change, the vacancy announcement will be reposted reflecting the changes.

## Section 3 - Vacancy

A.   All employees will have a fair and equitable opportunity to compete for selection for a posted vacancy. All applicants will be asked the same questions during an interview.

B.   At the request of the employee, the Department will supply the employee with an explanation of why they were not selected for the position.

## Section 4 - Title 38 Position Qualifications

A.   The Union will be predecisionally involved and may submit recommendations for criteria to be used in the development of all bargaining unit position qualifications.

B.   The Union will be provided copies of all position qualifications for vacant positions.

C.   Current employees will receive first consideration when filling position vacancies.

**SA337**

# ARTICLE 62 - VETERANS CANTEEN SERVICE

## Section 1 - Compensation

A. Pay Adjustments:

1. Upon the effective date of this Agreement, all Veterans Canteen Service (VCS) schedule employees shall receive pay raises equal to or greater than the uncapped pay line for each Non-Appropriated Fund (NAF) survey area in effect at that time. Pay will be set annually thereafter in accordance with the NAF pay survey. In no case shall any negative pay line be implemented by the Department.

2. VCS bargaining unit employees will receive awards in accordance with Article 16 - Employee Awards and Recognition and Article 27 - Performance Appraisal.

B. Benefits Programs:
VCS employees shall receive the same discretionary benefits as Title 5 employees.

C. Leave and Holidays:
VCS employees will accrue and use all categories and programs for absence, leave, and holidays as are applicable under this Agreement.

## Section 2 - Canteen Prices and Meal Allowances

A. The parties agree that for the duration of this Agreement the Department will set canteen prices and such prices will not be subject to negotiations. The Department agrees to notify the Union prior to the implementation of price increases.

B. Meal allowances for VCS employees will be provided to permit employees one complete meal per day (entrée and beverage) valued at no more than six dollars; or, a 60% discount per day on a meal of any value. The six dollar amount will be increased each January 1 to reflect Consumer Price Index increases.

## Section 3 - Internal Promotions in the VCS

To provide promotional opportunities for all VCS employees, internal candidates will be given first consideration for vacancies prior to hiring outside applicants. If a VCS employee is not selected, it shall be for bona fide reasons, and the employee will be given a written explanation of reasons for non-selection.

**SA338**

## Section 4 - Storage and Personal Belongings

The availability of employee lockers or secure storage space for personal belongings is a subject for local negotiations. The supervisor will provide locks or other security devices to secure personal belongings.

## Section 5 - Appointment to Competitive Status Positions

A. A VCS employee shall be considered for appointment to a Department position in the competitive service in the same manner that any other Department employee is considered for transfer to such position, in accordance with Article 23 – Title 5 Merit Promotion and 38 USC 7802(e).

B. When a VCS employee is appointed to a position in the competitive service, the Department shall credit the length of any previous period of employment in the VCS toward the time-in-service requirement for career appointment.

C. The service computation date for all purposes of an employee moving from a NAF position to a competitive service position shall be adjusted to include all previous periods of employment in the VCS.

## Section 6 - Counseling Prior to Separation

A. If a non-probationary VCS employee is being considered for termination for conduct, the employee will be allowed to provide their version of the events and, if appropriate, the Department will provide the employee the opportunity to correct the behavior. This provision does not create a new right of appeal for the employee.

B. If a non-probationary VCS employee is being considered for termination for performance, the employee will be given notification of the performance deficiency that is perceived and provided guidance and an opportunity to correct it prior to separation.

**SA339**

# ARTICLE 63 - RESEARCH GRANTS

A.  Employees who have made funding or other project applications will be immediately notified of the approval/disapproval. The notification will include the project ranking.

B.  Any employee in the Department Research Program whose status and/or employment rights are altered or jeopardized, for example due to a change in funding, will be fully advised of the possible impact of such change at the time a change to their status is considered.

**SA340**

# ARTICLE 64 - RESEARCH PROGRAMS AND DEMONSTRATION PROJECTS

## Section 1 - Definitions

A.  Research Program
    Means a planned study of the manner in which public management policies and systems are operating, the effects of those policies and systems, the possibilities for change, and comparisons among policies and systems.

B.  Demonstration Project
    Means a project conducted by the OPM or under its supervision to determine whether a specified change in personnel management policies or procedures would result in improved federal personnel management.

## Section 2 - Project Initiation

A.  When a demonstration project is considered, the Union and the Department are encouraged to jointly request demonstration authority from OPM and jointly develop the details of the demonstration project.

B.  When the Department receives notification from OPM, another federal agency, or some other public or private organization that a research and demonstration project will be conducted, the Department will notify the Union.

C.  The Department agrees not to enter into any research or demonstration project affecting unit employees without first meeting its obligation to consult or negotiate with the Union.

D.  The Union will receive the following without cost on a semiannual basis:

    1.  Information concerning research programs or demonstration projects proposed to OPM by the Department; and,

    2.  Data and reports of research provided to the Department by OPM or other federal agencies which concern research projects affecting unit employees.

E.  Employees participating in any activity covered by this article shall have their participation noted and placed in their eOPF.

## Section 3 - Comments on Reports

Whenever the Department submits an evaluation report to OPM concerning a research or demonstration project affecting unit employees, the Union will be provided an opportunity to submit its views in an accompanying report. After implementation of the program, the Union will be kept informed of the progress on a continuing basis.

**SA341**

# ARTICLE 65 - WAGE SURVEYS

## Section 1 - Membership Survey Teams

Survey teams will consist of one member nominated by the local facility and one member nominated by the labor member of the local wage survey committee. Each will be selected on the basis of qualifications set forth under FWS procedures. The number of teams needed to complete the survey will be determined by the local committee.

## Section 2 - Office Space

The host installation designated by the lead agency will provide office space and telephone capability to local committee members and survey teams for the purpose of conducting the survey. The Department will provide such facilities where necessary.

## Section 3 - Transportation

The Department will make every effort to provide official vehicles for the use of survey teams and, if necessary, for committee members involved in the survey. In the event such vehicles are unavailable, the Department will explore all other alternatives to provide transportation for the survey team.

**SA342**

# ARTICLE 66 - TECHNOLOGY FOR ADMINISTERING, TRACKING, AND MEASURING VBA WORK

## Section 1 - Scope

A. The provisions of this article shall apply to the application of the technology that may be used to administer, track, and/or measure the work of VBA bargaining unit employees.

B. The application of such technology is governed by established policy of the Department as contained in the Department's notification to the affected employees and the Union. It is also governed by this Agreement and by applicable requirements under law and government-wide regulations.

C. If the Department decides to modify or change its application of technology in a manner that triggers a duty to bargain, it will meet its contractual and statutory obligations.

D. Pursuant to 5 USC 7106(b)(1), technology is not a mandatory subject of bargaining. Under Executive Order 13522, employees and their Union representatives shall have predecisional involvement in all workplace matters to the fullest extent practicable, without regard to whether those matters are negotiable subjects of bargaining under 5 USC 7106(b)(1).

## Section 2 - Application of the Technology

To the extent consistent with Section 1, such technology shall be applied in a manner that ensures validity, reliability, and attainability by most similarly situated employees.

A. General - The application of the technology will be fair, equitable, consistent, and take into account matters beyond the control of the employee.

B. Where the selection of certain work of an employee is to be random, the Department will provide the employee and the Union with the methodology that was used to assure randomness.

## Section 3 - Contesting Results

At any time an employee disagrees with a record of their work that was obtained through or by technology, the employee may seek corrective action in accordance with Article 43 - Grievance Procedure.

## Section 4 - Annual System Review

A. The application of the technology will be evaluated annually by the parties to identify systemic problems and positive outcomes associated with it (in

**SA343**

relation to its stated purpose, unintended effects on work product, and impact on employees' conditions of employment).

B.  Recommendations for improvement of the technology and/or its application may be made by the Union at any time. The recommendations should address employees' positive and/or negative experiences, and will be addressed by the Department whether they are adopted or not.

C.  The application of technology is an appropriate subject for bargaining at the local union level, on aspects not in conflict with this article.

**SA344**

# ARTICLE 67 – SKILLS CERTIFICATION

<u>Preamble</u>

In accordance with PL 110-389, skills certification is a requirement for appropriate employees of the Veterans Benefits Administration who are responsible for processing claims for compensation and pension benefits.

Labor and Management agree that an effective Skills Certification program commits both parties to a standard of excellence in the timeliness, quality, and quantity of training, to improve service to our nation's Veterans.

## Section 1 – Purpose, Scope and Applicability

A.  This Article applies to appropriate bargaining unit employees of the Veteran Benefits Administration for whom the Skills Certification program is applicable and are responsible for processing claims for compensation and pension benefits under the laws administered by the Secretary of Veterans Affairs. Skills Certification is not intended for employees who are in a trainee status (non-journey level).

B.  The purposes of a Skills Certification are to comply with 38 USC 7732A; to provide a mechanism for measuring employee attainment of the skills, knowledge and abilities needed to be successful in their position; and to identify training needs. Skills Certification test results will not negatively impact an employee's performance appraisal.

C.  Employees as identified in Section 1.A of this Article will be required to take the skills certification test within one year and to retake the test each time offered until certification is achieved. To the extent practicable, skills certification testing will be offered twice per year for each position covered by the VBA Skills Certification program. Employees will be required to sit for periodic recertification as long as they remain in the position.

D.  Employees who have occupied the VSR GS-10 within the full-performance GS-11 career ladder for more than one year will be required to sit for Skills Certification within the first year after this agreement is implemented. For the VSRs on the career ladder track, the effective date of promotion will be the first date of the pay period following notification of the results, provided they meet the promotion criteria in Article 23 (Title 5 Merit Promotion). Current employees in a VSR career ladder position that included the full-performance GS-11 level when they entered the career ladder prior to implementation of this Article will have the opportunity to achieve GS-11 upon passing the VSR certification test. VSRs who are unable to pass

**SA345**

certification after three consecutive attempts, counted from the effective date of this Article, will be placed in a VSR position where the full performance level is a GS-10.

E.  Whenever the Department develops an annual schedule for skills certification, the Union will be provided a copy. The Union will be permitted to observe the Skills Certification testing. The local union will be provided notification at least 7 work days before the actual date of each test. In the event the 7 work day notice is not provided to the Union, the Department will explain in writing why the 7 work day notice was not provided. In the event the 7 work day notice is not provided, the results of the test will not be invalidated. The schedule for the Skills Certification testing, and any changes to the schedule, will be posted on the VBA intranet.

## Section 2 – Program and Test Administration

A.  The instrument (test) used to determine an employee's proficiency under the Skills Certification Program shall be valid and reliable, using generally accepted statistical and testing measures and methodologies, and be consistent with *EEOC Uniform Guidelines.* When developing certification examinations, the Department will consult with appropriate individuals or entities, including examination development experts, interested stakeholders, and employee representatives; and consider the data gathered and produced under 38 USC 7731(c)(3).

B.  The parties agree that the purpose and intent of the provisions contained herein are to ensure that the Skills Certification program will be administered fairly, equitably, and consistently across Veterans Benefits Administration.

C.  All employees required to sit for the skills certification test will be notified sufficiently in advance of their right to request reasonable accommodations; for example, additional time, alternate test site and lighting, etc. Reasonable accommodation will be provided to eligible employees sitting for the skills certification test.

## Section 3 – Notification of Test Results

The Department agrees to promptly notify employees and the NVAC President, or designee, when employee test results are received by the Department.

## Section 4 – Test Environment

The Department will take in account factors affecting the testing environment beyond the employee's control and take appropriate remedial action such as adding additional time, rescheduling the test, etc. The employee will not be disadvantaged by such factors. Examples of such factors include: computer system problems, excessive heat

or noise, building emergencies, or interruptions. Employees who have been using two monitors for their work will have two monitors for testing, when they are available in the testing environment nationwide.

## Section 5 – Testing Preparation and Information Feedback

A.    The Department will provide training sufficient for employees to participate in the certification program.

B.    The Department will continue to make available practice tests and sample Skills Certification questions and answers to all eligible employees, as identified in the Skills Certification Readiness Guide. As outlined in the Skills Certification Readiness Guide, test preparation will continue to be available. The Department will continue to require Core Technical training for all claims processors. Prior to their first time taking the test after the implementation of this Article, claims processors will be provided with an instructor-led test preparation class in the test environment. In addition to this class, claims processors will be afforded self-study excluded time not to exceed 3 hours.

1.    Along with the results of the test, employees will receive written (hard copy or electronic) feedback concerning their test performance, and also have the opportunity to discuss areas for improvement with their supervisor or another knowledgeable employee, such as an authorizer or senior employee.

2.    The feedback will identify knowledge areas in which improvement is needed and will direct the employee to applicable references for self-study. Feedback will be grounded in applicable statutes, regulations, and procedures. The feedback on test results will be as extensive as possible without compromising test integrity.

3.    Based on the results of the test and the feedback, the employee and supervisor will develop an individualized training plan, which may include repeating any classes as necessary.

C.    Training time associated with Skills Certification will be considered part of the employee's annual training requirement.

## Section 6 – Joint Skills Certification Committee

A.    The Parties will meet virtually at least twice annually, through a Joint Labor and Management Skills Certification Committee to discuss the program, and make recommendations for improvement. This does not preclude in person meetings by mutual agreement when funding is available. The Committee will have equal membership from the Department and the Union, up to 3 members each.

**SA347**

B.  The Union Committee members will be designated by the NVAC President. The Committee will be functioning within sixty days after the effective date of this Article. Management will continue to invite an AFGE representative to participate on each of the Design Teams and additional workgroups for each type of certification exam. Participation on the Committee will be on official time; this official time will not be counted against any allocated time as described in the Master Agreement.

## Section 7 – GS-12 Promotion for GS-11 RVSRs

GS-11 RVSRs will be promoted to GS-12 on the first day of the pay period following implementation of this Article, provided they meet the promotion criteria in Article 23 (Title 5 Merit Promotion).

## Section 8 – Changes to Skills Certification

If the Department makes any change that triggers a duty to bargain, the Department will meet its contractual and statutory obligations.

## Section 9 – Certificates

Upon successful completion of the Skills Certification testing, the Department will update the employee's eOPF indicating the employee has successfully met the requirement, and provide a copy to the employee.

## Section 10 – Local Negotiations

The parties agree to comply with the Master Agreement, with respect to local bargaining.

## Section 11 – Previous Agreements

Prior National MOUs on Skills Certification are superseded by this Article. Consistent with Article 46, local contracts/supplements in existence prior to the effective date of this Article, will continue in effect insofar as they do not conflict with the Master Agreement.

**SA348**

# DURATION OF AGREEMENT

## Section 1 - Effective Date

This Agreement will be implemented and become effective when it has been approved, ratified, and signed by the parties, including review pursuant to 5 USC 7114(c). The effective date of this Agreement is August 8, 2023

## Section 2 - Duration of Agreement

This Agreement shall remain in full force and effect for a period of three years after its effective date. It shall be automatically renewed for one year periods unless either party gives the other party notice of its intention to renegotiate this Agreement no less than sixty nor more than one hundred twenty days prior to its termination date. Negotiations shall begin no later than 30 days after these conditions have been met. If renegotiation of an Agreement is in progress but not completed upon the terminal date of this Agreement, this Agreement will be automatically extended until a new agreement is negotiated.

## Section 3 - Reopener

Negotiations initiated by either party during the term to add to, amend, or modify this Agreement may be conducted only by mutual consent of the parties. If mutual consent is reached, such notice to renegotiate must be accompanied by the revised proposals for the article(s) the party wishes to renegotiate. The parties will meet for the purpose of negotiating the amendments or modifications within 30 days of receipt of the proposals from the moving party.

## Section 4 - Negotiation Schedule

Arrangements for negotiating both the reopener or renegotiation under Section 2 or 3 above shall be in accordance with Article 47 - Mid-term Bargaining.

## Section 5 - Amendments and Modifications

This Agreement may only be amended, modified, or renegotiated in accordance with the provisions of this Agreement.

SA349

# SIGNATURE PAGE*

| | For the Department of Veterans Affairs | For the American Federation of Government Employees |
|---|---|---|
| **Leadership** | **/Denis McDonough/**<br>Denis McDonough,<br>Secretary of Veterans Affairs | **/Dr. Everett B. Kelley/**<br>Dr. Everett B. Kelley,<br>National President, AFGE |
| **Chief Negotiators** | **/Kurt P. Martin/**<br>Kurt P. Martin, Chief Negotiator | **/Alma L. Lee/**<br>Alma L. Lee, Chief Negotiator |
| **Members** | **/Scott Foster/**<br>Scott Foster, Member | **/Mary-Jean Burke/**<br>Mary-Jean Burke, Member |
| | **/Kevin Kelley/**<br>Kevin Kelley, Member | **/Oscar L. Williams, Jr./**<br>Oscar L. Williams, JR., Member |
| | **/Simon Kim/**<br>Simon Kim, Member | **/William Wetmore/**<br>William Wetmore, Member |
| | **/Karen Kormelink/**<br>Karen Kormelink, Member | **/Colin M. Barrett/**<br>Colin M. Barrett, member |
| | **/Michelle Mountfort/**<br>Michelle Mountfort, Member | **/Kathleen Pachomski/**<br>Kathleen Pachomski, Member |
| | **/Samuel Olson/**<br>Samuel Olson, Member | **/Steven M. Graves/**<br>Steven M. Graves, Member |
| | **/Sandra Terry/**<br>Sandra Terry, Member | **/Thomas Dargon, Jr./**<br>Thomas Dargon, Jr., Member |
| | **/Antione Waller/**<br>Antione Waller, Member | **/Ibidun Roberts/**<br>Ibidun Roberts, Member |
| | **/Cherri Waters/**<br>Cherri Waters, Member | |
| **Recorders** | **/Heidi Schramm/**<br>Heidi Schramm, Recorder | **/April Bizzelle/**<br>April Bizzelle, Recorder |
| | **/Elizabeth Shotwell/**<br>Elizabeth Shotwell, Recorder | |

*Wet signatures are on file. They have not been displayed for security reasons.

**SA350**

# INDEX

## A

**Abatement:** 138, 139, 141-143, 145-149

**Administrative Leave:** 135, 196, 198

**Advanced Annual Leave:** 190

**Advanced Sick Leave:** 190, 191

**Advance Notice:** 25, 38, 44, 76, 78, 84, 122, 145, 173,195, 209, 220, 225, 241, 244

**Adverse Actions:** 46, 48, 220
appeal rights: 47, 48, 133, 173, 261
counseling: 31, 50, 51,60, 61, 66, 71, 78, 109, 115, 127, 133, 134, 158, 171, 213, 274, 280
demotion: 42, 71, 131, 274
furlough: 46, 130, 131
grievance: 3, 10, 17, 20, 44, 48, 60, 90, 107,108, 129,133, 160, 219, 220, 221, 222-226, 236, 237, 241, 248, 255, 284
part-time employees: 84, 173, 176, 178,190
progressive discipline: 47
removal: 46, 78, 128, 146, 147-149, 219
reprimand: 46, 47
union notification: 28, 37,80, 106, 130, 265
union representation: 16, 17, 19, 32, 47-49, 57, 60, 70, 92, 93, 127, 137, 171, 220, 241, 261, 272, 273, 277

**Affirmative Action:** 62, 66, 67

**Allocated Official Time:** 9, 10, 19, 23, 26, 32, 137, 239, 244

**Alternative Work Schedule:** 77, 80, 81, 100, 254. See also AWS
lunch breaks: 84

**Anniversary Date:** 227-229, 264, 265

**Annual Leave:** 32, 79, 89, 90, 180-182,184, 187, 190-193, 197, 213, 216, 255, 256
advanced:189-191, 211, 223, 238, 246
part-time employees: 84, 173, 176, 178, 190
scheduling conflicts: 181
unplanned leave: 181

**Appeal Rights:** 47, 48, 133, 173, 261

**Appointments:** 89, 96, 99, 183

**Appraisals:** 26, 120, 134, 179.
*See also* Performance Appraisal: 26, 46, 74, 117, 118, 120, 121, 124-126

**Arbitration:** 17, 222-226
awards: 21, 26, 52-54, 103, 104, 121, 124, 189, 226, 252, 261, 279
expedited: 39
invoking: 48
official time for: 10, 67, 120, 232, 235, 237, 238
panels: 53, 258, 259
procedures: 10, 22,23, 26, 32, 34, 36, 38-40, 42, 45, 46, 62, 66, 68,70, 75, 76, 80,81, 84, 87, 90,94, 96, 07, 99, 103, 105, 113, 116, 125, 130, 137, 138, 142, 143, 145-150, 153, 160, 165, 166, 172, 181, 188, 199-203, 209, 211, 225, 227,229, 231, 232, 239, 268, 269, 273, 274, 282, 283, 288

**Areas of consideration:** 99, 100

**Asbestos:** 146-148, 165

**Assessment Criteria:** 101

**Assistive Devices:** 64

**Audit:** 33, 107, 162, 268
award amount: 53
criteria: 19, 53, 73, 94-96, 101, 102, 105, 119, 121, 122, 136, 151, 156, 162, 188, 196, 201, 259, 263-265, 276, 278, 286, 289
funding: 25, 31, 52, 171, 200, 281, 288
group: 3, 8, 1120-28, 30, 31, 52-54, 60, 67, 79, 81, 87, 106, 117, 123, 126, 132, 141, 142, 145, 152, 223, 289
individual: 9-11, 16, 20, 23, 28, 40, 50, 52-55, 58, 59, 62, 63, 65, 67-69 73, 76, 83, 97, 101, 102, 105, 106, 108-110, 117, 118, 132, 136, 138, 141, 145, 149, 151, 155, 158, 159, 161, 167, 178, 179, 194, 195, 197, 201, 232, 234, 237, 258, 260-264, 269, 273, 287, 288
nomination procedures: 55, 201
number of: 21, 38, 42, 52, 55, 75, 76, 80, 81, 84, 86, 100, 101, 135, 140, 170, 173, 176, 182, 190, 191, 204, 205, 221, 232, 234, 240, 257, 266, 267, 273, 283
Suggestion: 7, 53-56, 63, 175
types of: 8, 31, 43, 53, 58, 103, 140, 180, 213

**SA351**

**B**

**Bargaining:**3-5, 7-10, 19, 20, 24, 26-28, 32, 36, 37, 42, 46, 53, 56, 57, 67, 80, 81, 85-88, 90, 92-94, 99, 102, 107, 112, 113, 115, 116, 122, 125, 130, 133, 137-140, 146, 149, 150, 154, 157, 168, 170, 171, 192, 199, 200, 202, 204, 218, 219, 223, 227-241, 243, 244, 249, 252, 255, 258, 262, 270, 278, 279, 284-286, 289, 290

ground rules: 231, 232, 234, 235

interest-based:10, 231

proposals: 11, 233, 234, 290

supplemental agreements: 57, 181, 218, 221, 225, 231

**Bulletin Boards:** 57, 66, 92, 206, 215, 248

**C**

**Career Ladder:** 94-99, 101, 105, 123, 206, 268, 270, 286

suspension of: 46, 85

**Certification:** 3, 5, 36, 40, 45, 76, 150, 155, 185, 193-196, 219, 259, 264, 265, 278, 286-289

**Child Care:** 30, 32

committees: 8, 9, 31, 67, 137, 138, 140, 146, 158, 200, 238

**Civil Service Reform Act:** 226

**Classification:** 33-35, 40, 97, 99, 108, 131, 132, 165, 219, 249, 258, 270

**Classification Appeal:** 34, 35

**Committees:** 8, 9, 31, 67, 137, 138, 140, 146, 158, 200, 238

**Communicable Disease:** 161, 164-166, 168

**Communications:** 12, 79, 122, 138, 139, 236, 242, 243, 246-248

bulletin boards: 57, 66, 99, 206, 215, 248

formal discussions: 3, 126, 127, 171

internet: 246-248

intranet: 247, 248, 255, 284

mobile technology: 90

surveys: 243, 253, 257, 271, 283

telecommunications: 79, 246, 247

telephones: 246

videoconferencing: 74

with employees: 36, 117, 248

**Compensation:** 41, 44, 57, 69, 84, 88, 110, 144, 166, 187, 188, 199, 211, 213, 215, 216, 219, 251, 255-260, 279, 286

**Compensatory Time:** 85, 88, 89, 110, 111, 186, 189, 193, 254

**Competitive Actions:** 97, 98, 107

**Compressed Work Schedules:** 80, 81

*See also CWS:* 82, 83, 85, 86

Headquarters(Central Office): 66, 222, 223, 231

provisions: 11, 28, 47, 48, 65, 69, 85, 88, 90, 94, 95, 104, 111, 113, 127, 133, 146, 160, 162, 171, 179, 189, 200, 225, 226, 231, 238, 247, 249, 253, 254, 263, 268, 272, 284, 287

suspension of: 46, 85

**Conditions of Employment:** 3, 7, 38, 58, 81, 137, 196, 219, 231, 236, 238, 241, 243, 285

**Counseling:** 31, 50, 51,60, 61, 66, 71, 78, 109, 115, 127, 133, 134, 158, 171, 213, 274, 280

**Counselors:** 66, 67

**CPR:** 150

**Credit Hours:** 81-86, 193

field: 5, 10, 27, 77, 138, 223

provisions:11, 28, 47, 48, 65, 69, 85, 88, 90, 94, 95, 104, 111, 113, 127, 133, 146, 160, 162, 171, 179, 189, 200, 225, 226, 231, 238, 247, 249, 253, 254, 263, 268, 272, 284, 287

**Critical Element:** 70, 94, 118-124, 126-128, 132, 172, 272

CWS: 82, 83, 85, 86

*See also* Compressed Work Schedules: 80, 81

**D**

**Demonstration Project:** 282

**Demotion:** 42, 71, 131, 274

**Disability:** 63, 65, 69-71, 166, 214, 263, 273, 274

**Disability Retirement:** 69, 71, 166,274

**Disabled Veterans:** 62, 66, 99

**Disciplinary Action:** 46-51, 60, 92, 171, 180, 223, 260

**Discussions:** 3, 25, 70, 85, 126, 127, 171, 220, 245, 246, 251, 273

**Drug Abuse:** 50

**Dues Withholding:** 227-230

**Duty Time:** 9-11, 19, 32, 39, 57, 59, 67, 70, 87, 125, 137, 138, 225, 239, 272

**E**

**EEO:** 57, 62, 63, 65-68, 107, 108, 220, 239, 287

**Emergencies:** 79, 148, 150, 166, 191, 288

**Emergency Preparedness Plan:** 150

**Employee Rights:** 56, 93, 215
fair and equitable treatment: 87
privacy: 56, 58, 74, 76, 104, 107, 120, 160, 215
to union representation: 16, 17, 49, 57, 92, 171, 272, 273

**Equal Employment Opportunity:** 62, 63, 66
*See also* EEO
applicable regulations: 88, 158
assistive devices: 64
complaints: 20, 68, 236
counselors: 66, 67
disabled veterans: 62, 66, 99
discovery: 146, 148
grievance procedure: 44, 60, 90, 107, 129, 160, 219-223, 225, 255, 284
information: 5, 7, 8, 10, 12, 16, 18, 19, 31, 33, 37, 47,-51, 53, 55, 57-59, 66, 68, 71, 86, 90, 93, 94, 100-104, 106-109, 111, 113, 120, 121, 125, 126, 131-133, 135, 145-149, 151, 152, 154, 159, 162, 163, 165, 166, 169, 172, 175, 184, 194, 196, 201, 202, 206, 209, 214-216, 227, 241-244, 248, 251, 255, 256, 259, 261, 263, 266-269, 272, 274, 276, 277, 282, 288
interpreter service: 65
job restructuring: 63
leave without pay: 32, 65, 79, 156, 168, 184, 187, 195, 216
official time: 9-11, 15, 19, 23, 25, 26, 32, 57, 67, 112, 120, 137, 221, 225, 229, 232, 234-240, 244, 289
reasonable accommodations: 62, 63, 65, 287
reassignments: 42-46, 96, 98, 99, 201, 268
sexual harassment: 62
training: 8, 10-14, 21, 23, 25-29, 31, 36, 37, 59, 64, 65, 67, 68, 78, 85, 95, 96, 98, 101, 103, 110, 123, 126-128, 138, 140, 141, 144, 145, 147-151, 154, 158, 160, 162, 169, 172-177, 190, 200-202, 205, 206, 242, 247, 252, 268-270, 286, 288

union officials: 13, 120, 227-229, 234, 236, 237, 243, 246

**F**

**Family and Medical Leave:** 188, 192, 193, 196
adoption: 54, 183, 192

**Fitness for Duty:** 69, 70, 145, 165, 273

**Fixed Shift:** 81, 85

**Flexible Band:** 82

**Flextime:** 32, 81, 82, 84, 85

**Furlough:** 46, 130, 131

**G**

**Good Standing:** 221, 227

**Grievability:** 220, 224

**Grievance:** 3, 10, 17, 20, 44, 48, 60, 90, 107,108, 129,133, 160, 219, 220, 221, 222-226, 236, 237, 241, 248, 255, 284
EEO: 57, 62, 63, 65-68, 107, 108, 220, 239, 287
exclusions: 179, 219, 256
meetings: 13, 15, 21, 23, 25-27, 30, 31, 60, 67, 76, 78, 123, 179, 206, 221, 237-239, 246, 247, 288
part-time employees: 84, 173, 176, 178,190
representative:3, 4, 7,13, 15, 19, 20, 22, 23, 25-27, 31, 32, 34, 37, 40, 47, 48, 57, 60, 67, 70, 76, 85, 92, 93, 104, 107, 108, 112, 117, 127, 129, 134, 137-147, 149, 152, 160, 162, 171, 176, 193, 200, 210, 215, 218, 220-222, 229, 232, 235-243, 246, 248, 249, 253, 259, 262, 267, 273, 277, 284, 287, 289
time limits: 107, 139, 215, 222-225, 268
withdrawal: 28, 261

**Ground Rules:** 231, 232, 234, 235
*See also* Bargaining: Ground Rules

**H**

**Hazardous Weather:** 188, 189

Health: 15, 39, 40, 43, 45, 51, 56, 59, 69, 83, 108, 137-147, 149, 151, 152, 154, 156, 158-167, 170, 170, 174, 177, 183, 184, 192-196, 198, 212, 217, 219, 236, 237, 246, 259
safety: 15, 59, 76, 113, 114, 116, 137-147, 149, 151, 152, 159-164, 167, 217, 236, 237, 245, 246
abatement: 138, 139, 141-143, 145-149
abatement plan:139, 141, 142, 145, 147, 149

asbestos: 146-148, 165
committees: 8, 9, 31, 67, 137, 138, 140, 146, 158, 200, 238
CPR: 150
emergency numbers: 149
emergency preparedness plan: 150
inspections: 76, 116, 138-140, 152, 156
on-the-job injury: 69, 214
reports: 23, 30, 66, 76, 138, 139, 141, 143, 144, 159, 160, 183, 213, 282
smoking: 150, 151, 158
stress: 158, 159, 214
temperature: 146, 156
training: 8, 10-14, 21, 23, 25-29, 31, 36, 37, 59, 64, 65, 67, 68, 78, 85, 95, 96, 98, 101, 103, 110, 123, 126-128, 138, 140, 141, 144, 145, 147-151, 154, 158, 160, 162, 169, 172-177, 190, 200-202, 205, 206, 242, 247, 252, 268-270, 286, 288
union representative: 7, 9, 23, 25-27, 31, 37, 40, 48, 57, 60, 67, 70, 85, 93, 104, 107, 112, 127, 138, 143, 160, 176, 200, 210, 221, 222, 229, 235-238, 240-242, 246, 249, 259, 273, 277, 284

**Holidays:** 81, 87, 182, 279

**Hours of Work:** 76, 81, 100, 110, 111, 186, 204, 254

**Indoor Air Quality:** 156

**Infectious Disease:** 161, 164, 167

**Inspections:** 76, 116, 138-140, 152, 156

**Interest-based Bargaining:** 10

**Internal Union Business:** 10, 246

**Interpreter Services:** 65

**J**

**Job Restructuring:** 63

**Job Sharing:** 32, 178, 179

**L**

**Labor Relations:** 3, 10-14, 73
in the public interest: 54, 236

**Laws and Regulations:** 6, 50, 71, 130, 171, 174, 177, 193, 274, 277

**Leave:** 32, 44, 51, 65, 70, 73, 76, 77, 79, 81, 82, 89, 90, 134, 135, 145, 150, 156, 161, 168, 174, 177, 179-193, 195-199, 213, 216, 227, 238, 247, 255, 256, 261, 272, 279

*See also* Time and Leave
extended: 33, 81, 111, 123, 127, 156, 173, 180, 183, 187, 191, 220, 223-225, 267, 290

**Leave Transfer Program:** 191, 192

**Leave Without Pay:** 32, 65, 79, 156, 168, 184, 187, 195, 216
*See also* LWOP
for adoption: 192

**LWOP:** 51, 56, 184, 187, 188, 190, 192, 197, 216
*See also* Leave Without Pay

**M**

**Medical Evidence:** 69-71, 273, 274

**Medical Examination:** 67, 70, 147, 272, 273

**Merit Promotion:** 40, 53, 94, 101, 102, 200, 201, 217, 265, 268, 280, 286, 289
assessment criteria: 101
audits: 33, 107
competitive actions: 97, 98, 107
details: 38-40, 96, 98, 99, 135, 162, 174, 177, 260, 264, 265, 268, 269, 282
part-time employees: 84, 173, 176, 178, 190
reassignments: 42-46, 96, 98, 99, 201, 268
temporary promotion: 38-40, 97-99, 268, 269

**Military Leave:** 188-190

**Monetary Awards:** 26, 52, 53, 252
Instant: 53, 54

**N**

**Negotiations:** 3, 17, 28, 39, 40, 47, 80, 85, 89, 91, 115141, 159, 163, 174, 177, 181, 188, 202, 203, 233-235, 237, 244, 245, 279, 280, 289, 290
ground rules: 231, 232, 234, 235
levels: 7, 11-14, 16, 17, 19, 28, 37, 68, 104, 120, 124, 131, 138, 146-149, 156, 158, 162, 205, 222, 233, 236, 263, 268
reduction-in-force: 99, 131
supplemental agreements: 57, 181, 218, 221, 225, 231

**O**

**Official Time:** 9-11, 15, 19, 23, 25, 26, 32, 57, 67, 112, 120, 137, 221, 225, 229, 232, 234-240, 244, 289
EEO: 57, 62, 63, 65-68, 107, 108, 220, 239, 287

**Official Travel:** 110, 113

advance: 11, 15, 25, 30, 38, 44, 47, 48, 54, 60, 62, 65, 76-78, 83, 84, 86, 89, 92, 95, 110, 111, 122, 128, 137, 145, 147, 149, 157, 166, 169, 173, 180, 181, 184, 190, 195, 205, 209, 220, 221, 225, 239, 244, 250, 256, 260, 263, 287

compensation: 41, 44, 57, 69, 84, 88, 110, 144, 166, 187, 188, 199, 211, 213, 215, 216, 219, 251, 255-260, 279, 286

for employees with disabilities: 62, 63

per diem: 9, 13, 15, 67, 111-114, 135, 137, 138, 186, 232, 234, 237, 239, 249

privately owned vehicle: 113

reimbursement: 58, 112, 114, 116, 135, 155, 202, 249, 255

return trips: 113

**Overtime:** 23, 26, 76, 77, 81, 84, 85, 87-90, 110, 111, 179, 186, 189, 198, 204, 254

and credit hours: 81, 83

and travel: 15, 110, 200

compensation: 41, 44, 57, 69, 84, 88, 110, 144, 166, 187, 188, 199, 211, 213, 215, 216, 219, 251, 255-260, 279, 286

extended shift: 81

Fair Labor Standards Act: 88, 110

increments: 84, 88, 180, 191, 237

mandatory: 94, 284

notice: 10, 25, 28, 38, 44, 47, 48, 54, 71, 76, 78, 79, 81, 84, 86-88, 92, 95, 101, 106, 122, 128-132, 134, 136, 138, 139, 143, 145, 147, 149, 171-173, 175, 176, 193, 195,201, 209, 215,216, 220, 223, 225, 226, 235, 237, 241, 244, 247, 251, 259, 260, 264, 266, 274, 287, 290

regular: 23, 26, 33, 38, 39, 69, 73, 76, 88, 89, 100, 106, 110, 118, 120, 127, 152, 160, 186, 187, 190, 195, 246, 248, 254

roster: 89

voluntary: 16, 20, 25, 28, 43-45, 50, 72, 89, 111, 151, 178, 191, 227, 243, 244, 252, 260, 261

**OWCP:** 144, 146, 156, 166, 188, 213, 215, 216
*See also* Workers' Compensation

**P**

**Parking:** 115, 116, 187

shuttle: 115, 247

**Partnership:** 1, 2, 7, 22, 36, 60, 85, 115, 138, 246, 253

**Part-time Employees:** 84, 173, 176, 178,190

**Past Practices:** 170, 181, 239

**Payroll Deductions:** 227, 230

**Performance:** 21, 26, 36, 38, 44, 46, 50-52, 54, 60, 69, 71, 72, 74, 77-79, 85, 94, 95102, 106, 108-110, 117-129, 131, 132, 234, 138, 140, 142, 154, 161, 169, 171, 172, 175, 179, 183, 200, 206-210, 213, 264-271, 274, 279, 280, 286-288

assistance: 22, 28, 31, 50, 51, 57, 65, 72, 95, 113, 116, 127, 128, 133, 138, 144, 149, 151, 152, 172, 178, 191, 216

good standing: 221, 227

successful: 17-20, 26, 29, 51, 74, 78, 94, 102, 103, 118-120, 122, 124, 125, 127, 132, 170, 206, 207, 286, 289

unacceptable: 46, 118, 121, 128, 129

**Performance Appraisal:** 26, 46, 74, 117, 118, 120, 121, 124-126

**S**

**Sexual Harassment:** 62

**SF-71:** 180, 216

**Shuttle Service:** 115, 247

**Sick Leave:** 65, 156, 168, 182-185, 187, 190, 191, 193, 195-197, 216

for adoption: 192

for counseling:50, 127

restrictions: 163, 174, 177, 185, 200, 214, 217

**T**

**Telework:** 65, 72-80, 168, 196

**Telework Agreements:** 75, 77

**Time and Leave:** 76, 179, 180

hours of work: 76, 81, 100, 110, 111, 186, 204, 254

job sharing: 32, 178, 179

**Training:** 8, 10-14, 21, 23, 25-29, 31, 36, 37, 59, 64, 65, 67, 68, 78, 85, 95, 96, 98, 101, 103, 110, 123, 126-128, 138, 140, 141, 144, 145, 147-151, 154, 158, 160, 162, 169, 172-177, 190, 200-202, 205, 206, 242, 247, 252, 268-270, 286, 288

**Transfer:** 44, 46, 84, 96-98, 111, 130, 131, 134, 135, 154, 191, 192, 199, 227, 228, 236, 240, 280

**Travel:** 15, 110, 200
*See also* Official Travel

**U**

**Union Officials:** 13, 120, 227-229, 234,
236, 237, 243, 246

**Union Representative:** 7, 9, 23, 25-27, 31,
37, 40, 48, 57, 60, 67, 70, 85, 93, 104,
107, 112, 127, 138, 143, 160, 176, 200,
210, 221, 222, 229, 235-238, 240-242,
246, 249, 259, 273, 277, 284

**Upward Mobility:** 67, 200, 202, 205, 206

**V**

**Vacancy Announcements:** 99, 100, 101,
268, 278

**W**

**Warrant:** 56, 58, 172, 192, 265, 269
*See also* Within-Grade Increase

**Within-Grade Increase:** 124, 174, 177,
207, 208, 211
*See also* WIGI
administrative error: 253, 257
reconsideration: 24, 178, 209-212, 260,
263, 266, 267

**Workers' Compensation:** 44, 144, 213,
215, 216
*See also* OWCP

Page Intentionally Left Blank

SA357



Page Intentionally Left Blank

Page Intentionally Left Blank

Page Intentionally Left Blank

SA360





# Master Agreement Between the Department of Veterans Affairs and the American Federation of Government Employees

**Department of Veterans Affairs**
Office of Labor Management Relations (LMR)
810 Vermont Avenue, NW
Washington, DC  20420

**AFGE National VA Council,
VA Medical Center**
Building 76, Room 106
1970 Roanoke Boulevard
Salem, VA  24153

Contact:

Office of Labor Management Relations
**Phone: 202-461-4122**

AFGE National Council
**Phone: 540-345-6301
Email: afgenvac@aol.com**

To access or download Master Agreement:

**http://www.va.gov/LMR/**

**www.afgenvac.org**

How to Order:

Place your order through your station's PCO (Forms/Publications Supply Officer).

**Last Update August 2023
Printed September 2023**

**VA Pamphlet 05-68
P70450**

SA361

# Exhibit B

SA362



# AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO

| Eric Bunn Sr. | Dr. Everett B. Kelley | Dr. Kendrick B. Roberson |
|---|---|---|
| *National Secretary-Treasurer* | *National President* | *NVP for Women & Fair Practices* |

March 31, 2025

Honorable Douglas A. Collins
Secretary of Veterans Affairs
U.S. Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC 2420

      ***RE:***     ***Exclusions from Federal Labor-Management Relations Programs***

Dear Secretary Collins:

On March 27, 2025, President Donald J. Trump issued an Executive Order, *Exclusions from Federal Labor-Management Relations Programs* ("Order"). The Order identified executive agencies and subdivisions thereof that the President "*determined to have as a primary function intelligence, counterintelligence, investigative, or national security work.*" Order, Sec. 1-2. The Order delegates authority under 5 U.S.C. §7103(b)(1) to the Secretaries of Defense and Veterans Affairs to "*issue orders suspending the application of section 1-402 or 1-404 of Executive Order 12171, as amended, to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of the Federal Service Labor-Management Relations Statute.*" Order, Sec. 4(a).

On behalf of the 820,000 federal and D.C. government workers represented by the American Federation of Government Employees, AFL-CIO, including more than 310,000 employees at the U.S. Department of Veterans Affairs ("VA"), **I urge you to use the authority delegated to you by the President to issue an order certifying that the provisions of the Federal Service Labor-Management Relations Statute can be applied to VA employees consistent with national security requirements and considerations.**

The White House Fact Sheet supporting the Order cites VA's "Fourth Mission" as the "backstop healthcare provider for wounded troops in wartime" and "during national emergencies," such as COVID-19.[1] More specifically, as you know, VA's Fourth Mission is to improve the Nation's preparedness for response to war, terrorism, national emergencies, and natural disasters by developing plans and taking actions to ensure continued service to Veterans, as well as to support national, state, and local emergency management, public health, safety, and homeland security efforts.[2]

**VA's Fourth Mission operations are managed by one office: the Veterans Health Administration Office of Emergency Management ("OEM").**[3] Notably, OEM staff maintained collective bargaining rights while responding to the national, public health emergency caused by COVID-19,[4] which is now over, and as of May 9, 2022, OEM has no active assignments in support of VA's Fourth Mission.[5]

---

[1] *See Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements,* https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ (last accessed March 31, 2025).

[2] *See About the Department of Veterans Affairs: The Fourth Mission,* https://department.va.gov/about/ (last accessed March 31, 2025). *See also* 38 U.S.C. §1785; 38 U.S.C. §8111A; 38 U.S.C. §1784.

[3] *See About the VHA Office of Emergency Management,* https://www.va.gov/VHAEMERGENCYMANAGEMENT/ (last accessed March 31, 2025).

[4] *See VA News Release: VA responds with record number of Fourth Mission assignments to assist America during pandemic* (June 17, 2021), https://news.va.gov/press-room/va-responds-with-record-number-of-fourth-mission-assignments-to-assist-america-during-pandemic/ (last accessed March 31, 2025).

[5] *See VA Fourth Mission Summary,* https://www.va.gov/health/coronavirus/statesupport.asp (last accessed March 31, 2025).

---

**80 F Street, N.W., Washington D.C. 20001 • 202.737.8700 • Fax 202.639.6490 • www.afge.org**

**SA363**

**VA is the largest civilian agency in the federal government and the Nation's largest healthcare system.** VA employees, more than 150,000 of whom are veterans themselves, are responsible for delivering care and services to military veterans, their spouses, and their beneficiaries. They are the housekeepers cleaning VA hospitals, food service workers delivering meals, mental health professionals providing counseling and psychotherapy, crisis responders answering suicide prevention hotlines, physical therapists helping veterans recover from surgery, claims processors approving applications for benefits, cemetery workers assisting with military funerals, and so much more. These employees are not performing "national security work" as a "primary function" of their job within the meaning of 5 U.S.C. §7103(b)(1).

**Every American has the First Amendment right to freedom of association.** As Secretary of Veterans Affairs, you have a responsibility to ensure that VA fulfills its sacred mission to veterans and that VA employees remain free to exercise their rights without fear of retaliation, reprisal, or discrimination.

**The COVID-19 pandemic is over; the Nation is not at war.** Accordingly, no later than April 11, 2025, I urge you to exercise the authority delegated to you by the President to issue an order certifying that the Federal Service-Labor Management Relations Statute can be applied to VA employees in a manner consistent with national security requirements and considerations.

Thank you for your consideration.


Sincerely,

Everett B. Kelley
National President

**SA364**

# Exhibit C



AFGE National VA Council

# NATIONAL VETERANS AFFAIRS COUNCIL

American Federation of Government Employees

Affiliated with the AFL-CIO

Alma L. Lee - President

*Out of Many/***One Union**

AFGE NVAC / AFL-CIO

April 2, 2025

The Honorable Douglas A. Collins
Secretary of Veterans Affairs
U.S. Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC 2420

### RE:    *Exclusions from Federal Labor-Management Relations Programs*

Dear Secretary Collins:

On behalf of our more than 310,000 members at the U.S. Department of Veterans Affairs ("VA"), the National VA Council of the American Federation of Government Employees urges you to use the authority delegated to you by the President to issue an order certifying that the provisions of the Federal Service Labor-Management Relations Statute can be applied to VA employees consistent with national security requirements and considerations.

Under 5 U.S.C. §7103(b)(1), the President may issue an order excluding any agency or subdivision thereof from coverage under the Federal Service Labor Management Relations Statute (FSLMRS) if the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and if an agency's or its subdivisions' coverage under FSLMRS is inconsistent with national security requirements and considerations.

On March 27, 2025, President Donald J. Trump issued an Executive Order, *Exclusions from Federal Labor-Management Relations Programs* ("Order"). The Order identified executive agencies and subdivisions thereof that the President "*determined to have as a primary function intelligence, counterintelligence, investigative, or national security work*." Order, Sec. 1-2. The Order delegates authority under 5 U.S.C. §7103(b)(1) to the Secretaries of Defense and Veterans Affairs to "*issue orders suspending the application of section 1-402 or 1-404 of Executive Order 12171, as amended, to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of the Federal Service Labor-Management Relations Statute.*" Order, Sec. 4(a).

President Trumps' justification for inclusion of VA in its Executive Order cites the VA's "Fourth Mission" as the "backstop healthcare provider for wounded troops in wartime" and "during national emergencies," such as COVID-19.[1] VA's Fourth Mission is to improve the Nation's preparedness for response to war, terrorism, national emergencies, and natural disasters by developing plans and taking actions to ensure continued service to Veterans, as well as to support national, state, and local emergency management, public health, safety, and homeland security efforts.[2]

---

[1] *See Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements, https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/* (last accessed March 31, 2025).
[2] *See About the Department of Veterans Affairs: The Fourth Mission,* https://department.va.gov/about/ (last accessed March 31, 2025). *See also* 38 U.S.C. §1785; 38 U.S.C. §8111A; 38 U.S.C. §1784.

PO Box 2209 Salem, VA 24153 • (540) 345-6301



**SA366**

The U.S. is neither at war nor in a state of public emergency, so the factors that would trigger presidential exclusion under 5 U.S.C. §7103(b)(1) are not present. The VA's Fourth mission operations are managed under the office of the Veterans Health Administration Office of Emergency Management (OEM). As of May 9, 2022, OEM has no active assignments in support of VA's Fourth Mission..[3]

Further, during the COVID-19 public health emergency, OEM maintained its collective bargaining rights, an indication that the VA can fulfill Fourth Mission duties in ways that are consistent with national security requirements and consideration.

For these reasons, no later than April 11, 2025, the AFGE National Veterans Affairs Council urges you to exercise the authority delegated to you by the President to issue an order certifying that the Federal Service-Labor Management Relations Statute can be applied to VA employees in a manner consistent with national security requirements and considerations.

Thank you for your attention to this matter.

Sincerely,

AFGE NVAC Executive Council

Alma Lee - President

**Mary Jean Burke**
1st Executive Vice President

**Oscar Williams**
2nd Executive Vice President,
District 7 Representative

**Bill Wetmore**
3rd Executive Vice President

**Monica Fultz**
NVAC Treasurer

**Christopher Bovie**
District 1 Representative

**Geddes Scott**
District 2 Representative

**Joe Malizia**
District 3 Representative

**Bob Fetzer**
District 4 Representative

**Debra Cook-Rice**
District 5 Representative

**Tinita Cole**
District 6 Representative

**Annette Sage**
Interim District 8
Representative

**Barbara Whitson-Casanova**
District 9 Representative

**Derrick Mathis**
District 10 Representative

**Denise Lieb**
District 11 Representative

**Liz Turner-Nichols**
District 12 Representative

**Bernard Humbles**
District 13 Representative

**Calanit Kedem**
District 14 Representative

**Victor Ramirez-Rios**
District 15 Representative

---

[3] *See VA Fourth Mission Summary,* https://www.va.gov/health/coronavirus/statesupport.asp (last accessed March 31, 2025).

PO Box 2209 Salem, VA 24153 • (540) 345-6301

**SA367**

# Exhibit D

SA368



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

August 6, 2025

Dr. Everette B. Kelley
President
American Federation of Government Employees (AFGE), AFL-CIO
80 F Street NW
Washington, DC 20001

Dear Dr. Kelley:

This letter is regarding the master collective bargaining agreement (MCBA) between the Department of Veterans Affairs (VA or Department) and AFGE. On March 27, 2025, President Trump signed Executive Order (EO) 14251, titled *Exclusions from Federal Labor-Management Relations Programs* (*Exclusions*). EO 14251 invoked the President's authority under 5 U.S.C § 7103(b)(1) to exclude agencies and agency subdivisions, including VA, from the coverage of Chapter 71 of title 5, United States Code (the Federal Service Labor-Management Relations Statute, the FSLMRS or Statute). However, EO 14251 exempted police officers, firefighters, and security guards from its coverage.

As a result, except for the bargaining unit employees exempted from EO 14251's coverage, VA is no longer subject to the FSLMRS. Because the statutory authority underlying the original recognition of AFGE now applies only to police officers, firefighters and security guards, VA no longer recognizes AFGE as the exclusive representative of any other VA bargaining unit employee, effective August 6, 2025.

Accordingly, pursuant to EO 14251, I am providing notice that VA is terminating the VA-AFGE MCBA, any amendments, local supplemental agreements, and memoranda of understanding at all levels with AFGE for all VA bargaining unit employees, except police officers, firefighters, and security guards represented by AFGE, effective August 6, 2025.

Please ensure that any future correspondence concerning this notice is directed to Denise Biaggi-Ayer, Executive Director, Office of Labor-Management Relations, at Denise.Biaggi-Ayer@va.gov.

Douglas A. Collins

**SA369**

# Exhibit E

SA370



**THE SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

August 6, 2025

Ms. Alma L. Lee
National President
National Veterans Affairs Council (NVAC) #53/
 American Federation of Government Employees (AFGE)
1970 Roanoke Blvd (76-106)
Salem, VA 24153

Dear Ms. Lee:

This letter is regarding the master collective bargaining agreement (MCBA) between the Department of Veterans Affairs (VA or Department) and the National Veterans Affairs Council (NVAC)/AFGE. On March 27, 2025, President Trump signed Executive Order (EO) 14251, titled *Exclusions from Federal Labor-Management Relations Programs* (*Exclusions*). EO 14251 invoked the President's authority under 5 U.S.C § 7103(b)(1) to exclude agencies and agency subdivisions, including VA, from the coverage of Chapter 71 of title 5, United States Code (the Federal Service Labor-Management Relations Statute, the FSLMRS or Statute). However, EO 14251 exempted police officers, firefighters, and security guards from its coverage.

As a result, except for the bargaining unit employees exempted from EO 14251's coverage, VA is no longer subject to the FSLMRS. Because the statutory authority underlying the original recognition of NVAC/AFGE now applies only to police officers, firefighters and security guards, VA no longer recognizes NVAC/AFGE as the exclusive representative of any other VA bargaining unit employee, effective August 6, 2025.

Accordingly, pursuant to EO 14251, I am providing notice that VA is terminating the VA-NVAC/AFGE MCBA, any amendments, local supplemental agreements, and memoranda of understanding at all levels with NVAC/AFGE for all VA bargaining unit employees, except police officers, firefighters, and security guards represented by NVAC/AFGE, effective August 6, 2025.

Please ensure that any future correspondence concerning this notice is directed to Denise Biaggi-Ayer, Executive Director, Office of Labor-Management Relations, at Denise.Biaggi-Ayer@va.gov.

Douglas A. Collins

**SA371**

# Exhibit F

SA372

**Department of
Veterans Affairs**

# Memorandum

**Date:** August 6, 2025

**From:** Secretary (00)

**Subj:** Implementation of Executive Order (EO) 14251: Exclusions from Federal Labor-Management Relations Programs (Exclusions) (VIEWS 13530892)

**To:** Under Secretaries, Assistant Secretaries, and Other Key Officials

1. On March 27, 2025, President Trump signed EO 14251, titled *Exclusions from Federal Labor-Management Relations Programs* (*Exclusions*). EO 14251 invoked the President's authority under 5 U.S.C § 7103(b)(1) to exclude agencies and agency subdivisions, including the Department of Veterans Affairs (VA), from the coverage of Chapter 71 of title 5, United States Code (the Federal Service Labor-Management Relations Statute, the FSLMRS or Statute). As a result, except as described below, VA is no longer subject to the Statute.

2. Section 4 of EO 14251 delegated authority to the Secretary of Veterans Affairs to issue orders suspending the application of the EO to organizational components within VA. Federal Register Notice 16427, published on April 17, 2025, suspended the application of EO 14251 for employees represented by: Laborers International Union of North America (LIUNA); Western Federation of Nurses and Health Professionals (WFNHP), Veterans Affairs Staff Nurse Council (VASNC) Local 5032 at the VA Medical Center Milwaukee, Wisconsin; International Association of Fire Fighters (IAFF-99) at the VA Medical Center, Little Rock, Arkansas; United Nurses Association of California/Union of Healthcare Professionals (UNAC/UHCP) at the VA Medical Center, Loma Linda, California; Teamsters Union Local 115 at the VA Medical Center, Coatesville, Pennsylvania; International Brotherhood of Electrical Workers (IBEW) Local 2168 at the Cheyenne, Wyoming VA Medical Center; and International Association of Machinists and Aerospace Workers (IAMAW) Local 1998 at the VA National Cemetery of the Pacific in Honolulu, Hawaii. Therefore, VA is still subject to the requirements of the Statute for the employees represented by the local unions listed above, and the collective bargaining agreements for the local unions listed above will remain in full force and effect for all members of the bargaining unit unless and until Federal Register Notice 16427 is amended.

3. EO 14251 also exempted police officers, firefighters, and security guards from its coverage. This means the Statute still applies to all police officers, firefighters, and security guards who are included in a collective bargaining unit, and VA is still subject to the requirements of the Statute for those employees.

4. Today, I terminated all collective bargaining agreements at all levels with the American Federation of Government Employees (AFGE), the National Association of Government Employees (NAGE), Service Employees International Union (SEIU), National Nurses Organizing Committee/National Nurses United (NNOC/NNU), and the National Federation

**SA373**

Page 2.

Subj:  Implementation of Executive Order (EO) 14251: Exclusions from Federal Labor-Management Relations Programs (Exclusions) (VIEWS 13530892)

5.  of Federal Employees (NFFE), except insofar as those agreements cover police officers, firefighters, and security guards; for those employees and only those employees, the collective bargaining agreements remain in full force and effect.

6.  Taking this step removes barriers in VA's ability to effectively execute its mission without delay, resulting in a more responsive and accountable workforce that better serves Veterans and safeguards American interests.

7.  Key officials should immediately disseminate this Memorandum to all members of leadership and should ensure all bargaining unit employees within their organization receive the Memorandum.

8.  Additional guidance regarding the impact of terminating these agreements is forthcoming. If you have any questions, please contact Denise Biaggi-Ayer, Executive Director, Office of Labor-Management Relations, at Denise.Biaggi-Ayer@va.gov.

Douglas A. Collins

**SA374**

# Exhibit G

Redaction - Privilege

SA376

Redaction - Privilege

SA377



Redaction - Privilege

Redaction - Privilege

**From:** Smith, Tyler C. (OGC) <Tyler.Smith5@va.gov>
**Sent:** Tuesday, August 12, 2025 9:46 AM
**To:** EFCORNELIUS@COMCAST.NET; Reinhold, Rebecca L. <Rebecca.Reinhold@va.gov>
**Subject:** RE: [EXTERNAL] Appointment for case #240104-02414

Good morning,

Given the Secretary's decision to terminate the master collective bargaining agreement, we are prohibited from paying for any arbitration services rendered after August 6, 2025. If it is ultimately your determination to proceed with the arbitration, the Agency intends to file immediate interlocutory exceptions with the FLRA and will not be attending any scheduled arbitration hearings on the matter.

Thank you,

Tyler Smith
Staff Attorney
Office of General Counsel
U.S. Department of Veterans Affairs
Cell: 816-550-0294

Please submit requests for legal support here:  MD Request for Legal Assistance

This communication may contain information that is confidential, privileged, or otherwise protected by law, such as the Privacy Act of 1974, and is intended for solely the individual or entity to whom it is addressed. If you are not the intended recipient, please destroy all copies and notify the sender immediately. The transmission, screening, or any other processing of this email does not constitute a waiver of privilege or other applicable protections.

**PRE-DECISIONAL**

**From:** EFCORNELIUS@COMCAST.NET <EFCORNELIUS@COMCAST.NET>
**Sent:** Tuesday, August 12, 2025 9:13 AM
**To:** Reinhold, Rebecca L. <Rebecca.Reinhold@va.gov>; Smith, Tyler C. (OGC) <Tyler.Smith5@va.gov>
**Subject:** RE: [EXTERNAL] Appointment for case #240104-02414

I am on vacation and cannot readily access my files. However, I note that there is authority seemingly contrary to the Agency's position:
https://cdn.ca9.uscourts.gov/datastore/opinions/2025/08/01/25-4014.pdf
I fully expect to be paid for all of my work, which includes reading and responding to Agency emails and arguments. I hope to have something definitive to say on Friday, August 15, 2025, after I return.
On 08/11/2025 11:06 PM PDT Reinhold, Rebecca L. <rebecca.reinhold@va.gov> wrote:

The agency has already agreed to a date. This grievance predates any executive order and therefore AFGE L85 is prepared to move forward.

**SA379**

**From:** Smith, Tyler C. (OGC) <Tyler.Smith5@va.gov>
**Sent:** Monday, August 11, 2025 10:56 AM
**To:** EFCORNELIUS@COMCAST.NET
**Cc:** Reinhold, Rebecca L. <Rebecca.Reinhold@va.gov>
**Subject:** RE: [EXTERNAL] Appointment for case #240104-02414

Good morning,

On March 27, 2025, President Trump signed Executive Order (EO) 14251: Exclusions from Federal Labor-Management Relations Programs, exempting the Department of Veterans Affairs (VA) from Chapter 71 of title 5 of the United States Code, the Federal Service Labor-Management Relations Statute (FSLMRS or Statute). EO 14251 exempted police officers, firefighters, and security guards from its coverage (collectively referred to as Exempted Employees).

On August 6, 2025, pursuant to EO 14251, the Secretary terminated the American Federation of Government Employees master collective bargaining agreement, and all amendments, local supplemental agreements, and memoranda of understanding at all levels (collectively referred to as CBA), except insofar as those agreements cover Exempted Employees.

The union's grievance only applies to VA employees other than Exempted Employees (Non-Exempted Employees). Accordingly, VA is hereby denying the grievance pursuant to EO 14251 as AFGE is no longer recognized as the exclusive labor representative for Non-Exempted Employees and AFGE's CBA is no longer in effect for Non-Exempted Employees. Furthermore, these arbitration proceedings should cease immediately.

Finally, insomuch as the underlying grievance only covers Non-Exempted Employees, you are hereby put on notice that VA will not pay for any arbitration services rendered after August 6, 2025, related to this grievance. Additionally, VA will not participate any further in the arbitration process or abide by any arbitration decision issued after August 6, 2025, related to this grievance.

Thank you,

Tyler Smith
Staff Attorney
Office of General Counsel
U.S. Department of Veterans Affairs
Cell: 816-550-0294

Please submit requests for legal support here: MD Request for Legal Assistance

This communication may contain information that is confidential, privileged, or otherwise protected by law, such as the Privacy Act of 1974, and is intended for solely the individual or entity to whom it is addressed. If you are not the intended recipient, please destroy all copies and notify the sender immediately. The transmission, screening, or any other processing of this email does not constitute a waiver of privilege or other applicable protections.

**PRE-DECISIONAL**

**SA380**

**From:** EFCORNELIUS@COMCAST.NET <EFCORNELIUS@COMCAST.NET>
**Sent:** Tuesday, July 22, 2025 6:22 AM
**To:** Reinhold, Rebecca L. <Rebecca.Reinhold@va.gov>; Pahides, Stephen (OGC) <Stephen.Pahides@va.gov>; Smith, Tyler C. (OGC) <Tyler.Smith5@va.gov>
**Cc:** Franks, Scotty (FSC) <Scotty.Franks2@va.gov>
**Subject:** RE: [EXTERNAL] Appointment for case #240104-02414

Hear is what my records show about FMCS 24-08738:

4/30/2025  Ms. Reinhold emailed me "At this time, AFGE L85 is requesting to withdraw this case."
5/1/2025   I emailed Ms. Reinhold et al "Attached is a Statement  for the cancellation fee [$500] in # 24-08738."
I do not believe that the $500 cancellation fee for # 24-08738 has been paid.
5/8/2025  Mr. Summerfield emailed me "Please take this as formal notice that the Union is withdrawing this grievance [FMCS 24-08738]."

I believe that this where the parties stand:

(1)  FMCS 24-02414 is set for hearing on September 30, 2025.
     Please let me know if the parties want an in-person or videoconference hearing.
     My records indicate that a $500 cancellation fee has been paid, so that a credit is due.

(2)  The cancellation fee of $500 for FMCS 24-08738 is outstanding.
      FMCS records indicate that the case is closed.

That you for your kind assistance in confirming the status of these two cases.

On 07/21/2025 3:29 PM EDT Reinhold, Rebecca L. <rebecca.reinhold@va.gov> wrote:

FMCS 24-08738 (NCA 25% Official Time) was withdrawn by NVAC attorney Alec Summerfield on May 8, 2025.
FMCS 24-02414 (Unpaid Back Union Dues) is a still active case. Mr. Smith and myself agreed to September 30, 2025, and emailed you on June 30, 2025. You responded back that 'September 30 it is.'

**From:** EFCORNELIUS@COMCAST.NET <EFCORNELIUS@COMCAST.NET>
**Sent:** Monday, July 21, 2025 2:19 PM
**To:** Reinhold, Rebecca L. <Rebecca.Reinhold@va.gov>; Pahides, Stephen (OGC) <Stephen.Pahides@va.gov>; Smith, Tyler C. (OGC) <Tyler.Smith5@va.gov>
**Cc:** Franks, Scotty (FSC) <Scotty.Franks2@va.gov>
**Subject:** RE: [EXTERNAL] Appointment for case #240104-02414

I apologize if the confusion is mine, but I have an email pertaining to case FMCS 24-08738 (NCA 25% Official Time), in which the hearing date for that case is set for September 30, 2025.

**SA381**

My inquiry is about FMCS 24-02414 (Unpaid back Union dues.), a hearing date for which does not appear to have been set. It seems to me that there is some confusion about two different cases, which I would like to resolve.

Thank you for your assistance.
On 07/21/2025 2:54 PM EDT Reinhold, Rebecca L. <rebecca.reinhold@va.gov> wrote:


The agency and the union agreed to a date of September 30, 2025. I can forward you the email if you need it.

**From:** EFCORNELIUS@COMCAST.NET <EFCORNELIUS@COMCAST.NET>
**Sent:** Monday, July 21, 2025 11:21 AM
**To:** Reinhold, Rebecca L. <Rebecca.Reinhold@va.gov>; Pahides, Stephen (OGC) <Stephen.Pahides@va.gov>; Smith, Tyler C. (OGC) <Tyler.Smith5@va.gov>
**Cc:** Franks, Scotty (FSC) <Scotty.Franks2@va.gov>
**Subject:** RE: [EXTERNAL] Appointment for case #240104-02414

This case seems to have a long and confusing history. I am trying to get my schedule in order and would like to know the status of the case.
Thank you for your assistance.
On 02/28/2025 8:09 AM EST Reinhold, Rebecca L. <rebecca.reinhold@va.gov> wrote:


Arbitrator Cornelius- I have attached the national grievance and the decision for the national grievance. The decision was signed in July 2024. To date, our local has not been made whole by the national grievance. In our opinion, the case is not concluded.

**From:** EFCORNELIUS@COMCAST.NET <EFCORNELIUS@COMCAST.NET>
**Sent:** Friday, February 28, 2025 4:03 AM
**To:** Reinhold, Rebecca L. <Rebecca.Reinhold@va.gov>; Pahides, Stephen (OGC) <Stephen.Pahides@va.gov>; Smith, Tyler C. (OGC) <Tyler.Smith5@va.gov>
**Cc:** Franks, Scotty (FSC) <Scotty.Franks2@va.gov>
**Subject:** RE: [EXTERNAL] Appointment for case #240104-02414

Please let me know if this case has been concluded, as I must file a final report with FMCS.
On 01/30/2025 12:20 PM EST efcornelius@comcast.net wrote:


I want to clear my 2024 accruals at this time. Attached is a Statement for that purpose ($500.00). Please pay it now. If you decide to go ahead with an arbitration in 2025, I will credit you for the $500.00.

Thank you for selecting me as arbitrator.
On 11/07/2024 1:43 PM EST efcornelius@comcast.net wrote:


Thank you. I will do that.
On 11/07/2024 1:29 PM EST Reinhold, Rebecca L. <rebecca.reinhold@va.gov> wrote:

**SA382**

We are waiting for the agency to comply to the remedies of the National grievance. At this time, we are requesting for it to stay in abeyance.

**From:** EFCORNELIUS@COMCAST.NET <EFCORNELIUS@COMCAST.NET>
**Sent:** Tuesday, October 1, 2024 12:48 PM
**To:** Reinhold, Rebecca L. <Rebecca.Reinhold@va.gov>; Pahides, Stephen (OGC) <Stephen.Pahides@va.gov>; Smith, Tyler C. (OGC) <Tyler.Smith5@va.gov>
**Cc:** Franks, Scotty (FSC) <Scotty.Franks2@va.gov>
**Subject:** RE: [EXTERNAL] Appointment for case #240104-02414

Please give me a short status report on this case. Thank you.
On 08/02/2024 10:12 AM EDT efcornelius@comcast.net wrote:

Please let me know the status of this case. I have left the file open in case there remains something to be decided at the local level. Thank you.
On 02/28/2024 11:04 AM EST Reinhold, Rebecca L. <rebecca.reinhold@va.gov> wrote:

Good morning Mr. Cornelius- a grievance was filed at the national level by NVAC, which covers the same allegations as the grievance filed by AFGE Local 85. At this time, we are asking to put our grievance into abeyance until a decision is rendered by the arbitrator in regards to the national grievance.

**From:** EFCORNELIUS@COMCAST.NET <EFCORNELIUS@COMCAST.NET>
**Sent:** Friday, February 23, 2024 5:24 AM
**To:** Reinhold, Rebecca L. <Rebecca.Reinhold@va.gov>; Pahides, Stephen (OGC) <Stephen.Pahides@va.gov>
**Cc:** Franks, Scotty (FSC) <Scotty.Franks2@va.gov>
**Subject:** RE: [EXTERNAL] Appointment for case #240104-02414

Thank you. Please confer with the Agency and select a mutually convenient date and let me know the parties' choice.
On 02/22/2024 6:43 PM EST Reinhold, Rebecca L. <rebecca.reinhold@va.gov> wrote:

Good evening Mr. Cornelius- AFGE Local 85 is in receipt of the letter that you mailed regarding tentative dates for an arbitration. At this time, the earliest available for AFGE Local 85 is the beginning of July. Our next available time would be the beginning of September.

Rebecca Reinhold
AFGE Local 85 Treasurer
Rebecca.reinhold@va.gov
Becky.reinhold@yahoo.com
(913) 683-3542/(913) 682-2000 ext 63334
Boomshakalaka 🎤 Drop

SA383



**From:** arbsvc@fmcs.gov <arbsvc@fmcs.gov>
**Sent:** Wednesday, February 14, 2024 11:03 AM
**To:** EFCORNELIUS@COMCAST.NET
**Cc:** Franks, Scotty (FSC) <Scotty.Franks2@va.gov>; Reinhold, Rebecca L. <Rebecca.Reinhold@va.gov>
**Subject:** [EXTERNAL] Appointment for case #240104-02414

Cornelius, E. Frank you have been appointed to Case #240104-02414.

Employer: Financial Services Center
Employer Rep: Franks, Scotty
Phone: (512)736-5496
Email: scotty.franks2@va.gov


Union: AFGE
Union Rep: Reinhold, Rebecca
Phone: (913)683-3542
Email: rebecca.reinhold@va.gov


If you are unable to view the attachment Login at https://arbitration.fmcs.gov. On your home page under Open Appointed Cases click the button to Re-print Appointment Letter.


**IMPORTANT: Please do not respond to this email address. It is not monitored. To notify us, email arbitration@fmcs.gov or call 202-606-5111.**

**SA384**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305<br><br>     *Plaintiffs,*<br><br>     **v.**<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS<br><br>DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs<br><br>     *Defendants.* | **Case No. 1:25-cv-00583-MRD-PAS** |

### DECLARATION OF MARY-JEAN BURKE

1

**SA385**

I, Mary-Jean Burke, declare as follows:

1.     I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.     I am a physical therapist at Richard L. Roudebush VA Medical Center in Indianapolis, Indiana ("Roudebush VAMC"). I was hired to provide in-patient physical therapy in an acute care setting and have since worked in several units. In total, I have worked for the Department of Veterans Affairs for 30 years.

3.     I am President of the American Federation of Government Employees, AFL-CIO National Veterans Affairs Council ("NVAC"). I have served in this position since November 2025. Previously, I served as the NVAC First Executive Vice President from 2007 to 2025 and NVAC Health and Safety Representative from 2003 to 2007.

4.     There are approximately 170 local unions representing AFGE bargaining unit employees at the VA. These 170 local unions fall under the representational jurisdiction of the NVAC and are covered by the 2023 Master Collective Bargaining Agreement.

5.     I am also the Vice President of AFGE Local 609 at the Roudebush VAMC. I previously served as Secretary-Treasurer of AFGE Local 609.

**NVAC Bargaining Unit**

6.     NVAC represents nationwide bargaining units covering approximately 300,000 professional and non-professional employees who work at nearly every VA administration and component, including the Veterans Health Administration, Veterans Benefits Administration, National Cemetery Administration, and operational components such as, but not limited to, the Office of Information & Technology, Office of Finance, Office of Emergency Management, and the VA History Office. Hospitals and clinics under the Veterans Health Administration employ

2

SA386

the largest number of NVAC-represented workers; these employees include physicians, dentists, registered nurses, pharmacists, physical and occupational therapists, housekeepers, engineers, custodians, cooks, and numerous other healthcare and support staff. NVAC-represented workers in other VA administrations and components include, for example, cemetery workers, attorneys, gardeners, archivists, security officers, claim processors, clerical workers, IT professionals, bookkeepers, and a number of other civil servants.

7.    NVAC's mission is to support and advocate for the federal employees who take care of our nation's veterans, including working towards a safe and fair workplace for all members. Almost 40 percent of NVAC's members are themselves veterans. As the exclusive bargaining representative of these workers, NVAC provides numerous services to all bargaining unit employees. Core functions of NVAC include working in a mutually respectful partnership with the VA to secure a fair and reasonable master collective bargaining agreement; negotiating implementation of new policies during the term of the Master Agreement; filing and prosecuting grievances (locally and nationally) against the VA to enforce the terms and conditions of the Master Agreement; representing workers in arbitration and before professional standards boards; participating in safety inspections and negotiating safety abatements; and providing guidance and support to members navigating USERRA, EEO, and other federal processes.

8.    I served on the NVAC negotiating teams for the 2011 Master Agreement and 2023 Master Agreement. I am a signatory to both agreements. The 2011 Master Agreement negotiations lasted nearly 8 years. The 2023 Master Agreement negotiations lasted more than 6 years, from December 2017 to August 2023, and cover the largest consolidated bargaining unit of federal employees, not only in the VA but in any agency or department within the Executive Branch.

//

3

**SA387**

**Health and Safety**

9. As union representatives, one of our core responsibilities is to ensure that VA employees have a safe work environment. As the nation's largest health care institution, the VA is no stranger to the outbreak of infectious, and sometimes deadly, bacteria and disease.

10. For example, in 2013, there was a deadly outbreak of Legionnaires' disease at the Pittsburgh VAMC that took the lives of five veterans. AFGE and NVAC were at the forefront of the union's response to the outbreak, advising employees of applicable standards and guidelines under the Occupational Safety and Health Administration (OSHA) and ensuring that proper remedial steps were taken to protect employees and veterans. In February 2013, the President of AFGE Local 2028 testified before the House Veterans' Affairs Committee Subcommittee on Oversight and Investigations to answer questions about this deadly outbreak and the union's response.

11. In 2021, custodial staff at the Louisville VAMC were required to mop floors directly next to floor level outlets with the risk of electrocution. AFGE Local 1133 filed an OSHA complaint, which was later substantiated and forced the VA facility to correct this safety issue and additional electrical hazards in violation of applicable standards.

12. Several AFGE local unions have prevailed in grievance and arbitration to secure environmental differential pay or hazardous duty pay for bargaining unit employees who are exposed to virulent biologicals and toxic chemicals without proper personal protective equipment and training, resulting in back pay for affected VA workers. Recent examples include AFGE Local 910 at the Kansas City VAMC and AFGE Local 1061 at the Greater Los Angeles VAMC.

13. During the COVID-19 pandemic, VA hospitals and clinics remained open to the public, veterans, and their families and caregivers. Every single day, NVAC representatives and

4

**SA388**

union officials across the country were scrambling to assist and protect employees however and whenever we could. We worked with management officials to ensure that employees had adequate personal protective equipment, access to free testing, and that they understood their rights under the American Rescue Plan Act, the Families First Coronavirus Response Act, and the Federal Employees' Compensation Act. We held emergency town halls and union meetings during lunch breaks to educate employees on their collective bargaining rights under the Master Agreement. Though the precise number cannot be known with certainty, more than 25,000 VA employees contracted COVID-19 at work, and tragically, at least 203 dedicated VA employees lost their lives.

14.     In furtherance of NVAC's mission to protect and safeguard VA employees, Article 29 (Safety, Health, and Environment) is one of the strongest, most important sections of the Master Agreement. Article 29 aims to secure a healthy and safe workplace for bargaining unit employees, entitling the union to representation and participation in national, intermediate, and local safety committees tasked with jointly developing specific procedures for "preventing and abating safety and health hazards" in conjunction with the VA. *See* Master Agreement, Article 29, Section 1(C); Article 29, Sections 2 and 3.

15.     Under Article 29, NVAC is contractually entitled to five National Safety and Health Representatives whose responsibilities included serving as points of contact for health and safety initiatives, developing joint training programs and materials in health and safety for bargaining unit employees, and visiting facilities within the bargaining unit to work with local unions on health and safety matters, among others. *See* Master Agreement, Article 29, Section 3(A).

16.     Local unions were also empowered to designate a local Safety and Health Representative whose myriad functions included conducting joint inspections, participating in inspections conducted by non-VA governmental authorities, receiving a variety of reports related

5

to health and safety matters at the facility, and developing and monitoring abatement plans needed to correct local conditions. See Article 29, Section 3(G).

17.    NVAC also negotiated stricter procedures and more generous employee protections in the Master Agreement than those required by relevant law and regulations. For example, in Article 29, the VA agreed to:

a. Conduct a comprehensive analysis to better understand and remedy patterns of injuries and illnesses at each facility. *See* Master Agreement, Article 29, Section 6.

b. Allow a local union representative to be present during a facility safety inspection to ascertain whether a particular working condition qualified as an "imminent danger." *See* Master Agreement, Article 29, Section 7.

c. Provide additional and more specialized safety and health training for union Safety and Health Representatives. *See* Master Agreement, Article 29, Section 8.

d. Refrain from the application of insecticides/chemicals during working hours with the exception of sensitive hospital areas, and provide the Union advance notice of the use of any pesticides in a larger scale application. *See* Master Agreement, Article 29, Section 11.

e. Provide individuals with workstation modifications to ensure an ergonomic environment through a process negotiated with the Union. *See* Master Agreement, Article 29, Section 20.

f. Ensure safe indoor air quality by maintaining ventilation efficiency, minimizing the impact of contamination from outside sources, eliminating sources of microbial contaminants, and cleaning and disinfecting surfaces. *See* Master Agreement, Article 29, Section 22.

g. Develop a wellness program that allows employees to use wellness/fitness centers during duty hours, among other things. *See* Master Agreement, Article 29, Section 24.

h. Ensure equipment, machinery, and furniture is ergonomically compatible with employees who use them, by agreeing to work with the local union to select and purchase such items. *See* Master Agreement, Article 29, Section 25.

i. Develop a policy and plan with the local union on the prevention of workplace violence, with annual training offered to all employees. *See* Master Agreement,

6

**SA390**

Article 29, Section 26.

j.  Establish and maintain procedures with the Union for the medical surveillance of employees who occupy positions that carry potential risks to their health. *See* Master Agreement, Article 29, Section 27.

k.  Make appropriate arrangements for employees exposed to individuals with known communicable diseases such as tuberculosis, at no cost to the employee. *See* Master Agreement, Article 29, Section 29.

l.  Select lifting equipment to ensure ergonomic lifting and safe lifting with input and participation from the Union. *See* Master Agreement, Article 29, Section 33.

18.  Bargaining unit employees benefit from the negotiated provisions of Article 29. They are entitled to union representation at any time involving a work-related injury or illness. *See* Master Agreement, Article 29, Section 10(B). Employees who worked in and around areas with extreme temperature conditions were also entitled to have a written plan for appropriate emergent cooling or heating procedures. *See* Master Agreement, Article 29, Section 13. Employees working with Video Display Terminals ("VDT") were entitled to breaks during the day in addition to their regularly scheduled rest periods. *See* Master Agreement, Article 29, Section 20(F). Other VDT-related benefits concerning lighting, keyboards and screens, printers, chairs and desks and training and VDT-related vision benefits (which include monetary and leave-related entitlements), are also found in Article 29, Sections 20(G-K) and 21. Employees with temporary work restrictions were entitled to accommodations. *See* Master Agreement, Article 29, Section 34.

19.  Following Secretary Collins' termination of the Master Agreement, VA facilities are no longer honoring the terms of Article 29. The VA no longer recognizes the need to consult with health and safety representatives at the national level, and am I aware that local VA management is also refusing to consult with local health and safety representatives. Therefore, employees are left without the crucial health and safety protections negotiated by NVAC in Article

7

**SA391**

29.

### *NVAC Legislative Advocacy*

20.  I have served as Chair of the NVAC Legislative Committee since 2003. In this role, I am responsible for directing and implementing NVAC's legislative priorities on Capitol Hill. This includes working with executive leadership, staff members, and subject matter experts to assess and determine whether NVAC will support, oppose, endorse, or reject legislative and regulatory proposals that may impact VA workers. NVAC's legislative portfolio covers a wide and dynamic range of issues that include, for example, legal entitlements governing medical care and services for patients and beneficiaries, VA staffing and hiring requirements, mandated training and education, changes to licensure and certification requirements, employee due process rights and collective bargaining rights, pay and retirement programs, and much more. NVAC will also join AFGE and other unions in their efforts to support legislation with government-wide effect outside of the VA, such as the "Rights for the TSA Workforce Act," which would codify Title 5 collective bargaining rights for federal employees at the Transportation Security Agency.

21.  When NVAC takes a position on proposed legislation or regulations, NVAC often announces our position publicly via press releases, news releases, written statements, social media posts, email communications, sign-on letters, petitions, and more. To support our legislative and regulatory priorities, we ask our members and allies to work with us to accomplish these goals. We call on our union members to support NVAC's position. We lobby members of Congress to support NVAC's position. We advocate alongside veterans service organization and other labor unions to support NVAC's position.

22.  In the past, NVAC strongly advocated against the legislative priorities of President Trump that would would weaken the delivery of care and services to veterans and negatively

8

**SA392**

impact the working conditions of VA employees.

23.     One example from President Trump's first term was NVAC's opposition to the Veterans Affairs Accountability and Whistleblower Protection Act of 2017 (VA Accountability Act). The VA Accountability Act created a new disciplinary authority for VA to take adverse actions against VA employees, weakened due process protections, and expedited appeal deadlines to challenge unlawful adverse actions. President Trump signed the VA Accountability Act into law on June 23, 2017. At the signing ceremony, he praised the legislation, saying, "This is one of the largest reforms to the VA in its history. It's a reform that I campaigned on, and now I am thrilled to be able to sign that promise into law."

24.     In the months following its passage, NVAC began challenging the VA's unlawful implementation of the VA Accountability Act, which violated the Master Agreement and the Federal Service Labor-Management Relations Statute, 5 U.S.C. Chapter 71. For example, NVAC filed two grievances against the VA after it unilaterally implemented the Act without meeting its bargaining obligations and in breach of its contractual obligation to provide performance improvement plans. NVAC prevailed in both matters, and the VA was found to have violated its legal obligations to NVAC. In March 2023, following extensive litigation in administrative forums and federal court, former VA Secretary Denis McDonough announced that VA would not utilize its disciplinary authority under the VA Accountability Act.  VA announced that it would not utilize this authority because of its losses in court and in arbitration.

25.     Four months later, in July 2023, NVAC and the VA settled their dispute over the VA's implementation of the VA Accountability Act, resulting in thousands of former VA employees being offered monetary relief, and in some cases, reinstatement.  The settlement was the result of more than eight months of FLRA-mediated negotiations between the VA and NVAC.

SA393

NVAC, the VA, the FLRA, and members of Congress all issued statements announcing the historic settlement agreement, with the VA announcing that through the settlement it would make payments totaling "hundreds of millions of dollars" compensating nearly 5,000 former employees who had improperly been subjected to discipline.

26.    Another example of NVAC's opposition to the legislative priorities of the first Trump Administration is NVAC's opposition to the VA Maintaining Internal Systems and Strengthening Integrated Outside Networks Act of 2018 (VA MISSION Act). The VA MISSION Act privatized large segments of VA healthcare services and thus undermined the quality and accessibility of care available to veterans, resulting in the further privatization of the VA to for-profit "community care" providers who consistently underperform compared to VA employees. NVAC, in partnership with AFGE, lobbied against the VA MISSION Act and participated in legislative hearings and submitted testimony to Congress.

27.    On, May 17, 2017, then-AFGE National President J. David Cox testified during a legislative hearing before the Senate Committee on Veterans' Affairs, in which he criticized the VA MISSION Act: "None of the personnel provisions of this bill are really about veterans or accountability. It is about politics. It is about 'you are fired' as an easy way to shift blame of wrongdoing from executives and political appointees onto the rank and file." The statement is publicly available as part of the legislative record. A true and correct copy of Mr. Cox's May 17, 2017 statement is attached hereto as **Exhibit A**.

28.    On July 11, 2017, AFGE and NVAC submitted a statement for the record during a legislative hearing before the Senate Committee on Veterans' Affairs opposing various pending pieces of legislation, including the VA MISSION Act. The statement is publicly available as part of the legislative record. A true and correct copy of the July 11, 2017 statement is attached hereto

10

as **Exhibit B**.

29.    On October 24, 2017, AFGE and NVAC submitted a statement for the record during a legislative hearing before the House Committee on Veterans' Affairs. In the statement, AFGE and NVAC made clear that they "strongly oppose[d]" the VA MISSION Act, which "would serve the agenda of privatizers but ignore the needs and preferences of veterans to receive the vast majority of their care from a fully-funded, fully-staffed, world-class integrated VA health care system." The statement is publicly available as part of the legislative record. A true and correct copy of the October 24, 2017 statement is attached hereto as **Exhibit C**.

30.    On March 15, 2018, AFGE and NVAC submitted a statement for the record during a legislative hearing before the House Committee on Veterans' Affairs Subcommittee on Health regarding President Trump's Fiscal Year 2019 budget request for the VA. In the statement, AFGE and NVAC called out "outrageous understaffing" at the VA, noting that approximately 35,000 positions needed to be filled within the department. The statement took issue with channeling funds toward subsidizing unaccountable private sector care for veterans rather than adequately funding and staffing the VA.  The statement is publicly available as part of the legislative record. A true and correct copy of the March 15, 2018 statement is attached hereto as **Exhibit D**.

31.    On May 22, 2018, AFGE, along with 16 other labor organizations, urged the Senate to reject the VA MISSION Act because it "does nothing to help build up the internal capacity at the VA" and instead "outsources primary care to the private sector[.]" A true and correct copy of the letter opposing the VA MISSION Act is attached hereto as **Exhibit E**.

32.    President Trump signed the VA MISSION Act into law on June 6, 2018. At the signing ceremony, he praised the legislation and criticized the unions who opposed his agenda, saying, "For 40 years they've been trying to pass this — Phil [Roe], you know that. Forty

11

years. And they couldn't. Made so much sense. But it was hard. You have civil service, you have unions. Of course they'd never do anything to stop anything, but they had a very great deal of power. And in the end, they came along.  Everybody came along because they knew it was right." A true and correct copy of President Trump's remarks are attached hereto as **Exhibit F**.

33.    On June 21, 2018, AFGE and NVAC submitted a statement for the record during a legislative hearing before the House Committee on Veterans' Affairs called "More Than Just Filling Vacancies: A Closer Look at VA Hiring Authorities, Recruiting, and Retention." A true and correct copy of that June 21, 2018 statement is attached hereto as **Exhibit G**. In that statement, AFGE and NVAC continued to criticize efforts to privatize VA health care and called on the VA to fill tens of thousands of vacant positions. AFGE and NVAC called for increased transparency and accountability from the VA, citing Section 505 of the VA MISSION Act. "We were also pleased to see Sec. 505 include a reporting requirement so that the Department will have to face Congress and explain what steps it is taking to fully staff every VA facility across the country. This new transparency requirement is important, and we ask that Congress make certain that the VA complies with this section of the new law." In this statement, AFGE and NVAC expressed support for H.R.6101 (VA Personnel Equity Act), which would have undone the damage caused by the VA Accountability Act, a law that AFGE and NVAC "vociferously opposed."

34.    On July 17, 2018, AFGE and NVAC submitted a statement for the record during a legislative hearing before the House Committee on Veterans' Affairs. In the statement, AFGE and NVAC stated that the VA MISSION Act had "proven to be one of the most misguided and counterproductive VA laws ever enacted" that "demoralized and harmed its dedicated workforce." The statement is publicly available as part of the legislative record. A true and correct copy of the July 17, 2018 statement is attached hereto as **Exhibit H**.

12

**SA396**

35.    On April 10, 2019, AFGE and NVAC submitted a statement for the record during a legislative hearing before the Senate Committee on Veterans' Affairs. The statement provided comments on the "state of the VA MISSION Act implementation as well as the harm expanded private sector intrusion will have on the VA's ability to deliver high quality, timely care to veterans."  AFGE and NVAC reiterated their concerns about the law and its negative impact on the VA workforce to fulfill its duties, stating that "[T]he VA MISSION Act will lead to an irreversible dismantling and weakening of VA's exemplary, uniquely veteran-centric health care system." The statement is publicly available as part of the legislative record. A true and correct copy of the April 10, 2019 statement is attached hereto as **Exhibit I**.

36.    NVAC's opposition to the VA MISSION Act continued for years following its passage, and NVAC ultimately succeeded in stopping a key component of the legislation. NVAC, in partnership with AFGE and other labor unions, lobbied Senators to oppose any nominations to the Asset and Infrastructure Review Commission, which was created by the VA MISSION Act. This Commission was tasked by the VA MISSION Act to recommend and ultimately implement the largescale closure of VA hospitals and clinics, resulting in the further privatization of VA care and services and the elimination of VA jobs. As a result of NVAC and AFGE's advocacy, which included a lengthy "Save My VA" campaign that targeted specific Senators, in 2022 a bipartisan group of 12 Senators banded together to blockade all nominations to the Commission, effectively blocking the closure of several VA medical facilities.

37.    NVAC's opposition to the passage and subsequent implementation of the VA MISSION Act continued through 2022 and beyond.  For example, NVAC continues to advocate against the access standards drafted and implemented by the VA under the authority of the VA MISSION Act during President Trump's first term. In the 119th Congress, NVAC is actively

13

opposing H.R.740 and S.275, the "Veterans' Assuring Critical Care Expansions to Support Service (ACCESS) Act," which would codify these access standards.

38.     In addition to opposing President Trump's legislative priorities, NVAC officials and AFGE members have testified before various committees of the United States House of Representatives and Senate. In my capacity as an NVAC representative and officer, I have personally testified before Congress on several occasions, seeking to improve working conditions and conditions of employment for VA employees on issues including market pay adjustments, parental leave, and retirement benefits for police officers. *See Investing in the Future of the Federal Workforce: Paid Parental Leave Improves Recruitment and Retention,* House Committee on Oversight and Government Reform and Joint Economic Committee (March 6, 2008); *"Building a Better VA: Addressing Healthcare Workforce Recruitment and Retention Challenges,"* House Committee on Veterans' Affairs (March 17, 2022); *"VHA Recruitment and Retention: Is Bureaucracy Holding Back a Quality Workforce?,"* House Committee on Veterans' Affairs Subcommittee on Oversight and Investigations and Subcommittee on Health (May 17, 2023); Legislative Hearing, House Committee on Veterans' Affairs Subcommittee on Health (December 17, 2024).

39.     NVAC has also submitted numerous statements for the legislative record that were critical of initiatives designed or supported by the Trump Administration, such as the privatization of veteran care and attacks on collective bargaining and due process rights. *See* Hearing on Pending Legislation, Senate Committee on Veterans' Affairs (July 11, 2017).

### *Political Endorsements*

40.     AFGE endorsed Joe Biden in the 2020 presidential election.  It endorsed Kamala Harris in the 2024 presidential election, and in that endorsement, AFGE stated "AFGE members

14

have made clear that their top priority in 2024 is defeating Donald Trump and stopping anti-worker efforts."

### *Membership and Association*

41.     Since the termination of the Master Agreement on August 6, 2025, Secretary Collins, senior VA executives, and other management officials across the country have engaged in an anti-union crusade designed to misinform federal employees of their rights and ridicule NVAC for its speech, lobbying, and other advocacy on behalf of VA employees.

42.     On a daily basis, based on my discussions with union officials around the country and email correspondence that I have reviewed, VA management officials are disseminating false information in an effort to mislead and intimidate bargaining unit employees, claiming that AFGE and NVAC cannot help them because "they no longer have a union" or collective bargaining rights. They are encouraging AFGE members orally and in writing to terminate their membership agreements with (and agreement to pay dues to) the union. Unlike management, employees and union representatives are prohibited from speaking with one another about union-related issues during work hours. They are further prohibited from communicating about union-related issues over VA email and on VA equipment.

43.     Many members have told me about emails, messages, and other oral and written communications disseminated by VA management and human resources officials that are falsely claiming that neither AFGE nor NVAC can protect, represent, or otherwise assist bargaining unit employees. These communications claim that "The union is gone," or "There is no union," or when referring to the termination of the Master Agreement and loss of collective bargaining rights, "Now VA sets the rules." These remarks have had the intended effect of intimidating bargaining unit employees and chilling their speech and association with the union. A specific example (a true and

15

correct copy of which is attached hereto as Exhibit J) involved a Nurse Manager at the Michael E. DeBakey VA Medical Center in Houston, Texas responding to an employee's request for union representation at a mandatory meeting with, "there is not a Union anymore, a representative is not included in the meeting."

44.     As a result of the decisions of Secretary Collins and the anti-union campaign waged at his behest, AFGE members and represented employees are scared to be seen with union officials at the worksite. They are afraid to speak about union-related issues and employment concerns with their coworkers. For instance, at the Indianapolis VAMC, employees have asked to speak with me in storage rooms and closets to avoid even being seen associating with the union. They fear that meeting, associating with, or publicly supporting the union will result in retaliation, reprisal, discrimination, or other adverse consequences. Other national NVAC leaders and local union leaders have told me that, since the termination of the Master Agreement, they have had similar experiences communicating with their membership.

45.     As a result of the decisions of Secretary Collins and the anti-union campaign waged at his behest, NVAC has experienced significant reputational harm. Notably, the VA has falsely claimed that NVAC is not working in the best interests of veterans and bargaining unit employees. For example, the VA news release accompanying Secretary Collins' termination of the Master Agreement on August 6, 2025 refers to labor organizations, like NVAC, as "union bosses" who are working against the interests of veterans. Secretary Collins is quoted in that release saying, "Too often, unions that represent VA employees fight against the best interests of Veterans while protecting and rewarding bad workers." The release misleadingly portrays AFGE's efforts to obtain recompense, and in some instances reinstatement, for employees who were improperly terminated from VA employment during "the first Trump Administration" as work done on behalf

16

of employees who committed misconduct. The release, a true and correct copy of which is attached

hereto as **Exhibit K**, ridicules VA labor unions, and AFGE and NVAC specifically, as follows:

> **Background**
> VA-employee unions have repeatedly opposed significant, bipartisan VA reforms and rewarded bad employees for misconduct. Examples include:
> • AFGE, NFFE and NNOC/NNU opposed the MISSION Act, a law that makes it easier for Veterans to get health care.
> • NFFE supports rescinding the VA Accountability and Whistleblower Protection Act, a law designed to protect whistleblowers and hold employees accountable for misconduct.
> • AFGE worked hand-in-hand with the Biden Administration to reinstate more than 100 former employees fired for misconduct during the first Trump Administration and pay nearly $134 million to some 1,700 former VA employees who were fired for misconduct during President Trump's first term.

46.    On or about August 8, 2025, VA Central Office directed the distribution of an email

to more than 300,000 AFGE bargaining unit employees across all VA facilities titled

"Implementation of Executive Order 14251." That email, a true and correct copy of which is

attached hereto as **Exhibit L**, announced the termination of the Master Agreement and caused

reputational harm to NVAC. It generated thousands of emails, messages, and phone calls from

AFGE members and represented employees to their local unions and to NVAC. This email had

the intended effect of sowing chaos and division within the union. Members began asking to

terminate union membership out of fear of retaliation and targeting by the VA based on the anti-

union, misleading statements in this email. The relevant portion of this email reads as follows:

17

This notice is to inform you of an important change in your bargaining unit status and your union representation. As you may be aware, in response to President Trump's March 27, 2025, Executive Order (EO), *Exclusions from Federal Labor-Management Relations Programs*, that excluded certain federal agencies and agency subdivisions from the Federal Service Labor-Management Relations Statute, on August 6, 2025, VA announced the termination of collective bargaining agreements for most of VA's bargaining unit employees. This announcement begins a new chapter that will eliminate barriers and increase focus on the world class care and services Veterans deserve.

Terminating the collective bargaining agreements will benefit employees like you who were previously covered by agreements that restricted VA's ability to hire, promote and reward high performing employees, hold poor performers accountable, and implement changes that better serve Veterans. This decision also permits employees and managers to more freely engage in open communications to improve the organization without union filtering or interference.

You may see changes to some of the processes and procedures in your workplace that were previously contained in a collective bargaining agreement that is now terminated. Managers have been directed to exclusively follow VA policy for all matters, including things like promotions, alternative work schedules, details, hours of work, telework, leave usage, etc. You should also expect to see an updated SF-50 form in your personnel file, which will reflect the change to your bargaining unit status code.

47.      Also on August 8, 2025, every AFGE local representative at the VA, received a letter titled "Order to Return to Duty." The letter cited the termination of the Master Agreement and instructed representatives that they were no longer "serving in an occupation exempted from EO 14251" and, as a result, representatives "are excluded from coverage under the Statute and are no longer able to exercise the rights or entitlements of persons or entities covered under the Statute, including, but not limited to the use of Taxpayer Funded Union Time and the performance of representational activities." A true and correct copy of this letter is attached hereto as **Exhibit M**.

48.      In NVAC town hall and membership meetings held in the evenings or weekends since these events, local union presidents and other leaders from across the country have expressed fear of retaliation. Due to Secretary Collins' termination of the Master Agreement and collective bargaining rights for AFGE bargaining unit employees, union leaders are no longer covered by Chapter 71, including the right of union representatives to engage in "robust and meaningful debate" with VA management and human resources officials on behalf of employees without the fear of discipline, interference, discrimination, or reprisal.

18

**SA402**

49.     As a result, this has resulted in fewer union representatives who are willing to file grievances (which NVAC-affiliated local unions continue to do through the negotiated grievance procedure and the VA administrative grievance procedure, notwithstanding the termination of the Master Agreement), sign and send emails to management officials, communicate with members, represent employees in statutory and administrative appeals, attend rallies and mobilization events, and more. This has negatively impacted the ability of NVAC to fully and effectively represent the interests of our bargaining unit employees.

50.     Within two weeks of NVAC initiating this lawsuit, the VA began emailing AFGE officials and stewards to threaten discipline in connection with ongoing union activity.  A true and correct copy of one such email is attached hereto as **Exhibit N**, which is representative of other, recent correspondence that AFGE officials have shown me.  This email states that "[it] has been reported that there may be instances of union activities being conducted using government resources," without elaborating on the "reports."  In this email, the VA further states: "[i]t is important to emphasize that misuse of government property or resources for union business can lead to disciplinary action . . . up to and including removal from federal service."

51.     NVAC had more than 140,000 members in March 2025. However, our membership has dropped by nearly half to 72,000 members as of November 2025.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 25th day of November 2025, in Indianapolis, Indiana.


_____

Mary-Jean Burke


19

**SA403**

# Exhibit A

**SA404**



S. Hrg. 115–299

# HEARING ON PENDING LEGISLATION

# HEARING

BEFORE THE

## COMMITTEE ON VETERANS' AFFAIRS
## UNITED STATES SENATE

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

MAY 17, 2017

Printed for the use of the Committee on Veterans' Affairs



Available via the World Wide Web: http://www.fdsys.gov

U.S. GOVERNMENT PUBLISHING OFFICE

25–981 PDF          WASHINGTON : 2018

**SA405**

103

as doctors, nurses and other VA medical personnel can access paid sick leave in their first year, that they would otherwise have to accrue, to undergo medical treatment for their service-connected disabilities, as their counterparts in other Federal agencies are permitted. IAVA supports this legislation.

Mr. Chairman, many of these provisions are easy fixes, and some will require hard work and additional funds. When my soldiers and I were sent twice to face combat in Iraq, the Army and U.S. taxpayers spared no expense, with the goal of providing us with an overwhelming advantage in war. Veterans are proud to have served our country and we need Congress to know that the care we receive as a result of our service is a cost of war, and just as important as properly equipping those deploying downrange as we speak. We have got to spare no expense in caring for them after they return. Veterans are not a special interest—they answered the call when more than ninety-nine percent of American did not.

Chairman Isakson, Ranking Member Tester, and Members of the Committee, thank you again for inviting me to be here today, and on behalf of IAVA, I thank and remember our veterans who have served before us and those who are deploying now, again, to fight around the globe.

Chairman ISAKSON. Thank you, Ms. Jaslow.

Mr. Cox?

### STATEMENT OF J. DAVID COX, SR., NATIONAL PRESIDENT, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO

Mr. COX. Thank you for the opportunity to testify today. It is astounding that while the Secretary says there is over 45,000 unfilled health care vacancies in the Department, we are here today talking about firing rather than hiring. Does anyone here believe that the firing that has been in the news during the last week is an unusual occurrence? Does anyone here believe that an executive firing a subordinate to cover up his or her own misdeeds never happens in the Department of Veterans Affairs? I tell you what—when it happens where workers have due process rights, the innocent are protected.

At workplaces with a process for weighing evidence and making decisions based solely on facts, no one gets fired without just cause. If this bill passes, you can strike VA from that list. The innocent will be fired without good cause, the appeals will be a humiliating joke, and the executives will continue to ruin the lives of workers and hurting veterans.

So, let us be honest. None of the personnel provisions of this bill are really about veterans or accountability. It is about politics. It is about "you are fired" as an easy way to shift blame of wrongdoing from executives and political appointees onto the rank and file.

We have a bill that reeks of the—wrecks the apolitical civil service and is justified only by pretending that the most extreme examples of misconduct are occurring all over the place. In fact, instances of outrageous misconduct are rare.

AFGE has no use for people who abuse the public trust, who engage in unlawful conduct, or are poor performers, or violate government rules or our collective bargaining agreements, or the EEO laws. We want them out of the agency. They make everything more difficult for the vast majority who perform very well. In addition, this bill would supersede existing collective bargaining agreements and impose unworkable timeframes on the firing processes.

We have asked the Committee to at least show some respect for the integrity of the collective bargaining process by agreeing that

104

the provisions that affect the current contract go into effect only after a new contract is negotiated, and I, again, ask for that change to be made.

We understand that bashing Federal employees and taking away their rights makes for good politics, and it does make for bad government. And I promise you that under this bill, more employees will be fired for bad reasons than for good reasons.

You want to make it easy for VA managers to fire people. You have bought into complaints that firing is too hard for them, when every single study shows that current laws provide them all the authority they need to remove anybody who is actually a poor performer or engages in misconduct.

Our objections to the specifics of the bill are as follows. The first is lowering evidentiary standards for adverse actions for misconduct allegations. Replacing the preponderance standard with substantial evidence eviscerates due process. With misconduct charges, there needs to be a finding of fact. With proposed change, there will no longer be a finding of fact with misconduct. As with Mr. Comey, it will be enough for the boss to simply want someone gone.

The second and equally irresponsible provision of the bill is to prohibit administrative judges at the MSPB from mitigation of penalties. The VA will be able to fire with scant evidence of wrongdoing and reviewing authority will have no ability to correct the injustices by making the penalty match the offense. The prohibition on mitigation throws four decades of jurisprudence out the window. No more progressive discipline or consideration of whether the penalty is appropriate. No consideration of the nature of the seriousness of the offense, the level of the job, the employee's record, or whether others have committed the same offense and received a similar penalty. No rehabilitation and no consideration of the circumstances.

This bill is a serious mistake. We will all miss the apolitical professional civil service when it is gone, and this bill will have made a major role in its demise.

[The prepared statement of Mr. Cox follows:]

PREPARED STATEMENT OF J. DAVID COX, SR., NATIONAL PRESIDENT, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO

INTRODUCTION

MR. CHAIRMAN, RANKING MEMBER TESTER, AND MEMBERS OF THIS COMMITTEE, My name is J. David Cox, and I am the National President of the American Federation of Government Employees, AFL–CIO (AFGE). On behalf of the 700,000 Federal and District of Columbia employees represented by our union, including over 250,000 at the Department of Veterans Affairs (VA), I thank the Committee for the opportunity to present AFGE's views on the subject of this hearing: the "Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017." In AFGE's view, this bill not only decreases accountability at the VA, it eviscerates the agency it is supposed to improve, and ensures that no employee ever gets a fair shake on any proposed adverse action. Its name should be changed to the "2017 Scapegoating VA Rank and File Employees for Political Expediency Act."

In my nearly five years as president of AFGE, I have never testified at a more important hearing than this one. It is important, not only for the VA and the veterans that the we serve, it is also important for the men and women I am proud to represent. Finally, it is important because passage of this horrible bill would undermine the apolitical American civil service, perhaps the least appreciated and most threatened pillar of our democracy.

**SA407**

105

At issue is whether the United States, the most advanced country in the world and the leading democracy, will continue to have a merit-based career civil service, selected, promoted and retained on the basis of ability and competence, or whether we will descend back into 19th century corruption and all the maladministration of government that brought us.

Before I was elected to national office in AFGE, I worked for 22 years at the Salisbury, North Carolina VA Medical Center as a Registered Nurse. I love the VA and the veterans we serve, and the future of the agency means the world to me. I also care deeply about our democracy, and I am appalled at the political cynicism and short-sightedness that this bill represents.

While today we are focusing on the VA, much more than just the VA is at stake. The Veterans Health Administration is somewhat of a microcosm of the many ideas and institutions whose future is being hotly debated in politics today. I will discuss three: The first is health care. The second is the role of the Federal Government in providing essential services and on what terms these commitments will be met. The final issue is the status of the career civil service, and whether we will continue to administer government programs with apolitical professionals hired by the government, or whether most of what the VA does should be contracted out to favored private-sector firms, or even abandoned altogether.

First, let's deal with the backdrop—the American health care system. The VA operates the country's largest integrated healthcare system. The military veterans it serves are the most deserving group one can imagine. The commitment we have made to veterans is to care for those who have borne the battle. The VA cares for aging Vietnam-era veterans, veterans from the Korean War era and even some surviving WW II veterans. In the past 15 years we have added many more veterans who have served this country in Iraq and Afghanistan and other more recent conflicts. Almost all of these veterans often have ongoing service-connected illnesses and wounds, emotional and physical.

The VA has always been there to serve them. The economic cost of caring for these veterans is high and budget politics have been an ever-present threat to quality and accessibility. It is astounding that while there are reportedly up to 45,000 unfilled positions in VA healthcare, Congress has chosen to focus on attacking the rank and file employees who are have made the choice to spend their careers caring for this cherished group. Rather than addressing the critical need to fill thousands of urgently needed positions at VA in order to better serve veterans, this cynical, ideologically driven bill seeks to fire more VA personnel. Talk about misplaced priorities.

Why punish the VA's rank and file? Why punish the employees of VHA? There is no question that VA healthcare is of the highest quality. And that high quality healthcare is provided by the same VA employees this bill attacks. Every independent study has confirmed that the outcomes of VA provided healthcare are at least as high, and frequently higher than care provided by any other hospital system. Veterans know this and numerous surveys show that they very much like their VA-provided health care. They want more of it, not less.

Ever since the Phoenix waitlist scandal, the future of the VA became fodder for 24 hour cable news, largely fed by the right-wing. The focus of discussion for many politicians has been how to dismantle the VA piece-by-piece and outsource it to the private sector. Well-funded and therefore politically powerful groups have seized the opportunity to cement a narrative that the VA is "broken." Their purpose is to discredit the VA by blaming its problems on its rank and file employees and the fact that it is a government agency. Their real objection is that few are able to make profits on VA care.

I challenge anyone on this Committee to find a major healthcare provider, private or public, that doesn't face significant challenges. Most don't make the news because they are not answerable to the public the way the VA is, and most are able to fire or otherwise silence whistleblowers with ease. But anyone who has gone to a private hospital or even an emergency room can tell you about long waits, enormous bureaucracy, and waste, fraud and abuse. They can tell you about how getting an appointment with a specialist takes at least three months. That is sadly part and parcel of our healthcare system, including private sector providers. Just look at any hospital bill, or talk to any physician or nurse, and they will tell you of the complexities and contradictions of America's healthcare system.

Fortunately veterans have the VA, a system that does not charge them and that covers them extremely well. It is so much more than just a healthcare system. It is also a community that understands the unique needs of those who have served this country. Whatever ails VA healthcare delivery reflects America's overall healthcare system—and in most cases, the faults are more severe among private hospitals and healthcare facilities. The critics of the VA will never admit this, so

106

I will tell you. There is big money in VA healthcare and the privatizers salivate at the opportunity to gain access to those dollars. They try to hide their avarice with platitudes about "serving veterans," the "broken" VA and the miracles of the market, but the reality is that they hate the idea that a large government agency so successfully provides care to veterans, and they want a "piece of the action."

The VA may not be perfect, but it is better than any other healthcare system at serving veterans with special needs associated with service-connected illness, injury, or disability. The VA makes no money off veterans. Its facilities may not be glamorous. Yet every important indicator of quality of care strongly confirms that the VA is a success. The Committee should recall that the Phoenix scandal began with a wait times issue. I will not defend the manipulation of wait time data, but that was not an issue of quality of care. It was an issue of resources, combined with a performance bonus system for executives that incentivized lying and cheating. It is absolutely unconscionable that from those facts has come the deplorable legislation before you today that undermines the foundation of the civil service.

So let's be honest. None of this is really about veterans or the VA or accountability. It's about politics. I do believe that everyone wants the best care for veterans. I wish we were having a debate on how to provide that care and to ensure accountability for all those who are charged within doing so. But that is definitely not what is happening here.

We are here today because politicians understand that "You're FIRED!" is popular as a way to address complex issues. "You're FIRED!" is popular as a way to deflect responsibility from management decisionmakers and place it on the rank and file. We have before us a bill that wrecks the civil service and is justified only by reference to the false claim that the most extreme examples of misconduct are occurring all over the place. In fact, outrageous instances of misconduct are exceedingly rare. It must also be noted that some authors of this bill have a long track record of denigrating virtually every known government program except those that personally benefit them. No one who values the VA or respects veterans should support this legislation.

I have been specifically asked by this Committee to address the changes to the civil service due process provisions contained in the scapegoat/firing bill, the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017.

Before I address the specifics of these proposals, let me state that AFGE and its members have no use for people who abuse the public trust, who engage in unlawful conduct, who violate government rules, and who are demonstrably poor performers. We want those people out of the VA every bit as much as anyone—maybe more so. Employees who engage in misconduct or who are genuinely poor performers ruin the reputation of the agency and add more work for those who perform well and play by the rules. So you will not hear me or anyone in this union defend a person who steals drugs or watches pornography while on duty. In fact, AFGE counsels such employees to resign. We certainly will not defend their matters in arbitration.

The bill before you is a regressive piece of legislation. It takes us backward, not forward. Although marketed as a bill to make it easier to fire bad employees, the proposals are designed to kill off and bury the apolitical civil service. It makes it just as easy to fire a good employee, an innocent employee, as it will be to fire a bad employee. No one should pretend otherwise. The VA can and should terminate people whose conduct or performance justifies termination. But it is absolutely not necessary to destroy the foundation of the civil service in order to allow them to do so.

The legislation takes time-tested procedures for civil service removals and turns them on their head in order to accomplish a clearly political agenda. Every single study or report of civil service removal procedures has stated that the principle reasons poor performers are not removed expeditiously are management ignorance and aversion to conflict, i.e. incompetence. It has nothing to do with the underlying laws.

Federal managers, including those at the VA, do not lack adequate authority or tools to discipline those who engage in misconduct or who are poor performers. The Government Accountability Office (GAO), the Merit Systems Protection Board (MSPB) and the Office of Personnel Management (OPM) have all issued reports and analyses that have come to the same conclusion: When poor performers are not dealt with it is not because the civil service laws or procedures are too difficult to utilize. It is because managers do not want to put forward the effort to properly document poor performance so that they can remove or demote these people.

A recent GAO report, "Improved Supervision and Better Use of Probationary Periods Are Needed to Address Substandard Employee Performance," (GAO–151–191), February 6, 2015, found four main reasons why agencies do not use the already substantial tools they have available to them to remove poor performers. All four reasons related to management failures and/or unwillingness to properly identify and

107

document poor performance. Had this Committee taken GAO's well thought-out recommendations into consideration, the bill before us would never have been written.

Instead we have a cynical effort to ride the wave of public outrage over some legitimate problems that union whistleblowers and the VA Inspector General have brought forward and use it to destroy yet another union and the civil service. We continue to hear whining from management that civil service due process procedures are just too difficult to follow. They sound just like the President whining that his new job is too hard. S. 1094 accommodates these pitiful managers completely. Firing is too hard for you? Don't worry, we'll make it easy. We'll rig the system so no matter what you do, you'll be called a huge success. We'll let you fire the employee right away, and deal with due process in the future, if ever.

To call this a dangerous precedent is an understatement. To anyone who cares about the apolitical and objectively qualified civil service this bill is a disgrace.

The premise that the procedural hurdles for removing poorly performing employees are too high is simply untrue. When an employee invokes his/her rights to a formal adjudicatory hearing before the Merit Systems Protection Board (MSPB), the agency almost always prevails. For example, in 2013 only 3% of employees appealing their dismissal to the MSPB prevailed on the merits. In contrast, agencies were favored at a rate five times that of employees when formal appeals were pursued. The notion that the MSPB makes it impossible to fire a Federal employee is simply a myth.

GAO reviews and reports (e.g., GAO–15–191) have consistently found that the underlying reasons for permitting poor performers to remain in Federal service are managers' failure or unwillingness to document poor performance in accordance with due process procedures available to them under the Civil Service Reform Act. The bottom line of the GAO report is that lack of performance management by supervisors is the underlying reason why poor performers are not dealt with. Indeed, the preponderance of the evidence points in only one direction: the complaint that "it's too hard to fire a Federal employee" is not supported.

Let me address some of the most egregious and shameful aspects of the bill:

EVIDENTIARY STANDARD FOR MISCONDUCT

S. 1094 replaces the current evidentiary standard for misconduct removals (and other adverse actions) from a "preponderance of the evidence" standard (meaning more than 50% of the evidence must support the agency's recommendation) to a "substantial evidence" standard (meaning the agency only needs, among other things, more than "a mere scintilla of the evidence" to meet its burden of proof). The substantial evidence standard, with strong advance notice safeguards, is currently only used for performance-based firings, suspensions, and demotions. Applying this standard to misconduct cases would mean that even when the majority of the evidence supports the employee, he/she will lose.

With the current preponderance of the evidence standard, agencies win about 80% of all contested cases before the Merit Systems Protection Board (MSPB). Lowering the standard of review would mean that actual misconduct would barely need to be established before an employee could be fired. This upends nearly 140 years of civil service law, and makes VA employees very close to "at will" (which seems to be the real objective of the drafters of this provision).

There is a good reason why Congress has required different evidentiary standards for performance and conduct. When an employee receives a notice of a proposed adverse action related to performance, he or she has the opportunity to repair any performance failures through a Performance Improvement Plan (PIP). In contrast, allegations of misconduct must be validated with a higher standard of evidence because the question is only whether the alleged misconduct occurred.

This lower evidentiary standard is virtually pro forma, not a standard associated with the genuine administration of justice. It is yet another example of the cynicism that underlies this legislation, providing a false notion that due process is being upheld, when in fact, it is being eviscerated.

MITIGATION OF PROPOSED PENALTY

S. 1094 would prohibit MSPB administrative judges (AJs) from mitigating management's proposed penalty for misconduct. Under current law, MSPB AJs can reduce a proposed penalty for misconduct if the facts of the case warrant a lesser penalty. Removing the ability of MSPB AJs to mitigate a proposed penalty is not only unjust, but will also result in "penalty overcharging," meaning that a proposed penalty need not actually reflect the underlying charge. Combining a lower evidentiary standard of review to sustain a misconduct charge along with no ability to mitigate a proposed penalty means that employee appeal rights will be effectively neutered.

108

The VA will be able to fire employees with scant evidence and no ability for the reviewing entity to correct these injustices. This provision is the antithesis of justice and undermines not only the rights of the employee, but also the independence of the MSPB.

This provision also jettisons almost four decades of jurisprudence that followed the MSPB's 1981 decision in Douglas vs. Veterans Administration which gave rise to the use of progressive discipline in Federal personnel management. The basic principle of justice, that the punishment must fit the offense which was enshrined in the Douglas decision, has served the government well, and if S. 1094 becomes law, the Department of Veterans Affairs will have abandoned this management "best practice" altogether for an "Apprentice" TV-show type of system (You're FIRED!).

I ask you to consider these "Douglas Factors" for a moment and decide whether your intention is actually to throw away this eminently reasonable set of considerations. The Douglas Factors allow mitigation of proposed penalty after the following are considered:

1. The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2. The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

3. The employee's past disciplinary record;

4. The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's work ability to perform assigned duties;

6. Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7. Consistency of the penalty with any applicable agency table of penalties;

8. The notoriety of the offense or its impact upon the reputation of the agency;

9. The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10. The potential for the employee's rehabilitation;

11. Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and

12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

These factors are designed to ensure that the penalty selected by the agency fits the employee's alleged offense. Why are these controversial? Perhaps it is because those who genuinely wish to see this legislation enacted really don't care about the civil service or due process, and are particularly enraged that a government program such as VA healthcare actually works. Or perhaps, they just see political expediency in not challenging well-funded ideology-based advocacy courtesy of the Koch brothers and their allies.

PENSION FORFEITURE

The proposed legislation authorizes pension forfeitures for certain felony convictions for every VA employee. This would include Wage Grade 2 housekeepers and cemetery workers, virtually all of whom are veterans with service-connected disabilities. Private employer pension plans under the Employee Retirement Security Act of 1974 (ERISA) do not authorize pension forfeitures except for fraud against the pension plan. AFGE recognizes that there is precedent for Federal employee pension forfeiture, but these forfeitures have always involved involve espionage and treason, not drunk driving convictions.

It is curious that people who usually promote following private sector practices for Federal Government personnel have suddenly abandoned this principle when it comes to taking away earned pensions.

SUPERSEDES COLLECTIVE BARGAINING AGREEMENTS AND IMPOSES UNWORKABLE TIME FRAMES ON THE REMOVAL PROCESS

The proposed legislation supersedes the timeframes specified in current active collective bargaining agreements (CBAs). It also imposes unworkably short timeframes on grievance procedures and non-grievance based adverse actions. That Congress would summarily upend collective bargaining agreements in the middle of the term

109

of the agreement is an unprecedented attack on the integrity of the collective bargaining process and union contracts.

The proposed legislation provides that from date of first notice to the employee until actual removal that not more than 15 business days elapse. Employees are given only 7 business days to respond to the notice. Following removal, employee have only 10 business days to appeal the VA's decision to the MSPB.

Contrast these timeframes with the rights given to VA contractors. They have a minimum of 90 days to appeal a contracting officer's adverse decision to the Board of Contract Appeals (BCA), and one year to appeal to the U.S. Court of Federal Claims, if they decide to forego a BCA appeal. It is absolutely stunning, and a very sad commentary on the state of Federal agency priorities that employees are given such short response and appeal times, while favored Federal contractors are given months, and even up to a year to appeal VA decisions to the BCAs and a Federal court.

A merit-based civil service system is a cornerstone of a democratic society. It ensures that technical expertise is brought to bear on performing government agency work, without the threat of overt partisan agendas driving day-to-day operations. Agency career employees remain accountable to politically-appointed officials, but those appointees, and supervisors who serve under them, may not take actions against career employees for misconduct or poor performance without at least providing some level of due process to the employee, including third-party review by neutral decisionmakers. Career employees are only supposed to be fired for good cause, and "good cause" means reasons supported by evidence.

The Civil Service Reform Act (CSRA) of 1978 provides the modern-day basis for both selection of most career civil servants, and their protection from unwarranted personnel actions, including firings motivated by politics, bias, or other non-merit-based reasons. This CSRA protects the public from having their tax dollars used for hiring political partisans for non-political jobs, and helps ensure the efficient and effective governance of Federal agencies.

The CSRA provides that employees may be removed for either misconduct or poor performance. The employee merely needs to be informed of his or her alleged deficiency and the reason that management proposes to take an action against him or her, whether it be firing, demotion, or suspension.

Forty years of case law shows unambiguously that the CSRA does not give unfair advantages to Federal employees. Agencies prevail in 80%–90% of all cases at the MSPB administrative judge (AJ) level, and only about 18% of all AJ decisions are appealed to the full Board. AJs are upheld by the full MSPB in about 90% of all appealed cases.

It is very important to note that following an agency's adverse decision against an employee, the agency's decision is automatically effected. For example, the employee is removed from the agency's rolls the day of issuance of the decision or within several days following the decision. An employee removed by an agency receives no pay during the appeal process.

During the debate on VA firing I have heard several lawmakers and others argue that it takes forever to get rid of a bad VA employee. This is simply untrue. In almost all cases, an employee may be fired within 30 days of the first notice. Even when an arbitration procedure under a collective bargaining agreement is invoked the agency can fire the employee after 30 days, and the employee receives no pay during the entire appeal or arbitration process. They are off the agency's payroll. Attempts to portray removed employees appealing their removals as somehow lounging on the dole while their appeal is processed are simply untrue, and frankly dishonest. It doesn't matter whether the appeal route chosen is the MSPB or arbitration. The employee receives no pay. Anyone who says otherwise is lying or ignorant or both.

The importance of maintaining a nonpartisan, apolitical civil service in an increasingly partisan environment cannot be overstated. First, most Federal jobs require technical skills that cannot simply be obtained through non-merit based appointment. Second, career employees must be free to perform their work in accordance with objective professional standards. Those standards must remain the only basis for evaluating employee performance or misconduct.

Bills like S. 1094 that decrease due process rights are "dog whistles" for politicizing the civil service, subjecting the Federal workforce to partisan or personal whims of supervisors and political appointees. Whatever lack of public confidence in government exists today will be magnified a hundredfold if all civil servants become de facto political appointees, serving at the whim of supervisors. And that is exactly what this horrible piece of legislation will do.

Federal managers are already empowered under existing civil service laws to take appropriate action when employees are underperforming or engaged in misconduct.

**SA412**

110

There is no group who objects more to the continuing presence in the workplace of those who are not performing well or who engage in misconduct than fellow Federal employees. When someone doesn't perform up to speed, it simply means more work for the rest of the people who do perform well.

### THE REAL ISSUE—AGENCY RELUCTANCE TO DOCUMENT EMPLOYEE PERFORMANCE IN ACCORDANCE WITH DUE PROCESS PROCEDURES

In 1978, Congress enacted the CSRA, which is the modern-day statute governing civil service protections. In considering the law, Congress was specifically concerned about balancing employee rights and maintaining a non-partisan civil service with the need for management to deal with poor performers, or unacceptable conduct.

To help agency managers deal with poor performers, the CSRA included a new section, Chapter 43, specifically addressing performance issues. As previously mentioned, this chapter set a lower standard of review of agency decisions with respect to performance issues among employees, and restricts the MSPB from modifying agency determinations regarding removal of poorly performing personnel.

The GAO report previously mentioned (GAO–15–191) suggests many reasons why managers are sometimes reluctant to address performance issues. It also explores the many myths surrounding removal of poor performers. GAO's report echoed findings of the MSPB in its reported entitled, "Addressing Poor Performers and the Law" (September 2009). The fact is that the laws governing the firing of poor performers, primarily Chapters 43 and 75 of title 5, are straightforward and not unduly burdensome to agencies. However, the due process procedures inherent in these laws require documentation between the supervisor and the employee that addresses the performance or conduct issues. This can be very difficult for some supervisors. Nevertheless, the law is clear, agency supervisors have many tools available to them to address performance issues, and to fire poor performers.

### CONTINUED DENIGRATION OF VA EMPLOYEES

As Members of this Committee are undoubtedly aware, continuing partisan attacks on the work of VA employees only fuels a self-reinforcing feedback loop. Employees know they are punching bags. Morale plummets as a continuous stream of anti-Federal worker proclamations, almost all false or highly exaggerated, emanate from elected or appointed leaders. Not long ago, the majority leader in the House of Representatives wrote an op-ed in the Wall Street Journal describing the "Federal bureaucracy" as the entity that "poses the greatest threat to America's people, economy and Constitution." Such criticism is not only false, but misleads people into thinking that career civil servants create statutes and regulations wholly apart from supervision by elected leaders and political appointees. Anyone who has worked in Federal service will tell you that employees follow direction, whether that direction comes from Congress, the President or other politically-appointed officials. In other words, career Federal workers respond to and implement duly enacted laws and policies. They do not create these policies.

In all my years as an elected official of AFGE, I have never seen fit to denigrate my own staff. No leader should do that. There have been situations where employees have been disciplined or dismissed. But taking a battle axe to all employees and describing them in broad terms as "threats" to the American people heralds a new low in misinformation and outright dishonesty. As I told several news outlets at the time, "To call civil servants—one-third of whom are veterans—a 'threat to America's people, economy and Constitution' is an insult to the men and women who dedicate their lives to the programs and services that benefit all Americans."

### HOLDING THE VA ACCOUNTABLE

AFGE agrees that VA employees should be held accountable, and we also believe that includes VA managers, supervisors and political appointees. Statements implying that employees cannot be fired for months or years, or that fired employees remain on the government payroll for long periods while pursuing appeals following removal demand accountability every bit as much as an employee who is chronically late to work.

These are dishonest statements and VA leadership should be held to account for this dishonesty. If they can't fire, demote or properly discipline employees under current civil services rules, AFGE questions their competence to manage and lead such a large and complex organization. If they cannot hire for 45,000 health care vacancies, the same is true. They lack the competence to manage and lead the agency. Seeking the easy way out is not leadership. It is a politically-motivated response to fecklessness and incompetence.

**SA413**

111

Regardless of the outcome of the debate on this legislation, AFGE calls on this Committee to demand from the VA Secretary the following data on the number of employees fired, suspended or demoted ("adverse actions") by the VA under applicable statutory or regulatory authority; more specifically the following:

1. The number of employees proposed for and actually subject to adverse actions;
2. The veterans status of employees subject to adverse actions;
3. Locations, demographics and grades, and reasons for adverse actions; and
4. Periods of time to effect adverse actions from date of first employee notice until final agency decision.

We have yet to see this data, and we believe it will better inform the debate, not only as to whom the VA is disciplining, but also as to the level of competence within the agency in managing its personnel functions. We also believe that the Committee should focus more of its attention on the failure of the agency's leadership to fill the reported 45,000 healthcare vacancies. Firing should not be your only concern. Hiring deserves at least as much attention.

### A BETTER WAY FORWARD

History is replete with examples of public service corrupted by unfettered, politically-based employment decisions. That's why we continue to support a merit-based civil service system with appropriate due process, and checks and balances to ensure that both hiring and firing decisions be merit-based, and subject to meaningful review.

AFGE strongly supports improvements in agency performance management systems, and we look forward to working with lawmakers and other interested stakeholders to see this carried-out. AFGE also supports better training of both VA supervisors and employees so that clear expectations are established, performance is measurable, and appropriate steps are taken to either remedy performance problems, or to remove poor performers from the workplace.

AFGE vehemently opposes S. 1094, one of the worst pieces of legislation of the modern era. This legislation is an affront to hard working VA employees, more than a third of whom are veterans, directly lowers objective standards of review of proposed adverse actions, impinges on the union's ability to defend meritorious cases, and unfairly penalizes employees for what could be trivial offenses. S. 1094 will corrupt and ultimately destroy the professional civil service and return the country to the days of the "spoils system" of government employment.

### CONCLUSION

Attacks on government employees and the civil service in general may make for good politics, but they make for bad government. AFGE is aware that dealing with problem employees is essential to sound public administration. But the vast majority of employees at the VA perform well. Agency systems and the laws and regulations governing employee performance are well-thought-out. The issue is not whether the laws or regulations governing the civil service are adequate, but whether agencies, including VA managers and supervisors have the tools, training and will to effectively implement current rules. The current mindset of the VA and supporters of this legislation in Congress seems to be that fast and easy firing of employees will magically solve the VA's problems. Think again. This will cause far more problems than it will solve.

I urge the Committee to reconsider the very dangerous and ultimately destructive personnel provisions of this firing bill.

Thank you for your time and consideration and I will be happy to answer any questions you may have.

Chairman ISAKSON. Thank you, Mr. Cox. I will start and take 5 minutes, and then go to the Ranking Member for 5 minutes.

Let me first of all, Mr. Atizado, in your introduction of yourself, or the introduction of your statement, you made the reference to your organization being the largest claims organization in the world. Is that correct?

Mr. ATIZADO. In the Nation. I do not know about the world.

Chairman ISAKSON. In the Nation.

Mr. ATIZADO. Yes, sir.

Chairman ISAKSON. The nation is big enough so we will take that.

112

Mr. ATIZADO. Yes, sir.

Chairman ISAKSON. I think in your testimony, that caught my ear because that is what this appeals process is all about, making sure that people are treated right that are injured and have an appeal for a benefit and have a right to a benefit. I appreciated the time that you took to explain the effort you all went through to examine the appeals bill, and I appreciated the comments that you made. Would you thank your organization for that?

Mr. ATIZADO. I am sorry. What was the question?

Chairman ISAKSON. Be sure to thank your organization for that.

Mr. ATIZADO. Definitely, sir. I will be honest. We have a lot more intelligent people than in our organization, that have worked hand-in-hand with the VA for this bill, so the thanks goes to the VA as well.

Chairman ISAKSON. DAV is a great organization and our disabled veterans bear a scar for the rest of their lives, and we owe them a tremendous obligation. One of those obligations is to see to it that appeals of any claim that they have made are handled expeditiously and quickly. Now with this bill passing, hopefully in the next few weeks, they will be doing exactly that, and that will be a great day forward.

Ms. Jaslow, thank you for mentioning Memorial Day. Unless I missed it, of all of us on the Committee that asked questions and made opening statements, and of all of you who made statements, yours was the one that made reference to not forgetting that next week is Memorial Day, or within a week or so is Memorial Day, which is a very important day for our country.

I would just encourage all the Members—I cannot ask anybody or tell anybody to do anything, but I hope all the Committee Members will take time during the Memorial Day break to spend at least a little bit of time each day making sure our young people and our supporters and our voters understand the value that we have in the sacrifice that was made by the veterans of America who died so that we could have the liberty and the freedom that we are enjoying today.

I always tell the story, when I make Memorial Day speeches, about Roy C. Irwin, a veteran from World War II, in 1944. When I went to the Margraten Cemetery in the Netherlands and walked down the rows of crosses, on row 24 I came to the last cross in the row, and I go to each one and look at the dates and the place and the name of the individual who is buried there. The last grave in row 24, Roy C. Irwin of New Jersey, died December 28, 1944, was interred. I stopped in my tracks for a second, took a deep breath, and realized that the day I was born was December 28, 1944, I was standing on the grave of an American soldier from New Jersey who died on the same day I was born, so that I could enjoy the life that I have enjoyed over the last 72 years.

So, I think when all of us take a moment to talk about Memorial Day, we can talk about that sacrifice those soldiers made so that all of us who are here today, living and enjoying the freedoms of the United States of America, realize that, in large part and measure, that was paid for by singular American efforts who volunteered on our behalf, sacrificed their lives, and died for our freedom and our ability.

113

So, I just wanted to throw that in. I hope everybody will take a second to tell their own stories during that time.

I want to thank the input that everybody has given to the appeals process. We are excited about trying to get something fixed that has been broken for a long time and I appreciate the VA's attitude toward helping us to do that. I understand there is some concern and input on the accountability portion, but I think we have done a good job of hearing from everybody and putting together a piece of legislation that works for the Veterans Administration, the employees of the Veterans Administration, and the taxpayers of the United States of America, who pay for the Veterans Administration. I also appreciate the Ranking Member's cooperation in working with all of us on all these pieces of legislation, to make them happen.

Last, I will make a comment. Of all the legislation we have talked about today, everybody left out the one piece of legislation that a lot of people would have thought we would have mentioned first, but I think it shows the integrity of these organizations and the integrity of our vets and the integrity of the VA. But nobody mentioned the cost-of-living (COLA) increase that Senator Tester and I have put in, because they are taking it—that maybe we were going to make sure that happens. That shows we have got a good self-interest in part of all our people testifying here today.

Ranking Member, would you like to ask a question?

Senator TESTER. Yeah. Thank you, Johnny. I think we all have our Veterans Day memories of what has transpired and what that day is all about, and, quite frankly, what every day should be about. Every day should be Memorial Day for the people of this country.

I will just pass along a little story. When I was a seventh-grader I got tabbed to be the VFW bugler, which was kind of a big deal because everybody in the whole damn town would show up for Memorial Day. They would do the roll call, and at that moment in time—this is the late '60s so there were still a few World War I guys around. It was always an amazing experience.

I will never forget what one of them said to a 13-year-old kid, which was that we never want to forget that war is a god-awful thing, and you do not put people in harm's way without knowing what you are doing. You know, those are old World War II guys that knew what it was like. They knew getting your arm blown off was not something that was a pretty sight. Watching a guy die was not a pretty sight either. So, kind of interesting.

So, I thank you guys for your service and the folks you represent. I do want to thank—a couple of thank yous—number 1, to all five of you for the people you represent. Thank you for being here and representing them. For the VA staff sticking around and hearing this panel, I want to thank you for that. Oftentimes we have two panels and the first panel gets up and leaves, and I know you have got work to do, but you stuck around and I want to acknowledge that.

I know that Ms. Flanz is here. If there are any questions on MSPB, which Mr. Celli, you brought up, and their ability to make decisions, certainly utilize her.

114

I have got a couple of questions. Actually, I have got more than a couple. I want to start with Allison, with the IAVA. There was a GAO study that came out in December 2016, that found that across the VA system there was a significant lack of providers available for women veterans—I think you referenced it in your statement—as well as significant privacy issues.

I am interested to know how seriously you think, or IAVA thinks, that the Veterans Administration is taking these findings seriously, and if you have seen any changes since that report was issued.

Ms. JASLOW. Well, I certainly believe any person at the VA who I have talked to, and I believe many that you all have talked to, have very good intent. I think one of the reasons why we appreciate not only your leadership, sir, but why we are getting behind the Deborah Sampson Act is because, like many of the things at the VA, it is not happening fast enough.

I believe there was somebody on the panel ahead of me who said that she was able to quote how many VA facilities have gynecologists, but that clearly means that not all of them do, which means that you have VA health care centers that adequately support men and ones that inadequately support women.

We talk a lot about how the culture needs to be more welcoming, but one of the other barriers is women just do not think that they are going to get treated in the way that they need to be treated when they go into the VA.

To answer your question, sir, we are still talking to members. You know, I already told my story of running into snags when I walk into the VA. More work needs to be done, and what we really need to do is jump-start it. I think that, you know, our approach is not only raising awareness of this issue. I really do not think that you get the fuel in the tank that you really need to get this done until people really feel like it is an issue, so that is the first step. But the other step we have outlined in the bill.

Senator TESTER. OK. Very good.

Adrian, with DAV, you issued a fine report a few years ago titled "Women Veterans: A Long Journey Home." It had some compelling facts and findings about the challenges unique to women veterans. Have you or anybody within your organization spoke to the VA about this report, and what kind of reception have you received?

Mr. ATIZADO. Senator Tester, thank you for that question. VA has been more than welcoming of that report. If there is one thing I do find quite impressive about VA is that they are not shy about asking themselves what they are doing wrong and correcting those deficiencies. They are very much involved with trying to address those issues in our report, within their jurisdiction, because that report spans the entire Federal Government. We are trying to update that report now to reflect the abundant good work that VA has done.

I just want to tag on to what Allison had mentioned. You know, this bill—these two bills are good for a start, I think. It is important that we have these policies in place, these artifacts that show that VA's culture is, in fact, inclusive and respectful of women veterans and their service.

Senator TESTER. In their testimony, VA said they did not support compiling a report—and this is for any of the VSOs—a report on

115

how they are doing on providing prosthetics to women veterans. We hear, quite frequently, the VA's ability to provide gender-specific prosthetics is inconsistent, at best.

It does not have to be all of you, but it can. Can you share some insights from your membership on women veterans where it comes to prosthetics?

Mr. ATIZADO. So, if I can, for my colleagues, if you do not mind, we have a very active member of our organization and she had sought a prosthetic appliance from VA; at that time the only thing available was a male prosthetic. We thought that was falling a little short of what we expected of VA. They tried to make it work but clearly it did not.

We think these reporting measures are critically important. Our testimony says, though, that these reports should include a little bit more personalized reporting: how women veterans perceive these services and these programs, whether it speaks to them and their needs, whether it is respectful of them, and whether they are satisfied. I think adding those would make this bill just a little bit stronger, sir.

Senator TESTER. OK. Thank you. In closing, really quick, I just want to say that I met with about a dozen veterans, Vietnam veterans and veterans that have come back from the Middle East, up in Kalispell, MT, this last week, and we talked about many of these bills. I cannot tell you how committed they are to making the VA the best it can be and not privatizing the VA, which I think is important to be said here, because there are people around—I do not know around this dais, but maybe around this dais, certainly in the House, that want to privatize the VA. If we are not continually working to make the VA the best it can be, it will be privatized, and I do not want to see that happen, personally.

So, we thank you for your advocacy, and we look forward to working with everybody to try to make the VA the best it can be. It is an important backstop for our veterans.

Thank you, Mr. Chairman.

Chairman ISAKSON. Senator Blumenthal.

Senator BLUMENTHAL. Thank you, Mr. Chairman. Thank you all for being here and for all your tireless work for our veterans. If you were here earlier you may have heard my questions about the Veterans PEER Act, and I would like to reiterate them to you, without going through all the provisions which I am sure you know. I would like to know from you whether you think that these kinds of support specialists are necessary, whether they perform a function, and whether they ought to be an integral part of our mental health care service and primary care team for our veterans.

Mr. CELLI. Well, I can tell you that The American Legion has long been a supporter of peer support. We find that it is the best way especially for veterans who are new to the VA system to become comfortable with the system and to integrate well. Incorporating them into the PACT model is really the right thing to do. I just do not think that there is any—we believe in it so much we actually passed a resolution specifically supporting it.

Senator BLUMENTHAL. Thank you. I would welcome other comments.

116

Ms. KELEHER. The VFW has long been very supportive of expansion of peer support specialists, and as we said, we very, very adamantly support it, not just for gender-specific care but for mental health care and many other areas. It is something that we look forward to continuing to work on.

Senator BLUMENTHAL. Great.

Ms. JASLOW. I would be happy to chime in, sir. Specifically related to women, you know, I think something that I would encourage you to think about, as you are working within this chamber, if people do not feel like they can navigate the VA system, whether they are welcome at the VA, whether it is even a place that does not overwhelm them, they are not going to take advantage of no matter how great of care that you try to provide for them.

So, simply having somebody, especially somebody who can help somebody through foreign territory, which, if you are a woman walking in there, not only is there for most of our generation a generational divide, but a gender divide. So, we are strongly supportive of it as well.

Senator BLUMENTHAL. Great. Mr. Cox?

Mr. COX. Senator Blumenthal, I think that peer support is really important, and also I think the greatest peer support is that at the VA, over one-third of the employees are veterans themselves. They are the shining star. They work there. They get their care there. They believe in it. They are committed to it. I see that committed staff every day as they find veterans that are struggling to maneuver the system, that, hey, they reach out, they share, even if they are in VHA, about VBA, and other benefits, and the coaching and mentoring. I think there is no bond greater than what you find amongst veterans, and I believe every one of the veteran service organizations would join with me in saying, you know, peer support, let us support it, but let us also fill those 45,000 vacancies at the VA so that every veteran gets all the care they fully deserve.

Senator BLUMENTHAL. Well said, and points well taken. We tend to overlook the fact, all too often, that a vast number of the VA employees are veterans themselves, and they care more than anyone about keeping faith with our veterans. I think that peer support is extremely important and we should recognize, as all of you have said that veterans are often the best source of care for other veterans, because they tend to understand their brothers and sisters, and it is the reason why veterans want the VA health care system to continue to exist. I think of all the reasons that veterans support the VA health care system, that may include the best equipment, medicine, care, but it is also the fact that it is provided, often, by veterans, with other veterans at their side.

I want to just say, finally, in the few seconds that I have left, I have been working very, very hard on this Appeals Improvement and Modernization Act of 2017. This backlog and delay in addressing claims by veterans—many, many of them justified and deserving—is a scandal for our Nation. The present backlog and delay is unacceptable, and I hope that you will join me in pursuing the bill, which is based on a framework that the VSOs have helped to devise. I want to give you credit for it because you have participated, along with experts and the VA itself, in the appeal process. It would consolidate the current appeals process into distinct lanes

117

that can be pursued more efficiently and effectively and fairly for our veterans. So, thank you for your help on it and I hope we can get it across the finish line.

Thanks so much. Thank you, Mr. Chairman.

Chairman ISAKSON. Thank you, Senator Blumenthal. I want to thank all our witnesses from the VSOs for your testimony today. Thank all your membership for their support in continuing with the Veterans Administration and this Committee's work. I thank the VA employees who were here earlier. I think their comments made about the value of those employees cannot be overstated. They are a tremendous asset for our country. And as Mr. Cox said, in the VA I think about one-third of employees are veterans themselves, and it means a lot to them to make sure they are providing that service as veterans, to the veterans who have served this country.

I appreciate all your testimony and input. We will leave the record open for 10 days, if there are additional submissions any of you may have. If there are no further questions, the Committee will stand adjourned. Thank you all for your attendance.

[Whereupon, at 4:38 p.m., the Committee was adjourned.]

RESPONSE TO POSTHEARING QUESTIONS SUBMITTED BY HON. BILL CASSIDY TO JENNIFER S. LEE, M.D., DEPUTY UNDER SECRETARY FOR HEALTH FOR POLICY AND SERVICES, VETERANS HEALTH ADMINISTRATION, U.S. DEPARTMENT OF VETERANS AFFAIRS

In your prepared remarks, you note that the Veterans Administration would like to require the use of ISBT–128 for all biological implants. However, I have several concerns with this position, as noted below. Could you address these in turn?

*Question 1.* The VA defines biological implants to include xenografts (animal-derived grafts) and not just those products of human origin. ISBT–128 (International Standard for Blood and Transplantation) is only suitable for products of human origin. How do you intend to track xenografts that are biological implants? What system will you use for those?

Response. The VA does not intend to use ISBT–128 for all biological implants. Only those implants of human origin would be required to have a distinct identifier such as provided by ISBT–128. Currently, ISBT–128 is the only available identifier for this purpose. VA would accept a distinct identifier for HCT/P (Human Cell and Tissue Products) from any Food and Drug Administration (FDA) approved source. VA's system will be robust enough to track any biologic implant including both allografts and xenografts. ISBT–128 will only be used for products of human origin. Non-human products will be able to use GS1 (Global Standard One), HIBCC (Health Industry Business Communications Council) or other FDA UDI (Universal Device Identifiers) as appropriate.

*Question 2.* My understanding is that there are only 20 tissue processors within the U.S. that produce Human Cells, Tissues, and Cellular and Tissue-Based Products (HCT/P's) regulated as devices. According to a recent survey, of those 20, only 2 currently use ISBT–128. Have you checked with your vendors to ensure that you could have access to HCT/Ps if you move forward with your proposal to limit your issuing agency only to ISBT–128?

Response. VA has checked with its human tissue contractors and has been assured that they can provide ISBT–128 labeled tissue. Those who currently do not use ISBT–128, have indicated that they will be able to do so within a year if requested, at a minimal cost. As a result, VA intends to allow for up to a year for a vendor to come into compliance when it negotiates its contracts if they are not already using ISBT–128. It should be emphasized that a distinct identifier like ISBT–128 is essential to prevent the entry of prohibited tissue sources into the VA supply chain. It allows for the readily auditable trail necessary to ensure that only properly sourced tissue is in use by VA; the underlying intent expressed in the legislation.

While mechanical implants are regulated differently than human or animal derived implants, they could use the same tracking system for blood and biologics. A

SA420

118

common system would also be useful with the emergence of composite devices which combine both mechanical and biologic components.

*Question 3.* Obviously, track and trace efforts should be improved for all implants—not just biological ones. What efforts are you doing to maintain traceability in those areas? My understanding is that the vast majority of medical device companies within the U.S. are opting to use GS1 (barcodes) for labeling their devices. Does the VA have a process for utilizing GS1?

Response. VA does not have a process for utilizing GS1 at this time. Prosthetic & Sensory Aid Services is currently serving as a member of a VA cross-functional workgroup led by the Office of Strategic Integration (OSI) Veterans Engineering Resource Center (VERC) for implant tracking. This workgroup will identify and develop processes and process requirements that will meet all requirements established by FDA, The Joint Commission, and Congress for the tracking of implantable devices by September 30, 2017.

————

RESPONSE TO POSTHEARING QUESTIONS SUBMITTED BY HON. MAZIE K. HIRONO TO JENNIFER S. LEE, M.D., DEPUTY UNDER SECRETARY FOR HEALTH FOR POLICY AND SERVICES, VETERANS HEALTH ADMINISTRATION, U.S. DEPARTMENT OF VETERANS AFFAIRS

S. 899 VA VETERAN TRANSITION IMPROVEMENT ACT

*Question 4.* Deputy Under Secretary Lee, could you comment on the VA's current policies related to paid medical leave for your disabled veteran employees and how S. 899 would improve on that?

Response. Current disabled Veteran employees employed in the Veterans Health Administration (VHA) may request and use leave for medical purposes in accordance with established agency leave procedures. The proposal would require VA to establish a leave transfer program for the benefit of health care professionals appointed under 38 U.S.C. § 7401(1) and authorize the establishment of a leave bank program for the benefit of such health care providers. Inclusion of this provision would ensure that disabled Veteran employees performing health care services in Title 38 occupations have the same opportunity to schedule medical appointments and receive medical care related to their disability without being charged leave as employees in Title 5 and Hybrid Title 38 occupations.

According to January 2017 data from the VA, there are over 13,000 Title 38 critical medical vacancies in the positions not currently subject to the Wounded Warrior Federal Leave Act (these are physicians, physician assistants, registered nurses, chiropractors, podiatrists, optometrists, dentists, and expanded—function dental auxiliaries).

*Question 5.* Does VA have a goal to hire veterans for these positions and if so, could you comment on the impact of the additional paid medical leave provided in S. 899 on efforts hire disabled veterans?

Response. VHA continues to encourage the hiring of Veterans for healthcare occupations, as well as other administrative, technical, professional, and clerical occupations. When filling Title 38 positions, VHA also needs to ensure the best qualified individuals are hired to meet the health care needs of our Veteran patients, as well as support our health care mission. The proposed legislation may assist in the hiring of Veterans for Title 38 occupations. Extending the current provisions of 5 United States Code (U.S.C.) section 6329, Disabled Veteran Leave, to Title 38 employees appointed under 38 U.S.C. § 7401(1) would provide an opportunity for our disabled Veteran employees performing health care services in Title 38 occupations to have the same opportunity to schedule medical appointments and receive medical care related to their disability without being charged leave as employees in Title 5 and Hybrid Title 38 occupations. This will provide disabled Veteran employees an opportunity to undergo medical treatments for their disabilities without having to consider their leave balances or work-life issues to obtain such services outside of scheduled work hours. Although the disabled Veteran employees would be eligible for paid medical leave, the proposal is considered cost neutral as it will not increase VHA full-time employee equivalent levels or salaries of the employees.

S. 1094, DEPARTMENT OF VETERANS AFFAIRS ACCOUNTABILITY AND WHISTLEBLOWER PROTECTION ACT OF 2017

We all agree that more can be done to increase accountability for those at the VA who have betrayed the trust they have been given to serve our Nation's veterans.

While there are some good provisions in S. 1094, I am deeply concerned on the implications of the bill's provision lowering the evidentiary standard for misconduct

119

removals from a "preponderance of the evidence" standard (meaning more than 50% of the evidence) to a "substantial evidence" standard (meaning the agency only needs, among other things, more than a "mere scintilla of the evidence") as the Supreme Court defined in its 1971 decision in *Richardson* v. *Perales*. This new standard would mean that even when the majority of the evidence supports the employee, he/she will lose.

*Question 6.* Deputy Under Secretary Lee, can you explain how the VA can ensure due process for its employees under this bill when it says if the majority of the evidence supports the employee, he/she will lose?

Response. Employees at VA are entitled to constitutional due process and will continue to be entitled to constitutional due process even if S. 1094 is enacted into law. A change to the burden of proof from preponderant evidence to substantial evidence does not change an employee's right to constitutional due process.

At its simplest, constitutional due process requires that an individual receive notice of an action affecting the individual's interests and a reasonable opportunity to contest that action. Sometimes the notice and opportunity to contest must precede the action (pre-deprivation); sometimes it may come after (post-deprivation), in the form of a post-decisional appeal, whether to a third-party forum like the Merit Systems Protection Board (MSPB) or to the courts. Under S. 1094, this constitutional due process will not be adversely impacted. Under S. 1094, employees will continue to receive notice of a proposed disciplinary action, the ability to respond befsore a decision is made, and the ability to go to the MSPB or a court.

With regard to the burden of proof, a substantial evidence standard does not mean that an employee will lose, even if the majority of the evidence supports them. The MSPB defines "substantial evidence," the standard proposed under S. 1094, as the "degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree." 5 CFR § 1201.4(p). Substantial evidence is "a lower standard of proof than preponderance of the evidence." *Id.*

The MSPB's definition of "substantial evidence" is echoed in *Richardson* v. *Perales*, a case that pertains to a social security disability claim rather than the Federal civil service. *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971) citing *Consol. Edison Co.* v. *Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938) (substantial evidence is "more than a mere scintilla [of evidence and it] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). But, the MSPB further explains that, in the Federal civil service context, substantial evidence "obliges the presiding official to determine only whether, in light of the relevant and credible evidence[,] a reasonable person could agree with the agency's decision (even though other reasonable persons including the presiding official might disagree with that decision). *Parker* v. *Def. Logistics Agency*, 1 M.S.P.R. 505, 531 (M.S.P.B. 1980).

The MSPB currently uses the substantial evidence standard to adjudicate agency actions taken based on performance. See 5 U.S.C. § 7701(c)(1); 5 CFR § 1201.56(b)(1)(i). Even with this lower burden of proof, there are numerous cases where the MSPB and its reviewing court have determined that the agency failed to meet this lower burden of proof. See, e.g., *Parkinson* v. *Dep't of Justice*, 815 F.3d 757, 766 (Fed. Cir. 2016); *Thompson* v. *Dep't of the Army*, 122 M.S.P.R. 372, 381–82 (M.S.P.B. 2015); *Smith* v. *Dep't of Veterans Affairs*, 59 M.S.P.R. 340, 342–43 (M.S.P.B. 1993); *Cranwill* v. *Dep't of Veterans Affairs*, 52 M.S.P.R. 610, 616 (M.S.P.B. 1992). Consequently, it is doubtful that, even with a lower evidentiary burden, the MSPB would always agree with an action taken by VA or that, even if the majority of the evidence supports an employee, he or she will not succeed in a disciplinary appeal before the MSPB.

––––––––––

RESPONSE TO POSTHEARING QUESTIONS SUBMITTED BY HON. MAZIE K. HIRONO TO J. DAVID COX, SR., NATIONAL PRESIDENT, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO

S. 1094, DEPARTMENT OF VETERANS AFFAIRS ACCOUNTABILITY AND WHISTLEBLOWER PROTECTION ACT OF 2017

*Introduction:* President Cox, in your testimony you reference the unworkable timeframes for appeals using the Grievance and Arbitration Procedures in the Collective Bargaining Agreement.

*Question 1.* Can you explain how the short timeframes would threaten the reliability of the collective bargaining process?

120

*Question 2.* Can you share with the Committee any real-life examples of how this would impact your rank and file employees and possibly even reverse some removal decisions that were in favor of the employee due to the lowering of the evidentiary standard?

[Responses were not received within the Committee's timeframe for publication.]

# Exhibit B

SA424



S. Hrg. 115–320

# HEARING ON PENDING LEGISLATION

# HEARING

BEFORE THE

## COMMITTEE ON VETERANS' AFFAIRS
## UNITED STATES SENATE

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

———

JULY 11, 2017

———

Printed for the use of the Committee on Veterans' Affairs



Available via the World Wide Web: http://www.fdsys.gov

———

U.S. GOVERNMENT PUBLISHING OFFICE

28–513 PDF                    WASHINGTON : 2018

**SA425**

137

In addition to helping veterans find employment after they separate from military service, the GOOD pilot program would help alleviate the provider shortage for PAs that the VHA is currently facing, thus removing a barrier to care for the veterans who rely on the VHA for their medical needs.

Additionally, we are particularly pleased that the GOOD Pilot Program will provide priority to veterans who are from rural communities or who are willing to commit to providing care as PAs in VA facilities located in rural communities. This program would mirror the National Health Service Corps, a successful model that has been educating PAs and other healthcare professionals for decades in exchange for a commitment to serve in medically underserved areas.

Competitive Pay for PAs

A critical component of S.426 is its requirement that the VHA implement a long overdue update for PA compensation. Under the current system, VA compensation for PAs simply does not compete with the salaries offered outside the VA.

In the private sector, PAs are highly regarded and in-demand healthcare providers who command competitive salaries. According to the National Certification Commission for the Physician Assistant, the average salary of PAs in the United States for 2016 was $104,131. According to the 2015 VHA Workforce Planning Report, in 2015 starting pay for new PA graduates was usually 20-30% higher in the private sector than it was in the VA. This same report recommended that the VA update its compensation practices for PAs in order to become more competitive with the private sector. It is hard for the VA to recruit, hire, and retain PAs when the starting salary being offered for many PA positions is often significantly lower than what can easily be found in the private sector. The private healthcare market has embraced and rewarded the use of PAs to alleviate healthcare provider shortages; it is time for the VA to do so as well.

To AAPA's knowledge, the VHA has not expanded recruitment and retention initiatives related to fair compensation for PAs in response to the identification of PAs as one of the VA's top five critical occupation shortages. The VA has the authority to include PAs in the Locality Pay for Nurses and other Healthcare Professionals pay scale, but thus far has not taken action to do so. The addition of PAs to the VA locality pay system could assist the VA in recruiting PAs to replenish the ranks of approximately 40 percent of the VA PA workforce eligible for retirement within the next several years.

Additionally, PAs and nurse practitioners (NPs) employed by the VA frequently perform nearly identical functions and are employed in the same manner, but PAs are often paid significantly less than NPs for performing the exact same job. Because of inconsistencies in pay scales, NPs often start at a higher salary than PAs, and it is not uncommon for NPs in the VA to be compensated by as much as $30,000 more than PAs while providing similar, if not identical, medical services.

Examples of this pay discrepancy are unfortunately very easy to find. A job posting on 3/16/2017 for a position at the Chillicothe (Ohio) VA Medical Center, for a position that could be filled by either PA or a NP, advertises a salary range of $69,207-$82,185 for PA candidates, while the salary range for an NP was $93,065-$123,766. At the William Jennings Bryan Dorn VA Medical Center, in Columbia, SC, a position posted on 5/18/2017 was open to both PAs and NPs, with the salary range for a PA starting at $49,626 and the starting salary range for an NP starting at $76,992. In addition to these recent listings, there are disparities in pay ranging from $13,000 to $26,000 per year for PAs versus NPs in cities such as Augusta, GA, New Orleans, LA, and Las Vegas, NV. Ensuring compensation for PAs takes into consideration local wages, as the VA does for NPs, is critical to improving access to care by ensuring the VA is able to better recruit and retain PAs.

Conclusion

S. 426, the "Grow Our Own Directive: Physician Assistant Employment and Education Act of 2017," represents a significant step forward in building and strengthening the VA's PA workforce through proposals to create a five year pilot program to educate veterans as PAs and to require the VA to adopt standards leading to competitive pay for PAs employed by the VA. As the Committee moves forward with efforts to improve the quality of care available at the VHA, AAPA would be pleased to continue to serve as a resource. Thank you again for the opportunity to submit a statement for the record in support of S. 426.

2318 Mill Road, Suite 1300  |  Alexandria, VA 22314  |  P 703.836.2272  |  F 703.684.1924  |  aapa@aapa.org  |  www.aapa.org

———

PREPARED STATEMENT OF AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO

The American Federation of Government Employees, AFL–CIO and its National VA Council (AFGE) appreciates the opportunity to submit a statement for the record on the bills under consideration today. AFGE represents nearly 700,000 employees in the Federal and D.C. government including 250,000 rank and file employees at the Department of Veterans Affairs who provide vital care and services for our veterans.

138

S. 1153 would bar providers from participating in VA purchased care programs if they have been fired from the VA for certain misconduct, violated requirements of their medical license, lost a VA credential, or committed certain crimes.

AFGE supports S. 1153. When VA privatizes care, the standards must be as high as they are inside the VA.

### S. 1261—VETERANS EMERGENCY ROOM RELIEF ACT

AFGE opposes S. 1261 as currently written. Absent specific guidelines for when veterans can use non-VA urgent care centers, this bill could lead to more fragmented and uncoordinated care, and lead the VA further down the road of privatization. In addition, too many veterans are already subjected to harsh collection practices through Choice and through VA third party collection processes.

AFGE urges the Committee to first conduct an inventory of emergency departments and urgent care centers within VA medical centers; a number of facilities have closed emergency departments over the years without adequate justification. This study should also examine the feasibility of expanded urgent care centers within VA medical centers. Urgent care provided directly by the VA will be far more veteran-centric than urgent care provided in the private sector.

### S. 1266—ENHANCING VETERAN CARE ACT

This bill would give the VA authority to contract with non-VA entitles to investigate deficiencies at VA medical centers.

AFGE opposes S. 1266. The VA has adequate internal capacity to investigate its medical centers, alone or in conjunction with other independent governmental entities. Contracting out this responsibility is likely to be used to lay the groundwork for further privatization.

### S. 1279—VETERANS HEALTH ADMINISTRATION REFORM ACT OF 2017

AFGE opposes S. 1279 because the criteria that would be used to determine if a veteran can seek care outside the VA are too vague (e.g. clinical best interest, undue burden, not economical). VA medical centers across the Nation continue to be deprived of adequate staff and resources to provide all veterans with the timely, veteran-centric care they have earned and that they prefer. The conditions resulting from chronic underfunding and short staffing need to be addressed by strengthening the VA rather than further depleting resources away from the VA to provide more fragmented, nonspecialized care to veterans.

### S. 1325—BETTER WORKFORCE FOR VETERANS ACT OF 2017

AFGE concurs that it is critical to fill the reportedly 49,000 vacancies at the VA. However, in AFGE's view, some of the provisions in the underlying bill—as currently written—fall short of improving hiring, recruiting, and training efforts within the VA and may have unintended consequences

Sections 101 and 102 of the bill gives the Secretary more direct-hire authority to fill current staff level vacancies. AFGE has serious concerns about how this increase in direct-hire authority will impact current Federal employees. If this bill were to become law, AFGE fears that an unintended consequence could be preferential treatment given to outside candidates, thereby bypassing current VA employees who seek a promotion. Without adequate protections in place for current Federal workers who have worked diligently to move up the VA ladder, the bill could have a negative impact on efforts to strengthen the VA workforce.

Section 106 of the underlying bill directs the VA to collect data on hiring effectiveness and Section 107 calls for the VA to design a standardized exit survey that would be voluntarily administered to outgoing employees. AFGE wants to stress the importance of having stakeholder input throughout the process of developing these mechanisms. It is critical that the VA consult with labor organizations who represent their employees as well as the many Veterans Service Organizations (VSOs) whose members rely on the VA for vital care and services when developing these survey tools. By incorporating input from both labor and the VSO community, the VA will be able to develop tools that adequately address issues at the worker, manager, and patient level.

One goal that appears throughout the underlying bill is the notion of transparency. AFGE appreciates the inclusion of this provision in the bill and the acknowledgment that the VA should be more transparent as it relates to staffing levels and vacant positions. With that in mind, AFGE would like to see the bill go further by posting not just nurse staffing levels, but all staffing levels at every VA fa-

139

cility. In addition to the VA being transparent with its current workforce, AFGE would like to see the VA be transparent with posting job openings. AFGE highlighted its concern with new direct-hire authority above, and in that vein, wants to express its desire that necessary oversight is exercised so that the Secretary does not use this new direct-hire authority to fill positions without those jobs being publicly posted with an open announcement.

Another area where AFGE has significant concern with the underlying bill relates to the proposed use of non-Federal employees to provide care and services to our Nation's veterans. As it's currently written, Section 202 of the bill would allow the VA and private sector companies to essentially swap employees for a period that can range from three months to four years. AFGE has long opposed allowing the private sector to enter the Federal Government and then return to their original job outside of the government. This is an unnecessary step down the path to privatization, and AFGE opposes the section in its entirety.

AFGE opposes Section 204 as currently written. Section 204 establishes a two-tier payment system of base pay and market pay for directors of medical centers and Veterans Integrated Service Networks (VISN). The bill would set market pay for directors on a case-by-case basis through a process that requires the Secretary to consult at least two national surveys and takes into account managerial experience, complexity of the facility, and labor market conditions among other considerations.

Under Section 204, medical center and VISN directors—who would no longer have to be physicians themselves (as a result of Section 203)—would gain a significant right that was taken away from every VA physician and dentist last year. Public Law 114–315 repealed the requirement enacted in 2004 that "the Secretary shall consult two or more national surveys of pay" (Public Law 108–445).

In addition, Public Law 114–315 eliminated the requirement to set market pay through peer-based compensation panels, a valuable system for ensuring pay fairness, that protected providers from abuse of discretion by managers. According to reports from our physician members, the Secretary has not established any new policies to replace the compensation panels.

AFGE is ready and willing to work with the Committee to amend Section 204 to ensure that VA physicians and dentists reacquire adequate market pay protections, which in turn will strengthen recruitment and retention and enable the VA to provide medical care to more veterans on a timely basis.

AFGE also opposes Section 207 of the bill that would allow the Secretary to enter into a Memorandum of Understanding (MOU) with the Surgeon General to allow not less than 500 Public Health Service (PHS) commissioned officers to enter the VA. Allowing PHS to come into the VA would erode frontline workers collective bargaining rights and move the VA one step closer to privatization. PHS does not appear to have any significant expertise in treating veterans. In addition, Congress has provided VA with ample tools over the last two decades to recruit and retain nurses within the Federal workforce. The VA should be focused on recruiting, hiring, and retaining high quality medical professionals who will make a career out of serving veterans, not finding creative stop-gap measures. The United State Government must keep the promise it made to our veterans by rewarding their dedication and sacrifice with the best care and services imaginable, and the only way to do that is through hiring staff at every level who will be there long-term to care and provide for our veterans. AFGE opposes this section of S. 1325 in its entirety.

AFGE opposes Section 212 as currently written. Section 212 would require a review of the job descriptions, position classifications and grades for all VA police officers and firefighters to ensure compliance with Office of Personnel Management (OPM) classification standards. This section also mandates the development of staffing models and an audit of recruitment and retention efforts for both positions, and a report to Congress regarding the Department's use of special pay to address its critical shortage of police officers.

AFGE shares the concerns of lawmakers and veterans' groups that the outdated police officer job duties increase safety risks to the VA community. However, after consultation with classification experts, AFGE strongly urges the Committee to adopt a more comprehensive and aggressive approach to modernizing the VA police officer position, i.e. mandating that the Secretary exercise his existing statutory authority to convey law enforcement officer (LEO) status to all VA police officers. Only this major overhaul of VA police officer positions will ensure that VA has the capacity to adequately respond to the wide range of violent and non-violent incidents that arise on a regular basis at its facilities.

A recent expert analysis of VA police officer duties indicates that VA police officers already meet the statutory definition of law enforcement officer based on their primary duties and training requirements (5 CFR 831.902; 5 CFR 842.802).

**SA428**

140

AFGE previously requested that former VA Secretary Robert McDonald exercise this authority. AFGE stands ready to work with bill sponsors and other Members of the Committee to develop a stronger statutory solution to this significant VA safety issue.

S. _____—DISCUSSION DRAFT, THE VETERANS CHOICE ACT OF 2017

AFGE strongly opposes the Veterans Choice Act of 2017. This bill would vastly increase the use of non-VA care through a massive expansion of the Choice Program. Like the Concerned Veterans of America plan that was soundly rejected by the Commission on Care, this bill would erode the critical core of the VA health care system and put such an enormous financial strain on the VA so as to threaten its very survival.

The bulk of veterans' care, and all primary care and mental health care must continue to be provided within the VA system, to ensure that veterans continue to receive the world-class integrated care they have earned and prefer. Only the VA, as the coordinator of care, can ensure that non-VA care is used in a smart way to ensure that veterans can receive the most appropriate care for their circumstances.

In contrast, this bill would not result in a smart use of non-VA care but rather an unlimited use of non-VA care that would likely lead to worse care for veterans in both the short and long term, and the severe weakening of our Nation's leader in health care training and research.

AFGE also opposes this bill because it would not ensure the VA is the primary coordinator and arranger of non-VA care.

S. _____—DISCUSSION DRAFT, IMPROVING VETERANS ACCESS TO COMMUNITY CARE ACT OF 2017

AFGE generally supports the Improving Veterans Access to Community Care Act of 2017. This bill enables the VA to modernize its services, which will both allow the VA to better integrate a truly smart use of non-VA care with VA's own world class services, but also allow the VA to meet increased demand from higher functioning and consolidated non-VA care programs.

AFGE also supports this bill's provisions for ensuring that the VA is the primary coordinator of non-VA care. The integrated networks created by this bill would allow veterans to more seamlessly move between the VA and non-VA providers when the use of non-VA care to supplement VA's own care is warranted.

The VA has made great progress in making needed improvements to its health care system and other operations over the past three years. This bill ensures that veterans will continue to be well served by the VA and integrated networks providing non-VA care when the VA cannot meet the need itself. This bill also is the far better option for protecting the critical resources that the VA must retain in order to keep its promise to veterans.

S. _____—THE DEPARTMENT OF VETERANS AFFAIRS QUALITY EMPLOYMENT ACT OF 2017

AFGE does not support this bill as a whole, though it includes several positive management improvement provisions included in previous legislation.

Like some of the provisions that raised concerns from AFGE in S. 1325, as already discussed, this bill relies too heavily on the private sector to improve the Department. For example, Section 3 would provide management training to VBA and VHA employees in a private sector setting. VA managers need to learn the best practices of other VA managers and when applicable, exemplary managers from other agencies. That is why AFGE supports management improvement provisions that strengthen VA's own managers through better training and performance evaluation.

AFGE supports a public database on vacancies, but the database in Section 6 of this bill has too narrow a scope. Veterans, the public, employee representatives, and all stakeholders need access to complete data about vacancies throughout the Department, not just vacancies that are determined to be critical by the Secretary.

The human resources training proposed by Section 7 is greatly needed, but to ensure that it is truly effective, labor representatives, and other stakeholders must have regular input in the design and delivery of training curriculum. Without the perspective of front line employees, any H.R. training will continue to fall short.

AFGE has similar concerns in this bill regarding provisions for exit surveys and succession planning studies as we have for S. 1325, i.e. it is essential that these workforce improvement efforts reflect the regular input of representatives of front line employees.

Thank you for the opportunity to share the views of AFGE.

SA429

# Exhibit C

**SA430**

SA431

**STATEMENT OF**

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO**

**BEFORE THE**

**HOUSE COMMITTEE ON VETERANS' AFFAIRS**

**LEGISLATIVE HEARING**

**OCTOBER 24, 2017**

{00373570.DOCX - }

Mr. Chairman and Members of the Committee:

The American Federation of Government Employees (AFGE) appreciates the opportunity to submit a statement for the record on pending legislation under consideration today. AFGE represents nearly 700,000 federal employees across the nation, including 250,000 employees at the Department of Veterans Affairs on the front lines providing health care and other critical services for veterans.

**Draft legislation to amend title 38, United States Code, to establish a permanent Veterans Choice Program, and for other purposes**

AFGE strongly opposes this draft legislation.  It would establish a permanent Choice program that would continue to divert funding away from VA's internal capacity to pay for a costlier non-VA care services even when private sector wait times are higher and quality is lower. The bill is also likely to result in unsustainable costs by elimination of all wait time and distance eligibility restrictions.  Increased use of non-VA primary care providers will deprive veterans of critical screenings for wounds of war and essential integrated care.

This bill lacks provisions for strengthening the VA's own capacity or for sending veterans back to the VA even when private sector primary care or specialty care is no longer necessary or adequate.  It imposes new case manager duties on VHA staff without additional resources; Choice has already diverted staff away from direct care of veterans to handle overwhelming numbers of consults for non-VA care and to "clean up" after Choice clinical and bureaucratic problems.

Proposed market assessments lack transparency and rely too heavily on a private sector health care model and do not require an adequate focus on staffing and infrastructure needs.

Choice providers would continue to receive less scrutiny than VA's own providers under this bill. It does not require the same transparency about wait times for non-VA care as is required for VA care.  It also makes it too easy for non-VA providers to receive certifications that allow them to participate in networks regardless of whether their skills and training are equivalent to those of VA's own providers.

In short, this bill would serve the agenda of privatizers but ignore the needs and preferences of veterans to receive the vast majority of their care from a fully-funded, fully-staffed, world-class integrated VA health care system. Rather than continue to expand a broken non-VA care program, we urge the Committee to provide the mandate and funding needed to fill the nearly 50,000 vacancies reported by Secretary Shulkin and finally address the modernization and infrastructure needs of the VA that have been neglected for too long.

{00373570.DOCX - }

2

**SA432**

**Draft legislation to modify the authority of the Secretary of Veterans Affairs to enter into agreements with state homes to provide nursing home care to veterans, to direct the Secretary to carry out a program to increase the number of VA graduate medical education residency positions, and other purposes**

AFGE has no specific position on this legislation.

## H.R. 1133

AFGE has no specific position on this legislation.

## H.R. 2123

This bill would extend federal preemption of state licensing requirements to all licensed VHA personnel using telemedicine to provide treatment.  Last year, the Department amended its provider regulations to apply federal preemption to certain advanced practice registered nurses (APRN), relying on the federal supremacy clause of the Constitution.

AFGE opposes H.R. 2123.  This bill could have unintended consequences, including an adverse impact on recruitment and retention of licensed medical personnel who are already in critical shortage occupations. The licensed health care personnel we represent have expressed serious concerns about the risks to their state licenses (and therefore their entire livelihoods) if management is allowed to mandate the performance of duties outside their scope of practice.  These clinicians have received no assurances that the Department will assist them when their licensing boards pursue disciplinary actions against them for violating state licensing requirements.

This proposed change is premature.  The new APRN rule has only been in effect for less than a year.

Therefore, AFGE urges the Committee to delay possible changes to current law until completion of a study of the workforce implications of a broader application of federal preemption. Current bill provisions for a telemedicine study fail to address any workforce issues. We recommend a study that focuses on the impact of federal preemption on the state licenses of APRNs and other licensed personnel, and the Department's ability to remain competitive with other health care employers who do not operate under federal preemption.

## H.R. 2601

AFGE has no specific position on this legislation.

## H.R. 3642

**SA433**

This bill would establish a three-year private sector pilot program for the treatment of military sexual trauma (MST). At the completion of the three-year period, the Secretary would have permanent authority to approve non-VA treatment of MST on a case-by-case basis.

AFGE strongly opposes H.R. 3642. In fact, it is hard to contemplate a more inappropriate combat-related condition to outsource to the private sector than MST. This proposed pilot project is unnecessary and represents another back-door attempt to dismantle the VA's comprehensive, integrated health care system, like almost every other VHA private sector pilot project previously implemented.

VHA is a world leader in the screening and treatment of MST and provider training and research in this area. VHA requires that every veteran receive screening for MST and screening also plays a critical role in data collection on the treatment of this widespread condition. All VA mental health and primary care providers are required to complete initial and continuing MST training. MST specialists are available at every medical center and many outpatient clinics.  The VA's National Center for PTSD plays an integral role in the VA's treatment of MST.

Rather than proceed with another wasteful pilot project that sends MST sufferers out into a broken, fragmented private health care system that does not understand their unique needs, AFGE urges the Committee to review existing direct care resources and telemedicine capacity within the VA to identify ways to increase access for treatment in hard-to-serve areas.

### VA Legislative Proposal – Veteran Coordinated Access & Rewarding Experiences (CARE) Act

AFGE strongly opposes the non-VA care provisions in Titles I and II and has concerns about some of the personnel provisions in Title III.

*Non-VA Care*

The VA's proposal to replace the Choice program would greatly accelerate privatization of its health care system through virtually open-ended access to non-VA care and the absence of any mandates to address short staffing and deteriorating infrastructure.  It is absurd that non-VA programs would continue to rely on mandatory funds while VA's own funding would remain discretionary and therefore continue to have to close funding gaps on the backs of veterans through such proposals as COLA round-downs.

The bill's non-VA provisions are as problematic for what they say as for what they don't say. The lack of specificity through the bill will allow the VA to continue to engage in stealth privatization as illustrated by recent agency initiatives to convert specific purpose allocations to general purpose allocations and creation of pilot projects that send veterans out to CVS Minute Clinics without Congressional authorization.

AFGE strongly opposes the proposed replacement of the 30-day/40-mile restrictions with a vague patient-provider veteran's "best interest" evaluation process and criteria such as "clinically acceptable" wait times (Section 201).

We also strongly object to the expanded use of non-VA urgent care facilities already undertaken through pilot projects in numerous locations. This seems totally unnecessary considering Secretary Shulkin's recent announcements that the VA is providing same-day service at every medical center and significant increases in access to urgent care provided directly by the VA.

*Personnel Practices*

Section 301:

AFGE objects to the proposed expansion of "federal supremacy" that would extend federal preemption of state licensing requirements to all licensed VHA personnel. (In contrast to Chairman Roe's proposal, the VA's draft does not limit federal preemption to telemedicine.)

As already noted with regard to Chairman Roe's draft bill, this provision could have unintended consequences, including an adverse impact on recruitment and retention of licensed medical personnel who are already in critical shortage occupations. AFGE believes that this proposed change is premature as the new APRN rule has only been in effect for less than a year.

Therefore, AFGE urges the Committee to delay possible changes to current law until completion of a study of the workforce implications of a broader application of federal preemption.

Section 302:

This section repeals VA's longstanding statutory authority to contract for "scarce medical specialist services".

AFGE opposes this proposed change because it appears to broaden VA's authority to contract out medical services even when VA's own health care system can provide the care (and there is no scarcity). This will further erode VA's critical capacity to provide comprehensive, integrated, specialized care to veterans that has already been weakened by the Choice program.

Section 304
This section repeals the annual caps on VA bonuses across the entire VA workforce that were imposed by the Choice Act in 2014 and later modified downward through subsequent legislation.

SA435

AFGE supports elimination of annual dollar caps. AFGE appreciated the Sense of Congress language in the Choice Act that required fair allocation of bonuses to lower wage employees under the caps. AFGE urges Congress to continue to address the issue of lower wage employees' bonuses through a study of how bonus dollars have been allocated over the last five years and whether bonuses are used properly to incentivize high-performing non-management employees.

Section 305:

This section extends the statutory reimbursement right for continuing education from doctors and dentists to Advanced Practice Registered Nurses.

While AFGE supports the expansion of this critical medical professional benefit to other professions, we object to this provision as currently drafted. Reimbursement for continuing medical education is a critical recruitment and retention tool but AFGE opposes setting this benefit (for any professional group) at $1000 per year. This amount has not been updated since the legislation was first enacted *almost twenty years ago.* With each new year, VA becomes less competitive with private sector employees who adjust their reimbursement rates to match actual costs of attending these courses.

AFGE also objects to limiting this benefit to APRNs. It should also be available to physician assistants as they too are independent providers in the VA. Finally, AFGE urges a study of the reimbursement needs of all other VHA licensed professionals.

Thank you.

**SA436**

# Exhibit D

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO**

**PROVIDED TO THE**

**HOUSE COMMITTEE ON VETERANS' AFFAIRS**

**SUBCOMMITTEE ON HEALTH**

**"FY 2019 DEPARTMENT OF VETERANS AFFAIRS BUDGET REQUEST FOR THE VETERANS HEALTH ADMINISTRATION"**

**MARCH 15, 2018**

Chairman Wenstrup, Ranking Member Brownley, Members of the Subcommittee,

The American Federation of Government Employees (AFGE), appreciates the opportunity to submit a statement for the record for this hearing regarding President Trump's FY 2019 budget request for the Department of Veterans Affairs (VA). AFGE represents nearly 700,000 federal employees, including 250,000 employees at the VA, and more specifically, the overwhelming majority of non-management frontline VA employees who provide direct medical and mental health services to our nation's veterans. It is imperative that Congress give VA employees the resources they need to succeed, and that means investing money into the VA and its staff instead of sending precious resources to the private sector.

One issue that needs an immediate remedy is chronic understaffing across the VA system. AFGE has repeatedly raised the issue of the outrageous understaffing at the Department. It seems that VA has a policy of not filling positions that even they acknowledge should be filled. We would like to use this statement to once again point out that there are approximately 35,000 positions that need to be filled. But instead of seeking to hire for these positions, the Department proceeds without any sense of urgency. Pushing veterans to the unaccountable private sector while the Department needs 35,000 additional front line personnel is a national disgrace. If the White House and VA want to fix internal problems at the Department they absolutely must get serious about staffing the agency. Anything short of a firm hiring commitment is yet another Band-Aid on a multi-year problem. As the Independent Budget Veterans Service Organizations state in the Independent Budget, every expansion in the temporary CHOICE Program has increased demand for VA in-house services. Front line clinicians and support staff now have additional demands to manage Choice referrals, assist overwhelmed veterans and ensure continuity of care as veterans are shuttled between the two systems.

On January 17, 2018, Secretary Shulkin testified before the Senate Veterans' Affairs Committee and was asked directly about the Department's hiring plans. When asked about vacancies Secretary Shulkin said, "I just want to understand what they are,

**SA438**

35,000 vacancies, we have 370,000 employees, a 9 percent vacancy rate which is not overly high. So you're always going to have 40,000 vacancies during the course of the year." We respectfully disagree with this sentiment. The VA provides critical care and services to a special population, our nation's heroes, and we should not accept the status quo when it comes to serving their needs. Surely, we can all agree that the brave men and women who have worn the uniform and borne the battle deserve more than simply the bare minimum when it comes to adequate staffing of health care providers. AFGE continues to urge Congress and the Administration to address VA staffing and hire 35,000 additional and necessary front-line personnel.

Sadly, instead of addressing the internal problems with understaffing, leadership at the VA has opted to privatize core functions of the VA. The Department is opting to send care and services to costly, unaccountable private contractors instead of hiring adequate staff to perform these functions at the VA. A central topic last year was the notion of "accountability" yet the VA continues to send veterans outside of the VA to contractors who are held to no accountability standard. While VA employees must meet quality standards and have their performance scrutinized, no such oversight is conducted on private providers who operate in the CHOICE program. As Congress considers the VA budget, it must demand that the Department stop outsourcing vital functions.

AFGE continues to be concerned about the way money allocated to the VA is being spent. Specifically, as part of the larger budget deal in February there was a bipartisan agreement to allocate $4 billion to the VA over the course of two years. The intent was that this money would be used for the VA to address infrastructure needs. However, the White House has insinuated that they would like to see part of this money diverted from the VA and used to patch the CHOICE Program. We urge Congress to oppose any change in the way this funding is used and allocated. Leadership on both sides of the aisle agreed that the entire $4 billion – $2 billion in FY 18 and $2 billion in FY 19 – would be used for the VA and its internal needs.

The Senate and House VA Committees have spent a considerable amount of time debating and considering CHOICE funding and possible replacements. It is inappropriate to use the appropriations process to circumvent the Committees and send VA-specified money to CHOICE. The Department and the White House must be transparent in their dealings with Congress, VA employees, and veterans. It's disingenuous to accept money for the Department but then attempt to syphon that money off for other purposes. This smoke-and-mirrors approach to funding the VA is inappropriate, bad for veterans, and bad for employees. We urge Congress to adequately oversee how appropriated dollars are spent by the Department.

Finally, AFGE has serious reservations about using medical service dollars as a slush fund to subsidize unaccountable private sector care. Specifically, the President's

**SA439**

Budget recommends "combining the Medical Community Care and Medical Services accounts" in order to, supposedly, streamline operations.  AFGE unequivocally opposes this recommendation and urges Congress to reject it outright.  These are two separate and distinct accounts that should not be forced together for the Administration's convenience.  We further oppose any change in funding streams that could divert resources from the VA and send that money to contractors.  As can be seen by the 35,000 positions the VA needs to hire, the agency must have funding devoted to its own direct operations; and Congress must hold the Department accountable in the way the VA spends taxpayer money entrusted to it.

Thank you.

# Exhibit E

SA441

May 22, 2018

Dear Senator:

The undersigned labor organizations are writing today to vehemently oppose S. 2372, the VA MISSION Act. Our brothers and sisters at the American Federation of Government Employees (AFGE) tried to make this bill better; but none of their modest, reasonable changes have been incorporated into this text. As a result, we have no choice but to stand together with frontline employees at the Department of Veterans Affairs (VA) and oppose this legislation.

S. 2372, which passed the House last week, gives the VA Secretary the authority to privatize and dismantle broad swaths of the VA health care system. Sadly, while S. 2372 is titled the VA MISSION Act, it does nothing to help the VA fulfill its mission to veterans. The underlying bill does nothing to help build up internal capacity at the VA and assures that once care and services leave the VA they will not return. This bill outsources primary care to the private sector, authorizes the outsourcing of entire service lines, and fails to address the chronic and prolonged issue of understaffing that is currently plaguing the VA.

What is equally troubling is that included in S. 2372 is the authorization to establish a Base Realignment and Closure (BRAC)-style commission to evaluate the VA's infrastructure needs. This goes much further than prior BRACs that addressed only facility closures through its application to decisions over which facilities to build and repair. This bill also allows the BRAC process to deplete the VA medical services account without restrictions, which is especially troubling given the enormous cost overruns associated with military BRACs.

With that in mind, we must unequivocally oppose S. 2372, the VA MISSION Act. Too much is at stake for veterans, their families and everyone who benefits from the VA's extraordinary accomplishments to succumb to political pressures to hurriedly pass potentially damaging changes with many unknown consequences. We urge you to please vote no when the Senate considers S. 2372, the VA MISSION Act.

    American Federation of Labor and Congress of Industrial Organizations (AFL-CIO)
    American Federation of Government Employees, AFL-CIO (AFGE)
    Bakery, Confectionary, Tobacco Workers International Union
    Association of Flight Attendants-CWA
    Maritime Trades Department
    IFPTE
    AFSCME
    UNITE HERE
    Department for Professionals Employees
    International Union, United Automobile, Aerospace and Agricultural Implement Workers of America
    United Mine Workers of America
    United Steel Workers of America
    Professional Aviation Safety Specialists, AFL-CIO (PASS)
    National Federation of Federal Employees
    Union Veterans Council, AFL-CIO
    UFCW International Union
    National Association of Letter Carriers

SA442

# Exhibit F

SA443

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.



**REMARKS**

# Remarks by President Trump at Signing of the VA Mission Act of 2018

**VETERANS** | Issued on: **June 6, 2018**



Rose Garden

12:28 P.M. EDT

THE PRESIDENT:  Well, thank you very much.  This is a very big day.  Choice.  We've been looking for choice for a long time, and today is the day.  So it's very important.  Very happy.

Thank you all for being here.  This is truly a historic moment, historic time for our country.  I'll be signing landmark legislation to provide healthcare choice — what a beautiful word that is, "choice" — and freedom to our amazing veterans.

I want to welcome every veteran — we have many veterans here today — every caregiver, and servicemember who has joined us on this very momentous occasion.  All during the campaign, I'd go out and say, "Why can't they just go see a doctor instead of standing in line for weeks and weeks and weeks?"  Now they can go see a doctor.  It's going to be great.

11/20/25, 8:04 PM
Case 1:25-cv-00583-MRD-PAS   Document 14-4   Filed 11/25/25   Page 61 of 108   PageID
#: 1348
Remarks by President Trump at Signing of the VA Mission Act of 2018 – The White House

You fulfilled your duty to our nation with tremendous loyalty and courage.  And with the signing of this veterans choice legislation, we take one more crucial step in fulfilling our duty to you.

We're pleased to be joined today by our great Vice President, Mike Pence, along with my nominee to lead the VA, Robert Wilkie.  Wherever Robert — Robert.  Stand up, Robert.  (Applause.)  We're going to do a great job.  And working along with Robert is Acting VA Secretary Peter O'Rourke.  So, Peter, thank you.  Peter.  Where's Peter?  (Applause.)  That's a great team.

I also want to thank some of our many leaders.  I call them leaders because on this legislation they are indeed leaders.  You know, they said that it would be very slow.  It's a political season.  We have an election coming on November 6th.  So they said it would be very, very slow this period of time.

And I was just telling Mike, "You know, Mike, this hasn't been very slow."  If you look, we passed Dodd-Frank, Right to Try.  We just got $700 billion for our military.  (Applause.)  That's a big one.  We needed to get that.  The military is going to be stronger, bigger, better than it ever was before.  Hopefully we won't have to use it very much, but the fact that we have it so strong means we probably won't have to use it as much.  And I want to thank all of the great people in the audience that helped us so much.

On December 22nd, which doesn't quite fit into the January 1st date, but on December 22nd we signed the biggest tax cuts in the history of our country.  That's a big one.  (Applause.)  And we got $1.6 billion — we've already started the wall on the southern border.  The wall has started.  $1.6 billion.  So important.

I also have to recognize some of the people that have worked so hard to make all of this happen.  And Johnny Isakson — you're here.  Where's Johnny?  Boy, has Johnny been working — (applause) — have you worked with Jerry Moran and the whole group.  You and Jerry.  Where's Jerry?  Where's Jerry?  Hi, Jerry.  Good job.  Good job.  (Applause.)  Bill Cassidy, John Bozeman, Dean Heller, Tom Cotton — all here — Thom Tillis, Lindsey Graham.  I see Lindsey sitting right up there.  Hi, Lindsey.  Good job.  Todd Young.  Todd,

thank you.  Joni Ernst.  Where's Joni?  Because I did you a good favor for the farmers yesterday.  Right?  We love the farmers.  Right, Joni?  Good.  Good.  I'm glad it worked out.  John Hoeven, Steve Daines.  All here.

We have on the House of Representatives, Mike Coffman, Brian Mast, Jack Bergman, Buddy Carter.  Did I introduce you, Senator?  What's going on?  Huh?  I hope so.  If I didn't introduce you, I'm in trouble.  (Laughter.)  You know, the problem with this, there will be four people that we didn't introduce and they'll never speak to me for the rest of my life.  (Laughter.)  They'll make sure I suffer, right?  So please, I apologize.  Jenniffer González Colón.  Peter King.  Where's Peter?  Oh, stand up, Peter.  You have been so nice to me.  (Laughter.)  Well, he should; he comes from New York.  I mean, he should.  Right, Peter?  (Applause.)  Thank you, Peter.  Jack Bergman.  Our Chair, Phil Roe.  Phil.  What a great job.  (Applause.)  That was a lot tougher than we thought, right?  You would think it would have been easy.  It makes sense.  But you would have thought.

Kevin Cramer, Jim Banks, Andy Barr, Claudia Tenney, Martha McSally.  I hear you're doing very well, Martha, wherever you may be.  (Applause.)  I hear Martha is doing very well in the great state of Arizona.  That's what the word is.  Don Bacon, Brad Wenstrup, Jason Lewis, Cathy McMorris Rodgers — who's terrific.  Cathy?  (Applause.)  Hi, Cathy. Representative Neal Dunn, Representative Lee Zeldin, Ann Kuster, and Julia Brownley.  I want to just thank, and I assume we have a couple of others out there that — anybody I didn't announce?  You want to stand and we'll announce you?  You deserve it.  Thank you all very much.  Really, it's incredible.  (Applause.)

And finally, I want to thank the fantastic veteran service organizations that helped us push today's Choice legislation across the finish line.  Whenever I spoke, this was one of the most important things, and it was something I got the biggest hand for.  People want to take care of our great vets.  They are a great people.

Four years ago, our entire nation was shocked and outraged by stories of the VA system plagued by neglect, abuse, fraud, and mistreatment of our veterans.  And there was nothing they could do about it.  They couldn't do anything about it.  Good people that

**SA446**

worked there, they couldn't take care of the bad people.  Meaning, you're fired; get the hell out of here.  (Laughter.)

With us today are many brave veterans who endured that grave injustice, including Steve Cooper and Laura Vela.  They served their country with honor, only to be denied the medical treatment they desperately needed.  To Steve and Laura: No one should suffer what you suffered.  They suffered gravely.  No one who defends our country in uniform should have to fight for their lives when they come back, when they come to their home.

We commend your strength and courage in the face of hardship.  And we pledge to act in your name, and in the name of every other veteran who has been so badly wronged, neglected, and mistreated.

To those who serve our nation, who risk life and limb for country, we must never be denied care, access, or treatment that they need.  That is why we are here today and that is why we are signing this most important bill.  It made so much sense.  It's been so long.  They've been working on it for years and years and years.  And it wouldn't happen.  And accountability is the other one.

As a candidate for President, I promised to make reforming the VA one of my absolute highest priorities.  And from the first day of my administration, that is exactly what we've done.

Last year, I signed the historic VA Accountability legislation, meaning you now can immediately get rid of people that don't treat our veterans right; that rob us, or cheat us, or aren't good to our great vets.  You can get them out.  You couldn't do it.

For 40 years they've been trying to pass this — Phil, you know that.  Forty years.  And they couldn't.  Made so much sense.  But it was hard.  You have civil service, you have unions.  Of course they'd never do anything to stop anything, but they had a very great deal of power.  And in the end, they came along.  Everybody came along because they knew it was right.

So we passed something that hasn't been that recognized, and yet I would put it almost in the class with Choice. Almost in the class with Choice. VA Accountability — passed. And now, if people don't do a great job, they can't work with our vets anymore. They're gone. (Applause.) So we're very proud of Accountability.

In the campaign, I also promised that we would fight for Veterans Choice. And before I knew that much about it, it just seemed to be common sense. It seemed like if they're waiting on line for nine days and they can't see a doctor, why aren't they going outside to see a doctor and take care of themselves, and we pay the bill? It's less expensive for us, it works out much better, and it's immediate care. And that's what we're doing. So we're allowing our veterans to get access to the best medical care available, whether it's at the VA or at a private provider.

In a few moments, I will keep that promise that I've been making ever since the first day of my campaign — seems like a long time ago — and I'm going to sign legislation that will make veterans choice permanent.

And I just can't stress — the people here, the people in the audience, senators, congressmen, the great people working at the VA, and soon-to-be Secretary Wilkie, and everybody — the work that they've done to get this through is really inspirational to me. I've learned so much from the standpoint that I actually see how hard these people work. And this was very important. And Phil and Mike, and everybody, I really appreciate what you've done. It's been incredible. It's been incredible.

This has been for years; for 30, 40 years, they've been trying to get this done, and they haven't been able to. And we got it done.

If the VA can't meet the needs of a veteran in a timely manner, that veteran will have the right to go right outside to a private doctor. So simple and yet so complex. This legislation also expands access to the caregiver program for seriously injured veterans. Because no matter where you served or when you fought, if you were in uniform — at some point, if you wore that uniform, then you deserve our absolute best. And that's what we're doing. (Applause.) Right?

11/20/25, 8:04 PM
Case 1:25-cv-00583-MRD-PAS    Document 14-4    Filed 11/25/25    Page 65 of 108    PageID
#: 1352
Remarks by President Trump at Signing of the VA Mission Act of 2018 – The White House

This bill speeds up the claims process, increases the health services, expands access to walk-in clinics, and fights opioid addiction.  These are sweeping, historic changes.  There's never been anything like this in the history of the VA — never been anything close — and we will not rest until the job is fully done.

My administration has also taken action to ensure veterans can seamlessly transition their medical records from the Department of Defense into the VA.  And I've heard so many stories — how difficult it is, almost impossible.  I said, "How is that possible?"  It was almost impossible to do.  It took years to do.  We'll do it immediately now.  We're set up.  We have the right systems.  After years and years of waiting, the two departments will now finally use the same system.  They're matching.

Today we also mark another milestone, the 74th anniversary of D-Day, the Allied invasion of Normandy.  On June 6, 1944, more than 70,000 brave young Americans charged out of landing craft, jumped out of airplanes, and stormed into hell.  They gave their hearts, their blood, and their very lives on those beaches to drive out the enemy and strike a lasting victory for our country and for freedom.

In every generation there have been heroes like them, patriots who answer the call to serve, who do whatever it takes, wherever and whenever we need them to defend America.  They put everything on the line for us.  And when they come home, we must do everything that we can possibly do for them.  And that's what we're doing.  (Applause.)

And they can be very proud of their country because, literally, this week, we have gotten the best financial numbers, the best economic numbers, the best numbers on unemployment and employment that we've ever had as a country.  Strongest economy we've ever had.  It's so good, because we can do so many more things when that happens, including, of course, jobs.

Among the best job numbers ever, in the history of our country.  African American unemployment, the lowest it's ever been in history.  Hispanic unemployment, the lowest it's ever been in history.  Women unemployment, lowest it's been in 21 years, and soon

to be history.  A little bit more, it's going to be history.  Numbers that nobody has ever seen.

We've added $7 trillion since the election; $7 trillion to our country's worth, our country's — the value.  The value.  We've added $7 trillion to our country's worth.  We've never had anything like this.  And I'll tell you what — it's going to get better.  Cutting regulations, cutting taxes.  It's just starting.

So it's now my great honor to sign the VA Mission Act, or as we all know it, the Choice Act, and to make veterans choice the permanent law of our great country.  And nobody deserves it more than our veterans.  Thank you all very much.  Thank you.  (Applause.)

Thank you very much.

(The bill is signed.)

END

12:47 P.M. EDT

**The White House**

   

President Donald J. Trump

Vice President Mike Pence

First Lady Melania Trump

Mrs. Karen Pence

The Cabinet

Administration Accomplishments

News

Remarks

Articles

Presidential Actions

Briefings & Statements

About The White House

Economy & Jobs

Council of Economic Advisers

Case 1:25-cv-00583-MRD-PAS    Document 14-4    Filed 11/25/25    Page 67 of 108 PageID #: 1354

Budget & Spending

Education

Immigration

National Security & Defense

Healthcare

Council of Environmental Quality

National Security Council

Office of Management and Budget

Office of National Drug Control Policy

Office of Science and Technology Policy

Copyright    Privacy Policy

SA452

# Exhibit G



# CONGRESSIONAL TESTIMONY

SA453

**STATEMENT FOR THE RECORD BY**

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO**

**BEFORE**

**HOUSE COMMITTEE ON VETERANS' AFFAIRS**

**ON**

**"MORE THAN JUST FILLING VACANCIES: A CLOSER LOOK AT VA HIRING AUTHORITIES, RECRUITING AND RETENTION"**

**JUNE 21, 2018**

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, N.W., Washington, D.C. 20001   (202) 737-8700   www.afge.org

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO**

**PROVIDED TO THE**

**HOUSE COMMITTEE ON VETERANS' AFFAIRS**

**SUBCOMMITTEE ON HEALTH**

**"MORE THAN JUST FILLING VACANCIES: A CLOSER LOOK AT VA HIRING
AUTHORITIES, RECRUITING AND RETENTION"**

**JUNE 21, 2018**

Chairman Dunn, Ranking Member Brownley, and Members of the Subcommittee:

The American Federation of Government Employees, AFL-CIO (AFGE) and its National VA
Council (NVAC) appreciate the opportunity to submit a statement for the record for the June 21,
2018 hearing titled, "More Than Just Filling Vacancies: A Closer Look at VA Hiring
Authorities, Recruiting and Retention." AFGE and NVAC represent more than 700,000
employees in the federal and D.C. government, including 250,000 front line employees at the
Department of Veterans Affairs (VA) providing comprehensive benefits, health care, and other
critical services for veterans.

As numerous studies, reports, and anecdotal evidence have shown, veterans receive the best care
for their conditions in a system that is specifically designed for the treatment of veterans, the VA.
In turn, it is not surprising that the preferred "CHOICE" of veterans regarding where to receive
care is also the VA.  Because of these preferences, and the nation's commitment to those and the
families of those who have served, Congress must do all in its power to staff the VA to a point
where capacity meets the VA's exceptional demand, and where veterans receive the VA care
they have earned.  If proper staffing is not accomplished and positions are not filled, the VA will
continue down the path of privatization, and veterans will instead have a "CHOICE" made for
them by being sent to non-VA care.

AFGE and NVAC welcomes the opportunity to comment on several components that have an
impact on the future of VA staffing, including:

**Office of Inspector General Report on Staffing**

For years AFGE and NVAC have urged Congress to take a real look at hiring at the VA.  With
over 33,000 unfilled positions currently on the books at the VA, this hearing is timely.  It is
impossible for us to keep the promise made to our veterans without adequately funding and
staffing the VA.  The VA provides world-class, comprehensive, veteran-centric care and services
that simply are unavailable elsewhere and that is a system which must be preserved.  We hope
that the end result of the hearing today is with an even greater interest in staffing and a desire to
fill all 33,000 vacant VA positions.

*Additional data on nonclinical staffing needs:* Last week the VA Office of Inspector General
(OIG) released its annual report on staffing at the VA.  Unlike past years, Congress directed the
OIG to now include the top five clinical and non-clinical occupations which are the most short

**SA454**

staffed.  To comply, the OIG released data from 140 VA facilities nationwide and rank ordered the data based on how frequently the facilities cited an occupation as short staffed.

AFGE and NVAC were pleased to see the OIG provide a more thorough and complete review of facility staffing deficiencies including additional data on nonclinical staffing needs. This information will be useful to all stakeholders as we attempt to identify how to best staff the VA and fill these vacancies with fulltime federal employees who will make a career out of serving our veterans.

AFGE and NVAC are pleased to see an increased spotlight on the need for adequate staffing of nonclinical positions. Staffing levels for VA police ensure the safety of patients and employees, and staffing the VA with an appropriate number of custodial workers reduces the risk of hospital-acquired infections.  These are life and death issues.

Given the enormous burden that Choice and other non-VA private care programs have placed on VA's own support staff who are handling consults, medical records and requests for assistance from patients trying to navigate the private care maze, AFGE and NVAC strongly recommend that additional staffing data be collected to reflect staffing needs for these support positions as the Mission Act is rolled out.

*Mental health staffing needs:* Sadly, once again mental health topped the list of difficult to fill positions in the OIG report.  Of the 140 facilities surveyed, 98 facilities listed psychiatrist as the position which is most difficult to fill.  This made mental health the top category of those reported in the surveys.  At a time when private sector entities are hoping to carve out mental health care as a primary avenue for privatization, this finding is particularly disturbing.  The VA does veteran-centric mental health care better than any comparable entity in the private sector, and those professionals work every day to make sure our veterans get the help that they need.

AFGE and NVAC urge Congress to work to increase internal capacity within the VA's mental health practices instead of supplementing this care with the private sector.  AFGE and NVAC are very troubled by field reports from our locals who have observed that there appears to be widespread noncompliance with VA's own mental health staffing ratios.  Chronic short staffing of clinicians providing mental health treatment to our wounded warriors will directly undermine VA's continued ability to provide the exemplary specialty mental health care and Primary Care Mental Health Integration that are  a national model.

## Direct Hire Authority

The VA has long called for, and the Congress has consistently provided, direct hiring authority to bypass the regular civil service process and fill positions within the VA.  Less than a year ago, in August of 2017, the "VA Choice and Quality Employment Act of 2017" was enacted into law. This law goes beyond traditional direct hiring authority, and exclusively grants the VA additional direct authority when "there exists a severe shortage of highly qualified candidates" (Sec. 213). Furthermore, just as recently as last month, the VA MISSION ACT was signed into law, making two distinct references to how the VA should use direct hiring authority.  Specifically, it says it

2

SA455

should be used as a part of the remediation of closed medical service lines (Sec. 109), as well as for addressing the problems facing underserved facilities (Sec. 401).

Currently, tens of thousands of vacancies exist throughout the VA, and short staffing requires some veterans to receive non-VA care despite their preference to be treated within the VA. While the aforementioned laws address VA's direct hire authority, we must ask how the VA is using these hiring tools to address staffing challenges.

**Accountability Act**

Since the day of its introduction, AFGE and NVAC have vociferously opposed the "Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017." AFGE opposed this law with the belief that it would lead to a purge of frontline employees at the VA, including many veterans continuing their service to the nation within the VA, while failing to address managers who have failed in their ability to lead staff and serve the mission of the VA. While the VA has made collection of data related to terminations under the powers granted by the Accountability Act difficult to say the least, AFGE and NVAC have worked to compile and analyze data from these terminations. Through February 2018, 1646 individuals were removed under the Accountability Act, including 44 physicians, 100 Registered Nurses, 51 Licensed Practical Nurses, 40 Nurses, and eight Physicians Assistants, while only 18 Supervisors were terminated. With so many veterans requiring care, it is counterproductive to arbitrarily terminate medical personnel in short supply, while simultaneously failing to hold supervisors accountable. AFGE and NVAC are very pleased that a bipartisan bill, the VA Personnel Equity Act of 2018 (HR 6101) has just been introduced to restore critical workplace rights that the 2017 law severely weakened or eliminated. Regarding staffing, passage of this legislation will enable the VA to restore a more just and fair workplace that will enable it to be on a more level playing field in competing with other health care employers,

**Transparency**

AFGE and NVAC have urged Congress to seriously address VA staffing in a way that is transparent to patients, workers, and job seekers. We were pleased to see Congress include new transparency language in the VA MISSION Act, which is now law. Specifically, Sec. 505 of the new law requires the VA to submit a report to Congress outlining how many unfilled positions exist by occupation and by facility. This information will be posted on a publicly available website so that all interested parties will have access to the information. This section of the new law is an important step forward in staffing transparency at the Department. For entirely too long we have allowed the public to only see one side of the VA story: wait times. Now the public will be able to see how many unfilled positions exist at these facilities and ask questions about why those positions are going unfilled. We were also pleased to see Sec. 505 include a reporting requirement so that the Department will have to face Congress and explain what steps it is taking to fully staff every VA facility across the country. This new transparency requirement is important, and we ask that Congress make certain that the VA complies with this section of the new law.

3

**SA456**

**Other comments: Physician Assistant Pay**

As the OIG noted in its June 14, 2018 report, VHA has consistently faced a shortage of physician assistants (PA) in its workforce.  Section 212 of the VA Choice and Quality Employment Act of 2017 (VCQEA) added the requirement that physician assistants employed by VHA receive competitive pay through the same locality pay setting process already in place for registered nurses.

AFGE and NVAC have monitored the implementation of this new PA pay requirement. Our locals in multiple locations report problems with the types of surveys used. Management at some facilities are using 2016 contract wage surveys and they appear unwilling to consider any other options.  Given that the Medical Center Director has total discretion over the salary levelswhen converting to the new salary schedule and is only required to notify the Secretary of his decision, this leaves little recourse for the PAs adversely affected by the choice of survey, or their employee representatives to challenge unfair salary schedules.

As a result, despite these new provisions in the law, PAs working for the VA are paid significantly less than other PAs in the same local market; some report a $20,000 pay gap.  PAs with longstanding tenure with the VA are facing some of the worst pay gaps due to the VA's current pay ceilings for PAs.

PAs also report that their years of experience are undervalued relatives to VA advanced practice registered nurses (APRNs).  For APRNs working at the VA, nursing years of experience are counted as years of experience towards their APRN salary determination.  This practice results in APRN's receiving higher salaries than PAs with the same or less APRN experience.

AFGE and NVAC appreciate the opportunity to comment on these important staffing issues.

4

**SA457**

# Exhibit H

SA458



# CONGRESSIONAL TESTIMONY

**STATEMENT BY**

**J. DAVID COX, SR.**
**NATIONAL PRESIDENT**
**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO**

**BEFORE**

**HOUSE COMMITTEE ON VETERANS' AFFAIRS**

**ON**

**THE VA ACCOUNTABILITY AND WHISTLEBLOWER PROTECTION ACT:  ONE YEAR LATER**

**JULY 17, 2018**

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, N.W., Washington, D.C. 20001   (202) 737-8700   www.afge.org

SA459

Chairman Roe, Ranking Member Walz and Members of the Committee:

Thank you for the opportunity to present the views of the American Federation of Government Employees, AFL-CIO (AFGE) and its National VA Council (NVAC) regarding the implementation of the Department of Veterans Affairs (VA) Accountability and Whistleblower Protection Act of 2017 (Accountability Act). AFGE and NVAC represent over 250,000 front line employees who honor our nation's veterans every day by providing exemplary services at VA medical centers, benefits offices, vet centers and other VA entities.  It should be noted that AFGE and NVAC do not represent any VA management employees, the workforce segment targeted by bills leading up to the Accountability Act.

The Accountability Act has proven to be one of the most misguided and counterproductive VA laws ever enacted. It has demoralized and harmed its dedicated workforce, including a disproportionately large share of the 115,000 veterans who have the honor of taking care of other veterans as proud members of the VA workforce. It has deprived veterans who depend on the VA for health care and benefits of the services of employees with extensive training and experience who have been fired under the Act's new authorities without a fair chance to improve their performance or defend their jobs, as well as others who have left the VA or chose not to apply because of its uniquely harsh firing laws and hostile workplace. The Act has also squandered taxpayer dollars through unnecessary job turnover and litigation by empowering managers to go straight to the nuclear option of removal on the first alleged offense.

**SA460**

*Who is getting fired under the Accountability Act?*

Here's what "accountability" looks like under the new firing law*.* The VA has tried to hide the true harm that Act has caused by publishing limited firing data and denying information requests from Members of Congress and AFGE. Notwithstanding the VA's intentional lack of transparency, its own published data still illustrates the Act's severe unintended consequences and its failure to hold management accountable for mismanagement and misconduct.

For example, of the 2,742 VA employees fired in 2018, only 18 were supervisors (less than 1 percent). Housekeeping aides were the largest number fired, followed by nursing assistants, registered nurses, food service workers and medical support assistants. In contrast, supervisors (across the entire Department) ranked in *19th place.*

AFGE and NVAC attorneys discovered the perverse impact of this firing law soon after enactment, through individual cases involving positions historically held by veterans, including large numbers of service-connected disabled veterans. These include housekeeping aides, cemetery caretakers, police officers and Veterans Benefits Administration (VBA) veterans service representatives, claims examiners and claims assistants. Other cases highlighted the Act's greater impact on low wage VA employees generally, such as food service workers, nursing assistants and scheduling clerks.

The first set of VA published data confirmed what we were seeing at the facility level, i.e. that extremely few managers were being held accountable under a law that was justified largely as a management accountability tool.

2

**SA461**

After we learned that the VA's published data masked the disproportionate effect of this harsh law on the veterans and other vulnerable segments of the VA workforce, we filed a Freedom on Information request for data on *veteran status, age, gender and race* (Attachment A).  The VA has not responded with the data requested for nine months, forcing us to file an appeal.  Similarly, Members of Congress have not gotten a response to their data requests (Attachment B).

Despite the limited published data, the Act's disproportionately large impact on VA's low wage workforce and veterans is undeniable.  Currently, the Veterans Health Administration (VHA) has a national job posting for **housekeeping aides** at 13 medical centers.  All the openings are restricted to preference eligible veterans and all pay less than $35,000 annually. The salaries for VHA **nursing assistant** positions currently posted start at $30,449. All current food service national postings list hourly wages below $13 an hour.

The Act's adverse impact on the VA health care system is also evident from the large number of removals of employees in nursing positions.  VA Inspector General (IG) Michael J. Missal testified before this Committee last month that the IG has consistently included **registered nurses and other nursing occupations** in its top five determinations of VHA occupational staffing shortages.

*The VA cannot fire its way to success*

This destructive law was enacted despite warnings from experts that mismanagement, not job protections for front line employees, was undermining the VA's capacity to deliver

3

**SA462**

services to veterans. Health care experts repeatedly presented evidence that the VA health care system, the primary target of proponents of this firing law, outperforms the private sector.

First hand statements by VA scheduling personnel confirmed that wait list gaming was caused by severe shortages of providers and distorted management incentives, not incompetent or heartless employees who were too easy to fire.

Surveys by veterans' groups and other entities indicated that the VA remains a leader in customer satisfaction and that veterans using the VA health care system overwhelmingly prefer the VA's own providers to private providers and want the VA to increase its own staff.

Wait list gaming and its causes did not first make headlines in 2014.  When post-9/11 veterans started returning home with complex medical needs over 15 years ago, AFGE and veterans' groups cautioned Congress that chronic short staffing was causing wait list manipulation and severe access problems at VA medical centers.

Similarly, every year, the Independent Budget recommends additional staff to reduce claims backlogs at the Veterans Benefits Administration (VBA).  The VA's 2018 firing data reveals that four essential claims processor positions – veterans service representative, rating specialist, claims examiner and claims assistant – were among the 20 largest groups of fired employees in 2018.

Nonetheless, assaults on federal employee due process rights and collective bargaining rights have remained the vehicle of choice for those intent on destroying the civil service and starving the VA into further privatization and reduced health care services and benefits.  The Accountability Act was the culmination of three years of VA employee bashing and

4

**SA463**

misrepresentation about the quality and access of care provided by the VA as compared to the private sector.

*Impact of the new management authorities provided by the Accountability Act*

The new authorities caused severe cuts in the due process and existing collective bargaining rights of all VA frontline employees, as well as supervisors. These changes made it easier for managers to fire employees for any reason, good or bad and incentivized them to rush to fire without providing employees with an opportunity to improve.

The Act made changes in three major areas: the standard of evidence that the agency must meet to prove its case; shorter timeframes for employees to respond to the agency's proposal to remove or discipline; and elimination of the right of the Merit System Protection Board to impose a lower penalty when the evidence does not support removal.

*Lower evidentiary standard:* The Act requires the Merit System Protection Board (MSPB) administrative judges (AJ) and the Board to apply the *substantial evidence* standard to determine if the agency has proved its case instead of the higher, more widely applied *preponderance of the evidence* standard.  The *substantial evidence* standard only requires the agency to produce some evidence (or in the words of the U.S. Supreme Court, a "mere scintilla" of the evidence) to win, even if more of the evidence favors the employee.  Before this bill became law, the VA had to meet the preponderance standard that requires that the majority of evidence had to weigh against the employee. When managers know that the agency will easily prevail before the Merit System Protection Board, they are encouraged to skip over reprimands, suspensions and demotions and instead, propose removal in response to a single

5

**SA464**

alleged offense.  (This change applies only to Title 5 and Hybrid Title 38 employees. It does not apply to physicians, RNs and other Full Title 38 health care personnel as they do not appeal adverse actions to the MSPB).

*Elimination of the MSPB's authority to lower the penalty sought by the agency:*    Civil service case law has historically required that the MSPB AJs and the Board adjust the penalty to reflect that severity of the underlying misconduct or performance deficiencies.  If the Board or AJ concluded that the evidence did not support removal, he or she could apply a demotion, suspension or other lesser penalty instead of being forced to either carry out a removal or dismiss the entire case. The Act has been interpreted to eliminate the ability of the employee to argue that the penalty is too harsh in light of the seriousness of the charge or his or her prior good record. (This change also applies only to Title 5 and Hybrid Title 38 employees.)

Additionally, for all employees including Full Title 38 employees, the Act significantly reduced the amount of time that an employee facing a proposed removal or other major adverse action had to prepare a response to the agency and file an appeal.  Previously, employees had 14 calendar days to respond to the agency's notice of proposed removal.  Now, they must respond within 7 business days.  The timeframe for appealing a final agency decision to the MSPB (in the case of Title 5 and Hybrid Title 38 employees) has been reduced from 30 calendar days to 10 business days. Similarly, for Full Title 38 health care personnel, the timeframe for appealing a removal or other major adverse action involving professional conduct or competence to the agency Disciplinary Appeals Board has been reduced from 30 calendar days to 7 business days.

6

*Inadequate statutory whistleblower protections:* One of the strongest arguments made by proponents of this law to reduce rights was that it would provide stronger protections for "deserving" employees who are agency whistleblowers.  However, the Act has a flawed, inequitable and confusing process for protecting whistleblowers from retaliatory firings.  It is important to note that none of Full Title 38 health care personnel listed above are protected by the requirement in the new law that the Office of Special Counsel (OSC) approve the removal of whistleblowers proposed by the agency.  The VA can fire these clinicians unilaterally even if they have strong whistleblower claims, except in extremely limited cases.

This gap in the law has led to inequities and confusion. Recently, management proposed to remove an RN who had registered as a whistleblower with the Office of Special Counsel (OSC). VA management initially informed her (incorrectly) that OSC approval was required; then management proceeded to remove her because she did not have a right to review by the OSC to save her job.

 This gap in the Accountability Act will result in significant inequities. For example, if a Hybrid Title 38 psychologist (with both Title 5 and Title 38 rights) files with OSC as a whistleblower, he or she cannot be fired unless OSC approves the action. In contrast, a psychiatrist (who is covered only by Title 38) providing similar mental health treatment in the same clinic who also reports deficiencies in mental health services who files for whistleblower status will receive no OSC review prior to removal.

*Effect of the Accountability Act on Performance Improvement Plans:*  Prior to enactment of this law, the VA routinely offered employees with time limited opportunities to improve their

7

**SA466**

performance through Performance Improvement Plans (PIPs) prior to removing them for poor performance under Chapter 43 of Title 5. (Misconduct actions are covered by Chapter 75 of Title 5).

Since enactment, the Agency has incorrectly interpreted the Accountability Act as removing the requirement (found in federal statutes and the AFGE NVAC Master Agreement at Article 27) to give employees an opportunity to improve before they can be subject to a performance-based action under Chapter 43. While the Act does state that the procedures of Chapter 43 do not apply to an action under the Act, the reasonable interpretation of this provision is that the Act shortened the timelines in Chapter 43 performance actions similar to Chapter 75 misconduct actions *but did not eliminate the requirement to provide employees with an opportunity to improve.*

We recently grieved the elimination of PIPs in a VBA case. The arbitration hearing was held on April 26, 2018. Briefing was completed on June 18, 2018 and we are currently awaiting a decision from the arbitrator.

CASE EXAMPLES

AFGE and NVAC have handled and/or identified numerous examples of the harsh and counterproductive effects of the Accountability Act.

**Whistleblower cases**

- An employee out of the Overton Brooks VA Medical Center (Shreveport) reported a management official for improperly accessing her personnel medical records. A few weeks after management learned of the employee's whistleblowing activity, she was given a proposed removal for conduct that occurred four months earlier. The

8

conduct in question involved a dispute between two union officers about union matters.  She had received no prior discipline.  The employee has filed a whistleblower retaliation complaint with OSC, which is currently pending.

- A local union officer in Pittsburgh was featured in an article about the Accountability Act where he made disclosures about Management's abuse of authority. Management immediately expressed their dissatisfaction with his statements. On June 13, 2018, the VA proposed his removal under the Accountability Act. He has filed a whistleblower retaliation complaint with OSC, which is currently pending.

**Disabled veteran seeking accommodation:**

- A disabled veteran with a chronic condition requested a reasonable accommodation for telework to accommodate his condition. The accommodation would have obviated the alleged conduct. The Agency never responded to his request, then issued a proposed removal.

**VBA Performance Actions:**

AFGE and NVAC have serious concerns about the validity of VBA performance standards and whether employees know how these numbers are calculated or understand how to adjust their work flow in response. It is not sufficient to tell an employee that he or she is not "meeting the standards"; the employee also needs to know what is needed to meet them – which is exactly what a PIP would have provided.

Other VBA cases illustrate management's willingness to remove long term employees with valuable claims processing experience on the first offense for failure to meet questionable performance periods during brief evaluation periods.

- An employee with modest performance problems was denied a PIP prior to dismissal to attempt improvement.  Instead, the supervisor repeatedly told the employee that

9

**SA468**

he was not meeting the standards. The supervisor did not discuss why the employee was not meeting the standards.

- Another employee who had modest performance issues was proposed for removal after 9 years with the VA. The VA held the employee accountable for performance standards prior to the employee receiving them. The notice stated the employee failed to meet standards over a 6-month period when in fact he only received the standards 4 months in that time. Despite the VA's claims that the employee's problems were severe, it kept the employee on board for an additional 3 months yet refused to offer him a PIP or any other assistance prior to firing him.

- A career VA employee with approximately 28 years worked at the Philadelphia VBA and held various positions in the Insurance Center before being promoted to the Pension Management Center.   She was not performing regular VSR work because she was moved around within the PMC by multiple assignments for several years. When she was moved back to her regular VSR position, she was unfamiliar with the new PMC rules and regulations. She asked for retraining but was told by PMC Management that she was "fully trained" and they would not provide her with any additional training.  She was proposed for removal under the new law for failing to meet her performance standards.

- After working for more than 12 years for the VA, a Philadelphia VBA employee with two advanced degrees who teaches part time at a local community college was forced into retirement under the new law. When the performance standards underwent drastic changes, he repeatedly asked for help, but management refused to provide them. He was forced into a lower graded position. Instead of risking a termination or further downgrade, he chose to retire early.

**VHA Performance Action:** (*Walls v. VA*, 118 LRP 10484):

- This VHA claims assistant was fired for poor performance as a document scanner. The agency used flawed data to makes its case. The MSPB overturned the removal but the disruption of the employee's livelihood had already occurred.  This case also demonstrates the benefits of a PIP; it informed the employee of exactly what she was doing wrong and ways to improve, but because of its interpretation of the Act, the agency cut her PIP short and failed to give her the complete 90 days to improve.

**HOW THE OFFICE OF ACCOUNTABILITY AND WHISTLEBLOWER PROTECTION WORKS**

The AFGE NVAC legal team has had mixed experiences working with the Office of Accountability and Whistleblower Protection (OAWP).  OWAP appears to have met some of its requirements including establishing and staffing its office, creating a form for disclosures and

**SA469**

conducting investigations.  However, there are some significant items that have not been implemented.

For example, the Accountability Act requires that the OAWP include as a critical element in each supervisor's performance plan how he or she deals with whistleblowers. The VA has yet to do this. When questioned about this, they say they are working on a handbook to accomplish this but over a year has passed with no action.

In addition, the Act requires that OAWP have a toll-free phone number for anonymous whistleblower complaints. The VA does have a toll-free number (855-4AWONOW or 855-429-6669), but it is difficult to find because it is not posted on their site (va.gov/accountability). When asked about this, the VA stated that the number is available internally and that the intent was that they only receive disclosures from employees.

A third concern relates to the VA's policy on reports of wrongdoing. Wouldn't the VA want reports of wrongdoing from other groups with knowledge of the activity, such as the Union, contractors, or veterans service organizations? In fact, nothing in the Act requires that disclosures come exclusively from VA employees. Yet, the OAWP site describes its own disclosure form as follows: *"This form is only for use by VA Employees or Applicants for Employment."*

In addition, it appears that OAWP has overstepped its bounds by ordering investigations of matters filed with OSC. As previously noted, under Section 714(e) of the Act, if an employee seeks corrective action from OSC for a whistleblower retaliation complaint, the VA cannot exercise its new authorities to remove the employee. What is supposed to happen in order to

11

**SA470**

stop the action is that OSC reaches out to its contact in OAWP, who then reaches out to the facility. Then OSC does its own investigations of whistleblower retaliation.  While OAWP has been taking the necessary steps to proactively stop the actions, they have also been taking the information from OSC and doing their own investigations, and in some cases, retaliating *again* by subjecting the whistleblower to an additional mandatory investigation.

Our legal team is also concerned about the relationship between OAWP and the General Counsel. The Act states that OAWP is not an element of the General Counsel and the Assistant Secretary may not report to the General Counsel. In practice, these two offices work hand-in-hand. If the intention was that there be some semblance of independence, that has clearly not been given effect.

*Other concerns about OAWP:*

- The Accountability Act requires that OAWP have an internet website to receive anonymous whistleblower disclosures. The VA has yet to do this. They have an email address *VAAccountabilityTeam@va.gov* which is not anonymous.
- The Accountability Act requires the VA to provide training, in person (to the greatest extent practicable) regarding what whistleblowing is, how to make disclosures, and an explanation that they will not be reprised against. No such training has occurred.
- The Accountability Act requires the OAWP to take actions against senior leaders under Section 713. Based on their own "CY 2018 VA Accountability Report Details," https://www.va.gov/accountability/Accountability_Report_062618_1.pdf in the year since the Act was passed, they have done so in *one* case. This is out of the 1,044 disclosures and whistleblower retaliation complaints the office received. (It is unclear if this report includes referrals from OSC (https://www.va.gov/accountability/Whistleblower-Disclosures-Summary_070518_1.pdf)
- OAWP is required to have an Assistant Secretary; it currently has an Executive Director. VA's reason for this is that Congress has specified the number of Assistant Secretaries they could have. When they passed the Accountability Act, they did not simultaneously increase the VA's allotment. Assistant Secretaries report directly to

12

**SA471**

the Secretary, while Executive Directors must report to a Management official along the chain below the Secretary.

CONCLUSION

AFGE urges lawmakers to take immediate steps to curb the devastating impact of the Accountability Act and restore the essential VA employee rights it stripped away by supporting H.R. 6101, the VA Personnel Equity Act, a bipartisan bill that will restore the higher standard of evidence, longer timeframes and authority to provide appropriate penalties that will ensure fairness and true accountability.

We also urge lawmakers to enact legislation to mandate greater transparency of VA firing data.  Similar to the VA Mission Act, which requires greater transparency of VA *hiring* data, it seems very reasonable to impose a legislative mandate to publish full *firing* data.  The VA's refusal to respond properly to multiple requests for firing data confirms that this additional legislative authority is needed.  The Committee should also insist that the VA provide it with the data on veterans and other fired groups that has been requested to date.

Finally, any additional whistleblower protections afforded to VA employees should also apply to the entire workforce and not exclude VA Full Title 38 health care personnel.

Thank you.

13

# Exhibit I

SA473



S. Hrg. 116–205

# VA MISSION ACT: IMPLEMENTING THE VETERANS COMMUNITY CARE PROGRAM

# HEARING

BEFORE THE

## COMMITTEE ON VETERANS' AFFAIRS
## UNITED STATES SENATE

ONE HUNDRED SIXTEENTH CONGRESS

FIRST SESSION

———

APRIL 10, 2019

———

Printed for the use of the Committee on Veterans' Affairs



Available via the World Wide Web: http://www.govinfo.gov

———

U.S. GOVERNMENT PUBLISHING OFFICE

40–570 PDF                WASHINGTON : 2020

**SA474**

# A P P E N D I X

——————

PREPARED STATEMENT OF AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO

CHAIRMAN ISAKSON, RANKING MEMBER TESTER, AND MEMBERS OF THE COMMITTEE, On behalf of the over 700,000 Federal and D.C. employees represented by the American Federation of Government Employees (AFGE), AFL–CIO, including the over 250,000 frontline employees of the Department of Veterans Affairs (VA) represented by AFGE, we write today to provide our comments on the state of the VA MISSION Act implementation as well as the harm expanded private sector intrusion will have on the VA's ability to deliver high quality, timely care to veterans. We want to take this opportunity to repeat our concerns about the VA MISSION Act, its proposed access standards, expansion of walk-in clinics, and the negative impact this law will have on the VA workforce and the veteran patient population across the country. Without taking substantially more time to analyze the large-scale impact of this law, including the proposed access standards and new walk-in clinic program, the VA MISSION Act will lead to an irreversible dismantling and weakening of VA's exemplary, uniquely veteran-centric health care system.

While there are significant problems with the substance of the new law that must be considered, the first and most obvious problem is the secretive, unacceptable nature of the rule writing process. For example, the proposed access standards were created behind closed doors without any input from Congressional leadership, the veterans service organization (VSO) community, or representatives of the in-house frontline workforce. By writing this proposal without input from stakeholders the VA has made even more controversial an already controversial issue. Problems that are entirely foreseeable could have been mitigated if Congress, VSOs, and the VA workforce had been permitted to participate in the drafting process. That did not happen and, therefore the VA should withdraw the proposed rule and redraft the proposal in a more inclusive manner.

One of the most serious shortcomings of the access standards created by the CHOICE program was the arbitrary 30 day/40-mile rule. Under this program if a veteran's VA had a 30 day wait, or if s/he lived 40 miles or more away from the nearest VA, that veteran was authorized to seek care in the private sector. Under the CHOICE standards, approximately 8 percent of veterans were eligible to go into the private sector.

Unfortunately, the new proposed standards drastically increase the diversion of more VA care into the private sector. Under the proposed rule, if a veteran's nearest VA has a 20-day wait time for primary care (including mental health) or a 28-day wait time for specialty care the patient will be sent to the private sector. We also have strong concerns that if a veteran finds the wait time is too long outside of the VA, that veteran will have to go through an unnecessarily burdensome process to come back inside of the VA. This is not "choice" or "access;" it is a one-way ticket to a fully outsourced VA. Similarly, if a veteran can certify that he or she has an average drivetime of 30-minutes for primary care and one-hour drivetime for specialty care, that also triggers a private sector referral. According to the VA's own Economic Regulatory Impact Analysis the total number of veterans eligible to receive private sector care is estimated to increase from 8 percent to 39 percent if this proposed rule goes into effect. The Committee must demand that the VA withdraw and re-write this proposed rule.

Equally troubling is that if these new access standards are implemented, they will perpetuate the egregious double standard already inflicted upon VA providers (who have to meet stricter competency standards than private sector providers treating veterans). The private sector will not have to meet the same or even similar access standards. There is no metric in place that will guarantee that a veteran who qualifies for a private sector referral will not be sent out into the "community" to wait

(85)

86

20 days or more for primary care or drive 30 minutes or longer. Without providing an equal playing field the VA is setting itself up to fail and continues the push toward outright privatization.

Another major aspect of this law that is problematic is the expanded access to walk-in clinics for a veteran to receive their care. It's important to look at the Department's past performance with walk-in clinics to articulate our fears with this new proposal. For example, when then-Secretary Shulkin authorized the use of CVS Minute Clinics as a pilot program in 2017 the Department exercised virtually no oversight of the providers. It is premature to allow open access to walk-in clinics without studying the cost associated with these walk-in providers and the quality of care they provide. Since the CVS pilot has at least a year of data for examination, at a minimum, an estimate of how much this program will cost is needed, as well as information compiled on patient outcomes. Yet, unfortunately, no such study has been conducted prior to pushing implementation.

The thought that veterans could use walk-in clinics for mental health services gives AFGE significant pause. We cannot conceive of any appropriate instance when mental health treatment would be suitably provided in a walk-in clinic. The VA is the national leader in integrating primary care and mental health; walk-in clinics will result in inferior, fragmented mental health care by providers with significantly less veteran centric training and accountability. This will most certainly lead to negative health outcomes for veterans. Instead of outsourcing this vital component of veteran care, the VA should be working to build internal mental health capacity.

While it is encouraging to see the Department move toward placing a copayment on walk-in clinics after the third visit in a calendar year, more needs to be done to show this will be a deterrent. Currently there is no insight into how copayments will impact utilization or harm the veteran population. The underlying law also gives the Secretary full discretion to waive copayments. This poses a problem: if the Secretary routinely waives the copayments there will be no disincentive to using these clinics.

Ultimately, none of this would be necessary if the VA would commit to building internal capacity and provide adequate money for staffing and internal resources. In order for the VA to be fully operational it must be fully staffed. In addition to creating a new, permanent private sector care program, the VA MISSION Act also requires the Department to publish data on vacancies and hiring. Since the first set of data was published on August 31, 2018, the number of vacant positions at the VA has steadily increased. As of the most recent reporting the total number of unfilled positions at the VA is nearly 49,000—with nearly 43,000 of those positions located in VHA. Instead of finding ways to justify sending patients outside of the VA to receive their care, the VA should be laser focused on hiring more fulltime professionals who want to make a career out of serving the veterans.

AFGE insists that the VA stop rushing to implement the MISSION Act and start over, with more provisions in place to ensure the integrity of the program and more oversight of cost and quality. The VA MISSION Act represents a truly massive change to the future of the VA, and its rollout should not be fast tracked, and implementation should not proceed before critical data on market capacity, provider quality and wait times are collected.

Thank you for the opportunity to explain our concerns as it relates to implementing the VA MISSION Act and we look forward to working with the Committee to ensure that the VA workforce is able to grow, thrive, and continue providing world-class care and services to our Nation's heroes.

————

PREPARED STATEMENT OF DAN CALDWELL, EXECUTIVE DIRECTOR, CONCERNED VETERANS FOR AMERICA

TESTIMONY

Five years ago to the day, we learned that dozens of veterans died on secret wait lists waiting to receive health care appointments at the Phoenix VA Medical Center.

In the weeks that followed, the media reported alarming details about how the Phoenix VA and other VA facilities across the United States used secret wait lists to game the system and hide the number of veterans left waiting weeks and months to receive medical care.

That summer, Concerned Veterans for America along with dozens of other veterans organizations agreed an alternative option for veterans to access care in the community was necessary.

This led to the passage of the Veterans Access, Choice, and Accountability Act of 2014 which created the Veterans Choice Program. The temporary new program was

**SA476**

# Exhibit J

**SA477**



**Redaction - Privilege**

---

**From:** [Redaction - Privacy] @va.gov>
**Sent:** Wednesday, October 8, 2025 9:45 AM
**To:** [Redaction - Privacy] @va.gov>
**Subject:** RE: AWOL

Good morning [Redaction - Privacy],

Thanks for the reply. This meeting is mandatory; there is not an option to decline it. If you fail to come to the meeting, you could face corrective action, including disciplinary action. Also, there is not a Union anymore, a representative is not included in the meeting. Please meet with me tomorrow, 9/9/25 @ 11:45 am. I have an emergency meeting today @ 3pm, so unable to meet you today.

Thank you so kindly,

[Redaction - Privacy] **MSN,MBA,RN,BS**
**Nurse Manager 5C surgery clinics**
**Operative Care Line**
**Michael E. DeBakey VA Medical Center**

SA478

**Houston,Texas**
**Veterans Health Administration**

███ Redaction - Privacy ███

███ ██@va.gov

**From:** ███ Redaction - Privacy ███ @va.gov>
Sent: Wednesday, October 8, 2025 8:57 AM
**To:** ███ Redaction - Privacy ███ @va.gov>
**Subject:** AWOL

Hi ███ Redaction - Privacy ███ ,

I apologize but I have to decline the meeting.

Thanks,
███ Redaction - Privacy ███

**From:** ███ Redaction - Privacy ███ @va.gov>
Sent: Tuesday, October 7, 2025 8:14 AM
**To:** ███ Redaction - Privacy ███ @va.gov>
**Subject:** RE: RE:AWOL

Thanks for the reply. Please see me 10/8/25 @3 pm in my office.

Thank you so kindly,

███ Redaction - Privacy ███ **MSN,MBA,RN,BS**
**Nurse Manager 5C surgery clinics**
**Operative Care Line**
**Michael E. DeBakey VA Medical Center**
**Houston,Texas**
**Veterans Health Administration**

███ Redaction - Privacy ███

███ ██@va.gov

**From:** ███ Redaction - Privacy ███ @va.gov>
Sent: Friday, October 3, 2025 3:54 PM
**To:** ███ Redaction - Privacy ███ @va.gov>
**Subject:** RE: RE:AWOL

Hi ███ Redaction - Privacy ███ ,

**SA479**

I apologize I don't have a union representative available to witness the meeting. I have psychotherapy on Tuesday @ 3:00 P.m.

Thanks.



**From:** ████ Redaction - Privacy ████ @va.gov>
**Sent:** Wednesday, October 1, 2025 2:42 PM
**To:** ████ Redaction - Privacy ████ @va.gov>
**Subject:** RE: RE:AWOL

Please come see me in my office next Tuesday, 10/9/25 @ 3PM.

Thank you so kindly,

████ Redaction - Privacy ████ **MSN,MBA,RN,BS**
**Nurse Manager 5C surgery clinics**
**Operative Care Line**
**Michael E. DeBakey VA Medical Center**
**Houston,Texas**
**Veterans Health Administration**
████ Redaction - Privacy ████
**@va.gov**

**From:** ████ Redaction - Privacy ████ @va.gov>
**Sent:** Tuesday, September 30, 2025 8:13 AM
**To:** ████ Redaction - Privacy ████ @va.gov>
**Subject:** RE: RE:AWOL

Good morning.

I apologize. I forgot to enter my time before I left for vacation. Please advise any remedy to the situation.

Thanks,

Redaction - Privacy

**From:** ████ Redaction - Privacy ████ @va.gov>
**Sent:** Monday, September 29, 2025 11:30 AM
**To:** ████ Redaction - Privacy ████ @va.gov>
**Subject:** RE:AWOL
**Importance:** High

**SA480**

Good morning, ,

Since there is no approved Anuel Leave recorded in VATAS for you, the following days have been marked as AWOL: September 17- September 26.

Thank you so kindly,

 **MSN,MBA,RN,BS**
**Nurse Manager 5C surgery clinics**
**Operative Care Line**
**Michael E. DeBakey VA Medical Center**
**Houston,Texas**
**Veterans Health Administration**

**@va.gov**

SA481

# Exhibit K

SA482

Talk to the Veterans Crisis Line now ›

VA.gov    Locations    Business    VA Careers    Contact Us

## VA | News

News ⌄    Resources ⌄    VA Podcast Network    VA Press Room    🔍

Press Room

# VA terminates union contracts for most bargaining-unit employees

FOR IMMEDIATE RELEASE

August 6, 2025  3:35 pm

## The move will ensure VA stays focused on Veterans instead of spending millions of taxpayer dollars and approximately 750,000 hours per year on union activities

WASHINGTON — The U.S. Department of Veterans Affairs today announced the termination of collective bargaining agreements for most VA bargaining-unit employees, a move that will make it easier for VA leaders to promote high-performing employees, hold poor performers accountable, and improve benefits and services to America's Veterans.

The announcement comes in response to President Trump's executive order that excludes certain federal agencies from labor-management relations programs. In accordance with the same EO, VA on April 25 stopped withholding union dues from most employees' paychecks.

VA today notified the following unions that, effective immediately, pursuant to the EO their contracts with VA have been terminated for most bargaining-unit employees: American Federation of Government Employees, AFL-CIO (AFGE); National Association of Government Employees (NAGE); National Federation of Federal Employees (NFFE); National Nurses Organizing Committee/National Nurses United (NNOC/NNU); and the Service Employees International Union (SEIU).

Contracts covering the roughly 4,000 VA police officers, firefighters or security guards represented by these unions will remain in place, as those occupations are exempt from the EO.

This decision is good news for Veterans, families, caregivers and survivors for several reasons:

• VA staff will spend more time with Veterans: In 2024 alone, over 1,900 VA bargaining-unit employees spent more than 750,000 hours of work on taxpayer funded union time – including some who are paid more than $200,000 a year. With no collective bargaining obligations, those hours can now be used to serve Veterans instead of union bosses.
• VA facilities can focus on treating Veterans instead of hosting unions: More than 187,000 square feet of VA's office and clinical space is currently being used by union representatives, free of charge. This has cost VA millions of dollars in lost rent and expenses for union bosses' government phones and computer equipment. Today's decision will ensure VA facilities are fully focused on helping Veterans get the care and benefits they've earned, instead of serving as free regional offices for unions that oppose our efforts to improve VA.
• VA can manage its staff according to Veterans' needs, not union demands: Labor contracts have restricted managers' ability to hire, promote and reward high-performing employees, hold poor performers accountable and implement reforms to better serve Veterans. Today's decision frees VA managers to act in the best interests of Veterans rather than union bosses.

"Too often, unions that represent VA employees fight against the best interests of Veterans while protecting and rewarding bad workers," said VA Secretary Doug Collins. "We're making sure VA resources and employees are singularly focused on the job we were sent here to do: providing top-notch care and service to those who wore the uniform."

### Background

VA-employee unions have repeatedly opposed significant, bipartisan VA reforms and rewarded bad employees for misconduct. Examples include:
• AFGE, NFFE and NNOC/NNU opposed the MISSION Act, a law that makes it easier for Veterans to get health care.
• NFFE supports rescinding the VA Accountability and Whistleblower Protection Act,

SA483

a law designed to protect whistleblowers and hold employees accountable for misconduct.

• AFGE worked hand-in-hand with the Biden Administration to reinstate more than 100 former employees fired for misconduct during the first Trump Administration and pay nearly $134 million to some 1,700 former VA employees who were fired for misconduct during President Trump's first term.



Reporters and media outlets with questions or comments should contact the Office of Media Relations at vapublicaffairs@va.gov



Veterans with questions about their health care and benefits (including GI Bill). Questions, updates and documents can be submitted online.

Contact us online through Ask VA



Veterans can also use our chatbot to get information about VA benefits and services. The chatbot won't connect you with a person, but it can show you where to go on VA.gov to find answers to some common questions.

Learn about our chatbot and ask a question



Subscribe today to receive these news releases in your inbox.

**Topics**    bargaining-unit    union contracts

**LET OTHERS KNOW ABOUT THIS**

    

## More from the Press Room

NEWS RELEASES    SEPTEMBER 10, 2025

### VA dedicates new Southern Utah National Cemetery

VA dedicates the Southern Utah National Cemetery in Cedar City, Utah.

NEWS RELEASES    SEPTEMBER 8, 2025

### VA cemeteries to hold national day of service and remembrance marking the 24th anniversary of 9/11

Department of Veterans Affairs national cemeteries will host a day of service and remembrance to honor victims of the 9/11 attacks on Sept. 11, also known as Patriot Day.

NEWS RELEASES    AUGUST 29, 2025

### VA earns top scores in latest CMS hospital ratings report

More than three-fourths of Department of Veterans Affairs hospitals that received an Overall Hospital Quality Star Rating earned four-or-five-star ratings as part of the Centers for Medicare and Medicaid Services 2025 hospital quality ratings

Last updated August 6, 2025

 

  

**U.S. Department of Veterans Affairs**
810 Vermont Ave., NW
Washington, DC 20420
1-800-698-2411

**VA** News
An official website of the U.S. Department of Veterans Affairs

VA.gov

ChooseVA

DiscoverVA

DigitalVA

VA Outreach Events

VA Publications

About VA

VA mobile apps

Accessibility at VA

No FEAR Act data

Office of the Inspector General

VA plans, budget, finances, and performance

Agency Financial Report

Privacy policy

FOIA requests

Disclaimers

Open data

Vulnerability disclosure policy

Copyright policy

SA484

VA Forms                    Whistleblower Protection

Looking for U.S. government information and services?  Visit USA.gov

SA485

# Exhibit L

SA486

| From: | Redaction - Privacy |
|---|---|
| To: | Redaction - Privacy |
| Subject: | Change in Bargaining Unit Status |
| Date: | Friday, August 8, 2025 8:14:36 AM |

Dear Team Member,

This notice is to inform you of an important change in your bargaining unit status and your union representation. As you may be aware, in response to President Trump's March 27, 2025, Executive Order (EO), *Exclusions from Federal Labor-Management Relations Programs*, that excluded certain federal agencies and agency subdivisions from the Federal Service Labor-Management Relations Statute, on August 6, 2025, VA announced the termination of collective bargaining agreements for most of VA's bargaining unit employees. This announcement begins a new chapter that will eliminate barriers and increase focus on the world class care and services Veterans deserve.

Terminating the collective bargaining agreements will benefit employees like you who were previously covered by agreements that restricted VA's ability to hire, promote and reward high performing employees, hold poor performers accountable, and implement changes that better serve Veterans. This decision also permits employees and managers to more freely engage in open communications to improve the organization without union filtering or interference.

You may see changes to some of the processes and procedures in your workplace that were previously contained in a collective bargaining agreement that is now terminated. Managers have been directed to exclusively follow VA policy for all matters, including things like promotions, alternative work schedules, details, hours of work, telework, leave usage, etc. You should also expect to see an updated SF-50 form in your personnel file, which will reflect the change to your bargaining unit status code.

You are encouraged to discuss all workplace matters directly with your supervisor. We thank you for your continued service and dedication to Veterans.

**Sending for and on behalf of**
Redaction - Privacy   **FACHE**
**Medical Center Director**
**Alexandria VA Health Care System**

**SA487**

# Exhibit M

SA488

## ORDER TO RETURN TO DUTY

Date:   August 8, 2025

From:   Redaction - Privacy  Medical Center Director

Subj:   Order to Return to Duty

To:   Mary Jean Burke

1. On March 27, 2025, President Trump signed Executive Order (EO) 14251: *Exclusions from Federal Labor-Management Relations Programs*, exempting the Department of Veterans Affairs (VA) from Chapter 71 of title 5 of the United States Code, the Federal Service Labor-Management Relations Statute (hereinafter referred to as Statute). EO 14251 exempted police officers, firefighters, and security guards from its coverage, and further delegated authority to the VA Secretary to exempt VA organizational components from the EO. On April 17, 2025, Federal Register Notice 16427 was published, exempting certain non-national unions from EO 14251's coverage.

2. On August 6, 2025, pursuant to EO 14251, the Secretary terminated master collective bargaining agreements, and all amendments, local supplemental agreements, and memoranda of understanding at all levels (collectively referred to as CBAs) with the American Federation of Government Employees (AFGE), the National Association of Government Employees (NAGE), the Service Employees International Union (SEIU), the National Nurses Organizing Committee/National Nurses United (NNOC/NNU), and the National Federation of Federal Employees (NFFE), except insofar as those agreements cover exempted employees.

3. As a designated representative of AFGE, not serving in an occupation exempted from EO 14251, you are hereby notified that you are excluded from coverage under the Statute and are no longer able to exercise the rights or entitlements of persons or entities covered under the Statute, including, but not limited to the use of Taxpayer Funded Union Time and the performance of representational activities.

4. Accordingly, you are instructed to return to your position of record no later than the start of your tour, August 7, 2025. You should report to your supervisor.

5. You must remove any personal belongings from union office spaces at your VA facility and coordinate with the Office of Information and Technology to return all Government-Furnished Equipment provided for the purpose of union duties, no later than August 12, 2025. Any union information contained on the agency local area network or other similar agency networks may, upon your specific written request, be saved and provided to you or a designated union representative currently covered by the Statute.

6. Failure to follow the instructions above could lead to appropriate administrative action up to and including removal from Federal service. Upon return to your position

Attachment A

of record, your supervisor will assess and determine whether training is necessary for you to perform your assigned duties.

7. If you have any questions, please contact ( [Redaction - Privacy] , *ER/LR Specialist,* [Redaction - Privacy] *@va.gov or (317) 372-4864).*

[Redaction - Privacy]

[Redaction - Privacy] MHA, FASHCE

Medical Center Director

SA499

# Exhibit N

SA491

**From:**
**Sent:**    Redaction - Privacy    Friday, November 14, 2025 2:18 PM
**To:**    Redaction - Privacy
**Cc:**    Redaction - Privacy
**Subject:**    Important Notice: Compliance with Executive Order 14251 Regarding Union Activities

Dear Former AFGE Union Official/Steward,

I hope this e-mail finds you well. I am writing to address significant concerns that have recently been reported regarding ongoing union activities utilizing government resources. As you are aware, the implementation of Executive Order (EO) 14251, signed on March 27, 2025, by President Trump, has exempted the Department of Veterans Affairs (VA) from Chapter 71 of Title 5 of the United States Code, the Federal Service Labor-Management Relations Statute. This order has significantly altered our operations concerning union activities.

It has been reported that there may be instances of union activities being conducted using government resources. These activities potentially violate the provisions of EO 14251. Use of government property, office space, information technology resources, and other government facilities for union purposes is strictly prohibited under the current guidelines.

It is important to emphasize that misuse of government property or resources for union business can lead to disciplinary action. Any violation of these provisions may lead to disciplinary action up to and including removal from federal service. It is imperative that all personnel adhere strictly to these guidelines to avoid any adverse outcomes.

Furthermore, the Department has stopped authorizing TFUT (official time) for union officials who are not otherwise exempt. All employees who were on official time have transitioned back to performing Agency work 100% of their paid time in their position of record.

Finally, the Department will only participate in negotiated grievance or arbitration procedures that cover the Exempted Employees or bargaining unit employees represented by one of the Exempted Unions. We will not respond or participate in any grievance or arbitrations involving AFGE or NAGE (unless they are Police or Fire). Negotiated grievance and arbitration procedures shall be limited for use by unions which still represent Police and Fire.

We are committed to ensuring compliance with EO 14251 and maintaining the integrity of VA operations. We appreciate your cooperation and understanding during this transition.

Thank you for your attention to this critical issue and for your continued dedication to our mission and our Veterans.

Redaction - Privacy

HR Specialist, TEAM 1 | ER/LR Strategic Business Partner | Altoona Strategic Business Unit
Human Resources Management Service | VISN 4
(Office) Redaction - Privacy
Chat with me on MS TEAMS
(Email) Redaction - Privacy @va.gov
(TEAM 1 email) Redaction - Privacy rteam1@va.gov

**SA492**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305<br><br>    *Plaintiffs,*<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS<br><br>DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs<br><br>    *Defendants.* | Case No. 1:25-cv-00583-MRD-PAS |

## DECLARATION OF SONIA CHAVES

SA493

I, Sonia Chaves, declare as follows:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am a veteran of the United States Army where I served as an Automatic Logistics Specialist for approximately 4 years stationed in Germany and Iraq.

3.      I am a Lead Medical Support Assistant employed by the United States Department of Veterans Affairs ("VA") and have 17 years of civilian government service at the Orlando Veterans Affairs Health Care System ("Orlando VAHCS") in Orlando, Florida. Currently, I work at the Daytona Beach VA Clinic in Daytona Beach, Florida, which is part of the Orlando VAHCS.

4.      The Orlando VAHCS is comprised of multiple inpatient and outpatient facilities, including the main hospital at the Orlando VA Medical Center ("Orlando VAMC"), as well as the Clermont VA Clinic, Daytona Beach VA Clinic, Deltona VA Clinic, Kissimmee VA Clinic, Lake Baldwin VA Clinic, Palm Bay VA Clinic, Port Orange VA Clinic, Tavares VA Clinic, Viera VA Clinic, and Westside Pavilion VA Clinic.

5.      I am the Local President of the American Federation of Government Employees, AFL-CIO ("AFGE"), Local 559 ("AFGE Local 559"), a position I have held since August 2022. I previously served as Vice President, Secretary, and Steward for AFGE Local 559.

6.      AFGE Local 559 represents bargaining unit employees at every facility within the Orlando VAHCS. AFGE Local 559 also represents bargaining unit employees at four facilities within the VA Readjustment Counseling Service ("RCS"), which provides counseling and support to veterans, servicemembers, and their families when readjusting to civilian life after military service. These four RCS facilities include the Clermont Vet Center, Daytona Beach Vet Center, Melbourne Vet Center, and Orlando Vet Center.

7.      AFGE Local 559 also represents bargaining unit employees at the Cape Canaveral National Cemetery within the National Cemetery Administration ("NCA"), which manages burial and memorial affairs for veterans and servicemembers, as well as the Florida/Caribbean

1

**SA494**

Consolidated Patient Account Center, which manages the billing and collection of copayments, insurance payments, and reimbursements for VA services.

8. In total, across all VA facilities, AFGE Local 559 represents approximately 6,000 bargaining unit employees in dozens of occupations, including both professional and nonprofessional employees. Bargaining unit positions represented by AFGE Local 559 include, but are not limited to, physicians, dentists, physician assistants, registered nurses, nurse practitioners, psychologists, social workers, carpenters, police officers, medical support assistants, housekeepers, radiology technicians, health technicians, gardeners, electricians, mail clerks, transportation assistants, security assistants, and more.

9. I am aware that Douglas A. Collins, Secretary of Veterans Affairs, terminated the 2023 Master Collective Bargaining Agreement ("Master Agreement") on August 6, 2025, except as applied to police officers, firefighters, and security guards. I provide this declaration to describe how the termination of the Master Agreement has affected AFGE Local 559, my work as its Local President, and bargaining unit employees.

***Local Management Has Stopped Complying with the Master Agreement and Local Agreements***

10. Under the Master Agreement, Orlando VAHCS was obligated to provide notice and to bargain over changes to working conditions affecting bargaining unit employees. Prior to the August 6 termination of the Master Agreement, I or other local union officials would bargain over proposed changes to working conditions several times a month or year. Following Secretary Collins' termination of the Master Agreement, management officials and human resources officials at the Orlando VAHCS have refused to negotiate in good faith with AFGE Local 559 over changes to working conditions affecting bargaining unit employees, such as changes to shifts and work schedules, changes to performance standards, changes to local dress code policies, other changes to standard operating procedures and local policies, and more. Should an employee fail to comply with these policies or work rules, they may be subject to disciplinary

**SA495**

action up to and including removal from federal service. The VA unilaterally implemented these changes without notice to, or bargaining with, AFGE Local 559.

11.    Article 43 of the Master Agreement contains the negotiated grievance procedure that applies to bargaining unit employees. The negotiated grievance procedure includes a 3-step process that obligates bargaining unit employees, union representatives, and VA officials to meet and discuss employee grievances to resolve workplace disputes. Following completion of this 3-step process, parties have the option to proceed to binding arbitration before a neutral third party consistent with Article 44 of the Master Agreement. Historically, subject only to limitations in law, all disciplinary actions, pay disputes, and other complaints related to working conditions could be challenged through the negotiated grievance procedure and proceed to binding arbitration.

12.    As a result of the termination of the Master Agreement, management officials at the Orlando VAHCS stopped processing union grievances filed by AFGE Local 559 and have refused to allow AFGE Local 559 and bargaining unit employees to challenge various matters through the negotiated grievance procedure. The Orlando VAHCS and other VA facilities have unilaterally terminated multiple pending grievances filed under the negotiated grievance procedure and refused to participate in arbitration proceedings. They claim that bargaining unit employees can now only utilize the VA grievance procedure, but management officials refuse to process any grievance filed by AFGE Local 559 under the VA grievance procedure and instead will only accept grievances filed by individual employees. However, employees have told me that they are not filing grievances because they are afraid of retaliation and retribution for exercising these rights and speaking up on the job.

13.    Articles 14, 17, and 22 of the Master Agreement require the VA to provide bargaining unit employees with certain due process and procedural rights prior to issuing disciplinary action. These contractual protections include 14-day advance notice, an opportunity to review the evidence on which the proposed action is based, an opportunity to submit an oral and/or written response within 10 days, and union representation when responding to the

**SA496**

proposed disciplinary action. However, since the termination of the Master Agreement, the VA has issued disciplinary actions without regard for these contractual provisions. The VA is also issuing disciplinary action without providing evidence relied upon by VA, which prevents bargaining unit employees from having a fair and meaningful opportunity to defend themselves and challenge unjustified disciplinary action. Furthermore, the Orlando VAHCS and other VA facilities have refused to allow bargaining unit employees to obtain union representation in investigatory examinations that may result in discipline, also known as "*Weingarten* meetings." Bargaining unit employees represented by AFGE Local 559 have, in fact, been disciplined as a result of, or in connection with, these meetings.

14.    In one such case, a bargaining unit employee at the Orlando VAMC was investigated for speaking Spanish with a coworker in the workplace. Initially, AFGE Local 559 represented this employee in a fact-finding investigation where it seemed that the matter was resolved. However, following the termination of the Master Agreement, the Orlando VAMC issued an admonishment to this employee without providing a proposed action or opportunity to review the evidence and defend herself. The employee was not permitted union representation during this meeting and was also prohibited from filing a grievance under the Master Agreement.

15.    I am aware of other cases where employees represented by AFGE Local 559 have received disciplinary action without receiving the process provided by Articles 14, 17, and 22 of the Master Agreement, including employees who requested union representation during this disciplinary process but who were denied that right. For example, on November 17, 2025, a bargaining unit employee at Daytona Beach Multi Specialty Clinic was subjected to a fact finding interview and she was denied union representation during that interview. Further, employees disciplined with these Master Agreement protections were also prohibited from challenging these actions through the negotiated grievance and arbitration procedures in Articles 43 and 44 of the Master Agreement.

16.    Article 48 of the Master Agreement relates to official time.  Official time, which is defined in 5 U.S.C. § 7131, is intended to "facilitate and encourage the amicable settlement of

4

SA497

disputes between employees and the Department involving conditions of employment and should contribute to the effective and efficient conduct of public business." Master Agreement, Art. 48, § 1(A). Section 10 of Article 48 governs the use of official time at the local union level, and it provides that each local union "will receive an allotment of hours equal to 4.25 hours per year for each bargaining unit position represented by that local union." Master Agreement, Art. 48, § 10(A). In my capacity as President of AFGE Local 559, I am a local union official who takes official time under this provision of the Master Agreement.

17.    On August 8, 2025, I, along with all other union officials from AFGE Local 559, received a letter from the Medical Center Director titled "Order to Return to Duty." That letter cited Secretary Collins' termination of the Master Agreement and claimed, "[a]s a designated representative of Local 559 not serving in an occupation exempted from EO 14251, you are hereby notified that you are excluded from coverage under the Statute and are no longer able to exercise the rights or entitlements of persons or entities covered under the Statute, including, but not limited to the use of Taxpayer Funded Union Time and the performance of representational activities." (Taxpayer Funded Union Time is a term for official time.) A true and correct copy of this letter is attached hereto as **Exhibit A**. Per this directive, local union officials are now prohibited from using official time to represent bargaining unit employees or to communicate with these employees on duty time or VA email servers. Because we are prohibited from communicating with bargaining unit employees on official time during the workday and on government equipment, I have been unable to provide representation in reasonable accommodation meetings, investigations, hearings, and grievances.

18.    Article 51 of the Master Agreement relates to the union's use of official facilities. In Article 51, the VA "agree[d] to furnish office space to the Union appropriate for carrying out its representational and partnership duties in locations easily accessible to employees and private citizens." Master Agreement, Art. 51, § 1(A). Article 51 generally provides the terms by which the union can access official facilities. On or about August 12, 2025, AFGE Local 559 was forced to vacate union office space at the Orlando VAMC and return government-furnished

5

**SA498**

equipment and technology required under the provisions of the Master Agreement. We were also forced to vacate union office space at the Daytona Beach VA Clinic, Viera Beach VA Clinic, Lake Baldwin VA Clinic, Westside Pavilion VA Clinic and the Florida/Caribbean Consolidated Patient Account Center. Management officials instructed AFGE Local 559 to remove all union literature and information from VA work spaces and bulletin boards.

19. The Orlando VAHCS also unilaterally terminated a memorandum of understanding ("MOU") with AFGE Local 559 governing important issues related to the use of annual leave, including the procedures for advance leave planning, the assignment of holiday work schedules, how employee seniority would impact leave and holiday work schedules, and more. AFGE Local 559 negotiated this MOU to ensure fairness, transparency, and order in the annual leave planning process. The MOU, a true and correct copy of which is attached hereto as **Exhibit B**, permitted employees to prioritize their preferred annual leave and holiday periods for the forthcoming calendar year based on rank-choice voting. Employees were able to submit their annual leave plan between November 1 and November 30. Disputes were resolved according to employee seniority as defined by "service computation date." Since this MOU was terminated, the Orlando VAHCS is arbitrarily denying previously approved annual leave and distributing holiday work assignments without regard for seniority and other rules set forth in this MOU. For calendar year 2026, the Agency is prohibiting employees from taking the same holidays they were approved for in 2025, even though no such restriction exists in the MOU.

### _Local Management Seeks to Chill Union Activity_

20. I have been told by bargaining unit employees that management officials at the Orlando VAHCS and other VA facilities have told bargaining unit employees, "There is no more union," or "The union cannot help you," or "There is no reason to go to the union," or words to this effect. These statements were made orally and have had the intended effect of intimidating bargaining unit employees and chilling their speech and association with AFGE Local 559.

21. Bargaining unit employees have told me that they are intimidated by these anti-union messages and have told me that they are afraid to speak up on the job, ask questions about

6

their employment, report potential violations of law and contract, speak to AFGE representatives during the workday, or otherwise question or challenge management officials who are denigrating the union and refusing to comply with the Master Agreement.

22.    I have been told by members that management and human resources officials instructed bargaining unit employees that they can no longer wear AFGE-branded clothing or accessories to work. For example, the housekeeping aides in the Facility Management Service were told that they can no longer wear AFGE Local 559 t-shirts to the worksite. However, employees are still permitted to wear clothing displaying sports logos or educational logos. The VA is singling out employees and imposing new rules based exclusively on affiliation with, or support of, AFGE Local 559.

23.    Even our own union officers and stewards have told me that they are fearful of retaliation for associating with, and acting on behalf of, AFGE Local 559. This has resulted in fewer AFGE union representatives who are willing to file grievances, sign and send emails to management officials, communicate with members, represent employees in statutory and administrative appeals, attend rallies and mobilization events, and more. This has weakened the ability of AFGE Local 559 to fully and effectively represent the interests of our bargaining unit employees.

24.    AFGE Local 559 had more than 3,100 members in March 2025. However, due to the termination of the Master Agreement and the anti-union statements made by management officials at the Orlando VAHCS and other VA facilities, our membership has dropped by more than half to 1,400 members as of November 2025.

**_Local Employing Offices_**

25.    AFGE Local 559 represents VA police officers at multiple VA facilities, including the Orlando VAMC, Daytona Beach VA Clinic, Viera VA Clinic, and Lake Baldwin VA Clinic. The local, employing office of these police officers is the VA facility where they report to work, which is either the medical center or VA clinic. Official personnel records indicate that VA police officers are appointed by these individual, local facilities falling under

7

the Orlando VAHCS within the Veterans Health Administration. Within the police department, there are dispatchers, administrative assistants, and other bargaining unit employees who work alongside these police officers. Further, there are thousands of bargaining unit employees in dozens of occupations who fall under the jurisdiction of this same local, employing office – the Orlando VAHCS. However, the VA refuses to honor the Master Agreement for bargaining unit employees other than police officers.

26.     While the VA is currently following the Master Agreement as applied to police officers, AFGE Local 559 has been unable to recruit any police officers to act as union stewards due to their fear of retaliation for associating with, or acting on behalf of, the union. Therefore, AFGE Local 559 is unable to take advantage of what little official time we have left, leaving us unable to communicate with and represent employees during the workday.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 25th day of November 2025, in Orlando, Florida.

_____
Sonia Chaves

8

**SA501**

# Exhibit A

SA502



# DEPARTMENT OF VETERANS AFFAIRS

## Orlando VA Healthcare System

## 13800 Veterans Way

Date:    August 8, 2025

From:    Medical Center Director, Orlando VA Healthcare System (675/00)

Subj:    Order to Return to Duty

To:    Sonia Chaves, Local 559

1. On March 27, 2025, President Trump signed Executive Order (EO) 14251: *Exclusions from Federal Labor-Management Relations Programs*, exempting the Department of Veterans Affairs (VA) from Chapter 71 of title 5 of the United States Code, the Federal Service Labor-Management Relations Statute (hereinafter referred to as Statute). EO 14251 exempted police officers, firefighters, and security guards from its coverage, and further delegated authority to the VA Secretary to exempt VA organizational components from the EO. On April 17, 2025, Federal Register Notice 16427 was published, exempting certain non-national unions from EO 14251's coverage.

2. On August 6, 2025, pursuant to EO 14251, the Secretary terminated master collective bargaining agreements, and all amendments, local supplemental agreements, and memoranda of understanding at all levels (collectively referred to as CBAs) with the American Federation of Government Employees (AFGE), the National Association of Government Employees (NAGE), the Service Employees International Union (SEIU), the National Nurses Organizing Committee/National Nurses United (NNOC/NNU), and the National Federation of Federal Employees (NFFE), except insofar as those agreements cover exempted employees.

3. As a designated representative of Local 559 not serving in an occupation exempted from EO 14251, you are hereby notified that you are excluded from coverage under the Statute and are no longer able to exercise the rights or entitlements of persons or entities covered under the Statute, including, but not limited to the use of Taxpayer Funded Union Time and the performance of representational activities.

4. Accordingly, you are instructed to return to your position of record no later than 0800 am, Monday August 11th, 2025. You should report to Dawn Green, Daytona Beach Clinic, Daytona FL.

5. You must remove any personal belongings from union office spaces at your VA facility and coordinate with the Office of Information and Technology to return all Government-Furnished Equipment provided for the purpose of union duties, no later than August 12, 2025. Any union information contained on the agency local area network or other similar agency networks may, upon your specific written request, be

**SA503**

saved and provided to you or a designated union representative currently covered by the Statute.

6. Failure to follow the instructions above could lead to appropriate administrative action up to and including removal from Federal service. Upon return to your position of record, your supervisor will assess and determine whether training is necessary for you to perform your assigned duties.

7. If you have any questions, please contact ▮Redaction - Privacy▮, ER/LR Specialist, ▮Redaction - Privacy▮ @va.gov, ▮Redaction - Privacy▮.

▮Redaction - Privacy▮

▮Redaction - Privacy▮
Medical Center Director/CEO
Orlando VA Healthcare System

**SA504**

# Exhibit B

SA505

Memorandum of Understanding (MOU)

## Annual Leave Plan

This MOU supersedes all previous versions.

This following constitutes and agreement between the Orlando Healthcare System and AFGE Local 559 concerning procedures used to approve the advanced scheduled Annual Leave of bargaining unit employees.

The parties agree annual leave is provided to allow employees leave for rest and recreation and to provide periods of time off for personal purposes. All employees may request annual leave for any duration and take such leave subject to the Department's approval.

When an employee requests annual leave in conjunction with scheduled days off at the beginning and/or end of the leave period, the Department will not change that employee's days off.

Management will inform employees, and the union, the maximum number of employees able to use leave in accordance with coverage requirements. Management agrees to consider workload adjustments and generous leave approval during popular holiday periods.

Management will make available to employees, and the union, a current leave calendar for the entire year. A continually updated leave calendar will be available to appropriate employees and union officials. The calendar will clearly show available and unavailable days.

For the purpose of this MOU, seniority is calculated using the employee's Service Computation Date.

The Annual Leave Plan will be developed using the following procedures:

Management will solicit and employees will submit their Annual Leave Plan for the following Leave Year between November 1 and November 30. All leave requests will be in VATAS.

A Leave Year is January 1 to December 31.

Employees shall rank their requests in order of importance from most important request to least by using the comment section. For example, the comment on the highest priority request is "Priority 1" or "Rank Choice 1", the second highest priority is "Priority 2" etc.

In the event more employees in a specific work group desire a corresponding date off than can be accommodated by coverage requirements, management will resolve the dispute based on seniority.

**SA506**

Management shall inform employees of approved and disapproved annual leave in VATAS and will provide a reason if denied.  Approval and disapproval will be completed by December 15.  If VATAS does not allow approval, and the leave balance is not accrued, management will give confirmation to the employees via email. The VATAS approval will be made when the leave balance is sufficient.

In the event November 30 or December 15 are a non-business day, the next normal business day, 11:59pm, will be considered the deadline.

Management shall keep a clear record of which employees leave request were disapproved in order to facilitate contacting employees when a requested date becomes available.

This MOU is intended to create an Annual Leave Planning process which is not mentioned in the Master Agreement and does not invalidate any sections of the Master Agreement.

This MOU will be in effect until the termination of the 2023 Master Agreement or by mutual agreement by the parties.

TIMOTHY COOKE
Digitally signed by TIMOTHY COOKE
Date: 2024.05.30 16:50:09 -04'00'

Date 5/30/24

Timothy J. Cooke, CEO
Medical Center Director

SONIA CHAVES
Digitally signed by SONIA CHAVES
Date: 2024.06.13 14:28:58 -04'00'

Date _____

Sonia Chaves
President, AFGE Local 559

**SA507**

**SA508**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305<br><br>*Plaintiffs,*<br><br>**v.**<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS<br><br>DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs<br><br>*Defendants.* | Case No. 1:25-cv-00583-MRD-PAS |

**DECLARATION OF IRA KEDSON, PSY.D.**

SA509

I, Ira Kedson, Psy.D., declare as follows:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am a Clinical Psychologist employed by the United States Department of Veterans Affairs ("VA") Coatesville Veterans Affairs Medical Center ("Coatesville VAMC") in Coatesville, Pennsylvania. I have worked for the Coatesville VAMC for 19 years. Prior to that, I worked as Clinical Psychologist in the Federal Bureau of Prisons for 6 years in Philadelphia, Pennsylvania.

3.      The VA Coatesville Health Care System is comprised of multiple inpatient and outpatient facilities, including the main hospital at the Coatesville VAMC, as well as the Delaware County VA Clinic in Newtown Square, PA and the West Norriton VA Clinic in Norristown, PA.

4.      I am the Local President of the American Federation of Government Employees, AFL-CIO ("AFGE"), Local 310 ("AFGE Local 310"). I have served as Local President since 2013.

5.      AFGE Local 310 represents bargaining unit employees at the Coatesville VAMC and other VA facilities, including the Veterans Integrated Service Network 4 Clinical Contact Center ("VISN 4 CCC"), and Office of Community Care.

6.      AFGE Local 310 represents approximately 600 bargaining unit employees in dozens of occupations, including both professional and nonprofessional employees. Bargaining unit positions at the Coatesville VAMC represented by AFGE Local 310 include, but are not limited to, physician assistants, nurse practitioners, psychologists, social workers, pharmacists, dieticians, medical technologists, information technology specialists, accountants, audiologists, chaplains, occupational therapists, physical therapists, recreation therapists, and more. AFGE Local 310 also represents registered nurses, pharmacists, advanced medical support assistants, pharmacy technicians, and other health care professionals at the VISN 4 CCC and Office of Community Care.

1

**SA510**

7.      I am aware that Douglas A. Collins, Secretary of Veterans Affairs, terminated the 2023 Master Collective Bargaining Agreement ("Master Agreement") on August 6, 2025, except as applied to police officers, firefighters, and security guards.  I provide this declaration to describe how the termination of the Master Agreement has affected AFGE Local 310, my work as its Local President, and bargaining unit employees.

***Local Management Has Stopped Complying with the Master Agreement and Seeks to Chill Union Activity***

8.      Under the Master Agreement, the Coatesville VAMC had an obligation to provide notice and to bargain over changes to working conditions affecting bargaining unit employees. Before the August 6 termination of the Master Agreement, I or other local union officials would bargain, whether formally or informally, over management's proposal to change working conditions approximately 20 times a month.  But as a result of Secretary Collins' termination of the Master Agreement, management officials and human resources officials at the Coatesville VAMC have refused to negotiate in good faith with AFGE Local 310 over changes to working conditions affecting bargaining unit employees, including for example, changes to schedules and tours of duty, changes to job duties, changes to standard operating procedures, and more. The Coatesville VAMC unilaterally implemented these changes without notice to, or bargaining with, AFGE Local 310.

9.      In addition, local management officials and human resources officials have stopped processing union grievances filed by AFGE Local 310.  A human resources official told me that three of my union grievances were "null and void" due to the termination of the Master Agreement. These union grievances concerned a reprimand, leave denial, and performance appraisals for bargaining unit employees.

10.     In addition, the Coatesville VAMC has refused to allow bargaining unit employees to obtain union representation in investigatory examinations that may result in discipline, also known as "*Weingarten* meetings." Such rights are recognized and protected by the Master Agreement, Articles 14, 17, and 22.  Bargaining unit employees represented by

2

AFGE Local 310 have, in fact, been disciplined following investigatory examinations where management refused to honor the employee's *Weingarten* rights. Although it is within the scope of my responsibilities as Local President to accompany bargaining unit employees to *Weingarten* meetings, I have personally been told by management that since August 6, 2025, I am not allowed to "open my mouth" to defend employees in these meetings, and if I did, I would be asked to leave.

11.    Article 48 of the Master Agreement relates to official time.  Official time, which is defined in 5 U.S.C. § 7131, is intended to "facilitate and encourage the amicable settlement of disputes between employees and the Department involving conditions of employment and should contribute to the effective and efficient conduct of public business."  Master Agreement, Art. 48, § 1(A).  Section 10 of Article 48 governs the use of official time at the local union level, and it provides that each local union "will receive an allotment of hours equal to 4.25 hours per year for each bargaining unit position represented by that local union."  Master Agreement, Art. 48, § 10(A).  Local President of AFGE Local 310, I am one of the local union officials who takes official time under this provision of the Master Agreement.

12.    Since about August 6, 2025, the VA has prohibited AFGE Local 310 representatives, including myself from using official time to represent bargaining unit employees or to communicate with these employees on duty time or using VA email servers. Because I am prohibited from communicating with bargaining unit employees on official time during the workday or using government equipment, I have been unable to communicate quickly and effectively using the VA's email system, forcing me to use my personal email account to communicate with represented employees.  In addition, I do not have personal email addresses for all represented employees, so I cannot communicate with them all. I have been forced to take my own personal leave time to perform representational activity during the workday. I am unable to assist employees with work-related questions during the day.

13.    Article 51 of the Master Agreement relates to the union's use of official facilities. In Article 51, the VA "agree[d] to furnish office space to the Union appropriate for carrying out

**SA512**

its representational and partnership duties in locations easily accessible to employees and private citizens." Master Agreement, Art. 51, § 1(A). Article 51 generally provides the terms by which the union can access official facilities. On or about August 12, 2025, AFGE Local 310 was forced to vacate union office space at the Coatesville VAMC and return government-furnished equipment and technology required under the provisions of the Master Agreement. As a result, I do not have any dedicated union office space to meet with employees to discuss sensitive personnel issues.

14. Article 35, Section 16(A) of the Master Agreement provides bargaining unit employees with an entitlement to "16 weeks of [leave without pay] during any 12 month period for the . . . Birth of a son or daughter and the care of such son or daughter." This contractual benefit of 16 weeks negotiated under the Master Agreement is more generous than the 12 weeks required by law. As a result of Secretary Collins' termination of the Master Agreement, a bargaining unit employee at the Coatesville VAMC was denied this contractual benefit. This employee was preparing for maternity leave and told that she could no longer take the full 16 weeks of leave and was only eligible for the 12 weeks required by law.

15. Management officials at the Coatesville VAMC and other VA facilities have told bargaining unit employees, "There is no union," or "The union was cancelled," or "There is no one to help you," or words to this effect. They keep insisting that there is no longer a right to representation in any meetings. These statements were made orally and in writing and have had the intended effect of intimidating bargaining unit employees and chilling their speech and association with AFGE Local 310. In one example, the employee sought to cancel membership because the "union is removed from VA." A true and correct copy of this correspondence is attached hereto as **Exhibit A.** In another example, the employee sought to cancel because, "My position is no longer a 'bargaining unit' position." A true and correct copy of this correspondence is attached hereto as **Exhibit B.** While I have made deliberate efforts to combat these lies and the disinformation campaign by management and human resources officials, bargaining unit employees are intimidated by these anti-union comments. Bargaining unit

4

employees have told me that they are afraid to speak up on the job, ask questions about their employment, report potential violations of law and contract, speak to AFGE representatives during the workday, or otherwise question or challenge management officials who are denigrating the union and refusing to comply with the Master Agreement. People are afraid to come to the union, which makes it harder to provide effective representation.

***Comparison with Teamsters Local 115***

16.     I am aware that the VA did not terminate the collective bargaining agreement that covers bargaining unit employees represented by International Brotherhood of Teamsters Local 115 ("Teamsters Local 115") on August 6, 2025.  Teamsters Local 115 represents approximately 250 registered nurses at the Coatesville VAMC, Delaware County VA Clinic, and the West Norriton VA Clinic.

17.     From August 6, 2025 through at least November 13, 2025, the Coatesville VAMC and surrounding VA Clinics continued to honor collective bargaining agreements with Teamsters Local 115. Teamsters Local 115 continued to have access to union office space and government-furnished equipment and technology at the Coatesville VAMC. Teamsters Local 115 representatives continued using official time. Bargaining unit employees represented by Teamsters Local 115 remained covered by the Federal Service Labor-Management Relations Statute, 5 U.S.C. Chapter 71.

18.     Coatesville VAMC maintains the same organizational structure for all employees. Under this structure, all Coatesville VAMC employees ultimately report to the same executive leadership team, consisting of an executive director, chief of staff, associate director of patient care services, and other senior executives, regardless of whether they are represented by Teamsters Local 115, AFGE Local 310, another union, or unrepresented.

19.     The same training requirements, security protocol, and building access restrictions apply to all Coatesville VAMC employees, including Teamsters Local 115 and AFGE Local 310 employees. Events, such as "town halls," are often convened so that employees can discuss changes in operations, leadership, and other working conditions. These events are open to all

5

**SA514**

employees and all employees are expected to attend, if able, regardless of whether they are represented by Teamsters Local 115 or AFGE Local 310.

20.    The Coatesville VAMC is an integrated health care system. To provide direct and indirect care to veterans and their families and caregivers, the Coatesville VAMC depends on multi-disciplinary and cross-functional teams with nonstop, ongoing communication and coordination amongst and between departments and service lines. Many employees represented by Teamsters Local 115 work in conjunction with employees represented by AFGE Local 310. Employees represented by both unions work in the same teams, departments, or service lines, where they report to the same supervisors and cooperate in providing care and services to veterans. Employees must work together as a team to achieve the goal of delivering the best possible care and services that VA can offer. Constant communication and teamwork in a fast-paced, quickly evolving clinical environment is the best way to provide top quality care and effective hospital administration.

21.    In the Domiciliarry Unit, which is a residential environment where veterans live full-time at the Coatesville VAMC to attend various treatment programs, clinical providers including psychologists, licensed professional mental health counselors, social workers, physician assistants, and nurse practitioners all collaborate to develop treatment plans and implement those treatment plans. All employees in the Domiciliary Unit report to the same supervisor and are subject to the same work rules regardless of whether they are, for example, registered nurses represented by Teamsters Local 115 or social workers and psychologists represented by AFGE Local 310. Employees meet as a team to assess how veterans are doing in the Domiciliary Unit. If veterans are having difficulties adjusting to the new environment, we work together to figure out ways to assist them.

22.    In the Behavioral Health Interdisciplinary Program ("BHIP"), registered nurses represented by Teamsters Local 115 work hand in hand with clinical psychologists and social workers represented by AFGE Local 310 to ensure that veterans who are coming for outpatient services have their mental health and medical needs taken care of. There is significant overlap

**SA515**

between their care needs and services as provided by registered nurses and other health care workers. In BHIP, employees fall under the supervision of the Associate Chief of Staff for Mental Health regardless of whether they are represented by Teamsters Local 115 or AFGE Local 310.

23.     While the Coatesville VAMC does not have a medical-surgery unit, we do have a number of clinics where registered nurses represented by Teamsters Local 115 are working alongside health care workers, such as clinical pharmacists, audiologists, chiropractors, and physical therapists represented by AFGE Local 310. For example, this applies to the Audiology Clinic, Optometry Clinic, Chiropractic Clinic, and others.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 25th day of November 2025, in Coatesville, Pennsylvania.

Ira Kedson, Psy.D.

7

**SA516**

# Exhibit A

SA517

# Remove my dues

Via email



Redaction - Privacy  ✉  •  Aug 07 10:10 am

**To:** AFGE <edues@afge.org>

**CC:** Edues <edues@afge.org>

Show less

This Message Is From an Untrusted Sender
You have not previously corresponded with this sender.

Report Suspicious

Can you remove me as I union is removed from VA

SA518

# Exhibit B

SA519

**From:** ██ Redaction - Privacy ██ @gmail.com>
**Date:** August 26, 2025 at 12:05:24 PM EDT
**To:** afgelocal310@gmail.com
**Subject: Dues**

Good morning,

I attempted to cancel my membership due to recent changes with my position. My position is no longer a "bargaining unit" position. I went through the online form but they said I need to do it through my local. How do I go about doing this?

Thanks!

Redaction - Privacy

**SA520**

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and <br><br> AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305; <br><br>    Plaintiffs, <br><br>    *v.* <br><br> UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and <br><br> DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs; <br><br>    Defendants. | Civil Action No. 25-CV-583-MRD-PAS |

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**SA521**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................III

Introduction ....................................................................................... 1

Background ........................................................................................ 5

    I.    The FSLMRS Framework and Related Executive Orders ............................ 5

    II.   Executive Order 14,251........................................................... 7

    III. The VA's National Security Work................................................. 8

    IV. The VA's Implementation of the Executive Order ...................................... 10

    V.   The Statutory Channeling Requirement......................................... 12

    VI. Other Cases Challenging Executive Order 14,251 ...................................... 13

    VII. The Instant Action and Plaintiffs' Motion for Preliminary Injunction ........ 14

Argument ......................................................................................... 15

    I.    This Case Should Not Proceed Because It Constitutes Impermissible Claim Splitting. ........................................................................ 15

    II.   Alternatively, Plaintiffs' Request for a Preliminary Injunction Should be Denied. .......................................................................... 19

        A.   Legal Standard .................................................................. 19

        B.   Plaintiffs do not satisfy any of the preliminary injunction factors........ 19

            1.   Plaintiffs Cannot Show Likelihood of Success on the Merits of their Claims................................................................ 20

                a.   The FSLMRS precludes district court jurisdiction over Plaintiffs' claims................................................. 21

                   i.   The *Thunder Basin* exception to the channeling requirement does not apply here. ................................. 24

                b.   Plaintiffs are unlikely to succeed on the merits of their First Amendment claims................................................. 31

                   i.   Plaintiffs' First Amendment retaliation claim fails...... 31

                   ii.  Plaintiffs' First Amendment viewpoint discrimination claim also fails.......................................................... 38

i

      c.  Plaintiffs are unlikely to succeed on the merits of their APA claim................................................................................40

          i.  APA review is unavailable because of potential alternative remedies. ....................................................40

          ii.  The APA bars judicial review in this case because the challenged action is committed to Agency discretion by law................................................................................41

          iii. Alternatively, Plaintiffs are unlikely to prevail on the merits of their APA claim that the Secretary acted arbitrarily or capriciously. ............................................42

          iv. Alternatively, Plaintiffs are unlikely to prevail on the merits of their APA claim that the Secretary acted contrary to the First Amendment.................................47

    2.  Plaintiffs Cannot Show Irreparable Harm Absent a Preliminary Injunction ....................................................47

    3.  The Balance of the Equities and the Public Interest Favor the Government .................................................................50

III. Should the Court Grant Plaintiffs' Motion for Preliminary Injunction, the Injunction Should be Accompanied by a Bond.......................................54

CONCLUSION ....................................................................................56

ii

**SA523**

# TABLE OF AUTHORITIES

## Cases

*AFGE v. Loy,*
367 F.3d 932 (D.C. Cir. 2004) ........................................................................ 26, 29

*AFGE, AFL-CIO v. Loy,*
281 F. Supp. 2d 59 (D.D.C. 2003) ......................................................................... 39

*AFGE v. Sec'y of Air Force,*
716 F.3d 633 (D.C. Cir. 2013) ........................................................................ 23, 24

*AFGE, AFL-CIO v. Trump,*
148 F.4th 648 (9th Cir. 2025)......................................................................... passim

*AFGE v. Trump,*
929 F.3d 748 (D.C. Cir. 2019) ........................................ 22, 24, 26, 27, 28

*AFGE v. Trump,*
No. 4:25-cv-3070 (N.D. Cal. June 24, 2025) .......................................... 2, 13, 16, 17

*AFSA v. Trump,*
2025 WL 1742853 (D.C. Cir. June 20, 2025) ...................................... 14, 20, 48, 51

*Akebia Therapeutics, Inc. v. Azar,*
976 F.3d 86 (1st Cir. 2020)..............................................................................20-21

*Axon Enter., Inc. v. FTC,*
598 U.S. 175 (2023) ........................................................ 21, 22, 24, 25, 26

*Babbitt v. United Farm Workers Nat'l Union,*
442 U.S. 289 (1979) ............................................................................................ 39

*Bd. of Cnty. Comm'rs v. Umbehr,*
518 U.S. 668 (1996) ............................................................................................ 37

*Bureau of Alcohol, Tobacco and Firearms v. FLRA,*
464 U.S. 89 (1983) ........................................................................................5-6, 28

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) ............................................................................................ 40

iii

SA524

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
370 F.3d 151 (1st Cir. 2004)................................................................. 47

*Crowley v. Loc. No. 82, Furniture & Piano Moving,*
679 F.2d 978 (1st Cir. 1982)........................................................... 54, 55

*D.B. ex rel. Elizabeth B. v. Esposito,*
675 F.3d 26 (1st Cir. 2012)................................................................. 31

*Department of Defense v. AFGE,*
No. 6:25-cv-00119 (W.D. Tex. Mar. 27, 2025)................................. 18, 30

*Elgin v. Dep't of Treasury,*
567 U.S. 1 (2012) ......................................................................... 27, 29

*Esso Standard Oil Co. v. Monroig-Zayas,*
445 F.3d 13 (1st Cir. 2006)................................................................. 20

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) .......................................................................... 43

*Fed. L. Enf't Officers Ass'n v. Ahuja,*
62 F.4th 551 (D.C. Cir. 2023)............................................................. 25

*Federal Education Association v. Trump,*
2025 WL 2738626 (D.C. Cir. Sept. 25, 2025) ...................................... 20

*Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.,*
391 F. Supp. 2d 1 (D.D.C. 2005) ........................................................ 39

*Gattineri v. Town of Lynnfield,*
58 F.4th 512 (1st Cir. 2023) ......................................................... 32, 35

*Habitat Educ. Ctr. v. U.S. Forest Serv.,*
607 F.3d 453 (7th Cir. 2010) ............................................................. 54

*Heckler v. Chaney,*
470 U.S. 821 (1985) ..................................................................... 41, 42

*Heckler v. Ringer,*
466 U.S. 602 (1984) .......................................................................... 25

*Henderson for NLRB v. Bluefield Hospital Co., LLC,*
902 F.3d 432 (4th Cir. 2018) ............................................................. 49

*Holder v. Humanitarian L. Project,*
561 U.S. 1 (2010) .............................................................................. 38

iv

*Kale v. Combined Ins. Co. of Am.*,
   924 F.2d 1161 (1st Cir. 1991) ..................................................................... 15

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) .......................................................................... 33, 34

*Laccinole v. MRS BPO, LLC*,
   2023 WL 22136 (D.R.I. Jan. 3, 2023) ............................... 15, 16, 17, 18

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ........................................................................ 49

*Local 1498, AFGE v. AFGE, AFL/CIO*,
   522 F.2d 486 (3d Cir. 1975) ......................................................................... 5

*Magellan Tech., Inc. v. FDA*,
   70 F.4th 622 (2d Cir. 2023) ................................................................. 43, 46

*Maine v. U.S. Dep't of Agric.*,
   778 F. Supp. 3d 200 (D. Me. 2025) ......................................................... 54

*Manhattan-Bronx Postal Union v. Gronouski*,
   350 F.2d 451 (D.C. Cir. 1965) ..................................................................... 5

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
   367 F.3d 68 (1st Cir. 2004) ......................................................................... 47

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ...................................................................................... 43

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977) .............................................................................. 31, 36

*Munaf v. Geren*,
   553 U.S. 674 (2008) .................................................................................... 19

*Narragansett Indian Tribe v. Guilbert*,
   934 F.2d 4 (1st Cir. 1991) ..................................................................... 21, 47

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024) .................................................................................... 38

*New York v. Kennedy*,
   789 F. Supp. 3d 174 (D.R.I. 2025) ........................................................... 30

*Nieves v. Bartlett*,
   587 U.S. 391 (2019) .................................................................................... 32

v

**SA526**

*NIH v. Am. Ass'n of Public Health,*
606 U.S. ---, 145 S. Ct. 2658 (2025) ................................................................ 53, 55

*Nken v. Holder,*
556 U.S. 418 (2009) ......................................................................... 19, 20, 50-51

*NTEU v. Trump,*
2025 WL 561080 (D.D.C. Feb. 20, 2025) ................................................................. 22

*NTEU v. Trump,*
2025 WL 1441563 (D.C. Cir. May 16, 2025) ..................................................... passim

*NTEU v. Reagan,*
1981 WL 150530 (D.D.C. Sept. 3, 1981) ......................................................... 32, 39

*NTEU v. Vought,*
149 F.4th 762 (D.C. Cir. 2025) .......................................................................... 27-28

*Ohio Adjutant General's Department v. FLRA,*
598 U.S. 449 (2023) ...................................................................................... 28

*Padilla-Garcia v. Rodriguez,*
212 F.3d 69 (1st Cir. 2000) ............................................................................... 31

*Philip Morris USA Inc. v. Scott,*
561 U.S. 1301, (2010) ................................................................................. 53, 55

*Police Ass'n of the District of Columbia v. Dep't of Treasury,*
No. 78-0236 (D.D.C. May 19, 1980) .............................................................. 32, 39

*Pub. Serv. Co. v. Town of W. Newbury,*
835 F.2d 380 (1st Cir. 1987) .............................................................................. 47

*Respect Maine PAC v. McKee,*
622 F.3d 13 (1st Cir. 2010) ................................................................................ 21

*Rubacky v. Morgan Stanley Dean Witter Credit Corp.,*
104 F. App'x 757 (1st Cir. 2004) ........................................................................ 48

*SEIU Local 1996 v. Fortuño,*
699 F.3d 1 (1st Cir. 2012) .................................................................................. 21

*Smith v. Ark. State Highway Emps., Local1315,*
441 U.S. 463 (1979) ........................................................................................... 39

*Starbucks Corp. v. McKinney,*
602 U.S. 339 (2024) ........................................................................................... 19

SA527

*Thunder Basin Coal Co. v. Reich,*
510 U.S. 200 (1994) ..........................................................................................24

*TikTok Inc. v. Garland,*
122 F.4th 930 (D.C. Cir. 2024)........................................................................37

*Trump v. Boyle,*
606 U.S. ---, 145 S. Ct. 2653 (2025) ................................................................20

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) ..........................................................................................51

*Trump v. Hawaii,*
585 U.S. 667 (2018) ...................................................................................33, 51

*U.S. Dep't of Defense v. AFGE,*
No. 6:25-cv-00119 (W.D. Tex. Apr. 21, 2025) .............................................18

*U.S. Dep't of Health & Hum. Servs. & Laborers Int'l Union Loc. 1376,*
60 F.L.R.A. 202 (2004) ....................................................................................27

*Union of Concerned Scientists v. Wheeler,*
954 F.3d 11 (1st Cir. 2020)..............................................................................44

*United States Department of Defense Ohio National Guard & AFGE Local 3970,*
71 F.L.R.A. 829 (2020) ....................................................................................27

*Vill. W. Assocs. v. Rhode Island Hous. & Mortg. Fin. Corp.,*
618 F. Supp. 2d 134 (D.R.I. 2009)..................................................................40

*Winter v. NRDC,*
555 U.S. 7 (2008) .......................................................................................19, 49

## Statutes

Administrative Procedure Act ("APA"),
5 U.S.C. §§ 500-596
   § 701(a)(2) ....................................................................................................41
   § 705.............................................................................................................14

Federal Service Labor-Management Relations ("FSLMRS"),
5 U.S.C §§ 7101-7135 .......................................................................................21
   § 7101......................................................................................................5, 55
   § 7103...........................................................................................................33
   § 7103(a)(3) ...................................................................................................6

vii

**SA528**

§ 7103(a)(9) ........................................................................................................ 26

§ 7103(a)(12) ........................................................................................................ 6

§ 7103(b)(1) ........................................................................ 1, 32, 36, 39

§ 7105(f) .............................................................................................................. 12

§ 7105(f)–(g) ........................................................................................................ 48

§§ 7107–35 ........................................................................................................... 3

§ 7111(b)(2) ........................................................................................... 25, 27

§ 7116 ................................................................................................................ 12

§ 7116(a) .............................................................................................................. 28

§ 7116(a)(8) .......................................................................................................... 26

§ 7116(d) .............................................................................................................. 25

§ 7118 ................................................................................................................ 48

§ 7118(a)(1) .......................................................................................................... 12

§ 7121(a)(1) .......................................................................................................... 26

§ 7123(a) ................................................................................... 13, 23, 24, 31

VA/DoD Health Resources Sharing and Emergency Operations Act; Pub. L. No. 97-
174, 96 Stat. 70 (1982) ................................................................................ 8, 9

38 U.S.C. §§ 8111A ................................................................................................ 9

## Executive Orders

Exec. Order No. 10,988 ........................................................................................... 5

Exec. Order No. 11,491 ........................................................................................... 5

Exec. Order No. 11,616 ........................................................................................... 5

Exec. Order No. 11,636 ........................................................................................... 5

Exec. Order No. 11,838 ........................................................................................... 5

Exec. Order No. 12,171 ........................................................................................... 6

Exec. Order No. 13,039 ........................................................................................... 6

Exec. Order No. 13,252 ........................................................................................... 6

Exec. Order No. 13,480 ........................................................................................... 7

Exec. Order No. 13,760 ........................................................................................... 7

Exec. Order No. 14,251 .................................................................................... passim

SA529

Exec. Order No. 14,343 .............................................................................. 1, 28, 37, 39

**Regultaory**

5 C.F.R. §§ 2423.3–2423.6 ................................................................................ 12

U.S. Office of Personnel Management, Frequently Asked Questions: Executive
    Order 14251 "Exclusions from Federal Labor-Management Relations Programs"
    (Sept. 10, 2025) .......................................................................................... 45

**Federal Rules**

Federal Rule of Civil Procedure 17(a) ........................................................ 16
Federal Rule of Civil Procedure 65 ...................................................... 14, 56
Federal Rule of Civil Procedure 65(c) ............................................... 54, 55, 56

**Other Authorities**

6A Charles Alan Wright & Arthur R. Miller,
    *Federal Practice & Procedure Civ.* § 1543 (3d ed. 1998) ........................ 16

11 Charles Alan Wright & Arthur R. Miller,
    *Federal Practice & Procedure* § 2954 (3d ed. 1998) ............................... 54

**SA530**

## INTRODUCTION

The Federal Service Labor-Management Relations ("FSLMRS") authorizes the President to exempt from its coverage "*any* agency or subdivision thereof" if the President makes the determination that (A) "the agency . . . has as a primary function intelligence, counterintelligence, investigative, or national security work," and (B) the provisions of the statute "cannot be applied to that agency . . . in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1) (emphasis added). On March 27, 2025, President Trump issued such an order. Specifically in Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs*, the President made the required determinations, thereby excluding from statutory coverage the identified agencies and agency subdivisions, including as relevant here, the U.S. Department of Veterans Affairs ("VA" or "Agency").

Plaintiffs in this case argue that the VA unlawfully terminated the collective bargaining agreement ("CBA") between the VA and the American Federation of Government Employees ("AFGE"), with which Plaintiffs are affiliated. But the VA's termination decision flowed directly from Executive Order 14,251, which Plaintiffs do not challenge here. Executive Order 14,251 excluded the VA from collective bargaining. Executive Order § 2. It also included a provision specifying that "nothing in this" Executive Order shall exempt from FSLMRS coverage "the immediate, local employing offices of any agency police officers, security guards, or firefighters." *Id.* On August 6, 2025, the Secretary of Veterans affair notified the AFGE that "pursuant to EO 14251," the "VA is terminating the VA-AFGE [Master

1

SA531

CBA] . . . for all VA bargaining unit employees, except police officers, firefighters, and security guards represented by AFGE." Amended Compl. for Declaratory and Injunctive Relief ("Am. Compl."), Ex. C, ECF No. 13-3 (Letter from Douglas A. Collins, Sec'y of Veterans Affairs, to Everett B. Kelley, President of AFGE (Aug. 6, 2025)). Plaintiffs assert that the termination violates their First Amendment rights and the Administrative Procedure Act ("APA").

At minimum, this case should not proceed because it constitutes impermissible claim splitting. While Plaintiffs bring this action here, their claims are already being litigated in the Ninth Circuit case, *American Federation of Government Employees v. Trump*, No. 4:25-cv-3070, Dkt. No. 1 (N.D. Cal. June 24, 2025) ("*AFGE II*"). In *AFGE II*, labor organizations (including the AFGE) seek a preliminary injunction against the VA and other government agencies to prohibit the agencies from implementing Executive Order 14,251. Notably, the CBA at issue in this case was entered into by the AFGE itself, not by the two affiliates who nominally appear as plaintiffs here (AFGE National VA Council and AFGE Local 2305). The AFGE has raised a First Amendment claim already in *AFGE II*. And although Plaintiffs attempt to articulate APA claims here, their claims at bottom challenge the VA's implementation of Executive Order 14,251. Thus, their claims arise out of the same series of connected events as in *AFGE II*, and those claims could have and should have been brought in that case. On these facts alone, this case should be dismissed.

2

Moreover, Plaintiffs have failed to demonstrate that preliminary injunctive relief is warranted. Plaintiffs' delay in seeking such relief is reason alone to deny their motion. Moving for emergency relief nearly nine months after the Executive Order was issued (March 27, 2025) and nearly three months after the subject CBA was terminated (August 6, 2025) belies the need for such relief. Indeed, Plaintiffs did not even request a preliminary injunction concurrently with their original complaint; only after amending that complaint three weeks later did Plaintiffs move for a preliminary injunction. But should this Court nevertheless consider Plaintiffs' request, the elements for an injunction are not supported by the record.

First, Plaintiffs fail to establish a likelihood of success on the merits of their claims. Congress intended claims under the FSLMRS, 5 U.S.C. §§ 7107–35, to be covered by the comprehensive remedial scheme set forth in that statute. Plaintiffs' assertion that the VA is violating obligations under the FSLMRS by terminating the CBA with the AFGE does not fall within the narrow exception to such preclusion articulated in *Thunder Basin* and its progeny. Moreover, Plaintiffs fail to establish that Defendants terminated the CBA based on animus towards Plaintiffs' First Amendment speech, not the mandate of Executive Order 14,251. Further, while APA review is unavailable, even if Plaintiffs could proceed on this basis, Plaintiffs fail to demonstrate that the VA's decision to terminate the CBA was either arbitrary or capricious or a violation of the First Amendment.

Second, Plaintiffs fail to establish likelihood of irreparable harm absent preliminary relief. Plaintiffs' alleged harms purportedly arise from (1) the loss of

3

certain benefits and privileges Plaintiffs previously enjoyed under the CBA, and (2) an alleged "chilling" effect on their First Amendment speech. Neither type of harm qualifies as "irreparable." Rather, as recognized by two courts of appeals in other EO 14,251-related litigation, there is a greater likelihood Defendants will suffer irreparable harm if Plaintiffs' request for preliminary relief is granted because it would "tie[] the government's hands … in the national security context." *AFGE II*, 148 F.4th at 656 (quoting *Nat'l Treasury Emps. Union*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) ("*NTEU II*")). Thus, Plaintiffs are unable to show irreparable harm caused by the termination of the CBA.

Third, the balance of the equities and the public interest favor Defendants because a preliminary injunction would interfere with the VA's implementation of an Executive Order that the President lawfully issued to ensure the VA operates consistently with its primary national security purpose. Considering the prior significant disruptive impacts directly caused by collective bargaining requirements, as detailed in the declaration of Tracey Therit, the Chief Human Capital Officer for Human Resources and Administration in the Department of Veterans Affairs, attached as Exhibit A, forcing the VA to reinstate the CBA, with all its obligations, would only exacerbate those impacts and divert important resources away from the VA's critical emergency preparedness work.

Thus, the Court should dismiss Plaintiffs' claims or alternatively deny their motion.

4

**SA534**

## BACKGROUND

I.     **The FSLMRS Framework and Related Executive Orders**

The Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. This power includes the authority to make "improvement[s] in the efficiency of federal employment." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965). Before Congress enacted the FSLMRS, the President routinely "regulate[d] labor relations in the federal government and internal matters of unions representing federal government employees[]" by Executive Order. *See, e.g., Local 1498 v. AFGE, AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975). Indeed, President Kennedy took the first formal measure to regulate federal-sector labor relations in 1962 when he issued Executive Order No. 10988, *Employee-Management Cooperation in the Federal Service*, 27 Fed. Reg. 551 (Jan. 19, 1962); *see Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 91–92 (1983) ("*ATF*"). Multiple Presidents subsequently amended that Order.[1]

Against this backdrop, Congress in 1978 passed the FSLMRS, 5 U.S.C. § 7101 *et seq*. The Statute, enacted as Title VII of the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111, provides a "comprehensive . . . scheme governing labor relations between federal agencies and their employees." *ATF*, 464

---

[1] *See* Exec. Order No. 11,491, *Labor-Management Relations in the Federal Service*, 34 Fed. Reg. 17,605 (Oct. 31, 1961), as amended by Exec. Order No. 11,616, 36 Fed. Reg. 17,319 (Aug. 28, 1971), Exec. Order No. 11,636, 36 Fed. Reg. 24,901 (Dec. 24, 1971), and Exec. Order No. 11,838, 40 Fed. Reg. 5,743 (Feb. 7, 1975).

5

**SA535**

U.S. at 91. The FSLMRS establishes the right of certain federal employees to form or join a labor union, among other protections. However, the Statute exempts certain agencies and matters from its coverage. *See, e.g.*, 5 U.S.C. § 7103(a)(3) (excluding from coverage the Federal Bureau of Investigation, the Central Intelligence Agency, and the National Security Agency, among others); 5 U.S.C. § 7103(a)(12), (14) (defining "collective bargaining" as a good-faith effort to reach agreement with respect to "conditions of employment"—a term that is defined as excluding, for example, "policies, practices, and matters relating to the classification of any position"). The FSLMRS also empowers the President to exempt additional agencies and their subdivisions from its requirements. Specifically,

> The President may issue an order excluding *any* agency or subdivision thereof from coverage under [the Statute] if the President determines that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the Statute] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

*Id.* § 7103(b)(1) (emphasis added).

Pursuant to this authority, President Carter issued an executive order in 1979 excluding from FSLMRS coverage more than forty-five agencies or agency subdivisions, precluding their employees from collective bargaining. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979). Every President since, with the sole exception of President Biden, has issued similar executive orders expanding that list in response to changing circumstances and the evolving, complex national security responsibilities of federal agencies. *See, e.g.*, Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997); Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan.

6

**SA536**

7, 2002); Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec. Order No. 13,760, 82 Fed. Reg. 5,325 (Jan. 17, 2017).

**II.    Executive Order 14,251**

Like these other Presidents, on March 27, 2025, President Trump issued another such Executive Order—Executive Order 14,251—which directly led to the CBA termination that Plaintiffs challenge here. *Executive Order 14251 of March 27, 2025*, 90 Fed. Reg. 14553 (Apr. 3, 2025) (the "Executive Order" or "EO"). In Sections 1 and 2 of the Executive Order, the President determined that certain agencies— including the VA—have as a primary function intelligence, counterintelligence, investigative, or national security work, and that the FSLMRS cannot be applied to those agencies and subdivisions in a manner consistent with national security requirements and considerations. *Id.* §§ 1, 2(c).

In addition to excluding the VA and other agencies from the FSLMRS's coverage, the Executive Order contained two other provisions relevant here. First, it contained a carve-out from its coverage for "the immediate, local employing offices of any agency police officers, security guards, or firefighters," which remained subject to Chapter 71. Executive Order, § 2(b). Given its decentralized structure, the VA has interpreted this carve-out as applying only to employees holding one of the three occupations specified in the Executive Order: police officers, security guards, and firefighters. Therit Decl. ¶ 11.

Second, the Executive Order contained a delegation-of-authority provision authorizing the Secretary of the VA to issue orders suspending application of the Executive Order to any subdivision the Secretary supervises, "thereby bringing such

7

subdivisions under the coverage of the Federal Service Labor-Management Relations statute," if the Secretary determined that doing so would be "consistent with national security requirements and considerations." Executive Order § 4. There are no such suspension orders currently in effect.[2]

### III.    The VA's National Security Work

The VA has national security work as a primary function, as the President determined in the Executive Order. Therit Decl. ¶ 4; Executive Order §§ 1-2. Indeed, it plays an indispensable role in the United States's national emergency preparedness strategy.

The VA's emergency response capabilities have evolved since the 1980s. Prior to that time, the VA focused on just three primary missions: to deliver clinical care to veterans; to conduct research benefiting veterans and all Americans; and to educate future health professionals. Therit Decl. ¶ 4. In 1982, the VA and Department of Defense ("DoD") Health Resources Sharing and Emergency Operations Act assigned it a fourth primary mission: to improve the nation's preparedness for national emergencies, including war, terrorism, and natural

---

[2] In April 2025, the Secretary initially issued an Order suspending the application of the Executive Order for VA employees represented by certain local unions, but after further considering the Executive Order's delegation-of-authority provision, the Secretary rescinded that Order in its entirety. *See Rescission of Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12171*, 90 Fed. Reg. 50950 (Nov. 13, 2025) ("Rescission of Order") (Silva Decl., Ex. N). Plaintiffs incorrectly assert that the VA relied on the April 2025 Order when terminating the CBA at issue in this case. *See, e.g.*, Pls.' Mem. at 1. But the VA's notice of termination neither referenced nor relied on the April 2025 Order. Am. Compl., Ex. C. That notice solely cited and relied on Executive Order 14,251. *Id.*

8

disasters. *Id.*; VA/DoD Health Resources Sharing and Emergency Operations Act; Pub. L. No. 97-174, 96 Stat. 70 (1982). Specifically, that Act designated the VA as the primary backup for any health care services needed by the Department of Defense (now known as the Department of War) in the event of war or national emergency that involves armed conflict. *See* VA/DoD Health Resources Sharing and Emergency Operation Act, Pub. L. No. 97-174, 96 Stat. 70 (1982).

Congress further amplified the VA's role in homeland security and response to domestic emergencies in the Public Health Security and Bioterrorism Preparedness Response Act of 2002. Pub. L. No. 107-188, 116 Stat. 594. That law reorganized the National Disaster Medical System ("NDMS") to create an interagency partnership between the Department of Health and Human Services ("HHS"), the Department of Homeland Security, the Department of War, and the VA. 42 U.S.C. §§ 300hh-11(a)(1)-(2). Through the NDMS, the VA serves as the principal medical care backup for the Department of War during and immediately following a period of national emergency or war. 38 U.S.C. §§ 8111A. The statute also requires the VA to coordinate with HHS to maintain a stockpile of drugs, vaccines, medical devices, and other biological products and emergency supplies. Pub. L. No. 107-188, § 121(a)(1).

Today, the VA's "Forth Mission" involves developing plans and taking actions to ensure continued service to veterans, as well as supporting national, state, and local emergency management efforts. Therit Decl. ¶ 4. The law provides for the sharing of healthcare resources, including facilities, equipment, and personnel,

9

**SA539**

between the VA and the Department of War, even during peacetime. *Id.* ¶ 4(e)(ii). The VA also integrates its emergency response into the National Response Framework ("NRF"), which is coordinated by the Federal Emergency Management Agency ("FEMA"). *Id.* ¶ 5(b). For these reasons and others described in detail in the Therit Declaration, the VA clearly has, as a primary function, national security work.

## IV.    The VA's Implementation of the Executive Order

On August 6, 2025, the VA announced the termination of the national CBAs for most VA bargaining unit employees. *VA Terminates Union Contracts for Most Bargaining-Unit Employees*, VA News (August 6, 2025), https://news.va.gov/pressroom/va-terminates-union-contracts-for-most-bargaining-unit-employees/ ("VA press release") (Silva Decl., Ex. I). In a press release announcing the termination, the VA explained that the Agency had cancelled the union contracts "in response to President Trump's executive order that excludes certain federal agencies from labor-management relations programs." *Id.* The press release clarified that "Contracts covering the roughly 4,000 VA police officers, firefighters or security guards represented by these unions will remain in place, as those occupations are exempt from the EO." *Id.* The press release also listed examples of how the decision would benefit veterans, families, caregivers, and survivors, including the following:

- allowing VA staff to spend more time with veterans instead of collective-bargaining obligations;
- reclaiming VA facilities to focus on treating veterans instead of hosting unions;

10

**SA540**

- managing VA staff according to veterans' needs—not union demands; and

- ensuring millions of taxpayer dollars are spent, not on union activities, but veteran care.

*Id.*

AFGE was among the labor organizations that received notice from the VA on August 6, 2025, that its CBA was being terminated. Am. Compl. ¶ 10 & ex. C, ECF No. 13.

The VA also communicated the change, and the reason for it, in an email sent to employees who would no longer be covered by the CBA. Burke Decl., Ex. L, ECF No. 14-4. The change, the VA explained, would allow the VA to focus on its core mission of providing care to America's veterans:

> Terminating the collective bargaining agreements will benefit employees like you who were previously covered by agreements that restricted VA's ability to hire, promote and reward high performing employees, hold poor performers accountable, and implement changes that better serve Veterans. This decision also permits employees and managers to more freely engage in open communications to improve the organization without union filtering or interference.

*Id.* In sum, the VA widely publicized that terminating the CBA pursuant to the Executive Order would improve the VA's ability to execute and implement the President's initiatives.

Contemporaneously with cancelling the national union contracts, VA took three additional steps to implement the Executive Order:

1. The VA began advising representatives of AFGE that, pursuant to the Executive Order and the CBA termination, the VA would not engage in grievance and arbitration proceedings if the proceedings related exclusively to employees covered by the Executive Order.

11

**SA541**

2.      The VA began reclaiming government resources and space previously allocated to NVAC and local unions and repurposing those resources and space to meet VA's mission needs.

3.      The VA began denying requests for taxpayer-funded union time if the request came from a union representative who was also an employee subject to the Executive Order.

Therit Decl. ¶ 16(e)-(g).

## V.    The Statutory Channeling Requirement

In the FSLMRS, Congress established a dedicated review scheme for resolving federal labor disputes that provides multiple channels for a union to challenge conduct it alleges violates the FSLMRS. For example, an employee or a union may file a "charge" with the Federal Labor Relations Authority ("FLRA") alleging that an agency has engaged in an unfair labor practice ("ULP"), which can include, *inter alia*, a failure to negotiate in good faith or comply with any FSLMRS provision. *See* 5 U.S.C. §§ 7116, 7118(a)(1); 5 C.F.R. §§ 2423.3–2423.6. The FLRA's General Counsel "shall investigate" any such charge and may file a complaint against the agency before the FLRA. 5 U.S.C. § 7118(a)(1)–(2); *see also id.* § 7104(f)(2). Alternatively, an employee or union may file a "grievance" to challenge violations of CBAs or to pursue "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment[.]" *Id.* § 7103(a)(9)(C)(ii); *see also id.* § 7121. An employee or union may also file a "petition" with the FLRA "seeking clarification of … a certification [that a union is the exclusive bargaining representative of employees] then in effect or a matter relating to representation." *Id.* § 7111(b)(2). The FLRA is broadly authorized to order appropriate relief. 5 U.S.C. §§ 7105(f)–(g), 7118. The FLRA's final orders from

these various routes, with few exceptions not relevant here, are subject to judicial review "in the United States court of appeals in the circuit in which the [aggrieved] person resides or transacts business or in the United States Court of Appeals for the District of Columbia." *Id.* § 7123(a).

## VI.   Other Cases Challenging Executive Order 14,251

Labor organizations have brought multiple other suits seeking to enjoin the implementation of Executive Order 14,251.[3]

In one of those cases—*AFGE II*—the VA and Secretary Collins are named defendants. *Am. Fed. of Gov't Emps. v. Trump*, No. 4:25-cv-3070, Dkt. No. 1 (N.D. Cal. June 24, 2025). And the lead plaintiff is the AFGE. *Id.* (NVAC is a bargaining council of the AFGE, and AFGE Local 2305 is a subdivision of the AFGE. Pls.' Mem. at 19 n.14; *see also id.* at 5.) In *AFGE II*, the Ninth Circuit recently stayed a preliminary injunction seeking, as Plaintiffs do here, to prevent the VA from implementing the Executive Order. *Am. Fed. of Gov't Emps. v. Trump*, 148 F.4th 648, 648 (9th Cir. 2025) ("*AFGE II*").

In two cases filed in the District of Columbia involving substantially the same issues as those involved in the instant matter, courts of appeals have also

---

[3] *See, e.g.*, *Am. Fed. of Labor & Congress of Indus. Orgs. v. Trump*, No. 1:25-cv-2445, Dkt. No. 1 (D.D.C. Sept. 29, 2025); *Am. Foreign Serv. Assoc. v. Trump*, No. 1:25-cv-01030, Dkt. No. 1 (D.D.C. Apr. 7, 2025); *Am. Fed. of Gov't Emps. v. Trump*, No. 4:25-cv-3070, Dkt. No. 1 (N.D. Cal. Apr. 3, 2025); *Fed. Educ. Assoc. v. Trump*, No. 1:25-cv-01362, Dkt. No. 1 (D.D.C. May 5, 2025); *Nat'l Treasury Emps. Union v. Trump*, No. 1:25-cv-00935, Dkt. No. 1 (D.D.C. Mar. 31, 2025).

stayed pending appeal preliminary injunctions similar to what Plaintiffs seek here.[4] The D.C. Circuit recently held oral argument in the preliminary injunction appeals in those cases. The panel asked many questions regarding the district court's jurisdiction given the FSLMRS's channeling scheme. A decision in those cases is forthcoming.

## VII.   The Instant Action and Plaintiffs' Motion for Preliminary Injunction

Plaintiffs are two affiliates under the AFGE: (1) NVAC; and (2) the American Federation of Government Employees Local 2305 ("AFGE Local 2305"). Am. Compl. ¶¶ 1, 24-25.

Nearly nine months after the President issued the Executive Order and nearly three months after the VA terminated the CBA, Plaintiffs filed the current suit challenging the VA's action. Compl. for Decl. & Injunctive Relief, ECF No. 1. Three weeks later, Plaintiffs amended their complaint and moved for a preliminary injunction. Am. Compl. at 35; Pls.' Mot. for Prelim. Injun. and Relief Under 5 U.S.C. § 705 ("Pls.' Mot."), ECF No. 14.[5] Plaintiffs assert that Defendants' decision to terminate the CBA violates their First Amendment rights and the APA. Pls.' Mot. 1.

---

[4] *AFSA v. Trump*, No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025), *reh'g en banc denied* (July 30, 2025) ("*AFSA II*"); *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 20ll 25), *reh'g en banc denied* (July 16, 2025) ("*NTEU II*").

[5] Plaintiffs request two, distinct types of relief: (1) an injunction under Federal Rule of Civil Procedure 65, and (2) a stay under 5 U.S.C. § 705. Pls.' Mem. at 4 n.2. Plaintiffs make no argument in support of relief under § 705. For ease of reading, this brief adopts the same convention as Plaintiffs' supporting brief: this brief refers to both of Plaintiffs' requests collectively as a preliminary injunction. *See* Pls.' Mem. at 4 n.2.

**SA544**

## ARGUMENT

**I.   This Case Should Not Proceed Because It Constitutes Impermissible Claim Splitting.**

The doctrine of claim splitting safeguards judicial economy and protects litigants from "the vexation of concurrent litigation over the same subject matter." *Laccinole v. MRS BPO, LLC*, No. CV 22-233, 2023 WL 22136, at *2 (D.R.I. Jan. 3, 2023). The doctrine applies when a plaintiff files a second suit concerning the same subject matter before the first suit has reached final judgment. *Id.* A litigant with multiple related claims must not separate, or split, the claims into multiple successive cases, but must include in the first action all claims that fall within the court's jurisdiction. *Kale v. Combined Ins. Co. of Am.*, 924 F.2d 1161, 1165 (1st Cir. 1991). That "single suit" requirement applies even if the subsequent suit is based on events that occurred after the filing of the initial suit when those subsequent events are part of a "connected, related transaction." *Laccinole*, 2023 WL 22136, at *2 (explaining that a creditor's multiple actions to collect a debt were connected, related transactions).

To determine whether a later-filed suit constitutes impermissible claim-splitting, district courts in the First Circuit consider how the potential outcome of the first suit would impact the second suit and the factual overlap between the suits:

> [C]ourts ask "whether the first suit, assuming it were final, would preclude the second suit." Under the First Circuit's "transactional approach," the essential inquiry is whether "the causes of action arise out of a common nucleus of operative facts," in particular, "whether the facts are related in time, space, origin, or motivation, whether they

15

> form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations."

*Id.* (internal citations omitted).

Here, Plaintiffs filed the instant suit before the outcome of an earlier-filed suit arising out of the same transaction or occurrence. Specifically, on April 3, 2025, six major unions sued in the Northern District of California to enjoin the Executive Order. *AFGE II*, No. 4:25-cv-3070, Dkt. No. 1 (N.D. Cal. June 24, 2025). The AFGE is the lead plaintiff in that case. *Id.* ¶ 17. The AFGE is a party to the CBA at issue in this case, whereas the nominal plaintiffs here—the AFGE affiliates NVAC and AFGE Local 2305—are not. Am. Compl., Ex. A at 2 § 1, ECF No. 13-1 (Master Agreement between the VA and AFGE (Aug. 8, 2023)). Indeed, the AFGE has held recognition to act as "the sole and exclusive representative" of the VA's bargaining unit employees. *Id.* Plaintiffs have not. *Id.* Plaintiffs are affiliated sub-divisions of the AFGE. *See* Pls.' Mem. at 19 n.14; *see also id.* at 5. Any legal claims they have regarding the VA's termination of its CBA with the AFGE are at minimum either shared by or derivative of the AFGE's interests as a party to that CBA.[6] Both Defendants here are also defendants in *AFGE II*. Any decision in *AFGE II* will have a direct impact on Plaintiffs' rights and the VA's obligations to Plaintiffs.

---

[6] Although the AFGE appears to be the "real party in interest" here, *see* Fed. R. Civ. P. 17(a); 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure Civ.* § 1543 (3d ed. 1998), the Court need not make that determination to find that Plaintiffs are engaging in improper claim splitting. *See, e.g., Laccinole*, 2023 WL 22136, at *2 (setting forth the standard for the claim-splitting doctrine).

16

Both *AFGE II* and the instant case arise from a common nucleus of operative fact: the VA's implementation of the Executive Order. *Compare AFGE II*, 148 F.4th at 653 (describing the case as seeking a preliminary injunction "to enjoin the government from implementing EO 14,251") *with* Am. Compl. ¶ 3 (describing the instant case as one challenging Secretary Collins' decision to terminate the CBA "based on President Donald J. Trump's March 27, 2025 Executive Order 14251"). Specifically, the VA's cancellation of the CBA is one of a series of connected, related transactions implementing Executive Order 14,251. As noted above, the doctrine of claim splitting prohibits a plaintiff from splitting claims where, as here, the defendant's actions are part of a "connected, related transaction." *Laccinole*, 2023 WL 22136 at *2. That prohibition against claim splitting applies even when, as here, the subsequent connected, related event occurs after the plaintiff files the first lawsuit. *Id.*

The outcome of *AFGE II* has the potential to be either outcome dispositive for the instant case or, at the very least, to significantly narrow the issues to be decided. It would be outcome dispositive if the *AFGE II* plaintiffs prevail because the VA would be enjoined from implementing the Executive Order. At the very least, *AFGE II* has the potential to narrow the issues in dispute, given the common legal issues in both suits. *Compare* Am. Compl. ¶¶ 100-111, 116 *with Am. Fed. of Gov't Emps. v. Trump*, No. 4:25-cv-3070, Dkt. No. 1 (N.D. Cal. June 24, 2025) (both asserting First Amendment retaliation claims to challenge the VA's implementation of the Executive Order).

17

**SA547**

Where, as here, a plaintiff engages in claim splitting, the district court has at least four options: it "may exercise its discretion to dismiss a duplicative later-filed action, to stay that action pending resolution of the previously filed action, to enjoin the parties from proceeding with it, or to consolidate both actions." *Laccinole,* 2023 WL 22136 at *2. Any of the first three options would be appropriate here.

Plaintiffs cannot credibly argue otherwise. The AFGE proposed the same approach in a related case concerning the Executive Order filed in the Western District of Texas. *Department of Defense v. AFGE*, No. 6:25-cv-00119 (W.D. Tex. filed Mar. 27, 2025). In that case, the AFGE asked the district court not to proceed with the case given the ongoing proceedings in *AFGE II*:

> There is another lawsuit pending in the Northern District of California, filed by AFGE and several other national unions affected by the Executive Order. The plaintiffs in that case have already moved for a preliminary injunction and submitted evidence in support. That case will provide for full adjudication of the validity and effect of the Executive Order—including constitutional claims under the First and Fifth Amendments that are not before this Court, and the claims of the vast majority of AFGE affiliates, as well as other unions, who are not party to this suit.

*U.S. Dep't of Defense v. AFGE*, No. 6:25-cv-00119, Dkt. No. 41 at 16 (W.D. Tex. Apr. 21, 2025). The AFGE elaborated that allowing the case to proceed would waste judicial resources, contribute to "duplicative or piecemeal litigation," and pose an "obvious" risk of "confusing and/or conflicting judgements." *Id.* at 18. The same rationale applies here with greater force given that, in the eight months since the AFGE first made that argument, *AFGE II* has progressed even further. Most recently, the Ninth Circuit stayed a preliminary injunction seeking, as Plaintiffs do

18

**SA548**

here, to prevent the VA from implementing the Executive Order. *AFGE II*, 148 F.4th at 648.

In sum, after failing to obtain the relief sought in their original chosen forum, Plaintiffs now attempt with the action in this Court to get a second bite. For that reason and reasons the AFGE articulated in the Western District of Texas case, this case should not proceed.

## II.   Alternatively, Plaintiffs' Request for a Preliminary Injunction Should be Denied.

### A.   Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). Under the test in *Winter*, the moving party must "make a clear showing" on *each* of four factors: that the party is "likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [the party's] favor, and that an injunction is in the public interest." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting *Winter*, 555 U.S. at 20, 22); *see New Jersey v. Trump,* 131 F.4th 27, 33 (1st Cir. 2025) (citing *Winter*, 555 U.S. at 20). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### B.   Plaintiffs do not satisfy any of the preliminary injunction factors.

Plaintiffs are unable to "make a clear showing" on *any* of the four preliminary injunction factors, let alone "each" of them. *See Starbucks Corp.*, 602 U.S. at 345. Particularly given the "substantial overlap between" the factors courts use to assess

19

a stay "and the factors governing preliminary injunctions," *Nken*, 556 U.S. at 434, it is instructive that both the D.C. Circuit and the Ninth Circuit assessed each prong of the stay factors in the Government's favor in three cases challenging the implementation of the Executive Order: *AFGE II*, *NTEU II*, and *AFSA II*. *See AFGE II*, 148 F.4th at 654-56; *NTEU II*, 2025 WL 1441563, at *1–3; *AFSA II*, 2025 WL 1742853, at *1.[7] The reasoning of the appellate courts in those related cases should inform this Court's disposition of the pending motion. *See Trump v. Boyle*, 606 U.S. ---, 145 S. Ct. 2653, 2654 (2025) (although "interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases").

### 1. Plaintiffs Cannot Show Likelihood of Success on the Merits of their Claims

"The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor[,]" using "any relevant evidence" to support its conclusions. *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18, 19 (1st Cir. 2006). In evaluating whether Plaintiffs have demonstrated a likelihood of success on the merits, the merits need not be "conclusively determine[d];" instead, at this stage, decisions "'are to be understood as statements of probable outcomes' only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st

---

[7] Although the court of appeals did not stay the preliminary injunction in *Federal Education Association v. Trump*, No. 25-5303, 2025 WL 2738626, at *1 (D.C. Cir. Sept. 25, 2025), the only portion of that decision that commanded a majority concerned the Government's failure to demonstrate irreparable harm absent a stay, a burden the Government does not bear when opposing a preliminary injunction motion, *id.*

**SA550**

Cir. 2020) (quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *SEIU Local 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

Plaintiffs cannot establish a likelihood of success on the merits of their claims for at least two reasons. As an initial matter, this Court lacks jurisdiction to hear Plaintiffs' claims because their claims are statutorily channeled away from district court review and must be brought to the FLRA in the first instance followed by review in a court of appeals. Even if this Court could reach the merits of Plaintiffs' claims, those claims fail.

### a. The FSLMRS precludes district court jurisdiction over Plaintiffs' claims.

The Court lacks subject-matter jurisdiction over this lawsuit because Congress has implicitly precluded district courts from reviewing the agency action at issue—i.e., the cancellation of a CBA negotiated under the FSLMRS—"by specifying a different method to resolve" a dispute concerning that type of action. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). As explained below, Congress has channeled the dispute Plaintiffs raise in this case to the Federal Labor Relations Authority ("FLRA").

The FSLMRS, Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (1978), codified at 5 U.S.C. §§ 7101-7135, "establishes a scheme of administrative and

21

**SA551**

judicial review" for labor relations disputes between the Executive Branch and unions representing federal employees. *AFGE v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE I*"). That scheme is the exclusive avenue for raising and adjudicating legal challenges within its scope. *Id.* at 755. Thus, if a dispute is of the type Congress intended to fall within the ambit of the FSLMRS's special scheme, an aggrieved union is confined to that scheme and cannot proceed instead, or in parallel, with an action in district court. *AFGE I*, 929 F.3d at 754; *see generally Axon*, 598 U.S. at 185. A district court presented with such a dispute lacks subject-matter jurisdiction and must dismiss the case. *AFGE I*, 929 F.3d at 754; *Axon*, 598 U.S. at 185.

Under the FSLMRS, the FLRA is the exclusive entity charged with reviewing covered disputes in the first instance. *See, e.g.*, *AFGE I*, 929 F.3d at 752; *NTEU v. Trump*, No. 74-2181, 2025 WL 561080, at *4 (D.D.C. Feb. 20, 2025). Judicial review of the FLRA's decisions is thereafter available in the courts of appeals. *Id.*; 5 U.S.C. § 7123(a). When hearing a petition for review of an FLRA decision, the courts of appeals may review broad statutory and constitutional claims even if the FLRA lacked the authority to consider such claims in its proceedings. *AFGE I*, 929 F.3d at 759.

Here, Plaintiffs challenge Secretary Collins' decision to cancel the CBA for most VA employees. Am. Compl. ¶ 11. That challenge is plainly the type of dispute Congress channeled to the FLRA. Indeed, Plaintiff NVAC has already filed eight national grievances that challenge the VA's implementation of the Executive Order

22

and the termination of union agreements. *See* Therit Decl. ¶ 17. The following three examples illustrate that the issues before this Court overlap with the pending, national grievances filed by NVAC:

1. The AFGE has filed a national grievance over the termination of the CBA provision that allowed the union to use Government property, facilities, and equipment. *Id.* ¶ 17(a).

2. The AFGE has filed a national grievance over the termination of the CBA provision permitting taxpayer-funded union time. *Id.* ¶ 17(c).

3. The AFGE has filed a national grievance over the VA's purported unilateral changes to the CBA's grievance and arbitration procedures. *Id.* ¶ 17(f).

In each of those proceedings, NVAC has the benefit of FLRA review, followed by the opportunity for subsequent judicial review in the court of appeals.

Even beyond those grievances, Plaintiffs could file a case with the FLRA seeking clarification of a matter related to representation. *See* 5 U.S.C. § 7111(b)(2). Indeed, Plaintiffs could obtain FLRA review of its challenge to the termination of the bargaining contracts simply by filing such a petition with the FLRA and seeking to clarify their right to represent employees at the VA. If the FLRA dismissed the petition by, for example, citing its lack of jurisdiction given the EO, that would result in a "final order" of the FLRA appealable to a court of appeals. 5 U.S.C. § 7123(a); *see Eisinger v. FLRA*. 218 F.3d 1097, 1102 (9th Cir. 2000).

In sum, the FLRA's review scheme "provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims" and unions "cannot circumvent this regime by instead bringing a suit in district court." *AFGE v. Sec'y of Air Force*, 716 F.3d 633,

23

**SA553**

637–38 (D.C. Cir. 2013). Accordingly, this Court lacks jurisdiction to review Plaintiffs' claims alleging that the VA has acted contrary to the provisions of the FSLMRS by terminating the CBA for most VA employees.

### i. The *Thunder Basin* exception to the channeling requirement does not apply here.

There is an exception to the channeling requirement, but it does not apply here. Under that exception, channeling is not required when the claim is not "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994); *see AFGE I*, 929 F.3d at 755 ("Congress intended the [FSLMRS] scheme to be exclusive with respect to claims within its scope."). The *Thunder Basin* factors, which determine whether district-court review nevertheless is available despite a statutory review scheme, compel that conclusion. *See Axon Enter. v. FTC*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin*, 510 U.S. at 212–13). Those factors are: (1) the existence of meaningful relief without district court review, (2) whether a claim is "wholly collateral" to the statute's review scheme, and (3) the relevance of agency expertise. *Id.*

First, a finding of preclusion of district court jurisdiction here would not foreclose meaningful judicial review of Plaintiffs' claims. Plaintiffs can bring their claims before the FLRA, and any arguments that the FLRA cannot resolve (even on jurisdictional grounds) will be addressed by a circuit court on appeal through the FSLMRS's exclusive statutory review process. *See* 5 U.S.C. § 7123(a); *AFGE I*, 929 F.3d at 759; *Sec'y of Air Force*, 716 F.3d at 637–40 (describing "multiple paths" within the FSLMRS's "exclusive remedial regime" through which a union can obtain

24

FLRA and then federal circuit court review). As noted above, the AFGE has already started the administrative review process by filing eight purported grievances challenging the VA's cancellation of the CBA and implementation of the Executive Order. Therit Decl. ¶ 17. There is no reason for Plaintiffs to be able to proceed in multiple fora and potentially receive preclusive judgments about the lawfulness of the VA's cancellation of the CBA and its other steps to implement the EO from different adjudicating bodies (from the FLRA, a court of appeals on review of an FLRA order, and a district court) when Congress has created an exclusive statutory review process in the FSLMRS. *See, e.g.*, 5 U.S.C. § 7116(d) (barring a party from filing both a ULP and a grievance or statutory appeal over the same issue). And regardless, Plaintiffs could seek clarification of their right to represent VA employees from the FLRA. *See* 5 U.S.C. § 7111(b)(2); *supra* p. 23.

Second, Plaintiffs' claims are within the statutory scheme and not collateral to it. This Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *Fed. L. Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). As the Supreme Court explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Supreme Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices" and "business merger" that constituted the subject matter of the agency actions. *See id.* at 193–94. Nor were

25

they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* No such separation exists here. Plaintiffs challenge the termination of the CBA that they negotiated under the FSLMRS. *See, e.g.*, Am. Compl. ¶¶ 11, 92-116. The loss of these collectively bargained rights and privileges fall well within the Statute's broad definition of "grievance," which the CBA and FSLMRS provide the exclusive procedures for resolving.[8] 5 U.S.C. §§ 7103(a)(9), 7121(a)(1). Indeed, as contemplated by the FSLMRS, Plaintiffs have already filed eight different grievances arising from the termination of the CBA and implementation of the Executive Order. *See* Therit Decl. ¶ 17. Plaintiffs also broadly complain here that by following the Executive Order and terminating the CBA, the VA has violated FSLMRS requirements. Am. Compl. ¶¶ 28-33, 39. That is a quintessential ULP charge, which the FLRA General Counsel prosecutes, 5 U.S.C. §§ 7116(a)(8), 7118, and is central to the FLRA's work. Plaintiffs' claim is not collateral by any stretch. *See AFGE I*, 929 F.3d at 760 ("The unions' challenge in this case is of the type that is regularly adjudicated through the FSLMRS's scheme: disputes over whether the Statute has been violated."); *Loy*, 367 F.3d at 935

---

[8] The FSLMRS defines a "grievance" as including, inter alia, "any complaint[] . . . by any labor organization concerning any matter relating to the employment of any employee; or . . . by any labor organization . . . concerning . . . the effect or interpretation, or a claim of breach, of a collective bargaining agreement." 5 U.S.C. § 7103(a)(9). Also included within the definition is "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." *Id.* Pursuant to 5 U.S.C. § 7121(a)(1), "any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability[,]" and except for narrow circumstances provided for in the Statute, "[these] procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage."

26

(holding that federal district courts lack "concurrent jurisdiction over matters within the [FLRA's] exclusive purview"). In any event, Congress has also entrusted to the FLRA the ability to clarify Plaintiffs' right to represent employees at the VA—an avenue Plaintiffs have not pursued. *See* 5 U.S.C. § 7111(b)(2).

Plaintiffs may not evade the exclusive administrative scheme by raising a constitutional claim. *See, e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012) (holding that whether a claim is precluded under the Civil Service Reform Act does not "turn on the constitutional nature . . . but rather on the type of the employee and the challenged employment action"). In *AFGE I*, for example, numerous federal unions asserted broad constitutional and statutory challenges to Executive Orders issued by President Trump during his First Term. The orders would have enacted substantial changes to the way federal unions operated. The D.C. Circuit reversed the district court's decision on jurisdictional grounds, holding that the comprehensive administrative-judicial review scheme set forth by the FSLMRS channeled jurisdiction away from federal district courts. *AFGE I*, 929 F.3d 748, 761 (D.C. Cir. 2019). The D.C. Circuit emphasized that most federal labor disputes must be heard through the FLRA review scheme, with any judicial review occurring in the relevant federal court of appeals.[9] *Id.* at 754–61; *see also, e.g.*, *NTEU v. Vought*,

---

[9] The FLRA has "consistently" resolved constitutional claims, including First-Amendment-retaliation claims. *See U.S. Dep't of Health & Hum. Servs. & Laborers Int'l Union Loc. 1376*, 60 F.L.R.A. 202, 207 & n.7 (2004) (citing cases). For example, in *United States Department of Defense Ohio National Guard & AFGE Local 3970*, 71 F.L.R.A. 829 (2020), the FLRA addressed several constitutional provisions including the Militia Clause to resolve a jurisdictional dispute, *id.* at 853 n.13, 855–62 (citing and analyzing arguments regarding U.S. Const. art. I, § 8, cls. 15 & 16,

**SA557**

149 F.4th 762, 774 (D.C. Cir. 2025) (concluding that the district court lacked jurisdiction over the unions' claims because "a specialized-review scheme governs such claims").

Plaintiffs' claim is clearly within the expertise of the FLRA—the third *Thunder Basin* factor. The FLRA is the federal authority on matters of federal labor relations. *E.g.*, *ATF*, 464 U.S. at 97 ("[T]he FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act." (citation omitted)). And Plaintiffs' claim of improper denial of collectively bargaining rights is exactly the type of claim the FLRA regularly hears. *See* 5 U.S.C. §§ 7116(a), 7118, 7121. The same is true of any claim filed seeking to clarify Plaintiffs' ability to represent VA employees. *Id.* § 7111(b)(2). For example, in concluding that the unions had to first bring their constitutional claims before the FLRA in *AFGE I*, the D.C. Circuit noted that those agencies, despite having less expertise on constitutional issues, may be able to "offer an interpretation of the [statutes] in the course of the proceeding that might alleviate or shed light on the constitutional concerns." *AFGE I*, 929 F.3d at 761 (citation omitted). As discussed above, *supra* at 27 n.9, the FLRA regularly hears constitutional claims. And in any event, the FLRA "can apply its expertise" to Plaintiffs' statutory claims and may well offer an interpretation of the statute or Executive Order 14343 that "obviate[s] the need to address" some of Plaintiffs'

---

art. II § 2, cl. 1, and Amend. X), and this case was eventually appealed to the Supreme Court in *Ohio Adjutant General's Department v. FLRA,* 598 U.S. 449 (2023).

**SA558**

broader "constitutional challenge[s]." *See Elgin*, 567 U.S. at 22–23. In sum, the *Thunder Basin* factors establish that the FSLMRS precludes district court jurisdiction over Plaintiffs' claim.

Plaintiffs neither invoke *Thunder Basin* nor distinguish *AFGE I* or other decisions where courts have found that they lack jurisdiction over federal labor disputes. Pls.' Mem. at 14. Instead, Plaintiffs make three arguments—none of which is compelling.

First, Plaintiffs contend that the FLRA's authority does not extend to disputes about whether an agency is covered by Chapter 71. Pls.' Mem. at 14. But the D.C. Circuit has held that the FSLMRS precludes district court review *even where federal employees were excluded from FSLMRS bargaining rights*. In *AFGE v. Loy*, the D.C. Circuit held that despite (a) the Transportation Security Administration's determination that airport screeners could not collectively bargain, and (b) the FLRA's agreement that the employees could not engage in collective bargaining, the union-plaintiffs' only pathway to assert their bargaining rights in federal court was in an appeal to a circuit court after FLRA proceedings. *AFGE v. Loy*, 367 F.3d 932, 935 (D.C. Cir. 2004). The FLRA has "exclusive authority to render judgment on the question" whether the exclusion of employees from collective bargaining rights is valid. *Id.* at 936; *see also id.* at 935 ("[D]istrict courts do not have concurrent jurisdiction over matters within the exclusive purview of the FLRA."). Plaintiffs' first attempt to evade the FRLRA's jurisdiction therefore should be unavailing.

29

Second, Plaintiffs argue that because certain federal agencies brought a separate, affirmative lawsuit regarding the Executive Order, Defendants' channeling argument constitutes an "inconsistent position." Pls.' Mem. at 14. However, this Court has an independent duty to determine whether it has subject-matter jurisdiction notwithstanding lawsuits brought in other courts, and the claims brought in that affirmative lawsuit, *Department of Defense v. AFGE*, No. 6:25-cv-00119 (W.D. Tex. filed Mar. 27, 2025), were different. Here, the Plaintiffs' theory is based on the alleged unlawfulness of Secretary Collins' decision to terminate the CBA for most VA employees. Am. Compl. ¶ 11. The FLRA administrative review scheme provides the exclusive channel for that claim. 5 U.S.C. §§ 7118, 7123. By contrast, in the affirmative suits, the federal agencies contended that the FSLMRS was inapplicable and so recourse to its process would not make sense. Accordingly, and consistent with that position, the Government's claims do not have to be channeled through the FLRA's administrative scheme.

Third, Plaintiffs point out, in a footnote, that this Court rejected a channeling argument in *New York v. Kennedy*, 789 F. Supp. 3d 174, 199 (D.R.I. 2025). Pls.' Mem. at 14 n.11. But the reason the Court rejected the channeling argument in *New York* was because channeling the claims there would have foreclosed all meaningful judicial review. *New York*, 789 at 199. That is not the case here because Plaintiffs' do have meaningful judicial review—i.e., the FLRA's final orders, with few exceptions not relevant here, are subject to judicial review "in the United States court of appeals in the circuit in which the [aggrieved] person resides or transacts

30

business or in the United States Court of Appeals for the District of Columbia."

5 U.S.C. § 7123(a). The Court's decision in *New York* is therefore no basis for

allowing Plaintiffs to evade the FLRA's jurisdiction.

In sum, none of Plaintiffs' anti-channeling arguments is compelling.

Plaintiffs' claims must be channeled to the FLRA because the Court lacks

jurisdiction over those claims.

Even if the Court were to entertain Plaintiffs' claims, however, Plaintiffs

cannot show that they are likely to succeed on either their First Amendment or APA

claim, for the reasons explained in the next two sections.

> **b.**     **Plaintiffs are unlikely to succeed on the merits of their First Amendment claims.**

> > **i.**     **Plaintiffs' First Amendment retaliation claim fails.**

To prevail on a claim of First Amendment retaliation, Plaintiffs must prove

three elements: that "(1) [they] engaged in constitutionally protected conduct,

(2) [they] w[ere] subjected to an adverse action by the defendant, and (3) the

protected conduct was a substantial or motivating factor in the adverse action." *D.B.*

*ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). "The defendant may

then avoid a finding of liability by showing that it would have reached the same

decision . . . even in the absence of the protected conduct." *Id.* (cleaned up); *accord*

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)

(establishing a two-part burden-shifting analysis for evaluating free speech claims);

*Padilla-Garcia v. Rodriguez*, 212 F.3d 69, 74 (1st Cir. 2000) (applying the *Mt.*

*Healthy* analysis). To establish a causation link, a plaintiff must show that his or

31

her constitutional speech was the "'but-for' cause" of the defendants' retaliatory action. *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 515 (1st Cir. 2023); *see also Nieves v. Bartlett*, 587 U.S. 391, 398 (2019).

**First element: Protected conduct.** As for the first element, Plaintiffs allege that the AFGE and NVAC engaged in conduct protected by the First Amendment by advocating against the President's agenda. Pls.' Mem. at 15-16. Specifically, they lobbied against legislation that the Administration supported (such as the VA Accountability Act), testified before Congress in opposition to such legislation, filed grievances, endorsed the President's political opponent during the most recent Presidential campaign, and filed lawsuits challenging the Administration's actions. *Id.* at 15-16.

**Second Element: Adverse action.** Plaintiffs allege that the VA's decision to cancel the CBA pursuant to Executive Order 14,251 is retaliation for their First Amendment speech. Am. Compl. ¶ 3, 102-103, 116.

**Third Element: Substantial or Motivating factor.** At its heart, Plaintiffs' suit is a challenge to the VA's implementation of Executive Order 14,251. Courts have repeatedly rejected First Amendment challenges to Presidents' executive orders issued under 5 U.S.C. § 7103(b)(1). *See, e.g.*, *NTEU v. Reagan*, No. 80-606, 1981 WL 150530, at *3 (D.D.C. Sept. 3, 1981) (rejecting such a challenge and noting an identical holding in *Police Ass'n of the District of Columbia v. Dep't of Treasury*, No. 78-0236 (D.D.C. May 19, 1980)). Most recently, in *AFGE II*, the Ninth Circuit concluded that "the government has shown that it is likely to succeed on the merits

32

**SA562**

of the [First Amendment] retaliation claim" challenging the Executive Order. *AFGE II*, 148 F.4th at 654.

Plaintiffs fail to establish that Secretary Collins' motivation for terminating the CBA was animus based on Plaintiffs' First Amendment conduct. The Secretary terminated the CBA in response to the President's Executive Order, as reflected in the VA's press release announcing the termination and termination letters to Plaintiffs and other labor organizations—both expressly advising that the termination was "pursuant to EO 14251." VA Press Release (Silva Decl., Ex. I); *also* Am. Compl., Ex. C (Letters from Douglas A. Collins, Sec'y of Veterans Affairs, to Everett B. Kelley, President of AFGE, and Alma L. Lee, President of NVAC (Aug. 6, 2025)).

Rather than demonstrating that Secretary Collins acted in response to Plaintiffs' protected conduct, Plaintiffs ask the Court to infer animus on Secretary Collins' part by second-guessing the *President's* motives in issuing the Executive Order. Pls' Mem. at 17. Setting aside that the President is not a party to this action, and Plaintiffs must overcome the VA's argument that Secretary Collins would have terminated the CBA regardless of Plaintiffs' protected conduct, the Court's review of a presidential decision is limited to "whether the Executive gave a 'facially legitimate and bona fide' reason for its action." *Hawaii*, 585 U.S. at 703 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972)). The President wields significant constitutional and statutory authority over both matters of national security and federal labor-management relations. *See, e.g.,* 5 U.S.C. § 7103. Thus, "when the

33

**SA563**

Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against a plaintiff's asserted constitutional interests. *Mandel*, 408 U.S. at 770. The President has acted within the bounds of his clear authority over VA employees. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 496–97 ("Article II makes a single President responsible for the actions of the Executive Branch." (internal quotation marks and citation omitted)).

To the extent Plaintiffs address Secretary Collins' motives, Plaintiffs are similarly unable to show that their protected First Amendment speech was a "substantial or motivating factor" in the Secretary's decision to terminate the CBA. As noted above, Secretary Collins' decision to cancel the Agency's union agreements was in response to and directly flowed from the Executive Order. *See supra* p. 33. He did not single out Plaintiffs' union contract for termination; rather, he terminated all national union contracts, including contracts with four other national unions. Silva Decl., Ex. I (VA press release). Secretary Collins explained, in the press release announcing the terminations, how they would further the VA's mission—i.e., by "making sure VA resources and employees are singularly focused on the job we were sent here to do: providing top-notch care and service to those who wore the uniform" as opposed to resisting union efforts to "fight against the best interests of Veterans while protecting and rewarding bad workers." *Id.* In sum, the facts show that Secretary Collins cancelled the CBA based on the Executive Order—not based on any animus directed at Plaintiffs for First Amendment speech.

34

**SA564**

Attempting to show otherwise, Plaintiffs rely on three statements—one made by a VA spokesperson and two made by Secretary Collins. Pls.' Mem. at 18. None evidences that Secretary Collins retaliated against Plaintiffs for their protected conduct. In those statements, the VA spokesperson and Secretary Collins explain how the unions were frustrating the Administration's ability to manage the Agency—such as by diverting nearly $134 million to settle collective-bargaining grievances brought by employees who were fired for misconduct. *Id.*; Silva Decl., Ex. I (VA press release). Plaintiffs characterize these explanations as "political" and not "narrowly tailored to national security concerns." Pls.' Mem. at 18. (emphasis omitted). But Plaintiffs' characterizations are not sufficient to show animus. Rather, their burden, as the party seeking a preliminary injunction, is show that their constitutional speech was the "'but-for' cause" of the VA terminating their particular union agreement. *Gattineri*, 58 F.4th at 514. Moreover, Plaintiffs' characterization is wrong. Secretary Collins' statements are, in fact, directly tied to national security concerns. For example, spending 750,000 hours of VA staff on union activities and $134 million on union payments necessarily means that those resources are not available to put toward the VA's critical emergency preparedness work.

Plaintiffs also attempt to show that Secretary Collins harbored animus toward them based on his since-rescinded order pursuant to his delegated authority under the Executive Order. Pls.' Mem. at 20. *See* Rescission of Order (Silva Decl., Ex. N). The Secretary has stated his legitimate, non-retaliatory motive for the

35

rescission; namely, the Secretary decided to rescind the exemption based on further consideration of "the delegation of authority provision under Section 4 of E.O. 14521 and the statutory authority under 5 U.S.C. 7103(b)(1)." 90 Fed. Reg. at 50950. Plaintiffs speculate that the real reason Secretary Collins made the change was because they filed the present suit. Pls.' Mem. at 13, 20. They base that speculation on nothing more than the timing of events—i.e., that they filed the present suit on November 4 and, three days later, the Secretary approved the Notice for publication in the *Federal Register*. *Id.* at 13. But officials within the VA had been contemplating the rescission for several weeks before the rescission was published in the *Federal Register* and made the final decision to rescind the Notice before November 4, 2025 (the day Plaintiffs filed suit). Therit Decl. at 3 n.1. Clearly then, Secretary Collins' decision to issue the Notice is not evidence of the Secretary's improper motivation.

In the end, Plaintiffs are simply unable to show that Secretary Collins' stated reason for cancelling the CBA is a pretext for retaliation based on Plaintiffs' First Amendment activities.

**Final step: Defendants would have reached the same decision regardless.** In any event, even if the Plaintiffs could demonstrate that their First Amendment speech were a substantial or motivating factor in Secretary Collins' decision to terminate the CBA, Plaintiffs' claim still fails on the merits. That is because Defendants can show that they would have taken the same action even in the absence of the protected conduct. *See Mt. Healthy*, 429 U.S. at 287 (explaining

**SA566**

the "same decision" analysis). Again, Secretary Collins cancelled the CBA based on the Executive Order, and plainly the Secretary would have complied with the Executive Order regardless of any animus he allegedly harbored against Plaintiffs.

And to the extent Plaintiffs question whether *the President* would have issued the Executive Order anyway, he would have. The Ninth Circuit concluded as much when considering a similar First Amendment claim brought by the AFGE. *AFGE II*, 148 F.4th at 654–55. The Executive Order states on its face that the President took the challenged action for national security reasons. To find otherwise would require this Court to draw every inference against the President and ignore record evidence of the President's national security concerns. *See AFGE II*, 148 F.4th at 655 ("On its face, the [Executive] Order does not express any retaliatory animus," but rather "conveys the President's determination that the excluded agencies have primary functions implicating national security and cannot be subjected to the FSLMRS consistent with national security"). To find otherwise would also fly in the face of First Amendment caselaw requiring that this Court defer to the Government's interest in national security and employment matters when balancing First Amendment freedoms. *See Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 685 (1996) (recognizing the Government's "legitimate interests as contractor [or employer], deferentially viewed," can sometimes "outweigh [any] free speech interests at stake"); *see also TikTok Inc. v. Garland*, 122 F.4th 930, 953 (D.C. Cir. 2024) (affording great weight to the Government's "evaluation of the facts" because the Act "implicates sensitive and weighty interests of national security and

37

foreign affairs" (citing *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010)).

The White House Fact Sheets, which are not attributable to the President let alone the Secretary of Veterans Affairs, but which Plaintiffs rely on nonetheless (Pls.' Mem. at 17), reiterate the national security concerns that motivated the Executive Order and in turn the VA's implementation of it.

### ii. Plaintiffs' First Amendment viewpoint discrimination claim also fails.

To the extent that Plaintiffs raise a First Amendment viewpoint discrimination claim, *see* Am. Compl. ¶¶ 16, 103, 104, 114-15,[10] that claim is merely a repackaged version of their retaliation claim and should be dismissed as duplicative. "[D]etermining whether government action violates the First Amendment requires [the] application of different doctrines that vary depending on the circumstances." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 201 (2024) (Jackson, J. concurring). The allegations in Plaintiffs' Complaint are best addressed within the retaliation framework discussed above, and this Court should refuse to entertain a separate, duplicative viewpoint discrimination claim.

Plaintiffs' viewpoint discrimination claim would nonetheless fail on the merits. Plaintiffs argue that the VA terminated the CBA based on the unions' viewpoints. Pls.' Mem. at 20. But Plaintiffs lack a First Amendment right to collective bargaining. "[T]he First Amendment does not impose any affirmative

---

[10] The Amended Complaint contains one count (Count 4) asserting a "Violation of the First Amendment," which appears to encompass both their retaliation claim and their viewpoint discrimination claim. *See* Am. Compl. ¶¶ 114-15.

38

**SA568**

obligation on the government . . . to recognize [a public employee union] and bargain with it." *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465 (1979); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 313 (1979) (Arizona's recalcitrance to negotiate with union posed "no First Amendment problems"). Likewise, courts recognize that "[t]here is . . . no constitutionally protected right to bargain collectively." *Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.*, 391 F. Supp. 2d 1, 8–9 (D.D.C. 2005); *see also AFGE, AFL-CIO v. Loy*, 281 F. Supp. 2d 59, 65 (D.D.C. 2003). Courts have thus uniformly rejected First Amendment challenges to Presidents' executive orders issued under 5 U.S.C. § 7103(b)(1). *See, e.g., NTEU v. Reagan*, No. 80-606, 1981 WL 150530, at *3 (D.D.C. Sept. 3, 1981) (rejecting such a challenge and noting an identical holding in *Police Ass'n of the District of Columbia v. Dep't of Treasury*, No. 78-0236 (D.D.C. May 19, 1980)). Nor does the VA's termination of the CBA otherwise impinge on any protected activity: it does not bar Plaintiffs from recruiting employees to join their unions, petitioning the Government, or engaging in any other protected First Amendment activity.

The Executive Order and the VA's termination are facially neutral and silent as to any speech or viewpoint. Neither the VA's termination nor the Executive Order itself distinguish between unions, let alone draw lines based on unions' viewpoints. Instead, the Executive Order distinguishes *agencies or subdivisions*, and the VA implemented the viewpoint-neutral Executive Order by cancelling union contracts in alignment with how those distinctions apply to the VA's organizational

39

**SA569**

structure. Tellingly, Plaintiffs fail to identify any *viewpoint* that either the Executive Order or the VA's termination prohibits or targets. Pls.' Mem. at 20. Instead, they reiterate arguments that they are being "punished" for filing grievances. *Id.* But the effect of such grievances on the VA's national security functions is a valid consideration within the scope of § 7103(b)(1). Plaintiffs' viewpoint discrimination claim must therefore fail.

In sum, Plaintiffs are unlikely to succeed on the merits of their First Amendment claims because Plaintiffs fail to establish that the VA terminated the CBA with the AFGE in retaliation against Plaintiffs, that the termination targeted any particular viewpoints, or that the VA would not have independently taken such action to implement the Executive Order based on the President's independent national security considerations as encompassed in the Executive Order.

### c.      Plaintiffs are unlikely to succeed on the merits of their APA claim.

#### i.      APA review is unavailable because of potential alternative remedies.

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. That requirement reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). The alternative remedy need not provide relief identical to relief under the APA or the precise equitable relief the plaintiff seeks. *Vill. W. Assocs. v. Rhode Island Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 139 (D.R.I.), *judgment entered*, 641 F. Supp. 2d 135 (D.R.I. 2009). Accordingly, if there exists an alternative adequate remedy, a

40

**SA570**

plaintiff lacks a cause of action under the APA. *See id.* (dismissing putative APA claim because plaintiffs had an adequate remedy through the Claims Court).

As explained *supra* Part II(B)(1)(a), Plaintiffs have an alternative adequate remedy under the FSLMRS: initial review before the FLRA followed by an appeal to a circuit court. The existence of that alternative adequate remedy precludes them from filing suit under the APA.

> ii. **The APA bars judicial review in this case because the challenged action is committed to Agency discretion by law.**

Judicial review is unavailable here for a second reason. Namely, the APA bars judicial review when the challenged action "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agency action may be deemed committed to agency discretion "even where Congress has not affirmatively precluded review." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"—where, effectively, "there is no law to apply"—the APA does not permit judicial review. *Id.* When considering whether a matter is committed to agency discretion, courts review the statutory scheme to determine if it provides an adequate standard of review. *Id.* at 831. "Congress may limit an agency's exercise of enforcement power if it wishes," but only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, is there 'law to apply' under § 701(a)(2)." *Id.* at 833-34. Courts may also consider whether, as a matter of tradition, action is committed to agency discretion. *See id.* at 832 ("[S]uch a decision

41

**SA571**

has traditionally been 'committed to agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition.").

In this case, the action Plaintiffs seek to challenge under the APA the VA's termination of the CBA—an action committed to the VA's discretion by a lawful Executive Order issued by the President. Specifically, the Executive Order contained a delegation-of-authority provision giving the Secretary of the VA authority to make additional carve-outs if the Secretary determined that doing so would be "consistent with national security requirements and considerations." *Id.* § 4. In the Executive Order, the President committed to the Secretary's discretion the authority to issue orders suspending application of the Executive Order to any subdivisions of the departments the Secretary supervises if the Secretary certifies to the President that the provisions of the FSLMRS "can be applied to such subdivisions in a manner consistent with national security requirement and considerations." *Id.* § 4. Whether to issue such exemptions is thus lawfully committed to Secretary's discretion by law and, as such, exempt from APA review.

> ### iii. Alternatively, Plaintiffs are unlikely to prevail on the merits of their APA claim that the Secretary acted arbitrarily or capriciously.

Even if the APA permits review, Plaintiffs are unlikely to prevail on the merits of their claim that the VA's termination of the CBA was arbitrary and capricious. "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the

42

agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Magellan Tech., Inc. v. FDA*, 70 F.4th 622, 628 (2d Cir. 2023) (quoting *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43), *cert. denied*, 145 S. Ct. 1920 (2025). "Under the arbitrary-and-capricious standard, judicial review of agency action is necessarily narrow. A reviewing court may not itself weigh the evidence or substitute its judgment for that of the agency." *Magellan Tech, Inc.*, 70 F.4th at 628-29 (internal quotation marks omitted). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness." *Prometheus Radio*, 592 U.S. at 423.

Here, Secretary Collins clearly "acted within a zone of reasonableness" when terminating the CBA. None of Plaintiffs' five arguments to the contrary withstand scrutiny.

*First*, Plaintiffs assert that the Secretary "failed to offer a reasonable explanation for the Termination." Pls.' Mem. at 23. That is incorrect. The Secretary publicly stated, and the Plaintiffs acknowledge, that the Secretary's "basis for ordering the Termination was the Executive Order." *Id.* Plaintiffs criticize the Secretary's explanation by contending that the Secretary both acted too slowly and

43

too quickly when cancelling the CBA and by pointing out that other federal agencies have not yet terminated all their union contracts. Pls.' Mem. at 24. But Plaintiffs' dissatisfaction with the timing of the cancellation of the CBA does mean that the Secretary did not offer a reasonable explanation for terminating the CBA. Nor does the fact that other federal agencies have not yet terminated their union agreements demonstrate that the Secretary's explanation is unreasonable because Secretary Collins has no authority over those other agencies.

Given the President's statutorily authorized determination in the EO that most of the VA should not be subject to the requirements of the FSLMRS—which is not at issue here—the cancellation of the CBA because of the EO cannot be arbitrary and capricious or not reasonably explained. In fact, the terminations were *required* by law not contrary to it. And it is unclear what "judicially manageable standards" the Court could apply here to evaluate the propriety of the cancellation of the CBA here, where the Secretary relied on a statutorily authorized Presidential determination. *See Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 21-22 (1st Cir. 2020). There is simply no law to apply for a court to determine how long after the EO's publication would be too short or too long to cancel the CBA, as Plaintiffs ask this Court to do.

*Second,* contrary to Plaintiffs' argument, cancelling the CBA was not contrary to the Executive Order's provision that excluded "the immediate, local employing officers of any agency police officers, security guards, or firefighters." Executive Order § 2. Consistent with the plain intent of the Executive Order, the VA kept the

44

**SA574**

CBA in place for police officers, security guards, and firefighters. Am. Compl., Ex. C (Letters from Douglas A. Collins, Sec'y of Veterans Affairs, to Everett B. Kelley, President of AFGE, and Alma L. Lee, President of NVAC (Aug. 6, 2025)). Plaintiffs acknowledge that, given how the VA is organized, to do otherwise would have caused the exception to swallow the rule by exempting "hundreds of thousands of NVAC-represented employees, from doctors to registered nurses to housekeepers to social workers." Pls.' Mem. at 25.

Guidance from the U.S. Office of Personnel Management to the VA supports the reasonableness of the VA's application of the Executive Order to agency police officers, security guards, and firefighters. In an FAQ issued on September 10, 2025, OPM provided guidance about how to interpret that carve out:

> **Q8:** What is meant by Section 2 of Executive Order 14251 (Exclusions) where it states: "the immediate, local employing offices of any agency police officers, security guards, or firefighters…"
>
> **A8:** This means an agency or subdivision that directly supervises and employs such employees at the local level. Although this category will generally include purely the law enforcement officers in question, in some cases this may also include the administrative staff who support law enforcement operations.

U.S. Office of Personnel Management, Frequently Asked Questions: Executive Order 14251 "Exclusions from Federal Labor-Management Relations Programs" (Sept. 10, 2025).

*Third,* Plaintiffs raise a red herring by pointing to the Secretary's rescinded order that initially exempted VA employees covered by certain unions. Pls' Mem. at 25. The Secretary rescinded that order after further consideration of his Section 4

45

authority. *See* 90 Fed. Reg. 50950. If anything, the Secretary's rescission demonstrates the Secretary's commitment to compliance with the Executive Order's delegation-of-authority provision. Tellingly, Plaintiffs do not disagree with the Secretary's rescission or the Secretary's stated basis for it. Pls.' Mem. at 25.

*Fourth*, Plaintiffs repeat their opinion that the Secretary, when implementing the Executive Order failed to consider "national security requirements." Pls.' Mem. at 26. Their opinion is misguided, *see supra* p. 35, and in any event, their opinion does not prove that the Secretary's determination violated the APA. Plaintiffs' argument essentially asks the Court to substitute its judgment for the that of the Agency's, which a reviewing court may not do." *Magellan Tech, Inc.*, 70 F.4th at 628-29 (internal quotation marks omitted).

*Fifth*, Plaintiffs repeat their theory that the timing of Secretary's decision to rescind the initial exemptions shows retaliatory animus—i.e., that it was approved by the Secretary for publication in in the *Federal Register* three days after Plaintiffs filed their initial complaint. Pls.' Mem. at 27. But, as Defendants point out above, Plaintiffs' theory ignores the reality that the VA had already decided to issue the notice of rescission *before* Plaintiffs' filed suit. *See supra* at 36 (citing Therit Decl. at 3 n.1).

Accordingly, Secretary Collins' reasonable decision to implement the Executive Order by cancelling the CBA for most VA employees was not arbitrary and capricious, and Plaintiffs are unlikely to succeed on that claim, even if the APA permitted such review.

46

**SA576**

> #### iv. Alternatively, Plaintiffs are unlikely to prevail on the merits of their APA claim that the Secretary acted contrary to the First Amendment.

Plaintiffs' APA claim that the Secretary "acted contrary to the First Amendment" is merely a repackaged version of their First Amendment retaliation claim, as Plaintiffs' acknowledge in their brief. Pls.' Mem. at 27. This APA claim fails on the merits for the same reasons as their First Amendment retaliation claim, as explained *supra*, Part II(B)(1)(b).

> ### 2. Plaintiffs Cannot Show Irreparable Harm Absent a Preliminary Injunction

A motion for a preliminary injunction motion can, and should, be denied if the plaintiff has failed to demonstrate irreparable harm. "Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("In most cases—and the case at hand is no outlier—irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief."); *see also Narragansett Indian Tribe*, 934 F.2d at 6-7 ("[S]peculative injury does not constitute a showing of irreparable harm." (quoting *Pub. Serv. Co. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987)). Additionally, a plaintiff must demonstrate that the harm is both "immediate" and "irreparable." *Rubacky v. Morgan Stanley Dean Witter Credit Corp.*, 104 F. App'x 757, 759 (1st Cir. 2004).

First, the timing of Plaintiffs' own litigation conduct undercuts their purported need for a preliminary injunction. Plaintiffs waited nearly three months after the VA cancelled the CBA to file suit. Compl. 1 and ¶ 10. Then, Plaintiffs waited an additional three weeks to seek a preliminary injunction. Surely if they faced a harm that was truly "immediate" and "irreparable," Plaintiffs would have acted more quickly.

Second, the types of harms Plaintiffs allege are not "irreparable." Their alleged harm falls into two categories: (1) the loss of certain collective-bargaining benefits and privileges (such as allowing union officials to use the VA's facilities to conduct union business and providing union officials with paid time during the workday to perform union business); and (2) an alleged "chilling" of the Plaintiffs' and their members' pro-union speech. Pls.' Mem. at 27-33.

As for the first category, any loss of collective-bargaining benefits and privileges could be remedied upon a favorable ruling later in this case because the FLRA has broad authority to issue remedial relief. 5 U.S.C. §§ 7105(f)–(g), 7118. If Plaintiffs prevail, they can seek relief from Defendants for any violations of their rights conferred by the FSLMRS or the parties' CBA, including those pertaining to disciplinary proceedings. *See AFSA II*, 2025 WL 1742853 at *3 ("To the extent the [Union] or its members will suffer irreparable harm directly traceable to the Executive Order, as opposed to separate agency actions, the balance of [the] equities favors the Government. The competing interests—union representation versus national security—were already weighed by Congress when it passed the

48

[FSLMRS].") And "any terminated agreements can be reinstated if Plaintiffs ultimately prevail." *AFGE II*, 148 F.4th at 656.

An alleged loss of collective bargaining rights alone does not constitute irreparable harm. While Congress in the FSLMRS may have recognized that collective bargaining provides benefits in the federal workforce, "it does not follow that" absent a preliminary injunction the "public's interest in industrial peace is likely to be irreparably harmed during the time it takes to [adjudicate this case]." *Henderson for NLRB v. Bluefield Hosp. Co.,* 902 F.3d 432, 441 (4th Cir. 2018). And it is not enough that this alleged harm strikes at the union's primary mission. *See* Pls.' Mem. at 33 (citing *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)). The *League of Women Voters* court found such arguments persuasive because the plaintiff's primary mission—registering people to vote—would be pointless after the subject election occurred. *League of Women Voters*, 838 F.3d at 9. Plaintiffs have not identified any such deadline or constraint here and fail to show irreparable harm stemming from the alleged temporary loss of collective bargaining rights. To hold such a loss irreparable merely because Congress deemed such rights valuable or because those rights go to the primary mission of unions would negate the irreparable harm requirement in all cases involving unions and collapse the *Winter* test to a determination of whether Plaintiffs are likely to succeed on the merits. This is an insufficient basis to grant the extraordinary relief of a preliminary injunction.

49

The second type of harm that Plaintiffs allege is a chilling effect on Plaintiffs' and their members' enthusiasm for engaging in First Amendment speech. Pls.' Mem. at 31-32. But Plaintiffs fail to demonstrate that they are prevented from exercising their First Amendment rights. The termination of the CBA does not impinge on any activity protected by the First Amendment: it does not bar Plaintiffs or their members from recruiting employees to join their unions, lobbying the Government, or engaging in any other protected First Amendment activity. Rather, Plaintiffs and their members can express themselves and petition the Government, as they plainly continue to do.

Finally, any asserted irreparable loss of members, Pls.' Mem. at 32-33, is speculative. *See AFGE II*, 148 F.4th at 656 (finding it "speculative whether Plaintiffs will experience harm through 'weakened support for unions'" (citation omitted)). It is uncertain whether employees will choose to give up their union membership now and refuse to rejoin upon a favorable ruling in this case restoring the CBA.

In sum, Plaintiffs fail to establish irreparable harm absent preliminary injunctive relief.

### 3. The Balance of the Equities and the Public Interest Favor the Government

A preliminary injunction is not appropriate because the balance of the equities and the public interest weigh in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]here factors merge when the Government is the opposing party."). A preliminary injunction would inflict harm on the public and the

**SA580**

President by interfering with the national-security determinations regarding the VA entrusted to the President by Congress. *See* Therit Decl. ¶¶ 18-19; *AFSA II*, 2025 WL 1742853, at *3. As the D.C. Circuit recognized, the clear congressional purpose of § 7103(b)(1) is to allow the President to guarantee the effective operation of agencies relevant to national security without the constraints of collective bargaining. *See NTEU II*, 2025 WL 1441563, at *3 (holding that "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest" because holding otherwise "would give to the courts what the Constitution gave to Congress and the President"). "As the Supreme Court recently reiterated, '[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *AFGE II*, 148 F.4th at 656 (quoting *Trump v. CASA, Inc.,* 606 U.S. 831, 860 (2025)). To that end, the public has an interest in ensuring that agencies with a primary national security function, including the VA, operate effectively and without delay to protect the American people. A preliminary injunction would displace and frustrate the President's decision about how best to address issues of national security, matters on which the courts typically defer to the President's judgment. *See Hawaii*, 585 U.S. at 703–05; *AFSA II*, 2025 WL 1742853, at *3 ("[O]ur review must be exceedingly deferential. When a statutory delegation invokes the President's discretion in exercising core Article II responsibilities, there is little for [the] court to review."). The President has long been charged with directing the Executive Branch workforce, and he has

51

determined that the VA has a primary national security function that is hamstrung by restrictive terms of union agreements that frustrate his ability to safeguard the interests of the American people. *See* Executive Order § 1; Therit Decl. ¶¶ 6, 13-15. For example, restrictive CBA provisions interfere with the VA's ability to execute and implement the President's initiatives related to national security. Therit Decl. ¶¶ 13-15. They also obstruct the VA's ability to address employees with performance or conduct issues. *Id.* ¶ 15. The President determined that the FSLMRS is inconsistent with national security requirements and considerations, and his determination in this sphere is entitled to deference.

The VA has taken extensive actions to implement the Executive Order. Therit Decl. ¶ 16. If forced to comply with Plaintiffs' requested preliminary injunction by reinstating the CBA, the VA would have to undo those actions by reestablishing withholding of union dues; returning approximately 1,961 employee union representatives to their previous taxpayer funded union time allocations (with some employees spending up to 100 percent of their duty hours on taxpayer funded union time); reengaging in collective bargaining under the FSLMRS and in accordance with the provisions of the CBA; reissuing over 180,000 square feet of government office space and 2,000 pieces of information-technology equipment to union representatives (much of which has already been repurposed for mission-related needs), and otherwise reverting back to the same practices that the Executive Order found to be inconsistent with the VA's primary national-security work. *Id.* ¶¶ 18-19. These actions would require significant resources to accomplish,

52

**SA582**

including manhours on the part of Human Resources and legal staff, payroll providers, and supervisory personnel, as well as arbitration-related expenses. *Id.* ¶ 18(g). These are resources that otherwise could be devoted to the implementation of Administration priorities related to improving benefits and services to America's veterans—efforts which serve to strength the VA's ability to meet its critical national security mission. *Id.*

These lost resources are more concerning given that Plaintiffs have not agreed to repay any costs stemming from a wrongful injunction and are seeking to avoid the requirement of posting a bond. Pls.' Memo. at 34. Unless the Court requires Plaintiffs to post a bond, the cost of implementing any injunction will be unrecoverable even if Defendants ultimately prevail. And while the loss of money is not typically considered irreparable harm, here the lost funds "cannot be recouped" and are thus "irrevocably expended." *See NIH v. Am. Ass'n of Public Health*, 606 U.S. ---, 145 S. Ct. 2658, 2659 (2025) (quoting *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304, (2010) (Scalia, J., *in chambers*)).

For these reasons, the balance of the equities and the public interest weigh in Defendants' favor, and the Court should deny Plaintiffs' requested preliminary injunction.

53

**SA583**

### III. Should the Court Grant Plaintiffs' Motion for Preliminary Injunction, the Injunction Should be Accompanied by a Bond

Under Rule 65(c), the Court may issue a preliminary injunction "*only if* the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c) (emphasis added). The Court should enforce that rule here and require Plaintiffs to post security.

"(T)he conclusion seems inescapable that once the court decides to grant equitable relief under Rule 65 it must require security from the applicant." 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2954, at 524 (3d ed. 1998) (quoted in *Crowley v. Loc. No. 82, Furniture & Piano Moving*, 679 F.2d 978, 999 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984)); *see also NTEU II*, 2025 WL 1441563, at *3 n.4 (clarifying that "injunction bonds are generally required"). "[T]he district courts in this circuit have generally required a bond to be posted." *Maine v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 200, 237 (D. Me. 2025). Because the "costs of government are borne ultimately by taxpayers," Rule 65(c) applies no less when a government agency is subject to a preliminary injunction. *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 459 (7th Cir. 2010).

The First Circuit has articulated an analysis for a district court to employ in deciding whether a particular case's circumstances are unusual enough that they would justify departing from Rule 65(c)'s bond requirement. *See Crowley*, 679 F.2d at 1000. "First, at least in noncommercial cases, the court should consider the

54

**SA584**

possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant." *Id.* Here, the possible loss to the VA is $14 million. Therit Decl. ¶ 19. This is the minimum amount needed to cover the VA's costs and damages (for the first six months of a preliminary injunction) should it be later found that Defendants were wrongfully enjoined. *See* Fed. R. Civ. P. 65(c); Therit Decl. ¶ 19. This amount is supported in the Declaration of Tracey Therit, which explains the costs of restoring the bargaining relationship between the VA and Plaintiffs. Therit Decl. ¶¶ 18-19. Because Plaintiffs have not agreed to pay back any such costs should Defendants prevail, these funds would be unrecoverable absent a bond. *See Am. Ass'n of Public Health*, 145 S. Ct. at 2659 (citing P*hilip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers)). By contrast, Plaintiffs do not contend that a bond requirement poses a financial hardship for them. Pls.' Mem. at 34. The "plaintiffs' ability to pay" consideration therefore weighs in favor of requiring a bond here.

Second, under the First Circuit's analysis, district courts should consider the special nature of suits "to enforce important federal rights or 'public interests'" arising "out of comprehensive federal health and welfare statutes," particularly when the plaintiff in such a suit is an individual, indigent, or subject to the defendant's control. *Crowley*, 679 F.2d at 1000. When both parties are institutions, however, the "impact on plaintiffs' rights" factor is less of a consideration. *Id.* Here, neither the First Amendment nor Chapter 71 are "comprehensive federal health and welfare statutes." *See* 5 U.S.C § 7101 (stating the purpose of Chapter 71). And

55

**SA585**

the Plaintiffs are not individuals or indigents; rather, they are large labor organizations with over 300,000 members. Am. Compl. ¶¶ 24-25. This second consideration therefore does not support departing from Rule 65(c)'s bond requirement.

When determining the amount of the bond, this Court should require more than just a "nominal" amount. For the reasons explained by the D.C. Circuit in *NTEU II*, it is quite "doubt[ful]" a nominal bond is "appropriate" to pay the costs and damages sustained by a government agency should it be found that the requested preliminary injunction "'wrongfully enjoin[s] or restrains'" them. *NTEU*, 2025 WL 1441563, at *3 n.4 (quoting Fed. R. Civ. P. 65(c)). A bond in name only lacks justification in Rule 65(c).

## CONCLUSION

For these reasons, the instant case should not proceed because it constitutes impermissible claim splitting. Even if the Court entertains Plaintiffs' suit, Plaintiffs fail to establish that they are entitled to a preliminary injunction. And if the Court is inclined to grant any injunctive relief, Defendants request that any injunctive relief be secured by a bond.

56

Dated: December 19, 2025.         Respectfully submitted,

                               UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs,

By their attorneys,

SARA MIRON BLOOM
First Assistant United States Attorney

/s/ *Andrea Hyatt*
ANDREA HYATT
TX Bar No. 24007419
Assistant U.S. Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5001 (Fax)
Andrea.Hyatt@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2025, I electronically filed the foregoing document and the accompanying exhibits through this Court's Electronic Case Filing (ECF) system, which will serve it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E).

*/s/ Andrea Hyatt*
ANDREA HYATT
Assistant U.S. Attorney

57

**SA587**

**UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND**

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
NATIONAL VA COUNCIL; and

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES LOCAL
2305;

     Plaintiffs;

         *v.*

UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS; and

DOUGLAS A. COLLINS, in his official
capacity as U.S. Secretary of Veterans
Affairs;

     Defendants.

Civil Action No.
25-CV-583-MRD-PAS

**DECLARATION OF TRACEY THERIT**

Pursuant to 28 U.S.C. § 1746, I, Tracey Therit, declare as follows:

1.     I am the Chief Human Capital Officer for Human Resources and

Administration in the Department of Veterans Affairs (VA), and I have served in

this role since July 2019. I have worked for the Department for 19 years, and the

federal government for 34 years. The Office of the Chief Human Capital Officer

provides governance, policy and guidance with regard to recruitment, staffing,

enterprise-wide Human Resources (HR) systems, classification, compensation, leave,

performance management, recognition, work-life and benefits, workforce and

1

Therit Declaration
Exhibit A

**SA588**

succession planning, employee and labor relations, learning and development and alternative dispute resolution.

2.    I provide this declaration in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction in the above-captioned case. I make the following statements based upon my personal knowledge and information provided to me in my official capacity.

3.    I am familiar with Executive Order 14,251 of March 27, 2025, *Exclusions from Federal Labor-Management Relations Programs* (the Executive Order or EO). Section 1 of the Executive Order determines that the agencies and agency subdivisions set forth in Section 2 of the Executive Order have a primary function of intelligence, counterintelligence, investigative, or national security work. Exec. Order No. 14,251 § 2, 90 Fed. Reg. 14553 (Apr. 3, 2025). Section 2 of the Executive Order addresses additional national security exclusions and specifically excludes the VA from coverage under Chapter 71 of Title 5, United States Code, the Federal Service Labor-Management Relations Statute (FSLMRS), subject to two exceptions. *Id.* First, the "immediate, local employing offices of any agency police officers, security guards, or firefighters…" are excluded from EO 14,251's coverage and, as such, are still subject to coverage under the FSLMRS. *Id.* Second, Section 4 of the Executive Order delegates to the Secretary of Veterans Affairs authority to issue orders "suspending the application" of the Executive Order "to any subdivision[] of the department[] [he] supervise[s], thereby bringing such subdivisions under the coverage of the [FSLMRS]." *Id.* § 4. There are no such

2

**SA589**

suspension orders currently in effect.[1]

4.      The VA has national security work as a primary function, as the President determined in EO 14,251. The VA's emergency response capabilities have evolved since the 1980s. Prior to that time, the VA focused on just three primary missions: to deliver clinical care to veterans; to conduct research benefiting veterans and all Americans; and to educate future health professionals. In 1982, the VA/Department of Defense (DoD) Health Resources Sharing and Emergency Operations Act (Public Law 97-174) assigned the VA a fourth primary mission: to improve the nation's preparedness for national emergencies, including war, terrorism, and natural disasters. Today, this "Fourth Mission" involves developing plans and taking actions to ensure continued service to Veterans, as well as supporting national, state, and local emergency management efforts and includes, but is not limited to:

a.      Emergency Preparedness: The VA works to improve the nation's overall readiness to respond to various threats, including natural disasters, terrorist attacks, and conflicts;

b.      Supporting Emergency Management: The VA actively supports

---

[1] On April 11, 2025, the VA Secretary submitted an Order to the Federal Register suspending the application of EO 14,251 to certain VA employees. 90 Fed. Reg. 16,427 (Apr. 17, 2025). On November 13, 2025, the VA published a notice in the Federal Register rescinding the April 11, 2025, Order in its entirety. 90 Fed. Reg. 50,950 (Nov. 13, 2025). Officials within the VA had been contemplating the recission for several weeks before the recission was published in the Federal Register, and the VA made the final decision to issue it before November 4, 2025. Post-recission, the only VA employees subject to the FSLMRS are those who hold the exempted positions of police officer, firefighter, and security guard under Section 2 of the Executive Order.

3

**SA590**

national, state, and local emergency management efforts by providing

resources and personnel;

c.    Continuity of Service: The VA aims to ensure its mission-critical

services for Veterans can continue operating during emergencies and

disasters;

d.    Collaborations: The VA works with other federal agencies, state

and local governments, and private organizations to coordinate preparedness

and response efforts;

e.    Specific to wartime operations, the VA plays a crucial role in

supporting the Department of War, serving as a key backup medical system

for military personnel and their families, including:

i.    Primary Medical Backup: The VA/DoD Health Resources

Sharing and Emergency Operation Act (Public Law 97-174) designates

VA as the principal backup to the military health care system during

and after a war or national emergency involving armed conflict;

ii.    Shared Resources: The law provides for the sharing of

healthcare resources, including facilities, equipment, and personnel,

between the two agencies, even during peacetime;

iii.    Wartime: The VA provides medical care to military

personnel, including those injured in combat, and their families during

wartime; and

iv.    Priority for Care: Battlefield casualties are given priority

4

**SA591**

for care in VA facilities.

5.      The VA's Fourth Mission is accomplished by the following four primary vehicles:

a.      VA / Department of War contingency: The VA/DoD Health Resources Sharing and Emergency Operation Act (Public Law 97–174) passed on May 4, 1982. This law gave the VA its Fourth Mission: to serve as the primary backup for any health care services needed by the Department of War in the event of war or national emergency that involves armed conflict;

b.      National Response Framework (NRF): A guide on how the nation responds to all types of disasters and emergencies. Coordinated by the Federal Emergency Management Agency (FEMA), the NRF includes Support Annexes and Emergency Support Functions providing greater detail;

c.      National Disaster Medical System (NDMS): NDMS is a federally coordinated health care system and partnership of the United States Departments of Health and Human Services, Homeland Security, Defense and Veterans Affairs. The VA's responsibilities under the NDMS are to:

i.      Coordinate receipt, distribution, and medical care of civilian casualties through Federal Coordinating Centers (FCCs); and

ii.      Coordinate receipt, distribution, and medical care of prioritized military casualties in support of the VA-DoD Contingency Plan during armed conflicts or national emergencies.

**SA592**

d.      Other humanitarian assistance: VA Medical Center Directors and Veterans Health Administration (VHA) facility services have the authority to provide health care to civilians under a humanitarian basis if necessary.

6.      The President determined that applying the FSLMRS to the VA is inconsistent with national security requirements and considerations. The VA's ability to carry out its national security functions (as described in the prior paragraph) is hindered by the requirement that it comply with the FSLMRS.

7.      As relevant to this case, the certification of units for the American Federation of Government Employees, AFL-CIO (AFGE) professional and non-professional units are by and between the VA and AFGE. (A copy of the certifications are attached as Exhibit A-1). Article 1, Section 1 of the VA's collective bargaining agreement (CBA) with AFGE states: "AFGE is recognized as the sole and exclusive representative for all of those previously certified nonprofessional and professional employees… in units consolidated and certified by the Federal Labor Relations Authority [(FLRA)]…." Furthermore, the VA-AFGE CBA is signed by the Secretary of VA and the National President of AFGE. (A copy of the CBA is attached as Exhibit A to Plaintiff's Amended Complaint for Declaratory and Injunctive Relief). Plaintiff American Federation of Government Employees National Veterans Affairs Council (NVAC) is a council of AFGE. While AFGE has previously delegated authority to NVAC to act on its behalf in certain VA matters, AFGE is and remains the certified national exclusive bargaining representative. The CBA went into effect on August 8,

6

**SA593**

2023, and has a three-year term (until August 8, 2026). (CBA at 290 (Duration of Agreement)).

8.      Article XXI of the AFGE National Constitution (AFGE Constitution) authorizes AFGE locals to form councils and outlines the rights and obligations of AFGE and its councils. Specifically, Article XXI authorizes the AFGE National Executive Council (NEC) to approve applications for a council charter; requires council constitutions and bylaws be approved by the NEC; requires councils to submit an annual audit; and authorizes AFGE to take possession of any funds held by a council if the council's charter is revoked or disbanded. Pursuant to these requirements, NVAC's Constitution and Bylaws was approved by AFGE National President Everett B. Kelley on behalf of the NEC. (Copies of AFGE's National Constitution and Bylaws and NVAC's Constitution and Bylaws are attached as Exhibits A2 and A3 respectively).

9.      Prior to August 6, 2025, there were approximately 307,491 AFGE bargaining unit employees.

10.      Plaintiff American Federation of Government Employees Local 2305 (AFGE Local 2305) is a local affiliate that previously represented VA employees who work at the Providence VA Regional Benefit Office and the Providence Veterans Center (in addition to other VA employees outside this District). Prior to August 6, 2025, there were more than 450 bargaining unit employees represented by AFGE Local 2305.

11.      As I noted above, the Executive Order contained a carve-out: it did not

7

**SA594**

apply to "the immediate, local employing offices of any agency police officers, security guards, or firefighters," which remain subject to Chapter 71. Executive Order, § 2(b). The VA has interpreted this carve-out as applying only to employees who hold one of the three occupations specified in the Executive Order: police officers, security guards, and firefighters. The VA's interpretation of the carve out allows the VA to meet the intent of the Executive Order given the VA's decentralized structure. The VA's interpretation is consistent with OPM's guidance that "this category will generally include purely the law enforcement officers in question." *See* OPM, Frequently Asked Questions: Executive Order 14251, available at https://perma.cc/P2NG-N8S.

12.     On August 6, 2025, Douglas A. Collins, the Secretary of VA, notified NVAC and AFGE that the VA was terminating the above-referenced CBA, in addition to all amendments, local supplemental agreements, and memoranda of understanding (MOUs) at all levels (collectively referred to as CBA), except to the extent the CBA applied to police officers, firefighters, and security guards represented by AFGE. (Copies of the termination letters are attached as Exhibit C to Plaintiff's Amended Complaint for Declaratory and Injunctive Relief). After the termination of the CBA, there are approximately 2,798 AFGE bargaining unit employees.

13.     The above-referenced CBA interfered with the VA's ability to execute and implement the President's initiatives related to national security. For example, under the CBA, the VA could not implement government-wide rules and regulations

8

**SA595**

or executive orders by the President that conflict with the CBA unless AFGE/NVAC was willing to negotiate with the VA over the implementation of the rule, regulation, and/or executive order; notably, during the duration of the CBA, AFGE/NVAC was not obligated to bargain with the VA unless the CBA required it (e.g., Midterm Bargaining), meaning the VA was often prevented from complying with government-wide rules and regulations and executive orders.

14.     The CBA and requirements within the FSLMRS often required the VA to engage in protracted bargaining over matters that directly impact the VA's ability to fulfill its mission. For example, the realignment of bargaining unit employees to clinical contact centers (CCC) in VHA generated demands to bargain, requests for information, and grievances from all of the VA's national unions. The realignments impacted all Veterans Integrated Systems Networks (VISNs) and also resulted in the filing of unit clarification petitions. In March 2021, VHA announced the expectation that each VISN establish a centralized, operational and integrated CCC to optimize virtual care delivery and promote Veterans' safety by December 2021. However, NVAC filed a ULP regarding bargaining unit status code changes in VISN 4 in April 2021 and NVAC filed a demand to bargain on the implementation of the CCCs in July 2021. While bargaining occurred with all the VA's national unions, MOUs were not signed with NVAC, National Federation of Federal Employees (NFFE), and National Nurses Organizing Committee/National Nurses United (NNOC/NNU) until January 2022, March 2022, and April 2022, respectively. Even after the lengthy bargaining process (i.e., 208 days to bargain) concluded, the VA's

**SA596**

unions continued to file grievances on various aspects of the implementation of the CCCs, which were handled individually from 2022 to date. Additional examples of initiatives delayed because of protracted negotiations include: implementation of the Mandatory Influenza Vaccination Directive 1192.01; implementation of the Promise to Address Comprehensive Toxics (PACT) Act of 2022, Pub. L. No. 117-168, 36 Stat. 1759, section 603; implementation of VHA Directive 1167, Mental Health Environment of Care Checklist; and the use of Telesitters Technology in VHA facilities.

15.     The CBA and the requirements within the FSLMRS also obstruct the VA's ability to address employees with performance or conduct issues; however, the Executive Order removes these obstacles. Examples of CBA provisions that hinder the VA's ability to operate effectively and efficiently include:

    a.     Article 12, Section 1(C): required the VA to provide a minimum of 10 days advance notice to the local union before effectuating a temporary detail;

    b.     Article 13, Section 5: required the VA to provide 30-days advance notice to the local union and bargain to the extent required by the FSLMRS and CBA prior to effectuating an administrative reassignment/involuntary reassignment, mandated by VA's valid operational needs;

    c.     Article 14, Section 1: required the VA to apply the heightened "just and sufficient cause" standard to all disciplinary actions;

10

**SA597**

d.    Article 22, Section 2(D): required the VA to give advance notice to the local union when a bargaining unit employee is the subject of an investigation or inquiry, thus risking the integrity of the investigation;

e.    Article 22, Section 2(E): prohibited, "except in very rare and unusual circumstances," the VA from questioning an employee pursuant to an investigation if, during the employee interview, the employee requests local union representation. This contract provision results in investigations being delayed from occurring expeditiously.

f.    Article 27, Section 2(E): mandates a 90-day minimum appraisal period, which is inconsistent with the VA's Office of Personnel Management-approved performance rating system that only requires a minimum 30-day appraisal period. This burdensome requirement meant an employee must be under a performance plan for at least 90-days before they can be placed on a performance improvement plan, which, as noted below, must last for a minimum of 90-days. Resultingly, in some instances, it could take up to 6-months before the VA could issue a performance-based action against an employee. Although the VA attempted to negotiate out of this requirement during the last CBA negotiation, NVAC refused to make changes.

g.    Article 27, Section 10: required the VA to place an employee with performance deficiencies on a performance improvement plan lasting at least 90 calendar days. The VA was required to comply with this contractual provision notwithstanding the statutory authority Congress gave the VA

11

**SA598**

under 38 U.S.C. § 714 to dismiss poor performers without such performance improvement plan periods;

h.       Article 44 addressed Arbitration and required the VA to expend government resources on arbitration hearings, even though arbitrators were often unfamiliar with the federal sector or VA operations. These arbitrators were randomly selected by a process of elimination required by the CBA where the VA and NVAC alternatively struck potential arbitrator names until one name remained. That process often resulted in inexperienced arbitrators misapplying the law and costing taxpayers millions of dollars. Examples of grievance settlements and arbitration decisions resulting in harm to the VA include:

i.       Agency Use and Implementation of 38 U.S.C. § 714: After an arbitrator ruled the VA improperly implemented the statutory authority Congress gave the VA under 38 U.S.C. § 714, the VA was forced to enter into a settlement agreement with NVAC wherein the VA was obligated to reinstate more than 100 former employees who had been terminated for misconduct and pay nearly $134 million dollars to approximately 1,700 former VA employees who were terminated for misconduct. The settlement also resulted in the VA discontinuing use of the § 714 authority for any AFGE bargaining unit employee, thereby hindering VA's national security functions by preventing the VA from quickly terminating employees with

12

**SA599**

performance or conduct issues;

    ii.    VA Use of the Disaster Emergency Personnel System (DEMPS): NVAC grieved VA's use of the DEMPS system, resulting in the VA agreeing to NVAC's demand that employees be allowed to opt-out of the system (i.e., enrollment and registration in the DEMPS system was voluntary, not mandatory). This settlement had operational impact on management's ability to identify and require staff to be part of these cross-functional teams performing essential services during emergencies, including the COVID-19 pandemic. Further, without complete employee participation and Agency authority, during future emergencies, the VA may have insufficient volunteers, be required to incentivize staff to volunteer, or have the incorrect make-up of staff needed, resulting in a slower and potentially degraded response to emergencies.

    iii.    Agency Smoking Shelters: After the VA converted to a smoke-free facility, consistent with other private health-care systems, NVAC grieved VA's implementation of the policy, forcing the VA to retain smoking shelters on its campuses, even if in decay or being used to support mission-related services, due to ongoing litigation. The VA was ultimately ordered to reinstate the smoking shelters; and

    iv.    Timekeeping for Union Representatives: The VA attempted to require union representatives to enter and track their

13

**SA600**

taxpayer funded union time into the VA's timekeeping system. NVAC grieved this change and obtained an arbitration decision, wherein the arbitrator held the topic was covered by the CBA, the CBA only allowed for mid-term changes on any topic covered by the contract if the parties agreed by mutual consent, and NVAC did not have to bargain with the VA over whether the union representatives had to enter their taxpayer funded union time in the VA's timekeeping system, even though that mid-term change was not a subject of bargaining during term negotiations. Resultingly, VA timekeepers and supervisors are forced to continue entering union representatives' taxpayer funded union time into the VA's timekeeping system. This task is timely and takes supervisors and timekeepers away from other roles and responsibilities and often results in errors to employees' timecards, which the VA is responsible for correcting. Furthermore, NVAC has used this arbitration decision to prevent the VA from making any changes NVAC does not agree with if the change is even a generally covered topic in the CBA but was never a subject of bargaining during term negotiations.

i.      Article 45, Section 3: specified the VA's obligations regarding union dues and mandated VA expend significant time and resources to collect dues on AFGE's behalf, a task most other voluntary membership organizations are required to do without government assistance;

14

**SA601**

j.      Article 47, Section 4: required the VA to negotiate the local effect of changes agreed to in national negotiations, requiring extensive negotiations and delays before the VA could make changes to working conditions;

k.      Article 48: permitted VA employees to spend up to 100 percent of their on-duty hours on union matters, rather than performing the duties of their position of record; and

l.      Article 51: required the VA to use taxpayer funds to provide AFGE with office space, computers, printers, and other supplies, equipment, and government resources. As discussed below, once the VA was no longer contractually obligated to provide these resources to NVAC and the local unions pursuant to EO 14,251 and the August 6, 2025, CBA termination, it was able to repurpose and redirect the government resources and space to help meet the VA's mission needs.

16.     To implement Executive Order 14,251, the VA has taken the following actions thus far:

a.      On or about April 4, 2025, in response to orders issued by the FLRA regarding the applicability of EO 14,251, VA began requesting all FLRA matters be stayed or held in abeyance pending the outcome of the litigation related to EO 14,251;

b.      Oon or about April 10, 2025, the VA began requesting all grievance and arbitration proceedings be stayed or held in abeyance until the

15

**SA602**

litigation regarding EO 14,251 was resolved. However, as of August 6, 2025, the VA only requests grievance and arbitration proceedings be stayed or held in abeyance if the underlying matter was not clearly limited to employees exempted from EO 14,251's coverage (i.e., police officers, firefighters, and security guards) and the union who filed the grievance failed or refused to so limit the matter;

c.    Effective as of the April 25, 2025 pay period, the VA terminated dues deductions for all AFGE bargaining unit members subject to EO 14,251's coverage;

d.    On August 6, 2025, the VA terminated multiple national CBAs, including the above-referenced AFGE CBA, except to the extent those CBAs applied to police officers, firefighters, and security guards, in accordance with Sections 2 and 6 of the Executive Order;

e.    On or about August 6, 2025, the VA began advising representatives of AFGE, NVAC, and locals affiliated with AFGE/NVAC, as applicable, that, pursuant to EO 14,251 and the CBA termination, the VA would not engage in grievance and arbitration proceedings if the proceedings related exclusively to employees covered by EO 14,251 (i.e., employees who, pursuant to EO 14,251, are no longer subject to the FSLMRS).

f.    On or about August 6, 2025, the VA began reclaiming government resources and space previously allocated to NVAC and local unions and, on or about this same date, began repurposing the resources and

16

SA603

space to meet VA's mission needs. To the extent a local union represents employees excluded from EO 14,251's coverage, the VA has already begun the process of reissuing Agency resources and space, consistent with the CBA and commensurate with the local union's current representational needs.

g.      As of August 6, 2025, the VA began denying requests for taxpayer funded union time if the request came from a union representative who was also an employee subject to EO 14,251's coverage.

17.     Plaintiff NVAC has already filed numerous national grievances (NG) with the VA relevant to their claims in this case. Specifically:

a.      NG 8-13-2025 (CBA Termination 1.0), filed August 13, 2025, regarding AFGE's use of government property, facilities, and equipment;

b.      NG 08-29-2025 (CBA Termination 2.0), filed August 29, 2025, regarding the VA's purported refusal to recognize designated representatives who are not bargaining unit employees;

c.      NG 9-5-2025 (CBA Termination 3.0), filed September 5, 2025, regarding the denial of taxpayer funded union time and union access to VA facilities and resources;

d.      NG 9-9-2025 (CBA Termination 4.0), filed September 9, 2025, regarding the VA purportedly encouraging and instructing employees to terminate their enrollment in AFGE's E-Dues system;

e.      NG 9-16-2025 (CBA Termination 5.0), filed September 9, 2025, regarding NVAC's access to VA's SharePoint system;

17

**SA604**

f.      NG 9-19-2025 (CBA Termination 6.0), filed on September 19, 2025, regarding the VA's purported unilateral changes to the CBA's grievance and arbitration procedures;

g.      NG 10-20-25 (CBA Termination 7.0), filed October 20, 2025, regarding the removal of NVAC representatives from facility committees;

h.      NG 10-21-25 (CBA Termination 8), filed October 21, 2025, regarding NVAC representatives' participation in new employee orientation; and

i.      NG 11-11-2025, filed November 11, 2025, regarding the VA's purported denial of national grievances without first engaging in a discussion mandated by the CBA.

18.    The VA would suffer the following harms if Plaintiffs' requested preliminary injunction were entered and the VA were forced to return its labor management operations to the status quo that existed before the March 27, 2025, issuance of the Executive Order:

a.      The preliminary injunction would prevent the VA from complying with the President's directions in the Executive Order, in which the President made national-security determinations entrusted to him by Congress.

b.      The preliminary injunction would prevent the VA from complying with the numerous Presidential Actions, Memorandums, and Executive Orders, issued on or after January 20, 2025, which impact

18

**SA605**

employees' terms and conditions of employment, including the President's mandate that federal employees return to in-person work. Compliance with these Presidential initiatives required substantial Agency resources. These Agency resources would be lost if the VA was required to undo its actions because the actions were implemented without going through the notice and bargaining process mandated by the CBA and FSLMRS.

c.      The preliminary injunction would require the VA to direct its payroll service provider to restart collecting union dues for AFGE. The VA cannot restart dues automatically for these former union members because AFGE has been promoting the use of its internal dues collection system called e-Dues. The VA does not have information on which employees are now paying their membership dues directly to AFGE through the e-Dues system. As a result, restarting automatic payroll deductions for all impacted employees could harm those employees by having double payment of dues.

d.      The preliminary injunction would require the VA to reissue Agency space and government resources to union representatives. Post-CBA termination, the VA reclaimed over 180,000 square feet of office space, worth approximately $5.4 million and 2,000 pieces of information technology (IT) equipment, worth approximately $600,000, that had been provided to VA unions free of charge. The space and resources formally used by union representatives has already been repurposed by VA facilities and much of it is now used for mission-related work, including expanding administrative

19

**SA606**

and clinical services in several facilities across the country to provide and facilitate Veteran care. Requiring facilities to surrender critical space and resources to union representatives would likely result in impacts to Veteran care and other mission-related work.

e.      Any changes in conditions of employment impacting bargaining unit employees would have to be negotiated before implementation, per the CBA and FSLMRS. This requirement would delay implementation of all initiatives impacting services to Veterans.

f.      Reverting back to full compliance with the terms of the CBA would require the VA to return approximately 1,961 employee union representatives to their previous taxpayer funded union time allocations (with some employees spending up to 100 percent of their duty hours on taxpayer funded union time), thus removing them from performing work on behalf of the VA and its mission. The VA returned these employee union representatives to their position of record after the August 6, 2025, CBA termination. Of the 1,961 employees who were returned to their position of record after the August 6, 2025, CBA termination, more than 1,000 serve Veterans in direct patient-care roles. Reverting these employees back to full or part-time union work would be disruptive to facilities who rely on these employees to accomplish mission-related duties and costly for the VA as the VA spent approximately $39.75 million dollars in 2024 allowing the employee union representatives to spend nearly 750,000 hours working on behalf of

20

**SA607**

their union, rather than in their VA-assigned job.

g.      Reverting back to full compliance with the terms of the CBA would require the VA to expend significant resources to accomplish, including hours on the part of Human Resources and legal staff, payroll providers, and supervisory personnel, as well as grievance and arbitration-related expenses. These are resources that otherwise could be devoted to the implementation of Administration priorities related to establishing a high-performance Federal workforce, strengthening probationary periods in the Federal service, and restoring accountability to policy-influencing positions in the Federal workforce—efforts which serve to strength the VA's ability to meet its critical national security missions.

19.     The VA would face numerous costs and damages if the Court were to grant Plaintiffs' requested preliminary injunction, including the costs of grievance arbitrations, reconfiguring and resuming the collection of union dues (including back dues that were not collected) and costs of returning to negotiations, among others. Were the Court to grant Plaintiffs' requested preliminary injunction, and it was later determined that the VA had been wrongfully enjoined or restrained, the VA estimates it would take well over six months to undo the changes it has made and, during the first six months alone, the VA would incur more than $50 million dollars in damages and costs (with back dues alone costing approximately $36 million dollars), including, but not limited to, the following:

a.      Staff time, which has been calculated by identifying the

**SA608**

estimated number of hours required to perform each function and multiplying those hours by the applicable hourly rate for each employee or position involved. This includes time spent by Human Resources specialists, Payroll Personnel, and Attorneys in the Office of General Counsel. The hourly rates used for these calculations are based on current salary data, inclusive of benefits and overhead, to reflect the approximate cost to the Agency.

  i.  Time related to Agency preparation for arbitrations and grievances, including: (1) time spent preparing case files, rescheduling and attending hearings, and coordinating with legal counsel; (2) attorney hours spent conducting legal review, representation, and arbitration prep; (3) time spent by management officials testifying or preparing documentation. The VA estimates that this work would entail approximately 72,669 staff hours in the first 6 months of a preliminary injunction.

  ii.  Time related to mandatory union negotiations, including negotiations related to the upcoming reopener of the CBA, which would be more involved and complicated if the CBA negotiations included employees currently excluded from the FSLMRS by EO 14,251: (1) time spent by labor relations staff and legal counsel in bargaining sessions, drafting proposals, and responding to union demands; and (2) costs for senior leadership participation in high-level negotiations.

22

The VA estimates that this work would entail approximately 13,440 staff hours in the first 6 months of a preliminary injunction.

iii.      Time spent restarting union dues collection, including payroll staff time spent reconfiguring systems, processing back dues, and managing ongoing deductions. The VA estimates this work would entail approximately 2,573 staff hours in the first 6 months of a preliminary injunction.

iv.      Time spent on mid-term negotiations with AFGE aimed at aligning the current CBA with Executive Orders issued by the President, particularly those addressing Performance Management, Return to Office policies, and other workforce reforms introduced by the Administration. The VA estimates that this work would entail approximately 30,330 staff hours in the first 6 months of a preliminary injunction.

b.      Facilities and Administrative Overhead. This includes utilities (electricity, water, HVAC), janitorial services, and building maintenance (facilities), Agency-provided phones, email accounts, and network access for union representatives as well as time spent by Agency leadership, HR, and legal teams to monitor and support union activities. The VA estimates this work would entail approximately 9,360 staff hours plus (non-staff) costs of utilities, maintenance, and related services.

c.      Opportunity costs, including the impact of diverting staff from

23

SA610

mission critical work and lost productivity in national security, healthcare, or operational areas due to HR/legal staff being reassigned.

       d.     External costs, including payments to arbitrators, mediators, or consultants; arbitration fees, and administrative costs for hearings and negotiations. For example, the Agency previously had over a hundred grievances that would be expected to resume, including proceeding to arbitration. Each arbitration has an approximate administrative cost of $10,000.00. The average administrative cost of proceeding through arbitration reflects only the administrative and procedural expenses incurred during the process, such as arbitrator fees and facility costs. It does not account for any potential monetary awards, attorney fees, or damages that may be granted by the arbitrator, which could significantly increase the Agency's overall financial exposure.

       I declare under penalty of perjury that the foregoing is true and correct.

Executed on December __19__, 2025.

TRACEY THERIT

Digitally signed by TRACEY THERIT
Date: 2025.12.19 19:31:10 -05'00'

_____

Tracey Therit

24

**SA611**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - -X
American Federation of        : 25-cv-00583-MRD-PAS
Government Employees          :
Local 2305 & American         :
Federation of Government      :
Employees National VA         :
Council,                      :
       Plaintiffs,       : United States Courthouse
                : Providence, Rhode Island
                :
   vs.                     :
                :
United States Department      :
of Veterans Affairs &         :
Douglas Collins, *in his*     :
*official capacity as U.S.*   :
*Secretary of Veterans*       :
*Affairs*,                    :
       Defendants.       :
- - - - - - - - - - - - - - - -X

TRANSCRIPT OF CIVIL CAUSE FOR A PRELIMINARY INJUNCTION
HEARING
BEFORE THE HONORABLE MELISSA R. DuBOSE
UNITED STATES DISTRICT COURT JUDGE
COURTROOM 4

A P P E A R A N C E S:

For the Plaintiffs:   TRAVIS SILVA, ESQ.
                      JiLON LI, ESQ.
                      Keker, Van Nest & Peters LLP
                      633 Battery Street
                      San Francisco, CA  94111
For the Defendants:   TYLER J. BECKER, ESQ.
                      USDOJ, Office of the Assistant
                      Attorney General, Civil Division
                      950 Pennsylvania Avenue NW, Rm. 3632
                      Washington, DC  20530

                      ANDREA LENA HYATT, ESQ.
                      DOJ-USAO
                      District of Rhode Island
                      One Financial Plaza, Suite 17th Floor
                      Providence, RI  02903

Court Reporter:   Lisa Schwam, CRR-RPR-RMR
                  One Exchange Terrace
                  Providence, RI  02903

19 FEBRUARY 2026

(In open court; 11:03 a.m.)

THE COURT: Good morning. Welcome to Courtroom 4. Make sure I'm all set here. Perfect. We are here this morning; this is case number 25-cv-00583, American Federation of Government Employees National VA Council and American Federation of Government Employees Local 2305, plaintiffs, vs. United States Department of Veterans Affairs and Douglas A. Collins, in his official capacity.

If I could just have the parties identify themselves for the record, please.

MR. SILVA: Good morning, your Honor. Travis Silva, Keker, Van Nest & Peters, for the plaintiffs. I'm joined by my colleague JiLon Li and our local counsel Carly Iafrate.

THE COURT: Okay. Good morning.

Attorney Iafrate, did you want to move up? Are you fine where you are?

MS. IAFRATE: I'm fine where I am.

THE COURT: Okay. Good morning. Welcome.

MS. IAFRATE: Good morning.

MR. BECKER: Hello. Tyler Becker, counsel to the Assistant Attorney General at the U.S. Department of Justice for defendants, and with me we have from the

U.S. Attorney's Office here in the District of Rhode Island.

THE COURT: Okay. Good morning. Welcome.

So we're here this morning for a hearing on a motion for preliminary injunction that was filed by plaintiffs. I had the opportunity to read through all of the materials that were submitted to the Court, in addition to a supplemental filing that came in I believe it was yesterday.

I'm assuming all of the parties had the opportunity to read through that supplemental?

MR. BECKER: Yes, your Honor.

THE COURT: Very good. So I'm going to -- I think for the purposes of this hearing, I think I'm going to allot about approximately 30 minutes. You may not -- and you don't have to use all of that time, but approximately an hour is scheduled for this hearing; figuring 30 minutes per side. You can reserve whatever time you need for rebuttal. I will try to do my best not to interject not only for the purposes of keeping the hearing going, but also for the benefit of our court reporter who has to deal with that.

So if the petitioner is ready, I'm happy to hear from you.

MR. SILVA: Thank you, your Honor, and good

morning again.  Travis Silva for the plaintiffs.  It's my first time appearing before your Honor and in this district, and I appreciate the opportunity to do so.

I'd like to begin today by introducing my clients.  It's my honor and privilege to represent the National VA Council of AFGE and Local 2305.  Many members of the Union are present here today, including three representatives who I'd like to introduce to the Court.  Dr. Kelley, the National President of the entire AFGE.  He's up here today from D.C.  MJ Burke, the President of NVAC.  She works for the VA in Indiana.  And Fred Sacchi, the President of plaintiff Local 2305 which is based here in Rhode Island.  His executive board and many members of the rank and file are present today and also on Zoom.

The plaintiffs are challenging the Secretary's decision to terminate the Master Agreement.  As of course the Court knows, and I anticipate, that my presentation today will focus on three points.  First, the plaintiffs' likelihood of success on the prima facie case, the First Amendment claim which is about the *Mt. Healthy* framework and the APA claim.  Second, I hope to persuade the Court that the government's jurisdictional arguments lack merit and will not succeed.  And third, I'd like to say a few introductory

words about harm; why it's irreparable and why this is a here-and-now injury; because, of course, it relates to the *Winter* analysis, but it also relates to some of the government's defenses. And it explains why so many members of the Union are present before the Court today.

THE COURT: Thank you, counsel. And before you continue -- and that actually helps frame this for me a bit -- I had a kind of thinking coming into this hearing, thinking in terms of the Union as being harmed and then the individual members and whether or not the Court should kind of consider those two interchangeable for the purposes of this hearing or are there distinct harms that I need to focus on with respect to the Union as an entity and its members as the rank and file who make up that body.

MR. SILVA: I think that the harms are distinct, but I think that the remedy is the same because the remedy is rescission of the termination order itself, your Honor. And I think that the Court is, of course, correct that an individual employee would feel a different type of harm than the Union as an organization.

So, for example, we document in our papers in the declaration of Dewanda Mitchell, two workers at

the -- who she represents out in Los Angeles who were denied parental leave that they are otherwise entitled to because of the Secretary's decision to terminate the Master Agreement.

We document Ensonia Chavez's declaration. She represents workers in Florida. She testifies about a really chilling example of a VA worker who was disciplined for speaking Spanish in the workplace. And that worker went through the discipline process initially before the termination, and she was represented by her union which is her right under the Master Agreement; it's a benefit of the Master Agreement. And the Union and the worker together beat back the disciplinary charge. Then the termination went into effect and the VA put her through the discipline process again. She was not represented by her union, and the VA disciplined her the second time for speaking Spanish in the workplace in Florida.

We document how workers are being forced to remove the Union insignia from their clothes and from their workstations even though insignia aren't generally banned in the VA workplace. That, of course, is chilling First Amendment speech, and that's a per se injury under the law.

We talk about how our witnesses testify about

how workers are meeting with their union representatives in broom closets because they are afraid of being associated with their union, which is, again, an example of chilled speech. And then as the Court notes, there's harms to the Union as well; frustration of the Union's purpose is an irreparable harm under the law. We have the *PIE* case from the First Circuit that says that the chilling of the spirit to unionize is an irreparable harm. And we have documented the decline in the Union's membership since the termination.

Multiple witnesses, Mr. Sacchi, Ms. Mitchell and Mr. -- excuse me, Ms. Burke, testify to that, as well as the fact that Union officials cannot fulfill their Union function of representing their employees in the workplace. These here-and-now harms cannot be remedied after judgment, your Honor. They can't be remedied by the FLRA and they cannot be remedied by a court in California in the same way that this Court can remedy them here.

And that's why the plaintiffs have brought this case. That's our irreparable harm argument. And with that said, by way of introduction, I'd like to turn to the prima facie case on likelihood of success and then discuss the government's jurisdictional defenses.

On First Amendment, the plaintiffs will prevail on this case because we can show, and we have shown in our papers, that the plaintiffs' protected speech was a substantial or motivating factor in the Secretary's decision to terminate the Master Agreement. And the government cannot meet its burden under the *Mt. Healthy* framework of showing that it would have acted in the same manner absent the speech.

I think that the analysis here focuses at the third step of the *Mt. Healthy* framework. The government does not seriously contend or contest, I should say, either of the first two prongs in brief. The first part of the *Mt. Healthy* analysis is whether there was constitutionally protected speech. There clearly was. Legislative advocacy which we've documented is protected speech. AFGE's litigation is protected speech.

And in particular, something that arose out of that litigation, which comes up in the Secretary's statements, the VA's statements about the termination, is that AFGE and the VA entered into a settlement agreement that was really -- settled a broad, systemic issue and had touched on matters of public importance. And this is a settlement worth over a hundred-million dollars and it led to the reinstatement of about 100 VA

employees.  And it's protected speech arising out of litigation conduct -- litigation process, I should say -- and it becomes relevant again at the third step of the process, the *Mt. Healthy* process.

Similarly, the government does not contest step two of the *Mt. Healthy* framework.  There was an adverse action; it was the termination.  I think that's pretty cut and dry.

On causation, our standard is, was the protected speech a substantial or motivating factor?  That's the language of *Mt. Healthy* itself.  The First Circuit has reiterated it in the *D.B.* case that we cite in our papers.  And I think it is clear that we meet that standard.  And the two pieces of evidence where I would direct the Court's attention are Exhibits H and I to my declaration, the Silva declaration, submitted with the opening papers.

Exhibit H is a statement that the VA released in April 2025 when the VA acted to sweep some unions into the scope -- back into the scope of Chapter 71 and leave others without.  So let me just -- I think the chronology is important.  Let me just lay down what are the three most important executive branch actions in this case.

In March, the President issued the Executive

Order. The Secretary had 15 days during which time he could move back different employees into the Chapter 71 scheme if he chose to do so. During those 15 days, I think it's worth noting, AFGE filed a lawsuit in California -- this is the government's claim-splitting defense -- challenging the Executive Order, right. So that high-profile case, with AFGE as the lead plaintiff, was in the public domain at that point.

On April 11th, within the 15-day period, the Secretary issues his order moving some employees back within the scope of Chapter 71 and leaving other employees out. He left out AFGE. And in the press statement at Exhibit H, the VA explains with commendable candor why and how it chose the unions that got the benefit and how it left the others outside of the statute's coverage. They said that the unions that got the benefit, quote, posed no or minimal hindrance to VA operations. They filed no or few grievances against the VA. That's litigation conduct, your Honor.

And then by contrast, the statement says AFGE and the other unions, quote, by contrast are using their authority under the FSLMRS to broadly frustrate the Administration's ability to challenge the agency. And your Honor, if that is just a little, tiny bit opaque, the VA got more specific in Exhibit I which is

the VA's statement released contemporaneously with the third action in this case which is the Secretary's August termination of the Master Agreement.

So in April, the Secretary decided which unions were going to be within and without the scope of the Chapter's coverage, but the Master Agreement stayed in place May, June, July. We get to August and then he terminates the Master Agreement for this union and some others. And the VA releases another press statement, this is Exhibit I, and explains as background to the -- quote, background, to the VA's action, VA employee unions have repeatedly opposed significant, bipartisan VA reforms -- that's a reference to legislative advocacy, your Honor -- and rewarded bad employees for misconduct. We, of course, contest that -- the parties will characterize misconduct however they want -- but that's litigation.

Examples include AFGE opposing the Mission Act; another reference to legislative advocacy. And AFGE working hand in hand with the Biden administration to reinstate more than 100 former employees, ellipsis, and to pay $134 million, ellipsis. That's referring to the settlement that I talked to earlier also stemming from the litigation process.

These two pieces of evidence made crystal clear

that a substantial or motivating factor behind the Secretary's conduct was AFGE and NVAC's political advocacy, it's constitutionally protected speech both before the Courts within the administrative framework, and also before Congress. Reinforcing that point -- and I won't go through each piece of subsidiary evidence we offered the Court, your Honor, but I think it is worth noting that when the Administration issued the Executive Order, the VA sued NVAC in Texas. This case is referred to multiple times in the papers because it becomes relevant at a couple different points. And in that lawsuit, the VA alleges as a fact that NVAC was fighting against the President's agenda which is, again, a reference to political speech and that is in our papers, our opening brief, at page 15 -- excuse me, page 19.

So I believe that that evidence shows that the plaintiffs are likely to succeed at step three of the *Mt. Healthy* process -- the *Mt. Healthy* framework -- which shifts the burden to the government to show by a preponderance of the evidence that it would have acted in the same way even without the speech. The government produces no evidence about the contemporaneous decision that the Secretary made. They didn't prepare an administrative record. They have put

in one post hoc rationalization declaration from an HR official which I'll circle back to, but they have basically two themes in this case. The first is that the Secretary would have made the same decision anyway because he was just following the President's orders, that he was compelled to do so -- compelled to terminate the Master Agreement because of the Executive Order.

Well, we know that's wrong, your Honor, for a number of reasons. And the best reason is that the government spent the better part of the summer of 2025 telling the public and the courts that the EO and a termination of a collective bargaining agreement were separate things. In Exhibit L to my declaration, we have the OPM guidance issued immediately after the EO went into effect where OPM told the agencies not to terminate collective bargaining agreements while litigation was playing out. We know that other agencies left CBAs intact. There are CBAs still intact today that are CBAs that are within the scope of the President's Executive Order.

We know that Secretary Collins himself waited four months from when the Executive Order went in to when he terminated the Master Agreement so clearly those, during that period of time, he presumably felt

he was in compliance with the President's directives. And so I think it is crystal clear that these are two separate actions and that the Secretary cannot just say, oh, I was compelled to do this by the Executive Order when the Executive Order, the government has taken the contrary position in the Ninth Circuit and D.C. Circuits.

The government also offers its national security rationale. The issue with that in this case, your Honor, is that it's a post hoc -- one of the issues is that it's entirely a post hoc rationalization. So we have the Secretary's two termination letters; they don't mention national security. We have the VA's statement at the time; doesn't mention national security. We have a bunch of other statements from the VA after August 6th in the record; none of them mention national security.

Even after we filed this lawsuit, your Honor, the Secretary personally addressed in a video that we transcribed and had the transcript in the record, addressed his reasons for terminating the Master Agreement. He didn't mention national security after litigation commenced and so all that they have is this post hoc declaration from an HR official which is insufficient to invoke national security because courts

don't accept agency post hoc rationalizations in the litigation process. And we have a number of cases in our brief on that point.

In light of the Court suggesting that argument should last 30 minutes, and I would like to save some time for rebuttal, unless the Court has further questions on this, I'd like to turn to the APA claim and then address the jurisdictional defenses.

THE COURT: Please.

MR. SILVA: So on the APA, the punch line here is that there are basically three principal reasons why the action should be set aside under the APA. The first is that the Secretary failed to offer a reasonable explanation for his conduct at the time that he terminated the Master Agreement. The second is that it is arbitrary and capricious to retaliate against a political opponent. And the third, and this is very important, I will focus on this here, is that he ignored the plain text of the EO. He read out this critical language about the local employing offices of police officers.

So our basic framework is that the Secretary remains subject to the APA even when following the President's orders. That's the *New York against Trump* case in our brief. That's a First Circuit case, your

Honor. No post hoc rationales in the APA context. That's *Chenery*. And the agency needs to give a reasoned decision. That's *Ohio* and *Regents*. And I note that this Court has engaged with that in some of the cases before it in the past year.

On the no reasoned explanation, reasons are required under the APA, and I know that this Court in its *Rhode Island Collision against Domestic Violence against Kennedy* case actually set aside on a PI agency action because the court found that there was no rationale provided with the agency action. I know that Judge Smith did something similar in *Rhode Island Collision against Domestic Violence against Bondi*. We raised this argument in our briefing. That latter case is not cited in our papers so I'll read the citation into the record in case it is of aid to the Court. It's 794 F. Supp. 3d 58 at 70.

And I think it's -- the termination letters themselves say nothing other than the fact that the Secretary was acting pursuant to the Executive Order. I've already addressed how that's an insufficient rationale. So under the law at least on a PI, we don't know what the agency might provide in terms of an administrative record, but they have had a fair shot on PI; this was not expedited briefing. They didn't come

up with a rationale at the time of their action. So this action should be set aside on that basis.

The retaliation argument under the APA is the same as it is under the First Amendment and so I won't belabor it here; I've already addressed that issue. And I do want to talk about the immediate, local employing offices' language because sometimes these interpretation questions -- it's not a statute, but it kind of feels like statutory interpretation -- they can feel quite dry. And I want to make sure that the real-world consequences of this are clear.

The President's order says, and this is in Section 2 of the EO which amends Section 1-499 of President Carter's EO, notwithstanding the foregoing, nothing in this section shall exempt from the coverage of Chapter 71, ellipsis, the immediate, local employing offices of any agency police officers, security guards or firefighters.

Okay. Here's why this matters so much in this case. Huge numbers. The majority of AFGE-represented workers work at the immediate, local employing office of VA police officers. This is addressed in our declarations in a couple of places. I think it's most clearly laid out at paragraph 23 of the Mitchell declaration and, most importantly, the government

concedes it. It's at page 45 of their opposition. They don't take issue with the way that we've described as a factual matter the VA.

What's going on here is that the largest component of the Veterans Affairs Department is the medical unit that provides services, not the benefits or the cemetery unit; those are also agency divisions, they are much smaller. The Health Administration is what administers the hospitals and the medical offices. Those are locally run. Each of them has a director. The director is the appointing authority for everyone who works there; the police officers, the security guards and the firefighters and the doctors and the nurses and the psychologists and the gardeners and the kitchen staff. And so in a literal way, applying the plain text of the President's order, the local employing office of all of those police officers, is also the local employing office of the medical and nonmedical staff who aren't these public safety officers.

The VA says that they interpreted the President's order reasonably, but they offer no case and we're aware of none in which a secretary was given deference to interpret the President's Executive Order. And that just doesn't make sense. I mean, the

President's free to amend his order -- he has amended this order -- but he didn't amend this part of it. This case has been going on for a couple of months, still unamended. And I don't think the Secretary has discretion just to ignore the plain text of the President's order.

In light of time, I think I'll turn to channelling and claim splitting, and probably that will take us to the end of my hopefully 26 to 27 minutes. And I'll discuss channelling first. The FLRA, the VA and OPM all agree that this case does not belong in the FLRA. And I think that that fact alone defeats the channelling argument. So before we even talk about *Thunder Basin*, here are some basic facts about the channel that the plaintiffs would ask the Court to keep in mind.

The FLRA itself says it lacks jurisdiction over this type of case. Once you're outside the scope of Chapter 71, the FLRA says it cannot hear your dispute. We cite these cases at page 11 of our opening brief. And this isn't just one decision from the FLRA; they said it in the '80s, they said it in 2003, they said it again in 2012. That's its position.

In terms of this Executive Order, last year the FLRA stopped litigation for affected employees after

the EO came out. That's a factual determination that the Court can make. It's Exhibit A to the Reeves declaration. The VA refuses to appear in FLRA-related or Chapter 71-related proceedings be they arbitrations or something directly in front of the FLRA. They concede this. The Court can find this as a factual matter. It's in the declaration of Ms. Therit, paragraph 16. It's also in Exhibit H -- excuse me, Exhibit G to my declaration.

So the VA is not appearing in front of the FLRA. The OPM guidance -- and the Court has three copies of the OPM guidance because they keep updating it. The three copies are Exhibit L to my declaration, Exhibit L to the Reeves declaration and Exhibit B to the supplemental filing. And Questions 2 and 3 in that FAQ from OPM make clear OPM's position that the agencies should not be participating in the FLRA process. The government itself filed the Texas action and the Kentucky action which arose, in the government's view, under the EO. And that's why Judge Friedman in D.C. and Judge Donato in California rejected the channelling argument. There have been four appellate orders on Judge Donato and Judge Friedman's PIs.

I recognize that three of them went in favor of the government, one of them went in our favor. But my

point here is that in all four of those, the rationale had nothing to do with channelling. It just hasn't had purchase on appeal. And so this channel is not available.

And in the two cases where the Supreme Court has held that channelling is appropriate; that's *Thunder Basin* and *Elgin*. The channel was there, it was available, it was available to address the dispute. Those two disputes went within the core of what the agency did; assessing fines to a mine operator, reviewing a termination decision. And so I think this case is clearly distinguishable.

The government offers a few ways in which they speculate we could get up to the courts through the FLRA process. None of them hold water. As we lay out in our briefing, the grievances that are pending, those have been badly mischaracterized by the government; not a single one of those grievances raises our First Amendment claim, not a single one of those grievances raises our APA claim.

Those claims are not present before those arbitrators. Those arbitrations haven't happened yet. The FLRA has said it's not going to adjudicate any appeal. They hear the appeal from the adjudicator. They are not adjudicating appeals. And most

arbitrations don't have a route to meaningful judicial review. That's Section 7123 of Title 5. And that, of course, meaningful judicial review is a *Thunder Basin* factor.

Just in brief, the government also makes reference to Section 7111, the potential ULP charge. On 7111, I would just suggest that the Court read the statute; it's only a few sections. It clearly is about whether -- if gives the FLRA the authority to figure out -- if there's a dispute over whether employees want to be represented or if there's a dispute over the scope of the representation in terms of if it's going to be these employees and not those, or these two unions competing to represent the same pool, that those disputes go to the FLRA. And the sole remedy the FLRA can order under that statute is an election of workers.

And so under *Thunder Basin*, our task is to figure out whether you can fairly discern congressional intent to channel claims of the type present in this case to the FLRA. I think you cannot fairly discern congressional intent to channel First Amendment and APA claims to the FLRA under Section 7111 when the sole remedy available there is an election among workers.

And on the ULP, your Honor, just in brief, the agency -- those proceedings are instituted at the

discretion of the General Counsel of the FLRA. They have stopped instituting such proceedings and, most importantly, that decision is not judicially reviewable so it's a dead end; the agency can just stop it.

And then I'll turn to claim splitting and try to save some time for rebuttal. The big issue here is this is a pretty insubstantial argument. This case does not fit within the California case. The California case is brought by, I think, six different unions, five of which they're not AFGE. And it challenges -- just the EO, something like a dozen departments are present there, eight agencies are present there. It doesn't challenge any agency-level action, not one. And the case as we point out the timeline in the papers filed in April, decided in June, appealed in June, so the Ninth Circuit is considering a record from June and our action that we're challenging is from August. I mean, there was no way for us, in a practical manner, to tee up our claim there.

I don't think that -- the implication of the government's argument is that every agency-level case would have to go before Judge Donato in California. That's the termination of dozens and dozens of CBAs. That doesn't make sense from a judicial administration standpoint. And so that argument also to me seems

insubstantial.

I know I only have about two minutes left, your Honor. I already discussed irreparable harm at the beginning of my presentation so I'll rest on that presentation. We do ask that the Court issue the preliminary injunction that we've sought.

And I just want to close by saying that the Master Agreement is a parent agreement. There are -- it gives rise to agreements at the local level. And an order from this court should make clear that the VA needs to both rescind -- well, rescind the termination of the Master Agreement, which necessarily encompasses restoring all of the local agreements that are subsidiary to it, to the status quo ante.

And given the VA's statements that we have on the record, its effort to convince the rank and file that the Union's no longer there, that it's not functional, its effort to stop employees from voluntarily paying their dues after the termination, I think that it would also be appropriate for the Court to issue a remedial order ordering the VA just to issue one remedial communication to the workforce just saying that the Master Agreement has been put back into place. That could be very short, but I think it's an important part of this.

Your Honor, I appreciate the Court's attention and in allowing me to present for this length of time. If it has no questions, then I'll turn it over to opposing counsel and save whatever time I may have remaining for rebuttal.

THE COURT: Just a quick question, and it may be speculative and you may have covered it. I'm just curious as to your thinking on what potentially the impact of that California case or some of the parallel cases would have on this action. I understand the claim-splitting arguments, but how should this Court think about those other cases seeing that they are kind of happening in tandem with what's happening here?

MR. SILVA: I think that the parties agree that if the California case comes out in terms of the preliminary injunction being upheld -- it's currently stayed -- that that would lead to the VA rescinding the termination. I think that the parties agree on that; that's in their brief.

That case has been submitted to the Ninth Circuit; it's before the same panel that stayed the PI. And in the event that that panel adheres to its prior -- the prior course, then this case has its own separate and distinct character. Because the Secretary undertook a separate action and it's legally distinct.

For example -- it has I think obvious practical application. The Secretary is subject to APA review; the President is not. The Secretary made an action. There needs to be some forum for these plaintiffs to challenge sub-presidential action under the APA and this is the only court that can do it.

And so in the scenario in which the Ninth Circuit reverses the issuance of the preliminary injunction, the issue is live before this Court and this Court is the proper forum. I hope that answers that question.

THE COURT: It does.

MR. SILVA: Okay.

THE COURT: Thank you, counsel.

MR. SILVA: Thank you, your Honor.

MR. BECKER: Good morning, your Honor. And thank you for the opportunity to appear before you today. I just want to start by setting the stage and then go into the jurisdictional issues, First Amendment and APA and irreparable harm and equities. And the setting the stage that I want to get to is how we got here.

In late June, Judge Donato in the Northern District of California issued a preliminary injunction that enjoined the VA from implementing the Executive

Order. That order was pretty quickly stayed, an administrative stay by the Ninth Circuit, and on August 1st, 2025, that order was stayed pending appeal. Five days later, the VA canceled the relevant agreement here.

And I think that's important both to our claim-splitting argument, but also to our First Amendment argument. The cause, the evident cause from the record, the reason for the cancelation of this termination, as the Secretary said at the time, was because of the President's Executive Order. The VA was not able to -- at the time, the VA was following OPM guidance prior to Judge Donato's ruling and then after the Ninth Circuit's decision the VA, as well as some other agencies, including the EPA, decided to cancel certain collective bargaining agreements that were -- because they could implement the Executive Order. And that is at a very different time than about the April 11th decision of the Secretary to exempt certain unions from the Executive Order that plaintiffs really focus on.

Then following the cancelation of the CBA, AFGE went and the other unions there went to Judge Donato and asked Judge Donato to reopen proceedings there while the case was on appeal because of the cancelation

of the CBAs. Judge Donato refused to do so and said he would await the PI. Plaintiffs then still over a month after that filed this action in this court to seek to have the CBA reinstated.

So I think it's important for the Court to recognize just the kind of progression of how this occurred, but I also think it's important that the Ninth Circuit proceedings, I think as plaintiffs' counsel admits, are going to have an impact on this case and the Court may consider awaiting those proceedings as a result. Plaintiffs admit that if the Ninth Circuit were to rule for plaintiffs in that case, that the collective bargaining agreement would be reinstated because the agency would not be able to implement the Executive Order as it had.

And in that case, I think that this case would essentially be moot. If the Ninth Circuit rules against plaintiffs, of course, then there would be an action related to the cancelation. We have many defenses as to that action, but we just think that it's important for the Court to recognize that the Ninth Circuit case actually is quite -- matters to whether this case is moot, whether this case should be decided now or not.

I want to go next to jurisdiction. Plaintiffs

said repeatedly during their presentation that our channelling arguments have been -- that essentially our channelling arguments have been rejected by executive branch agencies or by the executive branch's actions. But channelling is a matter of congressional intent, not what the executive believes. None of the cases that plaintiffs cite from the FLRA even really deal with this issue of whether the plaintiffs can challenge the Executive Order itself. They deal with subsequent matters. For example, if a -- as the plaintiffs have here, filed grievances and with arbitrators and I think also filed ULPs with the FLRA and then if there's no challenge to the Executive Order itself, then the FLRA would obviously dismiss those because they have been exempted from the order. The plaintiffs can challenge the Executive Order, as well as the cancelation of the CBA, through at least four different mechanisms.

One of them that plaintiffs mention is 5 U.S.C. 7111(b). That is a matter that I know plaintiffs have said that there's been no purchase to that argument. However, the D.C. Circuit recently considered and ordered supplemental briefing on this issue in the December cases. It's a consolidated case with AFSA, FEA and NTEU. So I think that -- and the D.C. Circuit is considering that and the Ninth Circuit's decision in

the *AFGE* stay decision, in the *AFGE* case from August, also suggest that it will address jurisdiction at that stage. Now, I don't think those decisions would necessarily be binding on this Court, even the Ninth Circuit one, but of course they would certainly help with dealing with that issue or give the Court some guidance.

I just -- also on jurisdiction, there are other avenues that plaintiffs besides the ability to seek a matter -- clarification of a matter relating to representation, which I think is actually, contrary to what plaintiffs said, pretty clear from the statute that they can seek a redetermination as to any matter relating to representation. And this is clearly -- and cancelation of a CBA is clearly such a matter.

The other avenues that plaintiffs have are they can challenge the Executive Order through -- they can challenge the Executive Order through currently pending FLRA proceedings. They can raise the Executive Order issues or the CBA cancelations within arbitrations or as unfair labor practice complaints.

THE COURT: Counsel, can you help me understand because I want to make sure that we're talking about the same thing. Are you making a distinction between challenging the Executive Order versus the Secretary's

action in canceling and terminating the Master Agreement?

Are those two separate actions, and do we think about avenues to redress with a different eye whether it's one versus the other?

MR. BECKER: Yes, your Honor. I think that's a good question. So our -- so we believe that this is ultimately one action, because the President exempted the Department of Veterans Affairs from the FSLMRS's protections; and that is, I know, a very long name for an acronym for a statute that I trip over all the time.

However, if your Honor disagrees with that that it is one action, we think that even if it's a separate action here, the Secretary was just following the Executive Order in terminating the CBA. And that is exactly what the Secretary said in the decision. I don't think plaintiffs dispute that; I think plaintiffs just dispute that there may be some other reasons that the Secretary did it that aren't on the face of the Secretary's rescission letter.

THE COURT: Yeah. But were all agreements canceled or was there picking and choosing agreements to cancel?

MR. BECKER: Your Honor, there were certain agreements -- the VA has canceled agreements if the

Executive Order has applied to them. So at the time of the cancelation, there were some unions that had been exempted from the President's Executive Order. That has been rescinded and all those agreements have been canceled now.

THE COURT: So how should the Court consider or what weight should we give to language in -- such as this union has not posed a hindrance to or has not filed grievances against; where should the Court consider that language in assigning motivation to the Secretary or maybe we shouldn't consider that language at all?

MR. BECKER: Your Honor, that language deals with -- that language is something that is appropriate to consider in this particular context because the President and the Secretary here are trying to terminate or are trying to -- the Secretary implementing the President's directive are trying to implement the President's directive to not apply FSLMRS protections. And the President can certainly consider in doing so whether unions or whether certain agencies are being hampered by filing of grievances and the like. That is not First Amendment protected activity.

THE COURT: How is that not First Amendment activity?

MR. BECKER: Your Honor, the filing of grievances has never been seen as First Amendment activity. I think we cited a couple of cases in our brief, including *Babbitt*, that this ability to actually -- there's no right to file a grievance. Like, for example, if AFGE was -- if there was some agencies that aren't subject to the FSLMRS, there's no First Amendment right to have a grievance procedure as a result.

THE COURT: Setting aside any First Amendment implications, how does that play in -- with respect to any claims of retaliation or retaliatory actions?

MR. BECKER: Yes, your Honor. In terms of retaliation, we think that it's important for the Court to differentiate between the April 11th letter, or I should say notice, that exempted certain unions and from the Executive Order; and it's important to differentiate that from the August 6th rescission -- the August 6th cancelation of the CBAs.

The August 6th cancelation of the CBAs states on its face that it is canceling the CBAs because of the Executive Order. The April 11th order has been rescinded, the April 11th notice; the Secretary exempting certain unions has been rescinded at this point and all of the collective bargaining agreements

have been canceled.

So as a result of that, there is -- this is more a situation where even if the Court found that -- and this is without getting to the government's defense which is the fourth part of the *Mt. Healthy* standard, without even getting to the government's defense -- even if the Court found that this was a substantial motivating factor, really in this situation the best remedy would be to engage in something -- it's a little weird at the PI context, but it would be to remand to the agency without vacatur because the Secretary has clearly canceled all the agreements now so it's unclear, and now OPM guidance that the plaintiff submitted yesterday, the agreements would just all be canceled anyway for other reasons because of the Executive Order.

And the other thing to mention on this is that even if the Court were to find that this was a substantial motivating factor, which we don't think the Court -- we don't think plaintiffs have presented evidence of that because the closest in time action of the Secretary between the cancelation of the CBAs and -- was the Ninth Circuit decision, the Ninth Circuit decision was five days before the CBAs were canceled. So it seems pretty clear that the evidence in the

record which states that the Secretary's canceling as a result of the Executive Order, that the Ninth Circuit's decision staying a preliminary injunction preventing the Department of Veterans Affairs from implementing the Executive Order was the motivating reason. Now --

THE COURT: Is there any reasoning other than it's called for in the Executive Order that you could submit to the Court as to why this particular agreement was canceled?

MR. BECKER: Your Honor, the Therit declaration goes through the reasons, including national security reasons, that will be in the administrative record when they are presented to the Court. It is very common at the preliminary injunction stage for agencies to not submit the entire administrative record, which we are not -- under no obligation to do so yet, and the Therit declaration goes through some of the problems that the VA has had with this particular agreement.

And this agreement has caused -- causes the VA to have to, if they have an underperforming employee, they have to give the employee a 90-day performance improvement plan before even terminating them. That causes immense harm to the VA itself. The agreement requires the VA to allow nearly 2,000 government employees to be able to use union time -- to engage in

union activity during the workday.

The agreement also allows for -- requires advance notice to the Union before the employees can even be reassigned or involuntarily moved as a result of the changing dynamics in the VA. And it requires office space at the VA facilities. As a result of the cancelation of the CBA, the VA was able to reclaim 180,000 square feet of space, and VAs are already cramped so this would be immense harm to the government if the agreement was put back in place.

All of these decisions or all of these things are in the Therit declaration and describe material that will be in the administrative record once we get to that point.

THE COURT: Is it just that sole declaration?

MR. BECKER: Yes, your Honor. That's the declaration we're relying on.

I want to go also to the fourth prong of the *Mt. Healthy* standard on the First Amendment claim because I think that even if the Court were to find that there was a substantial motivating factor that was retaliation, the Court also needs to consider whether the government would have taken the action regardless of that prohibited motivation. The district court in California actually didn't consider this prong when

engaging in its analysis, which is one of the reasons that the decision was stayed.

Because the Ninth Circuit's decision occurred on August 1st and stayed the preliminary injunction there and on August 6th the CBAs were canceled and the CBAs were canceled with the reason that the VA was now implementing the President's Executive Order. This itself shows that there is a -- the government would have canceled the CBA's irregardless of a retaliatory motive.

THE COURT: Counsel, help me understand that.

MR. BECKER: Yes, your Honor. On August 1st, the Ninth Circuit stayed a preliminary injunction that was preventing the VA from implementing the Executive Order. Five days later, the VA canceled all of the relevant CBAs. That other -- that shows another motivation for considering them. The government would have canceled them regardless of the retaliatory motive because the Ninth Circuit allowed the VA to implement the Executive Order.

And then, your Honor, what's important is later -- so at that time, we concede that there were certain unions that were exempted from the Executive Order, but at this point all of the unions -- all of these CBAs have been canceled including among those unions because

of the November recision.

THE COURT: Was there guidance at some point from the OPM to hold off on any cancelation?

MR. BECKER: Your Honor, there was guidance from OPM to hold off on any cancelation. Some of that was the result of a decision in the D.C. Circuit which is now relevant to the Ninth Circuit case, but in the D.C. Circuit one of the stayed decisions, particularly in the *NTEU* case, the first appellate stay decision, that decision specifically said that if CBAs were canceled, the unions could consider going back to the Court. But that since the government had said they weren't going to cancel them, there was clearly no irreparable harm. And that was one of many reasons there was no irreparable harm.

The Ninth Circuit's decision is different. The Ninth Circuit says that any CBA that's canceled can be reinstated later and as a result there's no irreparable harm from a canceled CBA. After that decision, the government -- some agencies canceled CBAs -- not every agency has -- but plaintiffs really present no meaningful judicial standard as to how to evaluate that. And at this point the guidance that your Honor referenced from yesterday, the guidance specifically says that now the OPM guidance that all CBAs that are

not currently subject to preliminary injunctions should be canceled.

Now, I will also say that the OPM guidance is not binding on the EPA itself. The OPM guidance can certainly motivate reasons and be a reason that the VA would cancel an agreement, but it is not by itself binding. And the decision here was not OPMs, it was the Secretary's.

To address the APA claims briefly, here, we think that the Secretary offered -- the Secretary did offer an explanation. He did say that he was canceling the CBAs as a result of the President's directive, and the President determined that the Department of Veterans Affairs -- the protections of the FSLMRS cannot be applied consistent with national security under the statute. The Secretary then -- the President made that decision and the Secretary implemented that decision. And the Secretary gave that as the reason for implementing the decision.

THE COURT: Can you help me understand the national security -- how the national security's implemented or implicated outside of the declaration that you referenced?

MR. BECKER: Yes, your Honor. The President determined that the VA was engaged in -- had a primary

purpose of national security. And this relates to the VA's fourth mission here which includes being the backup medical care system for the military during times of war. It includes helping with -- if there's a natural disaster, the VA system is all over the country and has the ability to take in and help with getting over such a disaster. And these kind of things are -- these are in the Therit declaration, but also relate to one of the VA's missions which was established, as the Therit declaration explains, in a congressional statute in the 1980s.

And I want to briefly address the irreparable harm and the balance of the equities here. In this case, as I mentioned -- as I've already mentioned, the VA has already implemented this Executive Order and has canceled the CBAs. And any sort of -- and plaintiffs have not committed to, for example, repaying the VA if ultimately the CBA cancelation is found to be upheld. So plaintiffs present a lot of evidence of -- or present evidence of irreparable harm here, but we think there's also irreparable harm to the government that needs to be considered at the balance-of-the-equities stage and plaintiffs must make a showing under the Supreme Court *Starbucks* case under all four factors to receive a preliminary injunction.

The government, if the CBA is reinstated, will have to give back 180,000 square feet of office space, will have to -- the government will have to put employees back on union -- allow employees to engage in union activity during the workday. As a result, will have to reengage in arbitrations. It will have to put back in those performance improvement plans. And nearly 2,000 VA employees are going to be able to -- have to be taken off their mission-oriented roles to be engaging in union activity during the day, and the VA is going to have allow it. These kind of --

THE COURT: What is the inherent harm, you know, notwithstanding the last item, in having arbitration, having folks able to -- where is the harm in having to reinstate those aspects that you're enumerating as kind of the parade of horribles?

MR. BECKER: Yes, your Honor. These cause the VA -- the VA had a lot of members in unions and as a result there was -- I mean, there's hundreds of thousands of people. And as a result, there's significant costs to the government for -- among having to have employees engage in these arbitrations and grievance procedures and to deal with it.

So in some agencies this is a much smaller number, but there's quite a few employees because

there's hundreds of thousands of union members in the VA.

THE COURT: Okay.

MR. BECKER: So we think the Court -- we think here that the balance of the equities favors the government and that any of the irreparable harms plaintiffs mentioned are things that can be remedied later on final decision from this court, not at the preliminary injunction stage. For example, the Ninth Circuit has held that the CBAs can be reinstated later. And I don't think plaintiffs dispute that; I think plaintiffs say that as a result of the Ninth Circuit decision, if it comes out in their favor, the CBA will be reinstated.

And the other harms that plaintiffs mention can also be reinstated by the FLRA later -- can be remedied by the FLRA later. Union dues, for example, can be paid back -- can be remedied on final decision from the FLRA. After final decision, they can seek those in the FLRA. And this harm to the President's national security determinations from reinstating the CBA is itself also a harm to the government that I think the D.C. Circuit in the *NTEU* case specifically, as well in the *AFSA* case, which relates to a related statute involving the foreign service, that the D.C. Circuit

recognized that the balance of harms favored the government as a result and stayed those relevant injunctions.

If your Honor has no further questions, I think that we rest on what else is in our briefs and, of course, happy to take further questions. But the problem with this case is that it's going to cause immense harm to the government if the government has to reinstate these CBAs and is ultimately found later to -- that that reinstatement was not necessary. And we think that there are many reasons that this Court should consider even just staying this case at least awaiting the Ninth Circuit's decision since that is directly relevant here. Thank you.

THE COURT: Okay. Thank you, counsel.

MR. SILVA: Based on the notes I've jotted down here, your Honor, I would like to ask for about five to six minutes for rebuttal. Is that acceptable?

THE COURT: Sure.

MR. SILVA: Okay. Thank you, your Honor. I'll start I think with some of the more discrete points and then kind of maybe zoom out to the bigger picture from opposing counsel's presentation.

Opposing counsel represented to the Court that grievances coming out of a CBA cannot raise issues of

public importance.  That's wrong.  It's a misstatement of the law.  *Borough of Duryea* cited in our papers, 564 U.S. 379; *Connick against Myers*, 461 U.S. 138; the case called *Davignon* from the First Circuit, 524 F.3d 91 at 101.  When a union files a grievance that raises systemic issues, that's a matter of public importance.  Not necessarily challenging one employee's termination and nonemployee specific facts, but if it's broad, if it's systemic, it's First Amendment protected speech.

Point two on rebuttal; national security rationale, the declaration from Ms. Therit, the Chief Human Resources Officer, et cetera.  I do want to just reiterate the fact that this district, two courts in this district, including your Honor, have rejected the argument that at the PI phase this post hoc declaration maneuver is sufficient.  And I read in one citation earlier, the other is this Court's domestic violence case; that's at 2025 Westlaw 2988705.  So I think that issue has been addressed in this district, and just as a procedural matter that that declaration is -- it's the wrong declarant to start and it's the wrong time.  But on substance, I noticed that opposing counsel in reciting the contents of Ms. Therit's declaration was focused on issues about space; claiming that the VA is crammed and discussing official time awarded to union

officials to execute their obligations to their members.

Those aren't national security concerns, your Honor, those are just quotidian issues about government efficiency and government expenditures. And under the *Cole* case cited in our papers, you can't call that national security. The Secretary himself, his actions, his conduct and his reasons, are what's under review here, not Ms. Therit's, and he didn't say anything about national security in what he said.

Zooming out a little bit more to the big picture, opposing counsel referenced national security in the context of the third *Winter* prong where we begin to balance the equities. I wanted to point out just a few things in that regard. The first is that in the Master Agreement itself signed by the VA, in the preamble, the VA said that it's in the public interest to have the Master Agreement.

The second is that Congress wrote Chapter 71. Congress specifically exempted certain agencies from its scope in Section 7103(a) and, yes, it gave the President this additional authority in Subsection (b), but it listed particular agencies in Subsection (a). It didn't amend that list with respect to the VA when it changed the VA statute as time went on. And I would

submit that on a PI where the Court's task is to figure out how do I balance everything in the interim while we get to final judgment, it's Congress's intent and wishes that should be respected. And Congress did not carve this agency out of the statute. And I would also point out that this country went through the Persian Gulf Conflict, 9/11, the conflicts in Iraq and Afghanistan and COVID, all with the VA under Chapter 71 coverage.

The Court asked the question which I believe is insightful and relevant here to opposing counsel about whether all agreements were canceled. That question actually operates on two levels. The first level is whether all VA agreements were canceled. And opposing counsel did correctly note that as of today, all of them have been canceled, at least those arising under the scope of the President's Executive Order. But the action that we're challenging here is the action from August, and at the time that the Secretary acted, he was clearly picking and choosing between unions based on their politics. It does -- that was a discriminatory action; that's why we also mount our First Amendment case through the viewpoint discrimination claim -- framework. But whether it's viewed as a retaliatory action or viewpoint

discrimination, both of which obviously are proscribed, if you're picking and choosing, and that's what was happening in August, it is no remedy to later go back and start treating the other people the same as you treated your adversary. You are still discriminating at the time that you did the discrimination. You were still retaliating at the time that you did the retaliatory. And that's the action under review in front of the Court, and I think that's a point worth making.

The second level on which that question operates is whether throughout government CBAs have been terminated. I personally represent unions today that have their CBAs intact, and these are unions that are under the scope of the Executive Order. They haven't all been terminated. And opposing counsel admits that the forthcoming OPM guidance is nonbinding on the Secretary. I don't think we should presume, as opposing counsel would have it, that the Secretary will simply just reissue the same order if this Court vacates and remands. He might, for instance, take seriously the argument that we raise that he misread the Executive Order on this local employing offices issue which has tremendous implications. It would give substantial relief to the plaintiffs. Over half of the

workers that they represent would get relief if only that text of the President's order were properly implemented at this agency.

He also might continue -- this is a completely reasonable way to go about the -- to deal with this problem if you're the Secretary -- just leave the CBA in place throughout its temporal term. They have general contracting authority. There's no prohibition against entering into a collective bargaining agreement. It's a requirement if Chapter 71's in place, but there's no reason the agency couldn't do it. And so my point here is that the Secretary has options upon vacatur and remand, and that's why this case -- that's why the decision matters, that's why we're here today.

And then finally, I want to close on some of these issues about the Ninth Circuit. I agree completely with opposing counsel that the five-day timeline is important. Yes, that's really important. OPM said, and then the government told courts in D.C., California, the Ninth Circuit and the D.C. Circuits, that there's no irreparable harm in these cases because OPM had told the agencies to voluntarily not terminate these agreements. Courts issued orders staying preliminary injunctions in reliance on the government's

representation. They got relief from the Ninth Circuit.

Five days later, the VA acted contrary to the representations made to the court by the Department of Justice and contrary to the OPM guidance. And the about face that the DOJ had to file in the California case is in the record in this case, Reeves Exhibit L. So I do believe that that is important and that goes to arbitrary and capriciousness, not to, oh, I think that the action would happen anyway.

And that brings me to my final point, your Honor, about the Ninth Circuit, which is that I do not think it is appropriate for this Court to defer its actions based on what may or may not happen in the Ninth Circuit or the D.C. Circuit. There's a lot of things I can say about that as a lawyer. The Ninth Circuit, for instance, there was already -- this is extremely unusual -- there is an en banc call about an order staying a preliminary injunction before the panel even heard the case.

I mean, I've been a California lawyer and I was a Ninth Circuit clerk for ten years; I have never seen that. If there's going to be en banc review and there's going to be Supreme Court review, this litigation is going to be protracted. I don't think

it's appropriate to wait when there's no stay motion pending before this court. But as a person setting aside some of the legalistic reasons, we have documented irreparable harm; we have documented chilled speech, which is a per se injury under the law; we have documented mothers being denied parental leave; we have documented people talking to union reps in broom closets.

Those issues are properly before the Court, the motion is ripe, and I would ask the Court to adjudicate the motion now because there is, of course, parallel litigation going on, but these harms deserve their hearing before a member of the court. I appreciate the Court's time. And unless opposing counsel has further questions or further presentation, then we submit.

THE COURT: Thank you. Thank you, counsel. I'm happy to give you the opportunity to respond to anything on rebuttal if you would like to. You certainly don't have to, but I'm welcome to hear from you.

MR. BECKER: Yes, your Honor. I just have one thing that I think we want to respond to which is the government's representations in the Ninth Circuit. The government told the Ninth Circuit at oral argument, and it's very evident in that case, that it would

give -- that staying the injunction would give the ability to cancel CBAs. So I don't think that opposing counsel's representation on this is correct, and I think that is important that we clarify that with the Court. Other than that, I think we rest.

THE COURT: Okay. Thank you, counsel.

Again, thank you for a fine presentation. The briefing has been extensive and really, really helpful. I know that these are important matters, and folks are looking for speedy turnarounds from the Court. As you know, this Court, with many other courts, are grappling with lots of these issues and they are complicated; but at the end of the day, there are people who are waiting for this Court and are relying on this Court to come up with a decision.

So I appreciate your presentation. We will take it under advisement. We will act as expeditiously as we can. I know my clerks don't like when I say that, but we're going to do the best that we can to respond. So thank you.

MR. BECKER: Thank you, your Honor.

MR. SILVA: Thank you, your Honor.

MR. LI: Thank you.

THE CLERK: All rise.

(Proceedings concluded; 12:14 p.m.)

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Official Court Reporter                    March 2, 2026

**UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305;<br><br>      Plaintiffs,<br><br>            *v.*<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and<br><br>DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs;<br><br>      Defendants. | Civil Action No.<br>25-CV-583-MRD-PAS |

**DEFENDANTS' MOTION
FOR CLARIFICATION OF PRELIMINARY INJUNCTION**

On March 13, 2026, this Court issued a Memorandum Opinion & Order ("Order") concluding that Plaintiffs have shown a likelihood of success on their challenge to Defendants' decision to terminate the three-year Master Collective Bargaining Agreement ("Master CBA") between the U.S. Department of Veterans Affairs ("the VA") and the American Federation of Government Employees ("AFGE"). (Order 18, 28, ECF No. 30.) That Order requires Defendants to take the following action:

> The Defendants shall reinstate the Master CBA—as well as any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the Master CBA— for the remainder of the agreed-upon term provided in the Master CBA.

1

**SA664**

(*Id.* at 29.) The Order is ambiguous in two respects, and Defendants therefore seek clarification from the Court.

First, by its terms, the Order may be read to constrain the VA from re-terminating the Master CBA *for any reason* before its August 8, 2026 expiration, even though that relief would exceed the relief Plaintiffs requested and exceed the relief that would be appropriate based on the theories where the Court found a likelihood of success for Plaintiffs. Defendants therefore respectfully ask the Court to clarify that its Order does not enjoin re-termination of the Master CBA for other reasons.

Second, the Order may be read to provide relief to parties that are not before the Court—in particular, to local unions who did not and could not sue in this Court. Because such an interpretation would be contrary to Article III's case-or-controversy requirement and the Supreme Court's direction in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), Defendants ask the Court to clarify that the scope of the Court's injunction is limited to only those AFGE affiliates that sued in this Court.

In the alternative, if this Court intended its Order to have the broader effects discussed, Defendants respectfully seek reconsideration of those aspects of the Order.

## LEGAL STANDARD

### A.    Motion for Clarification

A preliminary injunction order must "state its terms specifically," and "describe in detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). District courts have the "sound discretion" to "clarif[y]" the scope of their injunctions so parties are not left "in the dark as to their duty toward the court." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 15 (1945) (stating that "we think courts would not be apt to withhold [such] clarification"); *see also Campus*

2

**SA665**

*Stores of Mass., Inc. v. Follett Higher Educ. Grp., Inc.*, No. CV 05-11116-NG, 2005 WL 8176133, at *4 (D. Mass. Sept. 19, 2005) (granting a motion to clarify a preliminary injunction so that it "clearly requires" certain action); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2956 (3d ed. 1987) ("It should be noted that when an interested individual is confused as to the applicability of an injunction to him or whether the scope of an order applies to certain conduct, he may request the granting court to construe or modify the decree."). Indeed, "[e]ntertaining such motions seems especially prudent if the parties must implement the ruling at issue at subsequent stages of the litigation." *United States v. All Assets Held at Bank Julius, Baer & Co.*, 315 F. Supp. 3d 90, 99 (D.D.C. 2018).

**B.     Motion for Reconsideration**

A district court "has substantial discretion and broad authority" to reconsider its own decisions. *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 81 (1st Cir. 2008). The court properly invokes its discretion to grant a Rule 59(e) motion if there is a legal error, newly discovered evidence, or if the district court "has patently misunderstood a party . . . or has made an error not of reasoning but apprehension." *Ruiz Rivera*, 521 F.3d at 81; *accord Biscayne Ent., Inc. v. City of Providence Bd. of Licenses*, No. CV 20-130-JJM-LDA, 2020 WL 3104934, at *2 (D.R.I. June 11, 2020).

<div align="center">ARGUMENT</div>

**A.     The Court should clarify that its Order does not constrain re-termination for the remainder of the Master CBA's Term.**

In its Order, the Court recognized that Plaintiffs were asking the Court to adjudicate only one "distinct, discrete action"—*i.e.*, the Secretary's termination of the Master CBA on August 6, 2025, as part of the Agency's implementation of Executive Order 14,251. (Order 1, 11.) Specifically, the Court appreciated the

<div align="center">3</div>

<div align="right">**SA666**</div>

distinction between that action and the President's issuance of Executive Order 14,251 and observed that "the Plaintiffs' claims only pertain to Secretary Collins' and the VA's actions." (*Id.* at 11; *see also id.* at 12 (clarifying that "[t]his case is not about the constitutionality of the EO").) "Secretary Collins had no role in the issuance of the EO," the Court correctly observed. (*Id.* at 11.)

Appropriately focused on the challenged action before it, the Court did not speculate about whether the VA may have other, lawful bases upon which to terminate the Master CBA during the remainder of its term (*i.e.*, until August 8, 2026). An injunction prohibiting a future termination based on a different record would have been improper for three reasons.

*First*, the "principle of party presentation" required the Court to focus on the August 6 termination, not hypothetical future terminations. *See Clark v. Sweeney*, 607 U.S. 7, 9 (2025). The only agency action the Plaintiffs challenge in this suit is the Defendants' August 6, 2025 termination of the Master CBA. (Am. Compl. for Declaratory & Injunctive Relief ("Am Compl.") ¶ 11, ECF No. 13 ("The Secretary's August 6 Termination was unlawful under either the Administrative Procedure Act (APA) and the Constitution."). Similarly, Plaintiffs' preliminary-injunction motion requested only that this Court issue a "preliminary injunction and/or an order to stay or preliminary set aside Defendants' *August 6, 2025 termination* of the 2023 Master Collective Bargaining Agreement." (Mot. for Prelim. Inj. & Relief Under 5 U.S.C. § 705 at 1, ECF No. 14 (emphasis added)). Granting Plaintiffs relief from any speculative future agency actions would go beyond the relief Plaintiffs sought in their complaint and preliminary-injunction motion, and run counter to the rule that Plaintiffs "frame the issues" and "courts call balls and strikes; they don't get a turn at bat." *Clark*, 607 U.S. at 9 (citations omitted).

4

*Second*, Article III independently bars advisory relief concerning speculative future conduct. The Constitution limits federal courts' jurisdiction to "cases" and "controversies." U.S. Const., art. III, § 2. As the Supreme Court has repeatedly emphasized, that limitation requires "a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 592 U.S. 53, 58 (2020); *accord Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 397 (2024) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."). In the instant case, the question and controversy before the Court is this: did Defendants' termination of the Master CBA on August 6, 2025, violate either the First Amendment or the Administrative Procedure Act (APA)? (Order 1, 5, 11.) Based on the record before the Court, the Court ruled that the answer is likely "yes." (*Id.* at 5, 18, 25.) Termination of the Master CBA on a different basis would require adjudication based on a different record—one not before the Court. In sum, enjoining the VA from taking any action regarding the current Master CBA—such as re-terminating the Master CBA for different reasons than those the Court considered in its preliminary-injunction order—would constitute precisely the type of advisory ruling Article III forbids.[1]

---

[1] The ripeness doctrine further supports reading the Order as not applicable to a contingent, future re-cancellation of the Master CBA. The doctrine bars adjudication of claims based on "contingent future events." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017). As specifically applied to cases involving the Executive Branch, the doctrine prevents "courts from 'entangling themselves in abstract disagreements over administrative policies' and from improperly interfering in the administrative decision-making process." *City of Fall River v. Fed. Energy Regulatory Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). "Agency action is not ripe for judicial review until an agency has made a final decision. *Abbott Labs.*, 387 U.S. at 149. And, for an agency review to be final, it must be both (a) "the consummation of the agency's decisionmaking process," and (b) a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177 (1997); *Abbott Labs.*, 387 U.S. at 148-49.

**SA668**

*Third*, it is axiomatic that equitable relief must be narrowly tailored to remedy the harm alleged. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."); *DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 423 (1st Cir. 2024) ("Judges must closely tailor injunctive relief to the specific harm alleged."). As discussed *supra*, the only action the Plaintiffs' complaint challenges and that Plaintiffs requested a preliminary-injunction setting aside is Defendants' August 6, 2025 termination of the Master CBA, and therefore the relief must be tailored to that particular agency action.

Despite all of this, the Court's Order could be read as forbidding Defendants from engaging in any future termination of the Master CBA through its scheduled expiration on August 8, 2026. Defendants seek clarification that such a construction was not intended. And if it was intended, Defendants seek reconsideration for the same reasons explained.

**B.    The Court should clarify its Order to confirm that it is limited to only those AFGE affiliates who are before the Court.**

The Order's instruction to reinstate "local supplemental agreements, and memoranda of understanding" should be understood to apply only to the local supplemental agreements and memoranda of understanding between Plaintiffs and the VA—and not parties not before the Court. Such a construction is consistent with the Supreme Court's direction in *Trump v. CASA, Inc.*, that injunctions must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." 606 U.S. 831, 835 (2025). "Under this principle, the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court.*" *Id.* at 852. "'[C]omplete relief' is not synonymous with 'universal relief.'" *Id.* at 851. And

6

"universal relief," which "falls outside the bounds of a federal court's equitable authority under the Judiciary Act," may not be entered. *Id.* at 847.

Here, only two Plaintiffs are before the Court: (1) American Federation of Government Employees National VA Council ("NVAC"),[2] and (2) American Federation of Government Employees Local 2305 ("AFGE Local 2305").[3] The ordered relief should be limited to them. The Court's opinion says nothing to suggest otherwise. Taken out of context, however, the Order's reference to "local supplemental agreements, and memoranda of understanding" could broadly be construed as requiring Defendants to reinstate "local supplemental agreements" and "memoranda of understanding" with the numerous AFGE local unions nationwide, regardless of whether those local unions were plaintiffs before the Court.[4]

Defendants therefore seek clarification that the Order is limited to "local supplemental agreements, and memoranda of understanding" it has with the two Plaintiffs in this case, and Defendants seek reconsideration to the extent the Order provides nationwide relief.

---

[2] NVAC is "an autonomous labor organization affiliated with the American Federation of Government Employees that represents, and bargains on behalf of, more than 300,000 bargaining unit employees at the VA. (Am. Compl. for Declaratory & Injunctive Relief ("Am. Compl.") ¶ 24, ECF No. 13; Decl. of Tracey Therit ¶ 7, ECF No. 17-1.)

[3] AFGE Local 2305 is a local affiliate that represents VA employees who work at the Providence VA Regional Benefit Office and the Providence Veterans Center (in addition to other VA employees outside this District). Before August 6, 2025, there were more than 450 bargaining unit employees represented by AFGE Local 2305. (Am. Compl. ¶ 25; Decl. of Tracey Therit ¶ 10.)

[4] According to NVAC's website, there are 178 local AFGE/NVAC unions. NVAC, https://afgenvac.org (last visited March 18, 2026).

**SA670**

## CONCLUSION

To the extent that Defendants have misunderstood the Court's preliminary injunction, they respectfully request clarification or reconsideration for the reasons explained.

Dated: March 20, 2026

Respectfully submitted,

UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs,

By their attorneys,

CHARLES C. CALENDA
United States Attorney

*/s/ Andrea Hyatt*
Andrea Hyatt
Assistant U.S. Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5001 (Fax)
Andrea.Hyatt@usdoj.gov

Tyler J. Becker
(VA Bar No. 97636)
Counsel to the Assistant Attorney General
U.S. Department of Justice
Civil Division
Office of the Assistant Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 514-4052
Tyler.Becker@usdoj.gov

**SA671**

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 20, 2026, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 304.

/s/ Andrea Hyatt
ANDREA HYATT
Assistant U.S. Attorney

9

SA672

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
NATIONAL VA COUNCIL

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
LOCAL 2305

     *Plaintiffs,*

     **v.**

UNITED STATES DEPARTMENT
OF VETERANS AFFAIRS; and

DOUGLAS A. COLLINS, in his official
capacity as U.S. Secretary of Veterans
Affairs

     *Defendants.*

Case No. 1:25-cv-00583-MRD-PAS

EXPEDITED RELIEF REQUESTED
(LR Cv 9)

## PLAINTIFFS' MOTION TO ENFORCE THE PRELIMINARY INJUNCTION

6092586

**SA673**

**TO THE COURT AND ALL PARTIES:**

Plaintiffs move the Court to enforce the preliminary injunction in this case issued on March 13, 2026.  Dkt. 30.  In support of this motion, Plaintiffs concurrently file a supporting memorandum and the sworn declaration of Alexandra Wheeler.

Pursuant to LR Cv 9, Plaintiffs respectfully request expedited relief.  Plaintiffs and the hundreds of thousands of VA employees they represent are irreparably harmed each day that Defendants fail to comply with the preliminary injunction.  **Plaintiffs respectfully request that the Court order that Defendants' opposition be filed on Tuesday, March 24, 2026, that Plaintiffs' reply brief be filed on Thursday, March 26, 2026, and any argument on the Motion to be heard as soon as is practicable for the Court.**

Pursuant to LR Cv 7(c), Plaintiffs request oral argument on this motion only to the extent it would aid the Court.  Should the Court desire oral argument, Plaintiffs will be prepared to attend on short notice, particularly if such argument is held remotely.

<div style="margin-left:45%">

Respectfully submitted,

LAW OFFICE OF CARLY B. IAFRATE, PC

</div>

Dated: March 20, 2026

<div style="margin-left:42%">

By:    */s/ Carly Beauvais Iafrate*

</div>

<div style="text-align:center">1</div>

6092586

<div style="text-align:right">

**SA674**

</div>

Carly Beauvais Iafrate, #6343
Law Office of Carly B. Iafrate, PC
408 Broadway, 1st Fl.
Providence, RI 02909
(401) 421-0065
ciafrate@verizon.net

Dated: March 20, 2026                    By:    */s/ Travis Silva*
                                                Brook Dooley *(pro hac vice)*
                                                Travis Silva *(pro hac vice)*
                                                Taylor Reeves *(pro hac vice)*
                                                JiLon Li *(pro hac vice)*
                                                Alexandra Wheeler *(pro hac vice)*
                                                KEKER, VAN NEST & PETERS LLP
                                                633 Battery Street
                                                San Francisco, CA 94111-1809
                                                Telephone:  415 391 5400
                                                Facsimile:  415 397 7188
                                                BDooley@keker.com
                                                TSilva@keker.com
                                                TReeves@keker.com
                                                JLi@keker.com
                                                AWheeler@keker.com

                                                *Attorneys for American Federation of*
                                                *Government Employees National VA*
                                                *Council and American Federation of*
                                                *Government Employees Local 2305*

2

6092586

**SA675**

3

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2026, I electronically filed the within motion and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

*/s/ Jessica M. Delgadillo*

3

6092586

**SA676**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and<br><br>DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs<br><br>*Defendants.* | Case No. 1:25-cv-00583-MRD-PAS<br><br>EXPEDITED RELIEF REQUESTED (LR Cv 9) |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE PRELIMINARY INJUNCTION

**SA677**

**INTRODUCTION**

The Defendants in this case are violating an order of this Court. Accordingly, Plaintiffs respectfully seek the Court's swift intervention to protect their rights—and the rights of the federal employees they represent—and to safeguard the integrity of the judicial process.

On March 13, 2026, this Court issued the PI Order[1] requiring Defendants to immediately comply with all terms of the Master Agreement, which is the collective bargaining agreement between the VA and NVAC. While asserting that the Master Agreement has been reinstated, Defendants are not, in fact, complying with the terms of the Master Agreement and, thus, they are not complying with the PI Order. Defendants continue to deny employees the benefits and protections they are due under the Master Agreement.

Nor have Defendants communicated to Plaintiffs how they will comply with the PI Order in the future. At the national level, Defendants have told the union's leadership that compliance with the PI Order "raises complex questions of law" and that "additional information and guidance regarding VA's reinstatement of the [Master Agreement] and compliance with the Order will be forthcoming," without providing any further detail. Wheeler Decl., Ex. C (03/18/26 Memorandum from Office of Labor-Management Relations to Human Resource Officials). At the local level, VA officials are refusing to interact with local union leadership or to confirm employees' eligibility for benefits and protections they are due under the Master Agreement. Defendants' counsel has brushed off Plaintiffs' counsel's requests for confirmation

---

[1] In this brief, "PI Order" refers to the order issued on March 13, 2026, at docket entry 30. The "FSLMRS" refers to the Federal Service Labor-Management Relations Statute. "NVAC" is Plaintiff American Federation of Government Employees National Veterans Affairs Council. The "Wheeler Decl." is the concurrently filed Declaration of Alexandra Wheeler in Support of Plaintiffs' Motion to Enforce. The "Termination" refers to Defendant U.S. Secretary of Veterans Affairs Douglas A. Collins's decision to terminate the Master Agreement on August 6, 2025. The "VA" refers to the United States Department of Veterans Affairs.

**SA678**

that the Master Agreement will be reinstated per the PI Order. In short, there is no compliance today, and no promise of compliance tomorrow.

Instead, Defendants filed a motion seeking "clarification" of the PI Order. Plaintiffs will submit an opposition explaining why that motion lacks merit. But, for the purposes of this motion, the critical fact about Defendants' clarification motion is that neither of the ancillary issues that it raises has any bearing on whether Defendants can comply with the PI Order today.

Defendants are failing to comply with an order of this Court. The Court should address this situation by issuing a remedial order enforcing the PI Order containing the remedial measures that Plaintiffs seek below.

## FACTUAL BACKGROUND

On March 13, 2026, the Court issued the PI Order. It requires that Defendants "reinstate the Master CBA—as well as any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the Master CBA—for the remainder of the agreed-upon term provided in the Master CBA." Dkt. 30 at 29.

On Tuesday, March 17, 2026, NVAC's President, Mary Jean Burke, raised to Defendant Collins' attention that VA officials were not complying with the PI Order but were instead claiming that they were "awaiting guidance" from the VA. Wheeler Decl., Ex. B (03/17/26 M. Burke Letter to D. Collins). Instead of engaging in good-faith implementation, the VA responded by pointing NVAC to an internal VA memorandum. The memorandum is ambiguous. It starts by stating that "Per the [PI] Order, the 2023 Master CBA with AFGE is reinstated." Wheeler Decl., Ex. C (03/18/26 Memorandum from Office of Labor-Management Relations to Human Resource Officials). But the memorandum goes on to say that the "VA is currently reviewing the Order and has engaged with the Department of Justice for guidance on how to

2

SA679

correctly implement the Order.  The Order raises complex questions of law about how to reinstate the CBA while the FSLMRS remains inapplicable to the vast majority of VA employees.  Additional information and guidance regarding VA's reinstatement of the 2023 Master CBA and compliance with the Order will be forthcoming." *Id.*  No timeline was provided.

On Thursday, March 19, 2026, lawyers for the VA asserted that the PI Order "did not address the validity of EO 14251, enjoin the implementation of EO 14251, or make the Federal Service Labor-Management Relations Statute (FSLMRS) broadly applicable to VA" and that the "Order's lack of clarity and failure to address how the CBA can be reinstated notwithstanding the valid and enforceable EO requires VA to get further guidance from the District Court." Wheeler Decl., Ex. L (03/19/26 N. Pasquarella Letter to F. Cornelius).

On Friday, March 20, 2026, the date this Motion is being filed, Defendants filed a "Motion for Clarification of Preliminary Injunction."  Dkt. 32.  But the March 20, 2026 Motion for Clarification omits any arguments about the relationship between the PI Order and Executive Order 14251, and instead raises two different and new issues that purportedly require clarification.  First, Defendants assert that the PI Order "could be read as forbidding Defendants from engaging in any future termination of the Master CBA through its scheduled expiration on August 8, 2026.  Defendants seek clarification that such a construction was not intended." *Id.* at 6.  Second, Defendants "seek clarification that the [PI] Order is limited to 'local supplemental agreements, and memoranda of understanding' it has with the two Plaintiffs in this case." *Id.* at 7.

Meanwhile Defendants' counsel has refused to confer with Plaintiffs' counsel about any of these issues.  When Plaintiffs' counsel first asked to confer, Defendants' counsel did not

3

**SA680**

respond and instead pointed to the ambiguous internal memorandum described above.  Wheeler Decl., Ex. M (03/18/26 T. Becker Email to T. Silva).  The following day, after Plaintiffs' counsel informed Defendants' counsel that the VA was continuing to deny employees their rights under the Master Agreement and asked for confirmation that the VA would comply with the PI Order by adhering to the Master Agreement, Wheeler Decl., Ex. N (03/19/26 T. Silva Email to T. Becker), defense counsel refused to provide that confirmation, instead stating that "If the union believes any provisions of the Master Agreement are not being honored, the agreement spells out the process for raising grievances."  Wheeler Decl., Ex. O (03/20/26 T. Becker Email to T. Silva).  Within minutes of sending this email, Defendants filed their Motion for Clarification.

All the while, Defendants have been defying the PI Order by openly refusing to follow the Master Agreement's terms.  As Plaintiffs show below, the VA continues to deny employees benefits due under the Master Agreement, to deny union officials official time to attend to union duties, to deny employees right during the disciplinary process, and to refuse to participate in the negotiated grievance and arbitration procedure.  *See infra*, Argument, Section D.

In sum, in the week since the Court issued the PI Order, Defendants have taken the position that they have complied with the PI Order by issuing a memorandum saying that the Master Agreement is "reinstated," without actually following the Master Agreement's terms. Defendants have simultaneously argued that the PI Order is so ambiguous and unclear that it needs clarification.  And the issues that Defendants claimed needed clarification on March 18 and 19 are different than the issues that Defendants claim need clarification in their March 20 Motion for Clarification.

4

**SA681**

**LEGAL STANDARD**

Courts may issue further orders "to compel compliance with a [prior] court order." *nited States v. Saccoccia*, 433 F.3d 19, 27 (1st Cir. 2005). To enforce a court order, the plaintiff must show that (1) Defendants "had notice of the order," (2) "the order was clear and unambiguous," (3) Defendants "had the ability to comply with the order", and (4) Defendants "violated the order." *Ne    or   v. Trump*, 777 F. Supp. 3d. 112, 116 (D.R.I. 2025) (citing *a    ins v. Dep t of   ealth and   uman Servs.*, 665 F.3d 25, 31 (1st Cir. 2012) and granting motion to enforce preliminary injunction against multiple governmental defendants, including Defendants here), *aff d* – F.4th –, –, 2026 WL 734941, *19 (1st Cir. Mar. 16, 2026).[2]

**ARGUMENT**

Plaintiffs have satisfied all four *a   ins* factors. There is no dispute that Defendants have actual notice of the PI Order. The PI Order's instruction to "reinstate the Master CBA" is short, direct, and precise, and Defendants have demonstrated that they understand what compliance means in this context. Defendants abided by the Master Agreement before and have the ability to abide by it again. And it is clear that Defendants are violating the PI Order.

**A. First Factor: Defendants had notice of the PI Order**

There is no dispute that Defendants had actual notice of the PI Order. The Order was electronically served upon them, and Defendants have referred to it in correspondence with Plaintiff NVAC. Wheeler Decl., Ex. C (03/18/26 Memorandum from Office of Labor-Management Relations to Human Resource Officials).

---

[2] This is the same standard that governs motions for civil contempt. *See   a   ins*, 665 F.3d at 31. That said, Plaintiffs do not seek civil contempt at this time.

**SA682**

**B. Second Factor: The PI Order is clear and unambiguous**

The PI Order directs that Defendants "shall reinstate the Master CBA—as well as any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the Master CBA—for the remainder of the agreed-upon term provided in the Master CBA." Dkt. 30 at 29. There are no exceptions or qualifications. Compliance is due immediately. The action required by Defendants is precisely stated and easy to identify. It requires Defendants to return to the status quo ante by complying with the Master Agreement.

Indeed, throughout the case, Defendants have made clear that compliance with a preliminary injunction would require the VA to follow the Master Agreement. Defendants acknowledged that reinstating the Master Agreement would require the VA to "allow nearly 2,000 government employees to be able to use union time -- to engage in union activity during the workday" *i.e.*, to provide union officials with official time. Wheeler Decl., Ex. A, (02/19/2026 H'rg) at Tr. 35: 23-25. Defendants stated that an injunction would require them to give "the employee a 90-day performance improvement plan before even terminating them," *id.* at Tr. 35:21-22; to provide "advance notice to the Union before employees can even be reassigned or involuntarily moved," *id.* at Tr. 36: 2-5; to furnish "office space at the VA facilities," *id.* at Tr. 36: 5-6; and to "engage in [] arbitrations and grievance procedures," *id.* at Tr. 41: 21-23.[3] The Court can thus be confident in knowing that Defendants understand what compliance looks like, given that Defendants have described it to the Court.

---

[3] *See also* Dkt. 17 at 10-11 (listing the VA's post-termination actions), 52-53 ("If forced to comply with Plaintiffs' requested preliminary injunction by reinstating the CBA, the VA would have to undo those actions by reestablishing withholding of union dues," recognizing official time, providing the union with use of VA premises, engaging in collective bargaining, and "otherwise reverting back" to prior practice.).

SA683

In contrast, none of Defendants' shifting claims about why the PI Order requires "clarification" actually suggests that the PI Order is unclear or ambiguous. Rather, Defendants' "clarification" arguments are either arguments that Defendants recycle from their opposition to Plaintiffs' Motion for Preliminary Injunction (and that the Court rejected) or are untimely new arguments in opposition to Plaintiffs' Motion that Defendants are only now raising for the first time.

On Wednesday, March 18, Defendants took the position that the PI Order is unclear because of a purported conflict between the PI Order, which enjoins the Termination, and the related Executive Order, which remains in effect.  Wheeler Decl., Ex. C (03/18/26 Memorandum from Office of Labor-Management Relations to Human Resource Officials).  There is no such conflict.  In their Opposition, Defendants had argued that the legality of the Executive Order and the Termination were one and the same, *see* Dkt. 17 at 17, 33-35, 36-37, 43-44, but the Court rejected those arguments.  In fact, the PI Order made very clear that the Court was "deeply mindful" of the distinction between the Executive Order and the Termination.  Dkt. 30 at 12. The Court noted that "[t]his case is not about the constitutionality of the EO.  The motion before the Court is about whether the Defendants' termination of the Master CBA is unconstitutional as a violation of the Plaintiffs' First Amendment rights and/or the APA as well as in violation of the APA as an arbitrary and capricious administrative action."  *Id.*  The Court then explained why Plaintiffs are likely to succeed in showing that the Termination ordered    *t e  e retar*  was unlawful independent of whatever force the Executive Order might have.  *Id.* at 12-24. Defendants also clearly understand this distinction; they devote nearly a full page of their Motion for Clarification to acknowledging it.  Dkt. 32 at 3-4.

7

Moreover, Defendants have long understood that the Master Agreement can remain in effect notwithstanding the Executive Order.  Immediately after the President issued Executive Order 14251, the Office of Personnel Management affirmatively advised the VA *n t* to terminate any collective bargaining agreement.  *See* Dkt. 30 at 16 & n.7; *see also* Dkt. 19 at 4-5 (describing the government's statements that the Executive Order and any termination of collective bargaining agreements are distinct events).  Indeed, the VA left the Master Agreement in place for more than four months after the President issued the Executive Order,[4] and many other collective bargaining agreements stayed in effect for much longer.  Dkt. 17 at 44.  In short, the objection the VA asserted in its March 18 memorandum is an issue that Defendants already put before the Court and which the Court already addressed in the PI Order.

Abandoning the explanation offered on March 18 for why they could not comply with the PI Order, on March 20, Defendants filed a Motion for Clarification that identifies totally different issues needing "clarification."  As noted above, the Motion for Clarification first asks for the Court's permission to issue a second termination of the Master Agreement, then seeks to limit the PI Order with respect to subsidiary agreements.  Plaintiffs will address the Motion for Clarification in a separate response, but, for present purposes, the key point is that neither of these arguments (even if colorable, which they are not) has anything to do with Defendants' ability to understand the PI Order or to comply with it today.  There is nothing about the question of whether the PI Order would bar some speculative, future conduct by the Defendants that would hamper Defendants' ability to follow the PI Order today.  And Defendants' non-

---

[4] Executive Order 14251 was enjoined, as to its application against Plaintiffs, between June 24, 2025, and July 7, 2025.  But it was not enjoined between its March 27, 2025 issuance and June 24, 2025, or again between July 7, 2025 and August 6, 2025.

**SA685**

compliance is not limited to subsidiary, local agreements, but rather is across-the-board defiance of the PI Order, as Plaintiffs illustrate below. *See infra*, Argument, Section D. Furthermore, Defendants have not provided even Plaintiffs NVAC and Local 2305 with union office space. Wheeler Decl., ¶ 17.

None of Defendants' changing explanations shows that the PI Order is "unclear" or "ambiguous." Indeed, when they were opposing Plaintiffs' request for a preliminary injunction, Defendants were able to identify, in detail, the tasks that would be necessary to comply such an injunction. *See supra*, p. 6. Defendants' protestations about the PI Order's alleged lack of clarity are pretexts for heel-dragging and re-litigating the merits of the PI motion. Such conduct is improper at this stage of the litigation.

## C. Third Factor: Defendants are able to comply with the PI Order

Defendants can comply with the PI Order. The Master Agreement was in effect for all represented employees from when it came into force on August 8, 2023 until the August 6, 2025 Termination at issue in this case. This includes the period of time between the March 27, 2025 issuance of Executive Order 14251 and the Termination. In fact, even after the Termination, the Master Agreement remained in effect for the small subgroup of represented employees, mostly police officers, who Defendants carved out of the Termination. The Court's restoration of the status quo ante imposes on Defendants only those obligations that they accepted as a matter of contract when they signed the Master Agreement.

## D. Fourth Factor: Defendants are violating the PI Order

Defendants are violating the PI Order. Although Defendants assert that the Master Agreement has been "reinstated," they are failing to comply with easy-to-understand and easy-to-implement provisions of the Master Agreement. The reality is, for the hundreds of thousands

9

**SA686**

of VA employees represented by Plaintiffs, absolutely nothing has changed since the issuance of the PI Order.

For example, the Master Agreement grants represented employees 16 weeks of parental leave. The Court ruled that denial of such parental leave is an irreparable harm, and this was one of the bases for the PI Order.  Dkt. 30 at 25-26 ("Parents cannot turn back the clock to have more time with an infant prior to returning to work once they have missed the early formative weeks of development and their own recovery time.").  Yet, this week, the VA told an AFGE-represented employee that she must return to work imminently—on March 23—even though under the Master Agreement she is entitled to an additional 4 weeks of parental leave to spend with her newborn child. Wheeler Decl., Ex. E (03/18/26 Watts Email).  In another example, the VA denied a represented employee expecting to deliver a child in May her contractual parental leave benefit, stating "your record still reflects that you are ineligible for inclusion in a bargaining unit. Currently we have no guidance on when this will change."  Wheeler Decl., Ex. F (03/18/26 Funseth Email).  Defendants' heel-dragging is particularly unconscionable in this context.

By way of another example, Defendants continue to deny employees covered by the Master Agreement the assistance of union representation during the disciplinary processes, as well as procedural protections guaranteed by the Master Agreement. Again, the Court referenced these harms when it issued the PI Order.  Dkt. 30 at 26 ("Disciplinary processes, once concluded, have an immediate and irreparable effect on the employee(s) in question"); *see also* Dkt. 13, Ex. A, at Art. 14 (relevant Master Agreement provision).  Yet, this week, the VA has continued to obstruct local union leaders' efforts to arrange for AFGE-represented employees to have union representation as a part of the discipline process.  Wheeler Decl., Exs. J (03/19/26 Stratton

<div align="center">10</div>

<div align="right">**SA687**</div>

Email), G (03/18/26 Brown Email).  On March 17, the VA terminated a represented employee, and the termination notice did not contain any notice the employee's option to appeal through the Master Agreement's procedure.  Wheeler Decl., Ex Q (03/17/26 Removal Decision).  Relatedly, the VA continues to deny union leadership's requests to recognize their right to official time, stating that the VA "will maintain status quo" and that "[o]fficial time request[s] from employees who are not police officers/firefighters/security guards are denied."  Wheeler Decl., Ex. P (03/16/26 E. Gallemyer Email to T. Stormoen).

Defendants are also refusing to participate in ongoing arbitration proceedings to resolve workplace disputes.  As outlined in the Declaration of William Wetmore in support of Plaintiffs' Motion for Preliminary Injunction, after Defendants unilaterally terminated the Master Agreement they also unilaterally refused to participate in any scheduled arbitrations.  *See* Dkt. 14-3, at ¶ 31.  One such example was a scheduled arbitration based on a grievance filed by AFGE Local 85.  On March 16, 2026, the arbitrator handling the AFGE Local 85 grievance requested that the parties move forward with rescheduling proceedings, *itin t e P rder*. On March 19, Defendants sent a letter arguing that the PI Order lacks clarity and the arbitration "should continue to be held in abeyance and processing should only be resumed once the controlling litigation concludes."  Wheeler Decl., Ex L (03/19/26 Pasquarella Letter). Defendants have relied on similar language in refusing to engage in other arbitrations. *See* Wheeler Decl., Exs. H (03/19/26 Greene Email); K (03/19/26 Greenstein Email).

### REMEDY

Plaintiffs respectfully request that the Court issue a remedial order requiring Defendants to comply with the Master Agreement, with respect to all employees covered by the terms of the

11

Master Agreement (and not just the approximately 3,000 police officers who the VA calls "Exempted Employees"). This order should require compliance with immediate effect.

Defendants should be required to submit weekly status reports to the Court and Plaintiffs regarding implementation.

In light of Defendants' equivocal communications with represented employees, Defendants should be required to issue a communication stating that they have reinstated the Master Agreement as to all employees who fell within its coverage before the Termination. A court overseeing similar litigation over the rescission of a collective bargaining agreement has required such notices. *Am. Fed n of Gov t Emps. AFL CI v. Noem*, 785 F. Supp. 3d 833, 863 (W.D. Wash. 2025) (requiring similar notification upon initial issuance of a preliminary injunction); *Am. Fed n of Gov t Emps. AFL CI v. Noem*, No. 2:25-CV-00451-JNW, 2026 WL 113599, at *4 (W.D. Wash. Jan. 15, 2026) (second required communication in same case).

## CONCLUSION

The Court should not tolerate open defiance of its orders. The Court should grant the motion to enforce.

Respectfully submitted,

LAW OFFICE OF CARLY B. IAFRATE, PC

Dated: March 20, 2026

By: */s/ Carly Beauvais Iafrate*

12

SA689

Carly Beauvais Iafrate, #6343
Law Office of Carly B. Iafrate, PC
408 Broadway, 1st Fl.
Providence, RI 02909
(401) 421-0065
ciafrate@verizon.net

Dated: March 20, 2026          By:     */s/ Travis Silva*
                                       Brook Dooley *(pro hac vice)*
                                       Travis Silva *(pro hac vice)*
                                       Taylor Reeves *(pro hac vice)*
                                       JiLon Li *(pro hac vice)*
                                       Alexandra Wheeler *(pro hac vice)*
                                       KEKER, VAN NEST & PETERS LLP
                                       633 Battery Street
                                       San Francisco, CA 94111-1809
                                       Telephone:  415 391 5400
                                       Facsimile:  415 397 7188
                                       BDooley@keker.com
                                       TSilva@keker.com
                                       TReeves@keker.com
                                       JLi@keker.com
                                       AWheeler@keker.com


                                       *Attorneys for American Federation of*
                                       *Government Employees National VA*
                                       *Council and American Federation of*
                                       *Government Employees Local 2305*

13

**SA690**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## District of Rhode Island

**Notice of Electronic Filing**

The following transaction was entered on 3/23/2026 at 3:06 PM EDT and filed on 3/23/2026

| | |
|---|---|
| **Case Name:** | American Federation of Government Employees Local 2305 et al v. United States Department of Veterans Affairs et al |
| **Case Number:** | 1:25-cv-00583-MRD-PAS |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**TEXT ORDER: Before the Court is Defendants Motion to Clarify the Preliminary Injunction entered on March13, 2026. ECF No. [32]. The Defendants claim to be confused by two ambiguities they perceive in the text of the preliminary injunction order. The Court does not know how to state the order any more simply or directly. The Court concluded that the Plaintiffs are likely to succeed on the merits of their claim that the August 2025 termination of the Master CBA was a retaliatory action in violation of the First Amendment and an arbitrary and capricious agency action in violation of the APA. The Court ordered the Defendants to reinstate the Master CBA. The additional plain language simply acknowledges that the Master CBA has an agreed-upon term and may have "amendments, local supplemental agreements, and memoranda of understanding" related thereto using the terms employed by Plaintiffs in their motion, ECF No. [14] at 2, and not questioned by the Defendants in their response in opposition. The Court is at a loss to understand how that conclusion and the resulting injunction could possibly be read to order that (1) the Defendants are wholesale prohibited from terminating the Master CBA again prior to the end of the three-year term governing the contract or (2) the Defendants must reinstate any contract that is not encompassed by the Master CBA and agreements related thereto as identified above. To reinstate the Master CBA means that all parties covered by this contract will continue to be covered by this contract until it is terminated or amended in a lawful manner. As the Defendants themselves explain in their pending motion, to have entered an order enjoining the Defendants beyond the scope the Court articulated would step beyond the Courts authority at this juncture of the case.**

**The Defendants' Motion to Clarify is, accordingly, GRANTED. As the Defendants prepare their response to the Plaintiffs' pending Motion for Enforcement (ECF No. [33]), the Court expects that the Defendants' compliance with the plain language of the preliminary injunction order will not be delayed. To be clear, the pending motion for enforcement is no reason to delay compliance with the Court's March 13, 2026 order to reinstate the Master CBA in full. So Ordered by District Judge Melissa R. DuBose on 3/23/2026. (Urizandi, Nissheneyra)**

**1:25-cv-00583-MRD-PAS Notice has been electronically mailed to:**

Alexandra Wheeler      awheeler@keker.com, alexandra-wheeler-8798@ecf.pacerpro.com, efiling@keker.com, rcirelli@keker.com

Andrea Lena Hyatt      andrea.hyatt@usdoj.gov, CaseView.ECF@usdoj.gov, maria.moran-smith@usdoj.gov, usari-ecf@usdoj.gov, USARI.Civil-Docket@usdoj.gov

Brook Dooley      bdooley@keker.com

Carly B. Iafrate      ciafrate@verizon.net

JiLon Li      JLi@keker.com

Taylor L. Reeves      treeves@keker.com

Travis Silva      tsilva@keker.com, efiling@keker.com, sandy-giminez-6735@ecf.pacerpro.com, travis-silva-0927@ecf.pacerpro.com

Tyler J. Becker      tyler.becker@usdoj.gov

**SA691**

**1:25-cv-00583-MRD-PAS** Notice has been delivered by other means to:

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305;<br><br>      Plaintiffs,<br><br>          *v.*<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and<br><br>DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs;<br><br>      Defendants. | Civil Action No.<br>25-CV-583-MRD-PAS |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION**
**TO ENFORCE THE PRELIMINARY INJUNCTION**

Defendants, the U.S. Department of Veterans Affairs ("the VA") and

Douglas A. Collins, in his official capacity as U.S. Secretary of Veterans Affairs,

file this response in opposition to Plaintiffs' Motion to Enforce the Preliminary

Injunction ("Pls.' Mot."), ECF No. 33.

1

SA693

## INTRODUCTION

Defendants have fully complied with the Court's preliminary injunction. Plaintiffs' motion to enforce the preliminary injunction is, in essence, an improper request that the Court police the terms of the three-year Master Collective Bargaining Agreement ("Master CBA") between the VA and the American Federation of Government Employees ("AFGE"). The root of this improper request is clear: Plaintiffs conflate the Court's order *reinstating* the Master CBA (including its panoply of remedies available for breach thereof) with an order mandating *adherence* to each and every one of its terms (under penalty of judicial contempt). The reinstated Master CBA itself provides the remedy for alleged breaches of its terms. Thus, Plaintiffs' recourse for alleged breaches is to follow the procedures provided in the Agreement—the same procedures that they followed before the termination of the Master CBA. Accordingly, the Court should deny Plaintiffs' motion.

## FACTUAL BACKGROUND

On March 27, 2025, President Trump issued Executive Order 14,251, which directly led to the termination of the Master CBA—the agency action that underlies Plaintiffs' claims in this lawsuit. *Executive Order 14251 of March 27, 2025*, 90 Fed. Reg. 14553 (Apr. 3, 2025) (the "Executive Order" or "EO"). In Sections 1 and 2 of the Executive Order, the President determined that certain agencies—including the VA—have as a primary function intelligence, counterintelligence, investigative, or national security work, and that the Federal Labor Management Relations Statute ("FSLMRS") cannot be applied to those agencies and subdivisions in a manner consistent with national security requirements and considerations. Executive Order §§ 1, 2(c).

Pursuant to that Executive Order, on August 6, 2025, the VA terminated the Master CBA. *VA Terminates Union Contracts for Most Bargaining-Unit*

SA694

*Employees*, VA News (August 6, 2025), https://news.va.gov/pressroom/va-terminates-union-contracts-for-most-bargaining-unit-employees/ ("VA press release") (Silva Decl., Ex. I); *see also* ex. C to Am. Compl. for Declaratory & Injunctive Relief ("Am. Compl."), ECF No. 13-3 (Letter from Secretary Collins to AFGE stating that "pursuant to EO 14251, I am providing notice that VA is terminating the VA-AFGE MCBA . . . .").

In this suit, Plaintiffs challenge the August 6, 2026 termination of the Master CBA, but do not challenge nor contest the validity of Executive Order 14,251. Am Compl. ¶ 11, ECF No. 13. Plaintiffs' suit does not challenge any alleged *breach* of the Master CBA, either. On November 25, 2025, Plaintiffs moved the Court for a preliminary injunction. Pls.' Mot. for Prelim. Inj. and Relief under 5 U.S.C. § 705, ECF No. 14.

On March 13, 2026, this Court issued a Memorandum Opinion & Order ("Order") concluding that Plaintiffs had shown a likelihood of success on their challenge to Defendants' decision to terminate the Master CBA. Order 18, 28, ECF No. 30. At the same time, the Court expressly avoided ruling on the legality of Executive Order 14,251. Order 11; *see also id.* at 12 (clarifying that "[t]his case is not about the constitutionality of the EO"). While leaving the Executive Order in place, the Court issued a preliminary injunction, which required Defendants to take the following action:

> The Defendants shall reinstate the Master CBA—as well as any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the Master CBA— for the remainder of the agreed-upon term provided in the Master CBA.

*Id.* at 29.

On March 18, 2026, the VA's Office of Labor-Management Relations issued a memorandum to its Human Resources officials, notifying them that

3

**SA695**

"[p]er the Order, the 2023 Master CBA with AFGE is reinstated." Wheeler Decl., Ex. C., ECF No. 33-2 (Mem. from Executive Director, Office of Labor-Management Relations to Department of Veterans Affairs Human Resource Officials) (Mar. 18, 2026) ("March 18 VA Memo").

Two days later, Defendants filed a motion seeking clarification of two aspects of the Order: that (1) it did not prohibit the VA from re-terminating the Master CBA; and (2) the Order's reference to "local supplemental agreements, and memoranda of understanding" was limited to such agreements and memorandum with the two Plaintiffs in this case. Defs.' Mot. for Clarification of Prelim. Inj., ECF No. 20. Later that same day, Plaintiffs filed a motion to enforce, along with a brief in support. Pls.' Mot.; Mem. in Supp. of Pls.' Mot. to Enforce Prelim. Inj. ("Pls.' Mem."), ECF No. 33-1. On March 23, 2026, the Court granted Defendants' motion for clarification. *See* Text Order of March 23, 2026.

## LEGAL STANDARD

A motion to enforce is appropriate when the movant demonstrates four elements:

(1) the nonmovant had notice of the court order;
(2) the court order was "clear and unambiguous;"
(3) the nonmovant "had the ability to comply with the order;" and
(4) the nonmovant "violated the order."

*Hawkins v. Dep't of Health and Human Servs.*, 665 F.3d 25, 31 (1st Cir. 2012). The burden is on the movant to demonstrate by "clear and convincing evidence" that the nonmovant failed to comply with the order. *Id.*

4

SA696

## ARGUMENT

### A.   Defendants have not violated the Court's Order.

Defendants have complied with the Court's Order. The Order required Defendants to "reinstate the Master CBA—as well as any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the Master CBA." Order 29. Defendants have done so. Plaintiffs acknowledge as much in their brief when they state, accurately, that the VA announced on March 18, 2026 that "the 2023 Master CBA with AFGE is reinstated." Pls.' Mem. at 2. The VA has also complied with the Court's Order by reinstating any amendments, local supplemental agreements, and memorandum of understanding with the two Plaintiffs who filed this suit: (1) American Federation of Government Employees Local 2305; and (2) American Federation of Government Employees National VA Counsel. *See* March 18 VA Memo.

Because Plaintiffs have not, and cannot, carry their burden of proving by clear and convincing evidence that Defendants have violated the Court's Order, their motion to enforce should be denied.

### B.   Plaintiffs seek to enforce requirements that exceed the Court's Order.

The key defect with Plaintiffs' motion is that it fails to recognize the significance of the Court's decision to leave in place the Executive Order, which exempts the vast majority of the VA from the FSLMRS's coverage. Executive Order, §§ 1, 2(c). Certain provisions of the Master CBA incorporate the FSLMRS to the extent applicable. *See, e.g.*, ECF No. 14-1 at 3 (§3(b)); 57 (§2); 220 (§ 3(A)). Thus, to the extent Plaintiffs seek to enforce any right afforded under the FSLMRS, their motion to enforce is without basis because the Order did not make Plaintiffs subject to the FSLMRS. Plaintiffs' motion conflates

5

*reinstating* the Master CBA with *adhering* to each and every one of its terms in existence before issuance of the Presidential Executive Order. *See, e.g.,* Pls.' Mem. at 1. In other words, Plaintiffs argue that if the VA is not adhering to every term of the Master CBA as Plaintiffs understand it, the VA is not merely in breach of the CBA but also in violation of the preliminary injunction. That is mistaken. The existence of a contract does not guarantee that both parties will adhere to each and every contract term indefinitely. Rather, the existence of a contract provides both parties to the contract certain rights and remedies if the other party breaches. *See United States v. Winstar Corp.*, 518 U.S. 839, 919 (1996) (Scalia, J., concurring in the judgment) ("Virtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance. . . ." (emphasis omitted)); *see generally* Restatement (Second) of Contracts § 1 (Am. Law Inst. 1981) (defining a "contract," as "a promise or a set of promises for the breach of which the law gives a remedy, . . . . ").

As Plaintiffs acknowledge, "the Master Agreement, Articles 43 and 44 outline detailed procedures, including the option of arbitration, that ensure due process and fair resolution of grievances." Decl. of Dewanda Mitchell. ¶ 11, ECF No. 14-8; *see also* ECF No. 14-1 at 219-26 (Articles 43 & 44). The Master CBA defines "grievance" broadly to include any complaint by the Union or an employee that the VA is breaching the Agreement:

> A grievance means any complaint by an employee(s) or the Union concerning any matter relating to employment, any complaint by an employee, the Union, or the Department concerning *the interpretation or application of this Agreement* and any supplements or any claimed violation, misinterpretation or misapplication of law, rule, or regulation affecting conditions of employment.

6

**SA698**

ECF No. 14-1 at 219 (§2(A)) (emphasis added).

If Plaintiffs have a good-faith basis for contending that the VA has breached a provision of the Master CBA (for example by not providing a covered employee with the proper amount of maternity leave), Plaintiffs' remedy is to file a complaint under the grievance procedures set out in the Master CBA, rather than filing a motion to enforce with the Court.

Even before President Trump issued the Executive Order that led to the Master CBA's termination, Plaintiffs routinely filed complaints, using the negotiated grievance procedures in the Master CBA, in which employees or Plaintiffs themselves alleged the Master CBA was not being followed in a specific situation. Indeed, even after the CBA was terminated, Plaintiffs continued filing grievances under the CBA. *See* Decl. of Tracey Therit ¶ 17, ECF No. 17-1. The labor organizations who are plaintiffs in this case should follow the same practice they have followed both before and after the August 6 termination now that the Master CBA has been reinstated. Indeed, it makes no sense to think the preliminary injunction requiring the Master CBA's reinstatement requires VA to remedy any and all labor grievances with Plaintiffs, even if those disputes were already in existence *before* the CBA's termination. The injunction simply restored the parties to the status quo as it existed before the Master CBA's termination.

Plaintiffs attempt an end-run around the exclusive procedures for resolving grievances that arise under the CBA by asking this Court to issue what amounts to a global and indefinite specific-performance injunction, such that any alleged breach of the Master CBA going forward would trigger the "potent weapon" of "judicial contempt power." *Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76 (1967). Such an approach

**SA699**

would be improper as a matter of federal labor law,[1] federal contracting law,[2] and even the ordinary common law of contracts.[3] Indeed, as the Supreme Court recently affirmed, "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money[.]" *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (internal quotations and citations removed); *see also Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004) ("We have held that the Tucker Act '"impliedly forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, but also injunctive relief, which the Claims Court may not.'"); *see also Massachusetts v. Nat'l Insts. of Health*, 164 F.4th 1, 10 (1st Cir. 2026). In short, this Court does not have jurisdiction to entertain Plaintiffs' request that mandate (and thereafter police) across-the-board compliance with the terms of the Master CBA, and that is certainly not what the preliminary injunction does.

---

[1] The FSLMRS contains a subpart governing how alleged violations of a collective bargaining agreement are to be handled, including grievances, appeals, and judicial review. *See* FSLMRS *See* 5 U.S.C. §§ 7121-712. None of the provisions governing judicial review and enforcement permit a labor union to petition a United States district court for a global and indefinite specific performance injunction. *See* 5 U.S.C. § 7123. To be sure, Plaintiffs are no longer subject to the FSLMRS by virtue of the Executive Order, which is unchallenged here. But it remains notable that even under that statute, this sort of remedy would clearly not have been permissible.

[2] "Federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations." *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989).

[3] Specific performance remedies must be narrow and targeted; courts will not decree specific performance of vague, indefinite, or uncertain contractual requirements. *See* Restatement (First) of Contracts § 370 (1932) ("Specific enforcement will not be decreed unless the terms of the contract are so expressed that the court can determine with reasonable certainty what is the duty of each party and the conditions under which performance is due."); *see also Pritzker v. Yari*, 42 F.3d 53, 72 (1st Cir. 1994) (stating "a basic tenet of contract law"—*i.e.,* "a legal remedy (*e.g.,* a sum of money) is presumptively preferable to an equitable remedy (*e.g.,* specific performance), so long as the former is adequate and ascertainable").

SA700

The status quo before the August 6, 2025 CBA termination further illustrates how Plaintiffs' motion to enforce exceeds the Court's Order. A "traditional, prohibitory preliminary injunction" is designed to restore the status quo ante. *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010). Plaintiffs acknowledge that the Order here is designed to require "Defendants to return to the status quo ante." Pls.' Mem. at 6.

Yet the status quo ante was not a situation where Plaintiffs could seek enforcement of the Master CBA in district court for alleged violations of the Master CBA's terms. Rather, before the Master CBA's termination, Plaintiffs filed labor grievances when they believed the VA was out of compliance with the Master CBA. In other words, restoring Plaintiffs to the status quo ante would not restore them to a situation where Plaintiffs could seek district court intervention for every alleged violation of the Master CBA. Moreover, as noted above, granting the Plaintiff's motion reinstating the CBA, and ignoring the existence of the Executive Order, would demonstrably improve Plaintiffs' position over the original status quo and effectively place the Court in a position that it has overridden the Presidential Executive Order.

## CONCLUSION

Plaintiffs' motion to enforce should be denied. Defendants have already complied with the Court's Order. The relief the Plaintiffs seek via their motion to enforce exceeds the relief afforded in the Court's Order.

**SA701**

Dated: March 24, 2026

Respectfully submitted,

UNITED STATES DEPARTMENT
OF VETERANS AFFAIRS; and
DOUGLAS A. COLLINS, in his
official capacity as U.S. Secretary of
Veterans Affairs,

By their attorneys,

CHARLES C. CALENDA
United States Attorney

*/s/ Andrea Hyatt*
Andrea Hyatt
Assistant U.S. Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5001 (Fax)
Andrea.Hyatt@usdoj.gov

Tyler J. Becker
(VA Bar No. 97636)
Counsel to the Assistant Attorney General
U.S. Department of Justice
Civil Division
Office of the Assistant Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 514-4052
Tyler.Becker@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on March 24, 2026, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 304.

*/s/ Andrea Hyatt*
ANDREA HYATT
Assistant U.S. Attorney

10

**SA702**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305;<br><br>     Plaintiffs,<br><br>         *v.*<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and<br><br>DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs;<br><br>     Defendants. | Civil Action No.<br>25-CV-583-MRD-PAS |

**DEFENDANTS' STATUS REPORT**

Defendants, the U.S. Department of Veterans Affairs ("the VA") and

Douglas A. Collins, in his official capacity as U.S. Secretary of Veterans Affairs,

file this Status Report to inform the Court that the VA has re-terminated the

Master Agreement Between the Department of Veterans Affairs and the

American Federation of Government Employees ("Master CBA"), ECF No. 13-1,

effective March 26, 2026. A copy of the notice of termination from Secretary

Collins to officials at the American Federation of Government Employees and

American Federation of Government Employees National Veterans Affairs

1

**SA703**

Council is filed contemporaneously herewith as Exhibit A. Plaintiffs' counsel

has also been provided with a copy of the notice of termination.

Dated: March 26, 2026                     Respectfully submitted,

                                          UNITED STATES DEPARTMENT
                                          OF VETERANS AFFAIRS; and
                                          DOUGLAS A. COLLINS, in his
                                          official capacity as U.S. Secretary of
                                          Veterans Affairs,

                                          By their attorneys,

                                          CHARLES C. CALENDA
                                          United States Attorney

                                          */s/ Andrea Hyatt*
                                          Andrea Hyatt
                                          Assistant U.S. Attorney
                                          One Financial Plaza, 17th Floor
                                          Providence, RI 02903
                                          (401) 709-5000
                                          (401) 709-5001 (Fax)
                                          Andrea.Hyatt@usdoj.gov

                                          Tyler J. Becker
                                          (VA Bar No. 97636)
                                          Counsel to the Assistant Attorney General
                                          U.S. Department of Justice
                                          Civil Division
                                          Office of the Assistant Attorney General
                                          950 Pennsylvania Ave. NW
                                          Washington, DC 20530
                                          (202) 514-4052
                                          Tyler.Becker@usdoj.gov

**SA704**

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 26, 2026, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 304.

*/s/ Andrea Hyatt*
ANDREA HYATT
Assistant U.S. Attorney

**SA705**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## District of Rhode Island

**Notice of Electronic Filing**

The following transaction was entered on 3/30/2026 at 11:01 AM EDT and filed on 3/30/2026

| | |
|---|---|
| **Case Name:** | American Federation of Government Employees Local 2305 et al v. United States Department of Veterans Affairs et al |
| **Case Number:** | 1:25-cv-00583-MRD-PAS |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**TEXT ORDER: Plaintiffs' response to the [45] Emergency Motion to Stay shall be filed by close of business on Wednesday, April 1, 2026.**

**The contempt proceeding is held in abeyance pending the Circuit's disposition of the appeal. So Ordered by District Judge Melissa R. DuBose on 3/30/2026. (Urizandi, Nissheneyra)**

**1:25-cv-00583-MRD-PAS Notice has been electronically mailed to:**

Alexandra Wheeler     awheeler@keker.com, alexandra-wheeler-8798@ecf.pacerpro.com, efiling@keker.com, rcirelli@keker.com

Andrea Lena Hyatt     andrea.hyatt@usdoj.gov, CaseView.ECF@usdoj.gov, maria.moran-smith@usdoj.gov, usari-ecf@usdoj.gov, USARI.Civil-Docket@usdoj.gov

Brook Dooley     bdooley@keker.com

Carly B. Iafrate     ciafrate@verizon.net

JiLon Li     JLi@keker.com

Taylor L. Reeves     treeves@keker.com

Travis Silva     tsilva@keker.com, efiling@keker.com, sandy-giminez-6735@ecf.pacerpro.com, travis-silva-0927@ecf.pacerpro.com

Tyler J. Becker     tyler.becker@usdoj.gov

**1:25-cv-00583-MRD-PAS Notice has been delivered by other means to:**

**SA706**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
NATIONAL VA COUNCIL; and

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
LOCAL 2305

    *Plaintiffs,*

    **v.**

UNITED STATES DEPARTMENT
OF VETERANS AFFAIRS; and

DOUGLAS A. COLLINS, in his official
capacity as U.S. Secretary of Veterans
Affairs

    *Defendants.*

**Case No. 1:25-cv-00583-MRD-PAS**

**OPPOSITION TO DEFENDANTS' EMERGENCY MOTION TO STAY PENDING
APPEAL**

6105036

**SA707**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................................1

BACKGROUND ............................................................................................................................3

LEGAL STANDARD......................................................................................................................6

ARGUMENT..................................................................................................................................6

    A.    Defendants fail to make a strong showing that they are likely to win reversal of the preliminary injunction.........................................................................6

        1.    Defendants are unlikely to show that the Court lacked jurisdiction to enjoin the Termination.................................................................................6

        2.    Defendants are unlikely to show that this Court abused its discretion when it rejected the claim-splitting argument.............................9

        3.    Defendants fail to demonstrate that they are likely to win reversal of the Court's First Amendment determination. .......................................10

        4.    Defendants are unlikely to demonstrate that the Court erred in ruling that the Termination violated the APA............................................10

    B.    Defendants fail to make a strong case that they are likely to win reversal of the Enforcement Order or that the Court erred by blocking the "re-termination." ......................................................................................................12

    C.    Defendants fail to demonstrate irreparable harm..................................................16

    D.    The balance of the equities and the public interest cut in Plaintiffs' favor............19

EFFECT OF THIS COURT'S FORTHCOMING ORDER ...........................................................19

CONCLUSION...............................................................................................................................20

CERTIFICATE OF SERVICE .......................................................................................................21

i

**SA708**

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AFGE v. Noem*,
  2026 WL 113599 (W.D. Wash. Jan. 15, 2026)..................................................................14, 15

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
  167 F.4th 1247 (9th Cir. 2026) .................................................................................6, 9, 10, 13

*Am. Pub. Health Ass'n v. Nat'l Institutes of Health*,
  145 F.4th 39 (1st Cir. 2025)......................................................................................................9, 13

*AngioDynamics, Inc. v. Biolitec AG*,
  780 F.3d 420 (1st Cir. 2015)........................................................................................................16

*Carrozza v. CVS Pharmacy, Inc.*,
  992 F.3d 44 (1st Cir. 2021)................................................................................................7, 9, 11

*Coggeshall Dev. Corp. v. Diamond*,
  884 F.2d 1 (1st Cir. 1989).............................................................................................................9

*Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo*,
  551 F.3d 10 (1st Cir. 2008)..........................................................................................................14

*Conservation L. Found., Inc. v. Longwood Venues & Destinations, Inc.*,
  415 F. Supp. 3d 240 (D. Mass. 2019) .........................................................................................9

*DHS v. Regents of the Univ. of California*,
  591 U.S. 1 (2020).........................................................................................................................15

*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012)...........................................................................................................................9

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005)........................................................................................................17

*GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*,
  445 U.S. 375 (1980).....................................................................................................................13

*Hawkins v. Dep't of Health & Hum. Servs. for New Hampshire, Com'r*,
  665 F.3d 25 (1st Cir. 2012)..........................................................................................................16

*J.G.G. v. Trump*,
  2025 WL 3198891 (D.D.C. Nov. 14, 2025) ...............................................................................14

6105036

SA709

*Nat'l Treasury Emps. Union v. Vought*,
   2025 WL 3771192 (D.D.C. Dec. 30, 2025)...........................................................................14

*New York v. Trump*,
   133 F.4th 51 (1st Cir. 2025)...........................................................................................6, 11

*New York v. Trump*,
   2026 WL 734941 (1st Cir. Mar. 16, 2026) ...........................................................................13

*Nken v. Holder*,
   556 U.S. 418 (2009).............................................................................................................3

*Ohio v. Env't Prot. Agency*,
   603 U.S. 279 (2024)...........................................................................................................12

*Rhode Island State Council of Churches v. Rollins*,
   158 F.4th 304 (1st Cir. 2025)....................................................................................6, 9, 13

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947)...........................................................................................................15

*Shillitani v. United States*,
   384 U.S. 364 (1966)........................................................................................................9, 13

*Somerville Pub. Schs. v. McMahon*,
   139 F.4th 63 (1st Cir. 2025)...............................................................................................6

*Sparkle Hill, Inc. v. Interstate Mat Corp.*,
   788 F.3d 25 (1st Cir. 2015).......................................................................................7, 9, 11

*Unite Here Loc. 217 v. Sage Hosp. Res.*,
   722 F. Supp. 2d 169 (D.R.I. 2010)....................................................................................6

**Federal Statutes**

5 U.S.C. § 705.......................................................................................................9, 13, 15

**Constitutional Provisions**

First Amendment ................................................................................................... *passim*

6105036

**SA710**

**INTRODUCTION**

Defendants' Motion to Stay relies on two untenable arguments.  First, Defendants argue that the Court should stay its well-reasoned preliminary injunction order because the Master CBA is "irreconcilable" with Executive Order 14251 and "impossible to perform outside … the FSLMRS."  Dkt. 45-1 at 3, 10–11. Next, Defendants continue to draw a distinction between "reinstating" the Master CBA in form only (which Defendants suggest they would accept) and "adhering" to it in substance (which Defendants apparently cannot abide), and they argue that the Court overstepped by requiring "adherence" to the Master CBA in form *and* substance.

No appellate court is likely to accept these arguments.  To start with the claim that the Court's preliminary injunction is "irreconcilable" with Executive Order 14251, Defendants did not raise this argument in opposition to Plaintiffs' motion for a preliminary injunction.  As such, the argument is waived and cannot be the basis for a reversal.  But the argument also fails on the merits.  Defendants never explain how adhering to the Master CBA, which Defendants negotiated and signed, is irreconcilable with the Executive Order, which does not mention collective bargaining agreements, much less require their termination.  Nor do Defendants explain how the Master CBA is "impossible to perform" if the employees represented by Plaintiffs are no longer covered by the FSLMRS.  To the contrary, for nearly three months (between March 27, 2025, when the Executive Order issued, and June 24, 2025, when it was enjoined by a federal court in California) Defendants left the Master CBA in place, and adhered to its terms, even though the Executive Order was in effect.  Moreover, after the California court's injunction was stayed on July 7, such that the Executive Order was again in effect, Defendants left the Master CBA in place until August 6. There is thus no legal or practical reason why Defendants cannot adhere to the Master CBA now.

1

**SA711**

Defendants' insistence on a distinction between *reinstatement of* and *adherence to* the Master CBA fares no better.  Again, this argument is unlikely to lead to reversal because Defendants did not raise it in opposing Plaintiffs' request for a preliminary injunction.  To the contrary, one of Defendants' main arguments in opposition to Plaintiffs' preliminary injunction motion was to assert that compliance with the requested injunction would be onerous.  In doing so, Defendants described in detail how *substantive* adherence to the Master CBA would look, belying any claim that Defendants were surprised to learn that the preliminary injunction required Defendants to adhere to the terms of the Master CBA.  Moreover, the preliminary injunction clearly requires that the Defendants reinstate the substantive provisions of the Master CBA; the word "reinstate" is clear and unambiguous. In short, when they profess that they thought that all that was at stake in Plaintiffs' preliminary injunction motion was nominal reinstatement of the Master CBA, Defendants are fooling no one.

Defendants likewise fail to show how they can meet the demanding standard for a stay pending appeal.  *First,* Defendants cannot show a likelihood of succeeding on the merits of their appeal from the Court's preliminary injunction.  They argue that the Court lacked jurisdiction to require reinstatement of the Master CBA, but the most relevant appellate authority holds that jurisdiction is proper.  Defendants argue that this Court erred in rejecting their claim-splitting defense, but they fail to acknowledge that that is a discretionary doctrine, let alone show how the Court abused its discretion in rejecting the defense.  Defendants argue that they are likely to flip the First Amendment analysis, but they will have the same flaw on appeal that they had in this Court—they failed to introduce any evidence to show that they would have ordered the Termination even in in the absence of Plaintiffs' protected speech and conduct.  Defendants argue that the Court's APA ruling was incorrect, but their main argument—that the Secretary's

2

6105036

**SA712**

action is unreviewable because he was following the President's orders—is foreclosed by binding First Circuit precedent.

Defendants likewise fail to show that they will succeed on their appeal from the Court's enforcement order. That order is not even appealable, and, in any event, Defendants' argument relies on authority that the First Circuit has held to be inapplicable to APA claims. Defendants argue that the Court permitted them to re-terminate the Master CBA, but they ignore critical text in the relevant order—the phrase "lawful manner"—as well as the rule that a defendant seeking relief from an injunction must move for such relief, not engage in self-help.

Defendants do no better on the other three prongs of the *Nken* analysis. Their irreparable harm argument reduces to asserting that they will bear costs when they comply with the Master CBA. But the cost of compliance is not itself a harm, particularly when the issue is complying with an agreement that Defendants signed. And, given the grave harms that Plaintiffs substantiated at the preliminary injunction phase, the balance of the equities tips sharply in Plaintiffs' favor.

Defendants' Motion to Stay is meritless. It should be denied in an order that also clarifies that the Court will continue to enforce the preliminary injunction pending appeal.

## BACKGROUND

The facts are well known to the Court and parties. On March 27, 2025, the President issued Executive Order 14251, which purported to exclude certain federal agencies and subdivisions thereof, including Defendant, the Department of Veterans Affairs ("VA"), from coverage under the Federal Service Labor-Management Relations Statute ("FSLMRS" or "Chapter 71"). The application of Executive Order 14251 to Plaintiffs was enjoined by order of the United States District Court for the Northern District of California between June 24, 2025,

3

6105036

SA713

and July 7, 2025, when the District Court's injunction was stayed by the United States Court of Appeals for the Ninth Circuit.

Executive Order 14251 does not mention, much less require, the termination of collective bargaining agreements.  Between March 27. 2025, and June 24, 2025, during which time the Executive Order was not enjoined, Defendants took no action to terminate the Master Agreement between the VA and Plaintiffs. Moreover, after the Ninth Circuit stayed the District Court's injunction on July 7, 2025, Defendant VA Secretary Douglas Collins did not act, instead waiting until August 6 to issue the Termination.

Thereafter, Plaintiffs filed suit and sought a preliminary injunction.  On Friday, March 13, 2026, the Court issued a thorough, 29-page memorandum and order granting Plaintiffs' preliminary injunction motion.  The Court ordered:

> The Defendants shall reinstate the Master CBA—as well as any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the Master CBA—for the remainder of the agreed-upon term provided in the Master CBA.

Dkt. 30 at 29.

Since issuing the Preliminary Injunction, the Court has resolved two motions.  On Friday, March 20, 2026, Defendants filed a "motion for clarification."  Dkt. 32.  Defendants asked the Court to "clarify" that the preliminary injunction "does not enjoin re-termination of the Master CBA for other reasons" and does not apply to local supplemental agreements and memoranda of understanding between the VA and AFGE affiliates other than Plaintiffs. *Id.* at 2.  The Court resolved the motion in a minute order stating that the preliminary injunction order could not be "read to order that (1) the Defendants are wholesale prohibited from terminating the Master CBA again prior to the end of the three-year term governing the contract or (2) the Defendants must reinstate any contract that is not encompassed by the Master CBA and agreements related thereto

4

6105036

as identified above." 3/23/26 Text Order. In the following sentence, the Court added: "To reinstate the Master CBA means that all parties covered by this contract will continue to be covered by this contract until it is terminated or amended in a *lawful manner*." *Id.* (emphasis added).

Also on Friday, March 20, Plaintiffs filed a motion to enforce the preliminary injunction. Dkt. 33. Plaintiffs documented that, in the week following the Court's preliminary injunction order, Defendants had failed to abide by the terms of the Master CBA and that Defendants' only effort at compliance with the preliminary injunction was to issue a statement that the Master CBA was "reinstated." Dkt. 33-1 at 10–12. In opposition, Defendants argued that the preliminary injunction requires only that they state that the Master CBA is "reinstated" and does not require them actually to adhere to the Master CBA. Dkt. 34 at 5–6. Defendants also asserted that the Court lacks jurisdiction to require Defendants to adhere to the Master CBA. *Id.* at 8. The Court set a hearing on Plaintiffs' motion to enforce for the morning of Friday, March 27.

At approximately 7:00 p.m. ET on Thursday, March 26, the night before the hearing on Plaintiffs' motion to enforce, without advance notice to Plaintiffs and without seeking the Court's input, Defendants purported to "re-terminate" the Master CBA effective immediately. Dkt. 36. On Friday, March 27, after holding a hearing, the Court issued a short order granting the motion to enforce. Dkt. 39. The Court enforced the preliminary injunction by requiring Defendants to comply with the reinstated Master CBA "in both form *and* substance." *Id.* at 2 (emphasis in original). The Court also ordered Defendants to show cause why the March 26 re-termination was not a violation of the preliminary injunction order and "in contempt" of the Court. *Id.* Hours after that hearing, Defendants filed a notice of appeal, Dkt. 42. Then, in the early hours of Sunday, March 29, Defendants filed this motion to stay and requested that the

5

SA715

Court to issue a decision the following day, Monday, March 30. Dkt. 45. Defendants have since "respectfully request[ed] a ruling by 12pm on Friday, 4/3."

## LEGAL STANDARD

A stay pending appeal is an "intrusion into the ordinary processes of administration and judicial review" and relief is not granted as "a matter of right." *New York v. Trump*, 133 F.4th 51, 65 (1st Cir. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)). "The appellants bear the burden of satisfying the well-established four-factor test for obtaining the extraordinary relief that is a stay of a preliminary injunction pending appeal." *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 68 (1st Cir. 2025). "To meet its burden for a stay, the government must satisfy four well-established requirements. It must make: (1) a strong showing that it is likely to succeed on the merits; (2) a showing that it will be irreparably injured absent a stay; (3) a showing that the issuance of the stay will not substantially injure the other parties interested in the proceeding; and (4) a showing that the public interest lies with it, not the plaintiffs." *Rhode Island State Council of Churches v. Rollins*, 158 F.4th 304, 311 (1st Cir. 2025) (internal alterations, quotation marks, and citation omitted). District courts apply the same standard. *E.g.*, *Unite Here Loc. 217 v. Sage Hosp. Res.*, 722 F. Supp. 2d 169, 172 (D.R.I. 2010).

## ARGUMENT

**A.    Defendants fail to make a strong showing that they are likely to win reversal of the preliminary injunction.**

**1.    Defendants are unlikely to show that the Court lacked jurisdiction to enjoin the Termination.**

Defendants make three unconnected arguments about the Court's jurisdiction.

Defendants re-run their channeling argument. Dkt. 45-1 at 12. The Court rejected that argument, relying in part on *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 167 F.4th 1247, 1255 (9th Cir. 2026), a Ninth Circuit opinion also rejecting the same channeling argument in a

case about Executive Order 14251.  *See* Dkt. 30 at 9.  Further, the Court correctly applied the

*Thunder Basin* factors (which Defendants do not even cite) and noted, among other concerns,

that "the FLRA is not actually available as a tribunal the Plaintiffs can utilize for the claims

pending before this Court."  Dkt. 30 at 7.  Given that there is no countervailing authority,

Defendants are unlikely to prevail in reversing this Court's jurisdictional ruling.

Defendants argue that "the CBA cannot be performed, and thus should not continue to

exist, while the VA and the vast majority of its employees are excluded from the FSLMRS."

Dkt. 45-1 at 10.  As a result of this exclusion, Defendants assert, the "pathway Congress

established for enforcement of a CBA is therefore gone."  *Id.* at 12; *see also id.* at 11.  This

seems more like a merits argument than a jurisdictional one, but either way, Defendants failed to

make this argument in opposition to the preliminary injunction motion.  They therefore waived

it, meaning that this argument is unlikely to lead to a reversal.  *Sparkle Hill, Inc. v. Interstate

Mat Corp.*, 788 F.3d 25, 29 (1st Cir. 2015) (arguments not raised in opening brief are waived);

*Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 59 (1st Cir. 2021) ("[A]ppellants cannot raise an

argument on appeal that was not 'squarely and timely raised in the trial court.'") (quoting

*Thomas v. Rhode Island*, 542 F.3d 944, 949 (1st Cir. 2008)).  Even if a court does consider this

argument, it will fail because Defendants never explain why the Master Agreement cannot exist

because certain provisions incorporate statutes in the FSLMRS.  *See* Dkt. 45-1 at 10 (citing ECF

No. 14-1 at 3 (§ 3(b)); 57 (§ 2); 220 (§ 3(A)).[1]  Defendants do not explain how or why they are

unable to comply with the Master CBA's contractual terms in the absence of FSLMRS coverage.

The FSLMRS's force is not necessary for Defendants to include an appropriate representative in

---

[1] As best Plaintiffs can tell, Defendants intended to cite Dkt. 13-1, not 14.1, and that the pin cites
are citing the Master CBA's internal pagination.

7

a discussion about a grievance;[2] for Defendants to recognize the right to join a union (a right independently protected by the First Amendment);[3] or for Defendants to participate in grievances through statutory procedures unaffected by the Executive Order or included as a matter of contract in the Master CBA.[4]  Not only did Defendants leave the Master CBA in force for months after the President issued Executive Order 14251, other agencies did the same, leaving their collective bargaining agreements in place for over six months after the Ninth Circuit stayed the Northern District of California's preliminary injunction of the Executive Order.  Schwartz Decl., ¶¶ 4-11.  Thus, the government, including Defendants, consistently understands collective bargaining agreements to have force and validity outside the FSLMRS framework.[5]

Defendants assert that "by extending its preliminary injunction well beyond the mere *existence* of a CBA—the ostensible subject of this litigation—the Court has in effect created a shadow collective-bargaining-enforcement regime unlike anything Congress contemplated in the FSLMRS" which, Defendants claim, is impermissible because "the Court does not have jurisdiction to order specific performance of the CBA." Dkt. 45-1 at 12.[6]  Again, the Court's

---

[2] *See* Dkt. 13-1 at Master CBA p. 3, Art. 1, § 3(b).

[3] *See* Dkt. 13-1 at Master CBA p. 57, Art. 17, § 2.

[4] *See* Dkt. 13-1 at Master CBA p. 220, Art. 43, § 3(A).

[5] In making this argument, Defendants fatally undermine the channeling argument they pressed before the Court in opposing the preliminary injunction.  *Compare* Dkt. 17 at 21 ("Congress has channeled the dispute Plaintiffs raise in this case to the Federal Labor Relations Authority") *with* Dkt. 45-1 at 12 ("[T]he pathway Congress established for enforcement of a CBA is therefore gone.").

[6] Defendants' reference to the "ostensible subject of this litigation" is a mischaracterization.  Plaintiffs' case and the remedy Plaintiffs seek have always been about having the Termination rescinded, causing the Master CBA to be reinstated and substantively applied to the relationship between the VA and covered employees.  *See* Dkt. 1 at 34–35; Dkt. 13 at 35; Dkt. 14; Dkt. 14-1 at 1–4; Dkt. 19 at 2.  Throughout this case, Defendants demonstrated their understanding that Plaintiffs sought an order compelling compliance with the Master CBA, not mere "paper reinstatement" with no real-world effects.  Dkt. 17 at 52–53; Dkt. 33-2, Ex. A at 11 (pin cites to ECF document pagination).

6105036

**SA718**

supposed inability to order "specific performance" is a merits argument against the preliminary injunction itself, and Defendants' failure to raise this argument at the proper point means that it is unlikely to lead to a reversal. *Sparkle Hill*, 788 F.3d at 29; *Carrozza*, 992 F.3d at 59. And, even if this argument is considered on the merits, it will fail. The Court's jurisdiction to enforce the preliminary injunction is beyond clear. 5 U.S.C. § 705; *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *Rollins*, 158 F.4th at 314–15.[7] Defendants' citation to *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989), does not move the needle in light of the First Circuit's on-point decision declining to extend *Coggeshall* to the APA context. *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 145 F.4th 39, 56 (1st Cir. 2025).

> **2.    Defendants are unlikely to show that this Court abused its discretion when it rejected the claim-splitting argument**

Defendants fail to show that Plaintiffs split a claim. Plaintiffs demonstrated that the agency action challenged here arose after the California case was filed and even after the California court granted the preliminary injunction. Dkt. 19 at 4–7. Defendants cite no case from any jurisdiction where claim-splitting was applied to bar a claim on those facts. The absence of any case on point shows that Defendants are unlikely to establish the necessary predicates for this defense.

Furthermore, claim-splitting is a discretionary doctrine. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 14 (2012); *accord Conservation L. Found., Inc. v. Longwood Venues & Destinations, Inc.*, 415 F. Supp. 3d 240, 242 (D. Mass. 2019) (doctrine is discretionary). Even if a claim is split—and that is not the case here—the Court exercised its discretion when it ruled that "the Plaintiffs need not wait to adjudicate the Secretary's distinct, discrete action of terminat[ing] the

---

[7] *Am. Fed'n of Gov't Emps., AFL-CIO, et al. v. Trump, et al.,* No. 3:25-cv-03070-JD (N.D. Cal.).

9

6105036

**SA719**

Master CBA." Dkt. 30 at 11. Defendants cite no case in which the First Circuit even reviewed a lower court for abusing its discretion in connection with the claim-splitting doctrine, let alone a case in which the First Circuit reversed. Without any cases to support their argument, Defendants are unlikely to prevail in showing that the Court's rejection of the claim-splitting defense was an abuse of discretion.

> **3.** **Defendants fail to demonstrate that they are likely to win reversal of the Court's First Amendment determination.**

As to the Termination, Defendants' sole argument is to point to the Ninth Circuit decision in *American Federation of Government Employees v. Trump*, 167 F.4th 1247, 1255 (9th Cir. 2026). But Defendants can find no solace there. As the Court well knows, the Ninth Circuit case raises different claims, and it focuses on the Executive Order, without considering the Termination. And the Ninth Circuit opinion that Defendants purport to rely on took pains to limit itself to the specific record in that case at that point. It should come as no surprise that different cases with different records at the preliminary injunction stage may yield different results. The record before this Court included evidence of Defendants' animus and retaliatory intent, and the Court's preliminary injunction order relies on this evidence. Dkt. 30 at 14–15. The preliminary injunction order faults Defendants for "provid[ing] little counterevidence to indicate the termination was not retaliatorily motivated and/or would have occurred in the absence of the Plaintiffs' grievances, litigation conduct, and advocacy," an evidentiary gap that Defendants have never filled. Dkt. 30 at 15–16. Having offered nothing more than an obviously distinguishable case and having ignored the bulk of the Court's First Amendment analysis, Defendants fail to demonstrate the likelihood of a reversal on appeal.

> **4.** **Defendants are unlikely to demonstrate that the Court erred in ruling**

10

**SA720**

**that the Termination violated the APA.**

Defendants' first argument is that "no further explanation was needed for the Termination because, again, the Termination was the natural result of Defendants' execution of the President's Executive Order" and "Plaintiffs cannot evade that conclusion by purporting to challenge the VA's termination, which merely carries out the President's decision." Dkt. 45-1 at 16–17. In other words, Defendants argue the APA does not apply to this case because (in their view) the Secretary was implementing presidential orders. However, binding First Circuit precedent rejects this argument. *Trump*, 133 F.4th at 70 n.17. Thus, this argument does not demonstrate a probability of reversal.

Defendants next argue that the Court should infer that the Secretary's action was reasonable because it came after the Ninth Circuit stayed the California injunction. Dkt. 45-1 at 16–17. Defendants raised this argument for the first time at oral argument on the preliminary injunction motion. Because it was not properly presented to this Court, it is unlikely to be a basis for reversal. *Sparkle Hill, Inc.*, 788 F.3d at 29; *Carrozza*, 992 F.3d at 59. Even so, Defendants fail to explain (in the motion or anywhere else) why this timing supports their position. As the Court noted, the Ninth Circuit's stay order did not signal the end of the litigation, whereas the then-operative OPM guidance was that agencies should not terminate collective bargaining agreements. The Court's finding of arbitrary and capricious action relied in part on its finding that the Secretary acted in contravention of OPM guidance as of the Termination, which was in place notwithstanding the timing of the Ninth Circuit's order. Dkt. 30 at 17.

Defendants then argue that the Secretary acted within a "zone of reasonableness." Dkt. 45-1 at 17. But Defendants' argument ignores key parts of the PI Order. For example, the Court noted the requirement that agency actions be reasonably explained, the fact that little to no explanation was provided here, and ultimately cited that fact (as one of many factors) in

11

6105036

**SA721**

explaining why the Termination was "neither reasonable nor reasonably explained" and thus violative of the APA. Dkt. 30 at 20, 24; *see Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024). Defendants offer no explanation for why this ruling is likely to be reversed. Defendants make no effort to address Plaintiffs' argument that the Termination misapplied the plain text of Section 2 of the Executive Order by limiting the force of that provision to police officers, security guards, and firefighters, without effectuating the text about "immediate, local employing offices." Dkt. 14-1 at 25–29. Further, Defendants misstate the import of the fact that in April 2025 the Secretary improperly initially excepted certain unions from the Executive Order's coverage. Defendants claim that the November 2025 rescission action eliminated "any alleged unevenness." Dkt. 45-1 at 18. But Plaintiffs had argued that the Secretary's treatment of other unions was evidence of animus and discrimination, Dkt. 14-1 at 25–29, and the Court accepted this as evidence of arbitrary and capricious action, *id.* at 24. Defendants offer no argument to counter the inference that Plaintiffs presented and that the Court drew.

> **B.** **Defendants fail to make a strong case that they are likely to win reversal of the Enforcement Order or that the Court erred by blocking the "re-termination."**

The Motion to Stay seeks to stay the Enforcement Order, Dkt. 45 at 2. Defendants argue that (1) the Court lacks jurisdiction to enforce the preliminary injunction (Dkt. 45-1 at 12); (2) the Court's issuance of the Enforcement Order contradicted the Court's order granting Defendants' clarification motion ("the 3/23 Text Order"), which, in Defendants' view, pre-cleared the re-termination (Dkt. 45-1 at 19); and (3) the Court erred on the merits by ordering Defendants not to implement the re-termination (*id.* at 14–15 (arguing that First Amendment claim was mooted by re-termination's inclusion of "new reasons"), *id.* at 18 (cursory APA argument), *id.* at 19 (arguing that preliminary injunction required only technical reinstatement of rather than substantive compliance with Master CBA)).

12

6105036

**SA722**

None of these arguments will succeed.  As a threshold matter, Defendants cannot appeal an order enforcing a preliminary injunction because it is not a "final judgment." *See New York v. Trump*, --- F.4th ---, 2026 WL 734941, at *18 (1st Cir. Mar. 16, 2026).  Defendants offer no theory of appellate jurisdiction.  This alone defeats any argument that Defendants are likely to succeed on the merits of this portion of their appeal.  But even if the First Circuit reviews the Enforcement Order, Defendants do not show the likelihood of a reversal.

**The Court had jurisdiction to issue the Enforcement Order**.  As explained above, the Court has jurisdiction to enforce the Preliminary Injunction.  5 U.S.C. § 705; *Shillitani*, 384 U.S. at 370; *Rollins*, 158 F.4th at 314–15; *Am. Pub. Health Ass'n*, 145 F.4th at 52, 56.  Defendants argue that the FSLMRS remedial procedures strip the Court of jurisdiction, Dkt. 45-1 at 12, but this is yet another version of Defendants' channeling argument, which has been rejected by this Court and by the Ninth Circuit.  *See* Dkt. 30 at 9; *Am. Fed'n of Gov't Emps., AFL-CIO*, 167 F.4th at 1255.

**The 3/23 Text Order did not authorize the re-termination**.  The 3/23 Text Order made clear that the preliminary injunction requires that "all parties covered by this contract will continue to be covered by this contract until it is terminated or amended in a *lawful manner*." *Id.* (emphasis added).  Defendants' decision to re-terminate the Master CBA effective immediately was not a "lawful manner" of terminating the Master CBA because at the time Defendants issued the re-termination, they were under this Court's order to "reinstate" the Master Agreement.  Dkt. 30 at 29.

It is an "established doctrine that persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed." *GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 386 (1980).  When a party under

13

6105036

**SA723**

injunction believes that changed circumstances warrant modification or termination of the injunction, the "lawful manner" of avoiding performance is to file a motion seeking relief.  The "standard that the district court must apply when considering a motion to dissolve a preliminary injunction is whether the movant has made a showing that changed circumstances warrant the discontinuation of the order."  *Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo*, 551 F.3d 10, 16 (1st Cir. 2008) (internal alterations, quotation marks, and citation omitted).  The government knows that this requirement applies to it in circumstances such as these.  In *AFGE v. Noem*, 2026 WL 113599 (W.D. Wash. Jan. 15, 2026), after the court preliminarily enjoined the DHS's directive to terminate a collective bargaining agreement, the government rescinded the initial termination and replaced it with a second termination that sought the same result as the enjoined directive. *Id.* at *1. There, as here, the agency sought to implement the second termination without first going to court.  The court rejected defendants' argument that, because the agency's first directive "was rescinded, the injunction no longer applie[d] and therefore cannot be 'improperly appl[ied] to the" second directive. *Id.* at *3. The court held that defendants' "framing sidesteps the obvious: the [second directive] seeks the same results as its predecessor only with new reasoning." *Id.*  And, "[w]hile a new rationale may be enough to show that rescinding the injunction is necessary, it is not a valid justification for the agency's unilateral decision to abandon its obligations under the injunction." *Id.* (quotation marks and citations omitted); *see also Nat'l Treasury Emps. Union v. Vought*, --- F. Supp. 3d ---, 2025 WL 3771192, at *17 (D.D.C. Dec. 30, 2025) (changed circumstances are "not a valid justification for the agency's unilateral decision to abandon its obligations under the injunction"). *J.G.G. v. Trump*, 2025 WL 3198891, at *2 (D.D.C. Nov. 14, 2025) ("Disagreements with judicial

14

**SA724**

decisions must be resolved through motions . . . not through unilateral noncompliance").[8]  Given this well-established rule, Defendants acted unreasonably and contrary to the preliminary injunction and the 3/23 Text Order when they purported to put the re-termination into immediate effect on March 26 without first seeking judicial approval.

**The re-termination does not moot Plaintiffs' claims.**  Citing *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 21 (2020), and *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947) ("*Chenery II*")), Defendants argue that they were entitled to re-terminate the Master CBA without judicial approval so long as they gave "new reasons."  Dkt. 45-1 at 15.  This argument, of course, sidesteps the requirement to seek relief from an injunction, as discussed above, but even so, the *Chenery II* principle cannot save Defendants.  To start, neither *Regents* nor *Chenery II* involved a constitutional claim.  This case, by contrast, is a constitutional case, with the Court having found that Plaintiffs are likely to succeed on their First Amendment claim.  Defendants offer no case extending the *Chenery II* principle to a First Amendment claim.  They also fail to offer any case extending the *Chenery II* principle to a preliminary injunction case or a case involving provisional relief under section 5 U.S.C. § 705.  So, there is no authority to support Defendants' argument that the agency can moot a claim through "new action" while litigation over the initial action is ongoing.

Furthermore, the re-termination also fails to stand up to scrutiny.  Of course, Defendants' failure to file a motion for relief from the preliminary injunction means that this issue has not been briefed and will not be properly before the First Circuit.  But it is notable that the re-

---

[8] Defendants' efforts to distinguish *Noem* are unpersuasive.  Dkt. 45-1 at 20.  The fact that *Noem* challenged a slightly broader set of agency actions than Plaintiffs do here does not change the requirement to seek relief before avoiding the terms of an injunction.

15

**SA725**

termination does not cite any source of authority for the Secretary's action.  Executive Order 14251 does not order the termination of any collective bargaining agreement, and the Master CBA provision contains no termination clause.  These basic deficiencies, in addition to the absence of appellate jurisdiction, show that Defendants are unlikely to succeed in obtaining review, let alone reversal, of the Enforcement Order.

### C.    Defendants fail to demonstrate irreparable harm.

Defendants' irreparable harm argument boils down to three main points. First, Defendants' assert that being directed to comply with the Master Agreement "under threat of contempt" constitutes irreparable harm.  Dkt. 45-1 at 22.  Defendants start this argument by claiming that "the original terms of the preliminary injunction [] required only reinstatement and did not extend the Court's supervision to performance of the collective-bargaining duties in the CBA." *Id.* As explained above, and in Plaintiffs' Motion to Enforce briefing, Dkt. 33-1 at 7–8, Dkt. 35 at 3–5, the PI Order required Defendants to reinstate the Master Agreement, which included reinstatement and compliance with its substantive terms. Dkt. 30 at 29. Defendants' attempts to re-define the scope of the PI Order after the fact are disingenuous.

To bolster their argument, Defendants try to cast the specter of contempt as inflicting irreparable injury.  But this reference to "contempt" is substantially overblown.  Of course, injunctions are enforceable through contempt proceedings. *See AngioDynamics, Inc. v. Biolitec AG*, 780 F.3d 420, 426 (1st Cir. 2015); *Hawkins v. Dep't of Health & Hum. Servs. for New Hampshire, Com'r*, 665 F.3d 25, 31 (1st Cir. 2012).  Indeed, Plaintiffs expect Defendants to expeditiously comply with the preliminary injunction and the Enforcement Order and will not hesitate to invoke the Court's jurisdiction if circumstances so dictate.  However, the Court is currently holding the contempt proceeding regarding the re-termination in abeyance, which disposes of the argument advanced by Defendants.  3/30/26 Text Order.  And while Defendants

16

6105036

**SA726**

assert that the Court's Enforcement Order "states expressly" that "any attempt to re-terminate the CBA absent a specific order of this Court allowing such action will be met with immediate contempt proceedings," Dkt. 45-1 at 22, the Court's Enforcement Order says no such thing.  Dkt. 39.  While Defendants' unilateral effort to re-terminate the Master CBA violated the preliminary injunction, Defendants are free, as is any litigant, to bring a motion to modify or dissolve the preliminary injunction.

Second, Defendants assert that the Court's PI Order "is a windfall to Plaintiffs" because it goes beyond returning the parties to the pre-Termination status quo."  Dkt. 45-1 at 23.  Defendants point to two provisions of the Master Agreement that they now admit to breaching prior to the August 6, 2025 Termination: (1) a provision involving the automatic deduction of membership dues via payroll and (2) provisions relating to FLRA and grievance proceedings. *Id.* But Defendants cannot leverage their prior breach of the Master Agreement as an argument for why compliance now would cause irreparable harm. And neither the administrative cost of re-instituting dues collection nor compliance with FLRA and grievance proceedings rises to the level of irreparable injury in any event.[9]

Defendants also complain about the cost of complying with the Master Agreement, but such costs do not alone constitute irreparable harm. *See Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005).  For example, Defendants raise the cost of returning VA workspace to the union and providing official time to union leadership.  Dkt. 45-1 at 23–24.  Defendants already made this argument twice before, *see* Dkt. 17 at 52–53; Dkt. 33-2, Ex. A at

---

[9] As for the FLRA and grievance proceedings, Defendants' claim is, again, a mischaracterization.  All Defendants' evidence points to is Defendants' litigation positions before the FLRA and arbitrators seeking to hold proceedings in abeyance after the President issued Executive Order 14251. Dkt. 45-2 at 23–25.  Loss of a procedural litigation position is not an irreparable harm, and Defendants offer no authority to support such a claim.

17

SA727

11 (Pin cites to the ECF document pagination), and this Court rejected it, Dkt. 30 at 27–28. Moreover, Defendants' claim that it will be overly burdensome to return facility space is overblown.  The Court will recall that Plaintiffs' preliminary injunction motion was supported by, among other evidence, declarations from local union leaders.  Dkts. 14-5 – 14-8.  Plaintiffs have surveyed these local union leaders, it appears that the VA still has not made any facility space available to the unions (further defying the preliminary injunction) and that such space could be re-allocated to union use with relative ease.  Burke Decl. ¶¶ 6–10.  The only new argument Defendants make involves automatic dues deductions for union members; the VA claims that it does not want to be "financially responsible" for duplicative payments made by members.  Setting aside the fact that a financial harm is not irreparable, Plaintiffs have the solution to this purported problem—Plaintiffs already bear the cost, through technology safeguards they implemented years ago, of avoiding such duplicative payments.  Schwartz Decl. ¶ 14.  Implementing those safeguards requires nothing more from Defendants than reinstating long-standing, established procedures and restoring the kinds of communications they engaged in with Plaintiffs prior to the Termination.  *Id.*

Third and finally, Defendants rehash their "deference to the President's national security determinations" arguments.  The Court already noted that these arguments are more appropriate for litigation over the Executive Order itself, rather than agency action. Dkt. 30 at 27 n.11.  And for all of Defendants' puffery about the "Fourth Mission," it is notable that even in the re-termination, the Secretary did not make any independent determination about "national security," but rather relied on the Executive Order itself, which does not require terminating any collective bargaining agreements.  Dkt. 36-1 at 3-4.

6105036

**SA728**

**D.** **The balance of the equities and the public interest cut in Plaintiffs' favor.**

Neither the balance of equities nor the public interest weigh in favor of a stay. Defendants again fall back on the President's national security determination as the reason that the public interest factor tilts in their favor. Dkt. 45-1 at 26. But simply invoking national security, without offering any evidence or explanation for why compliance with the Master Agreement actually compromises national security, is insufficient. On the balance of equities, Plaintiffs presented substantial evidence of concrete, proven harm suffered by both the union and represented employees stemming from the Termination. Such harm included, among other things, the loss of family leave benefits and procedural protections in disciplinary proceedings. *See* Dkts. 14-2 – 14-8. As this Court recognized, disciplinary proceedings "once concluded, have an immediate and irreparable effect on the employee(s) in question" and [p]arents cannot turn back the clock to have more time with an infant prior to returning to work." Dkt. 30 at 26. None of the purported harm to the VA from reimplementing the Master Agreement outweighs the real harm that Plaintiffs will suffer in the absence of the preliminary injunction.

## EFFECT OF THIS COURT'S FORTHCOMING ORDER

In light of Defendants' procedural machinations to date, Plaintiffs respectfully submit that the Court's forthcoming order on this Motion to Stay must make crystal clear that the preliminary injunction and Enforcement Order remain in effect and will remain in effect unless stayed or reversed by a higher court. In particular, the Court should make clear that its 3/30/26 Text Order ruling that the "contempt proceeding is held in abeyance pending the Circuit's disposition of the appeal" is limited to the previously-contemplated contempt proceeding regarding the re-termination. The Court must preserve a mechanism—*i.e.*, contempt proceedings—to enforce the preliminary injunction pending appeal to the extent it is in force pending appeal.

19

6105036

**SA729**

## CONCLUSION

The Motion to Stay lacks merit and should be denied.

Respectfully submitted,

Dated: April 1, 2026          By:   */s/ Carly Beauvais Iafrate*
Carly Beauvais Iafrate, #6343
Law Office of Carly B. Iafrate, PC
408 Broadway, 1st Fl.
Providence, RI 02909
(401) 421-0065
ciafrate@verizon.net

Dated: April 1, 2026          By:   */s/ Travis Silva*
Brook Dooley *(pro hac vice)*
Travis Silva *(pro hac vice)*
Taylor Reeves *(pro hac vice)*
JiLon Li *(pro hac vice)*
Alexandra Wheeler *(pro hac vice)*
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
BDooley@keker.com
TSilva@keker.com
TReeves@keker.com
JLi@keker.com
AWheeler@keker.com

*Attorneys for American Federation of Government Employees National VA Council and American Federation of Government Employees Local 2305*

20

6105036

**SA730**

## CERTIFICATE OF SERVICE

I certify that on April 1, 2026, I electronically filed the foregoing document(s) and that they are available for viewing and downloading from the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Travis Silva
Travis Silva

21

6105036

**SA731**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and<br><br>DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs<br><br>*Defendants.* | Case No. 1:25-cv-00583-MRD-PAS |

## DECLARATION OF PACE SCHWARZ IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' EMERGENCY MOTION TO STAY PENDING APPEAL

6106798

SA732

I, Pace Schwarz, declare as follows:

1.    I am a Research Assistant in the Office of the General Counsel for the American Federation of Government Employees, AFL-CIO ("AFGE"). I am over 18 years of age and competent to give this declaration. In my role as a Research Assistant, I conduct research for AFGE for litigation, certification, and delegation matters. Over the past several months, I have spent a considerable amount of time collecting and reviewing notices, letters, and other documents related to actions taken by the current Presidential administration affecting AFGE and its members, including actions terminating collective bargaining agreements ("CBAs") at various federal agencies.

2.    This declaration is based on my personal knowledge regarding the information and documents that I have reviewed and collected. I have been asked to compile information received from union officers, members, and that is publicly available regarding the termination of CBAs at federal agencies.

### *Terminations of collective bargaining agreements*

3.    Based on my review of notices sent to AFGE or AFGE affiliates (collectively referred to as "AFGE" below), as well as publicly available information, I am aware that several federal agencies purportedly covered by Executive Order 14251, *Exclusions From Federal Labor-Management Relations Programs* (the "Exclusions EO"), did not terminate their collective bargaining agreements with AFGE and other unions until after September 2025.

4.    On September 25, 2025, the Federal Bureau of Prisons, within the Department of Justice terminated its CBA with AFGE.

5.    On March 6, 2026, the Department of Energy ("DOE"), Bonneville Power Administration terminated its CBA with AFGE.

1

6106798                                                                                          **SA733**

6.      On March 6, 2026, the DOE's Western Area Power Administration terminated its CBA with AFGE.

7.      On March 6, 2026, the DOE's National Energy Technology Laboratory in Albany, Oregon, terminated its CBA with AFGE.

8.      On March 6, 2026, the DOE's National Energy Technology Laboratory in Pittsburgh, Pennsylvania, terminated its CBA with AFGE.

9.      On March 6, 2026, the DOE's Richland Operations Office and Office of River Protection in Hanford, Washington, terminated its CBA with AFGE.

10.     On March 26, 2026, the Department of the Treasury terminated the CBA covering employees of the United States Mint.

11.     Based on my review of publicly available information, I am aware that in late February, 2026, the Department of the Treasury terminated the CBAs covering employees of the Bureau of Fiscal Services and the Internal Revenue Service. The Associated Press published an article reporting on these terminations on February 27, 2026. A copy of the Associated Press's February 27, 2026, article was downloaded here: https://apnews.com/article/treasury-irs-fiscal-service-union-contracts-dcd42250d58c8e4d46a2c0256064a857.

### *AFGE's E-Dues System*

12.     I am generally familiar with the operation of AFGE's electronic dues payment system ("E-Dues"). The following paragraphs describe my understanding of how E-Dues operates to prevent duplicate dues payments for members who are both on an agency's payroll dues deduction list (referred to internally as the "TAPE") and also enrolled in E-Dues.

13.     E-Dues is an alternative mechanism for union members to pay union dues. While some union members have union dues deducted from their paychecks (which the VA then sends

2

6106798

**SA734**

to the union), some union members prefer to pay their union dues by making automated, standalone payments via AFGE's E-Dues system.

14. As a standard process, before each payroll deduction date, the Department of Veterans Affairs ("VA") sends AFGE a file of employees subject to payroll deduction for that pay period, including the social security number of each employee subject to payroll deduction. This practice predates the VA's discontinuation of payroll dues deductions. The VA's file (the TAPE), which is normally provided to AFGE in advance of the employee's payday, is then compared to AFGE's E-Dues system. AFGE's E-Dues system also contains employee social security numbers. The E-Dues system processes dues payments on a regular schedule that mirrors the VA's processing of dues payments via payroll deductions. The E-Dues system checks employee Social Security numbers from the VA's TAPE file against E-Dues enrollees and does not process E-Dues charges for employees enrolled in both systems. In the event that the VA sends the TAPE behind their normal schedule, AFGE's E-Dues system automatically identifies employees who have been double-charged and initiates reimbursements. This process runs on a biweekly basis and has been in place for approximately five years.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed April 1, 2026, in Washington, D.C.

Pace Schwarz

3

**SA735**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305<br><br>        *Plaintiffs,*<br><br>        **v.**<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and<br><br>DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs<br><br>        *Defendants.* | Case No. 1:25-cv-00583-MRD-PAS |

**SUPPLEMENTAL DECLARATION OF MARY JEAN BURKE IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' EMERGENCY MOTION TO STAY
PROCEEDINGS PENDING APPEAL**

6106865

SA736

I, Mary Jean Burke, declare:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am a retired physical therapist at Richard L. Roudebush VA Medical Center in Indianapolis, Indiana ("Roudebush VAMC"). I was hired to provide in-patient physical therapy in an acute care setting and have since worked in several units. In total, I worked for the Department of Veterans Affairs for 30 years.  I am submitting this declaration in support of Plaintiffs' Opposition to Defendants' Emergency Motion to Stay.

3.      I am President of the American Federation of Government Employees, AFL-CIO National Veterans Affairs Council ("NVAC"). I have served in this position since November 2025. Previously, I served as the NVAC First Executive Vice President from 2007 to 2025 and NVAC Health and Safety Representative from 2003 to 2007.

4.      After Secretary Collins terminated the Master CBA on August 6, 2025, the VA acted quickly to stop union officials from using official VA space.  On or about August 12, 2025, the VA forced AFGE local unions, including but not limited to Local 2305, Local 310, Local 1061, and Local 559, to vacate union office space and return government-furnished equipment and technology that had been provided to the union under the provisions of the Master Agreement.  Union officials were given hours to days, not weeks, to vacate this space.

5.      I am informed about the preliminary injunction issued by the Court on March 13 and its March 27 order granting Plaintiffs' Motion to Enforce.  I have been involved in Plaintiff NVAC's monitoring of Defendants' compliances with these two orders.  Based on discussions with NVAC personnel and AFGE Local representatives, I am informed of the following facts.

1

**SA737**

6.      As of March 31, 2026, the office space that was previously occupied by AFGE Local 2305 at the VA Providence Regional Office, located at 380 Westminster St. 3rd floor Providence, RI 02903, has not been repurposed.  The VA has not restored Local 2305's access to this or any office space.

7.      As of March 31, 2026, the office space that was previously occupied by AFGE Local 310 at the VAMC in Coatesville, Pennsylvania, located in Building 38, rooms 122 and 132, remains locked and does not appear to have been repurposed.  The VA has not restored Local 310's access to this or any office space.

8.      As of March 31, 2026, the office space that was previously occupied by AFGE Local 1061 at ten VA facilities across Greater Los Angeles, California have not been repurposed for other VA needs.  The VA has not restored Local 1061's access to this or any office space.

9.      As of March 31, 2026, five of the six office spaces that were previously occupied by AFGE Local 559 in Orlando, Florida have been repurposed as offices for VA personnel.  The VA has not restored Local 559's access to this or any office space.

10.     I do not avail myself of the Master CBA's provisions relating to official time because I am retired from the VA.  However, many union leaders are current employees and access to official time is vital to their ability to execute their union duties.  At the national level, the NVAC Second Executive Vice President Tinita Cole and the NVAC Treasurer Monica Fultz are current employees, and, based on my conversations with these individuals, I am aware that the VA has not restored their official time or their union office space.  Furthermore, I am personally aware of many local union leaders who still have not had their official time or union office space restored by the VA, and I am unaware of any local union leaders who, as of the signing of this declaration, have had their official time or union office space restored by the VA.

2

6106865

**SA738**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on April 1, 2026, at Indianapolis, Indiana.

_____
Mary Jean Burke

6106865

**SA739**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL VA COUNCIL; and<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2305<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and<br><br>DOUGLAS A. COLLINS, in his official capacity as U.S. Secretary of Veterans Affairs<br><br>*Defendants.* | Case No. 1:25-cv-00583-MRD-PAS |

## DECLARATION OF MARY JEAN BURKE IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' STATUS REPORT

6109424

**SA740**

I, Mary Jean Burke, declare as follows:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am President of the American Federation of Government Employees, AFL-CIO National Veterans Affairs Council ("NVAC"). I have served in this position since November 2025. Previously, I served as the NVAC First Executive Vice President from 2007 to 2025 and NVAC Health and Safety Representative from 2003 to 2007.  I make this declaration in support of Plaintiffs' Response to Defendants' Status Report in *AFGE Local 2305 et al. v. U.S. Department of Veterans Affairs*, No. 25-cv-00583-MRD-PAS (D.R.I.).  I am a signatory to the *Master Agreement Between the Department of Veterans Affairs and the American Federation of Government Employees* ("Master Agreement") that is the subject of this litigation.  I helped to negotiate the Master Agreement and am familiar with its contents.  I am familiar with the Court's March 13 preliminary injunction order and its March 27 order granting Plaintiffs' motion to enforce the preliminary injunction.

3.      Attached hereto as **Exhibit A** is a true and correct copy of an April 1, 2026 email sent by Thomas Dargon, Jr., AFGE Deputy General Counsel, to Kurt Martin, an official in the VA's Office of Labor Management Relations.  I am also a recipient of this email and the emails that preceded it.  The email reflects that on March 27. the Executive Director of the Office of Labor Management Relations emailed AFGE seeking to schedule a meeting "to discuss compliance with the March 13, 2026 and March 27, 2026, Orders issued by Judge DuBose, including the processes for re-starting dues withholding, taxpayer funded union time/official time, grievance/arbitration proceedings, office space, and equipment for union officials."  I participated in the resulting March 30, 2026 meeting, where the VA did not present any plan to put such "processes" into place.

1

6109424

**SA741**

4.      AFGE leaders, members, and represented employees frequently send me and/or AFGE personnel examples of Defendants' non-compliance with the Court's Preliminary Injunction.  The following testimony presents some examples of those reports.

5.      On Wednesday, March 25, 2026, a VA employee emailed a VA human relations official to request "taking the extended 4 weeks of unpaid parental leave since the union contract is reinstated."  This is a reference to a leave benefit provided by Article 35 of the Master Agreement.  The HR official replied on the same date stating: "The union contract has not been officially reinstated, so there is not BUE time at this time."  This conversation is reflected in a true and correct copy of the HR official's March 25, 2026 email to the employee, which is attached hereto as **Exhibit B**.

6.      On March 25 and 26, a represented employee requested union representation in connection with a disciplinary meeting.  Such representation is a right provided by the Master Agreement.  The VA employee made this request in scheduling correspondence with a local VA manager, James Leland.  In a Thursday, March 26 response, Mr. Leland wrote: "Although Judge Dubose has issued a ruling, the Department of Veterans Affairs has not yet issued any additional guidance to frontline supervisors regarding its implementation. You may have a representative present during this interview, but they may not be a Union representative acting in an official capacity. Currently, the agency does not recognize bargaining rights for any VA staff other than VA Police."  This conversation is reflected in a true and correct copy of Mr. Leland's March 26 email to the VA employee, which is attached hereto as **Exhibit C**.

7.      On Tuesday, March 24, 2026, Troy Stormoen, an officer of AFGE Local 2152, emailed VA officials to "request official time to perform representational duties pursuant to the reinstated Master Collective Bargaining Agreement."  On Wednesday March 25, Dr. John

2

**SA742**

Bucholtz, a VA Deputy District Director, denied the request, stating "With respect to implementation of the March 13, 2026, preliminary injunction, pending the forthcoming further guidance from VA's LMR, we will maintain status quo. Official time request from employees who are not police officers/firefighters/security guards are denied." This conversation is reflected in a true and correct copy of Dr. Bucholtz's March 25 email to Mr. Stormoen, which is attached hereto as **Exhibit D**.

8.      On Friday, March 27, Danny Rivera López, an official with AFGE Local 1133, requested official time.  Lesli Bethard, a local VA manager, denied the request, stating that "at this time VA is not approving official union time. We have not been given any guidance on changes from Washington on the union." This conversation is reflected in a true and correct copy of Ms. Bethard's March 27 email to Mr. Rivera López, which is attached hereto as **Exhibit E**.

9.      On Wednesday March 25, 2026, Jamie Smith, a VA official, sent Darren Petite, President of AFGE Local 25, a disciplinary noticed entitled "Notice of Written Counseling" ("Notice")  The Notice alleges that during "tours of duty on March 16 -18, 2026," (i.e., after the Court issued the preliminary injunction, Mr. Petite "sent multiple emails in a representative capacity without being on approved leave or taxpayer-funded union time." The Notice "directed" Mr. Petite "to immediately cease performing any representational activities during [his] VA duty time except for periods where [he] receive[s] advanced approval to be excused from VA work." The Notice states that failure to comply with this directive could result in "disciplinary action, up to and including removal from Federal service." A true and correct copy of the Notice is attached hereto as **Exhibit F**.

3

6109424

**SA743**

10.     On April 2, 2026, Zarina Chambers, Acting Director of the VA Providence Regional Office, sent an email denying President of Plaintiff AFGE Local 2305 Frederick Sacchi's request for reinstatement of office space, official time, and IT equipment. In the email, Ms. Chambers stated "We are waiting official guidance from the Department on our way forward. However, as it stands, the letter of March 30, 2026, may apply to some members of the Veterans Administration but would not apply to Veterans Benefits Administration because we have no bargaining unit employees." This conversation is reflected in a true and correct copy of Ms. Chambers' April 2 email to Mr. Sacchi, which is attached hereto as **Exhibit G**.

11.     On April 2, 2026, at approximately 6:25 PM ET, the VA Office of the Chief Human Capital Officer issued a "Bulletin" with the subject line "Department of Veterans Affairs (VA) implementation of Executive Order 14251, *Exclusions from Federal Labor-Management Relations Programs*," along with accompanying guidance entitled "Guidance Related to Ongoing Litigation and the Preliminary Injunction Concerning the Termination of Certain Collective Bargaining Agreements and Implementation of Executive Order 14251: *Exclusions From Federal Labor-Management Relations Programs*." A true and correct copy of the Bulletin and the related guidance document are attached hereto as **Exhibit H**.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed April 2, 2026, at Indianapolis, Indiana.

Mary Jean Burke (Apr 2, 2026 21:13:03 EDT)

Mary Jean Burke

4

**SA744**

SA745

# EXHIBIT B

# Redaction - Privilege

**From:** Redaction - Privilege >
**Sent:** Wednesday, March 25, 2026 3:04 PM
**To:** General Inquiries Mailbox <info@afge2157.org>
**Subject:** Re: Extended maternity leave

Hello,

I reached out to my HR department and they denied that the union contract was reinstated. I attached the email.

Best,
Redaction - Privacy

she/her

On Mon, Mar 23, 2026 at 7:18 PM Redaction - Privilege > wrote:

Sounds good, thank you for confirming!

Best,
Redaction - Privacy

she/her

On Mon, Mar 23, 2026 at 7:09 PM General Inquiries Mailbox <info@afge2157.org> wrote:

Hi ,

**SA746**

Yes, our CBA included negotiations of 4 additional weeks for maternity leave. You would need to reach out to HR and your supervisor to begin the process/planning. If they deny you, forward us the email and we will take the necessary steps from there.

Thank you,

AFGE Local 2157 Officers

---

**From:** Redaction - Privacy >
**Sent:** Monday, March 23, 2026 9:43 AM
**To:** General Inquiries Mailbox <info@afge2157.org>
**Subject:** Extended maternity leave

Hello,

I was wondering since the union is restored, if VA employees now qualify for the 4 weeks of additional maternity leave again. If so, is there a point of contact to coordinate this with?

Best,
Redaction - Privacy

she/her

2

**SA747**



Redaction - Privacy

**FW: Extended parental leave**

Redaction - Privacy                    @va.gov>                                          Wed, Mar 25 at 2:37 PM
To: Redaction - Privacy

Redaction - Privacy

Redaction - Privacy

Portland Outpatient Mental Health Clinic

Portland VA Health Care System

Phone: Redaction - Privacy    Ext: Redaction - Privacy

**From:** V20-Leave Programs <V20-LeavePrograms@va.gov>
**Sent:** Wednesday, March 25, 2026 1:40 PM
**To:** Redaction - Privacy              va.gov>; V20-Leave Programs <V20-LeavePrograms@va.gov>
**Subject:** RE: Extended parental leave

The union contract has not been officially reinstated, so there is not BUE time at this time.

Respectfully

**Gary D. Dupuy**

Human Resources Specialist WLB Leave Programs

V20 NWHRN (10N20/05)

Veterans Health Administration

US Dept of Veteran Affairs

Fax (503)273-5149

**SA748**

7:30am – 5:00pm (PST)

*If I provided great customer service, you can send me kudos here:* #VA Gratitudes – Power Apps

-

---

**From:** <span style="background:black;color:white">Redaction - Privacy</span> @va.gov>
**Sent:** Wednesday, March 25, 2026 12:56 PM
**To:** V20-Leave Programs <V20-LeavePrograms@va.gov>
**Subject:** Extended parental leave

Hello,

I'm planning on taking the extended 4 weeks of unpaid parental leave since the union contract is reinstated. My due date isn't until 5/22 but is there anything I need to do on my end to set this up?



Portland Outpatient Mental Health Clinic

Portland VA Health Care System

Phone: <span style="background:black;color:white">Redaction - Privacy</span> Ext: <span style="background:black;color:white">Redaction - Privacy</span>

**SA749**

# EXHIBIT H

SA750



**U.S. Department of Veterans Affairs**

Office of the Chief Human Capital Officer

<span style="color:red">**Revised as of April 2, 2026 – Significant Changes in Red**</span>

## OFFICE OF THE CHIEF HUMAN CAPITAL OFFICER (OCHCO) BULLETIN

**SUBJECT: Department of Veterans Affairs (VA) implementation of Executive Order 14251,** *Exclusions from Federal Labor-Management Relations Programs*

1. **PURPOSE:** On March 27, 2025, President Trump signed Executive Order (EO) 14251: *Exclusions from Federal Labor-Management Relations Programs,* exempting the Department of Veterans Affairs (VA) from Chapter 71 of title 5 of the United States Code, the Federal Service Labor-Management Relations Statute (FSLMRS or Statute). EO 14251 exempted police officers, firefighters, and security guards from its coverage (collectively referred to as Exempted Employees). EO 14251 also delegated authority to the Secretary to issue an order suspending the application of the EO to any organizational component of VA. On April 17, 2025, Federal Register Notice 16427 was published, exempting employees represented by certain non-national unions from EO 14251's coverage. On November 13, 2025, Federal Register Notice 16427 was rescinded and no other exclusion orders have been issued. Accordingly, except as described herein, the VA is no longer subject to the Statute's coverage.

2. Pursuant to EO 14251, the Statute applies to Exempted Employees at VA, and the VA is still subject to the requirements of the Statute for those employees.

3. On August 6, 2025, pursuant to EO 14251, the Secretary terminated master collective bargaining agreements, and all amendments, local supplemental agreements, and memoranda of understanding at all levels (collectively referred to as National CBAs) with the American Federation of Government Employees (AFGE), the National Association of Government Employees (NAGE), the Service Employees International Union (SEIU), the National Nurses Organizing Committee/National Nurses United (NNOC/NNU), and the National Federation of Federal Employees (NFFE), except insofar as those National CBAs cover Exempted Employees.[1]

4. Effective November 13, 2025, pursuant to EO 14251, the collective bargaining agreements, and any amendments, memoranda of understanding, and past practices (collectively referred to as Local CBAs), were terminated for the following local unions: Western Federation of Nurses and Health Professionals (WFNHP), Veterans Affairs Staff Nurse Council (VASNC) Local 5032 at the VA Medical Center Milwaukee, WI; United Nurses Association of California/Union of Healthcare Professionals (UNAC/UHCP) at the VA Medical Center, Loma Linda, CA; Teamsters Union Local 115 at the Department of Veterans Affairs Medical Center, Coatesville, PA;  International Brotherhood of Electrical

---

[1] NNOC/NNU and NFFE do not represent any Exempted Employees. Accordingly, VA no longer recognizes NNOC/NNU or NFFE as the exclusive labor representative of any VA bargaining unit employe.

**SA751**



**U.S. Department of Veterans Affairs**

Office of the Chief Human Capital Officer

Workers (IBEW) Local 2168 at the Cheyenne WY VA Medical Center; and, International Association of Machinists and Aerospace Workers, (IAMAW) Local 1998 at the VA National Cemetery of the Pacific in Honolulu, HI. Additionally, effective November 13, 2025, pursuant to EO 14251, the Local CBAs for Laborers International Union of North America (LIUNA) were terminated, except insofar as any LIUNA Local CBA covers Exempted Employees.[2]

5. Taking this step removed barriers in VA's ability to effectively execute its mission without delay, resulting in a more responsive and accountable workforce that better serves Veterans and safeguards American interests.

6. However, on March 13, 2026, the AFGE National CBA was reinstated pursuant a Memorandum and Order (Order) issued by the District Court for the District of Rhode Island. The Order was granted in response to a Motion for Preliminary Injunction filed by National VA Council (NVAC) and AFGE Local 2305 (Local 2305) in *AFGE Local 2305 & NVAC v. U.S. Department of Veterans Affairs*, No. 1:25-cv-583-MRD-PAS (*NVAC & Local 2305*). The Court later clarified, however, that VA was not prevented from re-terminating the National CBA "in a lawful manner," and on March 26, 2026, VA re-terminated the AFGE National CBA pursuant to EO 14251.

7. On March 27, 2026, the Court granted NVAC and Local 2305's Motion to Enforce the Preliminary Injunction and, effective that same date, the Court held the March 26 re-termination had no force or effect, and the AFGE National CBA — along with all amendments, local supplemental agreements, and memoranda of understanding — would remain fully applicable and binding in both form and substance.

8. Separately, on March 27, 2026, the District Court for the District of Rhode Island issued a Memorandum and Order granting a Motion for Preliminary Injunction in *United Nurses Association of California, et al. v. U.S. Department of Veterans Affairs*, No. 25-cv-674-MRD-PAS (*United Nurses*). As a result, effective March 27, 2026, the local union CBAs for the local unions involved in the *United Nurses* litigation were reinstated, and VA is once again governed by the terms of these reinstated agreements.

9. **PROCEDURES: While the preliminary injunctions issued in the *NVAC & Local 2305* and *United Nurses* cases remain in effect, this Bulletin and attachments (1) & (2) no longer apply to the following unions and their bargaining unit employees:**

   a. **AFGE;**
   b. **Western Federation of Nurses and Health Professionals (WFNHP), Veterans Affairs Staff Nurse Council (VASNC) Local 5032 at the VA Medical Center Milwaukee, WI;**

---

[2] LIUNA represents police officers at the VA Medical Center in Wilmington, Delaware.

**SA752**



**U.S. Department of Veterans Affairs**

Office of the Chief Human Capital Officer

   c. **United Nurses Association of California/Union of Healthcare Professionals (UNAC/UHCP) at the VA Medical Center, Loma Linda, CA**;
   d. **International Brotherhood of Electrical Workers (IBEW) Local 2168 at the Cheyenne WY VA Medical Center**;
   e. **International Association of Machinists and Aerospace Workers, (IAMAW) Local 1998 at the VA National Cemetery of the Pacific in Honolulu, HI**; and
   f. **Laborers International Union of North America (LIUNA) Locals 572, 1029, and 1322**.

For these unions, Department organizational components should apply their respective CBAs to both Exempted Employees and Non-Exempted Employees.

However, VA is still not required to follow the Statute, collective bargaining agreement, or any other labor obligation with respect to any Non-Exempted Employee (i.e., an employee covered by EO 14251) represented by a union that is not covered by the preliminary injunctions issued in the *NVAC & Local 2305* and *United Nurses* cases (i.e., NAGE, SEIU, NNOC/NNU, NFFE, and the Teamsters Union Local 115 at the Department of Veterans Affairs Medical Center, Coatesville, PA (Teamsters)). The Statute, National CBAs, and Local CBAs for the unions who are not involved in the *NVAC & Local 2305* and *United Nurses* litigation still only applies to Exempted Employees (i.e., employees in occupational series 0083 (Police Officers), 0081 (Firefighters), and 0085 (Security Guards)). Note, the International Association of Fire Fighters (IAFF) at the Little Rock, AR VA Medical Center only represents firefighters and, as such, the entirety of its bargaining unit is Exempted Employees. For the unions listed above (i.e., NAGE, SEIU, NNOC/NNU, NFFE, Teamsters, and IAFF), all Department organizational components should continue with the following actions:

**A. <u>Bargaining</u>:** The Department will only collectively bargain with the unions representing Exempted Employees. All other negotiations shall immediately cease.

**B. <u>Grievance and Arbitration proceedings</u>:** The Department will only participate in negotiated grievance or arbitration procedures that cover Exempted Employees. Negotiated grievance and arbitration procedures shall be limited for use by unions representing Exempted Employees. Any other grievance or arbitration procedures currently underway shall immediately cease. If applicable, the administrative grievance procedures outlined in VA Handbook 5021 remain available to employees for use.

**C. <u>Taxpayer-Funded Union Time (TFUT)</u>:** The Department will only authorize TFUT (official time) for Exempted Employees performing representational activities related to Exempted Employees. All other requests for TFUT will be denied. All employees who encumber positions not exempted from EO 14251's coverage (i.e., Non-Exempted Employees) must transition to perform Agency work 100% of their paid

**SA753**



U.S. Department of Veterans Affairs

Office of the Chief Human Capital Officer

time, in their position of record. Management will immediately develop transition plans to verify the competence of employees previously on TFUT, provide any necessary training, and return them to their Department-assigned duties. All organizations will be required to confirm that all employees who encumber positions not exempted from EO 14251's coverage and who were previously using TFUT have been returned full-time to Department-assigned duties.

D. **Use of Government Property or Other Government Resources:** The Department will only authorize the use of government property and other government resources for union business performed by employees who encumber an Exempted position (i.e., police officer, security guard, and/or firefighter) for the unions that represent Exempted Employees. All Non-Exempted Employees (i.e., non-bargaining unit employees) and non-employee union representatives are prohibited from using government property or other government resources to perform union business. Other government resources include, but are not limited to, government-owned or leased transportation, office and meeting space, reserved parking space(s), IT related resources and software, equipment, and inter-office mail and metered mail accounts. Steps to return non-authorized government property and other government resources shall begin immediately. The return of government property, government resources, and/or government-furnished equipment (GFE) must be coordinated with the Office of Information and Technology (OIT), as applicable, and must occur no later than November 26, 2025. Leadership will ensure the availability of necessary staff to facilitate these efforts. Any union information contained on agency local area network (LANs) or other similar agency networks may, upon specific written request by the union representative, be saved and provided to a designated union representative. Individuals no longer authorized to utilize government property should be directed to remove any personal belongings from union office space.

E. **Matters Previously Covered in Terminated National CBAs and Local CBAs:** Non-Exempted Employees (i.e., employees who are no longer subject to the Labor Statute pursuant to EO 14251) are no longer covered by the terms of terminated National CBAs and Local CBAs. For these employees, VA organizational components should only follow the procedures outlined in VA policy for human resources matters, including, but not limited to, merit promotion, tours of duty, details, reassignments, hours of work, overtime, telework, leave usage, performance or disciplinary related matters, and official travel.

10. The Office of Labor-Management Relations (LMR) remains responsible for the administration of the Statute and for handling all labor relations matters in VA at all levels. However, given the VA-wide impact of complying with the preliminary injunctions, it may delegate matters within its responsibility to other appropriate organizational components for processing.

**SA754**



**U.S. Department of Veterans Affairs**

Office of the Chief Human Capital Officer

**11. Questions:** Questions regarding this Bulletin or the attachment: *EO 14251 Frequently Asked Questions and Guidance v3* can be directed to the VACO Office of Labor-Management Relations at vacolmrfaqs@va.gov or the designated LMR Specialist, available at: LMR Specialist Assignments

**12. Attachments:** (1) EO 14251 Frequently Asked Questions and Guidance v3; (2) Employee Communication; (3) Federal Register Notice 50950 rescission published on November 13, 2025; and (4) Guidance Related to Ongoing Litigation and Preliminary Injunctions Concerning Termination of Certain Collective Bargaining Agreements and Implementation of Executive Order 14251.

**Issued by: VA/OCHCO**

SA755

Guidance Related to Ongoing Litigation and the Preliminary Injunction Concerning the Termination of Certain Collective Bargaining Agreements and Implementation of Executive Order 14251: *Exclusions From Federal Labor-Management Relations Programs*

I. **Background:**

On March 27, 2025, President Trump signed *Executive Order (EO) 14251: Exclusions From Federal Labor-Management Relations Programs*, exempting the Department of Veterans Affairs (VA or Department) from Chapter 71 of Title 5 of the United States Code, the Federal Services Labor-Management Relations Statute (Statute or FSLMRS), with exceptions for police officers, firefighters, and security guards (collectively referred to as Exempted Employees). EO 14251 remains in full force and effect for the Department.

A. **American Federation of Government Employees (AFGE)**:
On August 6, 2025, pursuant to EO 14251, VA terminated the VA-AFGE Master Collective Bargaining Agreement, any amendments, local supplemental agreements, and memoranda of understanding (collectively referred to as CBA) at all levels, except to the extent those agreements covered Exempted Employees. Pursuant to EO 14251, the Statute applies to all Exempted Employees at VA, and the VA is still subject to the requirements of the Statute for those employees, including all applicable collective bargaining obligations.

On March 13, 2026, the AFGE CBA was reinstated pursuant a Memorandum and Order (Order) issued by the United States District Court for the District of Rhode Island. The Order was granted in response to a Motion for Preliminary Injunction filed by National VA Council (NVAC) and AFGE Local 2305 (Local 2305) in *AFGE Local 2305 & NVAC v. U.S. Department of Veterans Affairs*, No. 1:25-cv-583-MRD-PAS (D.R.I.) (*NVAC & Local 2305*); however, the Court later clarified that VA was not prevented from re-terminating the CBA "in a lawful manner," and on March 26, 2026, pursuant to EO 14251, VA re-terminated the AFGE CBA.

On March 27, 2026, the Court granted NVAC and Local 2305's Motion to Enforce the Preliminary Injunction and, effective that same date, the Court held the March 26 re-termination had no force or effect and the AFGE CBA would remain fully applicable and binding in both form and substance. Pursuant to the Court's March 13, 2026, and March 27, 2026, Orders, VA reinstated the AFGE CBA.

As a result, effective March 27, 2026, the August 6, 2025, termination letter and the March 26, 2026, re-termination letter will not be given any force or effect. The Master Collective Bargaining Agreement (CBA) — along with any amendments, local supplemental agreements, and memoranda of understanding related thereto — shall remain applicable and binding in both form and substance for all employees covered by the CBA.[1]

B. **Local Unions:**

---

[1] NAGE, SEIU, NNOC/NNU, and NFFE have not obtained court orders reinstating their terminated CBAs. Accordingly, their CBAs remain terminated, and the instant guidance does not apply to them or employees formally represented by them.

**PRE-DECISIONAL**

**SA756**

Guidance Related to Ongoing Litigation and the Preliminary Injunction Concerning the Termination of Certain Collective Bargaining Agreements and Implementation of Executive Order 14251: *Exclusions From Federal Labor-Management Relations Programs*

On November 13, 2025, pursuant to EO 14251, VA terminated the collective bargaining agreements it held with its local unions, except to the extent those agreements covered Exempted Employees, specifically: Laborers' International Union of North America (LIUNA) Locals 572, 1029, and 1322; Western Federation of Nurses and Health Professionals (WFNHP) Veterans Affairs Staff Nurse Council (VASNC); United Nurses Association of California/Union of Health Care Professionals (UNAC/UHCP); Teamsters Union Local 115, International Brotherhood of Electrical Workers (IBEW); and International Association of Machinists and Aerospace Workers (IAMAW).

On March 27, 2026, the United States District Court for the District of Rhode Island issued a Memorandum and Order granting a Motion for Preliminary Injunction in *United Nurses Association of California, et al. v. U.S. Department of Veterans Affairs*, No. 25-cv-674-MRD-PAS (*United Nurses*).

As a result, effective March 27, 2026, the local union CBAs for the local unions involved in the *United Nurses* litigation were reinstated and the Department of Veterans Affairs is again governed by the terms of each reinstated CBA.

The Local Unions involved in the United Nurses litigation (and covered by the Court's March 27, 2026, Order) include:
- Western Federation of Nurses and Health Professionals (WFNHP), Veterans Affairs Staff Nurse Council (VASNC) Local 5032 at the VA Medical Center Milwaukee, WI;
- United Nurses Association of California/Union of Healthcare Professionals (UNAC/UHCP) at the VA Medical Center, Loma Linda, CA;
- International Brotherhood of Electrical Workers (IBEW) Local 2168 at the Cheyenne WY VA Medical Center;
- International Association of Machinists and Aerospace Workers, (IAMAW) Local 1998 at the VA National Cemetery of the Pacific in Honolulu, HI; and
- Laborers International Union of North America (LIUNA) Locals 572, 1029, and 1322.

**Note** - Teamsters Union Local 115 is not covered by the *United Nurses* litigation. Additionally, while the International Association of Fire Fighters (IAFF) at the Little Rock, AR VA Medical Center is not covered by the *United Nurses* litigation, IAFF only represents firefighters and, as such, the entirety of its bargaining unit is Exempted Employees.

II. **Guidance for AFGE and Local Unions impacted by the PIs:**

The following guidance **only** pertains to Non-Exempted Employees (i.e., employees covered by EO 14251 who were previously covered by the FSLMRS) represented by AFGE and the Local Non-National Unions covered by the Court's March 13, 2026, and March 27, 2026, preliminary injunctions (collectively referred to as preliminary injunctions).[2] Additional

---

[2] UNITED NURSES ASSOCIATION OF CALIFORNIA/UNION OF HEALTHCARE PROFESSIONALS; LABORERS' INTERNATIONAL UNION OF NORTH AMERICA LOCAL 1322; LABORERS' INTERNATIONAL UNION OF NORTH

PRE-DECISIONAL

SA757

Guidance Related to Ongoing Litigation and the Preliminary Injunction Concerning the Termination of Certain Collective Bargaining Agreements and Implementation of Executive Order 14251: *Exclusions From Federal Labor-Management Relations Programs*

guidance (see Section II) is provided for Exempted Employees (police officers, firefighters, and security guards) who remain covered by the Statute and their applicable CBA.

A. <u>Collective Bargaining Agreements</u>:
VA will follow the terms of all collective bargaining agreements for all employees covered by the CBAs.

B. <u>Bargaining</u>:
In accordance with the Statute and applicable collective bargaining agreements, VA should bargain any new changes to conditions of employment having a greater than *de minimis* impact on employees covered by a reinstated CBA.

*C.* <u>Requests for Information</u>: If a new Request for Information is filed, the Department management official should process the request in accordance with the FSLMRS and any contractual requirements.

D. <u>New and Pending Grievance and Arbitration Proceedings</u>:
If the union granted a previous request to hold a grievance(s) in abeyance, VA should continue to request that grievance be held in abeyance until the pending litigation concerning EO 14251 is resolved. If the union denies the request, follow the steps in the section below, as applicable.

The VA will process new and pending grievances and arbitrations consistent with contractual requirements. Where it is clear that a grievance does not apply solely to Exempted Employees (police officers, fire fighters, or security guards), VA officials should reference EO 14251, continue requesting union officials and arbitrators hold these matters in abeyance, and make arguments in grievance responses and before arbitrators that because of EO 14251 the matter is not grievable or arbitrable.

If you have specific questions regarding responses to grievance/arbitration matters you should contact your assigned VACO LMR Specialist or LMR at <u>vacolmrfaqs@va.gov</u> or your local Office of General Counsel attorney.

E. <u>Dues Withholding</u>:
Restarting of dues withholding is being coordinated at the national level.

F. <u>Taxpayer-Funded Union Time (TFUT)</u>:
TFUT (official time) must be administered in accordance with applicable collective bargaining agreements.

Return to office requirements pertain to union representatives who perform representational functions. Unless on an approved temporary extension, excepted by VA policy, or exempted, there is no exclusion from return to office requirements that allow union officials to telework on TFUT.

---

AMERICA LOCAL 1029; LABORERS' INTERNATIONAL UNION OF NORTH AMERICA LOCAL 572; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 415; WISCONSIN FEDERATION OF NURSES AND HEALTH PROFESSIONALS, LOCAL 5000, AFT, AFL-CIO; and INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS LOCAL 1998.

**PRE-DECISIONAL**

**SA758**

Guidance Related to Ongoing Litigation and the Preliminary Injunction Concerning the Termination of Certain Collective Bargaining Agreements and Implementation of Executive Order 14251: *Exclusions From Federal Labor-Management Relations Programs*

TFUT should not be approved for union representatives to attend any labor training conferences away from their official duty station, unless there is an established past practice or contractual obligation to do so. The use of authorized absence/administrative absence is not an appropriate leave status for TFUT. The use of all TFUT must be recorded in the VA Time and Attendance System in accordance with OCHCO Bulletin: Taxpayer Funded Union Time Recording in the VA Time and Attendance System.

G. Federal Labor Relations Authority (FLRA):
In the event there are current Department filings for exceptions to arbitration awards or the FLRA has requested Department position statements for unfair labor practice charges (ULP), Department management officials should request the FLRA hold these cases in abeyance pending the outcome of the ongoing national litigation concerning EO 14251. If the FLRA does not suspend the applicable deadlines or hold the case in abeyance, Department management officials should assert substantive argument(s) to preserve applicable legal positions.

H. Representational Activities:

1. Department management officials must invite union representatives to attend formal discussions in accordance with the Statute and collective bargaining agreements.

2. Department management officials must comply with all *Weingarten* rights in accordance with the Statute and collective bargaining agreements.

3. Changes to the bargaining unit status (BUS) codes for employees may not be changed by local stations and are being coordinated at the national level.

I. Office Space and Other Government Resources:
In accordance with the applicable collective bargaining agreements, VA should immediately take steps to issue space and other government resources to the impacted unions. Previously occupied union office space that has not been repurposed should be returned. If the space has been repurposed, the VA may offer alternate commensurate space in lieu of displacing VA employees. If employees are displaced by VA's efforts to provide union office space, supervisors may grant temporary telework or continue temporary telework extensions until alternative space arrangements can be provided because of employee displacement. Required changes to space for this accommodation exclusively applies to purely administrative staff and not to any patient facing functions.

III. **Guidance for Exempted Employees NOT Impacted by the Preliminary Injunctions:**
The following guidance is specific to police officers, firefighters, and security guards exempted from EO 14251's coverage:

The following positions are **NOT** subject to EO 14251's coverage and, accordingly, are not impacted by the preliminary injunctions:

| Positions | Occupational Series | Union/BUS | Location |
|---|---|---|---|
| Police Officer | 0083 | AFGE (Non-Professional) – 1272<br>AFGE (Professional) – 1276<br>NAGE (Non-Professional) – 1234 | Nationwide |

**PRE-DECISIONAL**

**SA759**

Guidance Related to Ongoing Litigation and the Preliminary Injunction Concerning the Termination of Certain Collective Bargaining Agreements and Implementation of Executive Order 14251: *Exclusions From Federal Labor-Management Relations Programs*

| | | SEIU (Non-Professional) – 2036<br>SEIU (Professional) – 2039 | |
|---|---|---|---|
| Police Officer | 0083 | LiUNA Local 1029 (Non-Professionals) - 1909 | Wilmington, DE Only |
| Firefighter | 0081 | AFGE – 1272<br>NAGE – 1234<br>SEIU – 2039 | Nationwide |
| Security Guard | 0085 | AFGE – 1272 | Nationwide |

A. VA will continue to adhere to all bargaining procedures, grievance/arbitration proceedings (see Section II(B) directly below), dues withholding, TFUT, FLRA proceedings, representational activities, and all other terms contained within the applicable collective bargaining agreements.

B. Grievance/Arbitration and FLRA Proceedings:
If a grievance, unfair labor practice (ULP) charge, or exceptions to an arbitrator award are filed by a union and it is **clear** the grievance, ULP charge, or exceptions are **limited** only to positions exempted from EO 14251's coverage (police officers, firefighters, and/or security guards), Department management officials should follow the negotiated grievance procedures consistent with the applicable contractual bargaining agreement and FLRA proceedings. For these employees only, the Department management official should **NOT** request the grievance/arbitration time limits, ULP charge, or exceptions be held in abeyance for reasons related to EO 14251.

IV. **Labor Management Forums (LMF) and Pre-Decisional Involvement (PDI):**

A. The preliminary injunctions issued in *AFGE Local 2305 & NVAC v. U.S. Department of Veterans Affairs*, No. 1:25-cv-583-MRD-PAS (D.R.I.) and *United Nurses Association of California, et al. v. U.S. Department of Veterans Affairs*, No. 25-cv-674-MRD-PAS **has no bearing or impact on** Executive Order 14236 "Additional Rescissions of Harmful Executive Order and Actions," issued March 14, 2025.

B. Unless expressly required by the terms of an applicable collective bargaining agreement, VA may continue to:

1. Cease all participation in LMFs and equivalent groups;

2. Cease engagement of employees and their union representatives in PDI over workplace matters; and,

3. Cancel LMF charters at all levels, as well as the National Partnership Council charter, dated July 20, 2022.

V. **Resources:**

A. Questions regarding this guidance may be directed to your designated VACO LMR Specialist or the Office of Labor-Management Relations at vacolmrfaqs@va.gov.

**PRE-DECISIONAL**

**SA760**